**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

--------------------------------------------------------- x

FUND RECOVERY SERVICES, LLC, a )
Delaware limited liability company, as assignee )
of PRINCETON ALTERNATIVE INCOME )
FUND, L.P., a New Jersey limited partnership, )
)
Plaintiff, )
)
)
v. ) Case No. 1:20-cv-5730
)
RBC CAPITAL MARKETS, LLC, d/b/a )
RBC WEALTH MARKETS, an Illinois limited ) **COMPLAINT**
liability company; JAMES I. UIHLEIN, an )
individual; JAMES P. UIHLEIN, an individual; )
JOHN A. KUHLMAN, JR., an individual; )
GLENORA COMPANY, a Wisconsin corporation; )
LITTLE OWL ARGON, LLC, a Florida limited )
Liability company; RAVIV WOLFE, an individual; )
NOAX, LLC, an Indiana limited liability )
company; GARY ZUMSKI, an individual; )
BERJ ARAKELIAN, an individual; B MONEY )
HOLDINGS, LLC, an Illinois limited liability )
company; BERGARVIV, LLC, an Illinois ) **JURY TRIAL DEMANDED**
limited liability company; ERIC )
SCHNOSENBERG, an individual; ROBERT )
SHEYBANI, an individual; PETER FERRO, )
JR., an individual; MARGON LLC, an Illinois )
limited liability company; SEAN )
TOMASZKIEWICZ, an individual; BLUE )
TREBLE SOLUTIONS, LLC, a Delaware )
limited liability company; HARRY )
MADANYAN, an individual; JOSEPH )
CANFORA, an individual; MARK TRIFFLER, )
an individual; MARK TRIFFLER as Trustee )
of the MARK TRIFFLER TRUST, an )
Illinois trust; BRUCE BREITWEISER, an )
individual; BYRON FAERMARK, an )
individual; BARRY KOSTINER, an individual; )
FINTECH ASSET MANAGEMENT, LLC, a )
Delaware limited liability company; SSF )
HOLDINGS LLC, a Delaware limited liability )
company; SPARTAN SPECIALTY FINANCE )
I LLC, a Delaware limited liability company; )
SPARTAN SPECIALTY FINANCE I SPV, )

LLC, a Delaware limited liability company;            )
BRUCE GOLDSTEIN, an individual;                      )
BROADMARK CAPITAL, LLC, a Washington                 )
limited liability company; PERAZA CAPITAL &          )
INVESTMENT, LLC, a Florida limited liability         )
company; ALHAMBRA CIRCLE PARTNERS,                   )
LLC, a Florida limited liability company;            )
BARRY EDMONSON, an individual; BARRY                 )
EDMONSON, as Trustee of the CARDINAL                 )
TRUST, an Illinois trust; DANIEL                     )
WIRZBERGER, an individual; and MERIT                 )
GAMING MANAGEMENT GROUP, L.P., an                    )
Illinois limited partnership,                        )
                                                     )
Defendants.                                          )
----------------------------------------------------- x

# **<u>COMPLAINT</u>**

**ASHMAN LAW, LLC**
2801 Orange Brace Road
Riverwoods, Illinois 60603
(312) 596-1700

**MITTS LAW, LLC**
1822 Spruce Street
Philadelphia, Pennsylvania 19103
(215) 866-0110

*Attorneys for Plaintiff FUND RECOVERY*
*SERVICES, LLC, as assignee of*
*PRINCETON ALTERNATIVE INCOME*
*FUND, L.P.*

Dated: September 25, 2020

# TABLE OF CONTENTS

**Page**

COMPLAINT ........................................................................................................ 7

NATURE OF THE ACTION .............................................................................. 7

PRELIMINARY STATEMENT ......................................................................... 9

PARTIES ............................................................................................................. 13

PLAINTIFF ........................................................................................................ 13

DEFENDANT INDIVIDUALS AND ENTITIES ........................................... 13

NON-DEFENDANT ENTITIES ....................................................................... 19

JURISDICTION AND VENUE ........................................................................ 20

INTERSTATE COMMERCE ........................................................................... 21

FACTUAL BACKGROUND ............................................................................. 22

The History Of The Argon Entities' Business Operations ............................ 22

Fintech Loan Agreement Finances The Operations Of The Argon Entities ... 23

Double Pledging Of Secured Collateral To SPARTAN FINANCE .............. 27

SPARTAN FINANCE And FTAM Defaulted On Hamilton Funding Loan ... 45

Various Defendants Knowingly Submitted False And Misleading Financial Reports
To PAIF ............................................................................................................. 48

Argon Credit Paid, And LITTLE OWL, MARGON, CARDINAL and TRIFFLER
TRUST Accepted, Interest Payments In Violation Of Executed Subordination
Agreements At A Time That Argon Credit Was Known To Be Insolvent .................. 60

LITTLE OWL Transactions and Board Manager Appointments ................. 60

Board Of Manager Appointments By LITTLE OWL ................................... 63

Margon Promissory Notes, Subscription Agreements and Transfers ............ 64

First Margon Note And Subscription Agreement .......................................... 64

Second Margon Note and Subscription Agreement ....................................... 65

Transfers to MARGON .................................................................................... 67

**Cardinal Trust Promissory Note, Subscription Agreement, and Transfers**............................................ 70

**Triffler Trust Promissory Note, Subscription Agreement, and Transfers** ..................................... 71

**Loans By MARGON, CARDINAL and TRIFFLER TRUST** ........................................................... 73

**Subordination Agreements Executed By And Between The Note Lenders And Princeton** .................. 74

**Prohibited Commissions Paid To BROADMARK And PERAZA** ................................................. 78

**Transfers To Or For The Benefit Of Certain Defendant Insiders** ................................................. 82

**Bergarviv Transfers**................................................................................................................. 82

**Blue Treble Payments** .............................................................................................................. 84

**Unnecessary Personal Las Vegas Trip Expenses** ........................................................................ 86

**Catalyst Lease For Personal Use Apartment** ............................................................................. 86

**Unnecessary WOLFE Personal Expenses And Incentive Payroll Payments**.................................. 87

**Argon Credit's Financial Condition**.......................................................................................... 88

**Argon Entities' Bankruptcy Filings** .......................................................................................... 90

**RICO FACTUAL PREDICATES** .............................................................................................. 90

**The RICO Scheme And RICO Enterprise** ................................................................................. 92

**Pattern Of Racketeering: False Financials As A Pattern**............................................................ 93

**Pattern Of Racketeering: Divestiture And Diversion Of Accounts Receivable As A Pattern** .............. 94

**RICO Offenses** ....................................................................................................................... 95

**Predicate Offenses – Wire Fraud & 18 U.S.C. § 2134** ................................................................. 96

**Participation Of Defendants In Pattern Of Racketeering Activity** ............................................... 97

**Princeton Has Financially Suffered As A Result Of The Predatory, Racketeering And Otherwise Unlawful Conduct Described Herein**.............................................................................. 98

# COUNTS OF COMPLAINT

**COUNT ONE** .................................................................................................**99**
    CONDUCT AND PARTICIPATION IN A RICO
    ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY
    (18 U.S.C. § 1962(c))
    (Against **ALL DEFENDANTS**)

**COUNT TWO** ...............................................................................................**100**
    CONSPIRACY TO ENGAGE IN A
    PATTERN OF RACKETEERING ACTIVITY
    (18 U.S.C. § 1962(d))
    (Against **ALL DEFENDANTS**)

**COUNT THREE** ...........................................................................................**101**
    FRAUD/INTENTIONAL MISREPRESENTATION
    (Against **ALL DEFENDANTS**)

**COUNT FOUR** .............................................................................................**109**
    AIDING AND ABETTING FRAUD/INTENTIONAL MISREPRESENTATION
    (Against **ALL DEFENDANTS**)

**COUNT FIVE** ...............................................................................................**111**
    FRAUDULENT CONCEALMENT
    (Against **ALL DEFENDANTS**)

**COUNT SIX** ..................................................................................................**113**
    AIDING AND ABETTING FRAUDULENT CONCEALMENT
    (Against **ALL DEFENDANTS**)

**COUNT SEVEN** ...........................................................................................**115**
    NEGLIGENT MISREPRESENTATION
    (Against **KUHLMAN, RBC CAPITAL, LITTLE OWL, WOLFE, JIU, JPU, GLENORA, NOAX, ZUMSKI, ARAKELIAN, BMONEY, SCHNOSENBERG, FERRO, MARGON, TOMASZKIEWICZ, MADANYAN, CANFORA, TRIFFLER, TRIFFLER TRUST, BREITWEISER, FAERMARK, KOSTINER, CARDINAL, SHEYBANI and EDMONSON**)

**COUNT EIGHT** ............................................................................................**118**
    CONVERSION
    (Against **ALL DEFENDANTS**)

**COUNT NINE** ..............................................................................................**119**
    AIDING AND ABETTING CONVERSION
    (Against **ALL DEFENDANTS**)

**COUNT TEN**................................................................................................**120**
    CIVIL CONSPIRACY
    (Against **ALL DEFENDANTS**)

**COUNT ELEVEN**..........................................................................................**121**
    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
    (Against **ALL DEFENDANTS**)

**COUNT TWELVE** ........................................................................................**122**
    BREACH OF PERSONAL GUARANTY
    (Against **WOLFE** and **ZUMSKI**)
    (Jury Trial Waived By Charged Defendants)

**COUNT THIRTEEN** .....................................................................................**125**
    BREACH OF CONTRACT
    (Against **LITTLE OWL, MARGON, CARDINAL** and
    **TRIFFLER TRUST**)
    (Jury Trial Waived By Charged Defendants)

**COUNT FOURTEEN** ....................................................................................**127**
    UNJUST ENRICHMENT
    (Against **ALL DEFENDANTS**)

**COUNT FIFTEEN**........................................................................................**128**
    EQUITABLE CLAIMS FOR RESTITUTION & DISGORGEMENT
    (Against **ALL DEFENDANTS**)

**COUNT SIXTEEN**........................................................................................**129**
    ALTER EGO/PIERCING THE CORPORATE VEIL
    (Against **LITTLE OWL, NOAX, BMONEY, BERGARVIV,**
    **MARGON, BLUE TREBLE, TRIFFLER TRUST,**
    **CARDINAL, FTAM, SPARTAN SPV, SPARTAN FINANCE**
    **and SSF HOLDINGS**)

**PRAYER FOR RELIEF**................................................................................**130**

**JURY TRIAL DEMANDED**........................................................................**131**

**EXHIBIT A**

## COMPLAINT

Plaintiff **FUND RECOVERY SERVICES, LLC** ("FRS"), as assignee of **PRINCETON ALTERNATIVE INCOME FUND, L.P.** ("PAIF") (together, FRS and PAIF, "Princeton"), by and through its undersigned counsel, **MITTS LAW, LLC**, and **ASHMAN LAW, LLC**, for its Complaint against Defendants alleges, upon knowledge as to itself and its own acts and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      Defendants engaged in racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and violated the common law of Illinois and/or Delaware with respect to their involvement in and association with **Argon Credit, LLC** ("Argon Credit"), and **Argon X, LLC** ("Argon X") (together, Argon Credit and Argon X, the "Argon Entities").[1]

2.      This action seeks compensatory, consequential, treble and punitive damages for the unlawful and prohibited acts and conduct of Defendants as described herein.

3.      By this Complaint, Princeton seeks entry of a judgment against Defendants, all of whom Princeton alleges actively conspired to violate, and did violate, the RICO statute by engaging in prohibited racketeering activities to further their schemes to defraud, divert and deprive Princeton of its Secured Collateral (as defined herein) through the repeated (i) submission of fraudulent financial documents that were designed to deceive and delay Princeton from its eventual discovery and declaration of an event of default under certain agreements so that Defendants could profit from the RICO enterprise and (ii) diversion of accounts receivable and

---

[1] Both Argon Credit and Argon X filed for bankruptcy, each of which is venued at *In re: Argon Credit, LLC et al.*, Case No. 16-39654 (jointly administered) (N.D. Ill. 2016) (the "Argon Bankruptcy"). This Complaint neither asserts any claims against the Argon Entities nor asserts any claims on behalf of, or otherwise owned by, the Argon Entities.

other Secured Collateral from the Argon Entities to themselves and other third parties away from Princeton, all actively concealed from and to the eventual detriment of, and significant financial loss to, Princeton.

4.      Princeton further alleges that Defendants, by and through their varying activity and conduct with regard to the Argon Entities, violated Illinois and/or Delaware common law for various unlawful acts involving the Argon Entities including, without limitation, (i) fraud/intentional misrepresentation, (ii) aiding and abetting fraud/intentional misrepresentation, (iii) fraudulent concealment, (iii) aiding and abetting fraudulent concealment, (iv) negligent misrepresentation, (v) conversion, (vi) aiding and abetting conversion, (vii) civil conspiracy, (viii) tortious interference with contractual relations, (ix) breach of personal guaranty, (x) breach of subordination agreements, (xi) unjust enrichment and (xii) equitable claims for restitution, disgorgement and *alter ego*/piercing the corporate veil.

5.      Princeton suffered monetary damages proximately caused by the actions of Defendants in the amount of $238,014,066.18 as more fully set forth in **COUNT I** *infra*, based upon the Defendants' respective involvement in, and financial reward gained from, the prohibited RICO racketeering activity.

6.      Defendants who engaged in and benefitted from the RICO enterprise include the following:

(i)      **RBC CAPITAL MARKETS, LLC** ("<u>RBC Capital</u>");
(ii)     **JAMES I. UIHLEIN** ("<u>JIU</u>");
(iii)    **JAMES P. UIHLEIN** ("<u>JPU</u>");
(iv)     **JOHN A. KUHLMAN, JR.** ("<u>KUHLMAN</u>");
(v)      **GLENORA COMPANY** ("<u>GLENORA</u>");
(vi)     **LITTLE OWL ARGON, LLC** ("<u>LITTLE OWL</u>");
(vii)    **RAVIV WOLFE** ("<u>WOLFE</u>");
(viii)   **NOAX, LLC** ("<u>NOAX</u>");
(ix)     **GARY ZUMSKI** ("<u>ZUMSKI</u>");
(x)      **BERJ ARAKELIAN** ("<u>ARAKELIAN</u>");
(xi)     **B MONEY HOLDINGS, LLC** ("<u>BMONEY</u>");

| | |
|---|---|
| (xii) | **BERGARVIV, LLC** ("<u>BERGARVIV</u>"); |
| (xiii) | **ERIC SCHNOSENBERG** ("<u>SCHNOSENBERG</u>"); |
| (xiv) | **ROBERT SHEYBANI** ("<u>SHEYBANI</u>"); |
| (xv) | **PETER FERRO, JR.** ("<u>FERRO</u>"); |
| (xvi) | **MARGON LLC** ("<u>MARGON</u>"); |
| (xvii) | **SEAN TOMASZKIEWICZ** ("<u>TOMASZKIEWICZ</u>"); |
| (xviii) | **BLUE TREBLE SOLUTIONS, LLC** ("<u>BLUE TREBLE</u>"); |
| (xix) | **HARRY MADANYAN** ("<u>MADANYAN</u>"); |
| (xx) | **JOSEPH CANFORA** ("<u>CANFORA</u>"); |
| (xxi) | **MARK TRIFFLER** ("<u>TRIFFLER</u>"); |
| (xxii) | **MARK TRIFFLER TRUST** ("<u>TRIFFLER TRUST</u>"); |
| (xxiii) | **BRUCE BREITWEISER** ("<u>BREITWEISER</u>"); |
| (xxiv) | **BYRON FAERMARK** ("<u>FAERMARK</u>"); |
| (xxv) | **BARRY KOSTINER** ("<u>KOSTINER</u>"); |
| (xxvi) | **FINTECH ASSET MANAGEMENT, LLC** ("<u>FTAM</u>"); |
| (xxvii) | **SSF HOLDINGS LLC** ("<u>SSF HOLDINGS</u>"); |
| (xxviii) | **SPARTAN SPECIALTY FINANCE I LLC** ("<u>SPARTAN FINANCE</u>"); |
| (xxix) | **SPARTAN SPECIALTY FINANCE I SPV, LLC** ("<u>SPARTAN SPV</u>"); |
| (xxx) | **BRUCE GOLDSTEIN** ("<u>GOLDSTEIN</u>"); |
| (xxxi) | **BROADMARK CAPITAL, LLC** ("<u>BROADMARK</u>"); |
| (xxxii) | **PERAZA CAPITAL & INVESTMENT, LLC** ("<u>PERAZA</u>"); |
| (xxxiii) | **ALHAMBRA CIRCLE PARTNERS, LLC** ("<u>ALHAMBRA</u>"); |
| (xxxiv) | **BARRY EDMONSON** ("<u>EDMONSON</u>"); and |
| (xxxv) | **CARDINAL TRUST** ("<u>CARDINAL</u>"); |
| (xxxvi) | **DANIEL WIRZBERGER** ("WIRZBERGER"); and |
| (xxxvii) | **MERIT MANAGEMENT GROUP, L.P.** ("MERIT GAMING"), |

(collectively, "<u>Defendants</u>").

## **PRELIMINARY STATEMENT**

7.     As set forth in greater detail below, during the course of the Argon Entities'

business operations from September 2014 until December 2016, certain Defendants, who included

the Argon Entities' investors, officers and members of the respective Argon Entities' Board of

Managers (the "<u>Argon Insiders</u>"), as well as a number of other individuals and entities named as

Defendants herein who were affiliated with, or otherwise conspired with, one or more of the Argon

Insiders (the "<u>Argon Outsiders</u>"), repeatedly engaged in sustained federal and state unlawful

activity by, *inter alia* and without limitation, knowingly, willfully, intentionally, recklessly and

negligently: (i) secretly double-pledging Secured Collateral to certain Argon Outsiders that were already pledged to, and secured in favor of, Princeton as the secured lender of the Argon Entities; (ii) creating and providing Princeton, as the secured lender, with false and grossly misleading financial statements and other financial information in an effort to conceal the insolvency of the Argon Entities relevant to this Complaint and delay the declaration of an Event of Default by Princeton; (iii) fraudulently scheming to conceal and then transfer Secured Collateral to Argon Insiders and Argon Outsiders and away from Princeton as the secured creditor, in violation of well-known Financial Covenants (as defined herein) owed to Princeton and then falsifying records to conceal the nature and extent of the illegal transfers of that Secured Collateral on the financial documents provided to Princeton as the secured lender; (iv) paying certain Argon Insiders and Argon Outsiders exorbitant "commissions" and other fees and sums in knowing violation of Financial Covenants owed to Princeton as the secured lender; (v) secretly diverting assets of the Argon Entities to subsidize extravagant personal expenses unrelated to the Argon Entities' respective business operations in knowing violation of Financial Covenants owed to Princeton as the secured lender (including funding a secret apartment where sexual trysts occurred); and (vi) authorizing the Argon Entities to pay "interest payments" to subordinated lenders in violation of executed subordination agreements at a time when the Argon Entities were insolvent, all of which activity was wrongfully concealed from Princeton as the secured lender.

8.     In addition, as noted in subsection (v) of the preceding paragraph, some Defendants, who were executives with the Argon Entities including, without limitation, WOLFE, participated in extra-marital affairs and intra-office relationships that both exceeded the bounds of acceptable workplace conduct and incentivized the diversion of company assets for such activities, including the leasing of a company apartment to facilitate various illicit affairs and trysts. The diversion of company assets for personal pleasures was a knowing and fraudulent theft and conversion of

Princeton's Secured Collateral and was only made possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

9.      All of these actions, and more, caused and contributed to the Argon Entities' inability to meet their financial obligations to Princeton as the secured lender which ultimately led to Princeton declaring a default under the Fintech Loan Agreement (as defined herein) much later in time than it could and otherwise would have.

10.      Princeton's declaration of default caused the Argon Entities to file for bankruptcy in December 2016.

11.      The predatory and racketeering acts described briefly above, and in more detail below, cumulatively constituted violations of the RICO Act and Illinois and Delaware common law, as described herein.

12.      A Trustee was appointed in the Argon Bankruptcy to liquidate the Argon Entities' remaining assets.

13.      The Trustee filed a complaint in December 2018 on behalf of the debtor Argon Entities against some of the Argon Insiders, all of whom are identified as Defendants in this action.

14.      Specifically, the Trustee has asserted claims against the following Defendants seeking damages based on harms committed against the Argon Entities: WOLFE, ZUMSKI, FERRO, ARAKELIAN, SCHNOSENBERG, TOMASZKIEWICZ, MADANYAN, CANFORA, TRIFFLER, KUHLMAN, BREITWEISER, FAERMARK, KOSTINER, BERGARVIV, BROADMARK, PERAZA and BLUE TREBLE (collectively, the "Bankruptcy Defendants").[2]

---

[2] On December 14, 2018, the Trustee of the Argon Bankruptcy filed the following two complaints against the Bankruptcy Defendants: (i) *Crane v. Margon LLC et al.*, Adv. P. No. 18-00947 (Bankr N.D. Ill.); and (ii) *Crane v. Wolfe et al.*, Adv. P. No. 18-00948 (the "Wolfe Complaint"). In the Wolfe Complaint, the Trustee alleged, *inter alia*, that certain of the Bankruptcy Defendants therein breached their fiduciary duties to Argon Credit by authorizing transactions for their personal benefit and, further, that certain of the Bankruptcy Defendants allowed, directed and/or authorized Argon Credit to pledge the same collateral to two different lenders.

15. For purposes of clarity and this Complaint, the "Argon Insiders" include those Defendants who were an owner, board member/manager and/or an executive officer of the Argon Entities and who, through various since-discovered communications, knew or should have known that the Argon Entities were insolvent and nevertheless participated in, and/or acquiesced with knowledge to, the pervasive rampant fraud that was being committed against, and concealed from, Princeton as the secured lender.

16. Upon information and belief, the Argon Insiders knew and were aware of all acts and decisions by the Argon Entities as set forth herein, whether through the Argon Entities' respective defendant owners, executive officers and/or board managers.

17. The Argon Insiders include the following Defendants: KUHLMAN, RBC CAPITAL, JIU, JPU, LITTLE OWL, WOLFE, NOAX, ZUMSKI, ARAKELIAN, BMONEY, SCHNOSENBERG, FERRO, MARGON, TOMASZKIEWICZ, MADANYAN, CANFORA, TRIFFLER, TRIFFLER TRUST, BREITWEISER, FAERMARK, GLENORA, KOSTINER, CARDINAL, SHEYBANI and EDMONSON.

18. For purposes of clarity and this Complaint, the "Argon Outsiders" include those Defendants who were owned by, affiliated with, managed by or executed self-dealing transactions with, any one or more of the Argon Entities and/or Argon Insiders who perpetrated and/or financially benefitted from the fraud that was being committed against the Argon Entities and actively concealed from Princeton as the secured lender

19. The Argon Outsiders include the following Defendants: BERGARVIV, BLUE TREBLE, GOLDSTEIN, PERAZA, BROADMARK, ALHAMBRA, SSF HOLDINGS, SPARTAN FINANCE, SPARTAN SPV, WIRZBERGER, MERIT GAMING and FTAM.

## PARTIES

## PLAINTIFF

20.     FRS is a Delaware limited liability company with its principal place of business in

Princeton, New Jersey. FRS is the assignee of all right, title and ownership interest of PAIF in the

Fintech Loan Agreement and related documents, including the Secured Collateral of the Argon

Entities.

21.     PAIF is a limited partnership with its principal place of business in Princeton, New

Jersey, that is the assignor to FRS of all of PAIF's right, title and ownership interest in the Fintech

Loan Agreement and related documents, including the Secured Collateral of the Argon Entities.

## DEFENDANT INDIVIDUALS AND ENTITIES

22.     WOLFE is an individual who, upon information and belief, resides in Chicago,

Illinois. Upon information and belief, WOLFE was a founder of Argon Credit and served as Argon

Credit's chief executive officer and a member of Argon Credit's board of managers at various

times relevant to this Complaint. WOLFE is an owner of NOAX and SSF HOLDINGS and part-

owner member of BERGARVIV.

23.     ZUMSKI is an individual who, upon information and belief, resides in Rolling

Meadows, Illinois. Upon information and belief, ZUMSKI was a founder of Argon Credit and

served as Argon Credit's chief risk officer at all times relevant to this Complaint and was a member

of Argon Credit's board of managers between September 8, 2014, and February 12, 2016.

24.     FERRO is an individual who, upon information and belief, resides in Minooka,

Illinois. Upon information and belief, FERRO was Argon Credit's president from June 2016

forward and, further, was a member of Argon Credit's board of managers between September 8,

2014 and February 3, 2015. FERRO is also part-owner member of MARGON and part-owner of,

and an executive with, MERIT GAMING.

25.     ARAKELIAN is an individual who, upon information and belief, resides in San Diego, California. Upon information and belief, ARAKELIAN was a founder of Argon Credit and served as Argon Credit's chief executive officer from September 8, 2014 through approximately May 2015, and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016, and is also the owner of BMONEY and part-owner member of BERGARVIV.

26.     SCHNOSENBERG is an individual who, upon information and belief, resides in Saint John, Indiana. Upon information and belief, SCHNOSENBERG was Argon Credit's executive vice president of finance at all times relevant to this Complaint.

27.     TOMASZKIEWICZ is an individual who, upon information and belief, resides in Naperville, Illinois. Upon information and belief, TOMASZKIEWICZ was Argon Credit's vice president of technology and business development at all times relevant to this Complaint and is the owner of BLUE TREBLE.

28.     MADANYAN is an individual who, upon information and belief, resides in Palos Heights, Illinois. Upon information and belief, MADANYAN was Argon Credit's interim chief operations officer and director of strategy at all times relevant to this Complaint.

29.     CANFORA is an individual who, upon information and belief, resides in Chicago, Illinois. Upon information and belief, CANFORA was a member of Argon Credit's board of managers at all times relevant to this Complaint and is also part-owner of MARGON and the Chief Executive Officer and part-owner and executive of MERIT GAMING.

30.     TRIFFLER is an individual who, upon information and belief, resides in Lemont, Illinois. Upon information and belief, TRIFFLER was a member of Argon Credit's board of managers at all times relevant to this Complaint and is trustee of the TRIFFLER TRUST, a part-owner of MARGON, and an executive and part-owner of MERIT GAMING. TRIFFLER is being

sued in both his individual capacity and as Trustee of TRIFFLER TRUST and as an executive and owner and executive of MERIT GAMING.

31.     TRIFFLER TRUST is an Illinois trust with its principal place of business in Lemont, Illinois. TRIFFLER is the trustee of TRIFFLER TRUST which itself was part-owner member of Argon Credit.

32.     KUHLMAN is an individual who, upon information and belief, resides in Burr Ridge, Illinois. Upon information and belief, KUHLMAN, a FINRA-registered broker-dealer with RBC CAPITAL, provided investment advice to GLENORA, LITTLE OWL, JIU and JPU, and was a member of Argon Credit's board of managers from February 3, 2015 forward. KUHLMAN was acting, at all times relevant to this Complaint, both individually and at the direction and benefit of and as a steward for RBC CAPITAL, LITTLE OWL, JIU, JPU and GLENORA.

33.     BREITWEISER is an individual who, upon information and belief, resides in Bloomington, Illinois. Upon information and belief, BREITWEISER was a member of Argon Credit's board of managers from February 12, 2015 through December 2016.

34.     FAERMARK is an individual who, upon information and belief, resides in Oakbrook Terrace, Illinois. Upon information and belief, FAERMARK was a member of Argon Credit's board of managers beginning in February 12, 2015 through December 2016.

35.     KOSTINER is an individual who, upon information and belief, resides in Monsey, New York. Upon information and belief, KOSTINER is the owner of FTAM, SPARTAN FINANCE (as defined below) and SPARTAN SPV.

36.     SHEYBANI is an individual who, upon information and belief, resides in Bronx, New York, and was an executive with Argon Credit.

37.     BERGARVIV is an Illinois limited liability company with its principal place of business located in Carpentersville, Illinois. Upon information and belief, ARAKELIAN and WOLFE own BERGARVIV.

38.     GOLDSTEIN is an individual who, upon information and belief, resides in Coral Gables, Florida. Upon information and belief, GOLDSTEIN was a FINRA-registered representative of BROADMARK and PERAZA, and the owner of ALHAMBRA at all times relevant to this Complaint.

39.     ALHAMBRA is a Florida limited liability company with its principal place of business in Coconut Grove, Florida.

40.     BROADMARK is a Washington limited liability company with its principal place of business in Seattle, Washington. Upon information and belief, BROADMARK employed GOLDSTEIN as a FINRA-registered representative.

41.     PERAZA is a Florida limited liability company with its principal place of business in Saint Petersburg, Florida. Upon information and belief, PERAZA employed GOLDSTEIN as a FINRA-registered representative.

42.     BLUE TREBLE is a limited liability company, organized under the laws of the state of Delaware with its principal place of business in Naperville, Illinois. Upon information and belief, TOMASZKIEWICZ owns BLUE TREBLE.

43.     LITTLE OWL is a Florida limited liability company with its principal place of business in Sarasota, Florida. Upon information and belief, LITTLE OWL's managers were JIU and JPU and LITTLE OWL's investment in the Argon Entities was further managed by GLENORA. GLENORA's representatives include Jill M. Newman ("Newman"), Jordan Crawford ("Crawford") and Elizabeth Dunn ("Dunn"). LITTLE OWL was part owner member of Argon Credit.

44. RBC CAPITAL is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

45. JIU is an individual who, upon information and belief, is a resident of both Florida and Wisconsin. Upon information and belief, JIU was a part-owner member, manager and investor in LITTLE OWL and GLENORA at all times relevant to this Complaint.

46. JPU is an individual who, upon information and belief, is a resident of both Florida and Wisconsin. Upon information and belief, JPU was a part-owner member, manager and investor in LITTLE OWL and GLENORA at all times relevant to this Complaint.

47. GLENORA is a domestic business corporation with its principal place of business in Wisconsin. Upon information and belief, GLENROA is part-owner and joint manager of LITTLE OWL and is the entity through which JIU and JPU invested in the Argon Entities.

48. MARGON is a limited liability company with its principal place of business in Burr Ridge, Illinois. Upon information and belief, MARGON is owned by FERRO, CANFORA and TRIFFLER TRUST and was part-owner of Argon Credit.

49. CARDINAL is an Illinois trust with its principal place of business in Burr Ridge, Illinois. CARDINAL was a part-owner of Argon Credit.

50. EDMONSON is an individual who, upon information and belief, resides in New Lenox, Illinois. Upon information and belief, EDMONSON was the trustee of CARDINAL at all times relevant to this Complaint as well as associated as an executive with and part-owner of MERIT GAMING. EDMONSON is being sued in both his individual capacity and as trustee of CARDINAL and as executive with and part-owner of MERIT GAMING.

51. NOAX is a limited liability company with its principal place of business in Valparaiso, Indiana. Upon information and belief, NOAX is partially owned and controlled by WOLFE and is a part-owner member of Argon Credit.

52.     BMONEY is an Illinois limited liability company with its principal place of business in Schaumburg, Illinois. Upon information and belief, BMONEY is owned by ARAKELIAN and was a part-owner member of Argon Credit.

53.     FTAM is a Delaware limited liability company that is, upon information and belief, owned by KOSTINER and is the managing member of SPARTAN FINANCE and SPARTAN SPV.

54.     SPARTAN FINANCE is a Delaware limited liability company with its principal place of business in Monsey, New York. Upon information and belief, SPARTAN FINANCE is owned by FTAM (which itself is owned by KOSTINER).

55.     SSF HOLDINGS is a Delaware limited liability company that was part-owner member of SPARTAN FINANCE. Upon information and belief, WOLFE was the managing member and chief executive officer of SSF HOLDINGS.

56.     SPARTAN SPV is a Delaware limited liability company and its sole member was FTAM, which itself is owned by KOSTINER.

57.     WIRZBERGER is an individual who, upon information and belief, resides in Lawrence, New York, and currently owns and is managing Pearl Manor Capital Partners based in New York, New York. Upon information and belief, WIRZBERGER was an executive with Exigent Alternative Capital at all times relevant to this Complaint.

58.     MERIT GAMING is an Illinois-based limited partnership. Upon information and belief, MERIT GAMING's executives included FERRO, CANFORA, TRIFFLER and EDMONSON. These executives used MERIT GAMING as a tool to effectuate the fraud described herein.

## NON-DEFENDANT ENTITIES

59.     Fintech Financial, LLC ("Fintech Financial"), is a limited liability company that has its principal place of business in Mission, South Dakota, and which executed the Fintech Loan Agreement (as defined herein). Pursuant to the Fintech Loan Agreement, Fintech Financial is the original secured lender to the Argon Entities which sold, transferred and assigned all of its right, title and ownership interest in the secured assets of the Argon Entities to PAIF. Fintech Financial also acted as PAIF's agent at various times after the assignment of the Fintech Loan Agreement to PAIF.

60.     Argon Credit is a Delaware limited liability company that had its principal place of business in Chicago, Illinois. Argon Credit is the sole owner of Argon X. Argon Credit was owned by CARDINAL, ZUMSKI, LITTLE OWL, MARGON, TRIFFLER TRUST, NOAX and BMONEY, and is now a bankrupt entity.

61.     Argon X is a Delaware limited liability company that had its principal place business in Chicago, Illinois. Argon X is wholly owned by Argon Credit and is now a bankrupt entity.

62.     RSM US LLP ("RSM") is a limited liability partnership, organized under the laws of the state of Iowa with its principal place of business at One South Wacker Drive, Suite 800, Chicago, IL 60606. RSM is also an accounting firm that, on September 6, 2016, prepared an Independent Accountant's Review Report (the "Independent Report") of the Consolidated Financial Report of the Argon Entities, as of December 31, 2015.

63.     The fundamental findings of the Independent Report were that, as of December 31, 2015, "[t]he events and circumstances described above create substantial doubt about the [Argon Entities'] ability to continue as a going concern." The Independent Report further found that, at all

times relevant to this Complaint, and as otherwise demonstrated herein, the Argon Entities were insolvent.

64.     Meghan Hubbard, Esquire ("Hubbard"), is an individual who, upon information and belief, resides in Oak Park, Illinois, and is practicing law as an Illinois-based attorney. Upon information and belief, Hubbard was the in-house counsel for the Argon Entities as well as MERIT GAMING and was fully cognizant of the terms and provisions of the underlying loan transactions involving Fintech Financial and PAIF, and was aware that the Spartan Transactions (as defined herein) violated the Financial Covenants (as defined herein) of the Fintech Loan Agreement (as defined herein).[3]

## JURISDICTION AND VENUE

65.     This Court has jurisdiction over Princeton's RICO claims pursuant to, *inter alia*, 28 U.S.C. § 1331 because Princeton sets forth claims under the RICO Act, 18 U.S.C. §§ 1964(c), 1965(a).

66.     This Court has supplemental jurisdiction over Princeton's common law claims that arise under the laws of the State of Illinois and Delaware pursuant to 28 U.S.C. § 1367 because such state law claims are factually related to Princeton's RICO claims and are part of the same case or controversy under Article III of the United States Constitution.

67.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), as many Defendants reside or do business in this District and the events or omissions giving rise to the claims asserted herein, both the RICO and state common law claims, occurred in this District.

68.     This Court has personal jurisdiction over Defendants under 735 ILCS 5/2-209(a)(1) and the United States Constitution because Defendants have transacted business within the State

---

[3] Plaintiff reserves the right to amend this Complaint to include Hubbard as a named defendant to the extent that discovery demonstrates that Hubbard participated in the schemes described herein and that such participation rose to the level of actionable conduct.

of Illinois and Northern District of Illinois and purposefully availed themselves of the privilege of conducting activities within the State of Illinois and the Northern District of Illinois, and Defendants should have reasonably expected their actions to have consequences within the State of Illinois and the Northern District of Illinois.

## **INTERSTATE COMMERCE**

69.     The Argon Entities maintained offices in Chicago, Illinois.

70.     The Argon Entities conducted business in various jurisdictions around the country including, without limitation, Utah, Georgia, Louisiana, Illinois, Alabama, California and Missouri (the "Argon Markets"), through its various wholly-owned "special purpose entity" subsidiaries (the "Argon Subsidiaries").[4]

71.     The Argon Entities and Argon Subsidiaries ran client acquisition marketing campaigns and advertisements that appeared in the Argon Markets.

72.     The Argon Entities actively solicited potential clients, secured business, and collected interest and fees from out-of-state clients residing in the Argon Markets, as well as financed their operations through the funds provided by the Fintech Loan Agreement (all of which were transacted through emails, other electronic communications platforms and paid through the use of the mails and interstate wires).

73.     The business activities of the Argon Entities, and Princeton as the secured lender, substantially affected interstate commerce and used regular communications in interstate commerce, including the United States mail and interstate wires, through the use of the internet and through wire payment systems and transactions.

---

[4] The Argon Subsidiaries include: (i) Argon Credit of Alabama, LLC; (ii) Argon Credit of California, LLC; (iii) Argon Credit of Louisiana, LLC; (iv) Argon Credit of Georgia, LLC; (v) Argon Credit of Utah, LLC; (vi) Argon Credit of Missouri, LLC; and (vii) Argon Credit of Illinois, LLC.

## FACTUAL BACKGROUND

**The History Of The Argon Entities' Business Operations**

74.     Argon Credit was formed as a Delaware limited liability company on October 15, 2013.

75.     Argon Credit did not begin significant business operations until late 2014.

76.     At that time, the member owners of Argon Credit included NOAX, MARGON, ZUMSKI and BMONEY, and the Board of Managers included WOLFE, ARAKELIAN, ZUMSKI, CANFORA, FERRO and TRIFFLER.

77.     Argon X was formed as a Delaware limited liability company on April 23, 2015.

78.     Argon Credit owns 100% of the membership interests in Argon X.

79.     Argon Credit and the Argon Subsidiaries were the originators of state-by-state internet-marketed unsecured consumer "subprime" loans that, depending upon the credit-worthiness of the potential borrower, were for amounts upwards of $35,000.00 and at interest rates ranging from 19% to 95%, with terms ranging from 12 to 60 months (the "Consumer Loans").

80.     The Argon Subsidiaries documented the Consumer Loans, while Argon Credit provided the financing for the Consumer Loans through the funds received from Princeton and the Fintech Loan Agreement.[5]

---

[5] The Argon Entities booked the interest they earned on the Consumer Loans over the life of the Consumer Loans to produce constant rates of interest (yields), assuming collectability was reasonably assured. However, the Argon Entities discontinued the accrual of interest income on their financial records on the consumer installment contracts when such contracts became more than 60 days contractually past due (the "Doubtful Accounts"). The terms of the installment contracts were typically not renegotiated, and settlement offers were not typically made on the Doubtful Accounts until after a receivable had been charged off. The Argon Entities did not resume the accrual of income until the account was current on a contractual basis, at which time Argon's management considered collectability of such formerly Doubtful Accounts to be probable.

81.     After the Consumer Loans were documented and funded, Argon Credit sold the Consumer Loans to Argon X, but retained the management of the servicing operations of the Consumer Loans.[6]

82.     Argon X held a perfected security interest in all assets of Argon Credit.[7]

83.     The Argon Entities' revenue was derived entirely from its consumer lending operations that included interest and various loan fee[8] payments on the Consumer Loans.

**Fintech Loan Agreement Finances The Operations Of The Argon Entities**

84.     On May 1, 2015, in order to finance the operations of the Argon Entities, Fintech Financial, as lender, and Argon X, as borrower and on behalf of Argon Credit and the Argon Subsidiaries, entered into both a Loan and Security Agreement (the "LSA") and Revolving Loan Note (the "Revolving Note") (together, the LSA and Revolving Note, the "Fintech Loan Agreement").

85.     The Fintech Loan Agreement initially provided the Argon Entities with a revolving line of credit with a maximum limit of $20,000,000.00.

86.     To secure repayment of their borrower obligations under the Revolving Note, pursuant to Section 5.1 of the LSA, the Argon Entities granted Fintech Financial, and Fintech Financial perfected,[9] a security interest in, and lien upon, all of the accounts receivable due from

---

[6] Pursuant to that certain Master Consumer Loan Purchase Agreement, on May 1, 2015 (the "Master Agreement"), Argon X agreed to purchase the Consumer Loans originated by Argon Credit and the Argon Subsidiaries. Pursuant to the Master Agreement, Argon X acquired the exclusive right to all Receivables and Collections (as such terms are defined herein) made on account of those Consumer Loans acquired by Argon X from Argon Credit or the Argon Subsidiaries.

[7] On June 4, 2015, Argon X perfected its security interest in the Consumer Loans and their proceeds (*i.e.*, the Receivables and Collections as defined herein) by filing UCC financing statements against Argon Credit and each of the Argon Subsidiaries.

[8] Fees included late, returned check and ACH/wire payment fees.

[9] Fintech Financial's security interest was perfected through the following filings on the Secretary of State of the District of Delaware: (i) UCC-1 #20152393261 (filed on June 4, 2015); (ii) UCC-1 #20152393881

the Consumer Loans in addition to all of the other assets of the Argon Entities (the "Secured Collateral").[10]

87.    Argon Credit and certain of the Argon Subsidiaries executed a Guaranty and Suretyship Agreements (the "Corporate Guaranty") in favor of Fintech Financial which, among other things, guaranteed the full, prompt and unconditional payment when due of Argon X's liabilities and obligations under the Fintech Loan Agreement.

88.    In addition, WOLFE and ZUMSKI, as individual owner members of Argon Credit, provided limited personal guarantees of Argon X's obligations under the Revolving Note (the "Personal Guaranty") which similarly guaranteed the full, prompt and unconditional payment of Argon X's liabilities and obligations under the Fintech Loan Agreement.[11]

89.    PAIF held a duly perfected, first priority security interest in and to the Secured Collateral including, without limitation, the Receivables and Collections from the Consumer Loans originated by Argon Credit and the Argon Subsidiaries.

---

(filed on June 4, 2015); (iii) UCC-1 #20152394186 (filed on June 4, 2015); and (iv) UCC-1 Amendment #20152660917 (filed on June 4, 2015).

[10] More specifically, the Secured Collateral included, without limitation: (i) all of Argon X's consumer loan receivables then owned or thereafter originated or acquired by Argon Credit, and all amounts due and to become due thereunder (the "Receivables"); (ii) all payments received on or with respect to the Receivables, including all payments of principal, interest and other fees paid by the borrowers pursuant to the installment contracts or otherwise collected or received in respect of the Receivables (the "Collections"); (iii) all instruments including, without limitation, all promissory notes and any other instruments related to the Receivables, whether in tangible or electronic form; (iv) all accounts, including without limitation the accounts related to the Receivables; (v) all contract files; and (vi) all of the pledged accounts and all other monies, credit balances, deposits and other property of [the Argon Entities] then or thereafter held or received by or in transit. Argon X's obligations under the LSA were guaranteed by Argon Credit and each of the Argon Subsidiaries.

[11] The obligations of the Personal Guaranty were limited to those circumstances where Princeton was not paid due to, among other reasons, fraud. Because Princeton alleges that WOLFE and ZUMSKI committed fraud against the Argon Entities and Princeton as the secured lender, Princeton asserts that they remain liable under the terms of the Personal Guaranty.

90.     The Revolving Note's initial principal amount of up to $20 million was later amended on two different occasions, first on September 30, 2015 (the "First Amendment") (increased to $34,700,000.00), and then second on February 12, 2016 (the "Second Amendment") (increased to $37,500.000.00), to allow Argon X to borrow up to a total of $37.5 million.[12]

91.     The approximate balance owed by Argon X to Princeton in December 2016 was $37 million.

92.     During its negotiations with the Argon Entities, Fintech Financial and its attorneys included PAIF and PAIF's attorneys in the negotiations in order to ensure that the underlying loan documents would be acceptable to PAIF which Fintech Financial knew would become the assignee of the Fintech Loan Agreement.

93.     On May 6, 2015, Fintech Financial and PAIF entered into a Master Assignment of Loans Agreement whereby Fintech Financial agreed to sell, assign and transfer to PAIF all of its rights, title, and ownership interests in certain of the Consumer Loans, as identified by Fintech Financial from time to time, as well as Fintech Financials' rights and remedies under the Fintech Loan Agreement and Revolving Note and its interest in the Secured Collateral, including the Receivables and Collections originated by the Argon Entities.[13]

94.     After the assignment, Fintech Financial remained involved in the continued mechanics of the Fintech Loan Agreement on a nominal basis to the extent necessary to serve as PAIF's agent in order to effectuate certain amendments to the Fintech Loan Agreement, including credit line increases and other accommodations requested by the Argon Entities.

---

[12] References hereafter to the Fintech Loan Agreement shall mean and include the additional First Amendment and Second Amendment agreements.

[13] As noted previously, PAIF filed UCC financing statements perfecting the assignment assigning all of Fintech Financial's rights in the Secured Collateral to PAIF.

95.     Specifically, PAIF directed Fintech Financial to execute, acting solely on behalf of PAIF as its agent: (i) the First Amendment; (ii) the Second Amendment; (iii) the letter agreement regarding interest payments to Margon, dated February 12, 2016 ("Margon Letter Agreement"); (iv) the February 12, 2016 subordination agreement executed by CARDINAL ("Cardinal Subordination"); (v) the February 12, 2016 subordination agreement executed by the TRIFFLER TRUST ("Triffler Subordination"); and (vi) the February 12, 2016 amended subordination agreement executed by MARGON ("Amended Margon Subordination").

96.     Fintech Financial complied with PAIF's instructions and executed each of these documents with the full understanding that Fintech Financial was acting solely as agent for and on behalf of PAIF.

97.     At all times from the date of the assignment to PAIF until the filing of the Argon Bankruptcy, the Argon Entities, Fintech Financial, MARGON, CARDINAL, TRIFFLER TRUST and all of the Argon Insiders and Argon Outsiders fully understood that PAIF held and controlled all applicable rights as lender under the Fintech Loan Agreement, Revolving Note, Corporate and Personal Guaranty, and other documents associated with and related to the Fintech Loan Agreement.

98.     Consequently, at all times relevant to this Complaint, PAIF was entitled to enforce all of the rights and remedies provided by such documents and were owed those obligations created or caused by the Fintech Loan Agreement on the Argon Entities.

99.     Pursuant to the terms of the Fintech Loan Agreement, Corporate and Personal Guaranties, Revolving Note and Subordination Agreements (as defined herein), the Argon Entities agreed to provide Fintech Financial (and PAIF by assignment) with accurate, timely and complete financial statements and other information applicable to the operations of the Argon Entities and other financial information as reasonably requested by Fintech Financial/PAIF.

100.    Pursuant to the terms of the Fintech Loan Agreement, among other obligations, Argon Credit would pay PAIF a weekly settlement that included 100% of the principal collected and up to 30% of the interest collected and Argon Credit would additionally be obligated to reserve up to 15% of weekly interest collected for loan losses (with the interest amount being trued-up at month end based on a *per diem* interest calculation).

101.    On December 7, 2016, pursuant to § 12.5 of the LSA, PAIF assigned its right, title and ownership interest in the LSA, the Revolving Note, any other Financing Agreements (as defined by § 1.31 of the LSA) and the Secured Collateral (as defined by § 5 of the LSA) to FRS.

102.    FRS subsequently filed proofs of claim against each of the Argon Entities.

103.    FRS's proofs of claim, as amended, assert an unsecured claim against Argon Credit in the amount of $37,291,193.98, an unsecured claim against Argon X in the amount of $11,700,000.00, and a secured claim against Argon X in the amount of $25,591,193.98.

**Double Pledging Of Secured Collateral To SPARTAN FINANCE**

104.    On May 22, 2015, within only a few weeks of the execution of the Fintech Loan Agreement, KOSTINER, who was an insider executive at Argon Credit at the time, acting as Argon Credit's Vice President of Capital Markets, with the knowledge, awareness and complicity of several other Argon Insiders including, without limitation, WOLFE, ZUMSKI and ARAKELIAN, in an obviously carefully constructed premeditated fraud, formed FTAM using an entity name that was intentionally strikingly similar to Fintech Financials' proper name.

105.    Whereas Fintech Financial's proper name is "Fintech Financial, LLC," KOSTINER's fraudulent entity was named "Fintech Asset Management, LLC."

106.    KOSTINER used his Argon Credit e-mail address for business transactions related to FTAM and was FTAM's managing member and owner.

107.    Upon information and belief, KOSTINER, as well as the other Argon Insiders working closely with him, were aware of the Fintech Loan Agreement and the Financial Covenants (as such term is defined herein) that had been assigned to and then held at that time by PAIF.

108.    By email, dated June 5, 2015, WOLFE, as CEO of Argon Credit, gave instructions to MADANYAN, Argon Credit's Director of Strategy and Program Management, to give KOSTINER and SHEYBANI unfettered access to the Dropbox of financing documents containing the loan documents related to the Fintech Loan Agreement.

109.    The purpose was to permit KOSTINER the opportunity, using such documents, to finance FTAM's operations through which KOSTINER, WOLFE, ZUMSKI, ARAKELIAN and others, intended to divest and divert the Secured Collateral away from the Argon Entities.

110.    Upon information and belief, those documents were subsequently shared with WIRZBERGER who later utilized them to further the fraud described herein.

111.    KOSTINER and SHEYBANI, at MADANYAN's suggestion in order to be less conspicuous and undiscoverable by anyone at Fintech Financial and/or PAIF, used their Argon Credit email addresses to access the Dropbox of financing documents.

112.    By email dated June 29, 2015, SCHNOSENBERG, as Argon Credit's CFO, with the knowledge and approval of WOLFE and others, wired from Argon Credit's accounts five thousand dollars ($5,000.00) to KOSTINER, as payment to KOSTINER for his efforts in establishing FTAM, which was the linchpin and keystone in the premeditated fraud.

113.    Thereafter, during July 2015 and the months following, KOSTINER, WOLFE, ARAKELIAN, SCHNOSENBERG and other Argon Insiders and Argon Outsiders, including WIRZBERGER, entertained potential investors for the funding of the Spartan Transactions (as

defined below),[14] during which time KOSTINER, with the assistance of various Argon Insiders, utilized Argon Credit's investor presentation to present to potential funders of the Spartan Transactions.

114.    Even as late as October 13, 2015, KOSTINER, working closely with SHEYBANI, was copying and plagiarizing from the form financing documents utilized in the Fintech Loan Agreement, including the Fintech Financial draw request.

115.    Thus, upon information and belief, KOSTINER, with the knowledge and intention of WOLFE, ZUMSKI, ARAKELIAN, MADANYAN, SHEYBANI, SCHNOSENBERG and all other Argon Insiders and Argon Outsiders, formed FTAM for the sole purpose of acquiring and servicing a portfolio of Consumer Loans originating from Argon Credit and being sold to FTAM (the "Spartan Loans") thereby being diverted from Argon X and otherwise divesting Princeton of its Secured Collateral.

116.    The Spartan Loans that were originated through Argon Credit and the Argon Subsidiaries, using the funds advanced by Princeton pursuant to the Fintech Loan Agreement, totaled approximately $4.8 million.

117.    However, when Argon Credit allegedly sold such Spartan Loans to FTAM, PAIF never received any value from Argon Credit for the sale of such Spartan Loans and instead, upon information and belief, the purchase price of those Spartan Loans was retained by FTAM, KOSTINER, WOLFE, ZUMSKI and other Argon Insiders and Argon Outsiders who controlled the Spartan Entities, and controlled any funds that Argon Credit may have received from such sale.

118.    This was confirmed, specifically by SCHNOSENBERG, at the end of the fraud, just days before the Argon Entities declared bankruptcy.

---

[14] The Spartan Transactions were, in effect, operations of various entities that included the name "Spartan" and that were akin and similar to the Argon Entities, but which were ultimately funded through the loan proceeds stolen from those sums financed to the Argon Entities through the Fintech Loan Agreement.

119.    Specifically, on December 7, 2016, FERRO, WOLFE and SCHNOSENBERG, along with convicted felon Ryan Gilbertson ("Gilbertson"), a family friend of defendant Uihleins (JIU and JPU), approached Princeton to advise Princeton that the Argon Entities were $8 to $11 million underwater on the line.

120.    Princeton had no knowledge (i) of FERRO or his relationship to the Argon Entities, or (ii) of Gilbertson prior to that meeting and was even unaware that Argon Credit had hired FERRO as its President.

121.    Interestingly, Gilbertson represented himself to Princeton's executives as a representative of the interests of the JPU, JIU and LITTLE OWL, in the hope that the Fintech Loan Agreement could be restructured.

122.    In an effort to curry favor with the Princeton executives, Gilbertson explained that he was the former college roommate of the younger James Uihlein and that he had been asked by the Uihlein family to broker a resolution between the Argon Entities and Princeton.

123.    Gilbertson tried to "hawk" the technological benefits of the alleged underwriting technologies of the Argon Entities when in fact such technologies were virtually non-existent and worthless.[15]

124.    Nevertheless, it was, at this time, in December 2016 that SCHNOSENBERG admitted that (i) Argon Credit sold the Spartan Loans that had been pledged as Secured Collateral to PAIF to SPARTAN SPV without turning the proceeds of that sale over to PAIF, and (ii) there was an $8-$11 million shortfall in the value of the collateral securing the credit line (though the actual shortfall turned out to be closer to approximately $17.5 million).

---

[15] Gilbertson, who was subsequently convicted of a federal securities scam, the illicit proceeds of which were used to purchase polo ponies, mentioned that he and James Uihlein played polo together in Florida and continued to run in the same circles in the Florida "Rich Men of the Polo world."

125.    The Spartan Loans were at all times Secured Collateral and were otherwise encumbered by PAIF's perfected security interest in the Secured Collateral.

126.    As part of the fraud in establishing the Spartan Entities, on August 21, 2015, WOLFE (as Argon Credit's CEO) and KOSTINER (as the managing member of FTAM) executed an Affidavit and Purchase Funding Request which was the purchase of the first tranche of the Spartan Loans.

127.    The financial statements provided by Argon Credit to Princeton recognized the $248,300.00 purchase price as a receivable in September 2015 from "SSF," and those same financial statements included a line item for a "notes payable" from Argon Credit to Fintech Financial, effectively zeroing out the transaction and demonstrating that the Argon Insiders sold the Spartan Loans to the Spartan Entities for no value, thereby defrauding not only Argon Credit but also Princeton as the secured lender.

128.    Upon information and belief, as asserted elsewhere, FTAM never paid full, fair or indeed any value for Argon Credit's sale of the Spartan Loans to FTAM, and the notes payable that were cryptically included in various amounts at various times in Argon Credit's financial statements were fictitious, false and deceptive.

129.    Specifically, with the knowledge and at the direction of the Argon Insiders and Argon Outsiders, Argon Credit used funds from the Revolving Note to originate the Spartan Loans that Argon Credit sold to FTAM for an alleged aggregate purchase price of approximately $4.8M (the "Spartan Loan Purchase Price"), incurred over the course of several months following August 2015.

130.    By email dated November 16, 2015, WOLFE, as CEO of Argon Credit, with a copy to KOSTINER and ARAKELIAN, and a subsequent forwarding to SCHNOSENBERG, advised First Associates, the vendor servicing those Consumer Loans originated by Argon Credit, that a

portion of the Consumer Loans was being acquired by the Spartan Entities and that those loans (that is, the Spartan Loans) had already been acquired by Argon Credit and were already being serviced by First Associates: "All of the loans to be acquired by SSFISPV will be loans that have already been acquired by Argon and boarded onto the Argon portfolio at First Associates."

131.    In that same email, WOLFE advised First Associates that it was Argon Credit's intention that it was going to sell to FTAM upwards of $15 million in loans and further advised First Associates to wire the "cash flows" generated by these Spartan Loans to a bank account managed and controlled by KOSTINER and FTAM: "Please wire the cash flows associated with the SSFISPV portfolio to a First Republic bank account, the same way Argon receives it wires. Fintech Asset Management is the Managing Member and 100% equity owner of SSF I SPV."

132.    This servicing revenue, generated by the Spartan Loans, was part of the Secured Collateral that now, upon the explicit instructions of WOLFE as Argon Credit's CEO, had been diverted to FTAM.

133.    In fact, in a series of emails, dated November 16, 19, 24 and 26, 2015, KOSTINER, WOLFE, ARAKELIAN, SCHNOSENBERG, WIRZBERGER and SHEYBANI exchanged information and documents regarding the establishment of the Spartan Entities and execution of the documents pertaining to the Spartan Transactions.

134. These Defendants and others, as evidenced and demonstrated by these and other emails, were well aware of the structure of the Spartan Transactions and that such Spartan Transactions were predicated upon the divestiture and diversion of the Secured Collateral away from the Argon Entities without the payment of any true value.

135.    The Argon Insiders and Argon Outsiders wrongly converted funds from the Revolving Note for illicit improper purposes by using such Revolving Note funds not to acquire a "performing asset" that would generate Receivables and Collections for Princeton, as required by the Fintech Loan Agreement, but rather to fund the origination of a distinct asset, the Spartan Loans, which could then be sold to FTAM for the Spartan Loan Purchase Price which purchase price was itself then stolen by the Argon Insiders and Argon Outsiders who had concocted the fraudulent Spartan Transaction scheme.

136.    As detailed below and noted above, the actual servicing fees (the Receivables and Collections that were generated by the Spartan Loans) were never paid to Argon Credit, but rather was absconded with by those Defendants who controlled, managed and structured FTAM, he Spartan Transactions and Spartan Entities.

137.    Specifically, the Argon Entities sought to sell the Spartan Loans, which were a subset of the Consumer Loans pledged to PAIF as Secured Collateral, to FTAM, which then transferred the Spartan Loans to the Spartan Entities (the "Spartan Transactions") for the purpose of re-pledging those Spartan Loans to another secondary secured lender (*i.e.*, Hamilton Funding I, L.P. ("Hamilton Funding")) other than, and without the knowledge of, or consent by, PAIF.

138.    The Spartan Transactions were fraudulent at their inception and their core given that the Argon Insiders and Argon Outsiders that facilitated the Argon Transactions knew or should have known the Spartan Loans were Secured Collateral incapable of being re-pledged or sold without Princeton's knowledge and approval (neither of which occurred).

139.    Along with other Argon Insiders and Argon Outsiders, WOLFE, as CEO of Argon Credit, and owner of NOAX, along with KOSTINER, ZUMSKI, ARAKELIAN, WIRZBERGER and other Defendants, were the ringleaders of the RICO Scheme and underlying fraud by (i) arranging for FTAM and the Spartan Entities to purchase the Spartan Loans from Argon Credit

without paying reasonably equivalent value in exchange for such Spartan Loans, (ii) having Argon Credit first acquire loans on its balance sheet and in its portfolio before selling and assigning such Spartan Loans to Spartan, (iii) executing a Memorandum of Understanding on or about July 2, 2015, which acknowledged that the Spartan Loans were funded from Argon Credit's balance sheet, (iv) requesting and, upon information and belief, receiving copies of Argon Credit's financial statements while WOLFE was operating FTAM and the Spartan Entities, and (v) requesting and receiving notification of incoming wires to Argon Credit from SCHNOSENBERG.

140.    Incredibly, WOLFE and KOSTINER prepared and executed a Conveyance and Certification of Release document, dated November 23, 2015, whereby WOLFE, on behalf of Argon Credit, acknowledged the sale of the Spartan Loans to SPARTAN SPV, as executed by KOSTINER, "**without recourse**." (emphasis supplied).

141.    The definition of "without recourse" means a formula used to disclaim responsibility for future nonpayment, especially of a negotiable financial instrument.

142.    In effect, WOLFE, on behalf of Argon Credit, sold the Spartan Loans without there being any legal responsibility of SPARTAN SPV, the new owner, to pay for them.

143.    Earlier that year, on August 4, 2015, FTAM, at KOSTINER's direction, formed SPARTAN FINANCE and acted as its managing member.

144.    On this same date, WOLFE formed SSF HOLDINGS and acted as its managing member and chief executive officer.

145.    At around this same time, in furtherance of the fraudulent Spartan Transactions, various Defendants executed various separate agreements which set forth the fraudulent deceptive framework for the Spartan Transactions.

146.    **First**, Argon Credit, FTAM and SPARTAN FINANCE executed a servicing agreement (the "Spartan Servicing Agreement") which provided that, among other things: (i)

Argon Credit would originate and transfer the Spartan Loans to SPARTAN FINANCE; (ii) Argon Credit would provide pre-servicing support and administrative services in connection with the Spartan Loans and would also service the Spartan Loans, including collecting monies which would be segregated from Argon Credit's other Secured Collateral and then deposited into SPARTAN FINANCE's account within one (1) business day; and (iii) Argon Credit would receive a servicing fee equal to fifteen percent (15%) of the amount invested by SPARTAN FINANCE in the Spartan Loans payable in equal monthly installments over six months (the "Spartan Servicing Fee"); *provided, however*, SPARTAN FINANCE was only obligated to pay the Spartan Servicing Fee to FTAM, which was then allegedly obligated to pay such Spartan Servicing Fee to Argon Credit, but the Spartan Servicing Agreement failed to provide Argon Credit with a right of recourse against the Spartan Loans for payment of the Spartan Servicing Fee if FTAM failed to remit such Spartan Servicing Fee to Argon Credit.

147.    As set forth below, FTAM failed to remit any Spartan Servicing Fees to Argon Credit at any time.

148.    WOLFE signed the Spartan Servicing Agreement on behalf of Argon Credit in his capacity as Argon Credit's CEO.

149.    **Second**, Argon Credit, FTAM and SPARTAN FINANCE executed a side agreement which provided that Argon Credit granted FTAM a right of allocation for up to twenty-five percent (25%) of the Consumer Loans originated by Argon Credit that had an annual percentage rate equal to or exceeding 40% to be assigned to FTAM on a monthly basis (the "40% Loans").

150.    Argon Credit also granted FTAM a right of first refusal to acquire such 40% Loans in the event Argon Credit proposed to sell them.

151.    Upon information and belief, since the interest rates on that subset of Consumer Loans equaled or exceeded 40%, the actual value was significantly higher than the attributed face value of the 40% Loans because of the potential cash flow to be generated from interest on such 40% Loans.

152.    SPARTAN FINANCE also executed a promissory note (the "Spartan Finance Note") in favor of SSF HOLDINGS in the principal amount of $330,000.00, which provided that the proceeds would be used to fund SPARTAN FINANCE's lending activities of originating and servicing loans.

153.    WOLFE signed the Spartan Finance Note as CEO of SSF HOLDINGS.

154.    The Spartan Finance Note called for quarterly payments to be made beginning August 2015 through February 2018 totaling $580,000.00 as a preferred return prior to equity payout.

155.    SPARTAN FINANCE and SSF HOLDINGS also executed a subscription agreement pursuant to which SPARTAN FINANCE issued and sold the Spartan Finance Note to SSF HOLDINGS.

156.    The Argon Entities, at the direction of the Argon Insiders, including owners, executives and managers of the Argon Entities, failed to disclose the existence of any of the Spartan Entities or the Spartan Transactions to PAIF and, to the contrary, actively concealed these Spartan Transactions involving FTAM and the Spartan Entities (as defined below).

157.    Thereafter, on August 20, 2015, Argon Credit and FTAM executed a Master Loan Sale Agreement ("Master Agreement") pursuant to which Argon Credit agreed to sell the Spartan Loans to FTAM.

158.    WOLFE signed the Master Agreement on behalf of Argon Credit as Argon Credit's CEO.

159. The Master Agreement provided that Argon Credit would make entries on its books and records to indicate the sale of the Spartan Loans to FTAM, but any such financials denoting such sale were never disclosed to Princeton as the secured lender.

160. Upon information and belief, Argon Credit sold or assigned to FTAM the Spartan Loans, totaling approximately 1,158 separate consumer loans, all originated by Argon Credit or the Argon Subsidiaries, with a face value of at least $4,840,024.67.

161. However, PAIF never received any value from the sale of this Secured Collateral to which PAIF was entitled pursuant to the Fintech Loan Agreement.

162. As noted, Argon Credit continued to service the Spartan Loans after FTAM purchased them, but neither SPARTAN FINANCE nor FTAM ever paid any Spartan Servicing Fees to Argon Credit in exchange for servicing the Spartan Loans.

163. The Spartan Loans sold to FTAM were integral to Princeton's Secured Collateral, which necessarily included all Consumer Loans originated by Argon Credit and the Argon Subsidiaries.

164. As further evidence of the fraudulent activity concerning the Spartan Transactions, by email, dated November 26, 2015 (11:51 a.m.), KOSTINER confirmed to WIRZBERGER that SSF HOLDINGS, which included, according to KOSTINER's email, "the Argon management team and their investors," had lent SPARTAN FINANCE, through a promissory note (the "Spartan Note"), $790K.

165. Upon information and belief, the funding for the Spartan Note came from funds from Argon Credit and not "the Argon Management team and their investors."

166. By subsequent email, dated November 26, 2015 (12:55 p.m.), KOSTINER further provided WIRZBERGER with confirmation of separate wire transfers of $500K each from

TRIFFLER and CARDINAL to an Argon Credit bank account titled "ARGON NEW OPE Acct" (the "Spartan Investment").

167.    KOSTINER had received just received the wire transfer confirmation from SCHNOSENBERG who, along with other Argon Insiders, was working closely with KOSTINER and WOLFE to effectuate the Spartan Transactions.

168.    KOSTINER misrepresented to WIRZBERGER that these Argon Insiders were investing in the Spartan Entities through Argon Credit.

169.    However, simultaneously SCHNOSENBERG, by email, dated November 17, 2015, was advising PAIF executives, Bob Farrell and Phil Burgess, that Argon Credit had taken in the $1.0M investment (*i.e*., the Spartan Investment) without any disclosure that that the Spartan Investment was being used to underwrite the Spartan Transactions.

170.    Argon Credit even granted equity to CARDINAL and TRIFFLER for the Spartan Investment and paid them certain interest payments in violation of the Subordination Agreements (as set forth in greater detail below).

171.    The double use of the Spartan Investment to underwrite the Spartan Transactions and deceive PAIF into believing that Argon Credit had received $1.0M in investment is reflective of the endemic fraud that was occurring without disclosure to PAIF.

172.    The Argon Entities, with the knowing, intentional and complicit understanding of the Argon Insiders, failed to disclose the Spartan Transactions to Princeton until December 2016.

173.    Argon Credit continued to reflect the value of these Spartan Loans (as it they were not sold to FTAM) on Argon Credit's borrowing base certificates (the "BB Certificates")[16] and other financial information submitted to Princeton pursuant to the terms of Fintech Loan

---

[16] Argon Credit's extent of borrowing is predicated upon eligible Receivables (as defined in the LSA). In this case, the Spartan Loans were included in the Receivables, even though such Receivables from the Spartan Loans were illusory and a phantom of fraud where the Spartan Loans had been sold.

Agreement; *provided, however*, the fact that these Spartan Loans were sold by Argon Insiders to Argon Outsiders was fraudulently concealed from Princeton.

174.    In turn, Argon Credit continued to borrow from the Revolving Note against these phantom Spartan Loans despite the fact that, unbeknownst to PAIF, there was no Secured Collateral to support such increased borrowing.

175.    By email dated September 10, 2015, KOSTINER forwarded the template agreements that had formed the basis of the Fintech Loan Agreement to Exigent Capital with instructions that these template agreements would form the underlying basis for the documents to be executed to support the Spartan Transactions.

176.    On or about October 12, 2015, KOSTINER also prepared and circulated a document entitled "FTAM-Argon Structure Overview Memo" (the "Spartan Memo").

177.    The Spartan Memo is a blueprint of the Spartan Transactions and details the interrelated relationships between the various parties involved in the Spartan Transactions, including the Argon Entities as well as the following Defendants identified therein: WOLF, ARAKELIAN, ZUMSKI, MARGON, LITTLE OWL, BERGARVIV, KOSTINER, FTAM and SSF HOLDINGS.

178.    The Spartan Memo was predicated upon the structure of the Fintech Loan Agreement and demonstrated the efforts of certain Argon Insiders and Argon Outsiders to defraud Princeton as a secured lender by diverting and divesting the Argon Entities of the value represented by the Spartan Loans.

179.    Through a series of emails from August 25, 2015, through to August 29, 2015, KOSTINER, on behalf of FTAM as well as other Argon Insiders, such as WOLFE and ARAKELIAN, actively negotiated the specific terms of the Spartan Transactions with other third

parties who included, in part, Eliezer Brender and WIRZBERGER with Exigent Capital, an entity

that was financing in part the Spartan Transactions as the senior debt holder.

180.    It is evident from these communications that the Spartan Transactions were

modeled specifically from the Fintech Loan Agreement.

181.    Specifically, with knowledge and understanding of the scheme, by email dated

September 21, 2015, and copying WOLFE and KOSTINER, among others, WIRZBERGER

prepared new loan documents for the Spartan Transactions that were specifically modeled from

the Fintech Loan Documents.

182.    WIRZBERGER and others, including without limitation, WOLFE and

KOSTINER, knew that the Spartan Transactions were intended to divest Argon Credit of a portion

of the Secured Collateral.

183.    By email dated September 24, 2015, KOSTINER told WOLFE, ARAKELIAN and

SHEYBANI that the new FTAM loan documents were "just a mark up off of Argon's existing

loan docs with Princeton."

184.    Thereafter, on October 20, 2015, FTAM, through KOSTINER as its sole member,

formed SPARTAN SPV (collectively, SPARTAN SPV, SPARTAN FINANCE and SSF

HOLDINGS, the "Spartan Entities").

185.    By email dated November 13, 2015, KUHLMAN, using his RBC CAPITAL email

address, communicated with WOLFE and SCHNOSENBERG, that included earlier emails which

had included, as recipients, JIU, JPU, and Newman and Crawford as representatives of

GLENORA.

186.    It is clear from the included email, dated November 13, 2015, that these Defendants,

including without limitation, KUHLMAN, RBC CAPITAL, WOLFE, SCHNOSENBERG, JIU,

JPU and GLENORA, were well aware of the Spartan Transactions and approved of such Spartan

Transactions, despite their understanding and knowledge that the Spartan Loans were already Secured Collateral.

187.     Specifically, by email dated November 13, 2015, Crawford of GLENORA was impressed by the generation of additional consumer loans:

> I was surprised by the partial sale of debt that took place with Spartan Specialty Finance, can we please provide additional documentation for the transaction **including the price they are paying for buying these existing loans from your books**? It is impressive that you have been able to generate over 2,300 loans 10/1-11/11/2015, would it be possible to provide updated financials for October? **We also look forward to further discussion regarding Princeton Capital** as I am surprised the line of credit is only for 12 month when your outstanding receivables averages 36 months.

(emphasis supplied).

188.     It is evident from this email string that these Defendants KUHLMAN (as representative of RBC CAPITAL, and acting on behalf of JIU and JPU), WOLFE, SCHNOSENBERG, JIU, JPU and GLENORA were all aware of the Spartan Transactions and failed to stop the obvious fraud of selling Princeton's Secured Collateral to a third party without prior authorization or approval from Princeton.

189.     By email dated November 13, 2015, KUHLMAN took a pot shot at Crawford's earlier email in separate communication with WOLFE and SCHNOSENBERG:

> The response report you put together was excellent. **It appears Jordan [Crawford] is searching for anything possible to disrupt Little Owl's comfort but it won't work.** :).

(emphasis supplied).

190.     It is evident that KUHLMAN, working at the behest of, and as a steward for, RBC CAPITAL, JIU, JPU, GLENORA and LITTLE OWL, would not allow Crawford's queries to disrupt the Spartan Transactions.

191.    During the pendency of the Argon Bankruptcy, the Bankruptcy Court determined in a written opinion that the Argon Entities were fraudulently concealing the "double counting" of the Spartan Loans as Princeton and SPARTAN FINANCE's collateral.

192.    Specifically, the Court determined as follows:

> Evidence was presented by each side as to the actual value of the portfolio and the value of the assets pledged to FRS through the Loan and Security Agreement. Testimony was presented concerned the apparent sale of a portion of the loan portfolio to Spartan Specialty Finance I SPV LLC ("SSF") in 2015. No written consent by Princeton (at the time the name of the lender) for the sale to SSF was presented and FRS' witnesses testified that they did not know about the sale and did not consent. Because of the sale of approximately $3 million of the Loan Portfolio, these loans are seemingly double pledged as security to both SSF and FRS. The Debtors continue to include these in their reports of the existing loan portfolio to FR throughout the period after the date.

(footnote omitted).

193.    The Court further ruled in its footnote: "The court observed that the funds from the sale were not turned over to Princeton and although the sold loans continued to be listed on the Debtors' aging report, those sold loans were also the collateral of SSF and certain insiders of the [Argon Entities]. In effect, those sold loans were being 'double counted' as both collateral of SSF and Princeton."

194.    The Argon Entities' books and records, as provided to Princeton during the term of the Fintech Loan agreement, did not reflect any disclosure of the Master Agreement or the Spartan Transactions.

195.    In fact, none of the board books maintained by Argon Credit's board of managers included any board meeting agendas, minutes, or resolutions between May 2015 and May 2016.

196.    Upon information and belief, WOLFE, ARAKELIAN, SCHNOSENBERG, MADANYAN, ZUMSKI, CANFORA, TRIFFLER, FERRO, KUHLMAN, BREITWEISER, TOMASZKIEWICZ and FAERMARK and all other Argon Insiders, as well as Hubbard, were

each aware at the time, or subsequently became aware, of the Spartan Transactions and Spartan Loans and, further, knew, or should have known, that the Spartan Transactions and Spartan Loans were neither disclosed to Princeton and nor reflected on Argon Credit's BB Certificates and other financial documents being provided to Princeton pursuant to the Financial Covenants included in the Fintech Loan Agreements.

197.    The Fintech Loan Agreement, and other associated agreements, contains multiple provisions regarding the maintenance and provision of accurate and truthful financial records and information to Fintech Financial (and PAIF, as successor) (the "Financial Covenants").

198.    Those Financial Covenants are located in the Fintech Loan Agreement, as amended, and without limitation, at sections 2.7, 4.1, 4.2, 5.3(d), 7.1, 7.2, 8.3, 8.17, 8.18, 9.6, 9.7, 9.9, 9.12, 9.19, as well as the Revolving Note, and the Corporate and Personal Guaranties, executed, as amended, by Argon Credit, ZUMSKI and WOLFE, at, without limitation, paragraphs, 3, 21 and 33.

199.    The Financial Covenants also include those provisions in the First Amendment and Second Amendment, as well as the various Subordination Agreements made by and between Fintech Financial, initially on behalf of itself, and then on behalf of PAIF, and LITTLE OWL, MARGON, CARDINAL and TRIFFLER TRUST.

200.    In fact, SCHNOSENBERG, WOLFE and ARAKELIAN and, without limitation, other Argon executive insiders, including Hubbard, received daily reports regarding the Spartan Loans and monitored and prominently participated in the Spartan Transactions, all to the financial detriment of Princeton as the secured lender.

201.    During the Bankruptcy, the Spartan Entities, including various Bankruptcy Defendants, attempted to deflect their liability by citing to non-binding non-executed documents

as the basis for the authority of the fraud that they had committed against Princeton as the secured lender.

202.    These same Bankruptcy Defendants further falsely asserted that the revenue earned from the sale of the Spartan Loans was reflected on certain financial statements of the Argon Entities and that, therefore, PAIF had valid advance notice of the Spartan Transactions and had actually, in a warped, undocumented and unsubstantiated allegation, consented to the sale of the Spartan Loans and the diversion of the accounts receivable from such Spartan Loans away from the Argon Entities and to other third parties.

203.    This argument by the Bankruptcy Defendants makes no logical sense and the Bankruptcy Defendants failed to identify any documents that demonstrated that PAIF, consistent with the terms of the Fintech Loan Agreement, had consented to the sale of the Spartan Loans and/or had acquiesced to the Spartan Transactions.

204.    The arguments of these Bankruptcy Defendants in the Argon Bankruptcy are just a continuation of these Defendants' efforts to deflect their liability for their extensive pattern of active fraud and fraudulent concealment of the Spartan Transactions and Spartan Loans, all to the significant financial detriment of Princeton.

205.    The fact of the matter is that these Defendants knowingly, intentionally and fraudulently failed to disclose and turn over the proceeds from the sale of the Spartan Loans and related Spartan Servicing Fees to PAIF as the secured lender.

206.    Moreover, although the sold Spartan Loans continued to be listed on SPARTAN FINANCE's aging report, those sold Spartan Loans were also collateral of SSF HOLDINGS and certain insiders of SPARTAN FINANCE, thereby "double counting" the Spartan Loans as both secured pledged collateral of PAIF (they continued to be listed on the assets of the Argon Entities) and SSF HOLDINGS.

207.     Even after SPARTAN FINANCE had filed for bankruptcy, SPARTAN FINANCE continued to collect the interest and fees from the Spartan Loans during that time and failed to turn over those collected loan proceeds or otherwise make any payment to FRS, notwithstanding FRS's first priority interest in such collected Secured Collateral.

**SPARTAN FINANCE And FTAM Defaulted On Hamilton Funding Loan**

208.     Upon information and belief, SPARTAN FINANCE financed the purchase of the Spartan Loans by, among other things, borrowing from Hamilton Funding.

209.     To secure its indebtedness to Hamilton Funding, SPARTAN FINANCE pledged the Spartan Loans as collateral for the Hamilton Funding financing.

210.     Specifically, on October 31, 2015, SPARTAN SPV entered into a Loan and Security Agreement with Hamilton Funding, pursuant to which Hamilton Funding agreed to loan up to $10,000,000.00 to SPARTAN SPV with a delayed draw term loan facility, secured by the assets Argon Credit transferred to SPARTAN SPV, with a 70% loan to collateral value borrowing base (the "Hamilton Funding Loan").

211.     FTAM, KOSTINER and WOLFE each also guaranteed the Hamilton Funding Loan.

212.     Argon Credit, which continued to act as servicer for the Spartan Loans, diverted the cash proceeds (*i.e.*, Princeton's Secured Collateral) collected from the Spartan Loans on a weekly basis into a bank account owned by SPARTAN FINANCE, which was subject to a security interest of Hamilton Funding through a deposit account control agreement (the "Spartan Bank Account").

213.     Upon information and belief, Argon Credit made deposits into the Spartan Bank Account of approximately $50,000.00 per week, all of which was a diversion of Princeton's Secured Collateral away from the control of the Argon Entities.

214.     Upon information and belief, in or around January 2016, SPARTAN SPV fell into noncompliance with the terms of the Hamilton Funding Loan.

215.     On February 5, 2016, SPARTAN SPV represented to Hamilton Funding that it would use Argon Credit's assets (as otherwise pledged to and perfected by PAIF), if necessary, to enable SPARTAN SPV to achieve compliance with the Hamilton Funding Loan.

216.     On February 5, 2016, KOSTINER sent an email, on behalf of SPARTAN SPV, to WIRZBERGER, a representative of Hamilton Funding, stating that "Argon is expecting to receive $5 mm from its investors this week, which will enable it to buy all the loans we need this month, as well as provide the remaining 30% advance on our senior line of credit with you, if needed. I have been working with my investors to try not to take it from Argon, but if needed, we will be able to draw whatever equity is required from Argon to complete a $7 mm draw on the Hamilton Funding line by the end of February."

217.     KOSTINER failed to satisfy the noncompliance and, on February 23, 2016, Hamilton Funding served a Notice of Event of Default of the Hamilton Funding Loan for failure to replace defaulted receivables.

218.     Hamilton Funding accelerated the balance of the loan and sought payment of $4,437,700.17, which consisted of $3,274,629.00 in principal.

219.     On March 3, 2016, Hamilton Funding took exclusive control of the Spartan Bank Account and began sweeping the cash proceeds from the Spartan Loans which Argon Credit was depositing.

220.     Upon information and belief, Hamilton Funding swept at least $705,000.00 from the Spartan Bank Account, all of which represented Princeton's Secured Collateral.

221.     While SPARTAN SPV and FTAM were engaged in discussions with Hamilton Funding regarding the default under the Hamilton Funding Loan, FTAM and SPARTAN

FINANCE separately engaged in discussions with Argon Credit to repurchase the Spartan Loans from FTAM, which were Hamilton Funding's collateral.

222.    KOSTINER, WOLFE, FTAM and other Argon Insiders were in effect going to "double down" on the fraud already being committed against Princeton as the secured lender and now commit additional fraud against Hamilton Funding.

223.    Upon information and belief, the plan to transfer the Spartan Loans back to Argon Credit was a fraudulent plan to hide those Spartan Loan assets from Hamilton Funding and prevent Hamilton Funding from continuing to sweep the Spartan Bank Account.

224.    Argon Credit and FTAM executed a repurchase agreement, dated March 1, 2016 (the "Repurchase Agreement"), pursuant to which Argon Credit agreed to repurchase from FTAM, and FTAM agreed to sell to Argon Credit, the assets represented by the Spartan Loans with original principal notes totaling $4,843,024.67 which would be immediately transferred to Argon Credit upon the execution of the repurchase agreement.

225.    In consideration for the transfer of the Spartan Loan assets, Argon Credit agreed that FTAM would continue to receive the future revenue streams from the Spartan Loans until the earlier of 18 months or September 30, 2017.

226.    Upon information and belief, FTAM and Argon Credit agreed to backdate the Repurchase Agreement by several weeks, but actually signed the Repurchase Agreement on or about March 24, 2016.

227.    Also, on March 24, 2016, upon information and belief, SPARTAN SPV sent a letter to Hamilton Funding, rejecting its notices of default and asserting a right to cure such Hamilton Funding Loan defaults.

228.    Despite the purported Repurchase Agreement, upon information and belief, the Spartan Loans were not transferred back to Argon Credit.

229.     SPARTAN SPV filed a voluntary petition for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York on June 29, 2016 and listed in its schedules of assets and liabilities a loan portfolio (*i.e.*, the Spartan Loans) having a value of $4,750,000.00 that represented the stolen Secured Collateral of Princeton.

230.     In that bankruptcy case, FERRO, on behalf of Argon Credit, submitted a proof of claim against SPARTAN SPV alleging that Argon Credit was owed $712,500.00 in Spartan Servicing Fees on account of the Spartan Servicing Agreement.

231.     FERRO and other Argon Insiders knew that the Spartan Servicing Fees were to be paid to Argon Credit by FTAM, but they never were because such Spartan Servicing Fees were converted by FTAM, KOSTINER, WOLFE, ZUMSKI and other Argon Insiders and Argon Outsiders during the term of the Spartan Transactions, for their own financial benefit.

232.     The entirety of the Spartan Transactions was a pattern of deceptive and fraudulent conduct and acts intended to deceive Princeton and steal its Secured Collateral (the "Spartan Fraud").

233.     The Spartan Fraud began almost simultaneously upon the execution of the Fintech Loan Agreement and, upon information and belief, was concocted well before the execution of the Fintech Loan Agreement by various Argon Insiders and Argon Outsiders, all of whom possessed a demonstrated knowledge about both the Financial Covenants and the Spartan Transactions, which are inherently mutually exclusive and conflictual.

**Various Defendants Knowingly Submitted
False And Misleading Financial Reports To PAIF**

234.     In addition, and simultaneous with the Spartan Fraud and the concealment of the double pledging of the Spartan Loans to Hamilton Funding as a secured lender to SPARTAN SPV, Argon Credit's executive, owners and board of managers, including the Bankruptcy Defendants

and other Argon Insiders, knowingly, willfully, intentionally, recklessly and negligently caused Argon Credit to submit false, misleading and deceptive financial reports to Princeton in further violation of the Financial Covenants.

235.    The purpose of this additional fraud was to further deceive PAIF and cause PAIF to delay in declaring an event of default of the Revolving Note until such time as the Argon Insiders and Argon Outsiders could steal, plunder and abscond with Princeton's Secured Collateral.

236.    As early as the Fall 2015, by email dated November 11, 2015, Newman, as President of GLENORA, the entity that owned LITTLE OWL, and the investment company that managed JIU's and JPU's various investments, upon reviewing the financials as provided by the Argon Entities, expressed significant concern that the "current model [was] not sustainable."

237.    The Argon Insiders knew that the Argon Entities were insolvent.

238.    On this email were Defendants SCHNOSENBERG, WOLFE, KUHLMAN (with RBC CAPITAL), RBC, JIU and JPU, all of whom were similarly informed about the unsustainability of the Argon business model as well as about the Spartan Transactions and missing Doubtful Accounts (as defined herein).

239.    In that same email, Newman questioned and requested information pertaining to the Spartan Transactions, with particular reference to those assets being held by a Spartan Entity, as well as information pertaining to delinquent Consumer Loans.

240.    The topics raised by Newman's questions implicated the very instruments of fraud (namely the extent of troubled accounts and the Spartan Transactions) being used by the Argon Insiders and Argon Outsiders against Princeton.

241.    Despite becoming aware of these issues in November 2015, neither GLENORA, nor any other Argon Insider on that email string or otherwise, ever stepped up to stop the fraud and instead participated in such fraud to Princeton's financial detriment.

242.     In fact, by email dated July 27, 2016 (at 12:49 p.m.), KUHLMAN disavowed

Newman's earlier concerns, stating:

> **The Uihlein Family [*i.e.*, JIU and JPU] and [GLENORA] agreed to fund**
> **based on the belief that the business model works and the talent at Argon**
> **can be managed to successfully attain significant profitability.** Byron,
> Bruce and I (as their advisors) agree one hundred percent. Without their
> financial support Argon would cease to exist.

(emphasis supplied).

243.     And yet, during the entirety of the operations of the Argon Entities, according to

the Independent Report, the Argon Entities were insolvent, unbeknownst to and concealed from

Princeton, but clearly known to the Argon Insiders.

244.     For example, Argon Credit submitted financial statements, including a balance

sheet and BB Certificate, to PAIF for the period ending December 31, 2015, which reflected

$38,833,915.00 in accounts receivable (*i.e.*, Receivables and Collections) but which failed to

include any allowance for the Doubtful Accounts.

245.     However, contrary to the documents provided to PAIF, Argon Credit's internal trial

balance and balance sheet reflected only $29,982,455.00 in accounts receivable, which included

an allowance of negative $5,376,501.74 for the Doubtful Accounts (on Line Item No. 12040) (as

of December 31, 2015).

246.     The value of these Doubtful Accounts was noted on Argon Credit's internal Profit

and Loss Statement for the period January to December 2015 as a Provision Expense (Line Item

No. 68010)

247.     Argon Credit also submitted financial statements to PAIF, dated March 20, 2016,

for the period ending February 28, 2016, which reflected $38,320,266.00 in accounts receivable,

which also did not include an allowance for the Doubtful Accounts.

248.    However, Argon Credit's internal balance sheet, purposefully and fraudulently not disclosed to PAIF and dated just two weeks later on April 5, 2016, reflected only $29,723,922.00 in accounts receivable, which included an allowance of negative $5,465,289.00 for the Doubtful Accounts.

249.    The balance sheet, as of July 31, 2016, circulated to those present at the August 25, 2016 Board Meeting, reflected total assets of $34,298,154.38, which included an allowance for the Doubtful Accounts of negative $6,383,492.43.

250.    Upon information and belief, the draft report of the Argon Entities' 2015 consolidated financial statements reflected total assets of $32,992,577.

251.    Nevertheless, the July 2016 balance sheet submitted to Princeton in mid-August 2016 instead fraudulently reflected $40,419,664.38 in assets and failed to include a $6 million deduction for the Doubtful Accounts.

252.    Argon Credit's financial difficulties were ever present.

253.    This was revealed in the Argon Credit Board Meeting Notes which WOLFE circulated by email, dated May 10, 2016, to KUHLMAN, CANFORA, TRIFFLER, FAERMARK, FERRO, BREITWEISER, EDMONSON and SCHNOSENBERG.

254.    WOLFE wrote in the May 2016 Board Agenda:

> Fund Strategy: The purpose is to separate the lucrative assets from the origination platform that incurs significant operating expenses. **This strategy provides the opportunity to create significant distributions while simultaneously defraying risk of a lender (Princeton) at the operating company level calling a loan.**

(emphasis supplied).

255.    The purpose of moving the Spartan Loans (as the "lucrative assets") was to "create significant distributions" that would financially benefit the Argon Insiders to the detriment of Princeton as the secured lender.

256.    This statement is telling inasmuch as it is a statement of self-interest (to maximize distributions) while also deceiving Princeton into not calling the Revolving Note.

257.    Argon Credit's tax return for the calendar year ending December 31, 2014, stated that it had total operating income of only $136,834.00, yet it took on $365,000.00 in purported debt to Margon under the First Margon Loan (as defined herein) during that same time period.

258.    Argon Credit's internal balance sheet reflects that, as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative $8,641.03 in equity.

259.    From that point forward, Argon Credit's financial condition deteriorated each month that it continued to operate and its negative equity balance increased each month.

260.    RSM's Independent Report reflected that, as of December 31, 2015, Argon Credit had negative equity of $11,285,946.

261.    That same Independent Report stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708 for the year ended December 31, 2015.

262.    As of November 30, 2016, Argon Credit's internal balance sheet reflected assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative equity of $7,162,685.51.

263.    On the following additional occasions through the following Defendants, the internal financials records presented to the Argon Insiders, and concealed from Princeton, reflected the following:

   (i)    By email dated April 7, 2016 (at 1:46 p.m.), SCHNOSENBERG to KOSTINER with 2015 Argon Financials, showing at line 28 "12040 Allowance for Doubtful Accounts" of $5,376,501.74;

   (ii)   By email dated May 9, 2016 (at 5:48 p.m.), SCHNOSENBERG to WOLFE, with Argon Financials for the first quarter (Jan-Mar 2016) with the Balance Sheet at line 33 reflecting "12040 Allowance for Doubtful Accounts" growing from $5.4 million in January 2016 to $5.5 million in March 2016;

(iii)  By email dated June 6, 2016 (at 11:18 a.m.), Rebecca Nelson sent a Board Report for upcoming board meeting that included the May 2016 Balance Sheet reflecting at line 35 "12040 Allowance for Doubtful Accounts" of $5.895 million; and

(iv)  By email dated September 1, 2016, at the same time that the Argon Insiders were intending to continue to draw down on the Revolving NOTE, EDMONSON sent an aging report, dated as of July 31, 2016, to GLENORA, FERRO, KUHLMAN, CANFORA, FAERMARK, BREITWEISER, JIU, JPU, WOLFE and SCHNOSENBERG, that reflected nearly $6,980,969 in Doubtful Accounts, all of which was fraudulently and actively concealed from Princeton.

264.  By contrast, the financial documents that the Argon Insiders forwarded and disclosed to Princeton failed to reveal that same impairment caused by the Doubtful Accounts.

265.  For example, by email dated November 16, 2016 (at 2:47 p.m.), SCHNOSENBERG sent the 2014-2016 Argon Entities' financials to MADANYAN.

266.  These financial documents, which were disclosed to Princeton, failed to reveal any allowance or line item for the Doubtful Accounts.

267.  On or about August 25, 2016, the Bankruptcy Defendants and other Argon Insiders[17] attended a board meeting in which those present discussed the Argon Entities' balance sheet and income statement as of July 31, 2016, as well as a draft of the Independent Report of the Argon Entities' 2015 consolidated financial statements (as prepared by RSM).

268.  The Board Minutes reflect not only a decision to continue to draw down on new debt (at a time when the Argon Entities were insolvent), but there was also significant discussion regarding the Spartan Transactions, the Spartan Loans and the SPARTAN SPV Bankruptcy.

---

[17] The Board Meeting Minutes dated August 25, 2016 (the "Board Minutes"), identify that defendants BREITWEISER, EDMONSON, FERRO, WOLFE, TOMASZKIEWICZ, TRIFFLER, FAERMARK, KUHLMAN, SCHNOSENBERG, CANFORA, ZUMSKI and MADANYAN were present, as well as Hubbard.

269.    The Board Minutes also reflect the approval of consulting costs by EDMONSON, FERRO's employment with the Argon Entities and a settlement payment to BMONEY.

270.    All of these actions regarded further diminishment of Princeton's Secured Collateral and none of it was disclosed to Princeton as the secured lender.

271.    The results of, and follow-up from, that August 2016 Board Meeting were discussed in an email dated August 30, 2016 sent by KUHLMAN to JIU, JPU, GLENORA, FERRO, EDMONSON, BREITWEISER, FAERMARK, CANFORA, TRIFFLER and WOLFE, as well as Hubbard.

272.    The Board Minutes and the August 30, 2016 email confirm that these attendees had a copy of the draft Independent Report in their possession and that it had been discussed at the Board meeting.

273.    The Independent Report raised significant concerns about the sustainability of the Argon business model.

274.    The Argon Entities failed to inform Princeton of the over-inflated financials until on or about December 7, 2016, at which time Princeton immediately, by letter dated December 7, 2016, to WOLFE, provided the Argon Entities with notice of its intent to call the Revolving Note.

275.    The December 7, 2016 letter demanded immediate payment of $37,017,774.97, which represented the total outstanding principal and interest on the Fintech Loan Agreement and stated that the basis for the event of default was "Borrower's admitted and intentional failure to provide full and accurate financial information pursuant to the Loan Agreement, constituting an Event of Default under the Loan Agreement."

276.     KUHLMAN, in a letter dated December 5, 2016, addressed to the "Argon Credit Corp. Board of Directors,"[18] disclaimed knowledge of certain payments to WOLFE (the "Wolfe Fees") and MARGON, and said that he had received "bad information" about these **"aforementioned fees, First Associates, SSF, Princeton, default rates, sustainability modeling and loan portfolio adjustments**." (emphasis supplied).

277.     In KUHLMAN's letter, KUHLMAN acknowledged that, when confronted, WOLFE asserted to KUHLMAN that the Wolfe Fees were paid "from Princeton," which is a falsity.

278.     Finally, in that same letter, KUHLMAN expressed the hope that WOLFE and MARGON would return the payments they received because KUHLMAN did "not want to be held accountable for someone else's actions and poor decisions."

279.     KUHLMAN's effort to distance himself from his responsibilities is not effective.

280.     For example, just a month earlier, by emails dated November 17 and 23, 2016, KUHLMAN was communicating with FERRO, inquiring about efforts that should be made to "approach Princeton with a restructuring plan" and needing "a good explanation as to why we shouldn't approach [Princeton] sooner than later regarding some relief."

281.     KUHLMAN's email dated November 17, 2016, acknowledged that the Princeton situation was being discussed with JIU and JPU.

282.     KUHLMAN's willful blindness to the fraud, like all of the other Argon Insiders and Argon Outsiders, does not shield KUHLMAN nor any other Defendant from their respective liabilities.

---

[18] At the time, in December 2016, Argon Credit was a limited liability company, though originally Argon Credit was formed as a corporation.

283.    From the beginning of LITTLE OWL's ownership and KUHLMAN's assistance, advice and stewardship, on behalf of JIU, JPU, LITTLE OWL and GLENORA, KUHLMAN was working extensively with other Argon Insiders to manage the operations of the Argon Entities.

284.    In an email dated October 7, 2016 (at 12:55 p.m.), KUHLMAN, as "Steward of the JIU Family," reiterated to EDMONSON, FERRO, WOLFE, SCHNOSENBERG, FAERMARK, BREITWEISER, CANFORA and TRIFFLER that:

> Little Owl will not contribute further capital or extend loans to Argon in order to protect its current investment. **Glenora and I are very serious about proper asset allocation for the Uihlein's.** A determination has been made that enough is enough regarding our investment in Argon. The family is wealthy as a result of being disciplined in its investment approach.

(emphasis supplied).

285.    KUHLMAN's October 2016 email confirms that KUHLMAN, RBC CAPITAL, GLENORA, LITTLE OWL, JIU and JPU were all acting cooperatively and as a single voice as controlling investors and insiders of the Argon Entities.

286.    For example, by email dated September 22, 2016, JPU wrote to FERRO, copying KUHLMAN, GLENORA and JIU, regarding a request to continue to be kept in the loop with regard to the operations of the Argon Entities and the efforts to raise additional capital and reorganize the operations of the Argon Entities.

287.    There were subsequent emails (each dated September 23, 2016) continuing this discussion and demonstrating JIU's and JPU's active involvement in the operations of the Argon Entities.

288.    In addition, there was an email, dated November 1, 2016 (at 10:08 a.m.), from Newman, on behalf of GLENORA, JIU and JPU, to SCHNOSENBERG, FERRO, WOLFE and KUHLMAN, where Newman, at the direction of JIU and JPU, requested weekly cash burn models.

289. KUHLMAN's effort to distance himself from his knowledge of the operations of the Argon Entities and his attendant responsibility at the time of the filing of the Argon Bankruptcy in December 2016 is not to be credited.

290. For example, by email dated May 13, 2016 (at 11:15 a.m.), KUHLMAN wrote to WOLFE, SCHNOSENBERG, FERRO, EDMONOSON, TRIFFLER, FAERMARK, CANFORA and BREITWEISER, KUHLMAN, challenging Argon's sustainability model that had been presented to him by these other Argon Insiders.

291. In this email, KUHLMAN acknowledged that, at that time, his clients' investment focus (RBC CAPITAL, GLENORA, LITTLE OWL, JIU and JPU) has been on principal protection and income (debt interest payments), but challenged the Argon Insiders' focus, stating that "**<u>Argon Management has ignored important disciplines and strayed from its original business plan</u>**." (emphasis added).

292. What KUHLMAN was referring to, knowingly or not, was the rampant fraud that had infected the operations of the Argon Entities and the insider self-dealing that ensured ultimate failure for the Argon Entities.

293. KUHLMAN admonished the Argon Insiders in his May 2016 email:

> <u>The board should know what Argon's action plan is</u>. From my perspective it appears default rate analytics, servicing, fund raising, operating expense management and the Gary/Berj situation need to be addressed.

(emphasis added).

294. Despite this admonition, KUHLMAN failed to act on behalf of himself, LITTLE OWL, GLENORA, RBC CAPITA, JIU and JPU, and effectively did nothing to protect the interests of Princeton as the secured lender at a time when KUHLMAN, along with all of the other Argon Insiders, knew or should have known the Argon Entities were insolvent.

295.    In fact, KUHLMAN's concerns about the operations of the Argon Entities were actually voiced at a much earlier time.

296.    For example, by email dated October 21, 2015, KUHLMAN wrote to SCHNOSENBERG, WOLFE, ZUMSKI, FERRO, CANFORA, TRIFFLER and EDMONSON about his concerns surrounding the sustainability model for the Argon Entities.

297.    As KUHLMAN stated in that October 2015 email: "As we discussed at the last board meeting **we would all like to know how the hamster gets off the hamster wheel.**" (emphasis supplied).

298.    KUHLMAN, prescient in his predications, failed to heed his own warning, as he revealed in this October 2015 email:

> I simply want to know at what level Argon's portfolio needs to stabilize in order to get to appoint where shareholders can take distributions without damaging Argon's balance sheet, income statement and continued growth realizing the growth curve will flatten. … **I don't like surprises nor do I like waiting around for what I consider to be necessary information flow, i.e. sustainability modeling and the like**.

(emphasis supplied).

299.    Despite his own stated concerns, KUHLMAN failed in his role as an Argon Insider and knew or should have known of the pillaging that the Argon Insiders and Argon Outsiders were committing with regard to Princeton's Secured Collateral.

300.    Thus, the Bankruptcy Defendants and other Argon Insiders assisted the Argon Entities in keeping two sets of books and records – one set for internal control purposes and the other fraudulent set for submission to PAIF that would permit the Argon Entities the ability to continue borrowing against the Revolving Note, at a time when, if PAIF had been fully informed, PAIF would have called the Revolving Note.

301.    In fact, RSM advised in its final version of the Independent Report[19] that the Consolidated Financial Report of the Argon Entities, dated December 31, 2015, was incomplete because it failed to include "substantially all disclosures relating to impaired loans and troubled debt restructuring have been omitted from these consolidated financial statements."

302.    Even RSM noted the omission of the Doubtful Accounts from the Argon Entities' financial statements.

303.    RSM further noted that, as of December 31, 2015, the Argon Entities had suffered recurring losses from operations and had incurred a net loss of $11,208,780.00 for the year ended December 31, 2015, and that "[t]he events and circumstances described above create substantial doubt about the Company's ability to continue as a going concern."

304.    This fact was well known among the Argon Insiders.

305.    Not only were the underlying financials of the Argon Entities fraudulently concealed from PAIF, the Independent Report was itself not even discovered by Princeton until after the Fintech Loan Agreement was called and the Argon Entities had filed for bankruptcy.

306.    In one section, the Independent Report contained a curious reference that certain Argon Insiders had told RSM, as they were preparing the Independent Report, that "[i]f necessary, the investment company [*i.e.*, PAIF] extending the line of credit would increase the limit."

307.    This statement is a falsity and under no circumstances was PAIF considering, or even asked to consider, an increase of the already twice amended and increased Revolving Note, and indeed, PAIF would not have authorized an increase of the Revolving Note.

---

[19] RSM did not audit the Consolidated Financials, instead only performing a review of them. In a review of financial statements, the auditor, such as RSM, is required to undertake the process that is important to give a proper base for obtaining assurance, in essence, that no relevant changes are necessary to be made in the financial statements of the company to conform to the financial reporting framework. In finer terms, a review states that the financial statements are free from material misstatement, which is expressed as negative assurance. In the Independent Report, RSM confirmed that a "review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the consolidated financial statements as a whole. Accordingly, we do not express such an opinion."

308.    This statement is another fraudulent attempt by the Bankruptcy Defendants and other Argon Insiders communicating with RSM to deceive and hide from the effects of their collective fraud and grand scale theft, and to suggest to RSM as independent examiners that they have a financial solution to the fraudulent financial morass that they had created, but failed to disclose to PAIF as the secured lender.

**Argon Credit Paid, And LITTLE OWL, MARGON, CARDINAL and TRIFFLER TRUST Accepted, Interest Payments In Violation Of Executed Subordination Agreements At A Time When Argon Credit Was Known To Be Insolvent.**

309.    Argon Credit had three original members: NOAX; BMONEY; and ZUMSKI.

310.    NOAX is owned and controlled by WOLFE whereas BMONEY is owned and controlled by ARAKELIAN.

311.    At a later date, in November 2014, based on a loan by MARGON, MARGON became a member of Argon Credit.

312.    Then, in February 2015, Argon Credit and its then-current members (MARGON, NOAX, BMONEY and ZUMSKI) permitted LITTLE OWL to become a member based upon a loan by LITTLE OWL.

**LITTLE OWL Transactions And Board Manager Appointments**

313.    Specifically, on or about February 3, 2015, LITTLE OWL and Argon Credit executed the Argon Credit, LLC-Little Owl Argon 18% APR Three Year Promissory Note (the "First Little Owl Note") pursuant to which LITTLE OWL transferred $3 million to Argon Credit (the "First Little Owl Transaction").

314.    Contemporaneously therewith, Argon Credit and LITTLE OWL executed a subscription agreement (the "First Little Owl Subscription Agreement"), pursuant to which LITTLE OWL acquired 90,322 Class A Units of Argon Credit (which equaled 8% of Argon Credit's outstanding voting interests).

315. On or about February 3, 2015, Argon Credit entered into the Third Amended and Restated Limited Liability Company Operating Agreement (the "Third Amended Operating Agreement"), which added LITTLE OWL as a member of Argon Credit.

316. The Third Amended Operating Agreement also granted LITTLE OWL rights to appoint an individual to fill one of the seven positions on Argon Credit's board of managers.

317. The First Little Owl Note was intended, described and treated by LITTLE OWL as debt.

318. The First Little Owl Note had a fixed maturity date of February 5, 2018.

319. The First Little Owl Note provided for regular payments of interest to be made on specified dates.

320. LITTLE OWL received a right to appoint a manager to Argon Credit's board of managers under Argon Credit's Third Amended Operating Agreement.

321. Thereafter, on February 6, 2016, LITTLE OWL and Argon Credit executed the Argon Credit, LLC-Little Owl Argon LLC Promissory Note (the "Second Little Owl Note," together with the First Little Owl Note, the "Little Owl Notes") pursuant to which, on February 12, 2016, LITTLE OWL transferred an additional $4 million to Argon Credit (the "Second Little Owl Transaction").

322. Contemporaneously therewith, Argon Credit and LITTLE OWL executed a second subscription agreement (the "Second Little Owl Subscription Agreement"), pursuant to which LITTLE OWL acquired 80,299 Class A Units of Argon Credit (which equaled 7.11% of Argon Credit's outstanding voting interests).

323. On or about February 12, 2016, the members of Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement (the "Fourth

Amended Operating Agreement"), which adjusted LITTLE OWL's increased equity ownership of Argon Credit to reflect a total of 15.11% of the membership interests.

324.    The Fourth Amended Operating Agreement also expanded Argon Credit's board of managers to nine members and granted LITTLE OWL rights to appoint individuals to fill three of the nine seats.

325.    The Second Little Owl Note was intended, described, and treated by LITTLE OWL as debt.

326.    The Second Little Owl Note had a fixed maturity date of August 6, 2021.

327.    The Second Little Owl Note provided for regular payments of interest to be made on specified dates.

328.    Between May 2015 and May 2016, LITTLE OWL received the following transfers from Argon Credit pursuant to the terms of the Little Owl Notes (the "Little Owl Transfers"):

| DATE | PAYMENT TO LITTLE OWL |
|:---:|:---:|
| 5/8/15 | $135,000.00 |
| 8/5/15 | $130,573.77 |
| 11/12/15 | $134,262.30 |
| 2/9/16 | $144,590.16 |
| 5/4/16 | $285,245.90 |
| 5/18/16 | $17,923.50 |
| **TOTAL** | **$847,595.63** |

329. The Little Owl Transfers included at least $447,759.56 (the "Little Owl Preference Period Transfers") in the year prior to the bankruptcy filing.

330. Based on Argon Credit's books and records, Argon Credit underpaid the purported quarterly interest payments due to LITTLE OWL by nearly $37,000.00 on account of the Little Owl loans through the second quarter of 2016 and did not make any quarterly payments to Little Owl for the third or fourth quarters of 2016 as required by the Little Owl Notes.

331. Each of the Little Owl Transfers was made within one to two weeks of the interest date stated in the respective Little Owl Notes.

332. On occasion, when LITTLE OWL did not receive payment on the due date, LITTLE OWL demanded that Argon Credit pay the amount due whereupon Argon Credit responded by making the payment due.

333. LITTLE OWL credited the amounts it received from the Little Owl Transfers pursuant to the terms of the First Little Owl Note and the Second Little Owl Note.

**Board Of Manager Appointments By LITTLE OWL**

334. Under the First Little Owl Subscription Agreement, LITTLE OWL was permitted to appoint one member of Argon Credit's board of managers and LITTLE OWL designated KUHLMAN to the Argon Credit board.

335. KUHLMAN was an outside advisor to LITTLE OWL, GLENORA, JIU and JPU.

336. When LITTLE OWL appointed KUHLMAN to the Argon Credit's board of managers, LITTLE OWL was aware of KUHLMAN's prior acquaintance with FERRO, CANFORA and EDMONSON, as well as other Argon Insiders.

337. Under the Second Little Owl Subscription Agreement, LITTLE OWL was permitted to appoint two additional members to the Argon Credit board of managers.

338.    LITTLE OWL appointed FAERMARK as its second member on the Argon Credit board.

339.    FAERMARK was an outside attorney for LITTLE OWL from approximately December 2014 to September 2016.

340.    LITTLE OWL appointed BREITWEISER as its third member on the Argon Credit board upon the recommendation of KUHLMAN.

341.    BREITWEISER was an outside tax advisor to LITTLE OWL.

**Margon Promissory Notes, Subscription Agreements and Transfers**

342.    MARGON is also an owner in Argon Credit and, in 2014, MARGON initially executed two sets of subscription agreements and promissory notes.

**First Margon Note And Subscription Agreement**

343.    On or about September 8, 2014, MARGON and Argon Credit executed the Argon Credit, LLC 20% APR Two Year Revolving Line of Credit Promissory Note (the "First Margon Note"), pursuant to which MARGON purportedly loaned Argon Credit $250,000.00 with a commitment to loan up to $750,000.00 (the "First Margon Loan").

344.    The parties also executed a security agreement which purported to grant MARGON a security interest in Argon Credit and Argon X's accounts receivable and receivables.

345.    Contemporaneously with the First Margon Note, Argon Credit and MARGON executed a subscription agreement (the "First Margon Subscription Agreement") pursuant to which MARGON acquired 200,000 Class A Units of Argon Credit, which equaled 20% of Argon Credit's outstanding voting interests, at a price of $3.75 per unit.

346.    MARGON made no payments to Argon Credit as consideration for the First Margon Subscription Agreement other than the First Margon Loan.

347. On or about September 8, 2014, Argon Credit entered into the First Amended and Restated Limited Liability Company Operating Agreement (the "First Amended Operating Agreement"), which added MARGON as a member of Argon Credit and granted MARGON three managers on Argon Credit's seven-member Board of Managers.

348. Pursuant to Argon Credit's First Amended Operating Agreement, one of MARGON's manager designees, CANFORA, was appointed as the chair of the Board of Managers.

349. TRIFFLER was also appointed as one of MARGON's designees on Argon Credit's Board of Managers.

350. MARGON ultimately funded $365,000.00 of the First Margon Loan by making the following transfers to Argon Credit:

| Date | Amount |
|------|--------|
| 10/7/2014 | $115,000.00 |
| 10/15/2014 | $134,000.00 |
| 10/15/2014 | $116,000.00 |

351. On or about May 1, 2015, MARGON, Fintech Financial, the Argon Entities, and certain of Argon Credit's subsidiaries executed a subordination agreement which subordinated the debt and security interests of MARGON to those of Fintech Financial, the predecessor-in-interest to Princeton.

**Second Margon Note and Subscription Agreement**

352. On November 6, 2014, MARGON and Argon Credit executed the Argon Credit, LLC 15% APR Three Year Revolving Line of Credit Promissory Note (the "Second Margon Note"

together with the First Margon Note, the "Margon Notes") pursuant to which MARGON purportedly loaned Argon Credit an additional $250,000.00 with a commitment to loan up to $1 million (the "Second Margon Loan," together with the First Margon Loan, the "Margon Loans").

353.    The parties to the Second Margon Loan also executed an amended security agreement purporting to grant MARGON a security interest in Argon Credit and Argon X's accounts receivable and receivables.

354.    Contemporaneously with the Second Margon Note, Argon Credit and MARGON executed a second subscription agreement (the "Second Margon Subscription Agreement," together with the First Margon Subscription Agreement, the "Margon Subscription Agreements") pursuant to which MARGON acquired 100,000 Class A Units of Argon Credit, which equaled 10% of Argon Credit's outstanding voting interests, at a price of $10.00 per unit.

355.    MARGON made no payments to Argon Credit as consideration for the Second Margon Subscription Agreement other than the Second Margon Loan.

356.    On or about November 6, 2014, the members of Argon Credit entered into Argon Credit's Second Amended and Restated Limited Liability Company Operating Agreement, which adjusted MARGON's increased equity ownership of Argon Credit to reflect a total of 30% of the membership interests.

357.    MARGON ultimately funded $1 million of the Second Margon Loan by making the following transfers to Argon Credit:

| DATE | AMOUNT |
|------|--------|
| 11/10/2014 | $100,000.00 |
| 11/10/2014 | $45,000.00 |

| | |
|---|---|
| 11/10/2014 | $105,000.00 |
| 11/24/2014 | $45,000.00 |
| 11/25/2014 | $205,000.00 |
| 12/11/2014 | $45,000.00 |
| 12/15/2014 | $105,000.00 |
| 12/29/2014 | $45,000.00 |
| 1/5/2014 | $205,000.00 |
| 1/28/2014 | $42,000.00 |
| 1/29/2014 | $40,000.00 |
| 1/29/2014 | $18,000.00 |

358.    On February 8, 2016, MARGON, Fintech Financial, the Argon Entities, and certain of Argon Credit's subsidiaries entered into an amended and restated subordination agreement pursuant to which MARGON's debt and security interests were subordinated to those of Fintech.

**Transfers to MARGON**

359.    Ultimately, MARGON funded approximately $1.365 million of the Margon Loans.

360.    Between May 2015 and June 2016, MARGON received at least $474,194.45 (the "Margon Transfers") in transfers from Argon Credit, including at least $197,416.68 (the "Margon Preference Period Transfers") in the year prior to the filing of the Argon Bankruptcy.

361.    The Margon Transfers included the following:

| Date | Method | Transfer |
|------|--------|----------|
| 5/8/2015 | Check 1141 (Account Ending 7142) | $37,083.33 |
| 6/9/2015 | Check 1181 (Account Ending 7142) | $23,000.00 |
| 8/5/2015 | Wire (Account Ending 7142) | $50,833.33 |
| 9/9/2015 | Wire (Account Ending 7142) | $23,000.00 |
| 10/8/2015 | Wire (Account Ending 7142) | $23,000.00 |
| 10/8/2015 | Wire (Account Ending 7142) | $23,000.00 |
| 10/8/2015 | Wire (Account Ending 7142) | $23,000.00 |
| 11/9/2015 | Wire (Account Ending 7142) | $51,111.11 |
| 12/10/2015 | Wire (Account Ending 1965) | $22,750.00 |
| 2/5/2016 | Wire (Account Ending 1965) | $50,555.56 |
| 2/8/2016 | Wire (Account Ending 1965) | $50,555.56 |
| 3/9/2016 | Wire (Account Ending 1965) | $22,750.00 |
| 5/6/2016 | Wire (Account Ending 1965) | $50,555.56 |
| 6/8/2016 | Wire (Account Ending 1965) | $23,000.00 |
|  | **TOTAL** | $474,194.45 |

362.     The Margon Transfers were not consistent with the schedule of purported interest payments due to MARGON under the Margon Notes, however.

363. Specifically, the First Margon Note called for quarterly interest payments at an annual percentage rate of 20% of the then-outstanding principal and the Second Margon Note called for quarterly interest payments as an annual percentage rate of 15% of the then-outstanding principal.

364. Based on Argon Credit's books and records and the amount and timing of the Margon Transfers, MARGON was overpaid on purported interest payments by approximately $588,000.00.

365. For example, Argon Credit's books and records reflect that MARGON only funded $365,000.00 of the First Margon Loan, but on February 6, 2015, Argon Credit transferred $300,000.00 to MARGON, supposedly pursuant to the terms of the First Margon Loan.

366. This amount far exceeded any interest payment then due and owing to MARGON and substantially reduced the principal amount of the First Margon Loan.

367. In total, Argon Credit paid MARGON at least $500,000.00 on account of the First Margon Loan despite the fact that only approximately $120,904.11 in interest payments were due and owing under the First Margon Note during that same time period.

368. As to the Second Margon Loan, Argon Credit's books and records reflect that Argon Credit paid MARGON at least $417,611.12 despite the fact that only $208,208.55 in interest payments were due and owing under the Second Margon Note during that same time period.

369. Argon Credit did not make any quarterly payments to MARGON for the third or fourth quarter of 2016, contrary to what was under the terms of the Margon Notes.

370. On May 30, 2017, MARGON filed a proof of claim against Argon Credit asserting a claim in the amount of $2,059,694.44, of which it claimed $497,750.00 as secured and the remaining $1,561,944.44 as unsecured.

371.    The Third Amended Operating Agreement also granted Little Owl one of the seven positions on Argon Credit's Board of Managers and reduced MARGON's board designees to two.

372.    CANFORA, one of MARGON's designated managers, retained his position as chairman of the board.

**Cardinal Trust Promissory Note, Subscription Agreement, and Transfers**

373.    On or about February 6, 2016, CARDINAL TRUST and Argon Credit executed the Argon Credit, LLC-Cardinal Trust Promissory Note (the "Cardinal Trust Note") pursuant to which CARDINAL TRUST purportedly loaned Argon Credit $1 million (the "Cardinal Trust Loan").

374.    Contemporaneously therewith, Argon Credit and CARDINAL TRUST executed a subscription agreement (the "Cardinal Trust Subscription Agreement"), pursuant to which CARDINAL TRUST acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests.

375.    CARDINAL TRUST made no payments to Argon Credit as consideration for the Cardinal Trust Subscription Agreement other than the Cardinal Trust Loan.

376.    On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement, which added CARDINAL TRUST as a member of Argon Credit.

377.    CARDINAL TRUST transferred $500,000.00 to Argon Credit on November 9, 2015, and an additional $500,000.00 to Argon Credit on February 12, 2016.

378.    Thus, CARDINAL TRUST funded half of the balance of the Cardinal Trust Loan nearly three months prior to executing the Cardinal Trust Note.

379.    On or about February 8, 2016, CARDINAL TRUST, Fintech Financial, the Argon Entities, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of CARDINAL TRUST to that of Fintech.

380. Between February 2016 and May 2016, CARDINAL TRUST received at least $94,444.44 in transfers from Argon Credit (the "Cardinal Trust Transfers").

381. The following is a list of the Cardinal Trust Transfers:

| TRANSFER DATE | METHOD | TRANSFER AMOUNT |
|---|---|---|
| 2/5/2016 | Wire (Account Ending 1965) | $25,722.22 |
| 2/8/2016 | Wire (Account Ending 1965) | $24,722.22 |
| 5/6/2016 | Wire (Account Ending 1965) | $50,000.00 |
| | **TOTAL** | **$99,444.44** |

382. Based on Argon Credit's books and records, Argon Credit overpaid the purported quarterly interest payments due to CARDINAL TRUST by more than $27,000.00 through the second quarter of 2016 and did not make any quarterly payments to CARDINAL TRUST for the third or fourth quarters of 2016 (contrary to the requirements of the Cardinal Trust Note).

383. On May 30, 2017, CARDINAL TRUST filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

**Triffler Trust Promissory Note, Subscription Agreement, and Transfers**

384. On or about February 6, 2016, TRIFFLER TRUST and Argon Credit executed the Argon Credit, LLC-Mark Triffler Declaration of Trust Dated December 5, 1991 Promissory Note (the "Triffler Trust Note" together with the Margon Notes, Little Owl Notes, and Cardinal Trust Note, the "Notes"), pursuant to which TRIFFLER TRUST purportedly loaned Argon Credit $1 million (the "Triffler Trust Loan" together with the Margon Loans, Little Owl Loans, and Cardinal Trust Loan, the "Loans").

385.    Contemporaneously therewith, Argon Credit and TRIFFLER TRUST executed a subscription agreement (the "Triffler Trust Subscription Agreement" together with the MARGON Subscription Agreements, Little Owl Subscription Agreements, and Cardinal Trust Subscription Agreement, the "Subscription Agreements"), pursuant to which TRIFFLER TRUST acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests.

386.    TRIFFLER TRUST made no payments to Argon Credit as consideration for the Triffler Trust Subscription Agreement other than the Triffler Trust Loan.

387.    The Triffler Trust Note and Triffler Trust Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

388.    On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement which added TRIFFLER TRUST as a member of Argon Credit.

389.    TRIFFLER TRUST transferred $500,000.00 to Argon Credit on November 9, 2015, and an additional $500,000.00 to Argon Credit on February 6, 2016.

390.    Thus, TRIFFLER TRUST funded half of the balance of the Triffler Trust Loan nearly three months prior to executing the Triffler Trust Note.

391.    On or about February 8, 2016, TRIFFLER TRUST, Fintech, the Argon Entities, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of TRIFFLER TRUST to that of Fintech.

392.    Between February 2016 and May 2016, TRIFFLER TRUST received at least $74,722.22 (the "Triffler Trust Transfers" together with the Margon Transfers, Little Owl Transfers, and Cardinal Trust Transfers, the "Challenged Transfers") in transfers from Argon Credit.

393. The Triffler Trust Transfers included the following:

| TRANSFER DATE | METHOD | TRANSFER AMOUNT |
|---|---|---|
| 2/5/2016 | Wire (Account Ending 1965) | $24,722.22 |
| 5/6/2016 | Wire (Account Ending 1965) | $50,000.00 |
| | **TOTAL** | **$74,722.22** |

394. Argon Credit overpaid the purported quarterly interest payments due to TRIFFLER TRUST by approximately $1,000.00 through the second quarter of 2016 and did not make any quarterly payments to TRIFFLER TRUST for the third or fourth quarters of 2016 as required by the Triffler Trust Note.

395. On May 30, 2017, TRIFFLER TRUST filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

**Loans By MARGON, CARDINAL and TRIFFLER TRUST**

396. Thereafter, at the time of the Second Little Owl Transaction, Argon Credit and its then current members (MARGON, NOAX, BMONEY, ZUMSKI and LITTLE OWL) also permitted CARDINAL and TRIFFLER TRUST to become new members based upon separate loans by each of CARDINAL and TRIFFLER TRUST (collectively, LITTLE OWL, MARGON, TRIFFLER TRUST and CARDINAL, the "Note Lenders").

397. At that time, in exchange for their grant of (i) new ownership in the case of TRIFFLER TRUST and CARDINAL, and (ii) increased ownership for LITTLE OWL, as noted above, TRIFFLER TRUST and CARDINAL each paid $1.0 million whereas LITTLE OWL paid an additional $4.0 million.

398.    Argon Credit and the Note Lenders executed subscription agreements pursuant to which the Note Lenders acquired their respective new and increased membership interests in Argon Credit commensurate with the amount of their loans.

399.    The respective loan amounts of the Note Lenders are summarized as follows:

| New Investor | Total Equity Contribution |
|---|---|
| MARGON | $1,365,000.00 |
| LITTLE OWL | $7,000,000.00[20] |
| TRIFFLER TRUST | $1,000,000.00 |
| CARDINAL | $1,000,000.00 |
| **TOTAL** | **$10,365,000.00** |

**Subordination Agreements Executed By And Between The Note Lenders And Princeton**

400.    On May 1, 2015, as part of the Fintech Loan Agreement financing, Fintech Financial executed initial Subordination Agreements with LITTLE OWL and MARGON ("Original Subordination Agreements").

401.    As part of the Note Lenders' respective loans to Argon Credit, Argon Credit issued various promissory notes, including the Little Owl Notes, in favor of each of the Note Lenders that required Argon Credit to pay the Note Lenders periodic interest payments at a specified annual percentage rate with a maturity date several years later (the "Subordinated Debt").

402.    At the time of the Second Little Owl Transaction, CARDINAL and TRIFFLER TRUST both executed subordination agreements with regard to the Subordinated Debt and

---

[20] As described below, LITTLE OWL also made an additional $2.65 million bridge loan to Argon Credit in 2016.

LITTLE OWL and MARGON both executed amended and restated subordination agreements (collectively, the "Subordination Agreements") (the Note Lenders are referred to hereafter as the "Subordinated Defendants").

403.    The Subordination Agreements, as did the Original Subordination Agreements, provided that the Subordinated Defendants agreed to subordinate and postpone "the payment and the time of payment of all of the Subordinated Debt."

404.    The Original Subordination Agreements and the Subordination Agreements at Paragraph 3 required that "until the Senior Lender has given written notice to the [Subordinated Defendants] that all Obligations to the Senior Lender have been fully and indefeasibly paid and satisfied in full, no Obligor shall pay to the [Subordinated Defendant], and the [Subordinated Defendant] shall not accept or receive, any payment of principal, interest, fees, costs and expenses under the Subordinated Debt." (the "No Payment Provision").

405.    The Original Subordination Agreements and the Subordination Agreements provided an exception to the No Payment Provision.

406.    Specifically, under that same No Payment Provision, interest payments could be made to the Subordinated Defendants in certain limited circumstances.

407.    The No Payment Provision provided that "so long as no Event of Default has occurred under the Loan Documents or would result from such payment, [Argon Credit] shall be entitled to pay and the Subordinated Lender shall be entitled to accept and receive, the scheduled payments of principal and interest . . . under the Subordinated Debt, but only when such payments are scheduled under the current Subordinated Loan Documents, correct and complete copies of which have been provided to the Senior Lender."

408.    Pursuant to the terms of the various notes, between May 5, 2015 and December 16, 2016, Argon Credit made at least $2,038,373.41 in interest payments to the Subordinated Defendants summarized as follows:

| Subordinated Defendant | Total Interest Payments |
|---|---|
| MARGON | $474,194.45 |
| LITTLE OWL | $847,595.63 |
| TRIFFLER TRUST | $99,444.44 |
| CARDINAL | $74,722.22 |
| **TOTAL** | **$1,495,956.74** |

409.    Newman, as manager of LITTLE OWL, in a sworn declaration dated December 2, 2019, and submitted to the bankruptcy court in the Argon Bankruptcy, admitted that LITTLE OWL treated the interest payments received from Argon Credit "as payments made pursuant to the terms of the Little Owl Notes" and that LITTLE OWL "applied the Little Owl Transfers to reduce the debt owed to Little Owl by Argon Credit pursuant to the terms of the Little Owl Notes."

410.    However, at the time that Argon Credit paid, and the Subordinated Defendants accepted, the interest payments, the Subordinated Defendants knew or should have known that Argon Credit was insolvent and that, thus, there existed an Event of Default which prohibited the payment by Argon Credit, and the receipt by any of the Subordinated Defendants, of any interest payments with regard to any of the outstanding notes held by the Subordinated Defendants.

411.    Specifically, Argon Credit's books and records reflected that Argon Credit was insolvent at the time of each of the interest payments to the Subordinated Defendants.

412.     The insolvency of Argon Credit precipitated an additional infusion of capital by LITTLE OWL which transferred, between July 2016 and November 2016, to Argon Credit an additional $2.65 million (the "Bridge Loan").

413.     The Bridge Loan was not secured by a lien and LITTLE OWL cannot locate an executed promissory note evidencing the purported Bridge Loan. LITTLE OWL also did not identify any terms of the purported Bridge Loan, such as an interest rate, repayment terms, or maturity date.

414.     The Argon Insiders who were either members or on the Board of Managers created a draft Member Term Sheet, dated for July 2016 ("Member Term Sheet"), which related to the Bridge Loan financing, and which was initially drafted to include a recital that Argon Credit was "insolvent and operations will cease as the close of business on July 22, 2016, without the Members agreement" to the terms of a new equity infusion by LITTLE OWL, FERRO, TRIFFLER and CANFORA.

415.     It was well known to all Argon Insiders that the Argon entities were insolvent.

416.     Upon information and belief, each of MARGON, LITTLE OWL, CARDINAL and TRIFFLER TRUST knew at the time of the Challenged Transfers that Argon Credit's liabilities exceeded the fair value of its assets because they regularly received copies of Argon Credit's financial reports.

417.     In that same draft Member Term Sheet, the Board of Managers and Members of Argon Credit, without disclosure to Princeton, agreed to increase the outstanding loan indebtedness of Argon Credit to LITTLE OWL, MARGON, CARDINAL and TRIFFLER TRUST to a flat twenty percent (20%).

418.    These same Argon Insiders approved a consultant fee to FERRO in the amount of $200,000.00 and a one-year guaranty contract for $60,000.00 to Merit Management Group, L.P., which is owned by Argon Insiders.

419.    These were more self-serving fraudulent efforts to further wrongfully diminish the Secured Collateral.

420.    These interest payments were approved by the Subordinated Defendants as well as NOAX, ZUMSKI, BMONEY, WOLFE, TRIFFLER, FAERMARK, BREITWEISER, CANFORA and KUHLMAN, as well as others Argon Insiders, all of whom knew or should have known that they were in violation of the Subordination Agreements.

421.    Moreover, the Subordinated Defendants failed to disclose or otherwise provide any notice to Princeton as to their respective demands for and receipt of such prohibited interest payments.

422.    LITTLE OWL and MARGON had also considered making an additional bridge loan of $3.0 million in October 2016 to the Argon Entities.

423.    The Board of Managers, which at that time included, among others, WOLFE, KUHLMAN, TRIFFLER, CANFORA, and FAERMARK, failed to disclose to Princeton either the necessity of bridge financing for the Argon Entities or that such bridge financing was going to come from LITTLE OWL or MARGON.

**Prohibited Commissions Paid To BROADMARK And PERAZA**

424.    On or about April 21, 2015, Argon Credit purportedly entered into a services agreement (the "Broadmark Agreement") with BROADMARK and ALHAMBRA to employ BROADMARK and ALHAMBRA to assist Argon Credit with certain debt and capital raising efforts.

425. GOLDSTEIN owns ALHAMBRA and was a FINRA-registered representative of Broadmark.

426. The Broadmark Agreement, executed only a short time period prior to the execution of the Fintech Loan Agreement, was actually signed by Broadmark on April 30, 2015, one day prior to the execution date of the Fintech Loan Agreement.

427. Broadmark and ALHAMBRA purportedly assisted the Argon Entities in connection with obtaining: (i) the loan from Fintech Financial; (ii) the equity transactions with LITTLE OWL, TRIFFLER TRUST and CARDINAL; and (iii) the Spartan Transactions.

428. At some point subsequent to entering into the Broadmark Agreement, ALHAMBRA disassociated itself from BROADMARK when GOLDSTEIN joined PERAZA as a registered representative and, pursuant to a February 15, 2016 agreement among ALHAMBRA, Argon Credit and PERAZA (the "Peraza Agreement").

429. GOLDSTEIN, through PERAZA, continued the capital raising efforts on behalf of the Argon Entities.

430. There was no formal assignment of the Broadmark Agreement to PERAZA.

431. The Fintech Loan Agreement's terms regarding the use of the proceeds from the Revolving Note permitted payment of transaction fees only out of the initial draw and only as approved and disclosed.

432. Moreover, the First Amendment to the Fintech Loan Agreement expressly prohibited use of the loan proceeds to pay a commission or finder's fees to any person or entity.

433. Regardless of the contractual provisions prohibiting such commission payments, between May 2015 and June 2016, Argon Credit made several transfers to BROADMARK totaling $528,333.33 (the "Broadmark Transfers") on account of purported consulting fees owed under the Broadmark Agreement (the "Prohibited Commission Payments").

434.    The Broadmark Transfers included the following:

| Date | Method | Transfer Amount |
|---|---|---|
| 5/8/2015 | Wire | $150,000.00 |
| 5/29/2015 | Wire | $75,000.00 |
| 6/29/2015 | Wire | $75,000.00 |
| 8/4/2015 | Wire | $20,000.00 |
| 9/1/2015 | Wire | $20,000.00 |
| 10/1/2015 | Wire | $20,000.00 |
| 11/20/2015 | Wire | $20,000.00 |
| 2/23/2016 | Wire | $60,000.00 |
| 3/4/2016 | Wire | $20,000.00 |
| 3/4/2016 | Wire | $20,000.00 |
| 4/1/2016 | Wire | $20,000.00 |
| 5/4/2016 | Wire | $20,000.00 |
| 6/7/2016 | Wire | $8,333.33 |
|  | **TOTAL** | **$528,333.33** |

435.    Upon information and belief, certain of the Broadmark Transfers are directly traceable to the proceeds of the Fintech Loan Agreement subsequent to the initial draw.

436. The Argon Insiders knowingly, willfully, intentionally, recklessly and negligently failed to disclose the Prohibited Commission Payments to Fintech Financial or PAIF.

437. The diversion of the Broadmark Payments for the benefit of Argon Outsiders was a knowing and fraudulent theft and conversion of Princeton's Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

438. Additionally, between November 2015 and June 2016, Argon Credit made several transfers to PERAZA totaling $248,791.67 (the "Peraza Transfers") on account of purported consulting fees allegedly owed by Argon Credit.

439. The Peraza Transfers included the following:

| Date | Method | Transfer Amount |
|------|--------|-----------------|
| 11/20/2015 | Wire | $180,000.00 |
| 2/23/2016 | Wire | $3,750.00 |
| 3/4/2016 | Wire | $17,500.00 |
| 4/4/2016 | Wire | $17,500.00 |
| 5/4/2016 | Wire | $17,500.00 |
| 6/7/2016 | Wire | $12,541.67 |
| | **TOTAL** | **$248,791.67** |

440. At least $180,000.00 of the Peraza Transfers are directly traceable from the proceeds of the Fintech Loan Agreement.

441.    However, none of the Prohibited Commission Payments were ever owed to PERAZA because the Broadmark Agreement was never assigned to PERAZA and no other written agreement existed between Argon Credit and PERAZA with respect to these specific Prohibited Commission Payments.[21]

442.    The diversion of the Peraza Transfers for the benefit of Argon Outsiders was a knowing and fraudulent theft and conversion of the Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Transfers To Or For The Benefit Of Certain Defendant Insiders**

443.    During the two-year period of Argon Credit's operations, WOLFE, ZUMSKI, ARAKELIAN and TOMASZKIEWICZ caused Argon Credit to pay hundreds of thousands of dollars to or for their own insider self-dealing benefit, often for little or no value to Argon Credit, all of which were in violation of the Financial Covenants and were done so knowingly, willfully, intentionally, recklessly and negligently, all in an effort to further diminish the value of the Secured Collateral for their personal financial gain.

**Bergarviv Transfers**

444.    For example, between May 11, 2015, and October 2, 2015, Argon Credit paid $381,000.00 (the "Bergarviv Transfers") to BERGARVIV, which is owned in whole or in part by WOLFE and ARAKELIAN, through their respective companies, BMONEY and NOAX.

445.    The Bergarviv Transfers included the following:

| Date | Method | Transfer Amount |
|------|--------|-----------------|
|      |        |                 |

---

[21] There was an agreement between Peraza and Argon Credit, but that agreement did not cover the Prohibited Commissions. Indeed, PERAZA filed a proof of claim against Argon Credit admitting that "[o]n further consideration, [PERAZA] determined that the claim is properly and entirely owed to [BROADMARK]."

| 5/11/2015 | Counter Withdrawal | $61,000.00 |
|---|---|---|
| 6/3/2015 | Check 1147 | $40,000.00 |
| 6/25/2015 | Check 1153 | $40,000.00 |
| 7/15/2015 | Check 1212 | $40,000.00 |
| 8/7/2015 | Check 2020 | $40,000.00 |
| 9/1/2015 | Check 2056 | $40,000.00 |
| 9/9/2015 | Check 2073 | $40,000.00 |
| 9/17/2015 | Check 2089 | $40,000.00 |
| 10/2/2015 | Check 2107 | $40,000.00 |
| | **Total:** | $381,000.00 |

446.    RSM's Independent Report similarly found that the Argon Entities paid $381,000.00 (*i.e.*, the Bergarviv Transfers) to a related party consultant (*i.e.*, BERGARVIV) related to securing the Fintech Loan Agreement.

447.    However, both BMONEY and NOAX were already equity owners of Argon Credit, and WOLFE and ARAKELIAN each received salaries from Argon Credit during that time period.

448.    The Fintech Loan Agreement and related Financial Covenants prohibited insider payments like the Bergarviv Transfers.

449.    The diversion of the Bergarviv Transfers for the benefit of Argon Insiders was a knowing and fraudulent theft and conversion of the Secured Collateral and was only possible

because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Blue Treble Payments**

450. WOLFE and TOMASZKIEWICZ, both Argon Insiders, caused Argon Credit to enter into an arrangement with BLUE TREBLE, an entity owned and managed exclusively by TOMASZKIEWICZ, purportedly to develop software on behalf of Argon Credit.

451. However, TOMASZKIEWICZ was already an officer of Argon Credit and obligated to perform his duties for the benefit of Argon Credit and not be paid an additional insider payment through BLUE TREBLE.

452. Instead, TOMASZKIEWICZ took advantage of the fraud being perpetrated at the Argon Entities by the various Argon Insiders and Argon Outsiders and caused Argon Credit to make hundreds of thousands of dollars in payments to BLUE TREBLE for his personal benefit.

453. Specifically, during a two-year period, Argon Credit made transfers to Blue Treble totaling at least $214,050.28 (the "Blue Treble Two Year Payments"), including at least $52,643.00 (the "Blue Treble One Year Payments," together with the Blue Treble Two Year Payments, the "Blue Treble Payments") in the year prior to the Petition Date.

454. The Blue Treble Payments included the following:

| Date | Check No. | Amount |
|---|---|---|
| 6/2/2015 | 1164 | $5,472.00 |
| 6/2/2015 | 1165 | $1,462.50 |
| 7/9/2015 | 1185 | $2,743.00 |

| 7/9/2015 | 1208 | $11,250.00 |
|---|---|---|
| 8/4/2015 | 2017 | $11,970.00 |
| 8/11/2015 | 2027 | $11,137.28 |
| 8/28/2015 | 2045 | $14,930.50 |
| 9/15/2015 | 2088 | $15,660.00 |
| 11/9/2015 | 2142 | $31,894.00 |
| 12/2/2015 | 2177 | $15,288.00 |
| 2/23/2016 | 2170 | $39,600.00 |
| 2/5/2016 | 2256 | $15,622.00 |
| 6/23/2016 | 2500 | $3,471.00 |
| 7/29/2016 | 2550 | $16,000.00 |
| 8/5/2016 | 2581 | $5,500.00 |
| 9/9/2016 | 2620 | $5,000.00 |
| 10/14/2016 | 2653 | $5,000.00 |
| 11/15/2016 | 3012 | $2,050.00 |
|  | Total: | **$214,050.28** |

455. The diversion of the Blue Treble Payments for the benefit of Argon Insiders was a knowing and fraudulent theft and conversion of the Secured Collateral and was only possible

because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Unnecessary Personal Las Vegas Trip Expenses**

456.    Additionally, in October 2015, WOLFE caused Argon Credit to pay more than $7,000.00 (the "Las Vegas Trip Expenses") in airfare, hotel, meal and entertainment charges for certain of the Argon Entities' favored personnel to travel to Las Vegas, Nevada, to celebrate an increase in the Revolving Note.

457.    Argon Credit did not receive any value in exchange for the Las Vegas Trip Expenses and these transfers were made at a time when Argon Credit was struggling financially and otherwise insolvent.

458.    The diversion of the Las Vegas Trip Expenses for the benefit of Argon Insiders was a knowing and fraudulent theft and conversion of PAIF's Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Catalyst Lease For Personal Use Apartment**

459.    In May 2016, WOLFE also caused Argon Credit to enter into a six-month apartment lease with Gateway Catalyst THC, LLC, for a monthly rent of $2,680.00 (the "Catalyst Lease").

460.    The Catalyst Lease identified WOLFE as the occupant of the apartment located at 123 North Des Plaines, Chicago, IL 60661.

461.    The Argon Entities' business operations did not require the use of a residential apartment and, upon information and belief, WOLFE and other Argon Credit employees used the apartment for personal, rather than business, use.

462.     The diversion of assets due to the Catalyst Lease for the benefit of Argon Insiders was a knowing and fraudulent theft and conversion of PAIF's Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Unnecessary WOLFE Personal Expenses And Incentive Payroll Payments**

463.     Moreover, WOLFE caused Argon Credit to pay for tens of thousands of dollars of his personal expenses ("Wolfe Expenses") including:

- •     Tires for his car;

- •     Food and alcohol purchases;

- •     iTunes purchases; and

- •     At least $18,145.51 on WOLFE's personal Discover card and $24,718.84 on WOLFE's personal American Express card.

464.     The diversion of the Wolfe Expenses to an Argon Insider was a knowing and fraudulent theft and conversion of PAIF's Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

465.     Finally, after Princeton called the Revolving Note and declared an event of default of the Fintech Loan Agreements in December 2016, Princeton proposed certain cuts to the Argon Entities' operations, including a demand that the Argon Entities not compensate the senior management of the Argon Entities in the subsequent December 16, 2016 payroll.

466.     Instead, on the eve of the Argon Entities' bankruptcy filing, WOLFE and ZUMSKI did the exact opposite and caused Argon Credit to add each of them to Argon Credit's payroll processor, The Synergy Companies, Inc. ("Synergy"), for the very first time in order to pay

themselves tens of thousands of dollars in purported vacation and "incentive" time for 2014 and 2015.

467.    Specifically, on or about December 16, 2016, the date of the filing of the Argon bankruptcy, Synergy processed a payment to WOLFE of $57,992.30 in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit.

468.    On that same date, Synergy processed a payment to ZUMSKI of $31,664.80 (in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit) (the vacation/incentive time payments to WOLFE and ZUMSKI, the "Incentive Payments").

469.    No other Argon Credit employees received any payment for purported incentive time during that same payroll period except WOLFE and ZUMSKI.

470.    The diversion of the Incentive Payments to WOLFE and ZUMSKI was a knowing and fraudulent theft and conversion of PAIF's Secured Collateral and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

**Argon Credit's Financial Condition**

471.    As previously set forth above, Argon Credit's books and records reflect that Argon Credit was insolvent at all times relevant to this Complaint.

472.    Argon Credit's tax return for the calendar year ending December 31, 2014, states that it had total operating income of only $136,834.00; yet, Argon Credit took on $365,000.00 in purported debt from MARGON under a loan agreement with MARGON during that same time period.

473.    Specifically, Argon Credit's internal balance sheet reflected that, as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative equity of $8,641.03.

474. The Independent Report of the Argon Entities' Consolidated Financials ending December 31, 2015, reflected that Argon Credit had negative equity of $11,285,946.00 as of that time.

475. The Independent Report stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708.00 for the year ended December 31, 2015.

476. As a result, RSM concluded in its Independent Report that the "events and circumstances described above create substantial doubt about the [Argon Entities'] ability to continue as a going concern."

477. From that point forward, the Argon Entities' financial condition continued to deteriorate each month that they continued to operate, and their negative equity balance increased each month, none of which was disclosed to Princeton and all of which was actively fraudulently concealed from Princeton.

478. As of November 30, 2016, Argon Credit's internal balance sheet reflected assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

479. As asserted above, this financial deterioration was occurring from the inception of Fintech Loan Agreement (and indeed well prior to) and was further knowingly, willfully, intentionally, recklessly and negligently concealed from, and not disclosed to, Princeton.

480. On December 7, 2016, pursuant to Section 12.5 of the LSA, PAIF assigned all of its right, title and ownership interest in, and claims to the Fintech Loan Agreement, all other financing agreements (as defined by Section 1.3 of the LSA), and the Secured Collateral (as defined in Section 5 of the LSA), to FRS.

481. PAIF's assignment to FRS included the assignment of all right, title, and ownership interest in, and claims to any and all other agreements between PAIF and the Argon Entities.

**Argon Entities' Bankruptcy Filings**

482.     On December 16, 2016 (the "Petition Date"), the Argon Entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

483.     As of December 16, 2016, the balance due from the Argon Entities to FRS under the Revolving Note was at least $37,291,193.98.

484.     The amount the Argon Entities owed to Princeton included the following: (i) principal outstanding of $36,486,142.16; (ii) past-due interest owed as of November 30, 2016, of $465,730.56; (iii) interest due since November 30, 2016, of $324,321.26 (represents $20,270.08 per day); and (iv) incurred legal fees due to the default at that time estimated to be $15,000.00.

485.     On January 11, 2017, the Argon Bankruptcy was converted from a Chapter 11 bankruptcy to a Chapter 7 bankruptcy.

486.     Immediately following the conversion of the Argon Bankruptcy, the Office of the United States Trustee appointed Deborah K. Ebner as interim trustee in accordance with 11 U.S.C. § 701.

487.     On April 13, 2017, Ms. Ebner resigned and Eugene Crane ("Trustee Crane") was appointed successor-trustee in the Argon Bankruptcy.

488.     On June 2, 2020, Trustee Crane voluntarily resigned as Trustee of the Argon Bankruptcy, and Trustee Karen R. Goodman, Esquire, was appointed as the next trustee.

## RICO FACTUAL PREDICATES

489.     As set forth below in greater detail, Defendants acted in concert, together and with others, over the years in various capacities, at various times, to pervert to their pecuniary advantage through a series of overt and covert predatory and racketeering acts, predicated upon, at its core, concerted delivery of false financial information to the Princeton as the secured Lender (the "RICO Scheme"), that included not only repeated violations of the RICO Act, but as importantly, a

plethora of violations of mail and wire fraud and other state laws prohibiting such unlawful, harmful, predatory and deceptive conduct.

490.     The various Defendants identified herein have violated the RICO Act by engaging in prohibited racketeering activities to further their schemes to defraud, divert and deprive Princeton of its Secured Collateral through the repeated (i) submission of false financial documents meant to delay Princeton's declaration of an event of default and (ii) diversion of Collections, Receivables and other Secured Collateral to third parties away from the Argon Entities, all actively concealed from, and to the financial loss and detriment of, Princeton.

491.     Among other things, Defendants' predicate acts, beginning as early as May 2015, within days of the closing on the Fintech Loan Agreement, included the widespread use of the United States mails and interstate wires to distribute false financial information of Princeton, through various methods and manners, and at different times, which Defendants knew to be false financial information.

492.     Specifically, Defendants facilitated and promoted through the execution of the sale of the Spartan Loans and the other Spartan Transactions with FTAM and the Spartan Entities unlawful and deceptive conduct whereby Defendants knowingly, intentionally and falsely utilized and transferred through interstate means false financial information in order to delay Princeton from declaring an event of default as the secured lender.

493.     As part of this RICO scheme, the underlying Spartan Loans were originated across the internet and wires and were serviced through the United States Mail and/or interstate wires.

494.     Defendants orchestrated these widespread deceptive and fraudulent schemes in order to defraud Princeton as the secured lender of its Secured Collateral.

495.     Defendants used the illicit cash and other monetary proceeds that represented the stolen accounts receivable from the Spartan Loan generated by this RICO Scheme, to enrich themselves.

496.     In order to effectuate the RICO Scheme, Defendants fraudulently concealed the nature and extent of the RICO Scheme from Princeton as the secured lender and engaged in an explicit pattern of deception through the Spartan Transactions that was designed to mislead Princeton as the secured lender.

497.     The RICO Scheme and these other false and deceptive schemes harmed Princeton by directly and proximately decreasing Princeton's revenues over the years and converting and stealing business opportunities that Princeton would have exploited to its own advantage.

**The RICO Scheme And RICO Enterprise**

498.     Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "<u>RICO Enterprise</u>."

499.     Each of Defendants participated in the operation or management of the RICO Enterprise because they engaged in acts that they knew would further the RICO Scheme, including the drafting, reviewing, revising and dissemination of fraudulent and misleading financial information (the "<u>False Financials</u>"), the structuring and implementation of the Spartan Transactions, all in furtherance of the continued fraudulent misuse of Secured Collateral for the financial benefit of FTAM and the Spartan Entities (to the detriment of Princeton as the secured lender), all of which in turn perpetuated the RICO Enterprise.

500.     Defendants associated together, under an association in fact organization, with the common purpose of using the Argon Entities (through the use of the False Financials) as a vehicle for misusing the Secure Collateral which Defendants would exploit and monetize in the Spartan Transactions.

501.    The Argon Entities are bankrupt but functioned as a continuing unit.

502.    The Argon Entities had an independent existence and purpose beyond the predicate acts and pattern of racketeering itself, which included the origination and generation of Collections and Receivables from Consumer Loans as Secured Collateral.

503.    The Argon Entities had a distinct structure based on the essential operating functions of the Argon Entities and the particular role that each of Defendants had within and outside of the operations of the Argon Entities.

504.    As set forth above in detail, the Argon Entities are engaged in interstate commerce.

**Pattern Of Racketeering: False Financials As A Pattern**

505.    The pattern of racketeering involved, *inter alia*, the knowing and intentional preparation, drafting, reviewing, revising and dissemination of the False Financials utilized by Defendants to enable them to use the Secured Collateral to their financial betterment and to the financial detriment of Princeton as the secured lender.

506.    Each instance of authorizing and disseminating a False Financial to Princeton is an individual act in furtherance of the RICO Scheme.

507.    Among many other instances, attached as **EXHIBIT A** is a chart of emails, including date of the email, sender of the email, the PAIF recipients, as noted, of the email and the documents attached to those emails, that were used to facilitate the scheme, all of which is incorporated herein as if set forth at length.

508.    Moreover, the delivery of each False Financial (i) involved the use of the mail and wires across interstate lines, (ii) constituted wire fraud as defined by 18 U.S.C. § 1343 and (iii) had a direct, proximate and material deleterious impact on Princeton's revenues generated from the Secured Collateral.

509.     As a result of each False Financial, Defendants could effectuate the RICO Scheme which was to secure unhindered and unabated continued access to the proceeds of the Revolving Note which could then be monetized by Defendants to fund their fraud perpetrated through the Spartan Transactions.

**Pattern Of Racketeering: Divestiture And**
**Diversion Of Accounts Receivable As A Pattern**

510.     From May 2015 until December 2016, Defendants planned to steal and defraud Princeton of its Secured Collateral.

511.     Within only a few days of the execution of the Fintech Loan Documents, certain Defendants began to put into action a plot to subvert the Secured Collateral for their own insider self-dealing.

512.     As part of this RICO Scheme, in addition to the dissemination of the False Financials, Defendants also began to plunder the Receivables and Collections that Princeton was due under the Secured Collateral.

513.     As described in greater detail above, Defendants created and implemented the Spartan Fraud involving the Spartan Transactions that had, at its core, the sale of a portion of the Secured Collateral to certain Argon Outsiders for the financial benefit of certain Argon Insiders and Argon Outsiders.

514.     The conversion of the Spartan Servicing Fees by Defendants hampered the financial viability of the Argon Entities and further harmed Princeton's Secured Collateral.

515.     Defendants orchestrated and structured the diversion of the Spartan Servicing Fees through the implementation of the Spartan Transactions, consistent with the blueprint prepared and circulated by KOSTINER.

516.    In order to cover up the RICO Scheme and hide their involvement, Defendants created the False Financials and stole revenue being generated from the Secured Collateral through undisclosed Spartan Transactions.

517.    Each act by Defendants that furthered these active concealment efforts constituted a separate racketeering act that collectively constituted distinct patterns over that same time period.

518.    Defendants were able to commit the predicate offenses by virtue of their insider status and control of the Argon Entities as the RICO Enterprise, either as owner, executive, board manager and/or contractual partner, with the aid of other Argon Insiders and Argon Outsiders.

519.    Defendants, acting in the furtherance of the operations of the Argon Entities, engaged in a pattern of racketeering by: (a) knowingly and intentionally preparing, drafting, reviewing, revising and disseminating False Financials to Princeton as the secured lender; (b) diverting and converting for their own financial benefit the revenue due and owing to the Argon Entities and that represented the basis upon which Princeton executed the Revolving Note; and (d) concealing the RICO Enterprise from Princeton as the secured lender.

520.    Defendants, in their pattern of racketeering activity, regularly used interstate telephone and facsimile transmission lines, cellular phones and internet transmission while they were engaging in interstate commerce for the purposes of committing fraud or deceit, conspiring to commit fraud or deceit, and harming Princeton by directly and proximately diverting revenue and assets away from the Argon Entities and that otherwise was Princeton's Secured Collateral.

**RICO Offenses**

521.    Each RICO Defendant is associated with the Argon Entities, and has conducted, or participated in, the operations of the Argon Entities through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d).

522. As alleged with particularity below, Defendants conspired together to violate 18 U.S.C. §§ 1962(c) and (d).

**Predicate Offenses – Wire Fraud & 18 U.S.C. § 2134**

523. Defendants knowingly and willfully devised a scheme to draft and disseminate the False Financials and divert accounts receivable that constituted Secured Collateral away from the Argon Entities.

524. The RICO Scheme constituted a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more," in violation of 18 U.S.C. § 2314.

525. Defendants knowingly and willfully devised a manner by which they could divert and steal Secured Collateral for their own self-dealing benefit.

526. Defendants elected to fund, in part, the fraudulent operations of the Argon Entities through the loan proceeds from the Fintech Loan Agreement.

527. Each of the predicate offenses described in the preceding and foregoing paragraphs involved use by Defendants of interstate telephone and facsimile transmission lines, cellular phones, and internet or wire transmission to disseminate the False Financials and divert the Secured Collateral's accounts receivable.

528. Each of Defendants committed numerous predicate acts in the nature of knowingly fraudulent communications by wire.

529. As part of the RICO Scheme, for example, through their control and direction of the Argon Entities, Defendants not only effectuated the Spartan Fraud, but controlled the delivery of the False Financials to Princeton as the secured lender.

530. The RICO Scheme began as early as 2014 and continued at least through December 2016.

531. As a result of the RICO Scheme, Princeton incurred damages in excess of $22,000,000.00 and additional damages from the redirection of its entire business operations to focus on its relationship with Argon Entities and Defendants.

**Participation Of Defendants In The Pattern Of Racketeering Activity**

532. In addition to the facts set forth herein, each of Defendants used their respective insider position with the Argon Entities to develop and implement the RICO Scheme.

533. Each RICO Defendant further used their respective positions to control and manage the dissemination of the False Financials and diversion of the Secured Collateral's accounts receivable.

534. The efforts by each RICO Defendant in furtherance of the RICO Scheme were accomplished through, *inter alia*, electronic mail, the internet, U.S. mail, facsimile and interstate telephone wires.

535. Each RICO Defendant knew that the dissemination of the False Financials and diversion of the Secured Collateral's accounts receivable were false and fraudulent and harmed Princeton as the secured lender.

536. Each RICO Defendant orchestrated, directed, managed, supervised, and otherwise controlled various aspects of the operations of the Argon Entities that permitted each of them to facilitate the dissemination of the False Financials and diversion of the Secured Collateral's accounts receivable

**Princeton Has Financially Suffered As A Result Of The**
**Predatory, Racketeering And Otherwise Unlawful Conduct Described Herein.**

537.    As a result of the predatory, racketeering and unlawful acts of the various Defendants, as described herein, Princeton has been severely, directly and proximately damaged through loss of Secured Collateral, lost profits, higher costs and loss of goodwill and name recognition in the consumer loan marketplace, from as early as 2017 through to the present.

**[remainder of page left intentionally blank]**

**[specific counts of complaint follow]**

## COUNT ONE

### CONDUCT AND PARTICIPATION IN A RICO
### ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

(18 U.S.C. § 1962(c))

**All Defendants**

538.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

539.     At all relevant times, Princeton was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

540.     At all relevant times, each RICO Defendant was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

541.     Defendants worked together, and in concert, participating in the conduct of the affairs of the RICO Enterprise through the aforementioned pattern of racketeering activities.

542.     The facts demonstrate that Defendants each unlawfully, willingly and knowingly performed the acts or omissions, and conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise, namely legitimate business affairs of the Argon Entities, through the means of a pattern of illegitimate racketeering activities, all predicated upon the RICO Scheme to falsify financial records in order to fraudulently divert and divest Princeton of its Secured Collateral.

543.     As a direct and proximate consequence of the aforementioned violations of 18 U.S.C. § 1962(c), Princeton has directly and proximately suffered substantial injury to its business and property within the meaning of 18 U.S.C. § 1964(c), including but not limited to, diminished and lost Secured Collateral as well as irreparable loss of goodwill and business opportunities.

544. Princeton's damages from the unlawful action of Defendants include, but are not limited to, the following, together with allowed costs and counsel fees:

|  | **TOTAL DAMAGES** |
|---|---|
| Argon Impairment | $27,727,970.71 |
| Lost interest income | $22,471,411.28 |
| Lost participation fees | $2,375,000.00 |
| Legal Expenses | $7,227,184.19 |
| Accounting Fees - Re-stating due to fraud | $25,000.00 |
| Lost Investment Opportunities | $31,675,000.00 |
| Lost Value of Fund Company | $146,512,500.00 |
| Grand Total of Damages | $238,014,066.18 |

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT TWO

### CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY

(18 U.S.C. § 1962(d))

**All Defendants**

545. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

546. Defendants associated in fact with the RICO Enterprise in order to perpetrate the RICO Scheme.

547.    The RICO Enterprise was engaged in and affected interstate commerce.

548.    Defendants conducted and participated, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through the aforementioned pattern of racketeering in violation of 18 U.S.C. § 1962(c).

549.    Since, as early as 2015, in various manners and efforts, Defendants cooperated jointly and severally in the commission of two or more of the overt predicate acts, namely the use of the United States mail and interstate wires, that are itemized in 18 U.S.C. § 1961(1)(A) and (B), in order to effectuate the RICO Scheme.

550.    The conspiracy of Defendants to commit those acts violates 18 U.S.C. § 1962(d)

551.    Defendants did commit two or more of the overt predicate acts itemized above in the preceding Counts in a manner intended to further their racketeering activities, in violation of 18 U.S.C. § 1962(d).

552.    As a result of the RICO Scheme, Princeton has incurred direct and proximate damages in excess of $238,014,066.18 including, but not limited to, harm and loss of its Secured Collateral.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT THREE

## FRAUD/INTENTIONAL MISREPRESENTATION

### All Defendants

553.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

554.    Princeton specifically charges in this Count all Defendants with fraud and/or intentional misrepresentation.

555.    Defendants identified in this Count, based on the facts set forth in this Complaint, knowingly, willfully, intentionally and/or recklessly committed fraud against Princeton as the secured lender to Princeton's financial detriment by scheming to steal, abscond, convert and otherwise thieve those assets of the Argon Entities that these Defendants knew or should have known were Princeton's Secured Collateral.

556.    At all times relevant to this Complaint, as set forth herein, each Defendant named in this Count was an Argon Insider, managed an Argon Insider or was substantively involved in the management of the Argon Entities due to the nature of their investments in and/or contracts with the Argon Entities, and they each committed fraud against Princeton through their unlawful schemes to divest the Argon Entities of the value of Secured Collateral to Princeton's financial detriment and their own financial benefit.

557.    Many of these Defendants were executive officers of the Argon Entities, were on the Board of Managers of the Argon Entities or were direct controlling owner members of the corporate entities that were members or on the Board of Managers of the Argon Entities.

558.    As set forth herein with particularity, Defendants identified in this Count knowingly, willfully, intentionally and recklessly committed fraud against Princeton as the secured lender, without limitation, in the following ways: (i) the double-pledging and sale of the Spartan Loans to FTAM and the Spartan Entities, all of whom were affiliated with an Argon Insider and/or the Argon Entities at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of the Financial Covenants owed to Princeton; (ii) the submission to Princeton as the secured lender of false and misleading financial statements and information on a repeated regular basis that failed to disclose an accurate and truthful financial

picture of the Argon Entities, its Doubtful Accounts and the Spartan Transactions at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of the Financial Covenants owed to Princeton as the secured lender; (iii) the fraudulent scheme to transfer and the transferring of certain assets, including, without limitation, the Spartan Loans, to various Argon Insiders and Argon Outsiders in a scheme to divest the Argon Entities and Princeton as the secured creditor of the value of those assets at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of the Financial Covenants owed to Princeton as the secured lender; (iv) the payment of exorbitant "commissions" and other insider payments without disclosure to Princeton as the secured lender at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of the Financial Covenants owed to Princeton as the secured lender; (vi) the use of assets of the Argon Entities that amounted to Secured Collateral to pay for personal expenses unrelated to the Argon Entities' business operations at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of the Financial Covenants owed to Princeton as the secured lender; and (vii) the authorizing of the Argon Entities to make interest payments on certain promissory notes to certain Argon Insiders at a time when it was known or should have been known that the Argon Entities were insolvent in knowing and reckless violation of those certain subordination agreements at a time when the Argon Entities were insolvent.

559.    As set forth herein with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by these various Defendants named in this Count, as set forth herein in detail, that amounted to active fraud and/or intentional misrepresentation as to the schemes to divest and diminish the Secured Collateral of the Argon

Entities, all at a time when these Defendants knew or should have known that the Argon Entities were insolvent.

560. Specifically, Defendants named in this Count, at various times and in various manners as set forth at length in this Complaint, made misrepresentations, omitted material facts and otherwise failed to disclose material information to Princeton, all in bad faith and with malicious intention to deceive, defraud and divest Princeton as the secured lender of its rights in the Secured Collateral including, *inter alia*, without limitation: (i) the double pledging of the Spartan Loans that caused Princeton to lose the financial value of such Spartan Loans; and (ii) the repeated falsification of the financial records of the Argon Entities that failed to disclose, in part and without limitation, the true nature of the Spartan Transactions and the Argon Entities' Doubtful Accounts, in repeated knowing and reckless disregard of the Financial Covenants, all of which was meant defraud and divest Princeton from the true value of the Secured Collateral by actively delaying Princeton from declaring an event of default.

561. For example, KOSTINER, an executive with Argon Credit at the time and using an Argon Credit e-mail address for business transactions related to the Spartan Transactions, knowingly schemed and conspired with WOLFE, ZUMSKI, FERRO, ARAKELIAN, SCHNOSENBERG, TOMASZKIEWICZ, MADANYAN, CANFORA, TRIFFLER, KUHLMAN, BREITWEISER, and FAERMARK, and those other Defendants identified in this Complaint, without limitation, to cause: (i) the Spartan Entities to be incorporated as an instruments of fraud; (ii) FTAM and the Spartan Entities to execute the Spartan Transactions through which Argon Credit sold the Spartan Loans to FTAM without disclosure to Princeton an d in knowing divestiture of the Secured Collateral; (iii) the Spartan Entities to fail to pay or pay considerably less than reasonably equivalent value to Argon Credit in exchange for the Spartan

Loans; and (iv) the Spartan Entities not to pay any Spartan Servicing Fees due and owing to the Argon Entities of more than $700,000.00.

562.     KOSTINER's activities were known to the Argon Insiders and Argon Outsiders, all of whom were well aware of the Fintech Loan Agreement and related Financial Covenants owed to Princeton as the secured lender.

563.     These Defendants, including without limitation, TRIFFLER, KUHLMAN, CANFORA, ZUMSKI, BREITWEISER, FAERMARK, SCHNOSENBERG, and FERRO engaged in fraudulent conduct against Princeton by engaging in, among other things, one or more of the following acts either individually or in conspiracy with others:

    a.     Authorizing the Argon Entities to enter into the Spartan Transactions pursuant to which Argon Credit sold approximately $4.8 million of its Consumer Loans (i.e., the Spartan Loans) to or for the benefit of FTAM and the Spartan Entities in which, upon information and belief, many of these Defendants had a personal financial interest, and all to the diminution of Princeton's Secured Collateral;

    b.     Causing Argon Credit to double-pledge certain of the Consumer Loans (i.e., the Spartan Loans) to Princeton which were actually sold to FTAM, thereby causing the Argon Entities to be in breach of the Fintech Loan Agreement and causing Argon Credit to borrow more funds from Princeton than it was permitted to borrow under the relevant Fintech Loan Agreement at a time when these Defendants knew or should have known that the Argon Entities were insolvent;

    c.     Causing the Argon Entities to submit false financial information to Princeton which improperly inflated the amount of Argon Credit's accounts receivables by failing to disclose (i) the sale of the Spartan Loans as well as (ii) the extent of the Doubtful Accounts, that thereby caused the Argon Entities to borrow more funds from Princeton more than they would have otherwise been permitted to borrow under the relevant Fintech Loan Agreement, and, as a result, caused Argon Credit to be in breach of the relevant Fintech Loan Agreement and to file for bankruptcy;

    d.     Causing Argon Credit to enter into the Broadmark Agreement and pay more than $700,000.00 to BROADMARK and PERAZA for commissions which were exorbitant, above market rate, and for which Argon Credit did not receive reasonably equivalent value;

e.    Causing Argon Credit to pay millions of dollars in interest payments to MARGON, LITTLE OWL, TRIFFLER TRUST and CARDINAL which were in violation of the various subordination agreements at a time when the Argon Entities were insolvent;

f.    Authorizing Argon Credit to pay $381,000.00 to BERGARVIV in purported commissions which personally benefitted various Defendants, such as, without limitation, WOLFE, ARAKELIAN and ZUMSKI, and which were not authorized by Argon Credit's Board of Managers;

g.    Authorizing Argon Credit to pay WOLFE $57,992.30 for purported vacation time and 2014 and 2015 "incentive time" on the eve of Argon Bankruptcy; and

h.    Authorizing Argon Credit to pay for to transfers as set forth above to various Argon Insiders, including tires for his vehicle, food and entertainment, the Catalyst Lease, and the Las Vegas Trip, which diminished the value of Princeton's Secured Collateral.

564.    Upon information and belief, these named Defendants absconded with and converted to their own financial benefit the purchase price of the Spartan Loans allegedly paid by FTAM to Argon Credit and further absconded and converted to their own financial benefit the Spartan Servicing Fees that were never paid to Argon Credit.

565.    In particular, among other losses, Princeton lost the yield value of the funds that Argon Credit borrowed from the Revolving Note in order to originate the Spartan Loans and for which Princeton never received equivalent value in the form of additional Secured Collateral.

566.    ZUMSKI committed fraud against Princeton by authorizing Argon Credit to pay himself $31,664.80 for purported vacation time and 2014 and 2015 "incentive time" on the eve of the Argon Bankruptcy.

567.    ARAKELIAN committed fraud against Princeton by among other things, authorizing Argon Credit to pay $381,000.00 to BERGARVIV in purported commissions which personally benefitted ARAKELIAN and which were not disclosed to or authorized by Argon

Credit's Board of Managers and which caused the value of Princeton's Secured Collateral to materially diminish.

568.    TOMASZKIEWICZ committed fraud against Princeton by entering into an arrangement with Argon Credit on behalf of his company, BLUE TREBLE, to pay himself more than $214,000.00 for supposed software development services at a time TOMASZKIEWICZ was already employed by Argon Credit and receiving a salary and which fees were exorbitant in relation to the purported services provided, all of which caused the value of Princeton's Secured Collateral to materially diminish.

569.    In taking and authorizing and approving all of these various actions, Defendants named in this Count committed fraud against Princeton and the value of its Secured Collateral for their self-serving interests.

570.    Such Defendants authorized prohibited, self-interested, self-dealing fraudulent transactions on which they appeared on both sides and took actions that financially benefitted themselves personally at the financial cost and detriment of Princeton as the secured lender.

571.    In taking these actions, such Defendants acted knowingly and intentionally causing the Argon Entities to (i) incur more debt to Princeton than they were entitled to borrow with insufficient assets to collateralize such loan, (ii) breach their contractual commitments with Princeton, (iii) make millions of dollars in fraudulent improper distributions to Argon Insiders and (iv) pay above market rate for alleged services at a time when it was known or should have been known that the Argon Entities were insolvent.

572.    Defendants named in this Count, at various times and in various manners, were the only source of material financial information for Princeton as the secured lender, and Princeton could not discover the repeated pervasive fraud by Defendants by other reasonable means or

methods of discovery until it was too late and Princeton's Secured Collateral was depleted, stolen and otherwise materially diminished.

573.    As described in this Complaint, Defendants identified in this Count, actively colluded to thieve, steal and otherwise convert the proceeds of the Fintech Loan Agreement and Revolving Note and subsequently schemed to hide these material misrepresentations, omissions and non-disclosures from Princeton as the secured lender.

574.    Through their respective misrepresentations, omissions and non-disclosures, Defendants named in this Count have committed fraud and/or intentional misrepresentation against Princeton as the secured lender.

575.    As a direct and proximate cause of Defendants' fraud and/or intentional misrepresentations set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury including the material loss of its Secured Collateral and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

576.    The aforementioned acts of fraud and/or intentional misrepresentation were intentional, reckless, wanton and outrageous and entitle Princeton as the secured lender to the recovery of punitive damages against Defendants named in this Count.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT FOUR

## <u>AIDING AND ABETTING FRAUD/INTENTIONAL MISREPRESENTATION</u>

### All Defendants

577.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

578.    Princeton specifically charges in this Count all Defendants with aiding and abetting the fraud and/or intentional misrepresentation (as set forth in the preceding Count).

579.    Defendants identified in this Count, based on the facts set forth in this Complaint, knowingly, willfully, intentionally and recklessly aided and abetted in the commission of the fraud being committed against Princeton as the secured lender.

580.    As set forth herein with particularity, these Defendants identified in this Count knowingly, willfully, intentionally and recklessly aided and abetted the active fraud set forth in the preceding Count.

581.    Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Count, who committed various tortious activity and wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Count and otherwise described herein.

582.    Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Count and otherwise described herein.

583.    As set forth here in with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, at various times to protect the interests of Princeton as the secured lender in the various transactions described herein.

584.    Defendants named in this Count, at various times and in various manners as set forth at length in this Complaint, have aided and abetted misrepresentations, omissions of material facts and failures to disclose material information to Princeton as the secured lender, all in bad faith and with malicious intention to deceive.

585.    Defendants named in this Count, at various times and in various manners, were the only source of material information for Princeton, and the repeated fraud that was pervasive throughout the entire time period of this Complaint was not discoverable by Princeton by other reasonable means or methods of discovery until after it was too late and Princeton's assets were depleted and stolen.

586.    Indeed, as described in this Complaint, these Defendants actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded, increased and distributed, to hide these material misrepresentations, omissions and non-disclosures from Princeton.

587.    Through the aiding and abetting of the various misrepresentations, omissions and non-disclosures, Defendants named in this Count have aided and abetted in the fraud and/or intentional misrepresentation against Princeton as the secured lender.

588.    As a direct and proximate cause of Defendants' conduct of aiding and abetting the fraud and/or intentional misrepresentation set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Secured Collateral and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

589.    The aforementioned acts of aiding and abetting fraud and/or intentional misrepresentation were intentional, reckless, wanton and outrageous and entitle Princeton to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT FIVE

## FRAUDULENT CONCEALMENT

### All Defendants

590.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

591.     Princeton specifically charges in this Count all Defendants with fraudulent concealment.

592.     As set forth elsewhere in this Complaint with particularity, including the preceding Counts, Defendants identified in this Count, based on the facts set forth in this Complaint, knowingly, willfully, intentionally and/or recklessly concealed the fraud that these Defendants committed against Princeton as the secured lender to Princeton's financial detriment.

593.     As set forth herein with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, that amounted to active fraudulent concealment of the divestiture and theft of the Secured Collateral at a time when the Argon Entities were insolvent.

594.     Specifically, Defendants named in this Count, at various times and in various manners as set forth at length in this Complaint, have made misrepresentations, omitted material facts and otherwise failed to disclose material information to Princeton, all in bad faith and with malicious intention to deceive and commit the fraud that is set forth with particularity elsewhere in this Complaint.

595. Defendants named in this Count, at various times and in various manners, were the only source of material financial information for Princeton as the secured lender, and Princeton could not discover the repeated pervasive fraud by other reasonable means or methods of discovery until after it was too late and Princeton's Secured Collateral was depleted and stolen.

596. Indeed, as described in this Complaint, Defendants identified in this Count, actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded to the Argon Entities, and subsequently increased, to hide these material misrepresentations, omissions and non-disclosures from Princeton as the secured lender.

597. Through their repetitive misrepresentations, omissions and non-disclosures, as well as the failure to fulfill their duty to advise Princeton as the secured party of the fraud and to otherwise prevent such fraud, Defendants named in this Count have committed fraudulent concealment against Princeton as the secured lender

598. As a direct and proximate cause of Defendants' conduct of fraudulent concealment set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Secured Collateral and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

599. The aforementioned acts of fraudulent concealment were intentional, reckless, wanton and outrageous and entitle Princeton as the secured lender to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT SIX

## AIDING AND ABETTING FRAUDULENT CONCEALMENT

### All Defendants

600.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

601.     Princeton specifically charges in this Count all Defendants with aiding and abetting the fraudulent concealment (as set forth in the preceding Count).

602.     Defendants identified in this Count, based on the facts set forth in this Complaint, knowingly, willfully, intentionally and recklessly aided and abetted in the concealment of the fraud being committed against Princeton as the secured lender (as set forth in particularity elsewhere in the Complaint).

603.     Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Count, who committed various tortious activity and wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Count and otherwise described herein.

604.     Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Count and otherwise described herein.

605.     As set forth here in with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, at various times to protect the interests of Princeton as the secured lender in the various transactions described herein.

606.     Defendants named in this Count, at various times and in various manners as set forth at length in this Complaint, have aided and abetted misrepresentations, omissions of material

facts and failures to disclose material information to Princeton as the secured lender, all in bad faith and with malicious intention to deceive Princeton as the secured lender.

607. Defendants named in this Count, at various times and in various manners, were the only source of material information for Princeton, and the repeated fraud that was pervasive throughout the entire time period of this Complaint was not discoverable by Princeton by other reasonable means or methods of discovery until after it was too late and Princeton's assets were depleted and stolen.

608. Indeed, as described in this Complaint, several of Defendants actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded and increased at various times, were distributed, to hide these material misrepresentations, omissions and non-disclosures from Princeton.

609. Through the aiding and abetting of the various misrepresentations, omissions and non-disclosures, as well as the failure to fulfill their duty to advise Princeton as the secured party of the fraud, Defendants named in this Count have aided and abetted in the fraudulent concealment against Princeton.

610. As a direct and proximate cause of Defendants' conduct of fraudulent concealment set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Secured Collateral and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

611. The aforementioned acts of aiding and abetting fraudulent concealment were intentional, reckless, wanton and outrageous and entitle Princeton to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT SEVEN**

**NEGLIGENT MISREPRESENTATION**

KUHLMAN, RBC CAPITAL, LITTLE OWL, WOLFE, JIU, JPU, GLENORA, NOAX, ZUMSKI, ARAKELIAN, BMONEY, SCHNOSENBERG, FERRO, MARGON, TOMASZKIEWICZ, MADANYAN, CANFORA, TRIFFLER, TRIFFLER TRUST, BREITWEISER, FAERMARK, KOSTINER, SHEYBANI, CARDINAL and EDMONSON

612.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

613.    Princeton specifically charges those Defendants set forth above in this Count with negligent misrepresentation.

614.    Defendants identified in this Count, based on the facts set forth in this Complaint, recklessly and/or negligently concealed the fraud that these Defendants committed against Princeton as the secured lender to Princeton's financial detriment.

615.    As set forth herein with particularity, Defendants identified in this Count recklessly and/or negligently concealed the following acts from Princeton as the secured lender: (i) the double-pledging and the sale of the Spartan Loans as Secured Collateral to FTAM and the Spartan Entities, all of whom were affiliated with an Argon Insiders and known to argon Outsiders; (ii) the submission to Princeton as the secured lender false and misleading financial statements and information on a repeated regular basis that failed to disclose the sale of the Spartan Loans as well as the extent to which there existed Doubtful Accounts; (iii) the fraudulent scheme to transfer and the transferring of certain assets, including, without limitation, the Spartan Loans, to various Argon

insiders and Argon Outsiders away from the Argon Entities and Princeton as the secured creditor in violation of the known Financial Covenants owed to Princeton; (iv) the payment of exorbitant "commissions" and other insider payments without disclosure to Princeton as the secured lender at a time when the Argon Entities were insolvent, in knowing and reckless violation of the Financial Covenants owed to Princeton as the secured lender; (vi) the use of assets of the Argon Entities that amounted to Secured Collateral to pay for personal expenses unrelated to the Argon Entities' business operations in violation of the Financial Covenants owed to Princeton as the secured lender; and (vii) the authorizing of the Argon Entities to enter into purported promissory notes with investors which were equity investments and then accepting interest payments in violation of a Subordination Agreement at a time when the Argon Entities were insolvent unbeknownst to Princeton as the secured lender due to the active fraud and negligent misrepresentation being asserted against Princeton.

616.    Defendants identified in this Count, based on the facts set forth in this Complaint, each as an Argon Insider, had a duty to provide, and thus were in the business of supplying, accurate financial information to the Argon Entities' respective Board of Managers as well as to Princeton as the secured lender.

617.    As set forth herein with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, that amounted to active negligent misrepresentation of the Argon Entities' insolvency.

618.    Specifically, Defendants identified in this Count, at various times and in various manners as set forth at length in this Complaint, have made misrepresentations, omitted material facts and otherwise failed to disclose material information to Princeton, including, *inter alia*, without limitation: (i) the double pledging of the Spartan Loans that caused Princeton to lose the

financial value of such Spartan Loans; and (ii) the repeated falsification of the financial records of the Argon Entities that failed to exclude the Spartan Loans and detail the Doubtful Accounts, in repeated disregard of the Financial Covenants, all of which was meant to conceal the active fraud and delay Princeton from calling the Revolving Note and protecting its Secured Collateral by declaring an event of default.

619. Defendants identified in this Count, at various times and in various manners, were the only source of material financial information for Princeton as the secured lender, and Princeton could not discover the repeated pervasive fraud by other reasonable means or methods of discovery until after it was too late and Princeton's Secured Collateral was depleted and stolen.

620. Indeed, as described in this Complaint, Defendants identified in this Count actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded to the Argon Entities, and subsequently increased, to hide these material misrepresentations, omissions and non-disclosures from Princeton as the secured lender.

621. Through their respective misrepresentations, omissions and non-disclosures, as well as the failure to fulfill their duty to advise Princeton as the secured party of the fraud and to otherwise prevent such fraud, Defendants identified in this Count have committed negligent misrepresentation against Princeton as the secured lender

622. As a direct and proximate cause of Defendants' conduct of negligent misrepresentation set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Secured Collateral and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

623. The aforementioned acts of negligent misrepresentation were reckless and negligent and entitle Princeton as the secured lender to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT EIGHT**

**<u>CONVERSION</u>**

**All Defendants**

624. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

625. Based on the foregoing, all Defendants, at various times and in various manners, stole, thieved and absconded away with the funds and sums placed into a segregated account, controlled by the Argon Entities, and pursuant to the Fintech Loan Agreement, which were then subsequently used to acquire the Secured Collateral, all to their personal financial gain while knowing and should have known that such funds and sums were the property of Princeton and were the property of Princeton and were to be used to acquire, maintain and secure the Secured Collateral.

626. The conversion by such Defendants was intentional, malicious and/or reckless and without lawful justification or the consent of Princeton, warranting the award of punitive damages against such Defendants.

627.     As a result of such conversion, Princeton has suffered significant financial losses and been deprived of the full value of its Secured Collateral.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT NINE

## AIDING AND ABETTING CONVERSION

### All Defendants

628.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

629.     Based on the foregoing, all Defendants, at various times and in various manners, aided and abetted in the stealing, thieving and absconding away the funds and sums placed into a segregated account, controlled by the Argon Entities, and pursuant to the Fintech Loan Agreement, which were used to acquire the Secured Collateral, all to their personal financial gain while knowing and should have known that such funds and sums were the property of Princeton and were to be used to acquire, maintain and secure the Secured Collateral.

630.     The aiding and abetting the conversion by such Defendants was intentional, malicious and/or reckless and without lawful justification or the consent of Princeton, warranting the award of punitive damages against such Defendants.

631.     Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Count, who committed various tortious activity and

wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Count and otherwise described herein.

632.    Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Count and otherwise described herein.

633.    As a result of such aiding and abetting of such conversion, Princeton has suffered significant financial losses and been deprived of the full value of its Secured Collateral.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT TEN

## CIVIL CONSPIRACY

### All Defendants

634.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

635.    All Defendants, as described herein with particularity, combined and agreed with other various Defendants at various times, with malicious intent, to harm, diminish and divest Princeton of its Secured Collateral and to otherwise engage in unlawful overt acts and achieve objectives by the unlawful means described above herein, all to the intended financial detriment of Princeton.

636.    Upon information and belief, the conspiracy involving Defendants began well prior to the Fintech Loan Agreement and continued until the filing of the Argon Bankruptcy.

Case: 1:20-cv-05730 Document #: 1 Filed: 09/25/20 Page 121 of 137 PageID #:121

637.     Plaintiff suffered damages as a result of the conspiring acts of Defendants, all done in furtherance of their common intentional and knowing plan and design to defraud Princeton as the secured Lender and divest and diminish the value of the Secured Collateral.

638.     The conspiratorial actions of Defendants were willful, wanton and outrageous, and justify the award of punitive damages.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT ELEVEN

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### All Defendants

639.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

640.     Princeton specifically charges all Defendants with tortious interference with contractual relations regarding the Fintech Loan Agreement.

641.     At all times relevant to this Complaint, all Defendants knew that Princeton was the primary secured lender and that the Secured Collateral was the property of Princeton pursuant to the Fintech Loan Agreement.

642.     All Defendants also knew or should have known that Princeton as the secured lender was entitled to full compliance with those Financial Covenants set forth in the Fintech Loan Agreement.

643. Defendants identified in this Count knew or should have known that the fraud that Defendants were either committing or aiding and abetting the commission of, was interfering with the Financial Covenants and the Argon Entities' full compliance with the Fintech Loan Agreement.

644. Put differently, by the conduct alleged in this Complaint, Defendants caused the Argon Entities to breach the Fintech Loan Agreement, causing significant damages to Princeton.

645. As a direct and proximate cause of the fraud or aiding and abetting in the commission of a fraud against Princeton as the secured lender, Defendants were willful, wanton and outrageous, justifying the award of punitive damages.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT TWELVE

## BREACH OF PERSONAL GUARANTY

### WOLFE and ZUMSKI

#### (Jury Trial Waived By Charged Defendants)

646. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

647. Princeton specifically charges the following Defendants in this Count: WOLFE and ZUMSKI.

648. As an express condition of the execution of the Fintech Loan Agreement, WOLFE and ZUMSKI each executed the Insider Guaranty.

649.    The Insider Guaranty provided that WOLFE and ZUMSKI personally guaranteed the "full, prompt and unconditional payment when due and performance of certain liabilities and obligations due and owing" by the Argon Entities to Fintech Financial pursuant to the Fintech Loan Agreement.

650.    The Insider Guaranty provided in Section 1 that "[i]n the event any Liability of [Fintech Financial] shall not be paid or performed according to its terms, the Guarantor shall immediately pay and perform the same, this Guaranty being a guaranty of full payment and performance, and not collectability."

651.    The Insider Guaranty further provided that this Insider Guaranty equally applied to "any successor" to Fintech Financial.

652.    The Argon Entities are in default of their obligations under the Fintech Loan Agreement by virtue of their failure to make timely principal and interest payments as required under the Fintech Loan Agreement and as demanded by Princeton.

653.    The Insider Guaranty provided that the guaranty was only limited to those "losses, damages, expenses and liabilities incurred by the Lender (including reasonable attorneys' fees and costs reasonably incurred and in connection therewith arising out of or in connection with any of the following circumstances:

> (i)     "fraud or intentional misrepresentation by the Borrower, the Parent, any Loan Originator or any Affiliate thereof in connection with the Loan Facility;
>
> (ii)    the gross negligence or willful misconduct of the Borrower, the Parent, any Loan Originator or any Affiliate thereof;
>
> (iii)   the misappropriation or conversion by the Borrower, the Parent, any Loan Originator or any Affiliate thereof of any of the Receivables, the Collections or other Collateral, including without limitation any diversion or misapplication thereof that is not permitted by the Loan Agreement and other Financing Agreements;

      (iv)    the grant by the Borrower, the Parent or any Loan Originator to any Person (other than the Lender) of any security interest, lien or other encumbrance on any of the Receivables, the Collections or other Collateral, or the assignment, transfer or conveyance to any Person (other than the Lender) of any other interest in any of the Receivables, the Collections or other Collateral, other than the Assignments contemplated by the Loan Agreement; or

      (v)    the seizure or forfeiture of the Receivables, the Collections or other Collateral, or any portion thereof, resulting from any alleged misconduct or wrongdoing of the Borrower, the Parent, any Loan Originator or any Affiliate thereof."

(collectively, the "Limited Exceptions")

654.    As a direct and proximate cause of the fraud being asserted against Princeton by the Argon insiders and Argon Outsiders, Princeton was not made whole on the amounts owed to Princeton pursuant to the Fintech Loan Agreement and thereby suffered significant losses.

655.    The Guaranty has not been assigned, and FRS is the current holder thereof.

656.    Judgment has not been entered on the Insider Guaranty in any other jurisdiction.

657.    For the reasons set forth in great particularity throughout this Complaint, WOLFE and ZUMSKI are obligated pursuant to the Insider Guaranty to repay to Princeton its losses sustained because the rampant fraud being perpetrated by the Argon Insiders and Argon Outsiders implicate the Limited Exceptions for which WOLFE and ZUMSKI can be held liable for Princeton's losses pursuant to the Insider Guaranty.

658.    The Insider Guaranty specifically provides at Paragraph 28 that "[i]n the case of any proceedings to collect any liabilities of the Guarantor owed to the Lender hereunder, the Guarantor shall pay all reasonable costs and expenses of every kind for collection, sale or delivery of any collateral or assets or properties of the Guarantor, including reasonable attorneys' fees ... ."

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with trebled damages, punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT THIRTEEN**

**BREACH OF CONTRACT**

**LITTLE OWL, MARGON, CARDINAL** and **TRIFFLER TRUST**

**(Jury Trial Waived By Charged Defendants)**

659.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

660.     As an express condition of the execution of the Fintech Loan Agreement, the Subordinated Defendants executed subordination agreements whereby they each agreed not to receive interest payments from Argon Credit for the outstanding notes that each of the Subordinated Defendants held from Argon Credit if there was an event of default.

661.     The Original Subordination Agreements and the Subordination Agreements included the No Payment Provision that provided that "until the Senior Lender has given written notice to the [Subordinated Defendants] that all Obligations to the Senior Lender have been fully and indefeasibly paid and satisfied in full, no Obligor shall pay to the [Subordinated Defendant], and the [Subordinated Defendant] shall not accept or receive, any payment of principal, interest, fees, costs and expenses under the Subordinated Debt."

662.     The No Payment Provision, however, included an exception that "so long as no Event of Default has occurred under the Loan Documents or would result from such payment, [Argon Credit] shall be entitled to pay and the Subordinated Lender shall be entitled to accept and

receive, the scheduled payments of principal and interest … under the Subordinated Debt, but only when such payments are scheduled under the current Subordinated Loan Documents, correct and complete copies of which have been provided to the Senior Lender."

663.    At the time that Argon Credit paid, and the Subordinated Defendants accepted, the interest payments, the Subordinated Defendants knew or should have known that Argon Credit was insolvent and thus there existed an Event of Default which would have prohibited the payment of any interest payments to the Subordinated Defendants.

664.    Moreover, the Subordinated Defendants failed to disclose or otherwise provide any notice to Princeton as to their respective demands for and receipt of such interest payments.

665.    The Subordinated Defendants, by their acceptance of the interest payments, have breached their respective Subordination Agreements and Original Subordination Agreements, as the case may be.

666.    For the reasons set forth in great particularity throughout this Complaint, the Subordination Defendants are obligated pursuant to the Subordination Agreement to repay to Princeton those interest payments that were received by each of them in violation of the Subordination Agreements.

667.    The Subordination Agreements specifically provided at Paragraph 17 that "[t]he [Subordinated Defendants] agree[] to indemnify and to hold [Princeton], its officers, directors, agents and employees harmless for any and all losses, damages, liabilities, expenses and obligations, including reasonable attorneys' fees and expense, as they arise relating to actions of the Subordinated Lender taken contrary to this Agreement." (emphasis supplied).

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants set forth and identified in this Count, jointly and severally, in an amount in excess of the amount of $75,000.00, including compensatory and punitive damages, pre-judgment interest

and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT FOURTEEN

## UNJUST ENRICHMENT

### All Defendants

668.   The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

669.   As set forth more fully above, Defendants, in various ways and manners, committed fraud or aided and abetted the commission of fraud against Princeton for their respective financial benefit.

670.   Defendants' wrongfully obtained financial gains were the result of fraud, or the aiding and abetting of such unlawful acts, and accordingly, Defendants must return those ill-gotten gains and unjust enrichments to Princeton as the secured lender.

671.   It would be unjust and inequitable for Defendants to retain the monies and revenues Defendants secured as a result of the fraud.

672.   As a result of such unjust enrichment, Princeton has suffered substantial financial losses related to its loss of the Secured Collateral.

673.   Princeton respectfully demands disgorgement and judgment against each Defendant in an amount to be determined at trial.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants set forth and identified in this Count, jointly and severally, in an amount in excess of the amount of $75,000.00, including compensatory and punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT FIFTEEN

## <u>EQUITABLE CLAIMS FOR RESTITUTION & DISGORGEMENT</u>

### All Defendants

674.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

675.    As set forth more fully above, Defendants, in various ways and manners, committed fraud or aided and abetted the commission of fraud against Princeton for their respective financial benefit.

676.    Because Defendants committed fraud or aided and abetted in the commission of the fraud against Princeton as the secured lender, each Defendant gained financially, as set forth herein in greater particularity, to the detriment of Princeton as the secured lender.

677.    Defendants' wrongfully obtained financial gains were the result of fraud, or the aiding and abetting of such unlawful acts, and accordingly, Defendants should be required to disgorge their ill-gotten gains and restitute those financial gains back to Princeton.

678.    It would be inequitable for Defendants to retain the monies and revenues Defendants secured as a result of the fraud.

679.    As a result, Princeton has suffered substantial financial losses related to its loss of the Secured Collateral and has no adequate remedies at law.

680.    Princeton respectfully demands disgorgement and judgment against each Defendant in an amount to be determined at trial.

**WHEREFORE,** Princeton respectfully requests that the Court exercise its equitable jurisdiction and grant Princeton against Defendants set forth in this Count the equitable remedies of disgorgement and restitution of those Secured Collateral stolen and thieved by such Defendants,

and such other equitable relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT SIXTEEN

### ALTER EGO/PIERCING THE CORPORATE VEIL

**LITTLE OWL, NOAX, BMONEY, BERGARVIV, MARGON, BLUE TREBLE, TRIFFLER TRUST, CARDINAL, FTAM, SPARTAN SPV, SPARTAN FINANCE and SSF HOLDINGS**

681.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

682.    Princeton specifically charge the following Defendant Entities as being the alter ego of other Argon Insiders or Argon Outsiders: LITTLE OWL, NOAX, BMONEY, BERGARVIV, MARGON, BLUE TREBLE, TRIFFLER TRUST, CARDINAL, FTAM, SPARTAN FINANCE, SSF HOLDINGS (collectively, "Defendant Entities").

683.    The Defendant Entities were corporate shams and the alter ego of their respective individual owners and the corporate veil of these Defendant Entities should be pierced to reach the personal assets of the individual Defendants who own or manage the Defendant Entity in order to satisfy any judgments achieved in this matter against any or all of such Defendant Entities.

684.    Upon information and belief, the individual Defendant owners of these Defendant Entities have commingled their personal funds with the corporate funds of these Defendant Entities, have not observed corporate formalities, have used the corporate form to perpetrate the fraud against Princeton and, in essence, has operated the Defendant Entities not as separate entities but rather as a single entity, in essence an informal proprietorship as an extension of himself.

685.    For the reasons and upon the facts set forth in this Complaint, the individual Defendants have also abused the corporate form of the Defendant Entities and utilized each of them to perpetrate a fraud upon Princeton.

686.     Accordingly, the corporate veil of these Defendant Entities should be pierced, and the individual owners of such Defendant Entities should be held directly liable for all amounts deemed to be owed to Princeton pursuant to this Complaint.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants set forth and identified in this Count, jointly and severally, in an amount in excess of the amount of $75,000.00, including compensatory and punitive damages, pre-judgment interest and such other relief as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## PRAYER FOR RELIEF

**WHEREFORE,** FRS respectfully prays that:

687.     This Court enter judgment that:

a.     The various Defendants identified herein have violated the RICO Act by engaging in prohibited racketeering activities to further their schemes to defraud, divert and deprive Princeton from its Secured Collateral through the repeated (i) submission of false financial documents meant to delay Princeton's declaration of an event of default and (ii) diversion of Collections, Receivables and other Secured Collateral to third parties away from the Argon Entities, all actively concealed from and to the financial loss and detriment of Princeton all as more fully set forth above and as will be proven at trial; and

b.     The various Defendants identified herein have knowingly, willfully, intentionally, recklessly and negligently violated Illinois and/or Delaware common law in various manners: (i) by committing fraud and fraudulent concealment of such fraud meant to defraud, divert and deprive Princeton from its Secured Collateral through the repeated submission of false financial documents meant to delay Princeton's declaration of an event of default and diversion of Collections, Receivables and other Secured Collateral to third parties away from the Argon

Entities, all actively concealed from and to the financial loss and detriment of Princeton; (ii) by aiding and abetting certain Defendants of these violations of Illinois and/or Delaware common law; and (iii) by otherwise thieving and absconding with the Secured Collateral that was the property of Princeton at a time when the Argon Entities were insolvent.

688.    This Court award a monetary amount to compensate FRS for those compensatory losses and damages sustained by FRS as a result of the various violations of the RICO Act and Illinois and Delaware common law, as set forth above in the preceding paragraphs, caused and committed by various Defendants as set forth above with particularity.

689.    All Defendants, as identified herein, be required, in the alternative, to account for and disgorge to FRS all funds and assets that were Secured Collateral, all of which FRS is entitled to pursuant to the RICO Act and Illinois and/or Delaware common law.

690.    This Court award to FRS recovery of: (i) the costs of the instant suit, including its reasonable attorneys' fees and costs incurred herein, as provided by the RICO Act, 18 U.S.C. § 1964.

691.    This Court award treble, punitive and exemplary damages to FRS based on the various acts and conduct of various Defendants in violation to the RICO Act and Illinois and/or Delaware common law and the damages of $238,014,066.18 suffered by the FRS.

692.    This Court award such other, different and further relief as the Court may deem just, equitable and proper.

## **<u>JURY TRIAL DEMANDED</u>**

FRS hereby demands a trial by jury, except as to the Breach of the Guaranty and Breach of Contract claims for which the named Defendants have contractually waived their right to a jury trial.

[**Remainder Of Page Left Intentionally Blank**]

[**Signature Page Follows**]

Dated: Chicago, Illinois

September 25, 2020

**FUND RECOVERY SERVICES, LLC, a
Delaware limited liability company, as assignee
of PRINCETON ALTERNATIVE INCOME
FUND, L.P., a New Jersey limited partnership,**

_____

One of Its Attorneys

Kenneth J. Ashman (ARDC 6206515)
ASHMAN LAW, LLC
2801 Orange Brace Road
Riverwoods, Illinois 60015
312.596.1700 (p)
312.873.3800 (f)
kashman@ashman.law

Maurice R. Mitts (Pa. Bar No. 50297)
(To be admitted _Pro Hac Vice_)
Gerard M. McCabe (Pa. Bar No. 66564)
(To be admitted _Pro Hac Vice_)
Geoffrey P. Huling (Pa. Bar No. 75800)
(To be admitted _Pro Hac Vice_)
MITTS LAW, LLC
1822 Spruce Street
Philadelphia, PA 19103
215.866.0110 (p)
215.866.0111 (f)
mmitts@mittslaw.com
gmccabe@mittslaw.com
ghuling@mittslaw.com

# **EXHIBIT A**

Index Of Partial Listing Of Predicate Acts

## INDEX OF PARTIAL LISTING OF EMAILS AS PREDICATE ACTS

| DATE | SENDER | RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|
| 9/9/15-9/10/15 | Eric Schnosenberg | Bob Farrell (PAIF), Shari Chorba (PAIF) | Re: Borrowing Base August (includes Borrowing Base Calculation as of 8/31/15, Detailed Tracking Sheet, Argon Aging Portfolio Performance, Argon Aging Portfolio by Percentages, Argon Aging Portfolio by Amount and Borrowing Base Calculation as of Today |
| 9/9/15-9/25/15 | Eric Schnosenberg | Bob Farrell (PAIF) | Re: Borrowing Base August (includes Argon Credit Balance Sheet 8/31/15 and Argon Credit Income Statement January-August 2015 |
| 10/2/15-10/4/15 | Eric Schnosenberg | Walt Wojciechowski (PAIF), Phil Burgess (PAIF), Bob Farrell (PAIF) | Re: Financial Statement Questions (includes answers to questions and Promissory Note between Argon Credit and Berj Arakelian) |
| 10/23/15 | Eric Schnosenberg | Bob Farrell (PAIF) | 9.15 FS Reporting Package (includes Argon Credit Trial Balance as of September 30, 2015, Argon Credit Balance Sheet as of September 30, 2015, Argon Credit Profit and Loss January-September 2015, Argon Credit General Ledger September 2015 and Argon Credit Borrowing Base Calculation as of 9/30/15) |
| 11/11/15 | Eric Schnosenberg | Bob Farrell (PAIF) | Re: Portfolio Snapshot |

| DATE | SENDER | RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|
| 11/16/15 | Eric Schnosenberg | Bob Farrell (PAIF) | Re: 10.15 Financial Reporting.xlsx (includes Argon Credit Trial Balance a of 11/1/16, Argon Credit Balance Sheet as of 10/31/15, Argon Credit Profit and Loss January-October 2015, Argon Credit General Ledger October 2015 and Argon Credit Borrowing Base Calculation as of 10/31/15) |
| 11/16/15-11/17/15 | Eric Schnosenberg | Bob Farrell (PAIF), Phil Burgess (PAIF) | Re: 10.15 Financial Reporting.xlsx (email only) |
| 6/15/16 | Eric Schnosenberg | Jack Cook (PAIF) Shari Chorba (PAIF) | 05.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report and Argon Bank Reconciliation Reports Argon Credit, LLC – May) |
| 6/17/16 | Eric Schnosenberg | Jack Cook (PAIF) | 05.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp) |
| 7/18/16 | Eric Schnosenberg | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF) | 06.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp and Bank of America Bank Statement Argon Credit, LLC – June) |
| 8/15/16 | Eric Schnosenberg | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | 07.15 Argon FS.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp) |
| 10/6/16 | Eric Schnosenberg | Howard Davner (PAIF), Jack Cook (PAIF) | 08.16 Argon FS.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp, and Bank of America Bank Statements Argon Credit, LLC July/August) |

| DATE | SENDER | RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|
| 10/17/16 | Eric Schnosenberg | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | 09.2016 FS Argon.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Bank Statements, Borrowing Base, Interest TrueUp) |
| 10/19/16 | Adam Diekelman | Eric Schnosenberg, Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | 09.16 Argon Financial Statements (includes Bank of America Bank Statement for Argon Credit, LLC and Elk Grove Village Bank Statement for Argon X, LLC – September 2016) |
| 11/21/16 | Adam Diekelman | Howard Davner (PAIF) | Elk Grove Village Bank Statements for Argon X, LLC – 10/31/16 |
| 11/21/16 | Adam Diekelman | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba PAIF), Victoria Behnke (PAIF) | 10.2016 FSV1.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report) |
| 11/22/16 | Adam Diekelman | Howard Davner (PAIF) | Bank of America Bank Statement Argon Credit, LLC – October 2016 |