**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FUND RECOVERY SERVICES, LLC,**

Plaintiff,

v.

**RBC CAPITAL MARKETS, LLC et al.,**

Defendants.

**Case No. 1:20-cv-5730**

**Hon. Judge Matthew F. Kennelly**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
COUNTS 1-2 AS TIME BARRED, COUNTS 1-11 AND 14-16 FOR
LACK OF STANDING, AND SPARTAN FRAUD CLAIM ON
COLLATERAL ESTOPPEL GROUNDS**

**Foley & Lardner, LLP**
321 N. Clark Street, Suite 3000
Chicago, Illinois 60654-4762
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Michael J. Small (IL Bar No. 6207645)
William J. McKenna (IL Bar No. 3124763)
David B. Goroff (IL Bar No. 6190039)
msmall@foley.com
wmckenna@foley.com
dgoroff@foley.com

*Attorneys for Little Owl Argon, LLC, Glenora
Company, James I. Uihlein and James P.
Uihlein*

**Greenberg Traurig, LLP**
77 W. Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8400
Scott T. Mendeloff
Gabriel Aizenberg
mendeloffs@gtlaw.com
aizenbergg@gtlaw.com

*Attorneys for Peter Ferro, Jr., Margon LLC,
Joseph Canfora, Mark Triffler, Mark Triffler
Trust, Bruce Breitweiser, Byron Faermark,
Barry Edmonson, Cardinal Trust and Merit
Gaming Management Group, L.P.*

**Cotsirilos, Tighe, Streicker, Pouolos &
Campbell, Ltd.**
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
Telephone: (312) 263-0345
Terence H. Campbell
Eric S. Pruitt
tcampbell@cotsiriloslaw.com
epruitt@cotsiriloslaw.com
*Attorneys for John A. Kuhlman, Jr.*

**Spach Manahan O'Dell LLP**
12707 High Bluff Drive, Suite 200
San Diego, California 92130
Telephone: (858) 925-3391
Ryan Dennis O'Dell
rodell@smolawfirm.com

*Attorney for Berj Arakelian, B. Money
Holdings, LLC and Bergarive, LLC*

**Abrahamson, Reed & Bilse**
8230 Hohman Avenue
Munster, Indiana 46321
Telephone: (219) 595-5306
Harold Abrahamson
aralawfirm@aol.com

*Attorney for Eric Schnosenberg*


**Bauch & Michaels, LLC**
53 W. Jackson Blvd., Suite 1115
Chicago, Illinois 60604
Telephone: (312) 588-5000
Paul M. Bauch
Carolina Y. Sales
pbauch@bmlawllc.com
csales@bmlawllc.com

*Attorneys for Sean Tomaszkiewicz and Blue
Treble Solutions, LLC*


**Greenberg Traurig, LLP**
77 W. Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8400
Steven Marc Malina
David Stephen Repking
malinas@gtlaw.com
repkingd@gtlaw.com

*Attorneys for RBC Capital Markets, LLC*


**Law Office of Peter S. Stamatis, PC**
1 E. Wacker Drive, Suite 2350
Chicago, Illinois 60601
Telephone: (312) 606-0045
Peter Sam Stamatis
peter@stamatislegal.com

and

**Law Offices of Steven S. Shonder**
1 E. Wacker Drive, Suite 2350
Chicago, Illinois 60601
Telephone: (312) 612-5191
Steven S. Shonder
steve@shonderlegal.com

*Attorneys for Harry Madanyan*

**Nishay Kumar Sanan**
53 W. Jackson, Suite 1437
Chicago, Illinois 60604
Telephone: (312) 692-0360
Nishay K. Sanan
nsanan@aol.com

*Attorney for Bruce Goldstein and Alhambra
Circle Partners, LLC*

**Jaszczuk P.C.**
30 S. Wacker Drive, Suite 2200
Chicago, Illinois 60606
Telephone: (312) 442-0366
Daniel I. Schlessinger
Seth Corthell
dschlessinger@jaszczuk.com
scorthell@jaszczuk.com

and

**Cohen Tauber Spievack & Wagner P.C.**
420 Lexington Avenue, Suite 2400
New York, New York 10170
Telephone: (212) 586-5800
Kenneth J. Rubinstein
Jackson S. Davis
krubinstein@ctswlaw.com
jdavis@ctswlaw.com

*Attorneys for Daniel Wirzberger*

**Gary Zumski**
4204 E. Frontage Road
Rolling Meadows, Illinois 60008
globalwide08@gmail.com

*Pro Se*

**Barry Kostiner**
bkostiner@fintecham.com

*Pro Se*

## TABLE OF CONTENTS

PRINCETON'S RICO CLAIMS (COUNTS 1-2) ARE TIME-BARRED ................................... 1

I.      Relevant Factual Background ........................................................................... 1

II.     Argument .......................................................................................................... 3

        A.  Applicable Standards for Dismissal on Statute of Limitations Grounds. .................... 3

        B.  Statute of Limitations for RICO Claims/Princeton's Discovery of its Injury. ............. 7

PRINCETON LACKS STANDING TO ASSERT ITS CLAIMS (COUNTS 1-11 & 14-16) ..... 10

I.      Relevant Factual Background. ........................................................................ 10

II.     Standing Law in Cases Related to Bankruptcy Estates. ................................. 13

III.    Application of Legal Principles: The Complaint Fails to Allege Direct or Personal
        Injuries to Princeton Regarding RICO Claims. .............................................. 15

        A.  The Purported RICO Scheme Preceded the Fintech/Princeton Loans to Argon,
            Which Means it Could not Have Been Directed at Princeton. ................................. 16

        B.  The Sole Injury Asserted Allegedly Arises From the Wrongful Depletion,
            Diversion, and Transfer of "Argon's" Assets From "Argon," Which Means
            the RICO Claims are General, not Personal to Princeton. .......................................... 18

            1.  Princeton's Claims Are Grounded Only Upon Allegations of Asset Depletion
                or Diversion. ...................................................................................................... 19

            2.  Alleged Diversion of Argon Credit Assets and Spartan Loans .............................. 22

        C.  Princeton's Allegations that Defendants Provided it with False Financial
            Information Did Not Give Rise to Direct Harms Unique to Princeton...................... 24

        D.  Princeton's Lawsuit is Virtually Identical to the Adversary Complaints the
            Argon Trustee has Brought Against Many of the Same Defendants......................... 26

        E.  Princeton Also Lacks Standing to Assert All But Two of Its State-Law Claims. ...... 30

PRINCETON SHOULD BE COLLATERALLY ESTOPPED FROM RELITIGATING
THE ALLEGED SPARTAN FRAUD.................................................................................. 31

I.      Relevant Facts ................................................................................................ 31

II.     The New Jersey Action ................................................................................... 32

III.    Argument ........................................................................................................ 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*188 LLC v. Trinity Indus. Inc.*,
300 F.3d 730 (7th Cir. 2002) ...............................................................11

*A & G Goldman P'ship v. Picard*,
2013 U.S. Dist. LEXIS 143956 (S.D.N.Y. 2013) ...................................29

*Ahmed v. Quinn*,
1996 WL 388418 (N.D. Ill. 1996) ...........................................................8

*In re AIG Workers Comp. Ins. Policyholder Litig.*,
2015 WL 1992723 ...............................................................................5, 7

*Appel v. LaSalle Cty. State's Atty. Felony*,
2019 U.S. Dist. LEXIS 150277 (N.D. Ill. 2019) .....................................9

*In re Argon Credit, LLC*,
570 B.R. 70 (Bankr. N.D. Ill. 2017) .................................................10, 22

*Avitia v. Metropolitan Club of Chicago, Inc.*,
924 F.2d 689 (7th Cir. 1991) ................................................................35

*Best v. City of Portland*,
554 F.3d 698 (7th Cir. 2009) ................................................................32

*Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Illinois, Inc.*,
2019 WL 2060934 (N.D. Ill. 2019) .........................................................4

*Brandt v. Luxor Hotel & Casino*,
2011 Bankr. LEXIS 2221 (Bankr. N.D. Ill. 2011) ...................................7

*Brandt v. Suntrust Leasing Corp.*,
2012 Bankr. LEXIS 6087 (Bankr. N.D. Ill. 2012) ...................................4

*In re Breland*,
2018 Bankr. LEXIS 2031 (Bankr. S.D. Ala. 2018) .................................4

*In re Brown*,
951 F.2d 564 (3d Cir. 1991)..................................................................34

*Campos v. Aegis Realty Mgmt. Corp.*,
2020 WL 433356 (S.D.N.Y. 2020)..........................................................7

*In re Cent. Illinois Energy Coop.*,
 2016 WL 299007 (C.D. Ill. 2016) ........................................................................4

*Collins v. Vill. of Palatine*,
 203 F. Supp. 3d 952 (N.D. Ill. 2016) ...................................................................3

*Commodity Futures Trading v. Bd. of Trade*,
 701 F.2d 653 (7th Cir. 1983) .............................................................................35

*Dana Molded Prods, Inc. v. Brodner*,
 58 B.R. 576 (Bankr. N.D. Ill. 1986) ...............................................18, 19, 22, 30

*Delgado Oil Co. v. Torres*,
 785 F.2d 857 (10th Cir. 1986) ..........................................................................26

*Deutsche Bank Nat'l Tr. Co. v. Klinger*,
 2019 N.J. Super. Unpub. LEXIS 1464 (N.J. App. Div. 2019)..........................34

*Dickman v. Office of the State's Attorney of Cook Cty.*,
 2018 WL 1377907 (N.D. Ill. 2018) .....................................................................5

*Ennega v. Starns*,
 677 F.3d 766 (7th Cir. 2012) ...............................................................................5

*Gecker v. GE Capital Corp.*,
 2015 U.S. Dist. LEXIS 97658 (N.D. Ill. 2015) ...............................13, 14, 15, 16

*Gourmet Center v. Fox*,
 2006 Bankr. LEXIS 1042 (Bankr. N.D. Ill. 2006).......................................25, 30

*Gregory Mktg. Corp. v. Wakefern Food Corp.*,
 207 N.J. Super. 607 (N.J. Super. Ct. 1985).......................................................34

*Haddad v. Am. Home Mortg. Serv., Inc.*,
 2019 WL 1425835 (N.D. Ill. 2019) .....................................................................8

*Hawthorne v. Silverleaf Funding, LLC*,
 2017 WL 2573213 (N.D. Ill. 2017) ...................................................................31

*Hills Dev. Co. v. Township of Bernards*,
 510 A.2d 621 (N.J. 1986).................................................................................34

*In re Ionosphere Clubs, Inc.*,
 156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .......................29

*Jabri v. Bank of Am., N.A.*,
 2021 U.S. Dist. LEXIS 32646 (D.N.J. 2021) ................................................32, 33

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
  610 F.3d 382 (7th Cir. 2010) ............................................................7, 35

*Koch Refining v. Farmers Union Central Exchange, Inc.*,
  831 F.2d 1339 (7th Cir. 1987) ..........................................13, 14, 15, 30

*Koch v. Christie's Int'l PLC*,
  785 F. Supp. 2d 105 (S.D.N.Y. 2011), *aff'd*, 699 F.3d 141 (2d Cir. 2012) ............................6

*Konieczny v. Micciche*,
  702 A.2d 831 (N.J. App. Div. 1997).....................................................37

*Leibowitz v. First Chicago Bank & Trust*,
  422 B.R. 659 (Bankr. N.D. Ill. 2010), *aff'd*, 458 B.R. 911 (N.D. Ill. 2011)....................22, 23

*Limestone Dev. Corp. v. Vill. of Lemont*,
  473 F. Supp. 2d 858 (N.D. Ill. 2007) ..................................................5, 6

*Microbilt Corp. v. Ranger Specialty Income Fund (In re Princeton Alt. Income Fund)*,
  2019 U.S. Dist. LEXIS 205745 (D.N.J. 2019) ......................................1

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
  877 F.2d 1333 (7th Cir. 1989) .................................................14, 19, 25

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.*,
  605 F.2d 990 (7th Cir. 1979) ...............................................................35

*Mitsubishi Elec. Sales America, Inc. v. Higgins*,
  1988 U.S. Dist. LEXIS 12898 (N.D. Ill. 1988) ............................. *passim*

*In re MortgageAmerica Corp.*,
  714 F.2d 1266 (5th Cir. 1983) .............................................................21

*Nat'l Therapeutic Assocs., Inc. v. Concept Rehab, Inc.*,
  2000 U.S. Dist. LEXIS 14563 (N.D. Ill. 2000) ................................18, 19

*O'Leary v. Liberty Mut. Ins. Co.*,
  923 F.2d 1062 (3d Cir. 1991)...............................................................36

*Olvera v. Blitt & Gaines, P.C.*,
  2004 WL 887372 (N.D. Ill. 2004) .........................................................2

*In re Pierport Dev. & Realty, Inc.*,
  502 B.R. 819 (Bankr. N.D. Ill. 2013) ..................................................14

*Rao v. BP Prods. N. Am., Inc*,
  2006 U.S. Dist. LEXIS 95271 (N.D. Ill. 2006) .................................8, 10

*Saladino v. Redisi*,
  2004 WL 2075126 (N.D. Ill. 2004) ................................................................8

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
  782 F.3d 922 (7th Cir. 2015) .......................................................................7

*In re Sillerman*,
  605 B.R. 631 (Bankr. S.D.N.Y. 2019) ..........................................................4

*State v. K.P.S.*,
  112 A.3d 579 (N.J. 2015) ............................................................................35

*Stelmokas v. Bank of Am., N.A.*,
  2020 WL 1487270 (N.D. Ill. 2020), *aff'd*, 819 F. App'x 441 (7th Cir. 2020) ......................31

*Tobia v. Lakewood Bd. of Educ.*,
  2020 U.S. Dist. LEXIS 234236 (D.N.J. 2020) .............................................33

*Town of Poughkeepsie v. Espie*,
  402 F. Supp. 2d 443 (S.D.N.Y. 2005).........................................................10

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
  67 F.3d 605 (7th Cir. 1995) ..........................................................................9

*Wooten v. Loshbough*,
  951 F.2d 768 (7th Cir. 1991) ............................................................. *passim*

*Youkelsone v. F.D.I.C.*,
  910 F. Supp. 2d 213 (D.D.C. 2012), *aff'd*, 560 F. App'x 4 (D.C. Cir. 2014)....................5, 6, 7

*Zalesiak v. UnumProvident Corp.*,
  2007 U.S. Dist. LEXIS 92233 (N.D. Ill. 2007) ...........................................8

**Statutes**

11 U.S.C. § 541(a)(1)...............................................................................4, 13, 14, 15

11 U.S.C. § 1106(a)(3)...........................................................................................1

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..................................................................................3, 4, 14

Fed. R. Evid. 201(b)............................................................................................5, 6

Restatement (2d) of Judgments, § 13, cmt. g...................................................35

Restatement (2d) of Judgments § 27, cmt.........................................................36

**PRINCETON'S RICO CLAIMS (COUNTS 1-2) ARE TIME-BARRED.**

The RICO claims (Counts 1-2) are time-barred. Under RICO, there is a four-year statute of limitations that begins to run when the plaintiff knew or through reasonable diligence should have known of its injury. Princeton repeatedly has admitted that it knew of its injury in or before February 2016, which means it had to file its RICO claim at the latest by February 2020. Princeton filed its RICO complaint in September 2020 so its RICO claims are untimely. Counts 1 and 2 thus should be dismissed with prejudice.

## I. Relevant Factual Background

***The Princeton Bankruptcy and Appointment of Chapter 11 Trustee.*** On March 9, 2018, Princeton filed a voluntary bankruptcy petition under Chapter 11 in the U.S. Bankruptcy Court for the District of New Jersey. *See Microbilt Corp. v. Ranger Specialty Income Fund (In re Princeton Alt. Income Fund)*, 2019 U.S. Dist. LEXIS 205745, *4 (D.N.J. 2019). In November 2018, the Bankruptcy Court authorized the appointment of Matthew Cantor as Princeton's Chapter 11 trustee ("Princeton Trustee"). *Id*. The District Court later affirmed this appointment. *Id. *2. As part of his duties as a Chapter 11 trustee, the Princeton Trustee was required to, among other things, "investigate the acts, conduct, assets, liabilities, and financial condition of [Princeton], the operation of [Princeton's] business." 11 U.S.C. § 1106(a)(3).

***Princeton's Admission of Knowledge of Injury at the Latest In or Before February 2016.*** On July 29, 2019, on behalf of Princeton, the Princeton Trustee filed an adversary complaint against officers of Princeton, including Philip N. Burgess, Jr. ("Burgess") and Walter Wojciechowski ("Wojciechowski"),[1] for violations of New Jersey's RICO Act, fraudulent conveyances, breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and other

---

[1] Princeton here alleges that Burgess and Wojciechowski are representatives of Princeton. (¶169; Cplt., Ex. A at 1.)

1

breaches. (*In re Princeton*, Dkt. No. 751 (July 29, 2019) ("Adv. Compl.") (Aizenberg Decl., **Ex. 1**).) FRS cannot effectively assert that it is somehow not bound by the actions of the Princeton Trustee.[2]

Critically, the Princeton Trustee, who stepped into the shoes of Princeton, also alleged that Princeton was on actual notice of the alleged misconduct at Argon ***before February 2016*** – when Princeton increased the credit line under the Fintech Loan Agreement (¶90) – that Argon X had committed fraud, converted collateral, and breached its loan agreement. The Trustee alleged:

> ***Before*** increasing the line to Argon X [in February 2016 ], Burgess, Wojciechowski and certain of the other Defendants were aware that the persons in control of Argon X had ***violated the credit agreements, converted collateral and committed other fraudulent transactions.***" [Adv. Compl. at ¶ 34.]

Consistent with this, the Princeton Trustee alleged elsewhere in his RICO complaint that Princeton's officers Burgess and Wojciechowski "had notice of 'red flags' concerning Argon X's performance ***months earlier***" than December 2016 "but turned a blind eye and allowed Argon X unfettered access to its PAIF revolver until December 7, 2016." (Adv. Compl. at ¶ 48.)

***Princeton Admission of Knowledge of Injury as of March 2016***. On February 19, 2020, the Trustee and Princeton's members jointly filed Princeton's Fifth Amended Disclosure Statement (*In re Princeton*, Dkt. No. 1098 (Feb. 19, 2020) ("Disclosure Statement") in support of

---

[2] On December 7, 2016, Princeton assigned to FRS "all of its right, title and ownership interest in, and claims to the Fintech Loan Agreement." (¶480.) "[Princeton's] assignment to [Plaintiff] included the assignment of all right, title, and ownership interest in, and claims to any and all other agreements between [Princeton] and the Argon Entities." (¶481.) As such, FRS refers to itself and Princeton collectively as "Princeton" (Cplt. at 1) and asserts the Counts in the Complaint on Princeton's behalf. (Count 1, ¶544 ("Princeton's damages from the unlawful actions of Defendants … ."), Prayer for Relief ("Princeton respectfully requests that the Court enter judgment … ."); Count 2, ¶552 ("Princeton has incurred direct and proximate damages … ."), Prayer for Relief ("Princeton respectfully requests that the Court enter judgment… .").) "It long has been held that '[t]he assignee stands in the shoes of the assignor.'" *Olvera v. Blitt & Gaines, P.C.*, 2004 WL 887372, *4 (N.D. Ill. 2004). "'[E]lementary contract law provides that upon a valid and unqualified assignment the assignee … assumes the same rights, title and interest possessed by the assignor.'" *Id.* (quoting *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849, 864 (7th Cir. 1997)).

the Fifth Amended Joint Chapter 11 Plan of Reorganization of Princeton (*In re Princeton*, Dkt.

No. 1097 (Feb. 19, 2020) ("Plan"). (Aizenberg Decl., **Ex. 2**.) In the Disclosure Statement,

Princeton and its owners, admitted that Princeton's knew of Argon's alleged fraud no later than

March 2016:

> During his tenure, the Trustee examined the facts underlying the creation of what
> has been described as the "Argon Side Pocket." [PAIF's assignment of the Argon
> investment to FRS] According to footnote 4 to the December 31, 2017 financial
> statements of PAIF, in December 2016, PAIF's largest portfolio investment, known
> as Argon, filed bankruptcy, and at that time PAIF assigned all of its rights against
> Argon to Fund Recovery Services, LLC, ("FRS") a wholly owned subsidiary of
> PAIF, allegedly pursuant to the LPA. The Argon Side Pocket was established by
> the Debtors to hold all of the Debtors' interests in the Argon investment. ***The
> creation of the Argon Side Pocket was effective as of <u>March</u> <u>2016,</u> <u>when</u> <u>the</u>
> <u>Debtors</u> <u>first</u> <u>learned</u> <u>of</u> <u>the</u> <u>fraud</u> <u>committed</u> <u>by</u> <u>Argon</u>***, at the direction of the
> Debtors' accountants. [Disclosure Statement at 11-12.]

On March 13, 2020, the Bankruptcy Court entered an order approving the Disclosure

Statement and confirming the Plan. (*In re Princeton*, Dkt. No. 1134 (Mar. 13, 2020) (Aizenberg

Decl., **Ex. 3**).) The Bankruptcy Court's order provides that the Plan is binding on Princeton. (*Id.*

at 17.)

## II.    Argument

### A.    Applicable Standards for Dismissal on Statute of Limitations Grounds.

The RICO claims in Counts 1-2 should be dismissed because FRS filed its action outside

of the statute of limitations. "[T]he law is clear that dismissal" on statute of limitations grounds "is

appropriate" on a motion to dismiss "if the complaint sets forth everything that is necessary to

establish the affirmative defense." *Collins v. Vill. of Palatine*, 203 F. Supp. 3d 952, 955 (N.D. Ill.

2016) (citing *Bonnstetter v. City of Chi.*, 811 F.3d 969, 974 (7th Cir. 2016) (a "statute of limitations

defense is properly considered in determining a Rule 12(b)(6) motion when the factual allegations

in the complaint establish such a defense.")). On a motion to dismiss a complaint as untimely, the

court also may "consider not just the complaint's allegations but also matters of which it may

properly take judicial notice, including official court records." *Id.* (granting motion to dismiss class action on statute of limitations by taking judicial notice of prior class action complaints involving the same facts and class members). Further, where "significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them." *Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Illinois, Inc.*, 2019 WL 2060934, *3 (N.D. Ill. 2019).

*The Trustee's statements in In re Princeton are binding on Princeton.* Upon appointment, a Chapter 11 Trustee steps into the shoes of the debtor and acts on behalf of the debtor in every respect throughout the bankruptcy proceedings. *See In re Cent. Illinois Energy Coop.*, 2016 WL 299007, *6 (C.D. Ill. 2016) ("the Trustee stands in the shoes of the Debtor"); *Brandt v. Suntrust Leasing Corp.*, 2012 Bankr. LEXIS 6087, *9 (Bankr. N.D. Ill. 2012) ("Such a cause of action constitutes property of the estate under section 541 of the Bankruptcy Code, and the trustee, in asserting it, steps into the shoes of the debtor in every respect."); *In re Sillerman*, 605 B.R. 631, 655 (Bankr. S.D.N.Y. 2019) (a Chapter 11 trustee "step[s] into the shoes of the debtor-in-possession" and "take[s] control of the estate and the Debtor's affairs…."); *In re Breland*, 2018 Bankr. LEXIS 2031, *7-8 (Bankr. S.D. Ala. 2018) ("Where a chapter 11 trustee has been appointed…the duties and obligations set forth in § 1107 are transferred to the trustee, in addition to the statutory duties set out in § 1106. A chapter 11 trustee thence stands in the shoes of the debtor and thereafter performs the fiduciary debtor-in-possession duties ….") (quotations omitted).

*Judicial Notice of Princeton Trustee's Filings.* Defendants here rely upon the Trustee's filings in the Princeton bankruptcy to support their statute of limitations argument, which is proper as a matter of law. Courts may properly take judicial notice of "facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of

4

accurate and ready determination through sources whose accuracy cannot be questioned." *Ennega v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *see also* Fed. R. Evid. 201(b). "[C]ourt records are generally appropriate subjects for judicial notice because they are sources 'whose accuracy cannot reasonably be questioned.'" *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 868 (N.D. Ill. 2007) (quoting *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records"), *aff'd sub nom.*, 520 F.3d 797 (7th Cir. 2008); *see also Dickman v. Office of the State's Attorney of Cook Cty.*, 2018 WL 1377907, *4 (N.D. Ill. 2018) (taking judicial notice of court records attached to motion to dismiss). On a motion to dismiss, a complaint may be dismissed on statute of limitations grounds where it is plain from the complaint, its attachments, and documents properly subject to judicial notice that the defense is a bar to the suit and dismissal is proper without further pleading. *See Limestone Dev.*, 473 F. Supp. 2d at 867 (taking judicial notice of plaintiff's allegations contained in complaint in previous litigation on motion to dismiss RICO claim based on statute of limitations); *In re AIG Workers Comp. Ins. Policyholder Litig.*, 2015 WL 1992723, *3 (taking judicial notice of national news articles on motion to dismiss to show that plaintiffs should have been aware of injury and dismissing RICO claims based on statute of limitations). Courts consider documents and facts subject to judicial notice on a motion to dismiss "to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Limestone Dev.*, 473 F. Supp. 2d at 867.

Courts routinely dismiss RICO claims as untimely at the motion to dismiss stage based on facts contained in judicially-noticed documents. *See, e.g.*, *Limestone Dev.*, 473 F. Supp. 2d at 867; *AIG Workers Comp. Ins.*, 2015 WL 1992723, *4 (judicial notice of national news articles); *Youkelsone v. F.D.I.C.*, 910 F. Supp. 2d 213, 226 (D.D.C. 2012), *aff'd*, 560 F. App'x 4 (D.C. Cir.

2014) (judicial notice of court documents); *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 111 (S.D.N.Y. 2011), *aff'd*, 699 F.3d 141 (2d Cir. 2012) (judicial notice of news articles, documents describing other lawsuits, test results, and deposition testimony from a related state court action).

In *Limestone Dev.*, the court took judicial notice on a motion to dismiss of allegations a plaintiff made in two state court lawsuits before the filing of the plaintiff's RICO claim. 473 F. Supp. 2d at 870. In dismissing the RICO claim as untimely, the court considered, *inter alia*, the "notice of the suit's filing … Plaintiff's allegations therein … and the outcome determined by the Cook County Circuit Court." *Id.* at 868 n.3. Based on these judicially noticed documents, the court ruled that the plaintiff "knew or should have known about its injury" no later than five years prior to filing its RICO claim. *Id.* at 871. Likewise, in *Youkelsone*, the court took judicial notice of allegations a plaintiff made in a prior conspiracy complaint which showed that the plaintiff "was certainly aware" of her injury more than four years prior to filing her RICO claim. *See* 910 F. Supp. 2d at 226-27 ("Certainly, she was not ignorant of the matters about which she complains in her RICO claim and about which she has complained in other courts on other occasions already.").

In this case, this Court should take judicial notice of the *Princeton's own* Adversary Complaint and the Disclosure Statement, which demonstrate that Princeton had discovered its claims no later than March 2016. (*See* Aizenberg Decl., **Exs. 1, 2**.) As Princeton's own filings, they are "not subject to reasonable dispute" and are documents "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Moreover, courts often take judicial notice of these types of documents (filings from another earlier-filed suit including in bankruptcy), which contain a party's judicial admissions regarding the untimeliness of its claim. *See Limestone Dev.*, 473 F. Supp. 2d at 868 n.3 (taking judicial notice of previous litigation commenced by plaintiff, including "(i) notice of the suit's filing, (ii) Plaintiff's allegations therein, and (iii) the outcome determined by

the Cook County Circuit Court"); *Youkelsone*, 910 F. Supp. 2d at 228 (taking judicial notice of "history of litigation over the foreclosure of [plaintiff's] property including all the appeals, her bankruptcy case, and WMI's bankruptcy case, which clearly demonstrate" plaintiff's knowledge of her claims); *see also Brandt v. Luxor Hotel & Casino*, 2011 Bankr. LEXIS 2221, *9 (Bankr. N.D. Ill. 2011) (judicial notice of plan of reorganization and disclosure statement on motion for judgment on the pleadings); *Campos v. Aegis Realty Mgmt. Corp.*, 2020 WL 433356, *4 (S.D.N.Y. 2020) (judicial notice on 12(b)(6) motion of "the Amended Disclosure Statement, the Plan, the Bankruptcy Court's adoption of the Plan, the Administrative Bar Date Order, and the affidavit of service for the Administrative Bar Date Order").

**B.     Statute of Limitations for RICO Claims/Princeton's Discovery of its Injury.**

The RICO claims must be dismissed because the Trustee, on behalf of Princeton, stated, among other things, that Princeton knew of the alleged fraud at Argon by February-March 2016, 4½ years prior to the date FRS, as assignee of Princeton's claim, filed the RICO claims in this case. The claims are untimely and must be dismissed with prejudice.

Princeton's RICO claims (Counts 1-2) "are governed by a four-year statute of limitations." *In re AIG Workers Comp. Ins. Policyholder Litig.*, 2015 WL 1992723, *3 (N.D. Ill. 2015). The statute of limitations "starts running when the prospective plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer … ." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010). The "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 926 (7th Cir. 2015). "Thus, the plaintiff need not know that the injury is actionable to trigger the statute of limitations." *AIG Workers Comp.*, 2015 WL 1992723, *3.

Discovery of an injury occurs and thus a RICO claim accrues when a plaintiff becomes aware or should have become aware of its injury. *See Zalesiak v. UnumProvident Corp.*, 2007 U.S. Dist. LEXIS 92233, *14 (N.D. Ill. 2007) ("A cause of action under RICO accrues when the plaintiff knew or *should have known* about the injury.") (emphasis in original); *Haddad v. Am. Home Mortg. Serv., Inc.*, 2019 WL 1425835, *6 (N.D. Ill. 2019) (dismissing RICO claim based on statute of limitations where plaintiffs "should have known" of their injuries more than four years before filing the complaint). Courts generally determine when a plaintiff discovered or should have discovered its injury based on the plaintiff's allegations – in the complaint before the court or made in another action. *See Cancer Found.*, 559 F.3d at 675 (plaintiffs were aware of their injury more than four years prior to filing RICO claim based on allegations that defendants forced an entity into bankruptcy which, in turn, prevented plaintiffs from receiving an $80 million donation pledge); *Saladino v. Redisi*, 2004 WL 2075126, *1 (N.D. Ill. 2004) (RICO claim untimely because it was "apparent from reading the factual discussion of [separate state court actions] by the Illinois appellate court that plaintiffs were aware of their alleged RICO injury when they filed [those previous actions]."); *Rao v. BP Prods. N. Am., Inc*, 2006 U.S. Dist. LEXIS 95271, *13-14 (N.D. Ill. 2006) ("Given the nature of his allegations … [plaintiff] should immediately have been aware of the resulting injury."). "In the fraud context, when the victim of alleged fraud becomes aware of facts that would lead a reasonable person to investigate whether a claim has arisen, that victim is on inquiry notice of his claim, and the limitations clock starts ticking." *Ahmed v. Quinn*, 1996 WL 388418, *5 (N.D. Ill. 1996) (citing *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995)); *see also Rao*, 2006 U.S. Dist. LEXIS 95271, *26 ("If Rao had acted with reasonable diligence, he would have become aware of the alleged fraud immediately.").

Princeton discovered its injury, or at a minimum was on notice of facts requiring further investigation of the alleged fraud at Argon, no later than March 2016. The clock began to run then even if Princeton did not discover the other elements of the claims until later. *See Appel v. LaSalle Cty. State's Atty. Felony*, 2019 U.S. Dist. LEXIS 150277, *19 (N.D. Ill. 2019) ("A [RICO] plaintiff who is aware of his injury is not allowed to wait until the time that he becomes aware of its unlawful nature.") (quoting *Chakonas v. City of Chicago*, 42 F.3d 1132, 1136 (7th Cir. 1994)).

*Princeton Learned of the Alleged Injury in or Before March 2016*. First, as detailed above, admissions of the Princeton Trustee in his RICO Action and statements by him in his Disclosure Statement – both judicially noticeable documents – show that Princeton knew of its injury, the alleged fraud at Argon and conversion of Princeton's collateral, no later than March 2016. (Adv. Compl. at ¶¶ 34, 48; Disclosure Statement at 11-12.) Thus, the injury of which Princeton complains in this case fits precisely with the injury the Princeton Trustee admitted was known as of March 2016. (*See, e.g.*, ¶519 (Princeton was injured by defendants "diverting and converting for their own financial benefit the revenue due and owing to the Argon Entities"; ¶537 ("Princeton has been … damaged through loss of Secured Collateral"); ¶543 ("Princeton has directly and proximately suffered substantial injury … diminished and lost Secured Collateral"); ¶552 ("Princeton has incurred direct and proximate damages … including … loss of its Secured Collateral").

Second, at a minimum, these statements show that Princeton was on notice that it needed to further investigate the alleged fraud at Argon. *See Scarabello*, 856 F. Supp. at 411; *Whirlpool Fin.*, 67 F.3d at 609. The Princeton Trustee stated that he was aware that there had been fraud at Argon and that Argon's collateral had been converted. (Adv. Compl. ¶¶34, 48; Disclosure Statement at 11-12.) Even if the Trustee/Princeton did not know the full contours of the alleged fraud at Argon in March 2016 or whether the alleged fraud at Argon directly impacted Princeton's

9

financial position, those facts would have put a reasonable person on notice that further investigation was needed to determine whether there has been an injury. *See Scarabello*, 856 F. Supp. at 411; *Rao*, 2006 U.S. Dist. LEXIS 95271, \*26; *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 453 (S.D.N.Y. 2005) ("where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.").

## PRINCETON LACKS STANDING TO ASSERT ITS CLAIMS (COUNTS 1-11 & 14-16)

### I. Relevant Factual Background.

"Argon X, LLC ('Argon X') and Argon Credit, LLC ("Argon Credit") were in the business of making near-prime consumer loans." *In re Argon Credit, LLC*, 570 B.R. 70, 72 (Bankr. N.D. Ill. 2017). The Complaint alleges that Argon Credit and its subsidiaries originated consumer loans (¶79), and Argon X is the sole borrower from Fintech/Princeton under the Revolving Note (¶84). As the Bankruptcy Court explained, "[t]he loans were sourced through non-debtor affiliates, then purchased by Argon X and serviced by Argon Credit." *Argon Credit*, 570 B.R. at 72. Princeton "provided Argon X with a line of credit for $37 million secured by the loan portfolio." *Id.*

Perhaps the core element of Princeton's Complaint is the allegation that the fraud scheme – and two alleged patterns of racketeering activity – relate to the alleged diversion of Princeton's so-called "Secured Collateral." (*See, e.g.*, ¶¶7, 104-207 ("Double Pledging of Secured Collateral"), 234-308 (alleged false financial statements regarding Secured Collateral), 489-490 (regarding RICO factual predicates, "core" is delivery of false financials to secured lender, "scheme to defraud Princeton of its Secured Collateral"), 505 & 513 (RICO patterns both focus on diversion of Secured Collateral). Princeton's contention is that Defendants caused the improper: (i) diversion

of alleged Secured Collateral in the form of the so-called Spartan Loans and other Argon Credit assets; (ii) provision to Princeton of false financial statements to conceal those alleged diversions; and (iii) double-pledging of the loans to Princeton and Spartan. (*See, e.g.*, *id.*) In so doing, Princeton bases its position that it had a security interest in the assets in question upon the fact that it "entered into both a Loan and Security Agreement ("LSA") and a Revolving Note (together…the 'Fintech Loan Agreement')" with Argon X (¶84) and that the "Argon Entities granted Fintech Financial…a security interest in…all of the … Secured Collateral" (¶86), on the strength of which it agreed "to allow Argon X to borrow up to a total of $37.5 million" "the approximate balance owed by Argon X to Princeton in December 2016."[3] (¶¶89-91.) The Complaint alleges that Argon X was the only borrower and does not allege that Argon Credit was a borrower at all. (¶¶84, 86.)

That Princeton relies exclusively upon the LSA as the basis for its alleged security interest is clear from the allegations of Paragraph 86. It is there that the Complaint alleges that Princeton received a "security interest and lien upon all of the accounts receivable due from the Consumer Loans in addition to **all of the other asserts of the Argon Entities** (the "Secured Collateral")." Princeton supports this claim by citing only to the LSA and a guaranty allegedly by "Argon Credit and each of the Argon Subsidiaries." (¶86 & n.10.)

It is clear that Princeton's allegations that it ever received a security interest in the Argon Credit assets or the Spartan Loans lacks a valid basis and should be rejected. The documents upon which Princeton relies to make this claim – the LSA and the guaranty – belie the allegations and in fact establish that there is no basis for the Complaint's allegation that Argon X acted "on behalf

---

[3] Princeton did not attach the documents its cites in his Complaint, including the LSA (Aizenberg Decl., **Ex. 4**, the Revolving Note (*id.*, **Ex. 5**), the Master Consumer Loan Purchase Agreement (*id.*, **Ex. 6**), and the Guaranty and Suretyship Agreement (*id.*, **Ex. 7**). "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *188 LLC v. Trinity Indus. Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). Defendants thus tender these documents for the Court's consideration.

of Argon Credit and the Argon Subsidiaries." (¶84.) The LSA and Revolving Note are exclusively agreements between Fintech and Argon X; neither is signed by nor otherwise executed on behalf of Argon Credit. (Aizenberg Decl., **Ex. 5**, Revolving Note at 4; *id.*, **Ex. 4**, LSA at 54.) The LSA states that only Argon X (as Borrower) grants Fintech a security interest; the document contains no reference whatsoever to the transfer of any security interest from Argon Credit or that Argon X possesses any interest in Argon Credit assets that have never been transferred to it. (*Id.*, **Ex. 4**, LSA §§ 1.63, 5.1.) Section 5.1 of the LSA, "Grant of Security Interest," which details the extent of the security interest provided, does not apply to all of the "Argon Entities." Section 5.1 applies only to the "Borrower," Argon X:

> To secure payment and performance of all Obligations, ***Borrower*** hereby grants to Lender a continuing security interest in, a lien upon… all personal and real property and fixtures and interests in property and fixtures ***of Borrower***, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by Lender, collectively, the "Collateral"), including without limitation all right, title and interest ***of Borrower*** in and to….

Nothing in the LSA grants – or could grant – a security interest in any loans or other assets of any Argon entity other than Argon X. Confirming this is the fact that FRS filed only an ***unsecured*** claim against Argon Credit (its claim against Argon X was only partially secured). (¶103.)

As noted, Princeton also bases its allegation of an interest in Argon Credit assets upon a guaranty Argon Credit executed in favor of Fintech. (¶¶86 n.10, 87.) This guaranty does not transfer any security interest to Princeton in Argon Credit assets, and guarantees only those consumer loans and related contracts that Argon Credit "may from [time] to time assign and transfer" to Argon X. (Aizenberg Decl., **Ex. 7**, Guaranty at § 2.) Neither the Guaranty nor any other agreement afforded Fintech/Princeton a security interest in loans that Argon Credit did not assign to Argon X.

12

The Complaint reinforces the foregoing, affirmatively stating that Argon Credit did not assign the Spartan Loans to Argon X.[4] It asserts that Argon Credit originated and assigned the Spartan Loans directly to FTAM, which it characterizes as a "diversion" of the Spartan Loans "from Argon X and otherwise divesting Princeton of its Secured Collateral." (¶115.) Because Argon Credit never assigned the Spartan Loans to Argon X, Princeton never received a security interest in them. The Spartan Loans thus are not a part of the so-called Secured Collateral.

## II. Standing Law in Cases Related to Bankruptcy Estates.

After Argon Credit and Argon X ("Argon Entities") filed bankruptcy petitions, the Chapter 7 Trustee ("Argon Trustee") filed two adversary cases against various individuals and entities, including officers, inside directors, outside directors, and investors, relating to the operation of the Argon Entities. A substantial portion of those defendants have settled with the Argon Trustee, while the cases against others are still pending. Nevertheless, Princeton has now sued those very same individuals and entities – as well as a raft of others – involving the same actions that the Argon Trustee alleges in her lawsuits.

The Bankruptcy Code defines "property of the estate" as comprising "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). After a bankruptcy petition is filed, property rights belonging to a debtor under state law become assets of the estate. *See Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343-44 (7th Cir. 1987). "[T]he trustee has the sole responsibility to represent the estate by bringing actions on its behalf, and the trustee has creditor status as the only party that can sue to represent the interests of the creditors as a class." *Gecker v. GE Capital Corp.*, 2015 U.S. Dist. LEXIS 97658, *17 (N.D. Ill. 2015) (citing *Koch*). So, for example, "rights of action against

---

[4] The Complaint alleges only that Argon Credit – <u>not</u> Argon X – originated and sold the Spartan Loans. (*See, e.g.*, ¶¶117, 124, 139, 142, 146, 149, 160, 234, 563(a)-(b).)

officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone has the right to pursue after the filing of a bankruptcy petition. *Id.* "Creditors' fraud claims brought under [RICO] have been found to be section 541 property assertable only by the trustee." *Id.*

It is the trustee's duty to marshal the estate's assets for pro rata distribution to the estate's creditors. *See Gecker*, 2015 U.S. Dist. LEXIS 97658, *17. "Recovery by the firm, followed by division according to entitlements, is especially important when the firm has landed in bankruptcy. Suits by shareholders, guarantors, and the like may well be efforts to divert the debtor's assets – to pay off one set of creditors . . . while keeping the proceeds out of the hands of the firm's other creditors." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1335-36 (7th Cir. 1989). The "trustee's single effort eliminates the many wasteful and competitive suits of individual creditors" and "protect[s] the creditors from one another." *Koch*, 831 F.2d at 1342-43 (internal citations and quotations omitted).

The trustee lacks standing, however, to bring "personal claims" of individual creditors.[5] *Id.* at 1348. "A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause." *Id.* In determining whether a creditor's claim is personal, the issue is "whether the [creditor] suffered an injury personal to it distinguishable from harm suffered by all of the estate's creditors…." *In re Pierport Dev. & Realty, Inc.*, 502 B.R. 819, 826

---

[5] "Most cases addressing the issue of whether a claim belongs to a bankruptcy trustee or a creditor … have used the term "standing" -- including the Supreme Court in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416…(1972)…. However, the Seventh Circuit has recently clarified that whether a claim belongs to a bankruptcy trustee or a creditor is a question on the merits rather than one of standing because it asks whether Congress has given a trustee 'authority' to pursue a certain kind of action." *Gecker*, 2015 U.S. Dist. LEXIS 97658, *16-17. Consistent with the bulk of authority, Defendants use the term standing but seek dismissal here under Rule 12(b)(6).

(Bankr. N.D. Ill. 2013). Thus, the personal creditor must establish that defendant(s) injured the creditor "directly in a way no other creditor can claim." *Id.* at *20. If individual creditors had standing to pursue claims for injury suffered by the corporation as a whole, the very purpose of the bankruptcy structure would be defeated: "all creditors' claims would be personal to the specific creditor … no creditor would have to wait in line behind the bankruptcy trustee to assert his claims." *Gecker*, 2015 U.S. Dist. LEXIS 97658, *17 (quotations omitted).

The improper diversion of corporate assets does not give rise to a claim personal to any particular creditor. "Courts have regularly applied section 541 broadly to include property fraudulently or improperly transferred by the debtor before bankruptcy." *Koch*, 831 F.2d at 1343. The Seventh Circuit thus held that "corporate creditors, like shareholders, cannot sue under RICO when their only injury comes about through the depletion of corporate assets." *Wooten v. Loshbough*, 951 F.2d 768, 769-70 (7th Cir. 1991) (no RICO standing where bankruptcy creditor alleged fraudulent diversion of corporate assets to benefit insiders; claim vested in the trustee to liquidate on behalf of all company creditors). Such injury is only derivative of injury to the company and are the corporation's (or trustee's) right to recover.

## III. Application of Legal Principles: The Complaint Fails to Allege Direct or Personal Injuries to Princeton Regarding RICO Claims.

Princeton lacks standing to bring its RICO claims because it fails to allege direct or personal injuries to it due to the fact that: (1) Princeton admits that the purported RICO scheme preceded the Fintech/Princeton loan to Argon, which means it could not have been directed at Princeton; (2) the sole injury asserted arises from the allegedly wrongful depletion, diversion, and transfer of Argon's assets from Argon, which means the RICO claim is general, not personal to

Princeton; and (3) Princeton's lawsuit is virtually identical to the adversary complaints the Argon Trustee has brought against many of the same Defendants.

The only thing that theoretically distinguishes Princeton's standing as a creditor from that of any other creditor are its repeated allegations that it possesses a security interest in the assets of Argon Credit and Argon X. The essence of Princeton's RICO claim (and other claims) – the alleged pattern of racketeering activity – is founded upon the assertion that Defendants: (a) "diverted" the Secured Collateral from the "Argon Entities" to the detriment of Princeton (¶519), focusing upon the alleged "Spartan Loans" that Princeton alleges "was a portion of the Secured Collateral…." (¶513); and (b) engaged in the "dissemination of the False Financials to enable them to use the Secured Collateral…." (¶505.) The Complaint also grounds its allegations of injury upon the claim that "Argon" intentionally impaired security interests in assets it had transferred to Princeton as loan collateral. (¶¶7, 115, 125, 206.) Princeton's claims on this score are baseless because: (1) as a matter of law, Princeton's possession of a security interest in Argon collateral (or receipt of false statements in relation to that collateral) does mean not it suffered direct/personal injuries; and (2) the contracts referenced in the Complaint establish that Princeton lacks a security interest in the Spartan Loans of other assets of Argon Credit not transferred to Argon X.

A.    **The Purported RICO Scheme Preceded the Fintech/Princeton Loans to Argon, Which Means it Could not Have Been Directed at Princeton.**

In *Wooten*, the Seventh Circuit ruled that the plaintiff failed to show that the "misconduct was aimed at her" because, *inter alia*, the fraud was alleged to have started before the plaintiff "appear[ed] on the scene." 951 F.2d at 770. Thus, the Seventh Circuit held that the plaintiff "was a target of the fraud only in the sense that any corporate creditor is likely to be hurt if the people controlling the corporation so deplete its assets that it cannot pay a large debt." *Id. See also Gecker*, 2015 U.S. Dist. LEXIS 97658, *22 (creditor failed to allege direct injury because fraud preceded

creditor's contact with the debtor, which meant that the "conduct alleged, and the resulting harm [was] not unique to" the creditor.).

Here, as in *Wooten*, the Complaint repeatedly alleges that the supposed fraud scheme began before Fintech/Princeton "appeared on the scene." According to the Complaint, Fintech/Princeton "appeared on the scene" in or about May 1, 2015 when the Fintech/Princeton loan agreement was executed. (¶84.) Thus, any alleged misconduct that occurred before May 1, 2015, pre-dates Fintech/Princeton's "appear[ance] on the scene." Multiple allegations about the alleged fraud scheme relate to conduct predating Fintech/Princeton's appearance. (¶530 ("The RICO Scheme began **as early as 2014** and continued at least through December 2016"); ¶636 ("Upon information and belief, the conspiracy involving Defendants **began well prior to the Fintech Loan Agreement** and continued until the filing of the Argon Bankruptcy"); ¶233 ("The Spartan Fraud began almost simultaneously upon the execution of the Fintech Loan Agreement and, upon information and belief, was concocted **well before the execution of the Fintech Loan Agreement** by various Argon Insiders and Argon Outsiders…."); ¶¶346 and 355 (challenging viability of the September and November 2014 Margon-Argon subscription agreements; "MARGON made no payments to Argon Credit as consideration for the First [and Second] Margon Subscription Agreement other than the First [and Second] Margon Loan"); ¶¶365-66 (payment to Margon on February 6, 2015 as "far exceeding any interest payment then due and owing to MARGON"); ¶¶367-68 (Argon overpaid Margon via quarterly interest payments on the two loans issued in September/November 2014 beginning 9 months prior to Princeton entry on May 1, 2015).) Because substantial elements of the alleged fraud scheme significantly preceded Fintech/ Princeton's "appear[ance] on the scene," Princeton was a "target of the fraud only in the sense that

a corporate creditor" such as Princeton is "likely to be hurt if the people controlling" Argon "so deplete[d] its assets that it cannot pay a large debt" to Princeton. *Wooten*, 951 F.2d at 770.

**B.      The Sole Injury Asserted Allegedly Arises From the Wrongful Depletion, Diversion, and Transfer of "Argon's" Assets From "Argon," Which Means the RICO Claims are General, not Personal to Princeton.**

"Corporate creditors" such as Princeton "cannot sue under RICO when their only injury comes through the wrongful depletion of corporate assets." *Wooten*, 951 F.2d at 770. *See also Mitsubishi Elec. Sales America, Inc. v. Higgins*, 1988 U.S. Dist. LEXIS 12898, *13 (N.D. Ill. 1988) ("the wrongful transfer of Video King's assets is not an injury personal to Mitsubishi. Those conveyances injured Mitsubishi only indirectly. Video King is the directly injured RICO victim."); *Dana Molded Prods, Inc. v. Brodner*, 58 B.R. 576, 579 (Bankr. N.D. Ill. 1986) ("the predicate acts of racketeering on which plaintiff bases its claim all involve fraudulent transfers of money from American Wheel…."). Any claim related to the status and disposition of Argon assets is a general claim involving property of the Argon estate. In *Mitsubishi*, plaintiff, a secured creditor, alleged that defendants defrauded it into extending credit and impairing its security interest. 1988 U.S. Dist. LEXIS 12898, *8. The court held that the company was "the directly injured RICO victim and hence only the trustee may pursue these claims." As in *Mitsubishi*, Princeton's claim involves the alleged wrongful transfer of estate assets to the detriment of the whole estate, a fact not affected by Princeton's alleged security interest or its receipt of false statements from Argon personnel. *Id.*

Allegations that a diversion claim affects the rights and interests of a secured creditor such as Princeton does not transform it into a personal claim because it also affects the rights of unsecured creditors. *See Nat'l Therapeutic Assocs., Inc. v. Concept Rehab, Inc.*, 2000 U.S. Dist. LEXIS 14563, *4-6 (N.D. Ill. 2000). It is only *after* the trustee liquidates an estate's claim regarding diversion of assets that the priority rights of individual creditors become pertinent. The

existence of a security interest that may permit a particular creditor to have first priority over the claims of another is "beside the point":

> Every creditor of the debtor has an interest in the invalidation of Concept Rehab's lien, for it would open up the possibility that their claims could be satisfied. Whether or not they ultimately would be is beside the point. RehabVisions may be entitled to all of the assets subject to the lien, but that would not be established until after the lien is invalidated. Even RehabVisions seems to acknowledge the possibility that other creditors may benefit, stating that the unsecured creditors would not receive any portions of the assets 'unless and until' RehabVisions is paid in full.

*Id.*; *see also Mid-State*, 877 F.2d at 1335-36 (guarantors of corporate loan lacked standing to pursue RICO violations against lender as their injury was derivative of the claim of the company).

### 1. Princeton's Claims Are Grounded Only Upon Allegations of Asset Depletion or Diversion.

Princeton's Complaint claims injuries arising solely from the allegedly wrongful depletion, diversion, and transfer of Argon's assets. In Count I, Princeton requests damages for "Argon Impairment," *i.e.*, the diminished value of Argon's assets. (¶544.) The remainder of the Complaint likewise repeatedly alleges that misconduct at issue "deplet[ed]" (¶¶572, 595, 619) and "diminish[ed]" (¶¶270, 419, 443, 543, 559, 563(h), 567, 568, 572, 637) the value of Argon's assets. Thus, the injuries for which Princeton seeks a recovery were not injuries to Princeton itself, but rather injuries to Argon and all its creditors due to the "impairment," "deplet[ion]," and "diminish[ment]" of the assets and value of Argon. An individual creditor's "injury due to the diminution in [a debtor]'s assets is no different from that suffered by the other . . . creditors [in a bankruptcy case]." *Dana*, 58 B.R. at 579.

The several alleged "unlawful activit[ies]" at issue in this case – summarized in ¶7 of its Complaint – are wholly in accord with the Complaint's allegations of injury. Five of the alleged "unlawful" acts involve the alleged depletion, diversion, or transfer of Argon assets, the other "unlawful" acts involve allegedly providing Princeton with false financial information.

"*[F]raudulently scheming to conceal and then transfer Secured Collateral to Argon Insiders and Argon Outsiders and away from Princeton as the secured creditor, in violation of well-known Financial Covenants (as defined herein) owed to Princeton*" (¶7(iii)). The central theme of the Complaint is the alleged transfer of the Argon assets to various members of the so-called Argon Insiders and Outsiders. Apparently recognizing that a claim arising from the transfer and depletion of Argon's assets will deprive it of standing, Princeton attempts to engage in linguistic sleight-of-hand to cure this problem. It refers to the transferred assets as its "Secured Collateral" and states that the Secured Collateral was transferred "away from Princeton," thereby suggesting that the alleged wrongdoers harmed Princeton directly by transferring *Princeton's* assets away from Princeton, rather than Argon's assets away from Argon. The Complaint itself, however, repeatedly making clear that (i) the so-called Secured Collateral was comprised solely of Argon's assets; and (ii) these Argon assets were transferred away from Argon, not Princeton. As such, the "first level of harm" was to Argon and "the creditor[s] here," and Princeton "suffer[ed] only because [it] has a claim against" Argon. *Wooten*, 951 F.2d at 771.

The Complaint defines and makes allegations regarding "Secured Collateral" as Argon's assets – not Princeton's assets: (i) "all of the accounts receivable due from the Consumer Loans [*i.e.*, consumer loans that Argon and its subsidiaries originated (¶79)] in addition to all of the other assets of the Argon Entities" (¶86); (ii) "diversion of Collections [*i.e.*, collections on receivables to Argon], Receivables [*i.e.*, consumer loan receivables to Argon] and other Secured Collateral…" (¶¶490, 687(a)); (iii) "accounts receivable [to Argon] that constituted Secured Collateral." (¶523). Likewise, Princeton repeatedly alleges that *Argon's assets* were transferred or diverted *from Argon* – not from Princeton, *e.g.*: Defendants "formed FTAM for the sole purpose of acquiring and servicing a portfolio of *Consumer Loans originating from Argon Credit* and being sold to FTAM

(the "Spartan Loans") thereby *being diverted from Argon X*…." (¶115); the Spartan Transactions involved "*diverting and divesting the Argon Entities* of the value represented by the Spartan Loans [*i.e.*, consumer loans originating from Argon]" (¶178); the so-called Little Owl, Margon, Cardinal Trust, Triffler Trust Transfers were "transfers *from Argon Credit…*" (¶¶328, 360, 380, 392); "The various Defendants identified herein have violated the RICO Act by engaging in prohibited racketeering activities…through the repeated…*diversion of Collections, Receivables and other Secured Collateral* to third parties *away from the Argon Entities*" (¶490); "Defendants, acting in the furtherance of the operations of the Argon Entities, engaged in a pattern of racketeering by:… diverting and converting for their own financial benefit the *revenue due and owing to the Argon Entities*…." (¶519); "Defendants knowingly and willfully devised a scheme to…*divert accounts receivable that constituted Secured Collateral away from the Argon Entities*" (¶523).

"[A]uthorizing the Argon Entities to pay "interest payments" to subordinated lenders in *violation of executed subordination agreements at a time when the Argon Entities were insolvent, all of which activity was wrongfully concealed from Princeton as the secured lender*" (¶7(iv)). The payment by "the Argon entities" of Argon funds for "interest payments" to lenders other than Princeton is just one more form of conduct that indirectly harmed Princeton via the alleged diversion of assets. In *Mitsubishi*, plaintiff likewise alleged that defendants violated the line of credit agreement with Mitsubishi by making improper payments to another creditor. 1988 U.S. Dist. LEXIS, *8. Nevertheless, the court held that these "conveyances" of the debtor's assets "injured Mitsubishi indirectly." *Id.* at *14. *See also In re MortgageAmerica Corp.*, 714 F.2d 1266, 1268 (5th Cir. 1983) (indirect injury to plaintiff: payment "to another bank in order partially to repay another loan on which [defendant] was personally liable.").

21

*"[P]aying certain Argon Insiders and Argon Outsiders exorbitant 'commissions' and other fees and sums in knowing violation of Financial Covenants owed to Princeton as the secured lender"* (¶7(iv)). Princeton's contention that Argon improperly paid "commissions" and other "fees and sums" is merely another way of saying that Defendants wrongfully transferred Argon's assets. Under the authorities cited above, this constituted direct injury to Argon, and indirect injury to Princeton. *See Wooten*, 951 F.2d at 769 (indirect injury to plaintiff: defendants paid "themselves inflated rents"); *Dana*, 58 B.R. at 16 (indirect injury to plaintiff: defendant "fraudulently represented that his services were necessary for the [debtor's] reorganization while secretly depleting the company" was indirect).

*"[S]ecretly diverting assets of the Argon Entities to subsidize extravagant personal expenses unrelated to the Argon Entities' respective business operations in knowing violation of Financial Covenants owed to Princeton as the secured lender (including funding a secret apartment where sexual trysts occurred)"* (¶7(v)). This alleged diversion of "assets of the Argon entities" for personal expenses also indirectly harmed Princeton. *See, e.g.*, *Wooten*, 951 F.2d at 769 (indirect injury: defendants "used funds belonging to [debtor] to pay their personal expenses."); *Leibowitz v. First Chicago Bank & Trust*, 422 B.R. 659, 661 (Bankr. N.D. Ill. 2010) (indirect injury: defendants "convert[ed] corporate collateral for their personal use"), *aff'd*, 458 B.R. 911 (N.D. Ill. 2011).

### 2. Alleged Diversion of Argon Credit Assets and Spartan Loans

*"[S]ecretly double-pledging Secured Collateral to certain Argon Outsiders that were already pledged to, and secured in favor of, Princeton as the secured lender of the Argon Entities"* (¶7(i)). Just like the above-referenced Argon asset transfers, this "double-pledging" involved the transfer of an *Argon* interest away from *Argon – i.e.*, the alleged transfer of a security interest in

Argon's assets from Argon to Spartan. Princeton tries to allege that the transfers were directed at Princeton because they allegedly affected Princeton's security interests and that Defendants made deceptive disclosures to Princeton regarding the assets, which rendered the Argon assets unavailable to Princeton. (¶¶171, 191, 193, 201-204, 206.) This fails to establish that the alleged double-pledging was a claim personal to Princeton as distinct from Argon's other creditors.

First, as noted, the Complaint repeatedly alleges that the so-called Spartan Fraud began before Princeton came on the scene, which means the alleged fraud was against Argon and its creditors generally. Second, as also noted, claims involving the alleged diversion of corporate assets are not personal claims. Third, as a matter of law, the fact that a claim involves the status and disposition of allegedly secured assets – *e.g.*, the Spartan Loans – does not convert the diversion from a general claim into a personal one. If Princeton's theory regarding the Spartan Loans is accurate, Argon and all of its creditors have an interest in undoing the Spartan Loan transaction and invalidating any lien Spartan may assert because: (i) the Spartan transaction injured Argon and all its creditors; and (ii) any recovery of the Spartan Loans and payment to Princeton would reduce Princeton's claims against Argon, thereby benefitting not only Princeton but also the Argon estate. *Id.* As FRS/Princeton itself asserted in the Argon bankruptcy, "[i]f FRS recovers its collateral from SSF, FRS's claims against the Debtors will be reduced, to the benefit of the Debtors' other creditors." (Aizenberg Decl., **Ex. 8** at ¶ 47.)

Princeton does not have a security interest in the Spartan Loans or other Argon Credit Assets Not Assigned to Argon X. A fourth reason the double-pledging allegations fail is that even if a security interest mattered (it doesn't), as explained above, Princeton does not have a security interest in the Spartan Loans or other Argon Credit assets. The Complaint and the Fintech/Princeton loan agreements establish that: (i) Argon X – not Argon Credit – was the only

entity that borrowed funds from Princeton; (ii) Argon X – not Argon Credit – was the only entity that granted Fintech/Princeton a security interest (LSA §§ 1.63, 5.1); (iii) Argon Credit's Guaranty did not give Fintech/Princeton a security interest in loans that Argon Credit did not assign to Argon X; and (iv) the Complaint alleges that Argon Credit did not assign the Spartan Loans to Argon X. *See supra* at 13. Given that Argon Credit never assigned the Spartan Loans to Argon X, Princeton never received a security interest in the Spartan Loans or other Argon Credit. Thus, the Complaint and the contracts cited therein (Aizenberg Decl., **Exs. 4-7**, LSA, Revolving Note, MCLPA, and Guaranty) doom Princeton's allegation that Defendants improperly sold, double-pledged, and made false statements as to its Secured Collateral, viz., the Spartan Loans, because those loans never were Princeton's Secured Collateral. Princeton's diversion-related Complaint alleges only an indirect injury, with any harm to Princeton coming due to the harm to Argon's assets.

### C. Princeton's Allegations that Defendants Provided it with False Financial Information Did Not Give Rise to Direct Harms Unique to Princeton.

In what appears to be an effort to allege conduct that it can claim was directed at it specifically, Princeton makes allegations relating to false or misleading financial statements it received from Argon Credit: "creating and providing Princeton, as the secured lender, with false and grossly misleading financial statements and other financial information in an effort to conceal the insolvency of the Argon Entities relevant to this Complaint and delay the declaration of an Event of Default by Princeton." (¶7(ii).) Princeton similarly asserts it continued to extend credit to Argon (and did not declare default) based on the misrepresentations to it, but would have done the opposite if Defendants had not caused Argon to make misrepresentations regarding Argon's financial condition and to conceal the Spartan transactions. (¶¶49-59.) Numerous cases teach that the alleged submission of false information to a creditor in relation to the diversion of assets does not convert its claims from general to personal.

A particularly instructive case in this regard is *Gourmet Center v. Fox*, 2006 Bankr. LEXIS 1042, *40-52 (Bankr. N.D. Ill. 2006). There, individual creditors sought to recover against insiders of a debtor for their misuse of corporate assets and for making false statements to the creditors to induce them to sell goods on credit to the debtor, for which the debtor then failed to pay as part of an alleged fraud scheme. *Id.* at *48-49. The theory of harm was that the plaintiffs would not have shipped goods to the debtor if the insider had not induced them to do so based on false statements regarding the debtor's willingness or ability to pay for the goods. *Id.* As in this case, the overall gist of the allegations was that the fraud scheme hurt the debtor's ability to satisfy its debts. *Id.* at 49. Although the misrepresentations had been made directly to the suing creditors, the *Gourmet Center* court held that such misrepresentations were insufficient to make out injuries to the plaintiffs that differed significantly from those generally suffered by all the creditors. *Id.* Relying on the Seventh Circuit's ruling in *Mid-State*, the court explained that "direct dealings" with a creditor, such as false or misleading statements made directly to a particular creditor, are insufficient to confer standing to sue over injuries that are not peculiar or unique to the particular creditor. *Id.*; *see also Mid-State*, 877 F.2d at 1336-37 (plaintiff lacked standing despite directly dealing defendant because direct dealing does not constitute direct injury for purposes of standing).

Similarly, in *Mitsubishi*, a secured creditor, Mitsubishi, alleged the defendants bilked Mitsubishi by using false information and omissions of material facts to cause Mitsubishi to extend credit and subordinate its security interest to a related entity, Berkshire Bank. 1988 U.S. Dist. LEXIS 12898, at *2. Nonetheless, the court dismissed plaintiff's RICO claim on standing grounds, holding that the alleged misconduct "injured Mitsubishi only indirectly. [The company] is the directly injured RICO victim and hence only the trustee may pursue these claims. (As noted below, the trustee is presently doing just that.)." *Id.* *14-17 (reaching the same conclusion with respect to

25

"false statements made by defendants" to Mitsubishi used to facilitate the allegedly fraudulent scheme); *Delgado Oil Co. v. Torres*, 785 F.2d 857, 859 (10th Cir. 1986) (same – defendant made false representations regarding the company's financial condition to the plaintiff).

The fact that certain Defendants made or caused Argon to make false or misleading statements to Princeton directly does not confer standing upon Princeton by converting its claims into personal ones. Princeton's injury was the same as that shared by all of Argon's creditors.

### D.     Princeton's Lawsuit is Virtually Identical to the Adversary Complaints the Argon Trustee has Brought Against Many of the Same Defendants.

Further establishing that Princeton's claims belong to the Argon estate is the fact the Princeton has substantially reproduced the claims the Argon Trustee has already brought for virtually identical conduct against many of the same Defendants. Indeed, Princeton lifted various allegations entirely from the complaints the Argon Trustee filed. As noted, a number of those cases have been fully and finally resolved. The identity between the "facts and events" contained in the cases brought by the Argon Trustee reinforces the point that the claims Princeton advances here are wholly derivative of the claims of the bankruptcy estate. The court in *Mitsubishi* ruled that Mitsubishi lacked standing to advance its RICO claim, in part, because the Chapter 7 trustee had brought adversary proceedings against the same defendants based upon the same "facts and events presented by Mitsubishi." 1988 U.S. Dist. LEXIS 12898, *16-17.

Like the plaintiff in *Mitsubishi*, Princeton's Complaint admits that the Argon Trustee has brought two adversary cases against many of the same defendants based upon the same "facts and events presented" by Princeton. (¶¶13-14 & n.2.) The Complaint further concedes that those cases involve the same core of operative facts as in this case: (i) the Spartan Fraud – *i.e.*, the defendants "allowed, directed and/or authorized Argon credit to pledge the same collateral to two different lenders;" and (ii) breaches of fiduciary duty by "authorizing transactions for their personal

benefit." (*Id.* at n.2.) In fact, the overlap between this case and the Argon Trustee's lawsuits is much more expansive than Princeton lets on.

Apart from conclusory legal assertions that purport to list the elements of RICO claims, all of the allegations in Princeton's Complaint are based exclusively upon the alleged fraudulent transfers of Argon's assets and breaches of duty to Argon that the Chapter 7 Trustee already has asserted in adversary complaints. As shown in the following table, both cases are grounded upon: (1) the facts and circumstances related to the original Spartan transaction, including that the Spartan Loans were sold for less than their value and were improperly double-pledged; (2) providing Princeton with false and misleading financial information to facilitate and hide these improper diversion of Argon's assets; (3) alleged improper interest payments to Margon, Little Owl, the Cardinal Trust, and the Triffler Trust; (4) supposed payments of exorbitant commissions; and (5) diversion of assets to pay personal expenses. In some instances, Princeton copies or very-closely tracks the allegations in the Argon Trustee's complaints in *Crane v. Wolfe*, Adv. No. 18-00948 (Aizenberg Decl., **Ex. 9**), and *Crane v. Margon, LLC*, Adv. No. 18-00947 (*id.*, **Ex. 10**):

| Content of Pleadings | Princeton's Complaint | Trustee's Complaint(s) | Copying/Close Tracking of Allegations |
|---|---|---|---|
| Spartan Transaction— Background and Structure | ¶¶104–07, 115–16, 137, 139, 143–44, 146–59, 184 | Wolfe Compl., at 8-9 | *Compare* ¶¶146–55 *with* Wolfe Compl., at ¶¶40–44 *and* ¶¶157–60 *with* Wolfe Compl., at ¶¶45–48 |
| Spartan Transaction— Status of Certain Receivables as Collateral | ¶¶109, 125, 132, 134, 137–38, 146, 163, 174, 192–93, 206 | Wolfe Compl., at 10 | *Compare* ¶137 *with* Wolfe Compl., ¶36, ¶146 *with* Wolfe Compl., ¶40 *and* ¶148 *with* Wolfe Compl., ¶ 41 |
| Spartan Transaction— Misrepresentations and Omissions | ¶¶119–24, 127–28, 137–38, 156, 159, 172–74, 194–95, 205 | Wolfe Compl., at 10 | *Compare* ¶159 *with* Wolfe Compl., ¶47, ¶¶172–73 *with* Wolfe Compl., ¶¶52–53 *and* ¶¶194–95 *with* Wolf Compl., ¶ 55 |

| Spartan Transaction—Defendants' Knowledge of Misrepresentations and Omissions | ¶¶104, 106–15, 124, 126, 130–34, 139, 143–44, 148, 153, 158, 164–69, 176–79, 181–82, 185–88, 196, 200 | Wolfe Compl., at 10–11 | *Compare* ¶106 *with* Wolfe Compl., ¶¶157, ¶139 *with* Wolfe Compl., ¶156 *and* ¶196 *with* Wolfe Compl., ¶56 |
|---|---|---|---|
| Spartan Transaction—Sale of Certain Receivables | ¶¶128, 136, 147, 160–62 | Wolfe Compl., at 9–10 | *Compare* ¶160 *with* Wolfe Compl., ¶48 *and* ¶162 *with* Wolfe Compl., ¶51 |
| Spartan Transaction—Disposition of Proceeds | ¶¶137, 209–11, 212–13 | Wolfe Compl., at 11 | *Compare* ¶¶210–21 *with* Wolfe Compl., ¶¶58–65 |
| Spartan Transaction—Default by SSF SPV and Its Bankruptcy Case | ¶¶214, 217–20, 221, 224–26, 228–30 | Wolfe Compl., at 11–13 | *Compare* ¶¶223–30 *with* Wolfe Compl., ¶¶66–73 |
| Misrepresentations—Submission of False or Misleading Financials | ¶¶244–51, 263–66, 274, 301–05 | Wolfe Compl., at 13–14 | *Compare* ¶¶244–51 *with* Wolfe Compl., ¶75–80 *and* ¶274 *with* Wolfe Compl., ¶81 |
| Misrepresentations—Defendants' Knowledge or Awareness | ¶¶267–74, 300 | Wolfe Compl., at 13–14 | *Compare* ¶267 *with* Wolfe Compl., ¶77, ¶274 *with* Wolfe Compl., ¶81 *and* ¶300 *with* Wolfe Compl., ¶82 |
| Little Owl Transfers | ¶¶313–41 | Margon Compl., at 9–12 | *Compare* ¶¶314–41 *with* Margon Compl., ¶¶48–70 |
| Margon Transfers | ¶¶342–69 | Margon Compl., at 5–8 | *Compare* ¶¶343–70 *with* Margon Compl., ¶¶17–46 |
| Cardinal Trust Transfers | ¶¶373–81 | Margon Compl., at 12–13 | *Compare* ¶¶373–83 *with* Margon Compl., ¶¶71–81 |
| Triffler Trust Transfers | ¶¶384–93 | Margon Compl., at 13–15 | *Compare* ¶¶384–95 *with* Margon Compl., ¶¶82–92 |
| Subordination Agreements Related to Above Transfers | ¶¶95, 351, 358, 379, 391, 400–11 | Margon Compl., at 5, 7, 10, 11, 13, 15 | *Compare* ¶¶351, 358, 379, 391 *with* Margon Compl., ¶¶26, 34, 55, 60, 78, 89 |
| Various Additional or Other Transfers of Estate | ¶¶424–70 | Wolfe Compl., at 18–2 | See below |

| Assets, Including to Insiders | | | |
|---|---|---|---|
| Excessive or Unearned Salary/Compensation | ¶¶424–55 | Wolfe Compl., at 18 | *Compare* ¶¶424–53 *with* Wolfe Compl., ¶¶93–113, 116–19 |
| Personal Expenses (Travel, Rent) | ¶¶456–64 | Wolfe Compl., at 19–20 | *Compare* ¶¶456–58 *with* Wolfe Compl., ¶¶114–15, ¶¶459–61 *with* Wolfe Compl., ¶¶120–22 *and* ¶¶463 *with* Wolfe Compl., ¶123 |
| Incentive Payments to Insiders Immediately Before Petition Date | ¶¶465–69 | Wolfe Compl., at 20 | *Compare* ¶¶465–69 *with* Wolfe Compl., ¶¶124–28 |
| Insolvency Allegations | ¶¶237, 243, 471–81 | Wolfe Compl., at 21; Margon Compl., at 15–16 | *Compare* ¶¶471–81 *with* Wolfe Compl., ¶¶129–35 *and* Margon Compl., ¶¶93–99 |

That Princeton has chosen to bring its case based upon different legal causes of action is immaterial.[6] Princeton's claims are clearly derivative of the claims the Trustee already has brought. *See A & G Goldman P'ship v. Picard*, 2013 U.S. Dist. LEXIS 143956, *28 (S.D.N.Y. 2013) (plaintiffs' securities fraud claims were "derivative of the Trustee's already-settled fraudulent transfer claims because, *inter alia*, "an estate creditor can simply relabel a claim the estate has already brought, add a few conclusory legal statements, and then protest that the resulting 'claim' is direct and non-derivative."); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 439 (S.D.N.Y. 1993) ("The creditor of any bankrupt may allege that the prior dealings of other parties with the bankrupt rendered it insolvent; however, such a claim is for fraudulent conveyance

---

[6] Regardless of what Princeton calls its claims, the Complaint in fact pleads fraudulent transfer and breach of fiduciary duty claims – that is, claims that the Defendants, directly or indirectly, caused the improper transfer of Argon's assets (¶7) and/or breached duties to Argon to the detriment of Argon and its creditors. (*See, e.g.*, ¶616: "each as an Argon Insider, had a duty to provide, and thus were in the business of supplying, accurate financial information to the Argon Entities' respective Board of Managers…."; ¶451: an officer of Argon Credit was "obligated to perform his duties for the benefit of Argon Credit….").

properly brought by the Trustee, not for tortious interference of contract."), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

###### E. Princeton Also Lacks Standing to Assert All But Two of Its State-Law Claims.

For the same reasons as are discussed above, Princeton lacks standing to assert the state-law claims it raises in Counts 3-11 and 14-16. These claims include, among others, fraud and intentional misrepresentation, fraudulent concealment, negligent misrepresentation, conversion, civil conspiracy, tortious interference with contractual relations, unjust enrichment, restitution, and alter ego/veil piercing. As with the RICO claims, all of these state-law claims seek to recover for injuries suffered directly by Argon, and only indirectly by Princeton, by virtue of its status as a creditor of Argon. As with the RICO claims, the theory of recovery is based only on the diminution of Argon's assets and the indirect harm such diminution caused – injuries that are common to all creditors. *See Koch*, 831 F.2d at 1343-52 (holding that alter ego claims, breach of fiduciary duty claims, and other similar claims against management were property of the estate and a creditor that were injured only indirectly did not have standing to bring such claims); *Mitsubishi*, 1988 U.S. Dist. LEXIS 12898, *12-17; *Dana*, 58 B.R. at 579. The fact that certain misrepresentations or omissions were allegedly made directly to Princeton does not alter this conclusion where the underlying injuries for which Princeton seeks to recover are not unique to Princeton, but rather are common to all creditors. *See Gourmet Center*, 2006 Bankr. LEXIS 1042, *48-50.[7]

---

[7] In the Argon bankruptcy, the Chapter 7 Trustee entered into settlement agreements with certain Defendants in this case (Margon, Triffler Trust, Cardinal Trust, Canfora, Triffler, Breitweiser, Faermark, Ferro, Kuhlman, Madanyan) that released them "from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, or the operation of their business, and/or the Adversary Proceedings, including without limitation the claims for relief asserted or that could have been asserted in the Adversary Proceedings." (Aizenberg Decl., **Ex. 11** at § 8.) In its October 20, 2020 order approving the settlement agreement, the Bankruptcy Court ruled that the settlement agreement "shall only release claims of the estate or the Trustee and shall not release or have any effect on

## PRINCETON SHOULD BE COLLATERALLY ESTOPPED FROM RELITIGATING THE ALLEGED SPARTAN FRAUD

This Court should hold that Princeton is collaterally estopped from relitigating one of the core issues in its Complaint: the so-called Spartan Fraud. According to Princeton, the Spartan Fraud consisted of: (i) the sale of the so-called Spartan Loans to Spartan; and (ii) double-pledging the Spartan Loans to both Spartan and Princeton. (¶¶234, 513.) Princeton already litigated that issue in a prior proceeding in New Jersey state court and lost.

## I.    Relevant Facts[8]

Princeton alleges that Spartan financed the purchase of the Spartan Loans with funds that Hamilton Funding 1 LP ("Hamilton") provided to Spartan. (¶208.) To secure its debt to Hamilton, Spartan pledged the Spartan Loans as collateral to Hamilton. (¶209.) On June 29, 2016, Spartan filed for bankruptcy, and "listed in its schedules of assets and liabilities a loan portfolio (i.e., the Spartan Loans) having a value of $4,750,000.00…." (¶229.) By orders entered on May 26, 2017, the Bankruptcy Court approved a settlement agreement between Spartan and Hamilton that permitted the disbursement of the proceeds of the Spartan Loans to Hamilton and dismissed the bankruptcy. (Aizenberg Decl., **Ex. 13**.)

---

non-derivative, direct claims of third parties, or on defenses to such claims." (*Id.*, **Ex. 12**.) Because Princeton's claims herein, as explained above, "are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, or the operation of their business, and/or the Adversary Proceedings, including without limitation the claims for relief asserted or that could have been asserted in the Adversary Proceedings" and are <u>not</u> "non-derivative, direct claims" of Princeton, these claims have been released. This release supplies an additional basis for dismissing Princeton's claims against these settling defendants.

[8] The facts set forth herein are derived from the Complaint and documents that were publicly filed in prior actions involving Princeton/FRS. As such, this Court can take judicial notice of such documents. *See, e.g.*, *Stelmokas v. Bank of Am., N.A.*, 2020 WL 1487270, *1 n.3 (N.D. Ill. 2020), *aff'd,* 819 F. App'x 441 (7th Cir. 2020); *Hawthorne v. Silverleaf Funding, LLC*, 2017 WL 2573213, *2 n.3 (N.D. Ill. 2017).

## II.      The New Jersey Action

To prevent the disbursement of the Spartan Loan proceeds, on May 26, 2017, FRS filed an *ex parte* application in the Superior Court of New Jersey ("NJ Court") seeking a TRO and preliminary injunction to prevent Spartan SPV (a defendant in this case) and Hamilton from withdrawing or transferring any funds from Spartan. (Aizenberg Decl., **Ex. 14**.) Princeton also filed a Verified Complaint for Writ of Attachment and Injunctive Relief ("NJ Complaint"). As detailed below, in the NJ Action, Princeton: (i) sought adjudication of the identical Spartan Fraud issue it advances in this case; (ii) had a full and fair opportunity to litigate the Spartan Fraud issue; and (iii) the NJ Court finally determined that issue, finding that Princeton failed to show it had a security interest in the Spartan Loans. FRS then moved for a stay of this decision pending appeal before the New Jersey Appellate Division, which was rejected. (Aizenberg Decl., **Ex. 15**.) Thereafter, the New Jersey Supreme Court denied an identical request for a stay pending appeal. (Aizenberg Decl., **Ex. 16**.) After exhausting its efforts before a full slate of New Jersey courts, FRS voluntarily dismissed the NJ Complaint. (Aizenberg Decl., **Ex. 17**.)

## III.      Argument

To determine the collateral estoppel effect of a state court ruling in a later federal court case, state law controls. *See Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2009). Under New Jersey law, "collateral estoppel applies where (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the prior proceeding's court issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *Jabri v. Bank of Am., N.A.*, 2021 U.S. Dist. LEXIS 32646, *6, n.7 (D.N.J. 2021). Each of these elements is satisfied here.

**Element #1: Identical Issues**. The issue on which Defendants seek preclusion here is identical to the issue litigated in the NJ Action: the Spartan Fraud. Princeton's NJ Complaint included an entire section entitled, "Argon Fraudulently Resells Loans Previously Pledged to FRS," which alleged that: (a) "Argon X" sold the loans "that were previously pledged to FRS as collateral for the Argon Line of Credit" (NJ Complaint ¶ 20 (Aizenberg Decl., **Ex. 18**)); and (b) the transfer of the Spartan Loans "was made to defraud [Princeton] of its collateral."[9] (*Id.* ¶ 24.) At the preliminary injunction hearing, Princeton stressed that this fraud was at the core of its NJ Action: "I just want to begin by reminding the Court that the complaint at issue here alleges that a fraud was perpetrated by Argon and Spartan, that the vice president of Argon Credit, Barry Kostner (phonetic), formed Spartan, that he was aware of the loans that, and the line of credit, that my client's predecessor [*i.e.*, Princeton] extended to Argon, that they were aware of." (6/27/17 Tr. at 5:3-9 (Aizenberg Decl., **Ex. 19**)); *see also id.* at 29:5-11 (same).) Princeton further pressed that the Spartan Loans were sold and double-pledged: "the key point there is all of this money constitute[s] proceeds of the loans that were first pledged to my client and sold out from under our security interest to these defendants." (*Id.* at 14:19-22.) In its appeal, Princeton continued to advance these positions – *i.e.*, that the Spartan Loans were wrongfully transferred to Spartan and double-pledged to Spartan and Argon. (Princeton Appeal Br. at 7-8, 16, 24 (Aizenberg Decl., **Ex. 15**).)

**Element #2: Actually Litigated**. "When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this Section." *Tobia v. Lakewood Bd. of Educ.*, 2020 U.S. Dist. LEXIS 234236, *44 (D.N.J. 2020) (applying New Jersey law).

---

[9] In fact, the allegations in the NJ Complaint are identical to those Princeton now asserts. (*Compare* ¶¶84-86, 93, 104-106, 110, 113, 133, 139, 181-184, 208-223, 232 *with* NJ Complaint ¶¶10-25, 43-49.)

Here, as noted, the Spartan Fraud issue was "raised, by the pleadings or otherwise" – in Princeton's complaint, in its arguments before the trial court, and on appeal of the denial of its preliminary injunction motion. The NJ Court also "actually determined" the Spartan Fraud issue, finding that Princeton failed to sustain its burden of proof. *See Gregory Mktg. Corp. v. Wakefern Food Corp.*, 207 N.J. Super. 607, 622 (N.J. Super. Ct. 1985) (quoting Restatement (2d) of Judgments § 27, cmt. d for the proposition that "[a] determination may be based on a failure of pleading or of proof as well as on the sustaining of the burden of proof."). The NJ Court found that Princeton could not establish a probability of success on the merits. (6/27/17 Tr. at 39:14-17 (Aizenberg Decl., **Ex. 19**).) It so ruled because Princeton did not show it had a security interest in the Spartan Loans, which means they could not have been double-pledged:

> The argument essentially by the plaintiff is that the -- that they still have a security -- they have a security interest in these [loans]. The defendants claim that they don't have a security interest in these [loans], that they have paid fair market value for these [loans] when they purchased it from Spartan and that -- that in fact if -- and that they purchased it from Argon Credit and that there was no security interest by Argon Credit. The plaintiffs argue that Argon Credit guaranteed the payment by Argon X to the plaintiff's predecessor and that guarantee provided for the security interest. But the language in the guarantee doesn't say that, it says security interest in any loans that are assigned by Argon Credit to Argon X. And so the assignment appears to be missing. The proof of claim filed in Chicago by the plaintiffs against Argon Credit indicates that their loan is unsecured. [*Id.* at 36:13-37:6.]

Princeton then lost both its appeals on the trial court's ruling. (Aizenberg Decl., **Ex. 16**.)

**Element #3: The prior proceeding's court issued a final judgment on the merits.**

Collateral estoppel "does not require the entry of a judgment, final [means] being appealable." *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991) (applying New Jersey law). Rather, "collateral estoppel applies whenever an action is 'sufficiently firm to be accorded conclusive effect.'" *Hills Dev. Co. v. Township of Bernards*, 510 A.2d 621, 652 (N.J. 1986) (quoting Restatement (2d) of Judgments § 13); *see also Deutsche Bank Nat'l Tr. Co. v. Klinger*, 2019 N.J. Super. Unpub. LEXIS 1464, *9-

34

10 (N.J. App. Div. 2019) (same). "Simply put, for collateral-estoppel purposes, 'the question to be decided is whether a party has had his day in court on an issue.'" *State v. K.P.S.*, 112 A.3d 579, 585 (N.J. 2015). Collateral estoppel is thus applicable when "the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal," and the decision was not "avowedly tentative." Restatement (2d) of Judgments, § 13, cmt. g. Thus, courts consistently hold that findings made in a preliminary injunction proceeding can have preclusive effect when these Restatement (or similar) factors are satisfied. *See, e.g.*, *Avitia v. Metropolitan Club of Chicago, Inc.*, 924 F.2d 689, 690-91 (7th Cir. 1991) (collateral estoppel precluded plaintiffs from challenging the court's second denial of the plaintiffs' request for injunctive relief; plaintiffs never appealed the first denial); *Commodity Futures Trading v. Bd. of Trade*, 701 F.2d 653, 657 (7th Cir. 1983) (findings made in preliminary injunction decisions may have a preclusive effect "if the circumstances make it likely that the findings are accurate [and] reliable"); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979) (giving collateral estoppel effect to preliminary injunction decision).

Applying these three factors, it is clear that the judgment here was "final" for purposes of collateral estoppel, and that the Spartan Fraud issue was essential to it. <u>First</u>, as quoted above, the decision here was "not avowedly tentative": the court definitively rejected Princeton's position that any fraud had occurred because Princeton failed to show that it even had a security interest in the Spartan Loans. <u>Second</u>, Princeton had a full and fair opportunity to be heard at *three* hearings. Initially, on May 26, 2017, Princeton was heard on its *ex parte* application for a TRO that the court granted. (Aizenberg Decl., **Ex. 14**.) Next, on June 9, 2017, Princeton was heard on a motion to dissolve the TRO. (6/9/17 Tr. (Aizenberg Decl., **Ex. 20**).) At the conclusion of the hearing, the court set a second hearing to address "is there a valid security interest that you [*i.e.*, Princeton]

have in those funds." (*Id.* at 56:24-25.) The court further explained that "the burden is yours [*i.e.*, Princeton's] to prove that you have a security interest…." (*id.* at 60:20-21), and that Princeton had "one more … bite at the apple" to show this. (*Id.* at 62:19-22.) In addition, the court permitted further briefing, allowing Princeton to file a reply in support of its preliminary injunction motion. (*Id*. at 64:3-6.) Finally, on June 27, 2017, Princeton was heard at a third hearing. (6/27/17 Tr. (Aizenberg Decl., **Ex. 19**).) The court began the hearing, explaining that he had asked the parties "to come back because I requested some supplemental materials" on the "two issues" the court was "interested in" – the first of which was the "security interest." (*Id.* at 4:15-21.) The remainder of the hearing focused primarily on this issue, and the court reached the reasoned opinion quoted above, *i.e.*, that Princeton simply had not shown it had a security interest in the Spartan Loans. (*Id.* at 36:13-37:6.) Third, there was a full opportunity for review of which Princeton took advantage by seeking and being denied leave to appeal by the New Jersey Appellate Division and Supreme Court. (Aizenberg Decl., **Ex. 16**.) After the New Jersey Supreme Court denied Princeton leave to appeal, Princeton abandoned its lawsuit by voluntarily dismissing its without prejudice.

**Element #4: The determination of the Spartan Fraud issue was essential to the judgment**. The Restatement explains that an issue is not essential "if…the judgment is not dependent upon the determination[]," because "[s]uch determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made." Restatement (2d) of Judgments § 27, cmt. h; *see also O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062 (3d Cir. 1991) (rejecting the notion that an issue is not essential merely because it could have been avoided "under some hypothetical resolution of the dispute"). Thus, in determining whether an issue is essential, it must be determined whether the issue "was critical to the judgment or merely dicta." *O'Leary*, 923 F.2d at 1067.

Here, the Spartan Fraud issue was critical to the NJ Court's determination of success on the merits. As explained above, the court: (i) specifically informed the parties that one of the key issues before it was whether Princeton had a security interest in the Spartan Loans; (ii) set a second hearing to allow the submission of additional proof on this issue; and (iii) denied the preliminary injunction because Princeton failed to submit proof of that security interest.

**Element #5: The party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding**. "[C]ollateral estoppel permits a defendant who was not a party to an action involving a common plaintiff to use a finding of fact from the prior action to preclude litigation of the issue in a pending case." *Konieczny v. Micciche*, 702 A.2d 831, 836 (N.J. App. Div. 1997) (citations omitted). This is known as "defensive collateral estoppel." *Id.* Here, Princeton had its day in court in the NJ Action on the critical issue – the Spartan Fraud – and thus is not entitled to relitigate that issue here again against the Defendants.

Dated: April 14, 2021          Respectfully submitted,

By:   *s/ Scott Mendeloff*

Scott Mendeloff
Gabriel Aizenberg
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
mendeloffs@gtlaw.com
aizenbergg@gtlaw.com

*Attorneys for Defendants Bruce Breitweiser, Joseph Canfora, Cardinal Trust, Barry Edmonson, Byron Faermark, Peter Ferro, Margon LLC, Mark Triffler Trust, Mark Triffler, and Merit Gaming Management Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Repking, certify that on April 14, 2021, a true and correct copy of the foregoing was filed electronically through the Northern District of Illinois CM/ECF electronic filing system, which will send a notification of filing to all counsel of record

/s/ *David S. Repking*