# Exhibit 1

Wᴏʟʟᴍᴜᴛʜ Mᴀʜᴇʀ & Dᴇᴜᴛsᴄʜ LLP
51 JFK Parkway
First Floor West
Short Hills, New Jersey 07078
  - and -
500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300
Fax: (212) 382-0050

*Counsel for Matthew Cantor, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

-------------------------------------------------------------x
In re:                                        :    Case No: 18-14603 (MBK)
                                              :
PRINCETON ALTERNATIVE INCOME FUND,            :    Chapter 11
LP, *et al.*,                                 :
                                              :
             Debtors.[1]                      :
-------------------------------------------------------------x
MATTHEW CANTOR, solely in his capacity        :
as Chapter 11 Trustee for Debtors Princeton   :    **ADVERSARY COMPLAINT**
Alternative Income Fund, LP, and Princeton    :
Alternative Funding, LLC f/k/a MicroBilt      :    Adv. Proc. No.
Capital Funding, LLC,                         :
                                              :
             Plaintiffs,                      :
                                              :
             v.                               :
                                              :
PHILIP N. BURGESS, JR., MICROBILT             :
CORPORATION, MICROBILT FINANCIAL             :
SERVICES CORPORATION, ROSEBUD                 :
MANAGEMENT LLC, ALONZO J. PRIMUS,             :
LJP CONSULTING LLC, WALTER                    :
WOJCIECHOWSKI, JOHN "JACK" COOK,              :
and PRINCETON ALTERNATIVE FUNDING             :
MANAGEMENT LLC,                               :
                                              :
             Defendants.                      :
-------------------------------------------------------------x

---

[1] The Debtors are Princeton Alternative Income Fund, LP ("PAIF") and Princeton Alternative Funding, LLC ("PAF").

Plaintiff, Matthew Cantor, solely in his capacity as Chapter 11 Trustee (the "Trustee") for

the Debtors, by and through his counsel, Wollmuth Maher & Deutsch LLP, as and for his

complaint (the "Complaint") in this Adversary Proceeding alleges as follows:

<u>Nature of the Action</u>

1.      This is an action for civil violations of New Jersey's Racketeer Influenced and

Corrupt Organization Act, N.J. Stat. Ann. § 2C:41-1 *et seq.* ("NJ RICO"), fraudulent

conveyances, common law breach of fiduciary duty, aiding and abetting breaches of fiduciary

duty, causing the Debtors to breach their fiduciary duties to investors, as well as for breaches of

contract and declaratory judgments that certain contractual and indemnification provisions

purporting to bind the Debtors are unenforceable and void.  Defendants owed fiduciary duties to

the Debtors, by virtue of their status as officers, partners, managers or agents of the Debtors.

Defendants misappropriated Debtors' funds, caused Debtors to incur liabilities, and caused

Debtors to lend money to third-parties, with whom Defendants had conflicting, self-interested

economic relationships on unreasonable terms and with the intent and effect of profiting at the

Debtors' expense.  In so doing, they caused the Debtors to breach their fiduciary and contractual

duties to direct and indirect investors in PAIF.  Defendants' fiduciary breaches and aiding and

abetting in such breaches were made in bad faith and/or through fraud, willful misconduct and

gross negligence.  Defendant MicroBilt Corporation ("MicroBilt") also directly contracted with

Debtors to provide them with data studies, analyses and monitoring services for loans to and

collateral of Debtors' third-party borrowers, but MicroBilt immediately and continually breached

the contract.  Defendants caused the Debtors to incur obligations to MicroBilt, and to pay monies

to MicroBilt and the incurrence of such obligations, and their payment, were intentionally and

constructively fraudulent.  Certain of the Defendants are liable as immediate or mediate

transferees of the avoidable transfers made to Defendant MicroBilt.  Plaintiff seeks treble

damages, restitution and disgorgement on behalf of the Debtors, avoidance of fraudulent billings

and transfers and declarations that Defendants are not entitled to any indemnification from either

Debtor under any applicable law, operating agreements or contract under which Defendants have

claimed.

<div align="center">Jurisdiction and Venue</div>

2.     This is a core proceeding by the Debtors against a group of insiders of the

Debtors, and their co-conspirators, under 28 U.S.C. § 157(b)(2)(b) and (c).  It arises in the

Debtors' above-captioned jointly-administered Chapter 11 case.  This Complaint is filed in the

nature of a counterclaim to proofs of claim filed by each of the Defendants in the Debtors'

Chapter 11 cases, and is brought in conjunction with objections the Trustee has also filed to such

proofs of claim.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1334(b) and venue is

proper in this Court pursuant to 28 U.S.C. § 1409(a).  This Court has personal jurisdiction over

each of the Defendants because they all reside or do business in the United States.

<div align="center">Parties and Significant Non-Parties</div>

3.     The Trustee was appointed Chapter 11 Trustee of the Debtors pursuant to orders

of this Court entered on November 7, 2018 and November 15, 2018, and is duly qualified and

acting.

4.     Debtor PAIF is a limited partnership formed under the laws of the State of

Delaware.  Defendants Walter Wojciechowski ("Wojciechowski"), Philip N. Burgess, Jr.

("Burgess"), MicroBilt, Alonzo J. Primus ("Primus") and others organized PAIF and sold its

limited partnership interests directly or indirectly to investors pursuant to a private placement

memorandum (the "PPM").  The stated objective of PAIF was profitably to lend the money

<div align="center">2</div>

raised through the sale of its limited partnership interests (including sales to the Feeder Fund, as defined herein) to third-party lenders that, in turn, made risky, short-term, high-interest loans to consumers unable to access credit from traditional lending sources. Defendants caused PAIF to acquire credit facilities originated by others, including by certain of the Defendants, and to extend credit to the third-party consumer lenders. PAIF obtained security interests in the loans that the consumer lenders made to end user borrowers and in substantially all the other assets of the consumer lenders. Defendants identified in the PPM, including Primus, MicroBilt and Wojciechowski, held themselves out to potential Limited Partners[2] in PAIF and to investors in the Feeder Fund as knowledgeable about which consumer lenders would make the most appropriate borrowers from PAIF, and as having proprietary software and data that would allow PAIF to monitor its loans to the consumer lenders on a real-time basis as those consumer lenders, in turn, made the funds available and serviced the loans to consumers and/or the consumers defaulted on their loans.

5.      Princeton Alternative Funding, LLC was a limited liability company formed in 2014 ("Old PAF") under the laws of the State of Delaware and was the General Partner[3] of PAIF, as defined in the PAIF Agreement, defined below, from the latter's formation until February 26, 2016. Effective February 26, 2016, certain Defendants caused Old PAF to be merged into another, then newly-formed Delaware limited liability company completely under their control named MicroBilt Capital Funding, LLC, which was the "Surviving Entity" in the merger. MicroBilt Capital Funding LLC simultaneously amended its name to Princeton

---

[2] As defined in the PAIF Agreement.

[3] As defined in the PPM.

Alternative Funding, LLC ("New PAF" or "Debtor").[4]  New PAF was the General Partner of

PAIF from February 26, 2016 until being improperly and temporarily removed in favor of

Defendant Princeton Alternative Funding Management LLC ("PAFM") shortly after the petition

date of March 9, 2018 (the "Petition Date").  By this Court's February 23, 2019 order, New PAF

has been reappointed as General Partner of PAIF *nunc pro tunc* to the Petition Date.

6.     Defendant Burgess is an individual who resides and maintains a place of business

in the United States.  On information and belief, affiliates of Burgess own a controlling equity

interest in MicroBilt, and Burgess is deeply and intimately involved in MicroBilt's operations.

On information and belief, Burgess does not serve as an officer of MicroBilt.  However, he was

designated by a company with which he is affiliated, known as AFAB International Ltd., as a

"consultant" to MicroBilt, and was, in turn, assigned by MicroBilt as a consultant to Debtors

under the "MicroBilt Services Agreement" (the "Services Agreement").  At all relevant times

prior to the appointment of the Trustee, Burgess acted as an agent of both Debtors and owed

them fiduciary duties.  On information and belief, Burgess is an insider of the Debtors.  Burgess

also owns or controls entities that originated loans that were sold and assigned to PAIF, and

which, in self-interested breaches of Burgess' fiduciary duties to Debtors, obtained "origination,"

"referral" or other fees in connection with such loans.  These Burgess-controlled entities include

Westminster National Capital Co., Inc. ("Westminster"), AFAB International Ltd. and Bristol

Investments Ltd. (collectively, the "Burgess Entities").

7.     Defendant MicroBilt is a Delaware corporation with its principal place of

business in the United States.  According to its website, MicroBilt is a "pioneer in the now

exploding alternative credit data space" and offers short-term lenders data, software and

---

[4] New PAF and Old PAF are sometimes jointly referred to herein as "PAF."

analytics to assist in lending decisions, loan monitoring and servicing and default recovery with respect to consumer borrowers with sub-prime credit.  On or about December 23, 2014, MicroBilt contracted with Old PAF to provide services to the latter in its capacity as General Partner of PAIF, through a "Services Agreement" which described MicroBilt as at least a 40% "shareholder" in Old PAF.  On information and belief, MicroBilt exercised control over the Debtors by virtue of its control over PAF.  MicroBilt was therefore an insider of both Old (and New) PAF, and also acted as an agent of PAF and PAIF.  MicroBilt owed the Debtors fiduciary duties.  As detailed herein, Defendant MicroBilt not only breached its fiduciary duties to Debtors, but it also immediately and continually breached the Services Agreement and is liable to the Debtors for, among other things, restitution of monies that MicroBilt improperly caused Old PAF, New PAF and PAIF to pay to it under the contract, as well as damages to those entities proximately caused by MicroBilt's breaches of the contract.  MicroBilt also participated in an "enterprise" under NJ RICO with Defendants Wojciechowski, Burgess and others, as described below, and is liable for the damages resulting therefrom.  MicroBilt received transfers from the Debtors avoidable under sections 544 and 548 of title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended from time to time (the "Bankruptcy Code") and the New Jersey Uniform Fraudulent Transfer Act.  MicroBilt should also be ordered to disgorge funds that it received from or through PAIF's borrowers, and vendors to those borrowers, as fruits of its wrongful acts.  The Services Agreement also contains several unconscionable terms which, whether MicroBilt breached the Services Agreement or not, should be declared to be unenforceable and void as a matter of public policy.  Those provisions include an unconscionably broad indemnification provision, and another provision that purports to make the Services Agreement non-terminable by Old PAF or New PAF.

8.    Defendant MicroBilt Financial Services Corporation ("MicroBilt Financial") is a Delaware corporation with a principal place of business in the United States.  MicroBilt Financial is a direct or indirect subsidiary of MicroBilt.  MicroBilt Financial is an insider of the Debtors as a managing member of Old PAF and New PAF holding more than 20% of the outstanding voting securities of each.  MicroBilt Financial owed both Debtors fiduciary duties.

9.    Defendant Rosebud Management LLC ("Rosebud Management") is a Delaware limited liability company with its principal place of business in the United States.  On information and belief, Rosebud Management is controlled by Defendant MicroBilt Financial and is thus indirectly controlled by Defendant MicroBilt.  Rosebud Management operated several credit lines nominally affiliated with the Rosebud Sioux Tribe of Native Americans.

10.    Defendant LJP Consulting LLC ("LJP") is a limited liability company that on information and belief is owned or controlled by Defendant Alonzo J. Primus.  Both LJP and Primus are residents of and do business in the United States.  LJP was a Member of New PAF and is an insider of the Debtors to whom it owes fiduciary duties.

11.    Defendant Primus is an individual who resides in the United States.  Primus was PAIF's Chief Credit Officer from its formation.  Primus was a Member of Old PAF, PAIF's first General Partner, in his individual capacity, and he controls Defendant LJP, which became one of the two managing members of New PAF.  Primus is an insider of the Debtors, to whom he owed fiduciary duties.

12.    Primus directly or indirectly owns at least 50% of several other companies, including HP Funding LLC, HP Funding II LLC, RAP Funding LLC, Learn2Comply LLC ("LTC") and VP Compliance Services LLC ("VPCS") (collectively with LJP, the "Primus Entities"), that billed, and were paid, hundreds of thousands of dollars by consumer lenders

nominally affiliated with a Native American tribe, including, but not limited to, those Rosebud

Management-operated tribal credit lines to which Defendants caused PAIF to lend.

13.  Defendant Wojciechowski is an individual who, upon information and belief,

resides in New Jersey. Wojciechowski is the President and Chief Executive Officer and, upon

information and belief, is a director of Defendant MicroBilt. Wojciechowski was Chief

Financial Officer of PAIF from its inception until the present and acted as PAIF's Chief

Executive Officer from January to March 2016, and is an insider of the Debtors to whom he

owed fiduciary duties.

14.  Defendant John "Jack" Cook ("Cook") is a resident of the United States and at all

times relevant hereto served as an officer and insider of the Debtor PAIF to whom he owed

fiduciary duties. Cook is also the Chief Executive Officer of Defendant PAFM.

15.  Defendant PAFM is a limited liability company formed under the laws of the

State of Delaware. Defendant MicroBilt Financial is a Managing Member of PAFM with an

86% membership interest. On or about the Petition Date, Defendants improperly substituted

PAFM for Debtor New PAF so that PAFM and its members could control the Debtors during

this bankruptcy, and reap the benefits that accrued to the General Partner of PAIF. By this

Court's February 13, 2019 order, PAFM was removed as PAIF's General Partner *nunc pro tunc*

to the Petition Date. Plaintiff seeks to recover from PAFM the amounts it was wrongfully paid

by PAIF in General Partner compensation, plus interest, and to disallow and/or subordinate all

amounts which PAFM has purported to charge PAIF in PAFM's capacity as General Partner

which remain unpaid.

16.  Non-party Robert Farrell ("Farrell") was a Managing Member and President of

Old PAF. Upon information and belief, Farrell had no business relationships with any of the

credit lines to which PAIF prospectively or actually lent money outside of his role at Old PAF
and Farrell was not suffering from a disabling conflict of interest in the discharge of his fiduciary
duties, compared to Defendants, in making business decisions on behalf of PAIF concerning
prospective or actual loans to such credit lines.  In furtherance of Defendants' breaches of
fiduciary duties and contract, Defendants, in late 2015 and early 2016, stripped Farrell of any
operational role at Old PAF, and thus at PAIF, and merged Old PAF into New PAF in which
Farrell was not a Managing Member, and thereby forced Farrell out of his positions with the
Debtors.

      17.     Non-party Ranger Alternative Management L.P. ("Ranger Management") is a
registered investment advisor and manager within the Ranger Capital Group, a multi-faceted
investment company.  Most relevant to this matter, Ranger Management managed the
investments of a domestic affiliate, Ranger Specialty Income Fund, L.P., ("Ranger Domestic")
and an offshore affiliate, Ranger Direct Lending Fund Trust ("Ranger Offshore") in PAIF.[5]
Between March 2015 and February 2016 Ranger Domestic invested $5.75 million directly in
PAIF as a Limited Partner.  Between May 2015 and January 2016, Ranger Offshore invested
$55.1 million in Princeton Alternative Income Offshore Fund, Ltd. ("PAIOF" or the "Feeder
Fund"), a British Virgin Islands company created by certain of Defendants to facilitate offshore
investments in PAIF (i.e., a "feeder fund" to PAIF).  All Ranger Offshore capital contributed to
PAIOF, net of expenses, was invested in PAIF and used as a part of the capital that PAIF used to
make loans to the consumer lenders.

      18.     Defendants' NJ RICO violations, breaches of fiduciary duty, their aiding and
abetting in such breaches, the fraudulent transfers to Defendants, and MicroBilt's breaches of its

---

[5] Unless specificity is needed or desirable, Plaintiff will hereafter refer to Ranger Management, Ranger Domestic
and Ranger Offshore individually and collectively simply as "Ranger."

contract obligations owed to and improper and fraudulent billing of Debtors, caused the Debtors

to be unable to fulfill a redemption demand by Ranger of its investments in PAIF and PAIOF, as

well as similar demands of other Limited Partners of PAIF and investors in PAIOF, thereby

exposing Debtors to liability to Ranger and those other Limited Partners/investors.  During

arbitration in July 2018, Ranger obtained a "Partial Final Award" (the "Award") against New

PAF and PAIF for $30.7 million plus 99 percent of the distributions attributable to the Argon

Side Pocket (defined below) plus pre-judgment interest thereon.  The Award also determined that

the Debtors breached their fiduciary duty to Ranger.

19.     With the possible exception of Defendant Rosebud Management, each and all of

the Defendants were officers, partners, managers and/or agents of the Debtors (collectively, the

"Insider Defendants"), and owed the Debtors fiduciary duties of care, loyalty, good faith and

honesty, including the obligation to act for the Debtors' benefit and in Debtors' best interests.

The Insider Defendants breached their fiduciary duties and Defendant Rosebud Management

aided and abetted therein by, among other things:  (1) causing the Debtors to breach their

contractual and fiduciary obligations, (2) causing the Debtors to incur and pay obligations to

MicroBilt instead of winding down the fund and paying the Ranger redemption demand, (3)

causing the Debtors to incur and pay obligations to the Burgess Entities, the Primus Entities and

others that were not in the best interests of the Debtors, (4) causing the Debtor PAF to enter into

and continue the Services Agreement, and overcharging the Debtors for services thereunder, (5)

causing the Debtor PAIF to acquire unsound and risky investments, including the Bristlecone

Loans, the Argon Loans and the Tribal Loans (as defined below) that were inadequately and

grossly negligently or recklessly structured, in order to benefit Defendants personally from the

payment of fees and the opportunity to obtain additional revenue from the consumer lenders, (6)

committing waste with respect to the assets of PAIF, including by making payments and

investments that were excessively risky, unauthorized or inappropriate, and (7) before and after

the Chapter 11 case by preferring the interests of MicroBilt, and the other Insider Defendants

over the interests of the Debtors.

20.     During the Chapter 11 case Defendants MicroBilt and Wojciechowski caused the

filing of Proof of Claim Number 8-1 by MicroBilt against PAIF for an amount in excess of $4

million.  Despite numerous requests by the Trustee that the claimant provide the invoices to

PAIF to support such claim, Defendants failed and refused to provide such documentation.  By

email dated May 31, 2019, the Trustee demanded that MicroBilt withdraw the unsupported proof

of claim, as violative of Bankruptcy Rule 9011, and warned that, if it did not, the Trustee would

seek sanctions against the persons responsible for its filing.  To date MicroBilt has not

withdrawn the undocumented claim.

<u>Factual Background</u>

21.     PAIF's first General Partner, Old PAF, was formed on or about August 29, 2014.

PAIF itself was formed on or about November 3, 2014.  In a PPM, Old PAF solicited

investments in limited partnership interests in PAIF.  The PPM identified PAIF as the "Fund"

and described its investment objective and strategy as linked to a contract with MicroBilt.  The

PPM states as follows:

> The Fund intends to invest substantially all of its assets into organizations which
> will originate loans in the alternative marketspace.  The Fund's investment
> objective is to provide investors consistent, risk-adjusted returns through direct
> loans to non-bank lenders operating in the alternative marketspace. The Fund will
> retain MicroBilt Corporation ("Microbilt") and employ its proprietary evaluation
> models to identify, analyze and monitor those lenders in real time.

PPM at 1.  An investor presentation slide deck created at the same time as the PPM similarly

described "The Process" for PAIF's investments as involving:  (i) screening "4000 Microbilt

10

customers" for "best in class" credit line operators as potential borrowers, (ii) analyzing the

operators' "historical lending performance for predictive returns," (iii) using "extensive

background data" supplied by MicroBilt to make lending decisions, and (iv) after extending

funds to approved operators, using "MicroBilt live data feeds [to] bring real time monitoring

capabilities to our portfolio."

      22.    According to the PPM, PAIF would hold revolving notes made by the consumer

lenders upon which the latter could repeatedly draw and pay down as they made consumer loans

and the consumers paid the lines back.  The consumer lenders would be contractually required to

build reserves against defaults on their loans by the consumer borrowers and would be limited in

their ability to continue to draw down on the revolver if, as and when consumer borrowers

became delinquent on their loans.  The PPM contemplated that the PAIF revolvers would charge

the credit lines interest of approximately 20% per annum and that, after expenses, including

management fees paid to PAIF's General Partner and administrative costs, PAIF would generate

substantial returns for its Limited Partners.  The intent of all transactions in which PAIF became

a lender was that the credit facility would be structured so that PAIF held a first priority secured

claim against the assets of its borrower.

      23.    The PPM further explained that Old PAF, as General Partner of PAIF, would be

"responsible for the affairs of the Fund and the management of the Fund's portfolio."  PPM at 2.

It identified non-party Farrell as "President and Co-founder" of Old PAF, another non-party,

Bert Szostak ("Szostak"), as Old PAF's "Managing Partner and Co-founder" and Defendant

Primus as a third "Managing Partner" of Old PAF.  *Id.*

      24.    Defendants did not allow the disinterested members of Old PAF any meaningful

say in the management of PAIF in the areas where the Defendants were suffering from conflicts

of interest.  Defendants MicroBilt, Burgess and Wojciechowski together with Defendant Primus, operated PAF and PAIF in their own self-interest (and that of the other Defendant entities in which they were financially interested) and adversely to the interests of PAF and PAIF.

25.     On or about December 23, 2014, Defendants caused Old PAF to execute the Services Agreement with MicroBilt, retroactively effective as of October 1, 2014.  In addition to providing Old PAF with office space, computers and internet and telephone access at $8,000-$10,000 per month, MicroBilt was to provide Old PAF with "Data Studies, Analysis and Monitoring" (billed at hourly rates) of the type represented in the PPM:  that is, "proprietary evaluation models to identify, analyze and monitor [the third-party] lenders in real time" who were obligated to PAIF under the revolving notes and who, in turn, would make the consumer loans that would generate returns on PAIF's investment.  In addition to causing the Debtor to enter into the Services Agreement, the individual Defendants caused PAF and PAIF to be entirely dependent on MicroBilt for all essential services, including maintenance of their books and records.  In doing so, the Defendants breached their fiduciary duties to the Debtors by entrenchment of MicroBilt in a position that was adverse to the Debtors' best interests, and which was designed to allow MicroBilt and the Defendants to profit personally from the perpetuation of such position.

26.     MicroBilt soon after breached the Services Agreement with Old PAF.  It overbilled Old PAF for the office space, equipment and utilities.  As far as "analytics" are concerned, MicroBilt's main service during the 2015 period was to provide credit checks on proposed individual consumer borrowers when the PAIF-funded lenders asked for access to their respective revolvers.  MicroBilt provided virtually no meaningful or valuable proprietary data studies or analyses to Old PAF's President, Farrell, to identify and rank in terms of past

experience the credit lines themselves with whom PAIF might enter into revolving credit

arrangements.  Rather, Defendants caused PAIF to lend to entities that they themselves managed

and/or that generated side-payments and kickbacks to Defendants' business interests outside of

PAIF and its General Partner, Old PAF.  MicroBilt further breached in 2015 by failing to provide

PAIF or Old PAF with proprietary studies or analyses to monitor in real-time the performance

(or delinquencies and defaults) in the portfolios of loans made by the third-parties to consumers

that were PAIF's collateral once the third-party credit lines had drawn down on their PAIF-

funded revolvers.  Instead of live reporting, the Debtors received only once-a-month snapshots of

the loan portfolios from their borrowers.  In 2016, when PAIF's borrowers had fully drawn down

on their revolvers from PAIF (and there were, therefore, decreasing numbers of new consumer

borrower applicants on whom MicroBilt needed to run credit checks), MicroBilt's invoices for

analytics falsely showed increased hours compared to the 2015 period.  In short, MicroBilt billed

PAIF, Old PAF (and, later, New PAF) and caused them to pay MicroBilt for fictitious,

overpriced, non-conforming and/or unnecessary services.

       27.    After the appointment of the Trustee, (a) MicroBilt further breached the Services

Agreement by failing to accurately and timely respond to the Trustee's request for information,

including by refusing to timely deliver information readily available in the ordinary course, and

(b) the Defendants continued to breach their fiduciary duties to the Debtors (and/or aided in the

breaches) by continually preferring the interests of adverse claimants against the Debtors over

the interests of the Debtors, including by taking positions adverse to the positions advanced by

the Trustee before the Court.

       28.    In breaching the Services Agreement, MicroBilt and the other Insider Defendants

also caused Old PAF, New PAF and PAIF itself to breach the above representations in the PPM

and investor presentation to Ranger and others about how they would invest Limited Partners'

funds with the third-party lenders—thereby exposing Old PAF, New PAF and PAIF to investor

claims and lawsuits.  The Insider Defendants also caused Old PAF, New PAF and PAIF to

breach side letters that they executed, in their capacities as agents of those entities, with Ranger

and to breach Ranger's redemption rights in the PAIF Limited Partnership Agreement, defined

below.

29.    Under the PAIF Limited Partnership Agreement dated as of January 14, 2015 (the

"PAIF Agreement"), all Limited Partners were granted the right to make withdrawals from their

capital accounts upon 180 days prior notice.  *See* PAIF Agreement, § 8.02.  To induce Ranger to

become the first Limited Partner, Old PAF executed a "side letter" dated March 3, 2015 in which

it agreed (among other things) to "transparency" provisions under which PAF and PAIF would

provide Ranger with advance notice of, and the right to opt-out of, prospective loans to credit

lines (at least with respect to money invested directly in PAIF as opposed to through PAIOF).

As discussed below, PAIF and PAF did not honor the transparency provisions of the side letter

with Ranger and, in 2016, the Insider Defendants (other than PAFM, which was not then yet

formed) caused PAIF to breach Ranger's redemption rights.

30.    Almost immediately after Ranger began investing in PAIF in March 2015,

Defendants began committing PAIF to revolving loans to consumer lenders aimed at offering

short-term, high-risk loans to consumers with deep subprime credit.  Old PAF did not give

Ranger advance notice of or the opportunity to opt out of the commitments with the credit lines,

the second of which was with an entity later designated as "Rosebud ZTC" and managed by

Defendant Rosebud Management, a MicroBilt subsidiary.  No disinterested fiduciary of PAF or

of PAIF had the benefit of any proprietary MicroBilt data or analyses before the entities made

the commitments to the credit lines, nor did either receive any "real-time" monitoring capabilities through MicroBilt once the consumer lenders began to draw on their revolvers in 2015 and 2016.

31. MicroBilt, through Rosebud Management, and Primus, through the Primus Entities, had financial ties to Rosebud ZTC and other "tribal lending entities" affiliated with the Rosebud Sioux Tribe of Native Americans which conflicted with their duty to make disinterested lending decisions on behalf of PAIF. Defendants dealt with the economic development arm of the Tribe, called the Rosebud Economic Development Corporation or "REDCO" and two of its subsidiaries, Rosebud Lending and Fintech Financial LLC ("Fintech").[6]

32. Rosebud Lending was the nominal sponsor not only of Rosebud ZTC, but also of several of the other consumer lenders to which Defendants ultimately caused PAIF to lend. However, Rosebud Lending contracted with Rosebud Management, Primus and the Primus Entities to perform all the operating and back-office functions for the Rosebud Lending-sponsored credit lines in return for fees and profit splits. Thus, Defendants were incentivized to cause PAIF to lend to newly-created Rosebud Lending affiliates to increase their compensation regardless of whether the lending relationship would be favorable for PAIF. Rosebud Management collected over $4 million from REDCO and its subsidiaries over the period 2014-2017. One Primus Entity, HP Funding II, invoiced Rosebud Lending over $450,000 in the period of 2015 through 2018. Another Primus Entity, Defendant LJP, billed and collected

---

[6] Because short-term, high interest consumer loans have the potential to violate state usury statutes, having a Native American tribe—a sovereign nation—issue and service the loan may provide legal protection under the doctrine of sovereign immunity. However, when the tribe cedes control over the loans to non-tribal management, such as the Defendants herein, the case for sovereign immunity is weakened and adds additional material legal risk to what is already a very risky consumer lending operation from a legal and business point-of-view. By causing PAIF to lend to Rosebud Lending affiliates that contracted with Rosebud Management and the Primus Entities, Defendants not only enriched themselves at PAIF's expense, but they also exposed PAIF to undue risks for the return on PAIF's investment in the tribal credit lines.

approximately $175,000 from MicroBilt for assistance in maintaining the latter's relationship

with Rosebud Lending between 2013 to mid-2017.

33.    Fintech, another arm of REDCO, originated loans to non-tribal lenders and then

shifted the risk to PAIF.  In one of the most fateful examples, on or about May 6, 2015,

Defendants caused PAIF to purchase from Fintech all right, title and interest in a $20 million

Loan and Security Agreement that Fintech had made to a newly-formed consumer lender called

Argon X LLC ("Argon X").  Just days earlier, on May 1, 2015, Primus Entity VPCS entered into

a consulting agreement with Argon X for a purported review of the latter's compliance and risk

management activities and procedures.  Argon X thus became PAIF's third borrower, and soon

thereafter, the first to go bankrupt at a time when it owed PAIF over $35 million.  Defendant

MicroBilt again provided no proprietary information to allow a disinterested Managing Member

of Old PAF to vet Argon X as an investment.

34.    Fintech's original Loan and Security Agreement required Argon X to use

MicroBilt for credit scoring and underwriting of Argon X's consumer loans.  Despite this,

however, MicroBilt did not provide PAF or PAIF with any tools with which to monitor Argon

X's consumer loans in real-time as contemplated in the MicroBilt Services Agreement.  And

despite MicroBilt's breach of its contract obligations to Old PAF and PAIF, Defendants caused

PAIF (through further assignments from Fintech) blindly to extend even more credit to Argon X

than the original $20 million—up to $35 million by September 2015 and $37.5 million by

February 2016.  Before increasing the line to Argon X, Burgess, Wojciechowski and certain of

the other Defendants were aware that the persons in control of Argon X had violated the credit

agreements, converted collateral and committed other fraudulent transactions.  Nevertheless,

putting their self-interest ahead of the interests of PAIF, Defendants caused the Argon X line to

be increased, ultimately causing PAIF to lose many millions of dollars from its Argon X investment.

35.     In another conflicted transaction that began in the summer of 2015, Defendants Burgess and Primus used their control of Old PAF and PAIF to cause them to acquire a fourth credit line, an entity known as "Green Circle," from a tribal lender called the Wakpamni Lake Community Corporation ("WLCC"). Primus, through Defendant LJP, provided back-office services to Green Circle, such as accounting and financial reporting. Primus Entities, HP Funding II, LLC, LTC and VPCS also received consulting fees from WLCC and Green Circle. Primus and the Primus Entities also received "referral fees" in connection with ACH processing services used in WLCC-affiliated and Rosebud Lending-affiliated credit lines' operations.

36.     By the fall of 2015, Farrell, on behalf of Old PAF and PAIF, complained to MicroBilt employees that MicroBilt was still not performing under the Services Agreement and that MicroBilt's non-performance was damaging PAF's and PAIF's ability to make lending decisions and to monitor its borrowers' portfolios. Defendant Burgess learned of Farrell's complaints and, assisted by Defendant Wojciechowski, began efforts to freeze Farrell and the other unconflicted Managing Member of Old PAF (Szostak), out of PAIF's General Partner. In October of 2015, Defendants temporarily locked Farrell and Szostak out of PAF's offices and blocked their access to network data about PAIF. They directed MicroBilt employees managing the payroll for PAF not to pay Farrell and Szostak their salary for November and December 2015. By letter dated January 4, 2016, Wojciechowski formally terminated their employment. Finally, in February 2016, Defendants merged Old PAF into New PAF in a transaction that left

17

MicroBilt Financial and Primus Entity, Defendant LJP, as the only Managing Members of PAIF's new General Partner, New PAF.[7]

37.     By letter dated March 28, 2016, Ranger notified New PAF, PAIF and PAIOF that it was redeeming all of its interests in the latter two funds effective 180 days hence, as provided in the PAIF Agreement.

38.     Shortly thereafter, Ranger instructed New PAF "to cease investing Ranger's assets" and that "PAIF should not renew the credit lines that were initially funded using investments from either [Ranger Domestic] or [Ranger Offshore]." As of April 1, 2016, PAIF had seven credit lines that had drawn down on their revolvers with a combined principal balance of approximately $62,628,000.

39.     Instead of preparing to honor Ranger's redemption demand, or bringing in disinterested fiduciaries for New PAF, PAIF and PAIOF to make business decisions on their behalf regarding the demand, Defendants ignored the demand and exposed New PAF, PAIF and PAIOF to even more liabilities by opening five additional credit lines:  Credit Line 5 (Credda); Credit Line 8 (TKC Worldwide); Credit Line 10 (Rosebud DRT); Credit Line 11 (Rosebud RQC); and Credit Line 12 (Big Valley).  The total commitment on the five new lines was $41,500,000, although PAIF had nowhere near that much additional capital to lend.[8]

---

[7] In 2016, Farrell and Szostak, individually and derivatively on behalf of Old PAF sued, among others, Burgess, Wojciechowski, MicroBilt, MicroBilt Financial and New PAF for the above conduct.  They have voluntarily dismissed the derivative claims without prejudice at the request of the Trustee.  The remaining claims in that litigation against the non-debtors (the "Farrell/Szostak Litigation") is proceeding in New Jersey State Court.  Upon information and belief, Defendants herein have used their control of PAIF and New PAF to cause them to advance or reimburse such Defendants for their legal fees and expenses in connection with the Farrell/Szostak Litigation.  This action seeks a declaration that Defendants were not entitled to such advances or reimbursements, a declaration that they are not entitled to any further advances or reimbursements or indemnity in connection with the Farrell/Szostak Litigation, or with any other litigation, and restitution of all indemnification amounts previously paid by PAIF or New PAF.

[8] As of the date of Ranger's redemption demand in March 2016, Ranger was the only Limited Partner in PAIF and investor in PAIOF, with a total contribution amount of $61,900,000.  From April 2016 to March 2017, Defendants

40. Defendants' acts in the face of Ranger's redemption demand can be explained only in terms of their conflicts of interest in obtaining fees from the consumer lenders in Defendants' personal and corporate capacities; that is, other than through their capital investments and economic interests in PAF. PAIF had the ability as a matter of contract in its revolving credit arrangements with the consumer lenders existing as of the date of Ranger's redemption demand to cease funding in its discretion, and also to demand payment on the lines at any time and have the consumer lenders repay PAIF without penalty. Thus, PAIF had little or no legal exposure to the consumer lenders in honoring Ranger's redemption demand. Moreover, Defendants knew or should have known from monthly reports that they were receiving from the consumer lenders that several consumer lenders were experiencing high levels of defaults on their consumer loans that had left PAIF severely under-collateralized and that materially negated the consumer lenders' ability to pay PAIF back the principal they had borrowed. Yet, Defendants continued to allow these same lines to draw down on their revolvers in breach of the contractual requirements for such draw downs and, in some cases, even increased the amounts of PAIF's commitments to such lines.

41. After the Insider Defendants caused the debtor PAIF to establish the Argon Side Pocket (as defined below) purportedly for the exclusive benefit of Ranger, they nevertheless diverted funds from the Argon Side Pocket rather than paying those funds to Ranger, thereby reducing Ranger's claims against the Debtors. In so doing, the Insider Defendants intentionally increased the liabilities of the Debtors to Ranger in violation of their fiduciary duties to the Debtors.

---

attracted a handful of other Limited Partners and other investors, who contributed a total of $8,575,000 in limited partnership interests and $2,743,000 to PAIOF.

42.     Defendants Wojciechowski and Cook (with the intentional assistance of Burgess) also recklessly or willfully failed to mark down PAIF's collateral and inaccurately calculated the net asset values of PAIF, and the Statements of its and the Feeder Fund's Limited Partners' Capital Accounts ("NAVs") as the defaults by the fund's borrowers increased. The falsification of PAIF's NAVs not only exposed PAF and PAIF to investor lawsuits, but also directly harmed PAIF by artificially increasing the management fee it was to pay to its General Partner. Limited Partners in turn were harmed because PAF purportedly took some portion of its management fees as Limited Partner equity interests in PAIF, diluting the other Limited Partners.

43.     MicroBilt billed and collected approximately $2 million for services that it supposedly provided to PAIF's consumer lender borrowers from the credit lines' inception to June 30, 2018. Westminster, a Burgess-owned company, collected at least $66,000 in fees and expenses from New PAF for "loan origination" services in connection with two credit lines that were funded by PAIF after the Ranger redemption demand. Yet another Burgess wholly-owned company, AFAB International Ltd., collected tens of thousands of dollars from PAIF credit lines and their vendors for various consulting services and referrals. Defendants Rosebud Management, Primus, LJP and the other Primus Entities similarly billed and collected hundreds of thousands of dollars from credit lines issued to Rosebud Lending affiliates that were funded by PAIF both before and after Ranger's redemption demand.

44.     The following charges/obligations incurred by Debtors and payment/transfers to MicroBilt (such obligations and payments, collectively, "Transfers") were made either (a) with actual intent to hinder, delay or defraud entities to which New PAF and PAIF were already or soon to be indebted, and are avoidable under sections 544 and 548(a)(1)(A) of the Bankruptcy Code and N.J. Stat. Ann. § 25:2-25 or (b) if occurring after November 2016 (i) constituted

20

payments of antecedent debts to an insider while the Debtor was insolvent and MicroBilt had

reasonable cause to believe the Debtor was insolvent, and are avoidable by the Trustee under

section 544 of the Bankruptcy Code and N.J. Stat. Ann. § 25:2-27(b), (ii) if occurring within one

year of March 9, 2018 constituted transfers voidable under section 547 of the Bankruptcy Code,

as they were made while the transferor was insolvent, to a creditor, on account of an antecedent

debt, which enabled the transferee to receive more than it would in a chapter 7 case if such

Transfers had not been made, and (iii) were made for less than reasonably equivalent value when

one or more of the conditions set forth in section 548(a)(1)(B)(ii) prevailed with respect to the

financial condition of the Debtor transferor, and are therefore avoidable under that section.

| | PAF | | PAIF | |
| | Shared Services | | Analytics | |
| Quarter | Charges | Payments | Charges | Payments |
|---|---|---|---|---|
| Q1'16 | 28,385 | - | 117,141 | - |
| Q2'16 | 94,941 | - | 175,925 | - |
| Q3'16 | 743,095 | - | 130,100 | - |
| Q4'16 | 273,583 | - | 130,875 | (462,391) |
| Q1'17 | 499,566 | - | 155,505 | - |
| Q2'17 | 310,882 | - | 161,933 | - |
| Q3'17 | 203,423 | (110,000) | 211,615 | (137,100) |
| Q4'17 | 502,912 | (363,084) | 210,050 | (271,988) |
| Q1'18 | 145,295 | - | 134,425 | (211,615) |

45.     In early September 2016, Defendants caused New PAF, PAIF and PAIOF to

request an extension of the 180-day period for the effectiveness of Ranger's March 28, 2016

redemption demand from September 30 to October 31, 2016.  Ranger agreed.  On October 28,

2016, three-days before the new deadline, Defendants caused counsel for New PAF to attempt to

preempt Ranger's redemption demand through what they called a "mandatory redemption" of

Ranger's interests under the PAIF Agreement that would further delay Ranger's repayment into

2017.  According to the arbitration panel that later decided Ranger's claims against New PAF

and PAIF for breach of the PAIF Agreement, the mandatory redemption notice was ineffective

and could not be justified in the name of protecting other investors in PAIF and/or PAIOF.  The

panel ordered New PAF and PAIF liable for damages and pre-judgment interest for failure to

honor Ranger's redemption demand beginning November 30, 2016.  PAIF and PAF were

insolvent no later than November 1, 2016 for purposes of the constructive fraudulent Transfers

set forth above.

46.     The Insider Defendants controlled the disposition of the Debtors' assets, and the

Insider Defendants' purposes and objectives as evidenced by their conduct after the receipt of

Ranger's redemption demand was to hinder, delay or defraud Ranger in the ability to recover the

capital it had invested in the Debtors.  Thus, the Insider Defendants' intent should be imputed to

the Debtors.

47.     Moreover, each of the Transfers was to an insider, was not disclosed, the Debtors

had been threatened with suit by Ranger before the Transfers were made, the Debtors received

less than reasonably equivalent consideration in exchange for the Transfers, the Debtors were or

became insolvent at the time of the Transfers or shortly thereafter, and the Transfers were made

at or around the time when the Debtors became liable for a substantial debt.

48.     On or about December 7, 2016, representatives of Argon Credit, LLC, the parent

company of PAIF's largest credit line (Argon X), informed New PAF that Argon X's prior

reporting concerning the performance of its loan portfolio—*viz.* PAIF's collateral—had been

misrepresented and that Argon X had many millions in non-performing loans.  Upon information

and belief, Defendants MicroBilt, Burgess and Wojciechowski had notice of "red flags"

concerning Argon X's performance months earlier but turned a blind eye and allowed Argon X

unfettered access to its PAIF revolver until December 7, 2016.  Argon Credit, LLC and Argon X

filed for bankruptcy later that month.  Another of PAIF's credit lines (Line 9, Bristlecone) filed

for bankruptcy in April 2017.

49.    Defendants created a wholly-owned subsidiary of PAIF called Fund Recovery

Services, LLC ("FRS") to prosecute claims on behalf of PAIF against Argon X in the latter's

bankruptcy proceedings.  At the same time, Defendants invoked the "side pocket" provisions of

PAIF Agreement to segregate the liabilities (and few remaining assets) associated with the

bankrupt Argon X credit line from the accounting for the other credit lines to which PAIF had

lent and to allocate the ensuing losses and any gains directly to individual Limited Partners (the

"Argon Side Pocket").  Those same "side pocket" provisions required Defendants to maximize

the return to those Limited Partners bearing the losses in the Argon X credit line (chiefly,

Ranger) by, among other things, taking over the servicing of the few consumer loans made by

that line which were still performing and minimizing the expenses incurred in connection with

the servicing and defaults.  Defendants, however, used their control of PAIF and FRS to bilk the

Argon Side Pocket of $2.5 million dollars in unrelated or exorbitant expenses (such as their own

attorneys' fees in legal disputes with Ranger discussed immediately below) and to direct $2

million in Argon Side Pocket recoveries into PAIF to be used to pay PAIF expenses instead of to

Ranger, thereby exposing PAIF to liability to Ranger for not honoring the Argon Side Pocket

provisions.

50.    In 2017, Ranger commenced arbitration against New PAF, PAIF, PAIOF and

several of the Defendants herein.  During the pendency of those proceedings, including several

days of testimony before the panel, on March 9, 2018, New PAF and PAIF filed the instant

bankruptcy proceedings. Ranger applied for and obtained relief from the automatic stay

provisions from this Court to proceed with the arbitration against New PAF and PAIF only, and

only on certain claims including breach of contract, breach of fiduciary duty, fraud and violations

of the securities law. On July 20, 2018, the panel issued a short-form "Partial Final Award"

(defined above as the "Award") on the claims as to which the stay was lifted, which included

findings of breach of contract and fiduciary duty by the Debtors and damages in favor of Ranger

for $30.7 million dollars plus 99 percent of the distributions for the Argon Side Pocket plus

prejudgment interest thereon calculated under Delaware law from November 30, 2016. The

Delaware Court of Chancery confirmed the Award on or about June 25, 2019.

51.     After the filing of the Debtors' Petition and the improper substitution of PAFM

for New PAF as General Partner for PAIF, PAFM claimed a substantial amount in General

Partner fees. Upon information and belief, any amounts collected by PAFM while it was

General Partner have been distributed to other Defendants, including MicroBilt. During the

period that PAFM was improperly substituted as General Partner for PAIF, Defendant Cook

refused to appropriately instruct MicroBilt under the Services Agreement and otherwise

facilitated MicroBilt's breach of that Services Agreement to the detriment of PAIF.

52.     As of the date of this Complaint, only four of the twelve credit lines to which

PAIF lent money were not in default, although the TKC line matured on June 30, 2019 and has

not been repaid in full. The Bankruptcy Court entered an Order on July 12, 2019 approving a

settlement with TKC whereby the Trustee expects to realize 72.5% of the principal balance

outstanding as of closing of that settlement on July 29, 2019.

53.     Of the twelve credit facilities operated by PAIF, five were to so-called Tribal Lenders, *i.e.*, consumer lenders who claim the purported sovereign immunity of Native American tribes allows them to charge interest rates vastly exceeding the amounts chargeable under the usury laws of every state in the United States.[9]  Making loans to Tribal Lenders carries substantially greater risk than lending to other deep subprime consumer lenders because of the enhanced difficulty in collecting on the collateral for such loans.  PAIF was not adequately compensated for the risks it incurred in loans it made to Tribal Lenders, as the interest rates PAIF was able to charge to such Tribal Lenders were not materially higher than the rates it charged to other consumer lenders.  All or substantially all of the loans to Tribal Lenders defaulted and PAIF incurred millions of dollars in losses on the loans it made to Tribal Lenders.

54.     Each of the loans to Tribal Lenders was originated by a company known as Fintech.  On information and belief, one or more of the Defendants obtained material personal benefits, directly or indirectly, by causing PAIF to acquire loans from Fintech and to commit to make advances to the various Tribal Lenders identified above.

55.     In causing PAIF to acquire loans to the Tribal Lenders, the Insider Defendants breached their fiduciary duties to PAIF, and committed waste of PAIF's assets.  Defendant Rosebud Management aided and abetted in the Insider Defendants' fiduciary breaches.

56.     The Insider Defendants also caused PAIF to acquire from Burgess Entity Westminster two loans to borrowers known as Bristlecone SPV ("Bristlecone") and Credda.  In structuring and originating the Bristlecone and Credda loans, Westminster failed to adequately investigate and understand the borrowers, the collateral and competing creditors for the same collateral.  Rather than structure the Bristlecone and Credda loans in a manner that would be

---

[9] The five Tribal Lenders to which PAIF extended credit were known as Green Circle, TKC, Rosebud DRC, Rosebud RQC, and Big Valley.

protective of the interests of PAIF, the Insider Defendants, motivated by the prospect of personal

gain, caused PAIF to acquire those loans nonetheless. In so doing, the Insider Defendants

breached their fiduciary duties to PAIF and committed waste of PAIF's assets.

57.    The Insider Defendants also caused the Debtors to become the subject of an

investigation by the Securities and Exchange Commission ("SEC"), which has caused the

Debtors to incur substantial expenses for counsel fees and other costs, and potential liability to

the SEC based on proofs of claim filed by the SEC in the Debtors' Chapter 11 cases.

58.    Plaintiff seeks recovery from all Defendants of the above amounts, with interest,

plus disgorgement, with interest, of all fees, profits and other funds Defendants received in self-

interested transactions with Debtors, their credit line borrowers and with affiliates of, vendors to

or consumer borrowers from the credit lines. Plaintiff also seeks to avoid the Debtors' fraudulent

and preferential Transfers and incurrence of obligations to or for the benefit of MicroBilt, treble

damages under NJ RICO and recovery of his attorneys' fees in this matter. Plaintiff also seeks

damages from all Defendants for breach of contract, breach of fiduciary duty, aiding and abetting

breaches of fiduciary duty, and violations of NJ RICO.

59.    Finally, several Defendants have filed proofs of claims seeking indemnification

and/or contribution from Debtors. Although Defendants have not identified the source of

indemnification, Plaintiff seeks a declaratory judgment that no indemnification or contribution

was or is owed by either Debtor in favor of such claimant Defendants, together with restitution

or disgorgement of any and all amounts previously paid pursuant to their indemnification claims

while Defendants were in control of the Debtors' purse strings. The Trustee also seeks common

law contribution from Defendants that caused (or that aided and abetted in causing) PAIF, Old

PAF or New PAF to be liable to third-parties, such as PAIF's Limited Partners and from those

Defendants that through their conduct caused (or that aided and abetted in causing) PAIF, Old

PAF or New PAF to incur attorneys' fees and expenses defending or otherwise, in connection

with lawsuits and investigations arising out of Defendants' conduct.

## AS AND FOR A FIRST CAUSE ACTION
### (Breach of Contract – Defendant MicroBilt Corporation)

60.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

61.     The Services Agreement provides, among other things, for MicroBilt to supply

PAF with daily access to offices and conference rooms, wireless laptops, VOIP telephones and

unlimited internet access.  Contemporaneous documents reveal that the agreed monthly charge

was to be $8,000 to $10,000.  MicroBilt overbilled PAF (and, after the Petition Date, PAFM) for

these services.

62.     The Services Agreement also required MicroBilt to provide Old PAF (and later

New PAF and, after the Petition Date, PAFM) on behalf of PAIF "Data Studies, Analysis and

Monitoring" as more fully described in the PPM and other materials that Old PAF and MicroBilt

contemporaneously circulated to potential investors in PAIF.  More specifically, MicroBilt

contracted to provide Old PAF on behalf of PAIF data studies and analyses that were proprietary

to MicroBilt (*i.e.*, not based on publicly available data) that would allow for:  (i) screening "4000

Microbilt customers" for "best in class" credit line operators as potential borrowers, (ii)

analyzing the operators' "historical lending performance for predictive returns," (iii) using

"extensive background data" supplied by MicroBilt to make lending decisions, and (iv) after

extending funds to approved operators using "MicroBilt live data feeds [to] bring real time

monitoring capabilities to our portfolio," as was described in the PPM, and an investor

presentation slide deck.

27

63.     MicroBilt breached the Services Agreement by failing to provide the contracted-for studies and analyses before Old PAF and PAIF extended credit to "credit line operators" and, thereafter, supplied Old PAF, New PAF and PAIF materials on a monthly (not real-time) basis that were non-proprietary and available from other credit services and/or that were materially duplicative of materials that it prepared under separate contracts for third-parties for which MicroBilt was paid by those third-parties.  MicroBilt also breached the Services Agreement by failing to render invoices monthly as required by its terms.

64.     PAF had fully performed the Services Agreement prior to MicroBilt's breach.

65.     The Trustee seeks and is entitled to restitution of money Old PAF, New PAF, PAFM and/or PAIF paid MicroBilt under the Services Agreement for non-conforming performance and/or paid pursuant to indemnification claims made by MicroBilt or its consultants (including, but not limited to Defendant Burgess) under the Services Agreement.

66.     The Trustee seeks and is also entitled to damages from MicroBilt for loans made by or on behalf of Old PAF, New PAF, PAFM and/or PAIF without the benefit of the contractual bargain of proprietary studies and analyses (a) identifying "best in class" borrowers, and (b) providing them with real-time "monitoring of borrowers" to whom PAIF lent money.

67.     The Trustee seeks and is entitled to a declaration that, as a result of MicroBilt's breaches of the Services Agreement, neither MicroBilt nor any affiliate of or consultant to it is entitled to claim any future indemnification under the Services Agreement from Old PAF, New PAF, PAFM or PAIF, and all proofs of claim filed by MicroBilt for unpaid invoices rendered to either Debtor should be expunged.

68.     Under Paragraph N of the Services Agreement, should the Trustee prevail, he is entitled to his attorneys' fees and other expenses in connection with enforcing the Services

Agreement against MicroBilt in this action and any subsequent judgment enforcement proceedings.

<div align="center">

AS AND FOR A SECOND CAUSE ACTION
(Primary Violation of NJ RICO – All Insider Defendants)

</div>

69.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

70.     Each of the Insider Defendants owed fiduciary duties to one or both of the Debtors.

71.     Each of PAIF, PAF and PAFM while under the control of the Defendants was an "enterprise" within the meaning of the NJ RICO statute, N.J. Stat. Ann. § 2C:41-1(c), the business of each of which was to act as either the General Partner of PAIF, or as an investment vehicle under the control of its General Partner.

72.     Each and all of the Insider Defendants conducted or participated in the affairs of PAIF, PAF and PAFM through a pattern of racketeering activity, including misappropriation by a fiduciary within the meaning of N.J. Stat. Ann. § 2C:21-15 and N.J. Stat. Ann. § 2C:20-4.

73.     The Insider Defendants did so by failing to disclose their adverse self-interests in conducting the affairs of PAIF, PAF and PAFM, causing PAF or PAIF to pay them or their affiliates directly or indirectly for services that promoted their adverse self-interest at PAIF's expense, and causing PAIF to make excessively risky loans, including Tribal Loans, and other loans whereby the Insider Defendants or their affiliates profited at PAIF's expense.  Specifically, these Defendants caused PAIF to lend money to third-party consumer lenders, or to acquire loans from third party originators like Fintech, that had contracted with Defendants or their affiliates, including but not limited to Rosebud Management, the Primus Entities and the Burgess Entities.

74.     The Insider Defendants failed to recuse themselves from PAF's and PAFM's decision-making on behalf of PAIF as to credit lines with which Defendants' affiliates had financial relationships and deliberately froze-out unconflicted Managing Members of Old PAF from that decision-making.  Defendants also caused Old PAF and PAIF to enter into (and New PAF and PAFM to maintain) oppressive, one sided agreements with Defendants or their affiliates designed to protect Defendants at the expense of the Debtors, which agreements contained provisions that were void and unenforceable as contrary to public policy.

75.     The Insider Defendants caused PAIF to lend to and to expand or renew lending relationships to consumer lenders for the unlawful purposes of prioritizing their gains from operation of the credit lines and without regard to their fiduciary duties (a) to maximize and achieve returns from the credit lines for PAIF or its subsidiaries or General Partner, and (b) to protect PAIF from liability to Ranger and from insolvency arising out of Ranger's redemption demand and Ranger's interest as the Limited Partner with the greatest interest in the Argon Side Pocket.

76.     The Insider Defendants misappropriated PAIF's and its subsidiaries' money in the conduct of the affairs of PAIF, PAF and PAFM through numerous breaches of their fiduciary duty.  All such acts and omissions were committed by the Insider Defendants willfully and in bad faith and are outside the exculpatory provisions of relevant agreements as a matter of fact and law.

77.     PAIF is a person that was injured in its business and property by reason of Defendants' conduct of the affairs of Old PAF, New PAF and PAFM, its General Partners, and its subsidiaries, through a pattern of racketing activity and PAIF is entitled to recover from said Defendants, jointly and severally, treble the amount of damages determined at trial.

## AS AND FOR A THIRD CAUSE ACTION
(Conspiracy to Violate NJ RICO – All Defendants)

78.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.    If and to the extent that any Defendant herein, including but not limited to Defendant Rosebud Management, was not itself a fiduciary to or of PAIF, PAF or PAFM, such Defendant (each a "Conspiring Defendant") agreed with those remaining Defendants that were the fiduciaries (each a "Primary Violator Defendant") to enable and profit from the latter's breach of duty to PAF and PAFM, and thus to PAIF, by contracting directly with the credit lines to which PAF and PAFM caused PAIF to lend.

80.    The contracts and relationships between each Conspiring Defendant and the credit lines constituted overt acts in furtherance of the agreement between all Conspiring Defendants and all Primary Violator Defendants to operate or participate in the operation of PAF and PAFM as General Partner of PAIF through a pattern of racketeering acts including misappropriation by a fiduciary.

81.    PAIF is a person that was injured in its business and property by the agreement and overt acts of the combined Conspiring Defendants and Primary Violator Defendants in furtherance of a conspiracy to operate PAIF's General Partners, PAF and PAFM, through a pattern of racketeering activity and, accordingly, PAIF is entitled to recover from said Defendants, jointly and severally, treble the amount of damages determined at trial.

## AS AND FOR A FOURTH CAUSE ACTION
### (Common Law Breach of Fiduciary Duty – All Insider Defendants)

82.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

83.     Each of the Insider Defendants owed fiduciary duties to the Debtors.

84.     Each of the Insider Defendants breached his or its fiduciary duties in the manner set forth above, including by failing to fully and accurately disclose his or its adverse self-interests in conducting the affairs of Old PAF, New PAF and PAFM as General Partner to PAIF and in causing PAIF and/or its subsidiaries, or other persons described above, to pay him or it directly or indirectly for services that promoted his or its adverse self-interest at PAIF's and its subsidiaries' expense.  The Insider Defendants also caused the Debtors to breach their contractual and fiduciary duties to Ranger, as determined by the Award.  In addition, the Insider Defendants caused PAIF to lend money to third-party credit lines that had contracted with Defendants' affiliates, including but not limited to Rosebud Management, the Primus Entities and the Burgess Entities.  The Insider Defendants also improperly charged FRS for expenses unrelated to the Argon Side Pocket, overcharged for services that did relate to the Argon Side Pocket and/or exposed PAIF to liability to Ranger by allocating Argon X recoveries to PAIF's general accounts rather than to the Argon Side Pocket they had created.  The Insider Defendants also caused the Debtors to commit waste as aforesaid, by making loans to Tribal Lenders, by negligently originating loans that they then foisted on PAIF as buyer, and by increasing or continuing advances to PAIF's borrowers when they should have honored Ranger's redemption demand and wound down and liquidated the fund.

85.     Each of the Insider Defendants failed to recuse himself or itself from PAF's and PAFM's decision-making on behalf of PAIF as to credit lines with which the Insider Defendants'

side-businesses had financial relationships and deliberately froze-out unconflicted Managing

Members of Old PAF from that decision-making.

86.     The Insider Defendants caused PAIF to lend to and to expand or renew lending

relationships to credit lines for the unlawful purposes of prioritizing their gains from their side-

businesses connected to the credit lines and without regard to their fiduciary duties to (a)

maximize and achieve returns from the credit lines for PAIF and PAF and (b) protect PAIF from

liability to Ranger and from insolvency arising out of Ranger's redemption demand.

87.     All such acts and omissions were committed by the Insider Defendants willfully

and in bad faith and are outside the exculpatory provisions of relevant agreements as a matter of

fact and law.

88.     The Insider Defendants are liable to the Debtors for all losses suffered by the

Debtors arising from their breaches of duty, for disgorgement of amounts paid to them directly or

to their affiliates proximately related to their self-interested breaches of fiduciary duty and for

damages in an amount to be determined at trial proximately resulting from their wrongful acts or

omissions.

### AS AND FOR A FIFTH CAUSE ACTION
(Aiding and Abetting Common Law Breach of Fiduciary Duty – All Defendants)

89.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

90.     If and to the extent that any Defendant herein, including but not limited to

Defendant Rosebud Management, was not itself a fiduciary to or of PAF or PAIF, such

Defendant (each an "Aiding and Abetting Defendant") had actual knowledge that the remaining

Defendants (each a "Primary Violator Defendant") were fiduciaries to those entities.

91.     Each Aiding and Abetting Defendant was an affiliate of one or more Primary Violator Defendant(s).

92.     The contracts and relationships between each Aiding and Abetting Defendant and the credit lines to which the Primary Violator Defendants caused PAIF to lend constituted substantial assistance in further of the Primary Violator Defendants' breaches of their fiduciary duties to PAF and/or PAIF.

93.     The Aiding and Abetting Defendants are liable to PAF and PAIF for disgorgement of amounts paid to them in assisting the Primary Violator Defendants' breaches of fiduciary duties and for damages in an amount to be determined at trial proximately resulting from the conflicted decision-making of the Primary Violator Defendants in PAIF's loans to the credit lines with whom the Aiding and Abetting Defendants had financial relationships.

<center>AS AND FOR A SIXTH CAUSE ACTION
(<u>Declaratory Judgment – All Defendants</u>)</center>

94.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

95.     The Services Agreement, PAIF Limited Partnership Agreement and the PAF and PAFM operating agreements provide for limited indemnification of claims made by third-parties against certain of their officers, partners and members and others (the "Indemnification Provisions").  Certain Defendant herein have claimed that the Indemnification Provisions purport to cause PAF, and indirectly PAIF, to indemnify some or all of said Defendants against negligent or intentional acts, as well as from causing damages alleged to result from violations of applicable law, theft, embezzlement, or any other crime, extortion, or any other tort or any unlawful act.

<center>34</center>

96.     To the extent that the Indemnification Provisions theoretically apply to any Defendant herein, the enforcement of those provisions would violate public policy and are legally unenforceable in light of said Defendants' intentional or grossly negligent wrongful acts and omissions alleged herein.

97.     Plaintiff is entitled to a declaration that, as a result of their breaches of fiduciary duty, other wrongful acts and acts and omissions under conflicts of interests, none of the Defendants are entitled to contractual or common law indemnification from any of Old PAF, New PAF or PAIF.

## AS AND FOR A SEVENTH CAUSE ACTION
### (Declaratory Judgment – Defendants MicroBilt, Wojciechowski, MicroBilt Financial & Primus)

98.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

99.     The Services Agreement between MicroBilt and PAF contains an indemnification clause at Paragraph 10(O).

100.     Defendants Wojciechowski, MicroBilt, MicroBilt Financial and Primus have claimed a right to contractual indemnification from the Debtors.  To the extent any of those claims are based on the indemnification provision of the Services Agreement, or other contracts to which either of the Debtors are parties, the Trustee seeks a declaratory judgment that any claim by any of the Defendants named in this paragraph against any of the Debtors for contractual indemnity is unenforceable.  PAIF is not a party to the Services Agreement and is not liable to indemnify anyone under it.

101.     The indemnification clause in the Services Agreement, by its terms, purports to bind each party to indemnify the other against claims of third-parties for acts or omissions of the indemnitee "whether negligent or intentional" that "directly or indirectly caused or [are] alleged

35

to have caused" damages or injury, including but not limited to "violation of applicable law,
theft, embezzlement or any other crime . . . tort or violation of any civil or personal right or any
unlawful act" (the "Willful Acts Indemnity").

102.    The Trustee, on behalf of PAF and PAIF, is entitled to declarations (a) that the
Willful Acts Indemnity is contrary to public policy, is void and is unenforceable and either
should be severed from the Services Agreement, or renders the Services Agreement null and
void, and (b) that MicroBilt is not entitled to any indemnification from any of the Debtors or
their predecessors-in-interest.

103.    The Trustee, on behalf of Old PAF, New PAF and PAIF, is also entitled to a
declaration that none of the Defendants are entitled to any indemnification from either of the
Debtors.

104.    The Services Agreement further provides at Paragraph 5 that it is not terminable
by Old PAF and shall continue in perpetuity, if not terminated for breach that remains uncured
for greater than 30 days, "so long as MicroBilt maintains greater than forty percent (40%)
ownership of [PAF]. . . ."

105.    The Trustee is entitled to a declaration that the Services Agreement has been
terminated because of MicroBilt's prior, uncured breach or, in the alternative, that the perpetuity
provisions of Services Agreement are void and unenforceable as a product of overreaching by a
fiduciary, unconscionability and as against public policy.

## AS AND FOR AN EIGHT CAUSE ACTION
### (Intentional Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(A) – MicroBilt)

106.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

107.     MicroBilt billed Debtors for and, against those bills, Debtors transferred their cash and other property and/or incurred obligations to or for the benefit of MicroBilt within two years before the date of the Debtors' filing of the petition for relief in the above-captioned bankruptcy case.

108.     Those transfers made or obligations incurred after the March 28, 2016 date of Ranger's redemption demand were made or incurred against false, fictitious or overstated MicroBilt invoices for goods or services (*i.e.*, for inadequate consideration to an insider) at a time when the Debtors faced extreme financial difficulties or actual insolvency and were made or incurred with actual intent to hinder, delay or defraud Ranger and other present or future creditors of Debtors.

109.     The Plaintiff is entitled to avoid all such intentionally fraudulent transfers made or obligations incurred voluntarily or involuntarily by the Debtors to or for benefit of the MicroBilt on or after March 28, 2016.

110.     Plaintiff seeks recovery of all transfers under section 550 of the Bankruptcy Code from either MicroBilt as initial transferee, or any mediate or immediate transferee of such initial transferee.

## AS AND FOR A NINTH CAUSE ACTION
### (Constructive Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(B) – MicroBilt)

111.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

112.    As of November 30, 2016, Debtors were liable to redeem Ranger's interests in PAIF and PAIOF.

113.    As of November 1, 2016, Debtors were insolvent, were engaged in business or transactions or were about to engage in business or transactions for which any property remaining with either or both of them was an unreasonably small capital and/or Debtors intended to incur, or believed that they would incur, debts beyond either or both of their ability to pay as such debts matured.

114.    On and after November 1, 2016, MicroBilt rendered false, fictitious or overstated invoices for goods or services to Debtors and Debtors transferred their cash and other property and/or incurred obligations to or for the benefit of MicroBilt in exchange for less than reasonably equivalent value.

115.    The Plaintiff is entitled to avoid all such constructively fraudulent transfers made or obligations incurred voluntarily or involuntarily by the Debtors to or for the benefit of MicroBilt on or after November 1, 2016.

116.    Plaintiff seeks recovery of all transfers under section 550 of the Bankruptcy Code from either MicroBilt as initial transferee, or any mediate or immediate transferee of such initial transferee.

## AS AND FOR A TENTH CAUSE ACTION
### (Intentional Fraudulent Transfer – N.J. Stat. Ann. § 25:2-25(a) – MicroBilt)

117.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

118.    Debtors made transfers of their cash and other property and/or incurred obligations to or for the benefit of MicroBilt at and after the time of Ranger's redemption demand on March 28, 2016 with actual intent to hinder, delay or defraud Ranger and other present or future creditors of PAIF and New PAF.

119.    The Plaintiff is entitled to avoid the transactions, and to recover under section 550 of the Bankruptcy Code against MicroBilt or any mediate or immediate transferee.

## AS AND FOR AN ELEVENTH CAUSE ACTION
### (Constructive Fraudulent Transfer – N.J. Stat. Ann. §§ 25:2-25(b), 25:2-27 – MicroBilt)

120.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

121.    As of November 30, 2016, Debtors were in default for failure to redeem Ranger's interests in PAIF and PAIOF.

122.    As of November 1, 2016, Debtors were insolvent, were engaged in business or transactions or were about to engage in business or transactions for which any assets remaining with either or both of them were unreasonably small in relation to the business or transaction and/or intended to incur, or believed that they would incur, debts beyond either or both of their ability to pay as such debts matured.

123.    On and after November 1, 2016, Defendants caused Debtors to transfer the Debtors' cash and other property and/or incurred obligations to or for the benefit of MicroBilt in exchange for less than reasonably equivalent value.

124.    The Plaintiff is entitled to avoid the transactions, other equitable relief or

damages for all such constructively fraudulent transfers made or obligations incurred by the

Debtors to or for MicroBilt on or after November 1, 2016.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Insider Preferences – N.J. Stat. Ann. § 25:2-27(b) – MicroBilt)

125.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

126.    Defendant MicroBilt, an insider, received payments of antecedent debts while the

Debtor was insolvent and MicroBilt had reasonable cause to believe the Debtor was insolvent,

which transfers are avoidable by the Trustee under section 544 of the Bankruptcy Code and N.J.

Stat. Ann. § 25:2-27(b).

127.    Plaintiff is entitled to avoid the transactions, and to recover under section 550 of

the Bankruptcy Code against MicroBilt

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Voidable Preferences – 11 U.S.C. § 547 – MicroBilt)

128.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

129.    All payments to MicroBilt by the Debtors set forth above occurring within one

year of March 9, 2018 constituted transfers voidable under section 547 of the Bankruptcy Code,

as they were made while the transferor was insolvent, to a creditor, on account of an antecedent

debt, which enabled the transferee to receive more than it would in a chapter 7 case if such

Transfers had not been made.

130.    The Plaintiff is entitled to avoid the transactions, and to recover under section 550

of the Bankruptcy Code against MicroBilt

## AS AND FOR A FOURTEENTH CAUSE ACTION
<u>(Contribution – All Tortfeasor Defendants)</u>

131.   Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

132.   On or about July 20, 2018, a JAMS arbitration panel in the matter captioned *Ranger Specialty Income Fund, L.P. et al. v. Princeton Alternative Funding, LLC, et al.*, JAMS Arbitration Ref. #1450004894 (the "JAMS Arbitration"), issued the Award in favor of Ranger against New PAF and PAIF in the amount of $30.7 million plus 99 percent of the distributions for the Argon Side Pocket plus pre-judgment interest from November 30, 2016 for, among other acts, breach of fiduciary duty to Ranger in denying Ranger's redemption request.

133.   The Insider Defendants who directed Old PAF, New PAF and PAIF, and each Aiding and Abetting Defendant who substantially assisted the Insider Defendants (collectively, the Insider Defendants and Aiding and Abetting Defendants are referred to hereafter as the "Tortfeasor Defendants"), are jointly liable with New PAF and PAIF for the above Award and are thus liable to New PAF and PAIF for contribution.

134.   In addition to incurring liability and attorneys' fees and expenses in the defense of the JAMS Arbitration, New PAF and PAIF have incurred attorneys' fees and expenses in connection with a SEC investigation (the "SEC Investigation") into each and both of them and into Old PAF for acts and omissions caused by and/or substantially assisted in by the Tortfeasor Defendants.

135.   New PAF and PAIF are entitled to contribution from the Tortfeasor Defendants for all attorneys' fees and expenses incurred by them in connection with the SEC Investigation and any private lawsuit, government investigation or regulatory action against either or both of them arising out of the Tortfeasor Defendants' acts or omissions alleged herein.

41

## AS AND FOR A FIFTEENTH CAUSE ACTION
### (Equitable Subordination – All Claimant Defendants)

136.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

137.     As of the date of this Complaint, certain Defendants herein—namely, MicroBilt, MicroBilt Financial, Burgess, Wojciechowski, Rosebud Management, Primus and LJP (collectively, the "Claimant Defendants") have filed proofs of claim in the Debtors' bankruptcy case under the Services Agreement, the PAIF Agreement, the New PAF Limited Liability Agreement, other agreements and documents and common law for fees, indemnity, contribution or other moneys allegedly due to each them.

138.     Each and all of the Claimant Defendants have engaged in inequitable conduct which conduct resulted in injury to creditors and Limited Partners of the Debtors or conferred an unfair advantage on said Claimant Defendant(s).

139.     Equitable subordination of the full amount of each and every one of each Claimant Defendant's claims against the Debtors to a position junior to the interests of the Limited Partners in the Debtor PAIF, and junior to the equity interests in the Debtor PAF, is necessary to offset the harm that the Debtors and their respective creditors have suffered as a result of the Claimant Defendant's inequitable conduct and such subordination would be consistent with the provisions and purposes of the Bankruptcy Code.

WHEREFORE, Plaintiff Matthew Cantor, in his capacity as Chapter 11 Trustee for Debtor New PAF, successor-in-interest to Old PAF, and of Debtor PAIF respectfully requests the following relief:

1.     Disgorgement of all monies received by any Insider Defendant or an affiliate of an Insider Defendant (including but not limited to Rosebud Management, the

Primus Entities and the Burgess Entities) from a breach of the Insider Defendant's duties to PAIF, Old PAF, New PAF or FRS;

2. Restitution from Defendant MicroBilt of monies paid to it by PAIF or by Old PAF, New PAF or PAFM on behalf of PAIF, under the Services Agreement;

3. A declaratory judgment that the Services Agreement is terminated because of MicroBilt's breaches and damages in an amount to be determined at trial from MicroBilt for breaches of the Services Agreement;

4. Damages in an amount to be determined at trial from each Insider Defendant proximately caused by its or his breach of duty and damages from each and every Defendant that aided and abetted the breach by an Insider Defendant and proximately caused or contributed to said damages;

5. Treble damages as allowed under NJ RICO for the injury to PAIF's business and property by reason of Defendants' conduct of the affairs of Old PAF, New PAF and PAFM, its General Partners, and FRS, PAIF's subsidiary, through a pattern of racketing activity and/or Defendants' conspiracy to do so;

6. A declaratory judgment that none of the Defendants are entitled to indemnification from any of Old PAF, New PAF or PAIF;

7. A declaratory judgment that the Willful Acts Indemnity in the Services Agreement is void and unenforceable and severed from the Services Agreement (if said Services Agreement is not terminated in its entirety);

8. A declaratory judgment that the perpetuity provisions of Services Agreement are void and unenforceable and severed from the Services Agreement (if said Services Agreement is not terminated in its entirety);

9. Avoidance, other equitable relief or damages under the above federal and state statutes, including 11 USC § 550, in connection with each fraudulent transfer to or obligation incurred by either PAIF or New PAF or both to or for the benefit of MicroBilt and each insider or voidable preference made by either Debtor or both to or for the benefit of MicroBilt;

10. Contribution from each Tortfeasor Defendant for damages to third-parties and/or attorneys' fees and expenses incurred by Old PAF, New PAF and/or PAIF as a result of the Tortfeasor Defendants' conduct;

11. Equitable subordination of the full amount of any and all claims filed against either Debtor in the above-captioned Chapter 11 proceedings by or on behalf of any Claimant Defendant to claims of all other creditors;

12.    The Trustee's attorneys' fees and litigation expenses in this Adversary Proceeding
and in connection with any subsequent enforcement proceedings related thereto;

13.    Pre-judgment and post-judgment interest;

14.    Costs; and

15.    Such other and further equitable or legal relief as the Court may deem just and
appropriate.

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP
*Counsel for Matthew Cantor, Chapter 11
Trustee*

By:_____/s/ Paul R. DeFilippo_____
Paul R. DeFilippo
James N. Lawlor

*Counsel for Matthew Cantor, Chapter 11 Trustee*

Dated:  July 29, 2019

44

Exhibit 2

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------------x
                                                    :
In re:                                              :    Case No: 18-14603 (MBK)
                                                    :
PRINCETON ALTERNATIVE INCOME FUND,                  :    Chapter 11
LP, *et al.*,                                       :
                                                    :    HEARING DATE: MARCH 13, 2020, 10:00 A.M.
            Debtors.                                :    NO HEARING REQUIRED
                                                    :    UNLESS OBJECTIONS FILED
-----------------------------------------------------------------x

<div align="center">

**FIFTH AMENDED DISCLOSURE STATEMENT**
**FOR FIFTH AMENDED JOINT CHAPTER 11**
**PLAN OF REORGANIZATION OF PRINCETON ALTERNATIVE**
**INCOME FUND, LP AND PRINCETON ALTERNATIVE FUNDING,**
**LLC PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

</div>

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE ACCOMPANYING PLAN OF REORGANIZATION.  THE TRUSTEE BELIEVES THAT THE PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF CREDITORS AND HOLDERS OF EQUITY INTERESTS AND THAT THE PLAN OF REORGANIZATION IS FAIR AND EQUITABLE.  THE TRUSTEE URGES THAT ALL PERSONS ENTITLED TO VOTE ACCEPT THE PLAN OF REORGANIZATION.**

Dated:  February 19, 2020

WOLLMUTH MAHER & DEUTSCH LLP

51 JFK Parkway
First Floor West
Short Hills, New Jersey 07078
- and -
500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300
pdefilippo@wmd-law.com
jlawlor@wmd-law.com

*Counsel for Matthew Cantor, Chapter 11 Trustee*

REED SMITH LLP
506 Carnegie Center, Suite 300
Princeton, NJ 08540
dbaker@reedsmith.com
*On behalf of MicroBilt Corporation, MicroBilt Financial Services Corporation, Rosebud Management, LLC, AFAB International, Ltd, AFAB International, LLC, Westminster National Capital Co., LLC, Bristol Investments, Ltd, Bristol Investments, LLC, HP Funding II LLC, LJP Consulting, LLC and Philip N. Burgess, Jr.*


SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
aabramowitz@shermansilverstein.com
BLuckman@shermansilverstein.com

*On behalf of Princeton Alternative Funding Management, LLC, Alonzo J. Primus, CPA, Jack Cook and Walter Wojciechowski*


BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
waldtd@ballardspahr.com
KatsiffT@ballardspahr.com

*On behalf of the Ranger Entities*


MCMANIMON, SCOTLAND & BAUMANN, LLC
75 Livingston Avenue, 2nd Floor
Roseland, NJ 07068
rtrenk@msbnj.com
RRoglieri@msbnj.com

*On behalf of the Ad-Hoc Committee of Minority Shareholders*

STEVENS & LEE, P.C.
100 Lenox Drive, Suite 200
Lawrenceville, NJ 08648
jhh@stevenslee.com


*On behalf of Covenant Strategic Income Fund*
*Series Interests of the SALI Multi-Series Fund II*
*3(c)(1), LP*

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

    A.  Purpose of This Document ..........................................................................2

    B.  Confirmation Procedures .............................................................................3

        1.  Persons Potentially Eligible to Vote on the Plan .............................3

        2.  Voting Instructions and Deadline for Voting for or Against the Plan ....................5

        3.  Acceptance or Rejection of the Plan ................................................5

        4.  Cramdown and No Unfair Discrimination .......................................6

        5.  Time and Place of the Confirmation Hearing ..................................7

        6.  Deadline for Objecting to the Confirmation of the Plan .................7

        7.  Identity of Person to Contact for More Information Regarding the Plan ...............7

    C.  Disclaimer ...................................................................................................7

II.    BACKGROUND .....................................................................................................8

    A.  Description and History of the Debtors' Businesses ...................................8

    B.  Principals/Affiliates of Debtors' Business .................................................9

    C.  Management of the Debtors Before and During the Bankruptcy ...............10

    D.  Events Leading to Chapter 11 Filing .......................................................10

    E.  The Chapter 11 Cases ...............................................................................12

        1.  Commencement of the Cases, PAFM and the Ranger Arbitration ....................12

        2.  The Appointment of the Trustee .....................................................12

        3.  The Global Settlement and Development of the Chapter 11 Plan ......................13

        4.  Other Notable Events in the Cases ..................................................13

     5.    Retention of Professionals ....................................................................17

     6.    Relevant Motions ................................................................................18

     7.    Other Legal Proceedings ....................................................................21

     8.    Avoidance Actions ..............................................................................22

     9.    Current and Historical Financial Conditions ......................................23

III.     SUMMARY OF THE PLAN OF REORGANIZATION ...................................23

    A.  What Creditors and Interest Holders Will Receive Under the Proposed Plan .............23

    B.  Unclassified Claims ...................................................................................23

     1.    Administrative Expenses and Fees ....................................................24

     2.    Court Approval of Schedule 2 Persons Compensation ......................25

     3.    Priority Tax Claims .............................................................................25

    C.  Classified Claims and Interests ..................................................................25

     1.  Claims and Interests Against PAIF ....................................................25

       a.   PAIF Class 1 – Allowed Priority Claims ..................................25

       b.   PAIF Class 2 – Allowed General Unsecured Claims ...............26

       c.   PAIF Class 3 – Ranger Claims .................................................26

       d.   PAIF Class 4 – Covenant Claims ...............................................26

       e.   PAIF Class 5 – Intercompany Claims .......................................26

       f.   PAIF Class 6 – General Partner Interests ..................................26

       g.   PAIF Class 7 – Limited Partner Interests (exclusive of the Ranger Entities and Covenant) ...................................................27

     2.  Claims and Interests Against PAF .....................................................27

       a.   PAF Class 1 – Allowed Priority Claims ...................................27

       b.   PAF Class 2 – Allowed General Unsecured Claims .................27

c.  PAF Class 3 – Ranger Claims .................................................................. 28

d.  PAF Class 4 – Equity Interests .............................................................. 28

D.  Means for Implementation of the Plan .......................................................... 28

1.  Feeder Fund .............................................................................................. 28

2.  Post-Confirmation Management ............................................................. 28

3.  Disbursing Agent ..................................................................................... 28

4.  New Common Equity in PAF ................................................................. 29

E.  Other Provisions of the Plan .......................................................................... 29

1.  Executory Contracts and Unexpired Leases ......................................... 29

2.  Changes in Rates Subject to Regulatory Commission Approval ......... 29

3.  Retention of Jurisdiction ........................................................................ 29

4.  Effective Date .......................................................................................... 30

5.  Modification ............................................................................................ 30

IV.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 30

A.  Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims ....... 32

1.  Consequences to Creditors Holding Allowed Claims .......................... 32

2.  Consequences of Holders of Equity Interests ....................................... 33

3.  Information Reporting and Backup Withholding .................................. 33

B.  Certain U.S. Federal Income Tax Consequences to the Debtors ................. 33

1.  Cancellation of Debt Income .................................................................. 33

V.   RISK FACTORS .................................................................................................... 34

VI.   CONFIRMATION REQUIREMENTS AND PROCEDURES ..................................... 35

A.  Who May Vote or Object .............................................................................. 36

1.   Who May Object to Confirmation of the Plan ....................................................36

2.   Who May Vote to Accept/Reject the Plan .........................................................36

B.  Liquidation Analysis ................................................................................................37

C.  Feasibility ................................................................................................................37

VII.  EFFECT OF CONFIRMATION OF PLAN ....................................................................38

A.  Injunction and Discharge ........................................................................................38

B.  Exculpation .............................................................................................................38

C.  Estimation Of Contingent and Unliquidated Claims .................................................39

# I.

# __INTRODUCTION__

Princeton Alternative Income Fund, LP ("PAIF") and Princeton Alternative Funding,

LLC ("PAF," and together with PAIF, the "Debtors" and each a "Debtor," as applicable), are the

debtors in these bankruptcy proceedings (the "Cases") under title 11 of the United States Code,

11 U.S.C. §§101-1532, as amended from time to time (the "Bankruptcy Code" or "Code").  On

March 9, 2018, the Debtors commenced the Cases by filing chapter 11 petitions under the

Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the

"Bankruptcy Court" or "Court").  By Order dated November 6, 2018, the Court ordered

appointment of a trustee for the Debtors under section 1104 of the Bankruptcy Code.  On

November 15, 2018, Matthew Cantor was appointed as the chapter 11 Trustee (the "Trustee").

Matthew Cantor, as the Trustee, together with MicroBilt and other parties to the Settlement

Agreement which forms the basis for the Plan, are the proponents of the Fifth Amended Joint

Chapter 11 Plan of Reorganization attached to this Disclosure Statement as Exhibit A (the

"Plan").  Capitalized terms used in this Fifth Amended Disclosure Statement (the "Disclosure

Statement") and not defined in this Disclosure Statement have the meaning ascribed to those

terms in the Plan.[1]

The Plan provides for the reorganization of the Debtors by means of a global settlement

among the parties with substantially all of the economic interests in these cases.  The terms of

that settlement are described in the Plan and in the Settlement Agreement attached to the Plan as

Exhibit A.

---

[1] A blackline of the Disclosure Statement against the Fourth Amended Disclosure Statement for Trustee's Fourth
Amended Joint Chapter 11 Plan of Reorganization of Princeton Alternative Income Fund, LP and Princeton
Alternative Funding, LLC Pursuant to Section 1125 of the Bankruptcy Code, dated January 13, 2020 (Doc. No.
1010) will be filed contemporaneously with the Disclosure Statement.

The Effective Date of the proposed Plan is anticipated to occur on the first business day

after the Confirmation Order becomes a final, non-appealable Order, which is generally fourteen

(14) days after entry by the Court of the Order confirming the Plan, provided, however, that no

timely notice of appeal has been filed before such fourteen-day period has expired, or no stay of

the Confirmation Order is issued.  Immediately following the Effective Date, the Bankruptcy

Cases will be closed pursuant to final decree.

A.      **Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan and tells you certain

information relating to the Plan and the process the Court follows in determining whether or not

to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW**

**ABOUT:**

(1)     WHO CAN VOTE OR OBJECT;
(2)     THE PROPOSED TREATMENT OF YOUR CLAIM (_i.e._, what your Claim or
        Interests will receive if the Plan is confirmed), AND HOW THIS TREATMENT
        COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION UNDER
        A CHAPTER 7 CASE;
(3)     THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING
        THE BANKRUPTCY;
(4)     WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO
        CONFIRM THE PLAN;
(5)     THE EFFECT OF CONFIRMATION; AND
(6)     THE FEASIBILITY OF THE PLAN.

This Disclosure Statement cannot tell you everything about your rights.  You should

consider consulting your own lawyer to obtain more specific advice on how this Plan will affect

you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any

inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

2

Section 1125 of the Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in section 1125(a) of the Bankruptcy Code as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of a debtor to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court has scheduled a hearing to approve this Disclosure Statement and confirm the Plan for March 13, 2020 at 10:00 a.m.

This Disclosure Statement is provided to each Creditor entitled to vote on the Plan, and to each Limited Partner. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.    Confirmation Procedures**

      **1.    Persons Potentially Eligible to Vote on the Plan**

This Disclosure Statement is accompanied by copies of the following: (a) the Plan, attached as Exhibit A to this Disclosure Statement, to which is attached the global Settlement Agreement (also known as the Plan Support Agreement or "PSA"); (b) schedule of the loans the Debtors made, and the status of those loans as of October 31, 2019, attached as Exhibit B; (c) a copy of Debtors' December 31, 2018 unaudited balance sheet, attached as Exhibit C; (d) a hypothetical liquidation analysis, attached as Exhibit D; (e) a list of scheduled and filed Claims and their treatment under the Plan, attached as Exhibit E; and (f) the PAIF Balance sheet, dated September 30, 2019, attached as Exhibit F.

Under the Bankruptcy Code, only Impaired Classes of Claims or Interests are entitled to vote to accept or reject a plan of reorganization. A Class that is not Impaired under a plan is

3

deemed to have accepted a plan and does not vote. A Class is Impaired under the Bankruptcy

Code when the legal, equitable, and contractual rights of the Holders of Claims or Interests in

that Class are modified or altered. For purposes of the Plan, the Holders of the PAIF Allowed

Priority Claims and Allowed General Unsecured Claims, and PAF Allowed Priority Claims and

PAF Allowed General Unsecured Claims are unimpaired, are deemed to have accepted the Plan

and do not vote. Holders of PAF Equity Interests are not receiving or retaining anything of value

under the Plan and so are deemed to reject it and need not vote. The balance of Classes are

Impaired and are allowed to vote.

**Certain Creditors have filed Claims which overlap in certain respects against both**

**Debtors. For example, the Ranger Entities assert claims against both PAIF and PAF**

**arising from the Arbitration. Members of the group of parties in interest led by MicroBilt**

**Corp. ("MicroBilt," and together with other clients of Reed Smith in these Cases, the**

**"MicroBilt Group"), and other Redeeming Limited Partners[2] have filed Proofs of Claim**

**against both PAIF and PAF. There appears to be full overlap of the indemnification**

**Claims by MicroBilt Group members, as well as of some of the claims for services rendered**

**by MicroBilt. Redeeming Limited Partners have also filed Claims against both Debtors.**

**However, Holders of Allowed Claims against the Debtors shall be entitled only to a single**

**satisfaction and shall not receive in the aggregate from both Debtors more than they are**

**owed from PAIF alone, unless they have a separate Allowed Claim against PAF, in addition**

**to their Allowed Claims against PAIF.**

---

[2] Redeeming Limited Partners means the Ranger Entities, Covenant, Shinnecock Income Fund, L.P. ("Shinnecock"), and Sirius Investments SICAV ("Sirius").

2.      <u>**Voting Instructions and Deadline for Voting for or Against the Plan**</u>

All votes to accept or reject the Plan must be cast by using the appropriate form of Ballot approved by the Court.  No votes other than ones using the Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has set the date of entry of the Order approving the Fourth Amended Disclosure Statement, as the Voting Record Date under the Plan.  The Voting Record Date is the date for the determination of record Holders of Claims or Interests entitled to receive a copy of this Disclosure Statement and vote, using appropriate Ballots, to accept or reject the Plan.  **For a vote to count, a Ballot must be properly completed according to the voting instructions on the Ballot, and all Ballots must be actually received by Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, NY 10110, Attn:  James Lawlor, Esq., by March 5, 2020, at 5:00 p.m. (New York City time) (the "Voting Deadline"), unless the Bankruptcy Court extends such date.  Any Ballot not indicating an acceptance or rejection will be submitted to the Court for determination as to its treatment.  Email, electronic or facsimile Ballots will not be accepted.**

The Ballot that you received does not constitute a Proof of Claim or Interest.  If you are uncertain whether your Claim or Interest has been correctly scheduled or Filed, you should check the Debtors' Schedules, and the Claims and Interest registers, which are available for review via the Pacer system at www.njb.uscourts.gov, provided you have the appropriate login credentials. The Clerk of the Bankruptcy Court will not provide this information by telephone.

3.      <u>**Acceptance or Rejection of the Plan**</u>

Under the Bankruptcy Code, a Class of Claims entitled to vote is deemed to have accepted the Plan if it is accepted by more than one half in number of Claimants in such Class who hold at least two-thirds in dollar amount of Allowed Claims of such Class that have actually

voted on the Plan.  A Class of Interests entitled to vote is deemed to have accepted the Plan if it

is accepted by Holders of Interests who hold at least two-thirds in amount of the Allowed

Interests of such Class that have actually voted on the Plan.

### 4.    Cramdown and No Unfair Discrimination

If any Impaired Class of Claims or Interests entitled to vote does not accept the Plan by

the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy

Code, as applicable, the Trustee reserves the right to undertake to have the Bankruptcy Court

confirm the Plan under section 1129(b) of the Bankruptcy Code, in which case the Plan will

constitute a motion for such relief, or to amend the Plan, or both.

In determining acceptance of the Plan, votes will only be counted if submitted by a

Holder of an Allowed Claim, *i.e.*, a Creditor whose Claim is duly scheduled by the Debtors as

undisputed, non-contingent and liquidated, or who, prior to the hearing on Confirmation of the

Plan, has filed with the Court a Proof of Claim which has not been the subject of objection or

disallowance prior to computation of the votes on the Plan.  All Holders of Allowed Interests as

of the Voting Record Date may vote on the Plan.  Holders of Allowed Interests may vote on the

Plan in their respective Percentage Interest set forth on Schedule 8 of the PSA

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE

NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS

THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL

CREDITORS AND INTEREST HOLDERS IN THIS CASE.

6

5.    <u>**Time and Place of the Confirmation Hearing**</u>

The hearing at which the Court will determine whether to confirm the Plan will take place on March 13, 2020, at 10:00 a.m., prevailing New York City time, before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher Federal Building & U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608.

6.    <u>**Deadline for Objecting to the Confirmation of the Plan**</u>

Objections to the Confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules and the Local Bankruptcy Rules of the Bankruptcy Court, be filed with the Court and served upon Paul R. DeFilippo, James N. Lawlor, Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, 12th Floor, New York, New York 10010, by March 3,, 2020.

7.    <u>**Identity of Person to Contact for More Information Regarding the Plan**</u>

Any interested party desiring further information about the Plan should contact James N. Lawlor, Esq., at Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, New York 10110, counsel for the Trustee, telephone:  (212) 382-3300 or email at jlawlor@wmd-law.com.

C.    <u>**Disclaimer**</u>

The historical financial and other data relied upon in formulating the Plan is based on the Debtors' books and records and financial statements, subject to the disclaimer that the Trustee does not endorse or adopt the Debtors' books and records or financial statements.  The information contained in this Disclosure Statement is also based the Debtors' books and records and financial statements, subject to the same disclaimer.  Projected financial information includes forward-looking statements and the Trustee does not warrant or guarantee that forecasted financial results will be the same as actual financial results.  The Trustee believes that

assumptions he has made in presenting forecasted results are reasonable.  The Trustee and his

advisors have reviewed the information and have provided what was reasonably available in

order to assist Holders of Claims and Interests evaluate the Plan, but the Trustee and his advisors

make no representations or warranties as to accuracy and completeness.  The Trustee as Plan

Proponent represents that everything stated in the Disclosure Statement (other than the Debtors'

historical financial information) is true to the best of the Plan Proponent's knowledge,

information, and belief.  ALL PROJECTED RECOVERY AMOUNTS ARE ESTIMATES

ONLY BASED ON ASSUMPTIONS THAT ARE FOR ILLUSTRATIVE PURPOSES ONLY.

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY**

**THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS,**

**FEASIBILITY, OR DESIRABILITY OF THE PLAN.**

<div align="center">

**II.**

**BACKGROUND**

</div>

**A.**     **Description and History of the Debtors' Businesses**

PAIF is a Delaware limited partnership with its principal place of business in New Jersey.

Prior to the Petition Date, PAIF's General Partner was PAF, a Delaware limited liability

company with its principal place of business in New Jersey.  PAIF described itself as a debt fund

which provides capital to consumer finance companies that operate in the alternative lending

marketplace.  It was structured as a passive investment vehicle with all investment and

operational authority vested in PAF as the sole General Partner of PAIF.  The Debtors have been

in this business since approximately 2015.  PAIF operated as a "master-feeder" structure,

whereby certain offshore investors invested in the Feeder Fund, which in turn invested in PAIF.

For purposes of administrative convenience only, and without officially changing an Investor's status as an investor in the Feeder Fund, the Plan Proponents will allow those Investors in the Feeder Fund to vote directly for purposes of Limited Partners' voting on the Plan, and treatment under the Plan.  Any Investor who previously invested through the Feeder Fund shall continue to retain its investment though the Feeder Fund, unless an Investor specifically elects to have its investment directly in PAIF.  An Investor shall be deemed to hold a Limited Partner Interest in PAIF with the amount of such Person's Interest calculated as if such Person's investment in the Feeder Fund was made directly by such investor into PAIF.  Feeder Fund Investors shall receive ballots allowing them to vote on the Plan as members of PAIF Class 7.  The Trustee intends to cause the Feeder Fund to vote to accept the Plan on behalf of the Limited Partner Interests it holds in PAIF that relate to those Feeder Fund Investors who do not vote directly.

## B.    Principals/Affiliates of Debtors' Business

**Debtor PAIF:**  Princeton Alternative Funding, LLC, General Partner.  The identities of Limited Partners can be found by consulting the filed Proofs of Interest in this Case.

**Debtor PAF:**  (i) Bert Szostak, Member (15.04%), (ii) Gold Drives US LLC Member (26.32%), (iii) LJP Consulting LLC, Member (6.00%), and (iv) Princeton Alternative Fund Management, LLC ("PAFM"), Member (52.64%).

**Affiliates:**  (i) Non-debtor PAFM is a Delaware Limited Liability Company with two members, John Cook (7%) and MicroBilt Financial Services Corp. (93%), and (ii) non-debtor Princeton Alternative Income Offshore Fund, Ltd. (the Feeder Fund) is a BVI company for which PAF acts as an investment manager.  The Court made a finding on November 6, 2018 that MicroBilt Financial Services Corp. is a subsidiary of MicroBilt.

9

**C.**   **Management of the Debtors Before and During the Bankruptcy**

Prior to Bankruptcy, PAF was the General Partner of PAIF and was responsible for

managing PAIF.  The Debtors identified John Cook as CEO and COO of PAIF, and Walter

Wojciechowski as CFO.  PAF was removed from its position as General Partner of PAIF shortly

after the filing of PAF's chapter 11 petition.  Princeton Alternative Funding Management, LLC

("PAFM"), a non-debtor, was installed as PAIF's General Partner.  The Trustee has been

informed that officers or employees of MicroBilt served as the officers of PAFM, and that

MicroBilt directly or indirectly owned a majority of the voting equity in PAFM.  The Trustee

filed a motion to restore PAF as General Partner which was granted on consent on February 13,

2019 (Doc. No. 553).  MicroBilt, which indirectly owns a majority Interest in PAF through

various subsidiaries, purported to provide services to the Debtors, including certain collection

activities.  MicroBilt also assigned Philip Burgess as a consultant to the Debtors, which

consultancy was terminated by the Trustee in February 2019.

**D.**   **Events Leading to Chapter 11 Filing**

PAIF began investing in consumer finance companies in approximately January 2015.  At

their height, the Debtors had extended approximately $75 million to customers pursuant to

revolving credit lines.  A schedule of the loans the Debtors made, and the status of those loans as

of September 30, 2019, is attached as Exhibit B.  When the Trustee was appointed, only four of

the loans that the Debtors made were active and operating.  Two of the borrowers, Bristlecone

and Argon, who owed PAIF about $48 million, had sought bankruptcy protection.  The other

defaulted borrowers owed a total of approximately $19 million when they defaulted.  As of May

27, 2019, the four active lines had total principal balances of approximately $21 million.

10

In addition to the borrower defaults, in March 2016, the Debtors received a redemption request from its largest investor the Ranger Entities, which the Debtors disputed. By March 2016, the Ranger Entities had invested a total of approximately $62 million in PAIF and the Feeder Fund. This represented over 99% of the Debtors' assets under management at that time. In March 2016, the Ranger Entities issued a request to redeem its direct and indirect Interests in PAIF. That redemption obligation became due and owing in November 2016, after the Ranger Entities granted the Debtors an extra thirty (30) days to perform which the Debtors disputed. When its redemption obligation was not paid and restructuring efforts were unsuccessful, the Ranger Entities commenced the Arbitration against PAIF and PAF, along with certain of their Affiliates in or around June 2017.

Also significant was the commencement by the Securities and Exchange Commission ("SEC") of an investigation of the Debtors and their management prior to the Cases. The Debtors engaged counsel to respond to SEC subpoenas and incurred substantial costs (which were covered by insurance). To date, the SEC has not asserted any monetary claims or identified any wrongdoing. Management of the Debtors also commenced other litigations, which were expensive to prosecute and was not resolved prior to the Effective Date. Certain of the foregoing matters contributed to the Debtors seeking relief under chapter 11.

During his tenure, the Trustee examined the facts underlying the creation of what has been described as the "Argon Side Pocket." According to footnote 4 to the December 31, 2017 financial statements of PAIF, in December 2016, PAIF's largest portfolio investment, known as Argon, filed bankruptcy, and at that time PAIF assigned all of its rights against Argon to Fund Recovery Services, LLC, ("FRS") a wholly owned subsidiary of PAIF, allegedly pursuant to the

11

LPA.[3]  The Argon Side Pocket was established by the Debtors to hold all of the Debtors'

interests in the Argon investment.  The creation of the Argon Side Pocket was effective as of

March 2016, when the Debtors first learned of the fraud committed by Argon, at the direction of

the Debtors' accountants.

## E.     The Chapter 11 Cases

### 1.     Commencement of the Cases, PAFM, and the Ranger Arbitration

On March 9, 2018, the Debtors commenced the Cases.  At that time, the insiders of the

Debtors caused PAF to be replaced with PAFM, and PAFM served as General Partner until

removed *nunc pro tunc* to the Petition Date by an Order of the Court entered on February 13,

2019.

On May 1, 2018, the Bankruptcy Court modified the automatic stay to permit the Ranger

Entities to proceed with Phase 1 of the Arbitration.  At the end of Phase 1 of the Arbitration and

on July 20, 2018, the arbitral panel issued an award to the Ranger Entities for damages, which

the Debtors disputed.  Importantly, the Award made clear that neither party was a prevailing

party in the Arbitration.

### 2.     The Appointment of the Trustee

The Ranger Entities filed a motion seeking the appointment of a chapter 11 Trustee in the

Cases on March 26, 2018.  As of the appointment of the Trustee, the Debtors had not yet

proposed a chapter 11 plan.  On or around November 7, 2018, the Court ordered the appointment

of the Trustee after reviewing the entire Case record, including the submissions of the parties

throughout the Case, the Arbitration, and the uncontested facts before the Court.  The Court

---

[3] PAIF's assignment of the Argon investment to FRS is generally referred to as the "Argon Side Pocket."

made it clear that its ruling was not based on any wrongdoing, and that the appointment of the

Trustee would preserve the integrity of the bankruptcy process and was in the best interest of

Creditors and Investors.

After the Trustee was appointed, the Debtors and MicroBilt appealed the decision to the

District Court and also moved to stay the Case in the Bankruptcy Court.  The motion to stay was

denied, and the District Court affirmed the appointment of the Trustee.  MicroBilt has appealed

the District Court's affirmance to the United States Court of Appeals for the Third Circuit.  That

appeal is pending.

### 3.      The Global Settlement and Development of the Chapter 11 Plan

After almost two years of litigation and disputes during the Bankruptcy Cases, the

Trustee, the MicroBilt Group, the Ad Hoc Committee, the Ranger Entities, and Covenant

reached agreement on a settlement resolving all of the issues in the Cases and leading to the

Debtors' emergence from bankruptcy by way of the Plan.  The terms of that settlement are

memorialized in the PSA, which is attached to the Plan as Exhibit A and incorporated therein.

The Settlement Agreement represents a compromise of all disputed issues in these cases among

the parties with substantially all of economic interests in the Cases.

### 4.      Other Notable Events in the Cases

In addition, the following events and dockets entries reflect the other activity that

occurred during the Cases:

(a)      March 16, 2018:  Interim Order Authorizing (A) Continued Use of Cash

Management System; (B) Maintenance of Existing Bank Accounts; and (C) Continued Use of

Existing Business Forms (Doc. No. 19).  This Order was entered in response to Debtors' First

Day Motion to continue to use their existing Cash management system, which was described as a

well-established mechanism for the collection, management and disbursement of funds used in

the Debtors' business;

(b)     May 1, 2018:  Order Denying Ranger Entities' Motion to Dismiss the Debtor's

Chapter 11 Case or for Abstention, Deferring Ranger Entities' Motion for Appointment of

Chapter 11 Trustee and Scheduling Further Hearings (Doc. No. 121).  This Order was entered in

response to Ranger Specialty Income Fund, LP, Ranger Alternative Management II, LP, and

Ranger Direct Lending Fund Trust's Motion to Dismiss the Cases on the basis that they were

filed without authority and in bad faith;

(c)     May 1, 2018: Order on Ranger's Motion for Relief from the Automatic Stay of 11

U.S.C. § 362 to Permit the Completion of Phase 1 of the Pending Arbitration Proceedings

Against the Debtors (Doc. No. 122).  This Order allowed the Arbitration to proceed with respect

to Counts 1 through 8 of the Arbitration and allowed the panel to issue a ruling and

determination of damages on those counts, effectively barring equitable relief and precluding

relief from other counts in the Arbitration;

(d)     May 1, 2018:  Order on Ranger's Motion for an Order Confirming the Automatic

Stay of 11 U.S.C. § 362 Does Not Apply to the Non-Debtor Feeder Fund in Phase 1 of the

Pending Arbitration (Doc. No. 123).  This Order determined that the Arbitration proceedings

against non-debtor related entities were subject to the automatic stay and were allowed to

proceed under the same terms of the Court's Order concerning the Arbitration proceeding against

the Debtors;

(e)     July 6, 2018:  Final Order Authorizing (A) Continued Use of Cash Management

System; (B) Maintenance of Existing Bank Accounts; and (C) Continued Use of Existing

Business Forms (Doc. No. 249).  This Order was entered in response to Debtors' First Day

Motion to continue to use their existing Cash management system, which was described as a well-established mechanism for the collection, management and disbursement of funds used in the Debtors' business;

(f)      July 17, 2018:  Consent Order Amending the May 1, 2018 Order Regarding Ranger's Motion for Relief from the Automatic Stay of 11 U.S.C. § 362 to Permit the Completion of Phase 1 of the Pending Arbitration Proceedings Against the Debtors (Doc. No. 255).  This Order modified the Court's May 1, 2018 Order concerning the pending JAMS Arbitration, staying the Order until further Order of the Court and making it subject to the Court's sealing power;

(g)      November 7, 2018:  Order Directing Appointment of Chapter 11 Trustee (Doc. No. 389);

(h)      December 4, 2018:  Order denying request to stay appointment of the Trustee (Doc. No. 457);

(i)      As of April 22, 2019, the Trustee entered into a Loan Management, Collection and Reporting Services Agreement on behalf of the Debtors with Sheridan Administrative Services I, LLC ("Sheridan"),[4] to provide as many of the services previously provided by MicroBilt as possible.  This Agreement will be terminated on the Effective Date pursuant to the PSA;

---

[4] Sheridan, which was represented by counsel in the negotiation of its agreement, did not condition entry into the Services Agreement on Court approval, and the Trustee believes that retention of Sheridan was an ordinary course of business event which did not require Court approval.  That is so because PAIF required servicing of its assets in the ordinary course, and to the extent MicroBilt had been performing such services, it did not treat itself as a professional, such as by filing fee applications or seeking court approval of its retention.  The Trustee discerned no legitimate distinction between the services MicroBilt had been performing and those Sheridan has been performing.

15

(j)     On July 12, 2019, the Court entered an order approving the Trustee's proposed

settlement with TKC (Doc. No. 720).  MicroBilt has appealed this Order and the case is still

pending in the District Court of New Jersey, Case No. 19-15986.  The settlement approved by

that Order has been consummated.  The Plan Proponents believes that confirmation will moot the

need to resolve this appeal;

(k)     On August 29, 2019, the Court entered an Order approving the Trustee's proposed

settlement with Monterey concerning the Bristlecone collateral (Doc. No. 782).  MicroBilt has

appealed this Order and the case is still pending in the District Court of New Jersey, Case No.

19-17914.  The settlement approved with the Monterey Entities has been substantially

consummated.  The Plan Proponents believes that confirmation will moot the need to resolve this

appeal.

(l)     On October 24, 2019, the Court entered the Capital Accounts Order (Doc. No.

872), holding that the Trustee has the authority to determine Limited Partners' Capital Accounts

for all purposes, subject to compliance with the LPA;  The Plan Proponents believes that

confirmation will moot the need to address this Order.

(m)     On October 24, 2019, the Court entered an Order (Doc. No. 873) partially

granting the Trustee's Motion to disallow claims of members of the MicroBilt Group.  The effect

of such Order was, among other things, to expunge MicroBilt's $4 million claim against PAIF

and the indemnification claims of many members of the MicroBilt Group.  The order expunging

MicroBilt's $4 million claim against PAIF is subject to a motion for reconsideration; and

(n)     On November 20, 2019, the Trustee filed the Motion to Approve the Settlement

with the SunUp Entities (Doc. No. 893), which was approved by the Court on February 3, 2020

(Doc. No. 1079), and, if consummated, would resolve the disputes with the SunUp Entities over

16

repayment of the line of credit issued to the SunUp Entities.  MicroBilt and the Ad Hoc

Committee have appealed this Order.  The Plan Proponents believes that confirmation will moot

the need to resolve this appeal.

5.    **Retention of Professionals**

The Court has approved the employment of the following professionals:

- Sills Cummis & Gross, P.C. was appointed by the Court as counsel for the Debtors on
  May 3, 2018.  Sills Cummis withdrew as counsel for the Debtors on November 12, 2018.

- Pepper Hamilton LLP was appointed by the Court as special litigation counsel to the
  Debtors on May 10, 2018.

- Bernard Katz was appointed by the Court as a member of PAIF's advisory committee on
  May 15, 2018.  He was authorized solely to provide finance and restructuring advice to
  management in his capacity as an advisory committee member, and not in any other
  capacity, and is not authorized to act as a representative of the Debtors.  Mr. Katz'
  engagement terminated on the Trustee's appointment.

- On June 15, 2018, the Court authorized (but did not require) the Debtors to retain the
  following ordinary course professionals utilized in the Debtors' ordinary course of
  business:

17

| Company | Contact | Services |
|---|---|---|
| Friedman LLP | Marc Eidelberg, CPA | Audit services |
| Kercsmar & Feltus PLLC | Geoffrey S. Kercsmar, Esq. | Legal services (AZ local counsel) |
| King & Spalding | M. Alexander Koch, Esq. | Legal services (regulatory) |
| Krovatin Klingeman | Gerald Krovatin, Esq. | Legal services (litigation) |
| Law Offices of Amy N. Tirre, A PC | Amy N. Tirre, Esq. | Legal services (NV local counsel) |
| Shaw Fishman | Peter J. Roberts, Esq. | Legal services (IL local counsel) |

- Wollmuth Maher & Deutsch LLP was appointed on December 19, 2018 as attorneys for the Trustee in the Cases. The firm is authorized to perform the necessary legal service required by the Trustee.

- TRS Advisors LLC was retained as financial advisor and investment banker to the Trustee.

- Ogier was retained as special counsel for the Trustee for matters related to British Virgin Islands law.

- McGlinchey Stafford PLLC was appointed by the court as special counsel for the Debtors *nunc pro tunc* to December 7, 2018. The firm is authorized to perform the necessary legal service required by the Trustee.

- Citrin Cooperman & Company, LLP was retained as accountant to the Trustee on July 12, 2019.

**6.    Relevant Motions**

Currently, the following significant motions, objections to claims and adversary

proceedings are still pending:

18

Motions:

- *The Ranger Entities' Motion for Relief from Stay to Pursue Claims against the Feeder Fund* (Doc. No. 334):  This is a motion by the Ranger Entities seeking relief from stay to pursue claims from the Arbitration against the Feeder Fund in the event Ranger Claims are disallowed against PAIF.  An objection to this motion was filed by Debtors (Doc. No. 349) and the Ranger Entities subsequently filed a response to the objection (Doc. No. 358).  If the motion to disallow these claims (Doc. No. 273) is successful, the Ranger Entities will instead seek to obtain these funds from the Feeder Fund.  A consent Order regarding this matter was filed on January 28, 2019 (Doc. No. 535) but was vacated on January 29, 2019 (Doc. No. 539).  Negotiation on this issue is currently ongoing.  The Plan Proponents believes that confirmation will moot the need to resolve this motion.

- *Ad Hoc Committee's Motion for Derivative Standing to sue Ranger and Covenant* (Doc. No. 796):  This motion was denied without prejudice.

- *Ad Hoc Committee's Motion to compel Arbitration of Disputes related to Capital Accounts* (Doc. No. 826):  In this Motion, the Ad Hoc Committee sought to arbitrate the determination of capital accounts by the Trustee.  This motion was denied.  The Ad Hoc Committee has appealed this Order.

- *Ad Hoc Committee's Motion to designate Ranger and Covenant Votes* (Doc. No. 829):  This motion is pending with a hearing date scheduled for March 13, 2020.  The Plan Proponents believes that confirmation will moot the need to resolve this motion.

Adversary Proceedings:

- *MicroBilt Corporation et al. v. Anderson and Dinsmore & Stohl LLP* (Adv. Proc. No. 18-01224-MBK):  This is a removed state court action alleging breaches of fiduciary duty and duty of loyalty against Timothy Anderson of Pepper Hamilton.  The complaint in this litigation alleges an unstated amount of compensatory and punitive damages from breach of fiduciary duty and duty of loyalty claim arising out of transactions totaling $17 million.  The Trustee expresses no view as to the merits of the claims asserted or the recoverability of any judgment in this matter, as it was commenced prior to the Trustee's appointment.

- *Fund Recovery Services v. Shoreside SPV et al.* (Adv. Proc. No. 18-01598-MBK):  This action was removed from District Court of New Jersey after removal from California.  In this action, Fund Recovery Service is asserting rights of PAIF suing for breach of guaranty.  FRS SS obtained a judgment against Shoreside, which is believed to be uncollectable, and has recently reached a settlement with the principals of Shoreside to pay $30,000 on account of the claims against them.

- *Matthew Cantor as Trustee v. MicroBilt Corp.* (Adv. Proc. No. 19-1157-MBK):  This is an action to restrain MicroBilt's termination of the services agreement between PAF and MicroBilt, and for other relief.  The Court entered a preliminary injunction on the Trustee's application by Order dated May 23, 2019 (Adv. Proc. No. 19-01157, Doc. No. 22).  The Plan Proponents believes that confirmation will moot the need to resolve this adversary proceeding.

20

- *Matthew Cantor as Trustee v. Burgess, et al.* (Adv. Proc. No. 19-2071-MBK): This is an action for civil violations of New Jersey's Racketeer Influenced and Corrupt Organization Act, fraudulent conveyances, common law breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, causing the Debtors to breach their fiduciary duties to investors, as well as for breaches of contract and declaratory judgments that certain contractual and indemnification provisions purporting to bind the Debtors are unenforceable and void. The Plan Proponents believes that confirmation will moot the need to resolve this adversary proceeding.

7.    **Other Legal Proceedings**

In addition to the proceedings discussed above, the Debtors are currently involved in the following non-bankruptcy legal proceedings:

- *Argon Bankruptcy Proceedings* (Case No. 16-39654 N.D. Ill.): Argon filed Chapter 11 in the Northern District of Illinois, which case was shortly after its filing converted to a Chapter 7 case. The Argon trustee has asserted preference claims against the Argon Side Pocket based upon payments made by Argon prior to its bankruptcy. The face amount of such claims is approximately $400,000. Negotiations are ongoing with respect to resolution of such claims.

- *MicroBilt Corporation v. Princeton Alternative Income Fund, et al.* (Case No. 18-16557 D.N.J.): This is an appeal to the District Court of New Jersey of the Order appointing the chapter 11 Trustee in this bankruptcy proceeding. The appeal was resolved on November 27, 2019 by affirmance of the bankruptcy Court's decision to order a trustee appointed. MicroBilt has appealed affirmance to the Court of Appeals. The Plan Proponents believes that confirmation will moot the need to resolve this appeal.

21

- *MicroBilt Corporation v. Matthew Cantor* (Case No. 19-15986 D.N.J.):  This is an appeal to the District Court of New Jersey of the Order approving the settlement pursuant to Bankruptcy Rule 9019 with TKC Worldwide, LLC.  The Plan Proponents believes that confirmation will moot the need to resolve this appeal.

- *MicroBilt Corporation v. Matthew Cantor* (Case No. 19-17914 D.N.J.):  This is an appeal to the District Court of New Jersey of the Order approving settlement with Monterey regarding the Bristlecone collateral dispute.  The Plan Proponents believes that confirmation will moot the need to resolve this appeal.

- *MicroBilt Corp. et al v Matthew Cantor* (Case No. 20-01037):  Adversary Proceeding filed in the Bankruptcy Court against the Trustee seeking monetary damages.  The Plan Proponents believes that confirmation will moot the need to resolve this adversary proceeding.

## 8. Avoidance Actions

The Bankruptcy Code provides the Debtors with potential Claims and Causes of Action against Creditors and/or other parties arising from their relationship with the Debtors pursuant to, among other applicable sections, sections 542, 543, 544, 546, 547, and/or 549.  In addition, the Debtors may have potential Claims and Causes of Action against Creditors and/or third-parties arising under applicable non-bankruptcy law.  Upon the Effective Date, all of these Avoidance Actions and Causes of Action shall revest in the Debtors, except to the extent previously released or released under the Settlement Agreement.

9.      **Current and Historical Financial Conditions**

A copy of Debtors' December 31, 2018 balance sheet is annexed hereto as Exhibit C.
The Trustee makes no representations or warranties as to the accuracy of this balance sheet and it
has not been relied upon as the basis for the liquidation analysis annexed hereto as Exhibit D.

A total of approximately $8 million in General Unsecured Claims have been filed against
PAIF, and a total of approximately $9 million in General Unsecured Claims have been filed
against PAF, exclusive of the Ranger Claims and the Covenant Claims.  All Claims scheduled
and asserted against the Debtors (other than Schedule 2 Parties) and their respective treatment
under the Plan are described on Exhibit E.

Attached as Exhibit F is a schedule of material assets of PAIF (other than litigation
claims) as of September 30, 2019.

<div align="center">

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

</div>

A.      **What Creditors and Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies Claims and Interests in various Classes.  The Plan states whether each
Class of Claims or Interests is Impaired or unimpaired.  The Plan provides the treatment each
Class will receive.

B.      **Unclassified Claims**

Certain types of Claims are not placed into voting Classes.  They are not considered
Impaired, and they do not vote on the Plan because they are automatically entitled to specific
treatment provided for them in the Bankruptcy Code.  As such, the Plan Proponent has <u>not</u>
placed the following Claims in a Class:

<div align="center">23</div>

1.    **Administrative Expenses and Fees**

Administrative Expense Claims are Claims for fees, costs or expenses of administering the Cases which are allowed under section 507(a)(1) of the Code, including all professional compensation requests pursuant to sections 330 and 331 of the Code.  The Code requires that all administrative expenses including fees payable to the Bankruptcy Court and the Office of the United States Trustee which were incurred during the pendency of the Cases must be paid on the Effective Date of the Plan, unless a particular Claimant agrees to a different treatment.

Allowed and unpaid Administrative Expense Claims (other than Trustee fees, Trustee Professional Fee Claims, and United States Trustee Fees due for the first calendar quarter of 2020) shall be the responsibility of the Reorganized Debtors, and will be paid, to the extent due and payable, by the Reorganized Debtors after the Effective Date.  The Reorganized Debtors shall retain all defenses to the payment of any unpaid Administrative Expense Claims that they held prior to the Effective Date.  No Substantial Contribution Claims shall be payable to any party to the PSA or to any professional employed by any party to the PSA.

All unpaid claims for fees and expenses of any Person listed on Schedule 2 to the PSA shall be paid in full from the Escrow Amount.  The United States Trustee Fees for the first calendar quarter of 2020 shall be paid form the Escrow Amount, up to a maximum of $50,000.  The Reorganized Debtors shall be released and discharged from all Claims held by any Schedule 2 Persons when the Escrow Amount has been paid to the Escrow Agent.

Each Ordinary Course Professional who has not been paid in full as of the Effective Date shall retain its rights to payment against the Debtors, in all cases limited by the restrictions set forth in the Ordinary Course Professional Order.  No Ordinary Course Professional shall be entitled to payment by the Reorganized Debtors of any amount in excess

24

of the limitations on allowable fees payable to such professional in the Ordinary Course
Professional Order.

### 2.     Court Approval of Schedule 2 Persons Compensation

Pursuant to the PSA, the Bankruptcy Court is being asked to approve payments from
the Escrow Amount to the Schedule 2 Persons without the need for filing fee applications.  The
Trustee has explained the rationale for this in the Motion to Approve the Settlement and
Confirm the Plan, filed February 19, 2020.

### 3.     Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment, and other taxes
described by section 507(a)(8) of the Code.  The Code requires that each holder of such a
section 507(a)(8) Priority Tax Claim receives the present value of such claim in deferred Cash
payments, over a period not exceeding six (6) years from the date of the assessment of such tax.
Priority Tax Claims are to be paid in full in Cash promptly after the Effective Date.

The Plan Proponents are only aware of the following Priority Tax Claims filed against
the Debtors: (i) Claim 2-1 filed by Internal Revenue Service against PAIF ($3,000); (ii) Claim
1-1 filed by Internal Revenue Service against PAF ($250); and, (iii) Claim 25-1 filed by State of
New Jersey Department of Taxation against PAF ($625).

## C.     Classified Claims and Interests

### 1.     Claims and Interests Against PAIF

#### a.   PAIF Class 1 – Allowed Priority Claims

Certain Priority Claims that are referred to in sections 507(a)(3), (4), (5), (6), (7) and (9)
of the Code are required to be placed in a priority Class.  Holders of Allowed Priority Claims

shall be paid the full Allowed amount of such Priority Claim in Cash as soon as practicable after the Effective Date. No Plan Proponent is aware of any Priority Claim subject to this Class.

### b.  PAIF Class 2 – Allowed General Unsecured Claims

Allowed General Unsecured Claims are Claims that are not an Administrative Expense Claim, Priority Claim, Priority Tax Claim, Ranger Claim, Covenant Claim, or Intercompany Claim. The members of this Class who are parties to the PSA are receiving the treatment set forth in the PSA. Members of this Class who are not parties to the PSA will retain their legal, equitable, and contractual rights against PAIF without alteration, subject to any defenses to enforcement held by PAIF. This Class is not Impaired. This Class is not Impaired Holders of PAIF Class 2 Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### c.  PAIF Class 3 – Ranger Claims

The Ranger Claims are Claims filed by the Ranger Entities. The Ranger Entities have filed unsecured Claims against both PAIF and PAF. The Ranger Claims will be paid from the Escrow Amount pursuant to the PSA. This Class is impaired.

### d.  PAIF Class 4 – Covenant Claims

The Covenant Claims will be paid in accordance with the PSA. This Class is impaired.

### e.  PAIF Class 5 – Intercompany Claims

The legal, equitable, and contractual rights of Intercompany Claims of PAF and the Feeder Fund against PAIF shall remain unaltered. This Class is not Impaired.

### f.  PAIF Class 6 – General Partner Interests

The legal, equitable, and contractual rights of the Holder of General Partner Interests in PAIF shall remain unaltered. This Class is not Impaired.

26

### g.  PAIF Class 7 – Limited Partner Interests (exclusive of the Ranger Entities and Covenant)

Members of this Class shall retain their Interests in PAIF (or the Feeder Fund, as the case may be), and shall be treated in accordance with the PSA.  This Class is impaired.

### 2.  Claims and Interests Against PAF

### a.  PAF Class 1 – Allowed Priority Claims

Allowed Priority Claims shall be paid the full Allowed amount of such Priority Claim in Cash as soon after the Effective Date as practicable.  This Class is not Impaired.  No Plan Proponent is aware of any Priority Claim subject to this Class.

### b.  PAF Class 2 – Allowed General Unsecured Claims

Allowed General Unsecured Claims are Claims that are not an Administrative Expense Claim, Priority Claim, Priority Tax Claim, Ranger Claims, or Intercompany Claim.  Unsecured Proofs of Claims of approximately $9 million have been filed in the Cases, exclusive of the Ranger Claims and the Covenant Claims, but inclusive of claims filed by certain other Limited Partners.  The members of this Class who are parties to the PSA are receiving the treatment set forth in the PSA.  Members of this Class who are not parties to the PSA will retain their legal, equitable, and contractual rights against PAF without alteration, subject to any defenses to enforcement held by PAF.  This Class is unimpaired.  This Class is not Impaired Holders of PAF Class 2 Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

27

### c.   PAF Class 3 – Ranger Claims

Claims of the Ranger Entities against PAF shall be treated in accordance with the PSA. This Class is impaired.

### d.   PAF Class 4 – Equity Interests

Equity Interests in PAF shall not receive or retain anything of value under the Plan and are deemed to have rejected.  This Class is impaired.

## D.   Means for Implementation of the Plan

Prior to the Effective Date, the Trustee shall close the SunUp settlement.  If the Court approves the PSA, then distributions to Creditors and Investors will occur after the Effective Date and closure of the Cases in accordance with the PSA.  The first business day after the closure of the Cases, the Debtors shall deposit the Escrow Amount with the Escrow Agent, who shall make the distributions of the Escrow Amount called for by the PSA, and the other actions will be taken called for by the Plan.

### 1.   Feeder Fund

The General Partner will resume control over the Feeder Fund after the Effective Date.

### 2.   Post-Confirmation Management

Post-Confirmation, the Ad Hoc Committee of Investors will form an advisory committee to advise and assist the General Partner in the management of the Debtors.  The LPA will be amended accordingly.

### 3.   Disbursing Agent

The Reorganized Debtors shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan.

### 4.    New Common Equity in PAF

As of the Effective Date, in consideration of the waivers, releases, and other contributions made to the reorganization of the Debtors under the Plan by the members of the MicroBilt Group, Reorganized PAF shall issue 100% of the new common equity interests in PAF to MicroBilt Financial Services Corp.

### E.    Other Provisions of the Plan

### 1.    Executory Contracts and Unexpired Leases

The Plan provides that all Executory Contracts and Unexpired Leases that exist between any Debtor and any Entity as described on Schedule G of the Schedules that have not been assumed or rejected prior to the Effective Date, shall be deemed assumed as of the Effective Date.  All Executory Contracts and Unexpired Leases that exist between any Debtor and any Entity as described on Schedule 4 of the PSA that have not been assumed or rejected prior to the Effective Date, shall be deemed rejected as of the Effective Date.  The LPA shall be deemed assumed upon entry of the Confirmation Order, and shall be amended in accordance with the PSA after the Effective Date.  Any Claims arising from rejection of any contracts set forth on Schedule 4 of the PSA shall be treated as General Unsecured Claims against the Debtor who is a party to such contract (other than the contract with Sheridan which is released).

### 2.    Changes in Rates Subject to Regulatory Commission Approval

These Debtors are not subject to governmental regulatory commission approval of their rates.

### 3.    Retention of Jurisdiction

The Court will retain jurisdiction as provided in Section 10.2 of the Plan.

29

4.    **Effective Date**

The Plan will become effective on the Effective Date. The Plan provides that the

Effective Date is the first Business Day upon which (a) no stay of the Confirmation Order is in

effect and (b) the conditions to the Effective Date set forth in the Plan have been satisfied or

waived.

5.    **Modification**

The Plan Proponents jointly may alter, amend or modify the Plan at any time prior to the

Confirmation Order. After entry of the Confirmation Order, the Plan Proponents jointly may,

upon Order of the Bankruptcy Court, amend or modify the Plan and related documents in

accordance with, and to the extent permitted by, section 1127 of the Bankruptcy Code, and

remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may

be necessary to carry out the purpose and intent of the Plan.

**IV.**

**CERTAIN U.S. FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences

of the consummation of the Plan to Holders of Allowed Claims and Interests and the Debtors.

This summary is based on the Internal Revenue Code (the "IRC"), the U.S. Treasury Regulations

promulgated thereunder, judicial authorities, published administrative positions of the Internal

Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this

Disclosure Statement and all of which are subject to change or differing interpretations, possibly

with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities

have been sought or obtained with respect to the tax consequences discussed herein, and the

30

discussion below is not binding upon the IRS or the courts.  No assurance can be given that the

IRS would not assert, or that a court would not sustain, a different position than any position

discussed herein.  Events occurring after the date of this Disclosure Statement, including changes

in law and changes in administrative positions, could affect the United States federal income tax

consequences of the Plan.

This discussion does not apply to Holders of Claims that are not "U.S. persons" (as such

phrase is defined in the IRC) and does not purport to address all aspects of U.S. federal income

taxation that may be relevant to the Debtors or to such Holders in light of their individual

circumstances.  This discussion does not address tax issues with respect to Holders subject to

special treatment under the U.S. federal income tax laws (including, for example, banks,

governmental authorities or agencies, pass-through entities, dealers and traders in securities,

insurance companies, financial institutions, tax-exempt organizations, small business investment

companies and regulated investment companies) or to Holders that hold more than one Class of

Claims or Interest.  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

**THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME
TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A
SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE
INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED
CLAIM OR INTERESTS.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED
TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE,
LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE:   TO ENSURE COMPLIANCE WITH
REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS**

31

DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

**1.    Consequences to Creditors Holding Allowed Claims**

Upon the approval of the Plan, each Holder of Allowed Claims shall receive, in full and final satisfaction of its Claims, (i) Cash on the Effective Date, (ii) payment of the Escrow Amount, or (iii) retention of all legal, equitable, and contractual rights of such Holders against the Reorganized Debtors.  A Holder who receives Cash with respect to indebtedness held by it will generally recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in such indebtedness.  Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the indebtedness has been held for more than one year.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

32

### 2. **Consequences of Holders of Equity Interests**

Upon the approval of the Plan, each Holder of Allowed Limited Partner Interests shall receive, in full and final satisfaction of its Interests, retention of their Interests in PAIF (or the Feeder Fund, as the case may be), and shall be treated in accordance with the PSA.

### 3. **Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRS.

## B.     **Certain U.S. Federal Income Tax Consequences to the Debtors**

### 1. **Cancellation of Debt Income**

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in

33

general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the

sum of (x) the amount of Cash paid, (y) the issue price of debt that is not publicly traded nor

deemed exchanged for publicly traded property, and (z) the fair market value of any new

consideration (including stock) given in satisfaction of such indebtedness at the time of the

exchange.  The Debtors should not recognize any COD Income in connection with the

consummation of the transactions contemplated by the Plan.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN
ARE COMPLEX AND IN MANY CASES UNCERTAIN.  THE FOREGOING SUMMARY
DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME
TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM
IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.
ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH
THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM
OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING,
INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR
FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

<div align="center">

**V.**

**RISK FACTORS**

</div>

The following discussion is intended to be a non-exclusive summary of certain risks

attendant upon the consummation of the Plan.  You are encouraged to supplement this

summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their

entirety, and in consultation with your own advisors.  Based on the analysis of the risks

<div align="center">34</div>

summarized below, the Plan Proponent believes that the Plan is viable and will meet all
requirements of Confirmation.

- The assets other than Cash may not be able to be realized upon for their expected values,
  or may be worth nothing.  The Debtors' investments are illiquid and secured by
  collateral and may be difficult to collect.  Efforts to collect the collateral for defaulted
  loans may be subject to numerous federal and state regulatory restrictions.

- Parties who are aggrieved by the Plan may challenge Confirmation which may delay
  implementation and Creditor and Partner recoveries.

- The IRS may audit the Debtors' prior year tax returns, and may challenge the Debtors'
  compliance with the rules regarding a "master-feeder" fund structure.

## VI.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN
SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON
CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following
discussion is intended solely for the purpose of alerting readers about basic Confirmation
issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The
Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a
complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the
requirements include that the Plan must be proposed in good faith, that Creditors or Interest
Holders have accepted the Plan, that the Plan pays Creditors at least as much as Creditors

would receive in a chapter 7 liquidation, and that the Plan is feasible.  These requirements are
<u>not</u> the only requirements for Confirmation.

A.    <u>**Who May Vote or Object**</u>

      1.    <u>**Who May Object to Confirmation of the Plan**</u>

Any party in interest may object to the Confirmation of the Plan, but as explained below
not everyone is entitled to vote to accept or reject the Plan.

      2.    <u>**Who May Vote to Accept/Reject the Plan**</u>

A Creditor or Interest Holder has a right to vote for or against the Plan if that Creditor or
Interest Holder has a Claim that is both (1) allowed or allowed for voting purposes and (2)
classified in an Impaired Class.

As noted above, a Creditor or Interest Holder must first have an <u>Allowed Claim or
Interest</u> to have the right to vote.  Generally, any Proof of Claim or Interest will be allowed,
unless a party in interest brings a motion objecting to the Claim.  When an objection to a Claim
or Interest is filed, the Creditor or Interest Holder holding the Claim or Interest cannot vote
unless the Court, after notice and hearing, either overrules the objection or allows the Claim or
Interest for voting purposes.

A Creditor or Interest Holder may have an allowed Claim or Interest even if a Proof of
Claim or Interest was not timely filed.  A Claim is deemed Allowed if (1) it is scheduled on the
Debtors' Schedules and such Claim is not scheduled as Disputed, Contingent, or Unliquidated,
and (2) no party in interest has objected to the Claim.  An Interest is deemed Allowed if it is
scheduled and no party in interest has objected to the Interest.

## B.     Liquidation Analysis

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis.  Under the Best Interest Test, if a Claimant or Interest Holder is in an Impaired Class and that Claimant or Interest Holder does not vote to accept the Plan, then that Claimant or Interest Holder must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the Debtors' assets are usually sold by a chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative Expense Claims are paid next.  Next, unsecured creditors are paid from any remaining sale proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their Allowed Claims.  Finally, Interest Holders receive the balance that remains after all creditors are paid in full, if any.

In order for the Court to be able to confirm this Plan, the Court must find that all Creditors and Interest Holders who do not accept the Plan will receive at least as much under the Plan as such Holders would receive under a chapter 7 liquidation.  The Plan Proponent maintains that this requirement is met here because of the PSA has the effect of resolving all Claims and Interests and allows certain Interest Holders to maintain their equity interests in the Reorganized Debtors.  Absent such settlement, there would be fractional recoveries by Holders of General Unsecured Claims, and there could be no money available for distribution to Limited or General Partner Interests.  In addition, the amounts realized form the liquidation of the Debtors' assets in a chapter 7 case would likely be less than will be realized in this Case, and the costs and

expenses of administering the chapter 7 case would further reduce distributions to parties in interest.

## C.     Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  Since the Debtors will emerge debt free with substantial assets, the Plan is inherently feasible.  In addition, the Trustee is confident that the Debtors will have sufficient Cash on the Effective Date to make the payments required under the PSA.

## VII.

## EFFECT OF CONFIRMATION OF PLAN

## A.     Injunction and Discharge

The Plan provides that the Debtors will be discharged on the Effective Date, that releases will be exchanged between the Parties to the PSA, and all Holders of Claims and Interests shall be enjoined and permanently restrained from seeking to recover on their Claims against or Interests in the Debtors, other than pursuant to the Plan.  The provisions of the Plan shall be binding upon Debtors, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest Holders are Impaired or whether such parties accept the Plan, upon Confirmation thereof.

## B.     Exculpation

The Plan provides that the Exculpated Parties shall, generally, have no liability for prosecution or Confirmation of the Plan or actions taken during the administration of the Cases.

38

The exculpation provided herein shall apply to the fullest extent allowable within the confines outlined in *In re PWS*, 228 F.3d 224 (3d Cir. 2000).

**C.**     **Estimation Of Contingent and Unliquidated Claims**

Any Contingent and Unliquidated Claims which have not been fixed as of the date of the Confirmation Hearing will be estimated at zero and will not receive any property under the Plan.

*Princeton Alternative Income Fund, LP*

BY:___*/s/ Matthew Cantor*_____
     Matthew Cantor, Chapter 11 Trustee

*Princeton Alternative Funding, LLC*

BY:___*/s/ Matthew Cantor*_____
     Matthew Cantor, Chapter 11 Trustee

*MicroBilt Corporation, MicroBilt Financial Services Corporation, Rosebud Management, LLC, AFAB International, Ltd, AFAB International, LLC, Westminster National Capital Co., LLC, Bristol Investments, Ltd, Bristol Investments, LLC, HP Funding II LLC, LJP Consulting, LLC and Philip N. Burgess, Jr.*

BY:___*/s/ Derek J. Baker*_____
     Derek J. Baker
     A member of the Firm

*Princeton Alternative Funding Management, LLC, Alonzo J. Primus, CPA, Jack Cook and Walter Wojciechowski*

BY:___*/s/ Arthur J. Abramowitz*_____
     Arthur J. Abramowitz
     A member of the firm

*Ranger Entities*

BY:___*/s/ Dean Waldt*_____
     Dean Waldt
     A member of the firm

*Ad-Hoc Committee of Minority Shareholders*

BY:___*/s/ Richard Trenk*_____
     Richard Trenk
     A member of the firm

*Covenant Strategic Income Fund Series Interests of the
SALI Multi-Series Fund II 3(c)(1), LP*

BY:  */s/ Joseph H. Huston, Jr.*
     Joseph H. Huston, Jr. (DE No. 4035)
     Counsel to the firm

NEW YORK, NEW YORK
February 19, 2020

Exhibit 3

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | | |
|---|---|---|
| WOLLMUTH MAHER & DEUTSCH LLP 51 JFK Parkway, First Floor West Short Hills, New Jersey 07078 - and - 500 Fifth Avenue New York, New York 10110 Tel: (212) 382-3300 Paul R. DeFilippo James N. Lawlor *Counsel for Matthew Cantor, Chapter 11 Trustee* | | **FILED** JEANNE A. NAUGHTON, CLERK **MAR 1 3 2020** **U.S. BANKRUPTCY COURT TRENTON, NJ** BY_____ DEPUTY |
| | Case No.: | 18-14603 (MBK) |
| | Judge: | Michael B. Kaplan |
| In Re: | Chapter 11 | |
| PRINCETON ALTERNATIVE INCOME FUND, LP, *et al.*,[1] | **Confirmation Hearing:** | March 13, 2020, 10:00a.m. |
| Debtors. | | |

**ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B) APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE EFFECTIVE DATE OF THE PLAN**

The relief set forth on the following pages, numbered two (2) through twenty-nine (29), is hereby **ORDERED**.

MICHAEL B. KAPLAN, USBJ

3/13/2020

---

[1] The Debtors are Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC.

Case 18-14603-MBK    Doc 1131    Filed 03/12/20    Entered 03/12/20 17:11:12    Desc Main
Document    Page 2 of 32

Page (2)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Upon the verified motion (the "Motion") of Matthew Cantor, as Chapter 11 Trustee (the

"Trustee") for the above-captioned debtors (the "Debtors"), (A) pursuant to Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a global Settlement

Agreement of the disputes among the Parties who are signatories to the Settlement Agreement

attached as Exhibit A to the Plan (the "Settlement Agreement" or "PSA"), (B) approving the

Fifth Amended Disclosure Statement (the "Disclosure Statement") for the Fifth Amended Plan of

Reorganization for the Debtors (the "Plan"), and approving the method of solicitation of

acceptances of the Plan, (C) confirming the Plan,   (D) entering a final decree closing the

Bankruptcy Cases as of the first day after the filing of a Notice of the Effective Date of the Plan,

and for other relief, and the Trustee and other Plan Proponents having filed on February 19,

2020, the Fifth Amended Joint Chapter 11 Plan of Reorganization of Princeton Alternative

Income Fund, LP and Princeton Alternative Funding, LLC (and, together with any amendments

approved by the Court at the Confirmation Hearing, the "Plan"), and having filed on February

19, 2020, the Fifth Amended Disclosure Statement (as may be amended, modified or

supplemented from time to time, collectively, the "Disclosure Statement") for the Plan, pursuant

to Section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code"); and the Court,

on January 16, 2020, having approved the Fourth Amended Disclosure Statement by entry of the

Order (A) Approving the Adequacy of the Disclosure Statement, (B) Approving the Form of

Ballots and Requirements for Voting on the Trustee's Plan, (C) Fixing a Date for the Hearing for

Confirmation of the Plan and for the Deadlines to Object and to Accept or Reject the Plan, (D)

2

Page (3)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Approving the Form and Manner of Notice of the Plan Confirmation Hearing and Other Matters

in Connection with Confirmation, and (E) Appointing the Trustee's Counsel as the Person

Responsible for Receiving and Tabulating Ballots (the "Disclosure Statement Approval Order");

and pursuant to the Order dated February 18, 2020 (Doc. 1091), the Court having set March 13,

2020 at 10.00 a.m. as the date and time of the commencement of the hearing (the "Confirmation

Hearing") to consider, *inter alia*, confirmation of the Plan pursuant to Section 1129 of the

Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), approval of the Settlement Agreement and approval of the Disclosure Statement; and

the Court by Order dated February 24, 2020 [Doc. 1107] having set March 5, 2020 at 5 p.m. as

the deadline for filing objections to approval of the Settlement Agreement or confirmation of the

Plan;  and copies of the Disclosure Statement, the Plan, Ballots, Disclosure Statement Approval

Order, and notice of the Confirmation Hearing (the "Confirmation Notice" and collectively with

the Disclosure Statement, Plan, Ballots, and Disclosure Statement Approval Order, the

"Solicitation Packages") having been transmitted in accordance with the Disclosure Statement

Approval Order, as set forth in the *Certification of Service* dated January 23, 2020, executed by

James N. Lawlor (the "Lawlor Certification"), in accordance with the Disclosure Statement

Approval Order; and based on the Certificate of Service filed February 28, 2020 [Doc1109] that

all persons with an interest in this case, and the relief requested by the Motion, were served on a

timely basis with the Motion, and upon the *Certification of Balloting* dated March 9, 2020 (the

"Balloting Certification"), executed by James N. Lawlor, Esq. with respect to the tabulation of

3

Page (4)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Ballots cast in respect of, *inter alia*, the Plan; and the Court having considered the Verified

Motion filed on February 19, 2020 to approve the Settlement Agreement, to confirm the Plan,

and for other relief; and the Court having further considered the filings by the Trustee and

professionals retained by the Trustee describing the bases for the amounts to be paid to them for

services, or for costs and expenses in or in connection with these cases, which together with the

Court's knowledge of the record of these proceedings and the conduct of these cases, permit the

Court to make a determination that the payments to be made to Schedule 2 Persons under the

PSA are reasonable;  and after hearing arguments of counsel and considering the evidence

admitted at the Confirmation Hearing, including the Declaration of the Trustee dated March 9,

2020 (Doc. 1117); and upon the record of the Confirmation Hearing and the entire record of the

case;  and all other objections to the relief requested in the Motion having been withdrawn or

overruled, and after due deliberation and good and sufficient cause appearing therefor; and the

Court having jurisdiction to consider approval of the Settlement Agreement and confirmation of

the Plan, and to grant all of the relief requested by the Motion; and it appearing that confirmation

of the Plan is necessary and in the best interests of the Debtors, their estates, and their creditors;

and due notice having been given, and for good cause shown:

Page (5)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

## IT IS HEREBY FOUND AND DETERMINED that:[2]

(A) **_Jurisdiction; Venue._** The Court has jurisdiction to grant the Motion, approve the

Settlement Agreement and confirm the Plan pursuant to 28 U.S.C. § 1334(a), approval of the

Settlement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. §

157(b)(2)(A), (L) and (O), as to which the Court has the power to enter a final adjudication, and

venue in this District for proceedings to approve settlements and confirm the Plan is proper

pursuant to 28 U.S.C. §§ 1408 and 1409(a).

(B) **_Judicial Notice._** The Court takes judicial notice of the docket of the Bankruptcy

Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without

limitation, all pleadings and other documents filed, all orders entered, and the evidence and

arguments made, proffered, or adduced at the hearings held before the Court during the pendency

of the Bankruptcy Cases, including, but not limited to, the hearing to consider the adequacy of

the Disclosure Statement.

(C) **_Burden of Proof._** The Plan Proponents have met their burden of proving the

proposed settlement contained in the PSA is fair, reasonable and in the best interests of the

estate, and that the elements of section 1129(a) and (b) of the Bankruptcy Code have been met,

by a preponderance of the evidence.

---

[2] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law
shall be construed as findings of fact, where appropriate.

5

Page (6)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(D)    *Solicitation; Notice*.  The Solicitation Packages, which were transmitted and

served as set forth in the Lawlor Certification, have been transmitted and served in compliance

with the Disclosure Statement Approval Order and the Bankruptcy Rules; such transmittal and

service was adequate and sufficient. The Fifth Amended Disclosure Statement contains adequate

information to enable a hypothetical reasonable creditor and investor to make an informed

decision whether to accept or reject the Plan, and is approved. Provision of the Fifth Amended

Disclosure Statement and Ballots to voting parties in interest was done fairly and provided such

persons with sufficient opportunity to vote to accept or reject the Plan.

(E)    *Voting*.  As recorded in the Balloting Certification, votes to accept or reject the

Plan have been solicited and tabulated fairly, in good faith and in a manner consistent with the

Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Approval Order and industry

practice.

(F)    ***Plan's Compliance with the Applicable Provisions of Title 11***.  The Plan

complies with the requirements for confirmation in Section 1129(a)(1) of the Bankruptcy Code,

as set forth below:

(i)    *Proper Classification*.  The Plan designates seven (7) Classes of Claims

and Interests for PAIF and four (4) Classes of Claims and Interests for

PAF.  The Claims and Interests placed in each Class are substantially

similar to other Claims and Interests, as the case may be, in each Class.

Valid, business, factual, and legal reasons exist for separately classifying

6

Page (7)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Interests.  The Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)    *Specified Unimpaired Classes*.  Article 4 of the Plan specifies that PAIF Classes 1, 2, 5, and 6 and PAF Classes 1 and 2 are unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

(iii)    *Specified Treatment of Impaired Classes*.  Article 4 of the Plan specifies that PAIF Classes 3, 4, and 7 and PAF Classes 3 and 4 are impaired, and Article 4 further specifies the treatment of Claims and Interests in those Classes, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

(iv)    *Same Treatment Within Classes*.  The Plan provides for the same treatment for each Claim or Interest within their respective Classes unless a holder of a particular Claim or Interest has agreed to less favorable treatment of such Claim or Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(v)    *Implementation*.  The Plan provides adequate and proper means for the Plan's implementation, thereby satisfying Section 1123(a)(5) of the Bankruptcy Code.

Page (8)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(vi) *Non-Voting Equity Securities.* The Debtors' constituent documents do not allow for the issuance of non-voting equity securities, satisfying the requirements of section 1123(a)(6) of the Bankruptcy Code.

(vii) *Additional Plan Provisions.* The Plan's provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

(viii) *Identity of Plan Proponents.* The Plan is dated and identifies the Plan Proponents, thereby satisfying the applicable provisions of Bankruptcy Rule 3016(a).

(F) **Plan Proponent's Compliance With Title 11.** The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code, as set forth below:

(i) The Debtors are proper debtors under Section 109 of the Bankruptcy Code.

(ii) The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or directed by Orders of the Court.

(iii) The Plan Proponents have satisfactorily complied with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Approval Order in transmitting the Plan, the Disclosure

Page (9)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Statement, the Ballots and related documents and notices in soliciting and

tabulating votes on the Plan.

(G) **Plan Proposed in Good Faith**. The Plan Proponents have proposed the Plan in

good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the

Bankruptcy Code.  No objection to the good faith of the proponents has been filed. The Plan

Proponents' good faith is evident from the facts and records of the Chapter 11 Case, the

Disclosure Statement and the hearing thereon, the Motion and the record of the Confirmation

Hearing.

(H) **Payments for Services; Costs and Expenses**.  Any payment made or to be made

for services or for costs and expenses in connection with this case or the Plan,  have been

approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying Section

1129(a)(4) of the Bankruptcy Code. The Court has reviewed the Fee Statements filed by the

Trustee and his Professionals who are Schedule 2 Parties (Docs 1112, 1113, 1114, 1115, 1116

and _____) , and the Sheridan agreement which is attached to the Trustee's Declaration as an

exhibit, and finds that all amounts payable to the Schedule 2 Persons under the PSA are

reasonable, that the services rendered were necessary and beneficial to the estates, and payment

of such amounts may be made without the necessity for the filing of formal fee applications. As

of the Effective Date of the Plan, all of the Trustee's duties to the estates and their interested

parties, and all of the Trustee's obligations under Bankruptcy Code section 1106, have been fully

performed and discharged.

Page (10)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(I)    ***Directors, Officers and Insiders***.  The Plan Proponents have disclosed in the

Plan, Disclosure Statement and the Motion the identity and affiliations of the person or persons

proposed to serve as post effective date management of the General Partner and the continuance

in or taking of such offices by such individuals is consistent with the interest of creditors and

equity security holders and public policy, thereby satisfying Section 1129(a)(5) of the

Bankruptcy Code.

(J)    ***Rate Changes***.  No governmental regulatory commission has jurisdiction over

rates charged by the Debtor, therefore Section 1129(a)(6) of the Bankruptcy Code does not

apply.

(K)    ***Best Interests of Creditors and Equity Holders***.  For purposes of the Plan, each

holder of an allowed Claim or Interest has accepted the Plan or will receive or retain under the

Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not

less than the amount that such holder would receive or retain if the Debtor was liquidated under

Chapter 7 of the Bankruptcy Code on such date, thereby satisfying Section 1129(a)(7) of the

Bankruptcy Code.

(L)    ***Results of Tabulation of Ballots***.  PAIF Classes 1, 2, 5, and 6 and PAF Classes 1

and 2 of the Plan are Classes of unimpaired Claims that are conclusively presumed to have

accepted the Plan under Section 1126(f) of the Bankruptcy Code.  PAIF Classes 3, 4, and 7 and

PAF Classes 3 and 4 are Classes of impaired Claims and Interests.  PAIF Classes 3, 4, and 7 and

PAF Class 3 have voted to accept the Plan in accordance with Section 1126(c) and (d) of the

10

Page (11)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Bankruptcy Code.  PAF Class 4 is not entitled to receive or retain any property under the Plan

and, therefore, is deemed to have rejected the Plan pursuant to Section 1126(g) of the

Bankruptcy Code without voting.

(M)    *Treatment of Administrative Claims and Priority Tax Claims*.  The treatment of

Administrative Expense and Priority Claims pursuant to Sections 2.01 and 2.06 of the Plan

satisfies the provisions of Sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.  The Plan

provides that unsecured priority tax claims and unpaid Allowed Administrative Expense Claims

are to be paid in accordance with section 1129(a)(9)(A) by the Reorganized Debtors immediately

after  the Effective Date.

(N)    *Ordinary Course Professionals*.  No Ordinary Course Professional shall be

entitled to payment by the Reorganized Debtors of any amount in excess of the limitations on

allowable fees payable to such professional in the Ordinary Course Professional Order.  The

Reorganized Debtors retain all claims and all defenses to the payment of any unpaid fees of any

Ordinary Court Professional that they held prior to the Effective Date.

(O)    *Acceptance by Impaired Class*.  PAIF Classes 3, 4, and 7 and PAF Classes 3 and

4 are Classes of impaired Claims and Interests and have voted to accept the Plan, without

including any acceptance of the Plan by any insider, thus satisfying the requirements of Section

1129(a)(10) of the Bankruptcy Code.

(P)    *Feasibility*.  The Disclosure Statement, the Motion and the other evidence

adduced by the Plan Proponents at the Confirmation Hearing established that confirmation of the

11

Page (12)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the Debtors. Therefore, the Plan satisfies the requirements of Section

1129(a)(11) of the Bankruptcy Code.

(Q) *Payment of Fees.* All fees payable under Section 1930 of Title 28 of the United

States Code have been paid, or the Plan provides for the payment of all such fees on the

Effective Date or as soon as practicable thereafter, thus satisfying Section 1129(a)(12) of the

Bankruptcy Code.

(R) *Retiree Benefits.* The Debtors do not maintain and are not liable for retiree

benefits, as that term is defined in Section 1114 of the Bankruptcy Code, thereby rendering

Section 1129(a)(13) of the Bankruptcy Code inapplicable.

(S) *Domestic Support Obligations.* The Debtor is not an individual subject to an

order or statute requiring payment of domestic support obligations making Section 1129(a)(14)

of the Bankruptcy Code inapplicable.

(T) *Projected Disposable Income.* The Debtors are not individuals required to

distribute an amount to unsecured creditors, the value of which is not less than either (i) the

amount of allowed unsecured claims or (ii) the projected disposable income of the Debtors for

the period of distributions under the Plan, thereby making Section 1129(a)(15) of the Bankruptcy

Code inapplicable.

Page (13)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(U)     *Property Transfers.* The Debtors are moneyed, businesses and/or commercial
corporations, thereby making Section 1129(a)(16) of the Bankruptcy Code inapplicable. In any
event, all transfers under the Plan are in compliance with applicable nonbankruptcy law.

(V)     *Confirmation of the Plan Over Nonacceptance of PAF Class 4.* PAF Class 4 is
deemed to reject the Plan. Pursuant to section 1129(b) of the Bankruptcy Code, the Plan may be
confirmed notwithstanding that not all Impaired Classes have voted to accept the Plan.    With
respect to PAF Class 4, no Holders of Claims or Interests junior to the Holders of such Classes
will receive or retain any property under the Plan on account of such Claims or Interests.
Additionally, no Class of Claims or Interests is receiving property under the Plan having a value
more than the Allowed amount of such Claim or Interest. Further, the Plan does not unfairly
discriminate among Classes of Claims and Interests because Holders of Claims with similar legal
rights will not be receiving materially different treatment under the Plan. Specifically,
classifications and recoveries under the Plan are based on the legal rights and priorities of
Holders of Claims and Interests. Accordingly, the Plan is fair and equitable and does not
discriminate unfairly, as required by section 1129(b) of the Bankruptcy Code, and may be
confirmed under Bankruptcy Code section 1129(b) notwithstanding PAF Class 4's deemed
rejection of the Plan.

(W)     *Principal Purpose of the Plan.* The principal purpose of the Plan is not the
avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933, as
amended, thereby satisfying Section 1129(d) of the Bankruptcy Code.

Page (14)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(X)    *Good Faith Solicitation*.  The Debtors, the Plan Proponents, and their respective

officers, directors, members, employees, advisors, consultants, attorneys, affiliates, and agents

have acted in good faith and in compliance with the applicable provisions of the Bankruptcy

Code, including but not limited to Sections 1125(e) and 1129(a)(3) of the Bankruptcy Code.

(Y)    *Required Consents*.  No consent of any governmental unit is required for

confirmation.

(Z)    *Issuance of New Equity in PAF.*  The issuance of all of the new equity interests in

PAF to Princeton Alternative Funding Management, LLC in consideration for the contributions

to the Plan being made by the MicroBilt Group is approved. The value of the benefits to the

Debtors being provided by the MicroBilt Group under the PSA exceeds the value of the new

equity interests in PAF.

(AA)    *Modifications to the Plan*.  The Plan as modified on the record at the

Confirmation Hearing and/or as set forth in this Confirmation Order does not adversely affect the

treatment of any Creditor or Holder of an Interest who has not accepted in writing the

modifications and, pursuant to Bankruptcy Rule 3019, the modifications neither require

additional disclosure under Section 1125 of the Bankruptcy Code nor resolicitations of

acceptances or rejections of the Plan under Section 1126 of the Bankruptcy Code, nor do they

require that the holders of Claims or Interests be afforded an opportunity to change previously

cast acceptances or rejections of the Plan.  Disclosure of the modifications on the record

constitutes due and sufficient notice and pursuant to Bankruptcy Rule 3019 and Section 1127 of

Page (15)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

the Bankruptcy Code, all holders of Claims or Interests that have accepted the Plan or are

conclusively deemed to accept the Plan are deemed to accept the modifications.

(BB)  *Rights to Causes of Action Reserved in the Plan*.  On the Effective Date, the

right to pursue Causes of Action of the Debtors shall revest in the appropriate Debtor.

(CC)  *Objections Overruled or Withdrawn*.  The only objection to confirmation of the

Plan was filed by the United States Trustee, and all of such  objections to confirmation have been

overruled or withdrawn. No objections have been filed to approval of the Settlement Agreement,

and the Court treats that aspect of the Motion as uncontested.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.    *Approval of the Settlement Agreement*.  The Settlement Agreement is approved

according to the terms and conditions set forth therein.  The parties are authorized and directed to

take all actions necessary and required to effectuate the Settlement Agreement.  The Settlement

Agreement provides fair and equitable recoveries to the Investors. Each Party to the Settlement

Agreement has delivered documentation sufficient to bind it to the terms and conditions of the

Settlement Agreement. All joinders to the Settlement Agreement submitted by any Party thereto

shall be deemed to contain the following language:

By the signature identified below, each signatory hereto specifically joins in, consents to, and
agrees to be bound by the terms of the Summary Of Terms And Conditions For Global
Settlement Dated February 19, 2020 (the "Settlement Agreement").  By way of amplification and
not limitation, each signatory hereto specifically acknowledges the terms of ¶ 10 of the
Settlement Agreement and agrees that such provisions are hereby adopted as the authorized act
of each signatory hereto, binding in all respects upon it/him.  Each signatory's joinder shall be
effective as of the Effective Date (as set forth in the Settlement Agreement.

Page (16)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

2.    *Final Approval of the Disclosure Statement*.  The Disclosure Statement is hereby

approved on a final basis.  The Disclosure Statement contains adequate information within the

meaning of section 1125 of the Bankruptcy Code.  The Disclosure Statement complies with

Bankruptcy Rule 3016(c) and describes, in specific and conspicuous language, the acts to be

enjoined and the entities subject to the injunction, exculpation, and release (including consensual

third party release) provisions contained in the Plan.

3.    *Confirmed Plan*.  The Plan is confirmed.  Any modifications to the Plan set forth

on the record at the Confirmation Hearing satisfy the requirements of Section 1127 of the

Bankruptcy Code, and pursuant to Bankruptcy Rule 3019, the modifications are deemed to have

been accepted by all creditors and holders of Interests who previously accepted the Plan.

4.    *Plan Modification*.  Any Plan modifications set forth herein are not material or do

not adversely affect the treatment of any Holder of a Claim or Interest under the Plan.

Accordingly, pursuant to section 1127(a) of the Bankruptcy Code, none of the modifications

require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of

votes under section 1126 of the Bankruptcy Code.  Further, in accordance with section 1127 of

the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the

Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted

the Plan as modified by the Plan Modifications.  No Holder of a Claim shall be permitted to

Page (17)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

change its vote as a consequence of the Plan Modifications. The Plan Modifications are hereby

approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

     5.      ***Objections***. All Objections received have been overruled or withdrawn.

     6.      ***Plan Classification Controlling***. The classification of Claims and Interests for

purposes of distribution to be made under the Plan shall be governed solely by the terms of the

Plan. The classification set forth in the Ballots tendered or returned by holders of Claims and

Interests in connection with voting on the Plan (a) were set forth on the ballots solely for

purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event

shall be deemed to modify or otherwise affect, the actual classification of such Claims and

Interests under the Plan for distribution purposes, and (c) shall not be binding upon the Plan

Proponents. All persons and entities are permanently enjoined from challenging the

classification and manner of satisfying all Claims and Interests under the Plan.

     7.      ***Binding Effect***. The Plan and its provisions shall be binding upon the Debtors,

the Plan Proponents, the Trustee, any entity acquiring or receiving property or a distribution

under the Plan, all parties subject to the permanent injunctions set forth in the Plan and any

holder of a Claim against or Interest in the Debtors, including all governmental entities, whether

or not the Claim or Interest of such holders is impaired under the Plan and whether or not such

holder or entity has accepted the Plan and notwithstanding otherwise applicable nonbankruptcy

law, pursuant to Sections 1123(a) and 1141(a) of the Bankruptcy Code.

Page (18)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

8.     *Transmittal; Notice; Good Faith Solicitation*.  The transmittal and service of the

Solicitation Packages, and the Fifth Amended Plan and Ballots related hereto, was proper

service, provided an adequate opportunity for voting and constituted sufficient notice and

opportunity to object to the Plan.  Pursuant to Section 1125(e) of the Bankruptcy Code, the Plan

Proponents, and their respective professionals and representatives are not liable on account of

their solicitation of acceptances of the Plan and the issuance, offer, purchase, or sale of securities

thereunder in good faith and in compliance with the Bankruptcy Code for any violation of

applicable law, rule, or regulation governing the solicitation of acceptances of a plan of

reorganization or the issuance, offer, purchase, or sale of securities.

9.     *Executory Contracts and Unexpired Leases*.  All Executory Contracts and

Unexpired Leases that exist between any Debtor and any Entity that have not been assumed or

rejected prior to the Effective Date, shall be assumed  and shall continue to bind PAIF and PAF

in the same manner and on the same terms as was the case prior to the Confirmation Hearing. No

cure costs are payable to any counterparty to an Executory Contract or Unexpired Lease as a

condition of assumption.

10.    *Settlement Agreement Distribution; Fee Applications*.  The Reorganized Debtors

shall distribute the Escrow Amount to the Escrow Agent in accordance with the PSA.  The

Escrow Agent shall distribute the Escrow Amount promptly after receipt as follows:  (1) to the

Ranger Entities, the aggregate sum of $15,150,000, consisting of $13,483,500 to RDL

Realisation PLC and $1,666,500 to Ranger Specialty Income Fund, L.P.; (2) to Covenant, the

Page (19)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

sum of $1,200,000, and (3) to the Schedule 2 Persons, the sums identified on Schedule 2 of the

PSA. The Court finds based on its observations in these cases, the fee statements and the

evidence adduced at the Confirmation Hearing that services rendered by the Schedule 2 Persons

were actual, necessary for the administration of the estates, and beneficial to the estates, and the

payments to Schedule 2 Persons on Schedule 2 to the PSA are approved without the need for

further fee applications being filed or heard. Any Order of the Court entered prior to the entry of

this Confirmation Order and which provides for the filing of fee applications by any of the

Schedule 2 Persons shall be amended by this Order so as to delete the requirement in such

Orders of filing of fee applications. Each of the Ranger Entities, Covenant and the Schedule 2

Persons shall provide the Escrow Agent with wire instructions for the purposes of making

payments of the Escrow Amount to them, at least five (5) days prior to the Effective Date. The

Debtors shall be released under the terms of the PSA and discharged from all liability to the

Ranger Entities, Covenant and the Schedule 2 Persons upon delivery of the Escrow Amount to

the Escrow Agent. If so directed by the Trustee, the Escrow Agent may adjust Schedule 2

amounts payable to the Trustee, Wollmuth Maher & Deutsch LLP, and TRS to pay (i) agreed

amounts to the Ogier firm, or (ii) United States Trustee fees in excess of $20,000 and up to

$50,000.

11.     *Monthly Operating Reports*.  As a condition of the occurrence of the Effective

Date, the Debtors' management shall prepare and the Trustee shall file all monthly operating

reports for the Debtors ("MORs") through the Effective Date, and pay United States Trustee fees

Page (20)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

under 28 U.S.C. § 1930 for the first quarter of 2020 calculated on the amount of disbursements

through the Effective Date.  As set forth in the Motion, the Court finds that all United States

Trustee quarterly fees due through December 31, 2019 have been paid in full. As a result, the

only United States Trustee fees payable by the Debtors in the Bankruptcy Cases are for periods

from January 1, 2020 through the Effective Date of the Plan.  MORs for January and February

2020 have been filed, and based on the January and February 2020 MORs on file, the amount of

United States Trustee fees due and payable for those months is $10,673.00 for January 2020 and

$5,270.00 for February 2020. The Trustee projects that actual disbursements from March 1, 2020

through March 27, 2020 will be approximately $450,000.00, and that accordingly the United

States Trustee fees for March 2020 will be approximately $4,500.00. Debtors' management shall

prepare and the Trustee shall cause to be filed an MOR for the period from March 1, 2020

through the Effective Date of the Plan showing  actual disbursements.  The amount of United

States Trustee Fees payable through the Effective Date shall be based on the amount of

disbursements set forth in the MORs filed for January, February and March 2020, and shall be

paid by the Debtors prior to the Effective Date, with a credit against the Escrow Amount for the

amount of fees so paid. The Reorganized Debtors shall provide the United States Trustee with

any missing information in the February and March 2020 MORs as soon as practicable after the

Effective Date.  The United States Trustee shall be entitled to examine such additional

information after the Effective Date for purposes of determining whether the first quarter 2020

United States Trustee Fees, which were paid, were for the amount actually due and owing.

20

Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

12.     ***United States Trustee Fees***.  The United States Trustee Fees payable for the first

calendar quarter of 2020 shall be payable as a Schedule 2 item from the Escrow Amount in an

amount up to $50,000 on the Effective Date. Payments on account of United States Trustee fees

for the first quarter of 2020, based on actual disbursements in the first quarter 2020 MORs,

which are made by the Debtors prior to the delivery of the Escrow Amount to the Escrow Agent,

shall constitute a credit against the Escrow Amount to be paid to the escrow Agent by the

Debtors after the effectiveness of the final decree closing the case. If the amount of the United

States Trustee Fees for the first quarter of 2020 claimed by the United States Trustee is more

than the amount paid on or before the Effective Date, the excess shall be paid by the Escrow

Agent from the portion of the Escrow Amount allocable to the Schedule 2 Persons, with the

aggregate amount of such payments not to exceed $50,000. If the amount of such fees for the

first quarter 2020 paid to the United States Trustee by the Debtors or the Escrow Agent is less

than the actual amount of such fees,  the excess shall be refunded by the United States Trustee to

the Escrow Agent.

13.     ***Consummation of Settlement Agreement***.  On the Effective Date, the Parties are

authorized and directed to take all actions necessary and appropriate to consummate the

Settlement Agreement.  On the first business day after the Effective Date and entry of the final

decree closing the Bankruptcy Cases, the Debtor PAIF shall transfer the Escrow Amount to the

Escrow Agent's non-interest bearing attorney trust account by wire transfer of $20,850,000.00 in

immediately available funds. The Escrow Amount shall be reduced solely by the amount of

Page (22)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

United States Trustee fees for the first quarter of 2020 paid to the United States Trustee by the

Debtors on or before the Effective Date.

14. *Release, Exculpations, Discharge, and Injunctions.* The release, exculpation,

discharge and injunction provisions contained in the Settlement Agreement and Plan are fair and

equitable, are given for valuable consideration, and are in the best interests of the Debtors and

their chapter 11 Estates, and such provisions shall be effective and binding upon all persons and

entities as provided in the Plan. The Releases provided in the Plan and PSA shall only be binding

upon each Party who expressly agreed to such release in the PSA and all persons controlled by or

claiming by, through or under such releasor. On the Effective Date of the Plan, other than as set

forth in the Plan or the PSA, all Claims against or Interests in the Debtors shall be discharged, to

the fullest extent permitted by section 1141 of the Bankruptcy Code.

15. *Permanent Injunction.* **PURSUANT TO THE PLAN AND THIS**

**CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN,**

**ALL PERSONS WHO HAVE BEEN, ARE, OR MAY BE HOLDERS OF CLAIMS**

**AGAINST OR INTERESTS IN THE DEBTORS ARISING PRIOR TO THE EFFECTIVE**

**DATE DISCHARGED BY THE PLAN, SHALL BE ENJOINED FROM TAKING ANY**

**OF THE FOLLOWING ACTIONS WITH RESPECT TO SUCH CLAIMS OR**

**INTERESTS (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHTS OR**

**OBLIGATIONS UNDER THE PLAN, THE SETTLEMENT AGREEMENT, OR THIS**

**CONFIRMATION ORDER):**

Page (23)
Debtors:  Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

    (a)    **COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND AGAINST THE TRUSTEE, THE REORGANIZED DEBTORS OR THE ESTATES, INCLUDING, WITHOUT LIMITATION, ALL SUITS, ACTIONS, AND PROCEEDINGS THAT ARE PENDING AS OF THE EFFECTIVE DATE, WHICH SHALL BE WITHDRAWN OR DISMISSED WITH PREJUDICE BASED UPON OR ARISING FROM THEIR CLAIMS AGAINST THE DEBTORS.**

    (b)    **ENFORCING, LEVYING, ATTACHING, COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTORS OR THE ESTATES.**

    (c)    **CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN AGAINST THE REORGANIZED DEBTORS OR THE ESTATES.**

    (d)    **ASSERTING ANY RIGHT OF SUBROGATION, SETOFF, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY AGAINST ANY OBLIGATION DUE THE REORGANIZED DEBTORS OR THE ESTATES.**

    (e)    **PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.**

16.    *Settlement Agreement Releases*.  Upon payment of the Escrow Amount, the

following releases, which are consistent with the Settlement Agreement and do not apply to the

Parties' obligations in the performance of the Settlement Agreement, shall be immediately

effective without the need for execution of any documents:

23

Page (24)
Debtors:  Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

(a)     As of the Effective Date, and conditioned on payment to the
Escrow Agent of the Escrow Amount, but without the need for any
further act by any Party, and without a separate release being
executed (i) each Party on behalf of itself and its successors,
affiliates, or subsidiaries, officers, directors, employees, agents,
representatives, attorneys, advisors, predecessors, controlling
persons, and assigns shall have, and shall be deemed to have fully,
absolutely, finally and forever released, relinquished and
discharged each other Party and any and all of their past and
present directors, parent entities, controlling persons, associates,
predecessors, successors, affiliates, or subsidiaries, past and
present officers, directors, employees, stockholders, officials,
members, principals, agents, representatives, attorneys, advisors,
administrators, auditors, accountants, consultants, contractors,
bankers, heirs, executors, trustees, general or limited partners or
partnerships, limited liability companies, managers, joint ventures,
personal or legal representatives, estates, administrators,
predecessors, successors, and assigns from all Released Claims
that they individually or collectively, whether directly,
representatively, derivatively or in any other capacity, ever had,
now have, or hereafter can, shall or may have against any Party
from the beginning of the world up to and including the Effective
Date. Notwithstanding the foregoing release, the members of the
Ad Hoc Committee and the members of the MicroBilt Group retain
the claims and/or interests asserted against the Debtors as
reinstated by Section 6 of the Settlement Agreement.

(b)     "Released Claims" means all and any manner of grievances,
disputes, actions, causes of action, and claims at law or equity,
notes, debts, accounts payable, rights of reimbursement or
contribution, demands, judgments, contracts, duties, suits, matters
and issues, whether known or unknown, whether individual, class,
derivative, representative, legal, equitable, or any other type,
including any right to seek or receive restitution from any foreign
or domestic governmental agency (including the Securities and
Exchange Commission or similar foreign regulatory body) on
account of any claims asserted by any Party in the Bankruptcy
Cases or Arbitration, or in any other capacity that the releasing
Party ever had against the released Party from the beginning of the

24

Page (25)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

world up to and including the Effective Date; provided, however, that Released Claims shall not include (i) a Person's covenants, obligations, representations, commitments and duties under this Agreement, or (ii) covenants, obligations, commitments or duties arising after the Effective Date.

(c)     Each Releasor hereby expressly agrees that it waives and releases, with respect to the Released Claims, any and all provisions, rights and benefits conferred either (i) by § 1542 of the California Civil Code, which reads: **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR,"** or (ii) by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code.

(d)     The waiver of Section 1542 provided by this Section is an essential term of this Mutual Release without which the settlement would not have been reached.

(e)     Each Party hereby covenants and agrees not to bring, commence, institute, or continue any action, proceeding or claim in any court, arbitration panel, agency or other tribunal against any other Party seeking to recover on any Released Claims, and the Court hereby enjoins the Parties to strictly observe the foregoing covenant not to sue.  In the event a Party violates the terms of this injunction, the Court shall retain jurisdiction to enforce said injunction and may award damages for violation (including, but not limited to punitive damages and/or reimbursement of attorney's fees and costs incurred in enforcing the injunction against the Party who violates said injunction).

17.     *Conflicts Between Confirmation Order, Plan, and Settlement Agreement*.  To the extent there is any inconsistency between the provisions of the Settlement Agreement, Plan,

Page (26)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

and this Confirmation Order, the terms and conditions contained in this Confirmation Order shall

govern.  The provisions of this Confirmation Order are integrated with each other and are

nonseverable and mutually dependent unless expressly stated by further order of this Court.  The

failure to reference or discuss all or part of any particular provision of the Plan or Settlement

Agreement herein shall have no effect on the validity, binding effect, and enforceability of such

provisions and such provision shall have the same validity, binding effect, and enforcement as

every other provision of the Plan and Settlement Agreement.

18.    *Exemption from Certain Taxes*.  Pursuant to Section 1146(c) of the Bankruptcy

Code, the issuance, transfer or exchange of securities or other property under the Plan; the

creation, transfer, filing or recording of any mortgage, deed of trust, financing statement, or other

security interest; or the making, delivery, filing, or recording of any deed or other instrument of

transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp

tax, real estate tax, conveyance, filing or transfer fees, mortgage, recording, or other similar tax,

or other government assessment.  All recording officers and other entities whose duties include

recordation of documents lodged for recording shall record, file, and accept such documents

delivered under the Plan without the imposition of any charge, fee, government assessment, or

tax.

19.    *Post-Effective Date Governance of PAIF and PAF*.  On the Effective Date,

management of the Debtors shall be under the control of the General Partner, or such

replacement General Partner as may be determined in accordance with the Settlement

Page (27)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

Agreement.  The LPA shall be amended to provide for an advisory board made up of no more than three (3) Investors, who shall advise and assist the General Partner in post-Effective Date management in accordance with the Settlement Agreement.

20.    *Revesting*.  On the Effective Date, all assets of PAIF and PAF other than the Escrow Amount, including, but not limited to, all remaining cash on hand, all rights to remaining operating lines (Big Valley & DRT), all PAIF controlled assets, all "charged-off" assets, all RTO-LTO Business Sales, all PAIF Subsidiaries (including the FRS Entities), all Assets in the Argon Side Pocket (Argon Cash / Argon Assets / Argon Causes of Action), and all claims of PAIF or PAF against any third parties which have not previously been released shall revest in PAIF/PAF.  The Escrow Amount shall not revest in PAIF or PAF but rather shall be deemed to be held in trust by PAIF for the sole and exclusive purpose of paying the Escrow Amount to the Escrow Agent in accordance with the Settlement Agreement, the Plan, and this Confirmation Order.

21.    *Notice of Effective Date*.  The Trustee shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within one Business Day after  the Effective Date.

22.    *Final Decree*.  The Court finds that as of the Effective Date of the Plan, the Debtors' estates will have been fully administered.  Effective one (1) day after the filing on the docket by the Trustee of a notice of the occurrence of the Effective date of the Plan, the Bankruptcy Cases of the Debtors shall be closed, pursuant to 11 U.S. C section 350(a).  On the

Page (28)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

date the final decree takes effect, the Trustee shall file a notice on the docket that the Bankruptcy

Cases have been closed.

23.    **_Discharge of Trustee._** On the Effective Date of the Plan, Mathew Cantor shall be

discharged as Trustee for the Debtors.  The Trustee will have no further obligation to the Debtors

or their estates, or to any party in interest in the Bankruptcy Cases after the Effective Date.

24.    **_Further Action Authorized; Deemed Concurrent_**.  As of the Effective Date, the

Plan Proponents, the Debtors and the Trustee are authorized to execute, deliver, file, or record

such contracts, instruments, releases, and other agreements or documents, and to take such

actions as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan.  All transactions that are required to occur on the Effective Date under the

terms of the Plan shall be deemed to have occurred simultaneously.

25.    **_Ratification_**.  Entry of this Confirmation Order and the occurrence of the

Effective Date shall ratify all transactions effected by the Debtors and the Trustee from and

including the Petition Date through the Effective Date.

26.    **_Further Investigation_**.  Based on the Motion and the record of the Bankruptcy

Cases,  the Court finds that the Settlement Agreement and the Plan  provide full, fair, and

equitable recoveries to the Investors, and that as a result of the Settlement Agreement, the

Trustee on behalf of the estates and anyone who could claim through, by, or under the estates,

including the Investors, believes there is no need to further investigate any acts or conduct of any

of the Debtors or their insiders or affiliates.

Page (29)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

27.     ***Continued Representation of Trustee***.  The Escrow Agent shall be permitted to
continue to represent the Trustee in any dispute over the terms of the Agreement, and in the
Bankruptcy Cases as required.

28.     ***Pending Litigation***.  On the Effective Date, all pending litigation by any Party to
the PSA against any other Party to the PSA will be dismissed with prejudice and without costs,
and all Parties will take the actions necessary to cause the pending cases to be dismissed and all
any pending appeals from any Bankruptcy Court rulings to be dismissed with prejudice and
without costs on the terms and conditions set forth in the Settlement Agreement.

29.     ***Books and Records in Possession of the Trustee***.  On the Effective Date, the
Trustee is authorized to destroy all documents or records created, generated, or obtained during
the course of the Bankruptcy Cases, including the Subpoenaed Documents (as defined in the
Trustee's Declaration filed March 9, 2020 (Doc. 1117) .  The Trustee and his Professionals are
relieved of any obligation to maintain any  documents or records, provided, however, that the
Trustee and his Professionals may, at their discretion, retain all documents which were created,
received from other persons, or compiled by the Trustee and/or his Professionals including,
without limitation, documents that are protected from discovery by the attorney-client privilege
or the work product doctrine.

30.     ***Bar on Third Party Discovery to the Trustee and the Schedule 2 Persons
consisting of Trustee Professionals***.  No testimonial discovery may be sought from the Trustee
or any of the Trustee Professionals identified on Schedule 2 of the PSA.  In the event discovery

29

Page (30)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

seeking production of documents is served on the Trustee or a Trustee Professional identified on

Schedule 2 to the PSA, it shall be an adequate response to such discovery that the recipient of

such document request has destroyed all Subpoenaed Documents and the only documents

remaining in the recipient's possession are documents either filed on the docket, delivered to or

received from another party to the case and available by subpoena from such other party, or

subject to the attorney client or work product privilege held by the Trustee.  In the event of such

a response to any document request served on the Trustee or one of his Professionals, no

discovery request may be enforced against the Trustee or a Trustee Professional without leave of

the Bankruptcy Court.

31. ***Retention of Jurisdiction***.  Notwithstanding entry of this Confirmation Order, the

occurrence of the Effective Date or consummation of the Plan, the Bankruptcy Court shall retain

jurisdiction after the Effective Date  to enforce the Plan, the Confirmation Order and the PSA.  In

order to enforce the Plan, the Confirmation Order or the PSA, an applicant shall apply to the

Bankruptcy Court on five (5) days' notice for an Order reopening the Bankruptcy Cases,

provided, however, that if the Escrow Amount has not been paid in full by wire transfer to the

Escrow Agent on the day after the effective date of the final decree closing the Bankruptcy

Cases, but in any event no later than the second day after the filing of the notice of the

occurrence of the Effective Date of the Plan, any Person with a beneficial interest in the Escrow

Amount may make an application by telephone to the Court, on email notice to the other Parties

to the PSA,  for appropriate relief against the Reorganized Debtors and their control persons.

Page (31)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order:  ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

32.    *Incorporation*.  The failure to specifically include any particular provision of the

Plan in this Confirmation Order will not diminish the effectiveness of such provision, it being the

intent of this Court that the Plan be confirmed and approved in its entirety by this Confirmation

Order and be incorporated herein by reference.

33.    *Confirmation Order Supersedes*.  Except as expressly provided in the Plan or this

Confirmation Order, it is hereby ordered that this Confirmation Order shall supersede any orders

of this Court issued prior to the Confirmation Date that may be inconsistent with this

Confirmation Order.

34.    *Governmental Approvals Not Required*.  This Confirmation Order shall

constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state

or any other governmental authority with respect to the implementation or consummation of the

Plan and any documents, instruments, or agreements, and any amendments or modifications

thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement,

and any documents, instruments, or agreements, and any amendments or modifications thereto.

35.    *Enforceability of Plan*.  Pursuant to Bankruptcy Code sections 1123(a), 1141(a),

and 1142, and the provisions of this Confirmation Order, the Plan shall be, and hereby is, valid,

binding, and enforceable, in any jurisdiction, notwithstanding any otherwise applicable non-

bankruptcy law.  The Debtors or the Trustee, as the case may be, are immediately authorized and

directed to take all actions necessary or appropriate to, enter into, amend, modify, implement,

and consummate, as necessary and applicable, all agreements or documents created under or

Page (32)
Debtors: Princeton Alternative Income Fund, LP and Princeton Alternative Funding, LLC
Case No.: 18-14603 (MBK)
Caption of Order: ORDER (A) APPROVING A GLOBAL SETTLEMENT AGREEMENT, (B)
APPROVING THE FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED
PLAN OF REORGANIZATION, (C) CONFIRMING THE FIFTH AMENDED PLAN OF
REORGANIZATION FOR THE DEBTORS, (D) DETERMINING THAT RESOLICITATION OF VOTES
ON THE PLAN IS NOT REQUIRED, AND (E) ENTERING A FINAL DECREE CLOSING THE
BANKRUPTCY CASES AS OF THE FIRST DAY AFTER THE FILING OF A NOTICE OF THE
EFFECTIVE DATE OF THE PLAN

arising in connection with the Plan, without further order of this Court, in accordance and

consistent with the provisions of the Plan.

36. **_Waiver of Stay_**. This Confirmation Order shall not be subject to a stay pursuant

to Bankruptcy Rule 3020(e).

Exhibit 4

[Execution version]

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement dated as of May 1, 2015 is entered into by and between FINTECH FINANCIAL, LLC, a Delaware limited liability company ("**Lender**") and ARGON X LLC, a Delaware limited liability company ("**Borrower**").

W I T N E S S E T H:

WHEREAS, Borrower has requested that Lender enter into a loan and security agreement with Borrower pursuant to which Lender may make revolving loans to Borrower; and

WHEREAS, Lender is willing to make such revolving loans on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

1.1  "**Accounts**" shall mean all present and future rights of Borrower to payment of a monetary obligation, whether or not earned by performance, (a) arising out of a loan or other extension of credit, (b) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (c) for services rendered or to be rendered, (d) for a secondary obligation incurred or to be incurred, or (e) arising out of the use of a credit or charge card or information contained on or for use with the card.

1.2  "**Account Party**" shall mean any obligor with respect to any Receivables whose recourse obligations thereunder constitute a principal source of payments thereunder, including any guarantor of such obligations.

1.3  "**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person. For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock, by agreement or otherwise.

1.4  "**Borrowing Base**" shall mean, as of any date, the amount equal to one hundred (100%) percent of the sum of (i) the Eligible Receivables, less any Reserves, as of such date, plus (ii) all unpaid accrued interest on the Eligible Receivables that are less than thirty (30) days

past due as of such date, but not exceeding ten percent (10%) of the principal amount of such Eligible Receivables.

1.5     "**Business Day**" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York, or other than a day on which the Deposit Bank is closed.

1.6     "**Capital Leases**" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

1.7     "**Capital Stock**" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

1.8     "**Change of Control**" shall mean, with respect to Borrower, the occurrence of any event that results in (i) the Parent Members collectively owning and controlling less than eighty percent (80%) of the issued and outstanding membership interests of the Parent, or (ii) the Parent owning and controlling less than one hundred percent (100%) of all issued and outstanding membership interests of Borrower and each Loan Originator.

1.9     "**Code**" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.10    "**Collateral**" shall have the meaning set forth in Section 5.1 hereof.

1.11    "**Collection Account**" shall mean the deposit account established pursuant to Section 6.1(a) hereof.

1.12    "**Collections**" shall mean any and all payments received on or with respect to the Receivables, including without limitation all payments of principal, interest and other fees paid by Account Parties pursuant to the Contracts or otherwise collected or received in respect of the Receivables.

1.13    "**Collateral Access Agreement**" shall mean an agreement in writing, in form and substance satisfactory to Lender, from any lessor of premises to Borrower, or any other person to whom any Collateral (including Equipment, bills of lading or other documents of title) is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, pursuant to which such lessor, consignee or other person, inter alia, acknowledges the first priority security interest of Lender in such Collateral, agrees to waive any and all claims such lessor, consignee or other person may, at any time, have against such Collateral, whether for processing, storage or

2

otherwise, and agrees to permit Lender access to, and the right to remain on, the premises of such lessor, consignee or other person so as to exercise Lender's rights and remedies and otherwise deal with such Collateral and, in the case of any consignee or other person who at any time has custody, control or possession of any Collateral, acknowledges that it holds and will hold possession of the Collateral for the benefit of Lender and agrees to follow all instructions of Lender with respect thereto.

1.14 "**Contract**" shall mean, collectively, the loan agreement, promissory note and/or all other agreements and instruments executed by the Account Party in connection with the consumer loan made by the Loan Originator to such Account Party, and all rights and remedies of Borrower thereunder.

1.15 "**Contract File**" shall mean, with respect to each Contract, the following documents:

(a) the fully executed electronic file of the Contract;

(b) the application of the related Account Party to obtain the consumer loan extended by the related Contract and any and all other documents that Borrower or the applicable Loan Originator keeps on file in accordance with its procedures relating to the Contract; and

(c) an Assignment pursuant to which the Loan Originator of such Contract has sold, assigned and transferred such Contract to Borrower (or to the Parent, with a subsequent Assignment from the Parent to Borrower) in the form set forth in Exhibit A to this Agreement (the "**Assignment**") with respect to such Contract.

1.16 "**Credit and Collection Policies**" shall mean the policies and procedures used by the Loan Originators in the origination, administration and enforcement of the consumer loans that are the subject of the Contracts, including without limitation the credit criteria and other standards and requirements applied by the Loan Originators in approving applications of prospective Account Parties for credit and the procedures used for administering, collecting and enforcing the Contracts, as provided to and approved by Lender, with such amendments and modifications as Lender shall approve in writing.

1.17 "**Default**" shall mean an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

1.18 "**Deposit Account Control Agreement**" shall mean an agreement in writing, in form and substance satisfactory to Lender, by and among Lender, Borrower and Deposit Bank which provides that such bank will comply with instructions originated by Lender directing disposition of the funds in the deposit account without further consent by Borrower and such other terms and conditions as Lender may require, including as to any such agreement with respect to any Pledged Account, providing that all items received or deposited in the Pledged Accounts are the property of Lender, that the bank has no lien upon, or right to setoff against, the Pledged Accounts, the items received for deposit therein, or the funds from time to time on

3

deposit therein and that the bank will wire, or otherwise transfer, in immediately available funds, on a daily basis to the Lender all funds received or deposited into the Pledged Accounts.

1.19    "**Deposit Bank**" shall mean Wells Fargo Bank, N.A.

1.20    "**Draw**" shall have the meaning set forth in Section 2.7(a) hereof.

1.21    "**Early Termination Fee**" shall have the meaning set forth in Section 12.1(d) hereof.

1.22    "**Eligible Receivables**" shall mean Receivables acquired and owned by Borrower which are and continue to be acceptable to Lender based on the criteria set forth below. In general, Receivables shall be Eligible Receivables if:

(a)    such Receivables arise from consumer loans originated by a Loan Originator and assigned to Borrower by a Loan Originator by an executed Assignment (as such term is defined in Section 1.15(c) of this Agreement), in each case in the ordinary course of business in compliance with the Credit and Collection Policies of Borrower and the Loan Originators which were approved by Lender and for which Microbilt issues credit reports;

(b)    such Receivables arise from consumer loans (i) for which a Loan Originator has given the consumer borrower all required federal disclosures under the Truth in Lending Act of 1968, as amended, and regulations promulgated thereunder, (ii) that comply with or are exempt from interest rate limitations under applicable law, (iii) that have interest rates that comply with any laws or regulations applicable to such loans, (iv) that have terms of not less than twelve (12) months and not more than thirty-six (36) months; provided, however, that the Receivables relating to consumer loans originated after the date hereof having terms greater than eighteen (18) months shall comprise no greater than twenty-five percent (25%) of the total Receivables, subject to Lender's sole discretion to increase such percentage after six (6) months following the date hereof, and (v) that provide for monthly payments of principal together with all accrued interest. Notwithstanding the foregoing, the restriction in clause (iv) above shall not apply to the consumer loans that are in the existing loan portfolio on the Closing Date, which will support the initial Draw on the Closing Date, but shall apply to all newly originated consumer loans after the Closing Date that will support any subsequent Draw;

(c)    such Receivables arise under Contracts that comply with all of the representations and warranties contained in Section 8.17 of this Agreement;

(d)    such Receivables arise under Contracts on which loan payments are not more than sixty (60) days past due;

(e)    the Account Party with respect to such Receivables made the first payment thereon when due;

(f)    the consumer loans giving rise to such Receivables have not been outstanding for more than eighteen (18) months, unless such consumer loans have been

4

performing and are in good standing, in which case they shall be Eligible Receivables if they satisfy all of the other criteria of Eligible Receivables;

(g)     the Account Party with respect to such Receivables resides in one of the Eligible States;

(h)     the Account Party with respect to such Receivables has not asserted a counterclaim, defense or dispute and does not have, and does not engage in transactions which may give rise to any right of setoff or recoupment against such Receivables;

(i)     there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Receivables or reduce the amount payable or delay payment thereunder;

(j)     such Receivables are subject to the first priority, valid and perfected security interest of Lender;

(k)     the Account Party with respect to such Receivables is not an officer, employee, agent or other Affiliate of Borrower;

(l)     there are no proceedings or actions which are threatened or pending against the Account Parties with respect to such Receivables which might result in any Material Adverse Change in any such Account Party's financial condition  (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(m)     such Receivables of a single Account Party or its affiliates do not constitute more than one (1%) percent of all otherwise Eligible Receivables (but the portion of the Receivables not in excess of such percentage may be deemed Eligible Receivables), however this requirement shall be waived for the first thirty (30) days of the Term of this Agreement;

(n)     such Receivables are owed by Account Parties whose total indebtedness to Borrower does not exceed the credit limit with respect to such Account Parties as determined by Borrower from time to time in the ordinary course of business consistent with its current practices as of the date hereof and as is reasonably acceptable to Lender (but the portion of the Receivables not in excess of such credit limit may be deemed Eligible Receivables);

(o)     such Receivables do not arise out of or relate to (i) "pay day loans"' or any single payment consumer product, (ii) merchant cash advance (MCA) loans, except with the prior written approval of Lender after the Loan Originators have at least twelve (12) months experience with such loans, or (iii) loans that arise from other new lending programs of Borrower or the Loan Originators; and

(p)     such Receivables are owed by Account Parties deemed creditworthy at all times by Lender in good faith.

The criteria for Eligible Receivables set forth above may only be changed and any new criteria for Eligible Receivables may only be established by Lender in good faith based on either:  (i) an

5

event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Lender has no written notice thereof from Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Receivables in the good faith determination of Lender. Any Receivables which are not Eligible Receivables shall nevertheless be part of the Collateral.

1.23    "**Eligible States"** shall mean the states listed on <u>Schedule 1.23</u> hereto, and any other state that the Lender may approve from time to time in its sole discretion as an Eligible State upon receipt of evidence from Borrower, in form and substance reasonably satisfactory to Lender, that (i) the Loan Originator that originates consumer loans in such state is properly licensed to engage in consumer lending activities in such state, (ii) that the Receivables arising from such consumer loans will meet all of the criteria of Eligible Receivables, and (iii) such other requirements as Lender may reasonably impose to assure that the Receivables arising from the consumer loans in such states are acceptable Collateral for the purpose of supporting and securing the Obligations of Borrower hereunder.

1.24    "**Environmental Laws**" shall mean all foreign, Federal, State and local laws (including common law), legislation, rules, codes, licenses, permits (including any conditions imposed therein), authorizations, judicial or administrative decisions, injunctions or agreements between Borrower and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, (b) relating to the exposure to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of Hazardous Materials, or (c) relating to all laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials. The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws, and (iii) any common law or equitable doctrine that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

1.25    "**Equipment**" shall mean all of Borrower's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment and computer hardware and software, whether owned or licensed, and including embedded software, vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

6

1.26    "**ERISA**" shall mean the United States Employee Retirement Income Security Act of 1974, together with all rules, regulations and interpretations thereunder or related thereto.

1.27    "**ERISA Affiliate**" shall mean any person required to be aggregated with Borrower under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

1.28    "**ERISA Event**" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a "prohibited transaction" with respect to which Borrower is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which Borrower could otherwise be liable; (f) a complete or partial withdrawal by Borrower or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the imposition of any liability under Title IV of ERISA, other than the Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon Borrower or any ERISA Affiliate in excess of $25,000; and (j) any other event or condition with respect to a Plan including any Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate that could reasonably be expected to result in liability of Borrower in excess of $25,000.

1.29    "**Event of Default**" shall mean the occurrence or existence of any event or condition described in Section 10.1 hereof.

1.30    "**Federal Consumer Compliance Laws**" shall mean all consumer compliance laws that related to including but not limited to, Regulations B, E and P, Military Lending Act, Servicemembers Civil Relief Act, Fair Lending, Fair Credit Reporting Act and Foreign Account Tax Compliance Act, Bank Secrecy Act, CAN Spam ACT, Section 5 of the FTC, federal anti-money laundering statutes and any other applicable regulations and statutes.

1.31    "**Financing Agreements**" shall mean, collectively, this Agreement and all notes, guarantees, security agreements, deposit account control agreements, investment property control agreements, intercreditor agreements, and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by Borrower or any Obligor in connection with this Agreement.

1.32    "**GAAP**" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

7

1.33 "**Governmental Authority**" shall mean any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

1.34 "**Guaranty and Suretyship Agreement**" shall mean the agreement in writing, in the form and substance reasonably satisfactory to Lender, where each of the Loan Originators guarantees the Borrower's Obligations hereunder, subject to the terms and conditions set forth therein.

1.35 "**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

1.36 "**Indebtedness**" shall mean, with respect to any Person, any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments; (b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person in connection with obtaining goods, materials or services that is not overdue by more than ninety (90) days, unless the trade payable is being contested in good faith); (c) all obligations as lessee under leases which have been, or should be, in accordance with GAAP recorded as Capital Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness, directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations under any Capital Stock or other equity securities issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person for borrowed money or indebtedness of another Person otherwise described in this definition that is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person, all as of such time; and

8

(h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under swap agreements, cap agreements and collar agreements and other agreements or arrangements designed to protect such person against fluctuations in interest rates or currency or commodity values.

1.37    "**Information Certificate**" shall mean the Information Certificate of Borrower constituting Exhibit B hereto containing material information with respect to Borrower, its business and assets provided by or on behalf of Borrower to Lender in connection with the preparation of this Agreement and the other Financing Agreements and the financing arrangements provided for herein.

1.38    "**Intellectual Property**" shall mean Borrower's now owned and hereafter arising or acquired:  patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or the license of any trademark); customer and other lists in whatever form maintained; and trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registrations; software and contract rights relating to software, in whatever form created or maintained.

1.39    "**Interest Rate**" shall mean as follows:

(a)    On the first $15,000,000 outstanding principal amount of the Loans, a rate equal to twenty-two percent (22.0%) per annum;

(b)    On the outstanding principal amount of the Loans in excess of $15,000,000 but not exceeding $30,000,000, a rate equal to twenty-one percent (21.0%) per annum;

(c)    On the outstanding principal amount of the Loans in excess of $30,000,000 but not exceeding $50,000,000, a rate equal to twenty percent (20.0%) per annum; and

(d)    On the outstanding principal amount of the Loans in excess of $50,000,000, a rate equal to nineteen percent (19.0%) per annum.

1.40    "**Inventory**" shall mean all of Borrower's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by Borrower as lessor; (b) are held by Borrower for sale or lease or to be furnished under a contract of service; (c) are furnished by Borrower under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

9

1.41 "**Lender's Accountant**" shall mean the firm of Raible, Cornaglia, Wenstrom & Raible, LLC.

1.42 "**Loan Loss Reserve Account**" shall mean the deposit account established pursuant to Section 6.1(b) hereof.

1.43 "**Loan Originators**" shall mean the Parent and/or the Subsidiaries of the Parent listed on Schedule 1.43 hereto that will originate consumer loans and assign and transfer them to Borrower and any other Subsidiary of the Parent that the Lender may approve from time to time in its sole discretion as a Loan Originator hereunder upon receipt of (i) evidence that such Loan Originator is duly licensed to engage in consumer lending activities in an Eligible State, (ii) a Guaranty and Suretyship Agreement duly executed by such Loan Originator in favor of Lender, and such other consents, certificates and opinions and other documents as Lender may require, all in form and substance satisfactory to Lender, and (iii) such other requirements as Lender may reasonably impose to assure that the Receivables arising from the consumer loans originated by such Loan Originator are acceptable Collateral for the purpose of supporting and securing the Obligations of Borrower hereunder.

1.44 "**Loans**" shall mean the Revolving Loans.

1.45 "**Material Adverse Change**" shall mean, as reasonably determined by Lender at any time, with respect to any Person, any event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities, or circumstances, or any change(s), including without limitation, changes in applicable laws or a regulatory action, which: (a) has any material adverse effect upon or change in the validity or enforceability of this Agreement or any of the other Financing Agreements; (b) is material and adverse to the value of the Receivables or to the business, operations, properties, assets, liabilities, prospects, or financial condition of any such Person (as applicable); (c) results in the origination, purchase or collection of the Receivables being in violation of applicable laws; or (d) materially impairs the ability of any counterparty to this Agreement or any of the other Financing Agreements to perform its obligations hereunder or thereunder or to consummate the transaction under this Agreement or any of the other Financing Agreements. Without limiting the generality or applicability of the foregoing, a Material Adverse Change includes any material deviation from the aggregate concentrations or underwriting estimates provided by Borrower to Lender.

1.46 "**Material Contract**" shall mean (a) any contract or other agreement (other than the Financing Agreements), written or oral, of Borrower involving monetary liability of or to any Person in an amount in excess of $25,000 in any fiscal year and (b) any other contract or other agreement (other than the Financing Agreements), whether written or oral, to which Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations or prospects of Borrower and the other Obligors, taken as a whole, or the validity or enforceability of this Agreement, any of the other Financing Agreements, or any of the rights and remedies of Lender hereunder or thereunder.

1.47   "**Maximum Credit**" shall mean the amount of $20,000,000 or such greater or lesser amount as may be mutually agreed by the parties from time to time as reflected in an Addendum to this Agreement signed by Lender and Borrower and consented to in writing by any Obligor.

1.48   "**Microbilt**" shall mean Microbilt Corporation or any successor thereto approved by Lender.

1.49   "**Minimum Utilization Requirement**" shall have the meaning set forth in Section 2.5 hereof.

1.50   "**Multiemployer Plan**" shall mean a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by Borrower or any ERISA Affiliate.

1.51   "**Note**" shall mean the Revolving Loan Note.

1.52   "**Obligations**" shall mean any and all Revolving Loans and all other obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Lender and/or its affiliates, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether arising under this Agreement or otherwise, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and however acquired by Lender.

1.53   "**Obligor**" shall mean each of the Loan Originators and any other guarantor, endorser, acceptor, surety or other person liable on or with respect to the Obligations or who is the owner of any property which is security for the Obligations, other than Borrower.

1.54   "**Parent**" shall mean Argon Credit LLC, a Delaware limited liability company.

1.55   "**Parent Members**" shall mean Margon, LLC, NOAX, LLC, Gary Zumski, BMoney Holdings, LLC, and Little Owl Argon, LLC.

1.56   "**Permitted Investments**" shall mean: (i) direct obligations of the United States of America or any agency or instrumentality thereof or obligations backed by the full faith and credit of the United States of America maturing in twelve (12) months or less from the date of acquisition; (ii) commercial paper maturing in 180 days or less rated not lower than A-1, by Standard & Poor's or P-1 by Moody's Investors Service, Inc. on the date of acquisition; (iii) demand deposits, time deposits or certificates of deposit maturing within one year in commercial banks whose obligations are rated A-1, A or the equivalent or better by Standard & Poor's on the

11

date of acquisition; and (iv) money market or mutual funds whose investments are limited to those types of investments described in clauses (i)-(iii) above.

1.57    "**Person**" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

1.58    "**Plan**" means an employee benefit plan (as defined in Section 3(3) of ERISA) which Borrower sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a Multiemployer Plan has made contributions at any time during the immediately preceding six (6) plan years.

1.59    "**Pledged Accounts**" shall mean the Collection Account, the Loan Loss Reserve Account and any other deposit account that is subject to a Deposit Account Control Agreement.

1.60    "**Program**" shall mean the consumer loan program conducted by Borrower.

1.61    "**Program Vendors**" shall have the meaning set forth in Section 8.16 hereof.

1.62    "**Real Property**" shall mean all now owned and hereafter acquired real property of Borrower, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

1.63    "**Receivables**" shall mean all consumer loan receivables now owned or hereafter originated or acquired by Borrower, and all amounts due and to become due thereunder.

1.64    "**Records**" shall mean all of Borrower's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Party, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to the foregoing maintained with or by any other person).

1.65    "**Reserves**" shall mean as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith reducing the amount of Revolving Loans which would otherwise be available to Borrower under the lending formula(s) provided for herein:  (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of Borrower or any Obligor, taken as a whole, or (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof) or (b) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of Borrower or any Obligor to

12

Lender is or may have been incomplete, inaccurate or misleading in any material respect or (c) in respect of any state of facts which Lender determines in good faith constitutes a Default or an Event of Default.

1.66   "**Revolving Loan Facility**" shall mean the revolving loan facility provided to Borrower under and subject to the terms and conditions of this Agreement.

1.67   "**Revolving Loans**" shall mean the loans now or hereafter made by Lender to or for the benefit of Borrower on a revolving basis (involving advances, repayments and readvances) as set forth in Section 2.1 hereof.

1.68   "**Revolving Loan Note**" shall have the meaning set forth in Section 2.6 hereof.

1.69   "**Servicer**" shall mean the Parent.

1.70   "**Solvent**" shall mean, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the date hereof, and (b) the assets and properties of such Person at a fair valuation (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

1.71   "**Subsidiary**" or "subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Capital Stock or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

1.72   "**Termination Date**" shall have the meaning set forth in Section 12.1(a) hereof.

1.73   "**UCC**" shall mean the Uniform Commercial Code as in effect in the State of New Jersey, and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New Jersey on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine).

13

**SECTION 2.  REVOLVING LOAN FACILITY**

2.1     Subject to and upon the terms and conditions contained herein, during the term of this Agreement Lender may (but shall not be obligated to) make Revolving Loans to Borrower from time to time in amounts requested by Borrower up to the amount equal to the lesser of: (a) the Borrowing Base or (b) the Maximum Credit.  Borrower acknowledges and agrees that the Revolving Loans, if any, shall be made at the sole discretion of Lender and shall be repayable on demand. Lender may decline to make advances under the Revolving Loan Facility or terminate the Revolving Loan Facility at any time and for any reason without prior notice to Borrower.

2.2     Except in Lender's discretion, the aggregate amount of the Revolving Loans outstanding at any time shall not exceed the Maximum Credit. In the event that the outstanding amount of the Loans shall at any time exceed the amount of the Borrowing Base or the Maximum Credit, as applicable, Borrower shall, upon demand by Lender, which may be made at any time or from time to time, immediately repay to Lender the entire amount of any such excess(es) for which payment is demanded. By the fifth day of each month, Borrower shall prepare a signed monthly certificate detailing the Borrowing Base and comparing it to the amount Borrowed ("**Monthly Borrowing Base Certificate**"). To the extent that the amount borrowed exceeds the Borrowing Base ("**Deficiency**"), Borrower shall immediately remit amounts needed to remove the Deficiency.

2.3     Notwithstanding anything to the contrary herein contained, including without limitation any implication created by the inclusion of affirmative and/or negative covenants or Events of Default herein, Borrower acknowledges and agrees that the outstanding Revolving Loans are payable on demand by Lender for any reason whether or not there exists an Event of Default under this Agreement.  Lender agrees that if, at a time when no Event of Default exists, it makes a demand for repayment of the outstanding Revolving Loans that is based on the withdrawal of Lender's funding sources or the need to repay such funding sources, Lender will not pursue the Parent under its Guaranty and Suretyship Agreement unless and until Lender has used commercially reasonable efforts to collect the Revolving Loans through the collection of the Eligible Receivables and there remains an unpaid balance of the Obligations of Borrower; provided, however, that this limitation shall not apply to any enforcement actions that Lender may elect to take in the event that an Event of Default has occurred and is continuing.

2.4     The Draws by Borrower during the first six (6) months of the Revolving Loan Facility shall be subject to the following limitations:

(a)     The initial Draw by Borrower on the Closing Date shall not exceed the lesser of (i) eighty-five percent (85.0%) of the Eligible Receivables of Borrower as of the Closing Date, or (ii) $3,050,000;

(b)     The second Draw by Borrower, which shall be made within the first month of the Term of this Agreement, shall not exceed the lesser of (i) the Borrowing Base based on Eligible Receivables of Borrower under Contracts originated by the Loan Originators and assigned to Borrower since the Closing Date, and (ii) $2,000,000; and

(c)      Subsequent Draws by Borrower during the next five (5) months shall total $3,000,000 or more per month, but not in excess of the Borrowing Base based on Eligible Receivables of Borrower under Contracts originated by the Loan Originators and assigned to Borrower since the prior Draw.

2.5      Commencing on the date that is five (5) months following the date of this Agreement and at all times thereafter, Borrower shall borrow and maintain outstanding Revolving Loans in an aggregate principal amount that is at least eighty-five percent (85.0%) of the Maximum Credit, and if at any time after such date the aggregate principal amount of the outstanding Revolving Loans is less than such amount, then Borrower shall pay to Lender as a non-use fee an amount equal to the difference between (i) the interest that is payable on such lesser amount of outstanding Revolving Loans and (ii) the interest that would have been payable on eighty-five percent (85.0%) of the Maximum Credit (the "**Minimum Utilization Requirement**").

2.6      The Revolving Loans shall be evidenced by a revolving loan note of Borrower in the principal amount of the Maximum Credit, in substantially the form of Exhibit C hereto (the "**Revolving Loan Note**"), duly executed and delivered by Borrower to Lender concurrently herewith.  The Revolving Loans shall bear interest at the rate set forth in the Revolving Loan Note and shall be repaid, together with interest and other amounts, in accordance with this Agreement, the Revolving Loan Note and the other Financing Agreements.  The Revolving Loans shall be secured by all of the Collateral.

2.7      In order to make a draw under the Revolving Loan Facility (a "**Draw**"), Borrower shall deliver to Lender a written request (the "**Draw Request**"), signed by an authorized officer of Borrower, setting forth (i) the amount of the requested Draw, (ii) the consumer loan(s) that have been funded since the most recent Draw Request made by Borrower, including the date and amount of each such loan and the name and address of the related Account Parties, (iii) payment instructions to Lender as to how the funds are to be disbursed, which shall be either through ACH or by Federal wire, and (iv) such other information as Lender may request. The Draw Request shall also contain a certification by Borrower that (w) each of the consumer loans for which the Draw Request is made have been funded by Borrower, (x) such consumer loans comply with the representations and warranties contained in Section 8.17 hereof, (y) the Receivables with respect to such consumer loans will meet all of the criteria of Eligible Receivables, and (z) Assignments have been executed by the Loan Originators irrevocably assigning and transferring such consumer loans to Borrower.  Notwithstanding any of the foregoing, the Draw process shall include a daily Draw, a weekly division of payments and, finally, a monthly settlement of payments, as set forth in Section 6.3 hereof. After the Draw process has been fully automated to permit the uploading of the consumer loan files in a manner satisfactory to Lender, the Borrower's daily Draw Request will be made in writing by email daily by 3:00 pm EST and following receipt thereof Lender will deliver Loan funds to the Servicer for the account of Borrower by 1:00 pm EST on next business day, by either wire transfer or ACH.

2.8      Authorization to Make Loans. Lender is authorized to make the Loans based upon telephonic or other instructions received from anyone purporting to be an officer of Borrower or other authorized person or, at the discretion of Lender, if such Loans are necessary to satisfy any

15

Obligations. All Loans under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrower when deposited to the credit of Borrower or otherwise disbursed or established in accordance with the instructions of Borrower or in accordance with the terms and conditions of this Agreement.

2.9     Flow of Funds. Borrower hereby authorizes and directs Lender to fund the proceeds of the Loans into a deposit account of the Servicer, for the account of and benefit of Borrower and subject to the restrictions on the use of proceeds set forth in Section 6.7 hereof.

## SECTION 3.  INTEREST AND FEES

3.1     Interest.

(a)     Borrower shall pay to Lender interest on the outstanding principal amount of the Loans at the Interest Rate. All interest accruing hereunder on and after the date of any Event of Default or demand for payment or termination or nonrenewal hereof shall be payable on demand.

(b)     Interest shall be payable by Borrower to Lender in arrears as set forth in Section 6.3 hereof and shall be calculated on the basis of actual days accrued and actual days elapsed (actual/actual). In no event shall charges constituting interest payable by Borrower to Lender exceed the maximum amount or the rate permitted under any applicable law or regulation, and if any such part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto.

3.2     Origination Fee. Borrower shall pay to Lender an origination fee equal to two percent (2.0%) of the principal amount of the scheduled Draws under Section 2.4 hereof (or of the actual Draws, if greater) until Borrower has paid two percent (2.0%) of the Maximum Credit. The origination fees shall be fully earned and payable (i) on the Closing Date, with respect to the origination fee for the initial Draw, and (ii) at the time of each Monthly Settlement thereafter, with respect to the origination fee for the Draws for the month in which such Monthly Settlement occurs. In the event of any increase in the Maximum Credit, Borrower shall pay an origination fee on all subsequent Draws until the total amount of such Draws equals the amount of the increase in the Maximum Credit.

3.3     Annual Fee. In the event that the Term of the Revolving Credit Facility is renewed for one or more one-year renewal terms, Borrower shall pay to Lender an annual fee equal to two percent (2.0%) of the Maximum Credit at the time of such renewal, payable in twelve (12) equal monthly installments, commencing on the date of the first Monthly Settlement in the renewal term and on the date of each Monthly Settlement thereafter until paid in full.

16

**SECTION 4. CONDITIONS PRECEDENT**

4.1     <u>Conditions Precedent to Initial Loans</u>.   Each of the following is a condition precedent to Lender making the initial Loans hereunder:

(a)     Lender shall have received, in form and substance satisfactory to Lender, all releases, terminations and such other documents as Lender may request to evidence and effectuate the termination by the existing lenders to Borrower of their respective financing arrangements, if any, with Borrower and the termination and release by it or them, as the case may be, of any interest in and to any assets and properties of Borrower and each Obligor, duly authorized, executed and delivered by it or each of them, including, but not limited to, (i) UCC termination statements for all UCC financing statements previously filed by it or any of them or their predecessors, as secured party and Borrower or any Obligor, as debtor and (ii) satisfactions and discharges of any mortgages, deeds of trust or deeds to secure debt by Borrower or any Obligor in favor of such existing lender or lenders, in form acceptable for recording with the appropriate Governmental Authority;

(b)     all requisite limited liability company action and proceedings in connection with this Agreement and the other Financing Agreements shall be reasonably satisfactory in form and substance to Lender, and Lender shall have received all information and copies of all documents, including records of requisite limited liability company action and proceedings which Lender may have reasonably requested in connection therewith, such documents where reasonably requested by Lender or its counsel to be certified by appropriate limited liability company officers or Governmental Authority (and including a copy of the certificate of organization of Borrower certified by the Secretary of State (or equivalent Governmental Authority) which shall set forth the same complete limited liability company name of Borrower as is set forth herein and such document as shall set forth the organizational identification number of Borrower, if one is issued in its jurisdiction of organization);

(c)     Lender shall have completed a review of the books and records of Borrower and such other information with respect to the Program and Collateral as Lender may require to determine the amount of Revolving Loans available to Borrower, together with such supporting documentation as may be necessary or appropriate, and other documents and information that will enable Lender to accurately identify and verify the Collateral), the results of which in each case shall be reasonably satisfactory to Lender;

(d)     Lender shall have received, in form and substance reasonably satisfactory to Lender, all consents, waivers, acknowledgments and other agreements from third persons which Lender may deem reasonably necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the Collateral or to effectuate the provisions or purposes of this Agreement and the other Financing Agreements;

(e)     Lender shall have received, in form and substance reasonably satisfactory to Lender, Deposit Account Control Agreements by and among Lender, Borrower and each bank where Borrower has a Pledged Account or other deposit account,  in each case, duly authorized, executed and delivered by such bank and Borrower;

(f)     Lender shall have received evidence, in form and substance reasonably satisfactory to Lender, that Lender has a valid perfected first priority security interest in all of the Collateral;

(g)     Lender shall have received evidence, in form and substance reasonably satisfactory to Lender, that each Loan Originator is authorized to conduct the Program in each of the Eligible States, including without limitation copies of all licenses and permits required to conduct the Program in such states;

(h)     Lender shall have received copies of the agreements between Borrower or Parent and each of the Program Vendors and all such agreements shall be in full force and effect;

(i)     Lender shall have received and reviewed lien and judgment search results for the jurisdiction of organization of Borrower, the jurisdiction of the chief executive office of Borrower and all jurisdictions in which assets of Borrower are located, which search results shall be in form and substance reasonably satisfactory to Lender;

(j)     Lender shall have received evidence of insurance and loss payee endorsements required hereunder and under the other Financing Agreements, in form and substance reasonably satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as loss payee;

(k)     Lender shall have received, in form and substance reasonably satisfactory to Lender, such opinion or advice letters of counsel to Borrower with respect to the Financing Agreements;

(l)     the other Financing Agreements and all instruments and documents hereunder and thereunder shall have been duly executed and delivered to Lender, in form and substance reasonably satisfactory to Lender; and

(m)     Borrower shall have paid Lender $15,000.00 on account of the legal fees and expenses incurred by Lender in connection with the preparation and negotiation of the Financing Agreements and the closing of the transactions contemplated thereby.

4.2     Conditions Precedent to All Loans. Each of the following is an additional condition precedent to Lender making Loans to Borrower, including the initial Loans and any future Loans:

(a)     Borrower shall have submitted a Draw Request for such Loans;

(b)     all representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date);

18

(c)      no law, regulation, order, judgment or decree of any Governmental Authority shall exist, and no action, suit, investigation, litigation or proceeding shall be pending or threatened in any court or before any arbitrator or Governmental Authority, which (i) purports to enjoin, prohibit, restrain or otherwise affect (A) the making of the Loans, or (B) the consummation of the transactions contemplated pursuant to the terms hereof or the other Financing Agreements or (ii) has or could reasonably be expected to have a material adverse effect on the assets, business or prospects of Borrower and the other Obligors, taken as a whole, or would impair the ability of Borrower or any other Obligor to perform its obligations hereunder or under any of the other Financing Agreements or of Lender to enforce any Obligations or realize upon any of the Collateral;

(d)      no Material Adverse Change shall have occurred since the date of the most recent financial statements furnished by Borrower to Lender; and

(e)      no Default or Event of Default shall exist or have occurred and be continuing on and as of the date of the making of such Loan and after giving effect thereto.

4.3      <u>Post-Closing Items and Clean-up Period</u>.

(a)      Borrower agrees to deliver the documents and to take the actions listed on <u>Schedule 4.3</u> within ten (10) days following the execution of this Agreement.

(b)      In addition, Lender and Borrower agree to discuss and consider in good faith any revisions or additions to the Loan Documents that either party may request in order to more accurately and completely reflect the understanding of the parties, provided that such revisions or additions are not inconsistent with the economic terms of set forth in the term sheet for the transaction, with the objective of completing any and all revisions and additions within ten (10) days following the execution of this Agreement.

## SECTION 5.  GRANT AND PERFECTION OF SECURITY INTEREST

5.1      <u>Grant of Security Interest</u>. To secure payment and performance of all Obligations, Borrower hereby grants to Lender a continuing security interest in, a lien upon, and a right of set off against, and hereby assigns to Lender as security, all personal and real property and fixtures and interests in property and fixtures of Borrower, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by Lender, collectively, the "**Collateral**"), including without limitation all right, title and interest of Borrower in and to:

(a)      the Assignments and all interests assigned to Borrower thereunder;

(b)      all Receivables and all Collections;

(c)      all instruments, including without limitation all promissory notes and any other instruments related to the Receivables, whether in tangible or electronic form;

19

(d)     all Accounts, including without limitation all Accounts related to the Receivables;

(e)     all Contract Files;

(f)     all of the Pledged Accounts and all other monies, credit balances, deposits and other property of Borrower now or hereafter held or received by or in transit to Lender or its Affiliates or at any other depository or other institution from or for the account of Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(g)     all general intangibles, including without limitation all general intangibles related to the Receivables and any and all Intellectual Property;

(h)     all goods, including without limitation all Inventory and Equipment;

(i)     all chattel paper (including all tangible and electronic chattel paper);

(j)     all documents;

(k)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(l)     all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of Account Parties or other persons securing the obligations of Account Parties;

(m)     all investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts);

(n)     all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(o)     all Records; and

(p)     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

5.2     <u>Assignments of Contracts and Receivables</u>. To secure its Obligations to Lender hereunder, Borrower hereby assigns, transfers and conveys to Lender all of its right, title and

20

interest (but none of its obligations) in, to and under the Assignments and all interests assigned thereunder. Lender shall have the absolute right to exercise all of Borrower's rights and remedies under the Assignments at all times during the Term of this Agreement and until the Obligations are paid in full, whether or not a Default or Event of Default exists and is continuing under this Agreement. Borrower shall execute and deliver to Lender such agreements and other documents as Lender may reasonably request from time to time, and shall otherwise cooperate with Lender, in order to allow Lender to exercise the rights and remedies under the Assignments for the purpose of protecting and enforcing the rights of Lender under this Agreement and the other Financing Agreements. Lender is authorized to file financing statements against Borrower to protect and perfect its rights as the assignee of the Assignments.

   5.3  <u>Perfection of Security Interests</u>.

     (a)  Borrower irrevocably and unconditionally authorizes Lender (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Lender or its designee as the secured party and Borrower as debtor, as Lender may require, and including any other information with respect to Borrower or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as Lender may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof. Borrower hereby ratifies and approves all financing statements naming Lender or its designee as secured party and Borrower as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Lender prior to the date hereof and ratifies and confirms the authorization of Lender to file such financing statements (and amendments, if any). Borrower hereby authorizes Lender to adopt on behalf of Borrower any symbol required for authenticating any electronic filing. In the event that the description of the collateral in any financing statement naming Lender or its designee as the secured party and Borrower as debtor includes assets and properties of Borrower that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by Borrower to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral. In no event shall Borrower at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming Lender or its designee as secured party and Borrower as debtor.

     (b)  Borrower does not have any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except as set forth in the Information Certificate. In the event that Borrower shall be entitled to or shall receive any chattel paper or instrument after the date hereof, Borrower shall promptly notify Lender thereof in writing. Promptly upon the receipt thereof by or on behalf of Borrower (including by any agent or representative), Borrower shall deliver, or cause to be delivered to Lender, all tangible chattel paper and instruments that Borrower or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify, in each case except as Lender may otherwise agree. At Lender's option, Borrower shall, or Lender may at any time

on behalf of Borrower, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner acceptable to Lender with the following legend referring to chattel paper or instruments as applicable: "This instrument or chattel paper is subject to the security interest of Fintech Financial, LLC, and any sale, transfer, assignment or encumbrance of this instrument or chattel paper violates the rights of such secured party."

(c)     In the event that Borrower shall at any time hold or acquire an interest in any electronic instrument or chattel paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), Borrower shall promptly notify Lender thereof in writing.  Promptly upon Lender's request, Borrower shall take, or cause to be taken, such actions as Lender may reasonably request to give Lender control of such electronic instrument or chattel paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d)     Borrower does not have any deposit accounts as of the date hereof, except as set forth in the Information Certificate.  Borrower shall not, directly or indirectly, after the date hereof open, establish or maintain any deposit account unless each of the following conditions is satisfied:  (i) Lender shall have received not less than five (5) Business Days prior written notice of the intention of Borrower to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Lender the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom Borrower is dealing and the purpose of the account, (ii)  the bank where such account is opened or maintained shall be acceptable to Lender, and (iii) on or before the opening of such deposit account, Borrower shall as Lender may specify either (A) deliver to Lender a Deposit Account Control Agreement with respect to such deposit account duly authorized, executed and delivered by Borrower and the bank at which such deposit account is opened and maintained or (B) arrange for Lender to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to Lender.  The terms of this subsection (d) shall not apply to deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees.

(e)     Borrower does not own or hold, directly or indirectly, beneficially or as record owner or both, any investment property, as of the date hereof, or have any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the date hereof, in each case except as set forth in the Information Certificate.

(f)     Borrower is not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the date hereof, except as set forth in the Information Certificate.

(g)     Borrower has no commercial tort claims as of the date hereof, except as set forth in the Information Certificate.

(h)     Borrower does not have any goods, documents of title or other Collateral in the custody, control or possession of a third party as of the date hereof, except as set forth in the Information Certificate.  In the event that any goods, documents of title or other Collateral are at any time after the date hereof in the custody, control or possession of any other person not referred to in the Information Certificate or such carriers, Borrower shall promptly notify Lender thereof in writing.  Promptly upon Lender's request, Borrower shall deliver to Lender a Collateral Access Agreement duly authorized, executed and delivered by such person and Borrower.

(i)     Borrower shall take any other actions reasonably requested by Lender from time to time to cause the attachment, perfection and first priority of, and the ability of Lender to enforce, the security interest of Lender in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that Borrower's signature thereon is required therefor, (ii) causing Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, and (iv) obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.

## SECTION 6.  COLLECTION AND ADMINISTRATION OF RECEIVABLES

6.1     <u>Collection Account; Loan Loss Reserve Account</u>.

(a)     Prior to the closing under this Agreement, Borrower shall, or shall cause the Servicer to, establish and maintain with the Deposit Bank (or another Eligible Institution acceptable to Lender) a segregated, non-interest bearing trust account designated the Collection Account and entitled "Fintech Financial, LLC – Argon X LLC Collection Account."

(b)     Borrower shall, or shall cause Servicer to, establish and maintain with the Deposit Bank a segregated, non-interest bearing trust account designated the Loan Loss Reserve Account and entitled "Fintech Financial, LLC – Argon X LLC Loan Loss Reserve Account."

(c)     All amounts on deposit in any of the Pledged Accounts shall upon the direction of Lender or Servicer be invested in Permitted Investments, such Permitted Investments to mature, or otherwise become payable without penalty or premium, no later than the following payment date on the Loans.

(d)      The Pledged Accounts shall be the property of Borrower and shall be so treated for all tax purposes.  All earnings on amounts on deposit in each such Account shall be for the account of Borrower, and Borrower agrees that it shall include such earnings in its income for all tax purposes and shall be liable for any taxes thereon.  Funds deposited in the Pledged Accounts shall not be commingled with any other funds of Borrower or any of its Affiliates.

(e)      Borrower hereby grants permission and authority to the Lender's Accountant to have ongoing access to the Pledged Accounts and to initiate transfers of the funds to and from the Pledged Accounts in order to carry out the administration of such accounts in accordance with the provisions of this Section 6.  Borrower agrees to execute and deliver such consents, authorizations, powers of attorney and other documents as may be required by the Deposit Bank, payment processor or other intermediary in order for the Lender's Accountant to carry out its responsibilities under this Agreement and the other Financing Agreements.  Lender agrees to indemnify and hold Borrower harmless from any and all damages resulting from any misappropriation of funds caused by the gross negligence or willful misconduct of Lender or Lender's Accountant.

(f)      Following any Event of Default, Lender may direct the Deposit Bank to follow the exclusive instructions of Lender with respect to disposition and investment of funds in the Pledged Accounts.  In addition, following any Event of Default, the Lender may, or may direct Borrower or the Servicer to (in which case Borrower and/or Servicer shall), notify the Account Parties under the Receivables to make all payments on such Receivables directly to the Collection Account or such other account as may be specified by Lender.

6.2      <u>Collection of Receivables</u>.

(a)      Borrower shall direct the Account Parties to directly remit all payments on the Receivables electronically to the Collection Account at the Deposit Bank and to send any cash, checks, money orders or other payments on the Receivables to the collection account established at the Deposit Bank.  Borrower agrees that all payments made to such Pledged Accounts or other funds received and collected by Lender, whether in respect of the Receivables or as proceeds of other Collateral or otherwise shall be treated as payments to Lender in respect of the Obligations and therefore shall constitute the property of Lender to the extent of the then outstanding Obligations.

(b)      Borrower and its members, managers, employees, agents or Affiliates shall, acting as trustee for Lender, receive, as the property of Lender, any cash, checks, money orders or any other payment relating to and/or proceeds of Receivables, Collections or other Collateral which come into their possession or under their control and immediately upon receipt thereof, shall deposit or cause the same to be deposited in the Collection Account, or remit the same or cause the same to be remitted, in kind, to Lender.  In no event shall the same be commingled with Borrower's own funds.

6.3     Application of Amounts in the Collection Account.

(a)     On Wednesday of each week (or if Wednesday is not a Business Day, then on the first Business Day thereafter), or such other day of the week as Lender and Borrower shall agree, the available funds on deposit in the Collection Account shall be applied by the Lender's Accountant in the following manner (the "**Weekly Settlement**"):

(i)     First, to Lender, all Collections that constitute principal payments on the Contracts (the "**Principal Collections**"), which the Lender shall apply to the payment of the outstanding principal of the Loans;

(ii)     Second, to the Loan Loss Reserve Account, an amount up to fifteen percent (15%) of the Collections that constitute  interest payments on the Contracts (the "**Interest Collections**") until the Loan Loss Reserve Account equals fifteen percent (15%) of the Maximum Credit (the "**Target Reserve Account Level**") and to maintain the balance in such Account at the Target Reserve Account Level;

(iii)     Third, to Borrower, seventy (70%) of the Interest Collections, less any portion of the Interest Collections paid into the Loan Loss Reserve Account under clause (ii) above;

(iv)     Fourth, to Lender, thirty percent (30%) of the Interest Collections to the extent necessary to pay all accrued but unpaid interest due on the Loans; and

(v)     Fifth, all other Collections shall be retained in the Collection Account (the "**Retained Amount**"). The Retained Amount shall be used to pay the Monthly Settlement.

(b)     On the first Wednesday after the fourth (4th) day of each  month, the Retained Amount in the Collection Account shall be disbursed by the Lender's Accountant as follows (the "**Monthly Settlement**"):

(i)     First, to Lender, an amount equal to all unpaid accrued interest, fees and expenses due to Lender under the Financing Agreements during the prior month;

(ii)     Second, to Lender, any amount by which the outstanding amount of the Loans exceeds the amount of the Borrowing Base or the Maximum Credit, as applicable;

(iii)     Third, to the Loan Loss Reserve Account, an amount up to fifteen percent (15%) of the Interest Collections received since that last Weekly Settlement, to the extent needed to grow the Loan Loss Reserve Account to the Target Reserve Account Level and to maintain it at the Target Reserve Account Level;

(iv)     Fourth, to Servicer, any amount needed to pay the fees and expenses of the Servicer;

(v) Fifth, to the other Program Vendors, the servicing fees (if any) and any other amounts payable to such vendors under their contracts with Borrower or Parent, as the case may be, for the prior month, to the extent such fees and amounts are not paid directly by Borrower or Parent; and

(vi) Sixth, to Borrower, any amounts remaining in the Collection Account.

6.4 <u>Application of Amounts in the Loan Loss Reserve Account</u>. Promptly following each Weekly Settlement and Monthly Settlement, the available funds on deposit in the Loan Loss Reserve Account shall be disbursed by the Lender's Accountant to Lender if and to the extent that the funds disbursed from the Collection Account pursuant to Section 6.3(a) or (b) were not sufficient to pay Lender the principal, interest or any other amount then due and payable on the Loans.

6.5 <u>Statements</u>. Lender shall render to Borrower each month a statement setting forth the balance in Borrower's loan account(s) maintained by Lender for Borrower pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses. Each such statement shall be subject to subsequent adjustment by Lender but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrower and conclusively binding upon Borrower as an account stated except to the extent that Lender receives a written notice from Borrower of any specific exceptions of Borrower thereto within thirty (30) days after the date such statement has been received by Borrower. Until such time as Lender shall have rendered to Borrower a written statement as provided above, the balance in Borrower's loan account(s) shall be presumptive evidence of the amounts due and owing to Lender by Borrower.

6.6 <u>Payments</u>.

(a) All Obligations shall be payable to the Lender by transfer to such account or to such other place as Lender may designate from time to time. Borrower shall make all payments to Lender on the Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind.

(b) If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Lender. Borrower shall be liable to pay to Lender, and does hereby indemnify and hold Lender harmless for the amount of any payments or proceeds surrendered or returned. This Section 6.6 shall remain effective notwithstanding any contrary action which may be taken by Lender in reliance upon such payment or proceeds. This Section 6.6 shall survive the payment of the Obligations and the termination or nonrenewal of this Agreement.

6.7     Use of Proceeds.  Borrower shall use the proceeds of the Loans provided by Lender to Borrower hereunder only for the acquisition of Contracts and related Receivables from a Loan Originator or the Parent pursuant to an Assignment; provided, however, that Borrower may use the proceeds from the initial Draw on the Closing Date to pay transaction fees relating to the Revolving Credit Facility. In no event shall any of the proceeds be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, as amended.

## SECTION 7.  COLLATERAL REPORTING AND COLLATERAL COVENANTS

7.1     Receivable and Account Reports.

(a)     Borrower shall, or shall cause the Servicer to, provide Lender with the following reports in form and substance reasonably satisfactory to Lender:

(i)     on a daily basis, a report with respect to all Collections received, broken down by principal, interest and other fees, and an updated list of outstanding Receivables, including any past due amounts, and such other information regarding the Receivables as Lender shall reasonably request from time to time;

(ii)     within ten (10) days following the end of each month, copies of bank statements from the Deposit Bank with respect to all activity in the Collection Account and the Loan Loss Reserve Account, and such other information regarding the Pledged Accounts as Lender shall reasonably request from time to time;

(iii)     such other reports as to the Receivables or other Collateral as Lender shall reasonably request from time to time.

(b)     If any of Borrower's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, Borrower hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Lender and to follow Lender's instructions with respect to further services at any time that an Event of Default exists or has occurred and is continuing.

7.2     Covenants Regarding Receivables.

(a)     Borrower shall notify Lender promptly of: (i) the assertion of any claims, offsets, defenses or counterclaims by any Account Party or any disputes with Account Parties, or any settlement, adjustment or compromise thereof, (ii) all material adverse information relating to the financial condition of any Account Party, and (iii) any event or circumstance which, to Borrower's knowledge would cause Lender to consider any existing Receivables as no longer constituting Eligible Receivables.  No extension or other modification of any Receivables shall be granted to any Account Party without Lender's consent, except for extensions in the ordinary course of Borrower's business in accordance with practices and policies previously disclosed in

27

writing to Lender and except as set forth in the reports delivered to Lender pursuant to Section 7.1(a) above. So long as no Event of Default exists or has occurred and is continuing, Borrower shall settle, adjust or compromise any claim, offset, counterclaim or dispute with any Account Party. At any time that an Event of Default exists or has occurred and is continuing, Lender shall, at its option, have the exclusive right to settle, adjust or compromise any claim, offset, counterclaim or dispute with Account Parties or grant any credits, discounts or allowances.

(b)     With respect to each Receivable: (i) the amounts shown on any report or schedule delivered to Lender shall be true and complete, (ii) no payments shall be made thereon except payments immediately delivered to Lender pursuant to the terms of this Agreement, (iii) no extension or modification of any of the foregoing shall be granted to any Account Party except as reported to Lender in accordance with this Agreement and except for extensions made or given in the ordinary course of Borrower's business in accordance with practices and policies previously disclosed to Lender, (iv) there shall be no setoffs, deductions, contras, defenses, counterclaims or disputes existing or asserted with respect thereto except as reported to Lender in accordance with the terms of this Agreement, and (v) none of the transactions giving rise thereto will violate any applicable foreign, Federal, State or local laws or regulations, all documentation relating thereto will be legally sufficient under such laws and regulations and all such documentation will be legally enforceable in accordance with its terms.

(c)     Lender shall have the right at any time or times, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to any Receivable or other Collateral, by mail, telephone, facsimile transmission or otherwise.

7.3     <u>Power of Attorney</u>.  Borrower hereby irrevocably designates and appoints Lender (and all persons designated by Lender) as Borrower's true and lawful attorney-in-fact, and authorizes Lender, in Borrower's or Lender's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on Receivables or other Collateral, (ii) enforce payment of Receivables by legal proceedings or otherwise, (iii) exercise all of Borrower's rights and remedies to collect any Receivable or other Collateral, (iv) sell or assign any Receivable upon such terms, for such amount and at such time or times as the Lender deems advisable, (v) settle, adjust, compromise, extend or renew an Account, (vi) discharge and release any Receivable, (vii) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against an Account Party or other obligor in respect of any Receivables or other Collateral, (viii) notify the post office authorities to change the address for delivery of remittances from Account Parties or other obligors in respect of Receivables or other proceeds of Collateral to an address designated by Lender, and open and dispose of all mail addressed to Borrower and handle and store all mail relating to the Collateral; and (ix) do all acts and things which are necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement and the other Financing Agreements and (b) at any time to (i) take control in any manner of any item of payment in respect of Receivables or constituting Collateral or otherwise received in or for deposit in the Pledged Accounts or otherwise received by Lender, (ii) have access to any lockbox or postal box into which remittances from Account Parties or other obligors in respect of Receivables or other proceeds of Collateral are sent or received, (iii) endorse Borrower's name upon any items of payment in respect of Receivables or constituting Collateral or otherwise received by Lender  and deposit the same in Lender's account for

28

application to the Obligations, (iv) endorse Borrower's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Receivable or any goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, (v) clear Inventory through U.S. Customs or foreign export control authorities in Borrower's name, Lender's name or the name of Lender's designee, and to sign and deliver to customs officials powers of attorney in Borrower's name for such purpose, and to complete in Borrower's or Lender's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, (vi) sign Borrower's name on any verification of Receivables and notices thereof to Account Parties or any secondary obligors or other obligors in respect thereof. Borrower hereby releases Lender and its officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Lender's own gross negligence or willful misconduct as determined pursuant to a final nonappealable order of a court of competent jurisdiction.

7.4    Right to Cure.   Lender may, at its option, (a) upon notice to Borrower, cure any default by Borrower under any material agreement with a third party that affects the Collateral, its value or the ability of Lender to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Lender therein or the ability of Borrower to perform its obligations hereunder or under the other Financing Agreements, (b) pay or bond on appeal any judgment entered against Borrower, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto. Lender may add any amounts so expended to the Obligations and charge Borrower's account therefor, such amounts to be repayable by Borrower on demand. Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower. Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.5    Access to Premises.   From time to time as reasonably requested by Lender, at the cost and expense of Borrower, (a) Lender or its designee shall have complete access to all of Borrower's premises during normal business hours and after notice to Borrower, or at any time and without notice to Borrower if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of Borrower's books and records, including the Records, and (b) Borrower shall promptly furnish to Lender such copies of such books and records or extracts therefrom as Lender may reasonably request, and (c) Lender or its designee may use during normal business hours such of Borrower's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Receivables and realization of other Collateral. Borrower shall not be obligated to reimburse Lender more than $5,000 for each such inspection, unless an Event of Default shall have occurred and be continuing.

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which are a continuing condition of the making of Loans by Lender to Borrower:

8.1     Limited Liability Company Existence; Power and Authority.  Borrower is a special purpose limited liability company duly organized and in good standing under the laws of its state of formation and is duly qualified as a foreign limited liability company and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on Borrower's financial condition, results of operation or business or the rights of Lender in or to any of the Collateral.  The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within Borrower's limited liability company powers, (b)  have been duly authorized, (c) are not in contravention of law or the terms of Borrower's certificate of organization, operating agreement, or other organizational documentation, or any indenture, agreement or undertaking to which Borrower is a party or by which Borrower or its property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of Borrower.  This Agreement and the other Financing Agreements constitute legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms.

8.2     Name; State of Organization; Chief Executive Office; Collateral Locations.

(a)     The exact legal name of Borrower is as set forth on the signature page of this Agreement and in the Information Certificate.  Borrower has not, during the past five years, been known by or used any other limited liability company or fictitious name or been a party to any merger or consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except as set forth in the Information Certificate.

(b)     Borrower is an organization of the type and organized in the jurisdiction set forth in the Information Certificate.  The Information Certificate accurately sets forth the organizational identification number of Borrower or accurately states that Borrower has none and accurately sets forth the federal employer identification number of Borrower.

(c)     The chief executive office and mailing address of Borrower and Borrower's Records concerning Receivables are located only at the address identified as such in Schedule 8.2 to the Information Certificate and its only other places of business and the only other locations of Collateral, if any, are the addresses set forth in Schedule 8.2 to the Information Certificate, subject to the right of Borrower to establish new locations in accordance with Section 9.2 below.  The Information Certificate correctly identifies any of such locations which are not owned by Borrower and sets forth the owners and/or operators thereof.

(d)     As of the date hereof, the Parent Members own one hundred percent (100%) of the issued and outstanding membership interests of the Parent, and the Parent owns one hundred percent (100%) of the issued and outstanding membership interests of Borrower and each Loan Originator (other than the Parent).

8.3     <u>Financial Statements; No Material Adverse Change</u>.   All financial statements relating to Borrower which have been or may hereafter be delivered by Borrower to Lender have been prepared in accordance with GAAP (except as to any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any notes) and fairly present the financial condition and the results of operation of Borrower as at the dates and for the periods set forth therein.  Except as disclosed in any interim financial statements furnished by Borrower to Lender prior to the date of this Agreement, there has been no Material Adverse Change of Borrower, since the date of the most recent audited financial statements furnished by Borrower to Lender prior to the date of this Agreement.

8.4     <u>Priority of Liens; Title to Properties</u>.   The security interests and liens granted to Lender under this Agreement and the other Financing Agreements constitute valid and perfected first priority liens and security interests in and upon the Collateral subject only to the liens indicated on Schedule 8.4 to the Information Certificate and the other liens permitted under Section 9.8 hereof.  Borrower has good and marketable fee simple title to or valid leasehold interests in all of its Real Property and good, valid and merchantable title to all of its other properties and assets subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Lender and such others as are specifically listed on Schedule 8.4 to the Information Certificate or permitted under Section 9.8 hereof.

8.5     <u>Tax Returns</u>.   Borrower has filed, or caused to be filed, in a timely manner all tax returns, reports and declarations which are required to be filed by it, except those for which extensions have been timely filed.  All information in such tax returns, reports and declarations is complete and accurate in all material respects.  Borrower has paid or caused to be paid all taxes due and payable or claimed due and payable in any assessment received by it, except taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower and with respect to which adequate reserves have been set aside on its books.  Adequate provision has been made for the payment of all accrued and unpaid Federal, State, county, local, foreign and other taxes whether or not yet due and payable and whether or not disputed.

8.6     <u>Litigation</u>.   Except as set forth in Schedule 8.6 to the Information Certificate, there is no present investigation by any Governmental Authority pending, or to the best of Borrower's knowledge threatened, against or affecting Borrower, its assets or business and there is no action, suit, proceeding or claim by any Person pending, or to the best of Borrower's knowledge threatened, against Borrower or its assets or goodwill, or against or affecting any transactions contemplated by this Agreement, which if adversely determined against Borrower would result in any Material Adverse Change of Borrower or would impair the ability of Borrower to perform its obligations hereunder or under any of the other Financing Agreements to which it is a party or of Lender to enforce any Obligations or realize upon any Collateral.

31

8.7     Compliance with Other Agreements and Applicable Laws.   Except as set forth in Schedule 8.7 to the Information Certificate, Borrower, the Parent and each Loan Originator have all licenses, permits, certificates, approvals or similar authorizations required to be obtained or filed in connection with the operation of the Program and all of such licenses, permits, certificates, approvals or similar authorizations are valid and in full force and effect.  Neither Borrower, the Parent nor any Loan Originator is in default in any material respect under, or in violation in any material respect of any of the terms of, any agreement, contract, instrument, lease or other commitment to which it is a party or by which it or any of its assets are bound, and the Program conducted by Borrower, the Parent and the Loan Originators complies with all material respects with all applicable provisions of laws, rules, regulations, licenses, permits, approvals and orders of any foreign, Federal, State or local Governmental Authority.

8.8     Environmental Compliance.

(a)     Except as set forth on Schedule 8.8 to the Information Certificate, Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates any applicable Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and the operations of Borrower complies in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.

(b)     Except as set forth on Schedule 8.8 to the Information Certificate, there has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other person nor is any pending or to the best of Borrower's knowledge threatened, with respect to any noncompliance with or violation of the requirements of any Environmental Law by Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects Borrower or its business, operations or assets or any properties at which Borrower has transported, stored or disposed of any Hazardous Materials.

(c)     Borrower has no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(d)     Borrower has all licenses, permits, certificates, approvals or similar authorizations required to be obtained or filed in connection with the operations of Borrower under any Environmental Law and all of such licenses, permits, certificates, approvals or similar authorizations are valid and in full force and effect.

8.9     Employee Benefits.

(a)     Each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state law.  Each Plan which is intended to qualify under Section 401(a)

32

of the Code has received a favorable determination letter from the Internal Revenue Service and to the best of Borrower's knowledge, nothing has occurred which would cause the loss of such qualification. Borrower and its ERISA Affiliates have made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)     There are no pending or to the best of Borrower's knowledge, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)     (i)     No ERISA Event has occurred or is reasonably expected to occur; (ii) the current value of each Plan's assets (determined in accordance with the assumptions used for funding such Plan pursuant to Section 412 of the Code) are not less than such Plan's liabilities under Section 4001(a)(16) of ERISA; (iii) Borrower and its ERISA Affiliates have not incurred and do not reasonably expect to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) Borrower and its ERISA Affiliates have not incurred and do not reasonably expect to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) Borrower and its ERISA Affiliates have not engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

8.10    Bank Receivables.    All of the deposit accounts, investment accounts or other accounts in the name of or used by Borrower maintained at any bank or other financial institution are set forth in Schedule 8.10 to the Information Certificate, subject to the right of Borrower to establish new accounts in accordance with Section 5.3(d) hereof.

8.11    Intellectual Property.    Borrower owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted or proposed to be conducted. As of the date hereof, Borrower does not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described in Schedule 8.11 to the Information Certificate hereto and has not granted any licenses with respect thereto other than as set forth in Schedule 8.11 to the Information Certificate. No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights. To the best of Borrower's knowledge, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by Borrower infringes any patent, trademark, servicemark, tradename, copyright, license or other Intellectual Property owned by any other Person presently and no claim or litigation is pending or threatened against or affecting Borrower contesting its right to sell or use any such Intellectual Property.

8.12    Subsidiaries; Affiliates; Capitalization; Solvency.

(a)     Borrower does not have any direct or indirect Subsidiaries and is not engaged in any joint venture or partnership. The Parent owns and controls all of the membership interests of each of the Loan Originators.

(b)     The issued and outstanding membership interests of Borrower are directly and beneficially owned and held by the Parent, and all of such membership interests have been duly authorized and are fully paid and nonassessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except as disclosed in writing to Lender prior to the date hereof.

(c)     Borrower is Solvent and will continue to be Solvent after the creation of the Obligations, the security interests of Lender and the other transaction contemplated hereunder.

8.13    Labor Disputes.

(a)     Set forth on Schedule 8.13 to the Information Certificate is a list (including dates of termination) of all collective bargaining or similar agreements between or applicable to Borrower and any union, labor organization or other bargaining agent in respect of the employees of Borrower on the date hereof.

(b)     There is (i) no significant unfair labor practice complaint pending against Borrower or, to the best of Borrower's knowledge, threatened against it, before the National Labor Relations Board, and no significant grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement is pending on the date hereof against Borrower or, to best of Borrower's knowledge, threatened against it, and (ii) no significant strike, labor dispute, slowdown or stoppage is pending against Borrower or, to the best of Borrower's knowledge, threatened against Borrower.

8.14    Material Contracts.   Schedule 8.14 to the Information Certificate sets forth all Material Contracts to which Borrower is a party or is bound as of the date hereof.  Borrower has delivered true, correct and complete copies of such Material Contracts to Lender on or before the date hereof.  Borrower is not in breach of or in default under any Material Contract and has not received any notice of the intention of any other party thereto to terminate any Material Contract.

8.15    Program Vendors.   Parent has engaged Microbilt to provide the primary credit scoring services for the Program and has engaged the other vendors listed in Schedule 8.15 to the Information Certificate to perform the loan servicing, payment processing, compliance and other functions required for the operation of the Program (the "**Program Vendors**").

8.16    Credit and Collection Policies.   Borrower has complied in all material respects with its Credit and Collection Policies in the origination, the administration and collection of each Contract and the operation of the Program.

8.17    Representations and Warranties regarding the Contracts.   Borrower makes the following additional representations and warranties with respect to the Contracts:

34

(a)     Each Contract shall comply in all material respects with all Federal Consumer Compliance Laws, and all other applicable consumer laws and equal credit opportunity and disclosure laws.

(b)     Borrower has a valid and enforceable security interest in the collateral, if any, securing the obligations of the Account Party under such Contract, which security interest is duly perfected and is prior to all other present and future liens and security interests (except future tax liens and liens that, by statute, may be granted priority over previously perfected security interests) that now exist or may hereafter arise.

(c)     Each Contract was originated by one of the Loan Originators and assigned by such Loan Originator to Borrower pursuant to duly executed Assignments, and was not originated or owned by any other Person.

(d)     No Contract is subject to any right of rescission, offset, defense or counterclaim to the obligation of the related Account Party to pay the unpaid principal or interest due under such Contract; the operation of the terms of such Contract or the exercise of any right thereunder will not render such Contract unenforceable in whole or in part or subject such Contract to any right of rescission, offset, defense or counterclaim, and no such right of rescission, offset, defense or counterclaim has been asserted.

(e)     Each Contract is in substantially the form of promissory note and other loan documents reviewed and approved by Lender. There have been no amendments or modifications to such Contract and the rights of Borrower thereunder have not been impaired, waived, altered or modified in any material respect, except by written instruments that are part of the Contract File, and no such Contract has been satisfied, subordinated or rescinded.  Each Contract contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the related collateral securing the obligations of the Account Party thereunder.

(f)     To the best knowledge of Borrower, all parties to each Contract to be transferred on such day had full legal capacity to execute such Contract and all documents related thereto and to grant the security interest purported to be granted thereby, if any.

(g)     Borrower has delivered to Lender the Contract File for such Contract, including the electronic file of the Contract. Neither the Loan Originators nor Borrower generates a paper or other tangible copy of any Contract, except as may be required under applicable law upon the request of an Account Party for a paper copy.  In the event that a paper or other tangible copy of any Contract is generated, Borrower shall promptly notify Lender and shall deliver the original of such paper or other tangible copy to Lender at its request.

(h)     All proceeds of each Contract were fully disbursed to the Account Party thereof at the origination of such Contract, there is no requirement for future advances thereunder, and all fees and expenses in connection with the origination of such Contract have been paid.

8.18 <u>Accuracy and Completeness of Information</u>.  All information furnished by or on behalf of Borrower in writing to Lender in connection with this Agreement or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not misleading.  No event or circumstance has occurred which has had or could reasonably be expected to have a material adverse effect on the business, assets or prospects of Borrower, taken as a whole, which has not been fully and accurately disclosed to Lender in writing prior to the date hereof.

8.19 <u>Survival of Warranties; Cumulative</u>.  All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Lender on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender.  The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrower shall now or hereafter give, or cause to be given, to Lender.

## SECTION 9.  AFFIRMATIVE AND NEGATIVE COVENANTS

9.1 <u>Maintenance of Existence</u>.

(a) Borrower shall at all times preserve, renew and keep in full force and effect its limited liability company existence and rights and franchises with respect thereto and maintain in full force and effect all permits, licenses, trademarks, tradenames, approvals, authorizations, leases and contracts necessary to carry on the business as presently or proposed to be conducted.

(b) Borrower shall not change its name unless each of the following conditions is satisfied: (i) Lender shall have received not less than thirty (30) days prior written notice from Borrower of such proposed change in its limited liability company name, which notice shall accurately set forth the new name; and (ii) Lender shall have received  a copy of the amendment to the Certificate of Formation of Borrower providing for the name change certified by the Secretary of State of the jurisdiction of organization of Borrower as soon as it is available.

(c) Borrower shall not change its chief executive office or its mailing address or organizational identification number (or if it does not have one, shall not acquire one) unless Lender shall have received not less than thirty (30) days' prior written notice from Borrower of such proposed change, which notice shall set forth such information with respect thereto as Lender may require and Lender shall have received such agreements as Lender may reasonably require in connection therewith.  Borrower shall not change its type of organization, jurisdiction of organization or other legal structure.

(d) Borrower shall not amend or otherwise change its articles of organization or its operating agreement, including but not limited to any change in the bankruptcy remote,

special purpose nature of Borrower, unless each of the following conditions is satisfied: (i) Lender shall have received not less than thirty (30) days prior written notice from Borrower of such proposed change in its articles of organization or its operating agreement which notice shall accurately set forth the proposed amendments or revisions; (ii) Lender consents to such amendments; and (iii) Lender shall have received, as applicable, a copy of the amendment to the certificate of organization of Borrower certified by the Secretary of State of the jurisdiction of incorporation or organization of Borrower and a copy of any amendment to the operating agreement, in each case as soon as it is available

9.2    New Collateral Locations.    Borrower may only open any new location within the continental United States provided Borrower (a) gives Lender thirty (30) days prior written notice from Borrower of the intended opening of any such new location and (b) executes and delivers, or causes to be executed and delivered, to Lender such agreements, documents, and instruments as Lender may deem necessary or desirable to protect its interests in the Collateral at such location.

9.3    Compliance with Laws, Regulations, Etc.    Borrower shall at all times comply in all material respects with all laws, rules, regulations, licenses, permits, approvals and orders applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority, including ERISA, the Code, the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, Federal Consumer Compliance Laws, and all statutes, rules, regulations, orders, permits and stipulations relating to environmental pollution and employee health and safety, including all of the Environmental Laws.    Borrower, at its expense, shall engage VP Compliance Services, LLC to conduct a compliance review of the Program and to issue a report regarding its findings and any recommendations with respect to ensuring that the Program is in compliance with all applicable law and Federal Consumer Compliance Laws.    Borrower shall deliver a copy of such report to Lender and shall make any reasonable modifications to the Program that such compliance consultant shall recommend. Borrower shall not be required to pay more than $7,500 for each such compliance review and report, which shall be conducted not more than two times a year, unless an Event of Default has occurred and is continuing. Further, Borrower shall continue to retain Professional Bank Services to review its legal compliance and to report periodically, not less than quarterly, to VP Compliance Services, LLC, at the sole cost of Borrower.

9.4    Payment of Taxes and Claims.    Borrower shall duly pay and discharge all taxes, assessments, contributions and governmental charges upon or against it or its properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower, and with respect to which adequate reserves have been set aside on its books.    Borrower shall be liable for any tax or penalties imposed on Lender as a result of the financing arrangements provided for herein and Borrower agrees to indemnify and hold Lender harmless with respect to the foregoing, and to repay to Lender on demand the amount thereof, and until paid by Borrower such amount shall be added and deemed part of the Loans, provided, that, nothing contained herein shall be construed to require Borrower to pay any income or franchise taxes attributable to the income of Lender from any amounts charged or paid hereunder to Lender.    The foregoing indemnity shall survive the payment of the Obligations and the termination or nonrenewal of this Agreement.

9.5    Insurance.    Borrower shall at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by companies of established reputation engaged in the same or similar businesses and similarly situated.  Said policies of insurance shall be reasonably satisfactory to Lender as to form, amount and insurer. Borrower shall furnish certificates, policies or endorsements to Lender as Lender shall require as proof of such insurance, and, if Borrower fails to do so, Lender is authorized, but not required, to obtain such insurance at the expense of Borrower.  All policies shall provide for at least thirty (30) days prior written notice to Lender of any cancellation or reduction of coverage and that Lender may act as attorney for Borrower in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance. Borrower shall cause Lender to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and Borrower shall obtain noncontributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender.  Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Lender as its interests may appear and further specify that Lender shall be paid regardless of any act or omission by Borrower or any of its Affiliates.  At its option, Lender may apply any insurance proceeds received by Lender at any time to the cost of repairs or replacement of Collateral and/or to payment of the Obligations, whether or not then due, in any order and in such manner as Lender may determine or hold such proceeds as cash collateral for the Obligations.

9.6    Financial Statements and Other Information.

(a)    Borrower shall keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of Borrower in accordance with GAAP.  Borrower shall promptly furnish to Lender all such financial and other information as Lender shall reasonably request relating to the Collateral and the assets, business and operations of Borrower, and shall notify the auditors and accountants of Borrower that Lender is authorized to obtain such information directly from them.  Without limiting the foregoing, Borrower shall furnish or cause to be furnished to Lender, the following: (i) within five business days after the end of each fiscal month, the Monthly Borrowing Base Certificate;  (ii) within fifteen (15) days after the end of each fiscal month, monthly unaudited consolidated financial statements, and unaudited consolidating financial statements (including in each case balance sheets, statements of income and loss, statements of cash flow, and statements of shareholders' equity), all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrower as of the end of and through such fiscal month, certified to be correct by the chief financial officer of Borrower, subject to normal year-end adjustments; (iii) within five business days after the end of each fiscal month any other portfolio analysis reports reasonably requested by Lender including but not limited to portfolio analytical reports such as cost per funded loan, delinquency reports, charge-off reports, and call center cost analysis; and (iv) within ninety (90) days after the end of each fiscal year, audited consolidated financial statements and audited consolidating financial statements of Borrower (including in each case balance sheets, statements of income and loss, statements of cash flow and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrower as of the end of

38

and for such fiscal year, together with the unqualified opinion of independent certified public accountants, which accountants shall be an independent accounting firm selected by Borrower and reasonably acceptable to Lender, that such financial statements have been prepared in accordance with GAAP, and present fairly the results of operations and financial condition of Borrower as of the end of and for the fiscal year then ended.

(b)      Borrower shall promptly notify Lender in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or any other property which is security for the Obligations or which would result in any Material Adverse Change of Borrower, (ii) any Material Contract of Borrower being terminated or amended or any new Material Contract entered into (in which event Borrower shall provide Lender with a copy of such Material Contract), (iii) any order, judgment or decree in excess of $25,000 which shall have been entered against Borrower or any of its properties or assets, (iv) any notification of violation of laws or regulations received by Borrower, (v) any ERISA Event, and (vi) the occurrence of any Default or Event of Default.

(c)      Borrower shall furnish or cause to be furnished to Lender such budgets, forecasts, projections and other information respecting the Collateral and the business of Borrower, as Lender may, from time to time, reasonably request. Lender is hereby authorized to deliver a copy of any financial statement or any other information relating to Borrower to any court or other Governmental Authority, to any Affiliate of Lender or to any participant or assignee or prospective participant or assignee. Borrower hereby irrevocably authorizes and directs all accountants or auditors to deliver to Lender, at Borrower's expense, copies of the financial statements of Borrower and any reports or management letters prepared by such accountants or auditors on behalf of Borrower and to disclose to Lender such information as they may have regarding the business of Borrower. Any documents, schedules, invoices or other papers delivered to Lender may be destroyed or otherwise disposed of by Lender one (1) year after the same are delivered to Lender, except as otherwise designated by Borrower to Lender in writing.

9.7     Sale of Assets, Consolidation, Merger, Dissolution, Etc.   Borrower shall not directly or indirectly, merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it; or

(b)      sell, assign, lease, transfer, abandon or otherwise dispose of any Capital Stock or Indebtedness to any other Person or any of its assets to any other Person, except for (i) sales of Inventory in the ordinary course of business, (ii) the disposition of worn-out or obsolete Equipment so long as (A) any proceeds are paid to Lender and (B) such sales do not involve Equipment having an aggregate fair market value in excess of $25,000 for all such Equipment disposed of in any fiscal year of Borrower;

(c)      wind up, liquidate or dissolve; or

(d)      agree to do any of the foregoing.

9.8     Encumbrances.   Borrower shall not create, incur, assume, suffer or permit to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, except:  (a) the security interests and liens of Lender; (b) liens securing the payment of taxes, either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrower and with respect to which adequate reserves have been set aside on its books; (c) nonconsensual statutory liens (other than liens securing the payment of taxes) arising in the ordinary course of Borrower's business; (d) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of Borrower as presently conducted thereon or materially impair the value of the Real Property which may be subject thereto; (e) purchase money security interests in Equipment (including Capital Leases) and purchase money mortgages on Real Property to secure Indebtedness permitted under Section 9.9(b) hereof; and (f) the security interests and liens set forth on Schedule 8.4 to the Information Certificate.

9.9     Indebtedness.   Borrower shall not incur, create, assume, become or be liable in any manner with respect to, suffer or permit to exist, any Indebtedness or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly) the performance, dividends or other obligations of any Person, except:

    (a)     the Obligations;

    (b)     purchase money Indebtedness (including Capital Leases) arising after the date hereof to the extent secured by purchase money security interests in Equipment (including Capital Leases) not to exceed $25,000 in the aggregate at any time outstanding so long as such security interests do not apply to any property of Borrower other than the Equipment so acquired, and the Indebtedness secured thereby does not exceed the cost of the Equipment so acquired; and

    (c)     the Indebtedness set forth on Schedule 9.9 to the Information Certificate.

9.10    Loans, Investments, Etc.   Borrower shall not, directly or indirectly, make, or suffer or permit to exist, any loans or advance money or property to any person, or any investment in (by capital contribution, dividend or otherwise) or purchase or repurchase the Capital Stock or Indebtedness or all or a substantial part of the assets or property of any person, or form or acquire any Subsidiaries, or agree to do any of the foregoing, except:

    (a)     the endorsement of instruments for collection or deposit in the ordinary course of business; and

    (b)     investments in cash or Permitted Investments, provided, that, (i) no Revolving Loans are then outstanding and (ii) the terms and conditions of Section 5.3(d) hereof shall have been satisfied with respect to the deposit account or investment account in which such cash or Permitted Investments are held.

40

9.11 <u>Dividends and Redemptions</u>. Borrower shall not, directly or indirectly, declare or pay any dividends on account of any units of class of Capital Stock of Borrower or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any units of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing. Notwithstanding the foregoing, provided that no Event of Default exists, Borrower shall have the right to make distributions to Parent on a quarterly basis in an amount equal to forty-five (45%) percent of the net income of borrower.

9.12 <u>Transactions with Affiliates</u>. Borrower shall not, directly or indirectly, (a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, manager, agent or other person affiliated with Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than Borrower would obtain in a comparable arm's length transaction with an unaffiliated person or (b) make any payments of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, manager or other Affiliate of Borrower except reasonable compensation to officers, employees and managers for services rendered to Borrower in the ordinary course of business.

9.13 <u>Compliance with ERISA</u>. Borrower shall and shall cause each of its ERISA Affiliates to: (a) maintain each Plan (other than a Multiemployer Plan) in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal and State law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) not terminate any of such Plans so as to incur any liability to the Pension Benefit Guaranty Corporation; (d) not allow or suffer to exist any prohibited transaction involving any of such Plans or any trust created thereunder which would subject Borrower or such ERISA Affiliate to a tax or penalty or other liability on prohibited transactions imposed under Section 4975 of the Code or ERISA; (e) make all required contributions to any Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Code or the terms of such Plan; (f) not allow or suffer to exist any accumulated funding deficiency, whether or not waived, with respect to any such Plan; or (g) not allow or suffer to exist any occurrence of a reportable event or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any such Plan that is a single employer plan, which termination could result in any liability to the Pension Benefit Guaranty Corporation.

9.14 <u>End of Fiscal Years; Fiscal Quarters</u>. Borrower shall, for financial reporting purposes, cause its (a) fiscal years to end on December 31 of each year and (b) fiscal quarters to end on March 31, June 30, September 30 and December 31 of each year.

9.15 <u>Change in Business</u>. Borrower shall not engage in any business other than the business of Borrower on the date hereof and any business reasonably related, ancillary or complimentary to the business in which Borrower is engaged on the date hereof.

9.16    Change in Credit and Collection Policies.   Borrower shall not make any material change in the terms and provisions of the Credit and Collection Policies without the prior written consent of Lender.

9.17    Change in Operation of Program.   Other than any changes as may be required to comply with any applicable laws or regulations, neither Borrower nor Parent shall not make any material change in the operation of the Program as presently conducted, including without limitation the termination or replacement of any of the Program Vendors listed on Schedule 8.15 to this Agreement, without the prior written consent of Lender.

9.18    Costs and Expenses.   Borrower shall pay to Lender the Lender's legal costs to the extent set forth in Section 4.1(m) of this Agreement, together with all non-legal costs, expenses, filing fees and taxes paid or payable by Lender in connection with the preparation, negotiation, execution, delivery and closing of the transactions under this Agreement.  In addition, Borrower shall pay to Lender on demand all costs, expenses (including reasonable attorney's fees), filing fees and taxes paid or payable in connection with the administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (a) all costs and expenses of filing or recording (including Uniform Commercial Code financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); (b) costs and expenses and fees for insurance premiums, environmental audits, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Pledged Accounts, together with Lender's customary charges and fees with respect thereto; (c) costs and expenses of preserving and protecting the Collateral; (d) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (e) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations of the Collateral and Borrower's operations (which shall be limited to two times per year, unless an Event of Default shall have occurred and be continuing), plus a per diem charge at the rate of $750 per person per day for Lender's examiners in the field; and (f) the reasonable attorneys' fees and disbursements to Lender in connection with any of the foregoing.

9.19    Further Assurances.   At the reasonable request of Lender at any time and from time to time, Borrower shall, at its expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements.  Lender may at any time and from time to time request a certificate from an officer of Borrower

representing that all conditions precedent to the making of Loans contained herein are satisfied. In the event of such request by Lender, Lender may, at its option, cease to make any further Loans until Lender has received such certificate and, in addition, Lender has determined that such conditions are satisfied.

**SECTION 10.**        **EVENTS OF DEFAULT AND REMEDIES**

10.1    <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "**Event of Default**", and collectively as "**Events of Default**":

(a)    Borrower fails to pay when due any of the Obligations and Borrower shall fail to cure such payment default within ten (10) days after such due date;

(b)    Borrower fails to perform any of the covenants, terms, conditions or provisions contained in Section 6 of this Agreement (<u>Collection and Administration of Receivables</u>);

(c)    Borrower fails to perform any of the terms, covenants, conditions or provisions contained in Section 7 of this Agreement (<u>Collateral Reporting and Collateral Covenants</u>), and Borrower shall fail to cure such default within three (3) Business Days after written notice thereof to Borrower;

(d)    Borrower fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements, other than those referred to in Section 10.1(a), (b) or (c) above, and Borrower shall fail to cure such default within thirty (30) days after written notice thereof to Borrower;

(e)    any representation, warranty or statement of fact made by Borrower to Lender in this Agreement, the other Financing Agreements or any other agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect;

(f)    any Obligor revokes or terminates, or purports to revoke or terminate, or fails to perform any of the terms, covenants, conditions or provisions of, any guarantee, endorsement or other agreement of such party in favor of Lender;

(g)    any one or more judgments for the payment of money are rendered against Borrower or any Obligor in excess of $25,000 in the aggregate and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against Borrower or any Obligor or any of their assets;

(h)    any Obligor (being a natural person or a general partner of an Obligor which is a partnership) dies or Borrower or any Obligor, which is a partnership, limited liability

43

company, limited liability partnership or a corporation, dissolves or suspends or discontinues doing business;

(i)     Borrower or any Obligor becomes insolvent (however defined or evidenced), makes an assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors;

(j)     a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against Borrower or any Obligor or all or any part of its properties and such petition or application is not dismissed within sixty (60) days after the date of its filing or Borrower or any Obligor shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(k)     a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or in equity) is filed by Borrower or any Obligor or for all or any part of its property; or

(l)     any default by Borrower or any Obligor in respect any Indebtedness (other than Indebtedness owing to Lender), in any case in an amount in excess of $25,000, which default continues for more than the applicable cure period, if any, with respect thereto, or any default by Borrower or any Obligor under any Material Contract, which default continues for more than the applicable cure period, if any, with respect thereto;

(m)     any material provision hereof or of any of the other Financing Agreements shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Lender) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Financing Agreements has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Financing Agreements shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(n)     an ERISA Event shall occur which results in or could reasonably be expected to result in liability of Borrower in an aggregate amount in excess of $25,000;

(o)     any Change of Control;

(p)     the indictment by any Governmental Authority, or as Lender may reasonably and in good faith determine, the threatened indictment by any Governmental Authority of Borrower or any Obligor of which Borrower, any Obligor or Lender receives notice,

118204924_1

in either case, as to which there is a reasonable possibility of an adverse determination, in the good faith determination of Lender, under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against Borrower pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of (i) any of the Collateral having a value in excess of $25,000 or (ii) any other property of Borrower which is necessary or material to the conduct of its business;

(q)     there shall be a Material Adverse Change of Borrower and the other Obligors, taken as a whole, after the date hereof;

(r)     there shall be an event of default under any of the other Financing Agreements;

(s)     Borrower shall fail to comply with the Minimum Utilization Requirement;

(t)     Borrower shall fail to engage and utilize at all times at least two Automated Clearing House ("ACH") payment processor vendors for the processing of the collection and processing of the Receivables; or

(u)     Borrower or Parent shall terminate or replace any of the Program Vendors, or assign any of the functions of the Program to any other vendor without the prior approval of Lender.

10.2    <u>Remedies</u>.

(a)     At any time an Event of Default exists or has occurred and is continuing, or at any time following Lender's demand for payment (whether or not an Event of Default has occurred and is continuing), Lender shall have all rights and remedies provided in this Agreement, the other Financing Agreements, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by Borrower or any Obligor, except as such notice or consent is expressly provided for hereunder or required by applicable law. All rights, remedies and powers granted to Lender hereunder, under any of the other Financing Agreements, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by Borrower of this Agreement or any of the other Financing Agreements. Lender may, at any time or times, proceed directly against Borrower or any Obligor to collect the Obligations without prior recourse to any Obligor or any of the Collateral.

(b)     Without limiting the foregoing, Lender may, in its discretion and, without limitation, (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender (provided, that, upon the occurrence of any Event of Default described in Sections 10.1(j) and 10.1(k), all Obligations shall automatically become immediately due and payable), (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or

45

complete processing, manufacturing and repair of all or any portion of the Collateral, (iii) require Borrower, at Borrower's expense, to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (vi) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with the Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of Borrower, which right or equity of redemption is hereby expressly waived and released by Borrower and/or (vii) terminate this Agreement. If any of the Collateral is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender. If notice of disposition of Collateral is required by law, ten (10) days prior notice by Lender to Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrower waives any other notice. In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, Borrower waives the posting of any bond which might otherwise be required.

(c)     Lender may enforce Borrower's rights against any Account Party, secondary obligor or other obligor in respect of any of the Receivables. Without limiting the generality of the foregoing, Lender may at such time or times (i) notify any or all Account Parties, secondary obligors or other obligors in respect thereof that the Receivables have been assigned to Lender and that Lender has a security interest therein and Lender may direct any or all Account Parties, secondary obligors and other obligors to make payment of Receivables directly to Lender, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the Account Party or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and Lender shall not be liable for its failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Lender  may deem necessary or desirable for the protection of its interests. At Lender's request, all invoices and statements sent to any Account Party shall state that the Receivables and such other obligations have been assigned to Lender and are payable directly and only to Lender and Borrower shall deliver to Lender such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Receivables as Lender may require.

(d)     To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (i) to fail to incur expenses reasonably deemed significant by Lender to prepare Collateral for disposition

46

or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Parties, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Parties and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other persons, whether or not in the same business as Borrower for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

(e)     Lender may apply the cash proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition to payment of the Obligations, in whole or in part and in such order as Lender may elect, whether or not then due. Borrower shall remain liable to Lender for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and legal expenses.

(f)     Without limiting the foregoing, Lender may at any time, at its option, without notice, (i) cease making Loans or reduce the lending formulas or amounts of Revolving Loans available to Borrower (ii) terminate any provision of this Agreement providing for any future Loans to be made by Lender to Borrower and/or (iii) establish such Reserves as Lender determines without limitation or restriction, notwithstanding anything to the contrary contained herein.

**SECTION 11.      JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW**

11.1     Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)      The validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New Jersey but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New Jersey.

(b)      Borrower and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the Superior Court of New Jersey, Mercer County, and the United States District Court for the District of New Jersey, Mercer County Vicinage, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower or its property).

(c)      Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Borrower in any other manner provided under the rules of any such courts.

(d)      BORROWER AND LENDER EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.    BORROWER AND LENDER EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)    Lender shall not have any liability to Borrower (whether in tort, contract, equity or otherwise) for losses suffered by Borrower in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct of Lender.  Except as prohibited by law, Borrower waives any right which it may have to claim or recover in any litigation with Lender any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  Borrower:  (i) certifies that neither Lender nor any representative, agent or attorney acting for or on behalf of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Financing Agreements and (ii) acknowledges that in entering into this Agreement and the other Financing Agreements, Lender is relying upon, among other things, the waivers and certifications set forth in this Section 11.1 and elsewhere herein and therein.

11.2    Waiver of Notices.    Borrower hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein.  No notice to or demand on Borrower which Lender may elect to give shall entitle Borrower to any other or further notice or demand in the same, similar or other circumstances.

11.3    Amendments and Waivers.  Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender, and as to amendments, as also signed by an authorized officer of Borrower.  Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar in kind or otherwise.

11.4    Waiver of Counterclaims.    Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

11.5    Indemnification.    Borrower shall indemnify and hold Lender, and its members, managers, directors, agents and employees, harmless from and against any and all losses, claims, damages, liabilities, costs or expenses imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced, asserted or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or

proceeding related to any of the transactions contemplated hereby, or the relationship between Lender and Borrower, or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the reasonable attorneys' fees and expenses.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion which it is permitted to pay under applicable law to Lender in satisfaction of indemnified matters under this Section.  The foregoing indemnity shall survive the payment of the Obligations and the termination or nonrenewal of this Agreement.

11.6    Waiver of Consequential and Other Damages.   To the fullest extent permitted by applicable law, Borrower shall not assert, and Borrower hereby waives, any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby.

**SECTION 12.        TERM OF AGREEMENT; MISCELLANEOUS**

12.1    <u>Term</u>.

(a)    This Agreement and the other Financing Agreements shall become effective as of the date set forth on the first page hereof and shall continue in full force and effect for a term ending on the date one year (1) year from the date hereof (the "**Termination Date**"), and for subsequent one-year renewal terms thereafter, unless sooner terminated pursuant to the terms hereof.

(b)    Borrower may terminate this Agreement prior to the Termination Date upon sixty (60) days advance written notice to Lender; provided, however, that Borrower may not terminate this Agreement sooner than six (6) months from the date hereof unless Borrower and Lender mutually agree to an earlier date in writing; and further provided, that such early termination by Borrower at any time during the first year of this Agreement shall be subject to the payment of the Early Termination Fee referred to below. On or prior to the termination of this Agreement, Borrower shall pay in full all outstanding Revolving Loans and other Obligations, including the Early Termination Fee referred to below.

(c)    No termination of this Agreement or the other Financing Agreements shall relieve or discharge Borrower of its respective duties, obligations and covenants under this Agreement or the other Financing Agreements until all Obligations have been fully and finally discharged and paid, and Lender's continuing security interest in the Collateral and the rights and remedies of Lender hereunder, under the other Financing Agreements and applicable law, shall remain in effect until all such Obligations have been fully and finally discharged and paid. Accordingly, Borrower waives any rights which it may have under the UCC to demand the filing of termination statements with respect to the Collateral, and Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement is terminated in accordance with its terms and all of the Obligations are paid and satisfied in full in immediately available funds.

(d)    If for any reason this Agreement is terminated by Borrower prior to the Termination Date, in view of the impracticality and extreme difficulty of ascertaining actual damages to Lender and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrower agrees to pay to Lender, upon the effective date of such termination, an early termination fee ("**Early Termination Fee**") equal to ten percent (10.0%) of the Maximum Credit.

SUCH EARLY TERMINATION FEE SHALL BE PRESUMED TO BE THE AMOUNT OF DAMAGES SUSTAINED BY LENDER AS A RESULT OF SUCH EARLY TERMINATION AND BORROWER AGREES THAT IT IS REASONABLE UNDER THE CIRCUMSTANCES CURRENTLY EXISTING.  IN ADDITION, LENDER SHALL BE ENTITLED TO SUCH EARLY TERMINATION FEE UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT DESCRIBED IN SECTIONS 10.1(J) AND 10.1(K) HEREOF, EVEN IF LENDER DOES NOT EXERCISE ITS RIGHT TO TERMINATE THIS AGREEMENT, BUT ELECTS, AT ITS OPTION, TO PROVIDE FINANCING TO BORROWER OR PERMIT THE USE OF CASH COLLATERAL UNDER THE UNITED STATES BANKRUPTCY CODE.  THE EARLY TERMINATION FEE PROVIDED FOR IN THIS SECTION 12.1 SHALL BE DEEMED INCLUDED IN THE OBLIGATIONS.

12.2    Interpretative Provisions.

(a)    All terms used herein which are defined in Article 1 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement.

(b)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(c)    All references to Borrower and Lender pursuant to the definitions set forth in the recitals hereto, or to any other person herein, shall include their respective successors and assigns.

(d)    The words "hereof", "herein", "hereunder", "this Agreement" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)    The word "including" when used in this Agreement shall mean "including, without limitation".

(f)    All references to the term "good faith" used herein when applicable to Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned.  Borrower shall have the burden of proving any lack of good faith on the part of Lender alleged by Borrower at any time.

(g)    An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3 or is cured in a manner satisfactory to Lender, if such Event of Default is capable of being cured as determined by Lender.

(h)     Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements of Borrower most recently received by Lender prior to the date hereof.

(i)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

(j)     Unless otherwise expressly provided herein, (i) references herein to any agreement, document or instrument shall be deemed to include all subsequent amendments, modifications, supplements, extensions, renewals, restatements or replacements with respect thereto, but only to the extent the same are not prohibited by the terms hereof or of any other Financing Agreement, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting the statute or regulation.

(k)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(l)     This Agreement and other Financing Agreements may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(m)     This Agreement and the other Financing Agreements are the result of negotiations among and have been reviewed by counsel to Lender and the other parties, and are the products of all parties.  Accordingly, this Agreement and the other Financing Agreements shall not be construed against Lender merely because of Lender's involvement in their preparation.

12.3     Notices.  All notices, requests and demands hereunder shall be in writing and deemed to have been given or made:  if delivered in person, immediately upon delivery; if by telex, telegram or facsimile transmission, immediately upon sending and upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next Business Day, one (1) Business Day after sending; and if by certified mail, return receipt requested, five (5) days after mailing.  All notices, requests and demands upon the parties are to be given to the following addresses (or to such other address as any party may designate by notice in accordance with this Section):

If to Borrower:            Argon X LLC
                          760 Village Center Drive, Suite 230
                          Burr Ridge, IL 60527
                          Attention: Compliance

|  |  |
|---|---|
| With a copy to: | Argon Credit LLC<br>760 Village Center Drive, Suite 230<br>Burr Ridge, IL 60527<br>Attention:  Compliance |
| If to Lender: | Fintech Financial, LLC<br>101 Research Park Drive<br>Mission, SD 57570<br>Attn: Gabe Doney, Chief Credit Officer |
| With a copy to: | Timothy Anderson, Esquire<br>Dilworth Paxson LLP<br>1500 Market Street, Suite 3500E<br>Philadelphia, PA 19102 |

12.4    <u>Partial Invalidity</u>. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

12.5    <u>Successors</u>.   This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender, Borrower and their respective successors and assigns, except that Borrower may not assign its rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of Lender. Lender may, after notice to Borrower, assign its rights and delegate its obligations under this Agreement and the other Financing Agreements and further may assign, or sell participations in, all or any part of the Loans or any other interest herein to another financial institution or other person, in which event, the assignee or participant shall have, to the extent of such assignment or participation, the same rights and benefits as it would have if it were the Lender hereunder, except as otherwise provided by the terms of such assignment or participation.

12.6    <u>Entire Agreement</u>.   This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

12.7    Injunctive Relief.  Borrower recognizes that if it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Financing Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities,

<div align="center">53</div>

any remedy at law may prove to be inadequate relief to Lender; therefore, Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

12.8    Publicity.    Borrower hereby authorizes Lender to make appropriate announcements regarding the credit facility entered into between Borrower and Lender, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate.

12.9    Acknowledgments.  Borrower hereby acknowledges that (i) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Financing Agreements; (ii) Lender has no fiduciary relationship to Borrower or any other party to the Financing Agreements (or any of them) and the relationship hereunder between Lender and Borrower is solely that of debtor and creditor; and (iii) no partnership or joint venture exists among Borrower and Lender.

12.10   Counterparts, Etc.   This Agreement or any of the other Financing Agreements may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any of the other Financing Agreements by telefacsimile shall have the same force and effect as the delivery of an original executed counterpart of this Agreement or any of such other Financing Agreements.  Any party delivering an executed counterpart of any such agreement by telefacsimile shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreement.

*[signatures appear on next page]*

54

IN WITNESS WHEREOF, Lender and Borrower have caused these presents to be duly executed as of the day and year first above written.

BORROWER:

ARGON X, LLC

By: _____
Name: GARY ZUASIC
Title: President

LENDER:

FINTECH FINANCIAL, LLC

By: _____
Name: Coope Money
Title: Chief Credit Officer

54

[Execution version]

**SCHEDULE 1.23**

**TO**

**LOAN AND SECURITY AGREEMENT**

**<u>Eligible States</u>**

Alabama

California

Louisiana

Georgia

Utah

Illinois

**SCHEDULE 1.43**

**TO**

**LOAN AND SECURITY AGREEMENT[1]**

**<u>Loan Originators</u>**

Argon Credit of Alabama LLC

Argon Credit of California LLC

Argon Credit of Louisiana LLC

Argon Credit of Georgia LLC

Argon Credit of Utah LLC

Argon Credit of Illinois LLC

---

[1] Other than Argon Credit of Alabama LLC and Argon Credit LLC, none of the above listed entities are currently licensed in any state to conduct the Program, but are in the process of obtaining such licensure in the states reflected in their limited liability company name. Argon Credit of Georgia LLC does not require licensure in Georgia to conduct the Program. Argon Credit LLC is currently licensed in the States of California, Illinois and Utah to conduct the Program.

**SCHEDULE 4.3**

**TO**

**LOAN AND SECURITY AGREEMENT**

**Post-Closing Items**

**None**

**SCHEDULE 8.16**

**TO**

**LOAN AND SECURITY AGREEMENT**

**Program Vendors**

The following functions of the Program will be performed by the vendors listed below:

| | |
|---|---|
| Credit scoring and underwriting of consumer loans | Microbilt Corporation |
| Servicer | Argon Credit LLC |
| Subservicer for consumer loans | First Associates Loan Servicing, LLC |
| Compliance Consultants | VP Compliance Services, LLC<br><br>Professional Bank Services |
| Treasury management | Raible, Cornaglia, Wenstrom & Raible, LLC |
| Deposit bank | Wells Fargo Bank, N.A. |
| Payment processing | First Associates Loan Servicing, LLC |

**EXHIBIT A**

**TO**

**LOAN AND SECURITY AGREEMENT**

**<u>Form of Assignment of Contracts</u>**

[see attachment]

**EXHIBIT B**

**TO**

**LOAN AND SECURITY AGREEMENT**

**<u>Information Certificate</u>**

[see attachment]

**EXHIBIT C**

**TO**

**LOAN AND SECURITY AGREEMENT**

**<u>Revolving Loan Note</u>**

[see attachment]

**LOAN AND SECURITY AGREEMENT**

**BY AND BETWEEN**

**FINTECH FINANCIAL, LLC**

**AS LENDER**

**AND**

**ARGON X LLC**

**AS BORROWER**

**DATED:  MAY 1, 2015**

## TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS ................................................................................... 1

SECTION 2.  REVOLVING LOAN FACILITY ................................................... 14

SECTION 3.  INTEREST AND FEES ................................................................. 16

3.1 Interest. ............................................................................................................ 16

3.2 Origination Fee. ............................................................................................... 16

3.3 Annual Fee. ...................................................................................................... 16

3.4 [Intentionally Omitted] ...................................................................................

3.5 [Intentionally Omitted]. ..................................................................................

SECTION 4.  CONDITIONS PRECEDENT ....................................................... 17

4.1 Conditions Precedent to Initial Loans ............................................................ 17

4.2 Conditions Precedent to All Loans ................................................................. 18

SECTION 5.  GRANT AND PERFECTION OF SECURITY INTEREST ........... 19

5.1 Grant of Security Interest. ............................................................................... 19

5.2 Perfection of Security Interests. ...................................................................... 20

SECTION 6.  COLLECTION AND ADMINISTRATION ................................... 23

6.1 Borrower's Loan Account. ............................................................................... 23

6.2 Statements. ....................................................................................................... 26

6.3 Collection of Receivables. ............................................................................... 24

6.4 Payments. ......................................................................................................... 26

6.5 Authorization to Make Loans. .........................................................................

6.6 Use of Proceeds. .............................................................................................. 27

SECTION 7.  COLLATERAL REPORTING AND COLLATERAL COVENANTS ........... 27

7.1 Collateral Reporting. ....................................................................................... 27

7.2 Receivables Covenants. ................................................................................... 27

7.3 Inventory Covenants. .......................................................................................

7.4 Equipment and Real Property Covenants. .......................................................

7.5 Power of Attorney. ........................................................................................... 28

7.6 Right to Cure. ................................................................................................... 29

7.7 Access to Premises. ......................................................................................... 29

-i-

SECTION 8.  REPRESENTATIONS AND WARRANTIES ................................................ 30

8.1 Corporate Existence; Power and Authority. ........................................................30

8.2 Name; State of Organization; Chief Executive Office; Collateral Locations.....................30

8.3 Financial Statements; No Material Adverse Change. ..........................................31

8.4 Priority of Liens; Title to Properties. ...................................................31

8.5 Tax Returns. .................................................................................31

8.6 Litigation. ................................................................................31

8.7 Compliance with Other Agreements and Applicable Laws.....................................32

8.8 Environmental Compliance. ...............................................................32

8.9 Employee Benefits. ......................................................................32

8.10 Bank Receivables. .......................................................................33

8.11 Intellectual Property. ..................................................................33

8.12 Subsidiaries; Affiliates; Capitalization; Solvency. ....................................33

8.13 Labor Disputes. .........................................................................34

8.14 Restrictions on Subsidiaries. ...........................................................

8.15 Material Contracts. .....................................................................34

8.16 Payable Practices. ......................................................................34

8.17 Accuracy and Completeness of Information. ...............................................36

8.18 Survival of Warranties; Cumulative. .....................................................36

SECTION 9.  AFFIRMATIVE AND NEGATIVE COVENANTS ...................................... 36

9.1 Maintenance of Existence. ...............................................................36

9.2 New Collateral Locations. ................................................................37

9.3 Compliance with Laws, Regulations, Etc. .................................................37

9.4 Payment of Taxes and Claims. ...........................................................37

9.5 Insurance. ...............................................................................38

9.6 Financial Statements and Other Information. .............................................38

9.7 Sale of Assets, Consolidation, Merger, Dissolution, Etc.................................39

9.8 Encumbrances. ...........................................................................40

9.9 Indebtedness. ...........................................................................40

9.10 Loans, Investments, Etc. ...............................................................40

9.11 Dividends and Redemptions. .............................................................41

9.12 Transactions with Affiliates. ..........................................................41

-ii-

9.13   Compliance with ERISA. ................................................................................41

9.14   End of Fiscal Years; Fiscal Quarters. ............................................................41

9.15   Change in Business. ........................................................................................41

9.16   Limitation of Restrictions Affecting Subsidiaries. ...........................................

9.17   Adjusted Tangible Net Worth. ..........................................................................

9.18   Working Capital. ...............................................................................................

9.19   License Agreements. ........................................................................................

9.20   After Acquired Real Property. ..........................................................................

9.21   Costs and Expenses. ......................................................................................42

9.22   Further Assurances. .......................................................................................42

SECTION 10.    EVENTS OF DEFAULT AND REMEDIES ................................... 43

10.1   Events of Default. ...........................................................................................43

10.2   Remedies. .......................................................................................................45

SECTION 11.    JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS;
GOVERNING LAW ............................................................................................... 47

11.1   Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.....................48

11.2   Waiver of Notices. ..........................................................................................49

11.3   Amendments and Waivers  .............................................................................49

11.4   Waiver of Counterclaims. ...............................................................................49

11.5   Indemnification. ..............................................................................................49

SECTION 12.    TERM OF AGREEMENT; MISCELLANEOUS .......................... 50

12.1   Term. ...............................................................................................................50

12.2   Interpretative Provisions. ................................................................................51

12.3   Notices. ...........................................................................................................52

12.4   Partial Invalidity. .............................................................................................53

12.5   Successors. .....................................................................................................53

12.6   Entire Agreement. ...........................................................................................53

12.7   Counterparts, Etc. ..........................................................................................54

## INDEX TO

## EXHIBITS AND SCHEDULES

Exhibit A             Information Certificate

Exhibit B             Form of Assignment of Contract

Exhibit C             Revolving Loan Note


Schedule 1.23         Eligible States

Schedule 1.43         Loan Originators

Schedule 4.3          Post-Closing Items

Schedule 8.15         Program Vendors

-iv-

**FIRST AMENDMENT TO
LOAN AND SECURITY AGREEMENT
AND
MODIFICATION TO OTHER FINANCING AGREEMENTS**

This FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT AND MODIFICATION TO OTHER FINANCING AGREEMENTS, dated as of September 30, 2015 (this "**First Amendment**") by and between ARGON X, LLC, a Delaware limited liability company (the "**Borrower**"), and FINTECH FINANCIAL, LLC, a Delaware limited liability company (the "**Lender**").

W I T N E S S E T H

WHEREAS, the Borrower and the Lender are parties to that certain Loan and Security Agreement dated as of May 1, 2015 (the "**Loan Agreement**"); unless otherwise defined herein, all capitalized terms used in this First Amendment shall have the meanings given to such terms in the Loan Agreement;

WHEREAS, in order to induce the Lender to enter into the Loan Agreement, ARGON CREDIT LLC, a Delaware limited liability company (the "**Parent**"), ARGON CREDIT OF ALABAMA LLC, a Delaware limited liability company, ARGON CREDIT OF CALIFORNIA LLC, a Delaware limited liability company, ARGON CREDIT OF LOUISIANA LLC, a Delaware limited liability company, ARGON CREDIT OF GEORGIA LLC, a Delaware limited liability company, ARGON CREDIT OF UTAH LLC, a Delaware limited liability company and ARGON CREDIT OF ILLINOIS LLC, a Delaware limited liability company (such other limited liability companies being hereinafter individually and collectively referred to as the "**Loan Originators**", and together with the Parent, the "**Guarantor**") executed and delivered that certain Guaranty and Suretyship Agreement dated May 1, 2015 in favor of Lender (the "**Guaranty**");

WHEREAS, in order to induce the Lender to enter into the Loan Agreement, RAVIV WOLFE and GARY ZUMSKI (herein individually and collected referred to as the "**Limited Guarantor**") executed and delivered that certain Limited Guaranty and Suretyship Agreement dated May 1, 2015 in favor of Lender (the "**Limited Guaranty**");

WHEREAS, the Borrower has requested an increase in the Maximum Credit under the Loan Agreement, and the Lender is willing to increase the Maximum Credit, subject to and conditioned upon certain modifications to the terms of the Loan Agreement and other Financing Agreements, as set forth below;

WHEREAS, the Guarantor has agreed that the increase to the Maximum Credit will be deemed to modify and be included within the meaning of the Liability of Borrower, as that term is defined pursuant to the Guaranty, and hereby acknowledges that its obligations under the Guaranty will be expanded consistent with the terms and conditions herein;

NOW, THEREFORE, in consideration of the agreements herein contained, and for other valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      <u>Background</u>. The recitals of this First Amendment are incorporated herein as if set forth in full.

2.      <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to such terms in the Loan Agreement.

3.      <u>Loan Agreement</u>. The Loan Agreement is hereby amended as follows:

(a) The definition of Maximum Credit in <u>Section 1.47</u> of the Loan Agreement is amended by deletion of the amount "$20,000,000" and substitution therefor of the amount "$34,000,000", and all the other Financing Agreements are hereby amended, to the extent necessary, to reflect such increase in the Maximum Credit.

(b) The definition of UCC in <u>Section 1.73</u> of the Loan Agreement is amended and restated to read in full as follows:

"1.73     "**UCC**" shall mean the Uniform Commercial Code as in effect in the State of Delaware, and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of Delaware on the date of this Agreement shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine)."

(c) <u>Section 6.7</u> of the Loan Agreement is amended and restated to read in full as follows:

"6.7 <u>Use of Proceeds</u>.

(a)     Borrower shall use the proceeds of the Loans provided by Lender to Borrower hereunder only for the acquisition of Contracts and related Receivables from a Loan Originator or the Parent pursuant to an Assignment; provided, however, that Borrower may use the proceeds from any Loan pursuant to a Draw to pay any fees or other transaction expenses relating to the Revolving Loan Facility that are approved in writing by Lender.

(b)     In no event shall any of the proceeds be used, directly or indirectly, (i) to pay any commissions or finder's fees or brokerage commissions or similar payments; (ii) to pay bonus or other performance incentive payments or similar payments to any consultant, independent contractor, officer, employee, shareholder, member, director, manager, or

2

managing member of Borrower or of Parent or any Affiliate thereof; or (iii) for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, as amended."

(d) Section 9.6(a) of the Loan Agreement is amended and restated to read in full as follows:

"(a) Borrower shall keep proper books and records in which true and complete entries shall be made of all dealings or transactions with respect to or related to the Collateral and the business of Borrower in accordance with GAAP. Borrower shall promptly furnish to Lender all such financial and other information as Lender shall reasonably request relating to the Collateral and the assets, business and operations of Borrower and the Guarantors, and to notify the auditors and accountants of Borrower and the Guarantors that Lender is authorized to obtain such information directly from them. Without limiting the foregoing, Borrower shall furnish or cause to be furnished to Lender, the following:

(i) on a daily basis, view access to all Pledged Accounts and to all of the deposit accounts, investment accounts or other accounts in the name of or used by any Borrower and any Guarantor maintained at any bank or other financial institution, and daily transaction log files from Borrower's and each Guarantor's ACH payment processor vendors and card processors;

(ii) within five business days after the end of each fiscal month, the Monthly Borrowing Base Certificate;

(iii) within fifteen (15) days after the end of each fiscal month, monthly unaudited financial statements of Borrower and each Guarantor (prepared on a consolidated basis), together with, in each case (prepared on a non-consolidated basis), trial balance sheets, other balance sheets, general ledger account detail, statements of income and loss, statements of cash flow, and statements of shareholders' equity, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrower and each Guarantor as of the end of and through such fiscal month, certified to be correct by the chief financial officer of Borrower and each Guarantor, as the case may be, subject to normal year-end adjustments;

3

(iv) within five business days after the end of each fiscal month any other portfolio analysis reports reasonably requested by Lender, including but not limited to portfolio analytical reports such as cost per funded loan, delinquency reports, charge-off reports and call center cost analysis; and

(v) within ninety (90) days after the end of each fiscal year, audited financial statements of Borrower and each Guarantor (prepared on a consolidated basis), together with, in each case (prepared on a non-consolidated basis), trial balance sheets, other balance sheets, general ledger account detail, statements of income and loss, statements of cash flow and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrower and each Guarantor as of the end of and for such fiscal year, together with the unqualified opinion of independent certified public accountants, which accountants shall be an independent accounting firm selected by Parent or Borrower and reasonably acceptable to Lender, that such financial statements have been prepared in accordance with GAAP and present fairly the results of operations and financial condition of Borrower and each Guarantor as of the end of and for the fiscal year then ended."

(e) Section 9.12 of the Loan Agreement is amended and restated to read in full as follows:

"9.12    Transactions with Affiliates.    Borrower shall not, directly or indirectly, (a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, manager, agent or other person affiliated with Borrower, except (i) pursuant to a Master Consumer Loan Purchase Agreement among Borrower, Parent and each Loan Originator; and (ii) in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than Borrower would obtain in a comparable arm's length transaction with an unaffiliated person, (b) make any payments of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, manager of Borrower, or any Guarantor, or other Affiliate of Borrower except for reasonable compensation (as approved in writing by Lender) to officers, employees and managers for services rendered in the ordinary course of business and which are properly reflected as such direct compensation for such officers, employees and managers for such services on the financial statements of Parent prepared prior to or on May 1, 2015, or (c) make any payments whatsoever to Broadmark Capital, LLC or Bergarviv, LLC. Notwithstanding the foregoing, neither Borrower nor any Guarantor or other Affiliate of Borrower shall raise or increase the salaries of any officers, employees and managers without prior written notice to Lender,

4

except for percentage increases no more frequent than once a calendar year and no greater than the Consumer-Price Index (CPI) as published by *The Wall Street Journal* on the first day of the respective calendar year. Without limiting the discretionary nature of the Loan Facility, Lender reserves the right to suspend funding any Draw Request should Lender deem the salary increases excessive or otherwise unreasonable."

(f) <u>Section 11.1(a)</u> of the Loan Agreement is amended and restated to read in full as follows:

"(a)      The validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Delaware but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Delaware."

(g) <u>Section 11.1(b)</u> of the Loan Agreement is amended and restated to read in full as follows:

"(b)      Borrower and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower or its property)."

4.      <u>Guaranty</u>. The Guaranty is hereby amended as follows:

a.      <u>Paragraph 3</u> of the Guaranty is amended and restated in full to read as follows:

"3. The Guarantor further hereby represents and warrants to Lender the following (which shall survive the execution and delivery of this Guaranty), the truth and accuracy of which are a continuing condition of the making of Loans by Lender to Borrower:

<div align="center">5</div>

(i) <u>Financial Statements; No Material Adverse Change</u>.  All financial statements relating to the Guarantor which have been or may hereafter be delivered by the Guarantor to Lender have been prepared in accordance with GAAP (except as to any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any footnotes) and fairly present the financial condition and the results of operation of the Guarantor as at the dates and for the periods set forth therein.  Except as disclosed in any interim financial statements furnished by Guarantor to Lender prior to the date of this Guaranty, there has been no Material Adverse Change of the Guarantor, since the date of the most recent audited financial statements furnished by the Guarantor to Lender prior to the date of this Guaranty.

(ii) <u>Accuracy and Completeness of Information</u>.  All information furnished by or on behalf of the Guarantor in writing to Lender in connection with this Guaranty or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not misleading.  No event or circumstance has occurred which has had or could reasonably be expected to have a material adverse effect on the business, assets or prospects of the Guarantor, taken as a whole, which has not been fully and accurately disclosed to Lender in writing prior to the date hereof.

(iii) <u>Survival and Bring-Down of Warranties</u>.  All representations and warranties contained in this Guaranty or any of the other Financing Agreements shall survive the execution and delivery of this Guaranty and shall be deemed to have been made again to Lender on and as of the date of each additional borrowing or other credit accommodation under the Loan Agreement and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender, except for any exceptions that have been disclosed in writing to Lender and consented in writing by Lender in its sole discretion prior to the date of such additional borrowing or other credit accommodation.  The representations and warranties set forth herein shall be in addition to any other representations or warranties which the Guarantor shall now or hereafter give, or cause to be given, to Lender."

b.  <u>Paragraph 21(ii)</u> of the Guaranty is amended and restated in full to read as follows:

"(ii)    Each Guarantor hereby covenants and agrees to provide to the Lender all of the financial statements and other information of and for each Guarantor as set forth in <u>Section 9.6</u> of the Loan Agreement."

c.  <u>Paragraph 35</u> of the Guaranty is amended and restated in full to read as follows:

6

"35.    The validity, interpretation and enforcement of this Guaranty and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Delaware but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Delaware."

d.    Paragraph 36 of the Guaranty is amended and restated in full to read as follows:

"36.    Guarantor and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Guaranty or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Guaranty or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Guarantor, Borrower, or Borrower's property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Guarantor, Borrower, or Borrower's property)."

e.    Paragraph 39 of the Guaranty is added to the Guaranty to read as follows:

"39.    Transactions with Affiliates.    Guarantor shall not, directly or indirectly, (a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, manager, agent or other person affiliated with Guarantor, except (i) pursuant to Master Consumer Loan Purchase Agreement among Borrower, Parent and each Loan Originator, and; (ii) in the ordinary course of and pursuant to the reasonable requirements of Guarantor's business and upon fair and reasonable terms no less favorable to Guarantor than Guarantor would obtain in a comparable arm's length transaction with an unaffiliated person, (b) make any payments of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, manager of Guarantor or other Affiliate of Guarantor except for reasonable compensation (as approved in writing by Lender) to officers, employees and managers for services rendered to Guarantor in the ordinary course of business and which are properly reflected as such direct compensation for such officers, employees and managers on the

7

financial statements of Guarantor for the period prior to May 1, 2015, as previously furnished to Lender; *provided, however*, that such compensation may be increased by Guarantor (i) for the period May 1 to September 30, 2015, as disclosed in writing by Guarantor to Lender (such disclosed increase not to be deemed approved by or consented to by Lender), and (ii) on or after September 30, 2015, to the extent such compensation is greater than that which is reflected in the preceding clause (i), with the prior written approval of Lender, such approval not to be unreasonably withheld, or (c) make any payments whatsoever to Broadmark Capital, LLC or Bergarviv, LLC except as approved in writing by Lender under Paragraph 6 of that certain First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements dated as of September 30, 2015 by and between Borrower and Lender. Notwithstanding the foregoing, Guarantor shall not raise or increase the salaries of any officers, employees and managers without prior written notice to Lender, except for percentage increases no frequent than once a calendar year and no greater than the Consumer-Price Index (CPI) as published by *The Wall Street Journal* on the first day of the respective calendar year. Without limiting the discretionary nature of the Loan Facility, Lender reserves the right to suspend funding any Draw Request should Lender deem the salary increases excessive or otherwise unreasonable."

5.  <u>Limited Guaranty.</u> The Limited Guaranty is hereby amended as follows:

    a.  <u>Paragraph 32</u> of the Limited Guaranty is amended and restated in full to read as follows:

        "32.    The validity, interpretation and enforcement of this Guaranty and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Delaware but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Delaware."

    b.  <u>Paragraph 33</u> of the Limited Guaranty is amended and restated in full to read as follows:

        "33.    Guarantor and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Guaranty or any of the other Financing Agreements or in any way connected with or related or incidental to the

8

dealings of the parties hereto in respect of this Guaranty or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Guarantor, Borrower, or Borrower's property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Guarantor, Borrower, or Borrower's property)."

6. <u>Disclosures and Consents Under Paragraph 39 of the Guaranty</u>.

    a. Pursuant to Paragraph 39(b) of the Guaranty, Parent hereby discloses the payment of compensation as set forth on Exhibit A hereto to officers, employees and managers of Parent.

    b. Pursuant to Paragraph 39(c) of the Guaranty, Parent hereby requests that Lender consent to, and Lender hereby provides its consent to, payment of sums due or to become due to Broadmark Capital, LLC and any other investment bankers hereafter engaged by Borrower conditioned upon (i) Parent first consummating an equity investment into Parent of not less than $2,000,000; (ii) upon Parent consummating an equity investment in accordance with subsection (i) hereof and making the payments contemplated hereunder, there will exist positive member equity on Parent's balance sheet prepared and delivered in accordance with Section 9.6 of the Loan Agreement (as amended) and Paragraph 21(ii) of the Guaranty (as amended), and; (iii) upon Parent consummating an equity investment in accordance with subsection (i) hereof and making the payments contemplated hereunder, there will exist positive cash balance on Parent's balance sheet prepared and delivered in accordance with Section 9.6 of the Loan Agreement (as amended) and Paragraph 21(ii) of the Guaranty (as amended).

7. <u>Other Financing Agreements</u>. To the extent not otherwise expressly provided in this First Amendment, the other Financing Agreements are hereby generally amended to read that (a) the governing law of all the Financing Agreements shall be governed by the internal laws of the State of Delaware, and (b) all parties to the other Financing Agreements irrevocably consent and submit to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under any of the other Financing Agreements.

8. <u>Conditions Precedent</u>. The effectiveness of the amendments set forth herein is subject to the fulfillment, to the satisfaction of Lender and its counsel, of the following conditions precedent:

a. Borrower, Parent, and all Loan Originators shall have delivered, or caused to be delivered, to Lender the following, all of which shall be in form and substance satisfactory to Lender and shall be duly completed and executed:

  i. This First Amendment, duly executed by the Borrower and the Guarantors;

  ii. The origination fee referenced in <u>Section 3.2</u> of the Loan Agreement, which the Borrower hereby authorizes the Lender to debit from the Collection Account, and which shall be fully earned as of the date hereof;

  iii. Cash flow projections of Borrower and each Guarantor for the six months following the date hereof;

  iv. All minutes of the Board of Managers of Parent since the formation of Parent;

  v. Such documents as are necessary to convert all notes, debentures, or other Indebtedness of Parent held by or in the name of Berj Arakelian and/or Raviv Wolfe into equity interests of Parent, with no option to convert such equity interests back into a note, debenture, or other Indebtedness;

  vi. a certificate signed by the Secretary of the Borrower, certifying as to: (A) all action taken by the Borrower in connection with this First Amendment; (B) the names of the Authorized Officers authorized to sign this First Amendment on behalf of the Borrower, and their true signatures;

  vii. a certificate signed by the Secretary of each Guarantor, certifying as to: (A) all action taken by the Guarantor in connection with this First Amendment; (B) the names of the Authorized Officers authorized to sign this First Amendment on behalf of the Guarantor, and their true signatures; and

  viii. Such additional documents, certificates and information as Lender may reasonably require pursuant to the terms hereof or otherwise reasonably request.

b. All representations and warranties of the Borrower set forth in the Loan Agreement and the other Financing Agreements, as amended hereby, shall be true and correct (i) in the case of representations and warranties qualified by materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of such date as if made on and as of such date (except to the extent that such representations and warranties relate to an earlier date in which case such representations and warranties that expressly relate to an earlier date are true and correct, in the case of such representations and warranties qualified by materiality, in all respects, and otherwise in all material respects, as of such earlier date);

c. All representations and warranties of each Guarantor set forth in the Guaranty and the other Financing Agreements, as amended hereby, shall be true and correct (i) in the case of representations and warranties qualified by materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of such date as if made on and as of such date (except to the extent that such

10

representations and warranties relate to an earlier date in which case such representations and warranties that expressly relate to an earlier date are true and correct, in the case of such representations and warranties qualified by materiality, in all respects, and otherwise in all material respects, as of such earlier date);

d. No Event of Default or Default shall have occurred and be continuing as of the date hereof;

e. Since May 1, 2015, there shall have been no Material Adverse Change; and

f. Lender shall have received, to the extent invoiced, reimbursement of all fees and expenses of counsel (in an aggregate amount not to exceed $3,000.00) to the Lender required to be paid or reimbursed by the Borrowers hereunder.

9. <u>Affirmations</u>. The Borrower and each Guarantor hereby: (i) ratify and affirm all the provisions of the Loan Agreement, the Guaranty, and the other Financing Agreements as supplemented and amended hereby, (ii) agree that except as expressly amended or terminated hereby the terms and conditions of the Loan Agreement, the Guaranty, and the other Financing Agreements shall continue in full force and effect as supplemented and amended hereby, (iii) affirm and agree that none of this First Amendment or any other agreement executed in connection herewith shall constitute a novation, or complete or partial termination of the Obligations under the Loan Agreement and the other Financing Agreements as in effect prior to the date hereof and (iv) acknowledges and agrees that it has no defense, set-off, counterclaim or challenge against the payment of any sums owing under the Loan Agreement, the Guaranty, and the other Financing Agreements as of the date hereof or the enforcement of any of the terms or conditions thereof and agrees to be bound thereby and perform thereunder.

10. <u>Ratification; References; No Waiver</u>. Except as expressly amended or terminated by this First Amendment, the Loan Agreement, the Guaranty, and the other Financing Agreements shall continue to be, and shall remain, unaltered and in full force and effect in accordance with their terms and the execution, delivery and effectiveness of this First Amendment shall neither operate as a waiver of any right, power or remedy of Lender under the Loan Agreement, the Guaranty, or the other Financing Agreements nor constitute a waiver of any Default or Event of Default thereunder. All references in the Loan Agreement, the Guaranty, and the other Financing Agreements to "this Agreement," "this Guaranty," "hereof," "hereto," and "hereunder" shall be deemed to be references to the Loan Agreement, the Guaranty, or other Financing Agreements as amended hereby, and all references in any of the other Financing Agreements to the Loan Agreement, the Guaranty, or the other Financing Agreements shall be deemed to be to the Loan Agreement, the Guaranty, or the other Financing Agreements as amended hereby.

11. <u>Release</u>. Recognizing and in consideration of Lenders' agreements set forth herein, Borrower and the Guarantor each hereby waive and release Lender, and its respective Affiliates and officers, attorneys, agents, employees and advisors of such Persons and

11

Affiliates (the "**Released Parties**") from any and all losses, claims, damages, liabilities and related reasonable expenses (including the fees and expenses of counsel for such Released Parties) of any kind nature whatsoever and howsoever arising that such Borrower or Guarantor, as the case may be, ever had or now has against any of them through and including the date hereof arising out of or relating to any acts or omissions with respect to this First Amendment, the Loan Agreement, the Guaranty, the other Financing Agreements or any other matters described or referred to herein or therein or related hereto or thereto.

12. <u>Miscellaneous</u>.

    a. <u>Counterparts; Integration</u>. This First Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this First Amendment by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this First Amendment. This First Amendment, the Loan Agreement, the Guaranty and the other Financing Agreements constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof including any prior confidentiality agreements and commitments.

    b. <u>Severability</u>. The provisions of this First Amendment are intended to be severable. If any provision of this First Amendment shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

    c. <u>Headings</u>. The headings used herein are included for convenience and shall not affect the interpretation of this First Amendment.

13. <u>Cost and Expenses</u>. The Borrower and the Guarantor shall, jointly and severally, pay all expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel for Lender) in connection with the preparation, negotiation, execution, delivery and administration of this First Amendment and the other Financing Agreements in an aggregate amount not to exceed $5,000.00.

14. <u>Governing Law</u>. This First Amendment shall be deemed to be governed under the laws of the State of Delaware without regard to its conflict of laws principles.

15. <u>Modifications</u>. No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed on behalf of the party against whom enforcement is sought.

<div align="center">12</div>

IN WITNESS WHEREOF, the undersigned have caused this First Amendment to be duly executed by their respective, duly authorized officers as of the date first above written.

BORROWER:

**ARGON X, LLC**

By: _____
Name: Gary Zumski
Title: President

LENDER:

**FINTECH FINANCIAL, LLC**

By: _____
Name: Mindi Vavra
Title: Chief Risk Officer

Consented to and agreed upon in respect of Sections 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 of this First Amendment only, with the intent to be legally bound hereby:

**GUARANTOR:**

**ARGON X, LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

**ARGON CREDIT LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF ALABAMA LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

13

*Signature Page to First Amendment*

IN WITNESS WHEREOF, the undersigned have caused this First Amendment to be duly executed by their respective, duly authorized officers as of the date first above written.

**BORROWER:**

**ARGON X, LLC**

By: _____
Name: Gary Zumski
Title: President

**LENDER:**

**FINTECH FINANCIAL, LLC**

By: _____
Name: Mindi Vavra
Title: Chief Risk Officer

Consented to and agreed upon in respect of <u>Sections 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15</u> of this First Amendment only, with the intent to be legally bound hereby:

**GUARANTOR:**

**ARGON X, LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

**ARGON CREDIT LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF ALABAMA LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski

14

*Signature Page to First Amendment*

118522744_12

Title: President

**ARGON CREDIT OF CALIFORNIA LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF LOUISIANA LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF GEORGIA LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF UTAH LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF ILLINOIS LLC,**
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

Consented to and agreed upon in respect of <u>Sections 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15</u> of this First Amendment only, with the intent to be legally bound hereby:

**LIMITED GUARANTOR:**

By:_____


15

*Signature Page to First Amendment*

118522744_12

Name: Gary Zumski

By:_____

Name: Raviv Wolfe

16

*Signature Page to First Amendment*

118522744_12

# EXHIBIT A

<u>Payments to officers, employees and managers of Parent</u>

See attached.

*Exhibit A to First Amendment*

118522744_12

EXECUTION VERSION

### SECOND AMENDMENT TO
### LOAN AND SECURITY AGREEMENT
### AND
### MODIFICATION TO OTHER FINANCING AGREEMENTS

This SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT AND MODIFICATION TO OTHER FINANCING AGREEMENTS, dated as of February 12, 2016 (this "**Second Amendment**") by and between ARGON X, LLC, a Delaware limited liability company (the "**Borrower**"), and FINTECH FINANCIAL, LLC, a Delaware limited liability company (the "**Lender**").

## W I T N E S S E T H

WHEREAS, the Borrower and the Lender are parties to that certain Loan and Security Agreement dated as of May 1, 2015, as amended by that certain First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements (collectively, the "**Loan Agreement**"); unless otherwise defined herein, all capitalized terms used in this Second Amendment shall have the meanings given to such terms in the Loan Agreement;

WHEREAS, in order to induce the Lender to enter into the Loan Agreement, ARGON CREDIT LLC, a Delaware limited liability company (the **"Parent"**), ARGON CREDIT OF ALABAMA LLC, a Delaware limited liability company, ARGON CREDIT OF CALIFORNIA LLC, a Delaware limited liability company, ARGON CREDIT OF LOUISIANA LLC, a Delaware limited liability company, ARGON CREDIT OF GEORGIA LLC, a Delaware limited liability company, ARGON CREDIT OF UTAH LLC, a Delaware limited liability company, and ARGON CREDIT OF ILLINOIS LLC, a Delaware limited liability company (such companies being hereinafter individually and collectively referred to as the "**Original Loan Originators**") executed and delivered that certain Guaranty and Suretyship Agreement dated May 1, 2015 in favor of Lender (the "**Guaranty**"), and ARGON CREDIT OF MISSOURI LLC, a Delaware limited liability company (such company, together with the Original Loan Originators, being hereinafter individually and collectively referred to as the "**Loan Originators**", and together with the Parent, the "**Guarantor**"), executed and delivered a Consent and Joinder Agreement to become a party to the Guaranty effective as of October 1, 2015;

WHEREAS, in order to induce the Lender to enter into the Loan Agreement, RAVIV WOLFE and GARY ZUMSKI (herein individually and collected referred to as the "**Limited Guarantor**") executed and delivered that certain Limited Guaranty and Suretyship Agreement dated May 1, 2015 in favor of Lender (the "**Limited Guaranty**");

WHEREAS, the Borrower has requested an increase in the Maximum Credit under the Loan Agreement, and the Lender is willing to increase the Maximum Credit, subject to and conditioned upon certain modifications to the terms of the Loan Agreement and other Financing Agreements, as set forth below;

WHEREAS, the Borrower has requested that Lender approve of the scheduled interest payments to be made by the Parent under the following Promissory Notes dated as of the date hereof

and made by the Parent in exchange for a loan by each of the following parties to the Parent: (a) the Cardinal Trust, $1,000,000, (b) Mark Triffler Declaration of Trust Dated December 5, 1991, $1,000,000, and (c) Little Owl Argon, LLC, $4,000,000, and the Lender is willing to approve such interest payments, subject to and conditioned upon certain modifications to the terms of the Loan Agreement and other Financing Agreements, as set forth below;

WHEREAS, Borrower has requested that Lender reduce certain of its rights and obligations regarding Section 9.12 of the Loan Agreement and Paragraph 39 of the Guaranty and the Lender is willing to approve such modification, subject to and conditioned upon certain modifications to the terms of the Loan Agreement and other Financing Agreements, as set forth below;

WHEREAS, the Guarantor hereby acknowledges that its obligations under the Guaranty will be expanded consistent with the terms and conditions herein;

NOW, THEREFORE, in consideration of the agreements herein contained, and for other valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Background</u>. The recitals of this Second Amendment are incorporated herein as if set forth in full.

2. <u>Terms</u>. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to such terms in the Loan Agreement.

3. <u>Loan Agreement</u>. The Loan Agreement is hereby amended as follows:

(a) A new definition of "Insider" shall be added as <u>Section 1.37</u>, which shall read as follows, and the former <u>Section 1.37</u> shall be renumbered <u>Section 1.38</u>, and all subsequent subsections of <u>Section 1</u> shall be renumbered accordingly:

"Insider" shall mean, with respect to the Borrower and any Guarantor, any founder, principal, shareholder, member, partner, greater than five percent (5%) equity holder (including without limitation the holder of any note or other security convertible or exchangeable into greater than five percent (5%) of the equity), manager, director or officer of (i) the Borrower, (ii) any Guarantor, or (iii) any Affiliate of the Borrower or of any Guarantor."

(b) The definition of Maximum Credit in <u>Section 1.47</u> of the Loan Agreement is amended by deletion of the amount "$34,000,000" and substitution therefor of the amount "$37,500,000".

(c) <u>Section 9.12</u> of the Loan Agreement is amended and restated to read in full as follows:

"9.12 <u>Transactions with Insiders and Affiliates</u>. Borrower shall not, directly or indirectly,

(a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any Insider or Affiliate of Borrower or of any Guarantor, except (i) pursuant to a Master Consumer Loan Purchase Agreement among Borrower, Parent and each Loan Originator; and (ii) in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than Borrower would obtain in a comparable arm's length transaction with an unaffiliated person, or

(b) make any payments to any Insider or Affiliate of Borrower or of any Guarantor, including without limitation, salary, bonuses or management, consulting or other fees for management or similar services, or any payments in respect of any Indebtedness owing to any Insider or Affiliate of Borrower or of any Guarantor, except for (i) (A) for the period prior to May 1, 2015, as reflected on the financial statements of the Guarantor prepared prior to May 1, 2015, (B) for the period May 1 to September 30, 2015, as disclosed in writing by Guarantor to Lender prior to or on September 30, 2015 (such disclosed amounts if increases from amounts referenced in clause (A) during such period not to be deemed approved by or consented to by Lender) and (C) for the period September 30 to December 16, 2015, to the extent such compensation is greater than that which is reflected in the preceding clauses (A) or (B), as approved in writing by Lender prior to such increase, and (ii) for the period December 17, 2015 and at all times thereafter, reasonable compensation (as determined in the reasonable discretion of the compensation committee of the Board of Managers of Borrower or any Guarantor), to any officers, employees and managers of Borrower for services rendered in the ordinary course of business and which are properly reflected as such direct compensation for such officers, employees and managers for such services on the financial statements of Borrower; *provided, however,* that from and after December 17, 2015, the compensation for the provision of services of any Insider of Borrower or any Guarantor shall not be raised more than 25% per year based on such Insider's compensation as reflected on the financial statements of Parent prepared prior to or on May 1, 2015 and provided to Lender, except with the prior written consent of Lender, and (ii) payments in respect of any Indebtedness owing to any Insider or Affiliate of Borrower or of Guarantor that may be permitted by a Subordination Agreement among such Insider or Affiliate, such Borrower or Guarantor and Lender."

4.  Guaranty. The Guaranty is hereby amended as follows:

    a.  Paragraph 39 of the Guaranty is amended and restated to read in full as follows:

        "39.  Transactions with Insiders and Affiliates.  Guarantor shall not, directly or indirectly,

        (a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any Insider or Affiliate of Borrower or of any

<div align="center">3</div>

Guarantor, except (i) pursuant to a Master Consumer Loan Purchase Agreement among Borrower, Parent and each Loan Originator, and (ii) in the ordinary course of and pursuant to the reasonable requirements of Guarantor's business and upon fair and reasonable terms no less favorable to Guarantor than Guarantor would obtain in a comparable arm's length transaction with an unaffiliated person,

(b) make any payments to any Insider or Affiliate of Borrower or of any Guarantor, including without limitation, salary, bonuses or management, consulting or other fees for management or similar services, except (i) (A) for the period prior to May 1, 2015, as reflected on the financial statements of the Guarantor prepared prior to May 1, 2015, (B) for the period May 1 to September 30, 2015, as disclosed in writing by Guarantor to Lender prior to or on September 30, 2015 (such disclosed amounts if increases from amounts referenced in clause (A) during such period not to be deemed approved by or consented to by Lender), (C) for the period September 30 to December 16, 2015, to the extent such compensation is greater than that which is reflected in the preceding clauses (A) or (B), as approved in writing by Lender prior to such increase, (D) from and after December 17, 2015, reasonable compensation (as determined in the reasonable discretion of the compensation committee of the Board of Managers of Parent), to officers, employees and managers of Parent for services rendered to Parent in the ordinary course of business and which is properly reflected as such direct compensation for such officers, employees and managers on the financial statements of Parent; *provided, however*, that the compensation for the provision of services of any Insider may not be raised more than 25% per year based on such Insider's compensation as reflected on the financial statements of Parent prepared prior to or on May 1, 2015 and provided to Lender, except with the prior written consent of Lender, and (ii) payments in respect of any Indebtedness owing to any Insider or Affiliate of Borrower or of Guarantor as may be permitted pursuant to a Subordination Agreement among such Insider or Affiliate, such Borrower or Guarantor and Lender;

(c) make any payments in respect of any Indebtedness owing to any Insider or Affiliate of Borrower or of any Guarantor, except as may be permitted pursuant to Subordination Agreements entered into between the Lender and each of Margon, LLC, Little Owl Argon, LLC, Cardinal Trust and Mark Triffler Declaration of Trust Dated December 5, 1991; or

(d) make any payments whatsoever to Bergarviv, LLC other than distributions for tax purposes pursuant to Parent's Fourth Amended and Restated Operating Agreement and except as approved in writing by Lender under Paragraph 6 of that certain First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements dated as of September 30, 2015 by and between Borrower and Lender;

<div align="center">4</div>

*provided, however,* that no such payments for tax purposes shall be permitted after the occurrence and during the continuance of an Event of Default."

5.   <u>Conditions Precedent</u>.  The effectiveness of the amendments set forth herein is subject to the fulfillment, to the satisfaction of Lender and its counsel, of the following conditions precedent:

    a.   Borrower, Parent, and all Loan Originators shall have delivered, or caused to be delivered, to Lender the following, all of which shall be in form and substance satisfactory to Lender and shall be duly completed and executed:

        i.   This Second Amendment, duly executed by the Borrower and the Guarantors;

        ii.   A Subordination Agreement in the form of Exhibit A to this Second Amendment with Cardinal Trust;

        iii.   A Subordination Agreement in the form of Exhibit B to this Second Amendment with Mark Triffler Declaration of Trust Dated December 5, 1991;

        iv.   An Amended and Restated Subordination Agreement in the form of Exhibit C with Little Owl Argon, LLC;

        v.   Cash flow projections of Borrower and each Guarantor for the six months following the date hereof';

        vi.   All minutes of the Board of Managers of Parent since the formation of Parent;

        vii.   Evidence reasonably satisfactory to Lender that Parent has established a compensation committee of the Board of Managers;

        viii.   Such documents as are necessary to convert all notes, debentures, or other Indebtedness of Parent held by or in the name of Berj Arakelian and/or Raviv Wolfe into equity interests of Parent, with no option to convert such equity interests back into a note, debenture, or other Indebtedness;

        ix.   a certificate signed by the Secretary of the Borrower, certifying as to: (A) all action taken by the Borrower in connection with this Second Amendment; and (B) the names of the Authorized Officers authorized to sign this Second Amendment on behalf of the Borrower, and their true signatures;

<div align="center">5</div>

         x.  a certificate signed by the Secretary of each Guarantor, certifying as to: (A) all action taken by the Guarantor in connection with this Second Amendment; and (B) the names of the Authorized Officers authorized to sign this Second Amendment on behalf of the Guarantor, and their true signatures; and

        xi.  Such additional documents, certificates and information as Lender may reasonably require pursuant to the terms hereof or otherwise reasonably request.

b.  All representations and warranties of the Borrower set forth in the Loan Agreement and the other Financing Agreements, as amended hereby, shall be true and correct (i) in the case of representations and warranties qualified by materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of such date as if made on and as of such date (except to the extent that such representations and warranties relate to an earlier date in which case such representations and warranties that expressly relate to an earlier date are true and correct, in the case of such representations and warranties qualified by materiality, in all respects, and otherwise in all material respects, as of such earlier date);

c.  All representations and warranties of each Guarantor set forth in the Guaranty and the other Financing Agreements, as amended hereby, shall be true and correct (i) in the case of representations and warranties qualified by materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of such date as if made on and as of such date (except to the extent that such representations and warranties relate to an earlier date in which case such representations and warranties that expressly relate to an earlier date are true and correct, in the case of such representations and warranties qualified by materiality, in all respects, and otherwise in all material respects, as of such earlier date);

d.  No Event of Default or Default shall have occurred and be continuing as of the date hereof;

e.  Since September 30, 2015, there shall have been no Material Adverse Change; and

f.  Lender shall have received, to the extent invoiced, reimbursement of all fees and expenses of counsel to the Lender required to be paid or reimbursed by the Borrowers hereunder.

6.  <u>Affirmations</u>. The Borrower and each Guarantor hereby: (i) ratify and affirm all the provisions of the Loan Agreement, as amended, the Guaranty, as amended, and the other Financing Agreements as supplemented and amended hereby, (ii) agree that except as expressly amended or terminated hereby and by the First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements, the terms and conditions of the Loan Agreement, the Guaranty, and the other Financing Agreements

shall continue in full force and effect as supplemented and amended hereby, (iii) affirm and agree that none of this Second Amendment or any other agreement executed in connection herewith shall constitute a novation, or complete or partial termination of the Obligations under the Loan Agreement and the other Financing Agreements as in effect prior to the date hereof and (iv) acknowledges and agrees that it has no defense, set-off, counterclaim or challenge against the payment of any sums owing under the Loan Agreement, the Guaranty, and the other Financing Agreements as of the date hereof or the enforcement of any of the terms or conditions thereof and agrees to be bound thereby and perform thereunder.

7. <u>Ratification; References; No Waiver</u>. Except as expressly amended or terminated by this Second Amendment, the Loan Agreement, the Guaranty, and the other Financing Agreements, each as amended by the First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements, shall continue to be, and shall remain, unaltered and in full force and effect in accordance with their terms and the execution, delivery and effectiveness of this Second Amendment shall neither operate as a waiver of any right, power or remedy of Lender under the Loan Agreement, the Guaranty, or the other Financing Agreements nor constitute a waiver of any Default or Event of Default thereunder. All references in the Loan Agreement, the Guaranty, and the other Financing Agreements to "this Agreement," "this Guaranty," "hereof," "hereto," and "hereunder" shall be deemed to be references to the Loan Agreement, the Guaranty, or other Financing Agreements as amended hereby, and all references in any of the other Financing Agreements to the Loan Agreement, the Guaranty, or the other Financing Agreements shall be deemed to be to the Loan Agreement, the Guaranty, or the other Financing Agreements as amended hereby. Lender hereby acknowledges and agrees that satisfaction of each of the conditions to this Second Amendment will be deemed to be satisfaction of all of the post-closing conditions of the First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements.

8. <u>Release</u>. Recognizing and in consideration of Lenders' agreements set forth herein, Borrower and the Guarantor each hereby waive and release Lender, and its respective Affiliates and officers, attorneys, agents, employees and advisors of such Persons and Affiliates (the "**Released Parties**") from any and all losses, claims, damages, liabilities and related reasonable expenses (including the fees and expenses of counsel for such Released Parties) of any kind nature whatsoever and howsoever arising that such Borrower or Guarantor, as the case may be, ever had or now has against any of them through and including the date hereof arising out of or relating to any acts or omissions with respect to this Second Amendment, the Loan Agreement, the Guaranty, the other Financing Agreements or any other matters described or referred to herein or therein or related hereto or thereto.

9. <u>Miscellaneous</u>.

   a. <u>Counterparts; Integration</u>. This Second Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall

7

constitute a single contract. Delivery of an executed counterpart of a signature page of this Second Amendment by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Second Amendment. This Second Amendment, the Loan Agreement, the Guaranty and the other Financing Agreements constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof including any prior confidentiality agreements and commitments.

b. <u>Severability</u>. The provisions of this Second Amendment are intended to be severable. If any provision of this Second Amendment shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

c. <u>Headings</u>. The headings used herein are included for convenience and shall not affect the interpretation of this Second Amendment.

10. <u>Cost and Expenses</u>. The Borrower and the Guarantor shall, jointly and severally, pay all expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel for Lender) in connection with the preparation, negotiation, execution, delivery and administration of this Second Amendment and the other Financing Agreements in an aggregate amount not to exceed $2,500.00.

11. <u>Governing Law</u>. This Second Amendment shall be deemed to be governed under the laws of the State of Delaware without regard to its conflict of laws principles.

12. <u>Modifications</u>. No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed on behalf of the party against whom enforcement is sought.

8

IN WITNESS WHEREOF, the undersigned have caused this Second Amendment to be duly executed by their respective, duly authorized officers as of the date first above written.

**BORROWER:**

**ARGON X, LLC**

By: _____
Name: Gary Zumski
Title: President

**LENDER:**

**FINTECH FINANCIAL, LLC**

By: _____
Name: Mindi Vavra
Title: Chief Risk Officer

Consented to and agreed upon in respect of <u>Sections 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12</u> of this Second Amendment only, with the intent to be legally bound hereby:

**GUARANTOR:**

**ARGON X, LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

**ARGON CREDIT LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

**ARGON CREDIT OF ALABAMA LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

9

*Signature Page to Second Amendment*

**ARGON CREDIT OF CALIFORNIA LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


**ARGON CREDIT OF LOUISIANA LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


**ARGON CREDIT OF GEORGIA LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


**ARGON CREDIT OF UTAH LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


**ARGON CREDIT OF ILLINOIS LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


**ARGON CREDIT OF MISSOURI LLC,**
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President


10

*Signature Page to Second Amendment*

Consented to and agreed upon in respect <u>Sections 1, 2, 5, 6, 7, 8, 9, 10, 11, and 12</u> of this Second Amendment only, with the intent to be legally bound hereby:

LIMITED GUARANTOR:

By: _____

Name: Gary Zumski

By: _____

Name: Raviv Wolfe

*Signature Page to Second Amendment*

IN WITNESS WHEREOF, the undersigned have caused this Second Amendment to be duly executed by their respective, duly authorized officers as of the date first above written.

### BORROWER:

### ARGON X, LLC

By: _____
Name: Gary Zumski
Title: President

### LENDER:

### FINTECH FINANCIAL, LLC

By: _____
Name: Mindi Vavra
Title: Chief Risk Officer


Consented to and agreed upon in respect of <u>Sections 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12</u> of this Second Amendment only, with the intent to be legally bound hereby:

### GUARANTOR:

### ARGON X, LLC,
a Delaware limited liability company

By: _____
Name: Gary Zumski
Title: President

### ARGON CREDIT LLC,
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

### ARGON CREDIT OF ALABAMA LLC,
a Delaware limited liability company

By:_____
Name: Gary Zumski
Title: President

9

*Signature Page to Second Amendment*

Exhibit 5

DP DRAFT 05/07/15

## REVOLVING LOAN NOTE

$20,000,000.00                                                                    May 1, 2015

FOR VALUE RECEIVED, and intending to be legally bound, **ARGON X LLC**, a Delaware limited liability company ("**Borrower**"), hereby unconditionally promises to pay to the order of **FINTECH FINANCIAL LLC**, a Delaware limited liability company ("**Lender**"), the principal sum of TWENTY MILLION DOLLARS ($20,000,000), or such lesser or greater principal amount as may be outstanding from time to time under a discretionary revolving credit facility established by Lender for the benefit of Borrower, together with interest on the outstanding balance from the date of this Revolving Loan Note ("**Note**") at the rate ("**Contractual Rate**") specified herein until paid in full:

This Note evidences the obligation of Borrower to repay the Revolving Loans made by the Lender pursuant to the Loan and Security Agreement dated of even date herewith (as the same may be amended, restated or otherwise modified from time to time, the "**Loan Agreement**") by and between Borrower and the Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Loan Agreement.

This Note is entitled to the benefits of, and evidences the Obligations of Borrower for the Revolving Loans made by the Lender under, the Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which Borrower is permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Note and on which such Obligations may be declared to be immediately due and payable.

Principal shall be paid ON DEMAND. Interest shall be payable as set forth in the Loan Agreement ON DEMAND, and shall be calculated at a rate per annum which varies according to the aggregate outstanding principal amount of the Loans on each day, as follows:

(a)     On the first $15,000,000 outstanding principal amount of the Loans, at an annual rate equal to twenty-two percent (22.0%);

(b)     On the outstanding principal amount of the Loans in excess of $15,000,000 but not exceeding $30,000,000, at an annual rate equal to twenty-one percent (21.0%);

(c)     On the outstanding principal amount of the Loans in excess of $30,000,000 but not exceeding $50,000,000, at an annual rate equal to twenty percent (20.0%); and

(d)     On the outstanding principal amount of the Loans in excess of $50,000,000, at an annual rate equal to nineteen percent (19.0%);

provided, however, that in no event shall charges constituting interest payable by Borrower to Lender exceed the maximum amount or the rate permitted under any applicable law or regulation, and if any such part or provision of this Note is in contravention of any such law or

regulation, such part or provision shall be deemed amended to conform thereto. Interest shall continue to accrue after the entry of judgment by confession or otherwise at the Contractual Rate until all sums due hereunder and/or under the judgment are paid. All payments of principal and interest on this Note shall be payable to the Lender or other holder of this Note in lawful currency of the United States of America in immediately available funds in the manner and location indicated in the Loan Agreement or wherever else the Lender or such other holder may specify.

So long as Lender is the holder hereof, Lender's books and records shall be presumed, except in the case of manifest error, to accurately evidence at all times all amounts outstanding under this Note and the date and amount of each advance and payment made pursuant hereto.

Upon either (a) the occurrence of any Event of Default, or (b) on demand by Lender: (i) all amounts due under this Note, including the unpaid balance of principal and interest hereof, shall become immediately due and payable at the option of Lender, without any demand or notice whatsoever; and (ii) Lender may immediately and without demand exercise any of its rights and remedies granted under the Loan Agreement, other Financing Agreements, under applicable law, or which it may otherwise have, against Borrower or otherwise.

Borrower acknowledges and agrees that the amounts outstanding hereunder are payable on demand by Lender for any reason whether or not such reason is within the control of either the Borrower or Lender and whether or not there exists an Event of Default or breach of any of the Borrower's affirmative or negative covenants or other agreements hereunder or under any other instruments, documents or agreements delivered in connection herewith.

Borrower waives presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, except for such notices, if any, as are expressly required to be delivered by the Lender to Borrower under the Loan Agreement. Lender shall be entitled to exercise any right notwithstanding any prior exercise, failure to exercise or delay in exercising any such right.

The validity, interpretation and enforcement of this Note and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New Jersey but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New Jersey.

Borrower and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the Superior Court of New Jersey, Mercer County, and the United States District Court for the District of New Jersey, Mercer County Vicinage, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Note or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Note or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described

2

above (except that Lender shall have the right to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower or its property).

Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Borrower in any other manner provided under the rules of any such courts.

BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS NOTE OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS NOTE OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  BORROWER AND LENDER EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS NOTE WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

[Signature Page Follows On Next Page]

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has caused this Note to be executed by its duly authorized representatives the day and year first written above.

BORROWER:

**ARGON X LLC**,
a Delaware limited liability company

By:
Name: GARY ZUMSKI
Title: PRESIDENT

*Signature Page to Revolving Loan Note*

Exhibit 6

Execution Version

## MASTER CONSUMER LOAN PURCHASE AGREEMENT

This MASTER CONSUMER LOAN PURCHASE AGREEMENT (as amended, supplemented or otherwise modified and in effect from time to time, this "Agreement"), dated as of May 1, 2015, by and among ARGON X, LLC, a Delaware limited liability company (together with its successor in interest or any successor or assign under this Agreement as herein provided, the "Purchaser"), ARGON CREDIT LLC, a Delaware limited liability company ("ACC") and each of the subsidiary entities of ACC listed on Schedule 1.42 of the Loan Agreement (collectively, the "Subsidiary Originators" and together with ACC, the "Sellers").

W -I -T -N -E -S -E -T –H

**WHEREAS**, the Sellers desire to sell, from time to time, to the Purchaser, and the Purchaser desires to purchase, from time to time, from the Sellers, certain consumer loans as described herein which shall be delivered in groups of whole loans, on various dates as provided in the related Assignment and Conveyance (each, a "Closing Date");

**WHEREAS**, a schedule listing each Consumer Loan is annexed to the related Assignment and Conveyance delivered on the Closing Date as Schedule 1 thereto; and

**WHEREAS**, the Purchaser and the Sellers wish to prescribe the manner of the conveyance of the Consumer Loans;

**NOW, THEREFORE**, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

**SECTION 1.** Definitions. For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below. Capitalized terms used but not defined in this Agreement have the meaning ascribed to them in the Loan Agreement.

Adverse Claim: Any lien, charge, pledge, hypothecation, assignment, mortgage, claim, security interest, encumbrance or similar arrangement of any nature whatsoever.

Agreement: This Master Consumer Loan Purchase Agreement including all exhibits, schedules, amendments and supplements hereto.

Assignment and Conveyance: An assignment and conveyance and certification of release of the Consumer Loans purchased on a Closing Date in the form annexed hereto as Exhibit 1, each of which Assignment and Conveyance is incorporated by reference herein and made a part hereof.

Closing Date: The date or dates on which the Purchaser from time to time purchases and the Sellers from time to time sell to the Purchaser, the Consumer Loans listed on the related Consumer Loan Schedule with respect to the related Consumer Loan Pool.

Closing Documents: With respect to any Closing Date, the documents required pursuant to Section 9.

Collateral: As provided in Section 6.02.

Consumer Loan: Each consumer loan or Eligible Receivable, sold, assigned and transferred to the Purchaser pursuant to this Agreement and the related Assignment and Conveyance on the related Closing Date, which Consumer Loan includes without limitation, the Consumer Loan File, the Scheduled Payments, Prepayments and all other rights, benefits, proceeds and obligations arising from, received on account of, or in connection with such Consumer Loan.

Consumer Loan Documents: The documents, including the related Consumer Loan File, provided by or to a Consumer Loan Obligor in connection with the origination of any Consumer Loan.

Consumer Loan File: The Original Note, Records and other items pertaining to a particular Consumer Loan and any additional documents required to be added to the Consumer Loan File pursuant to this Agreement.

Consumer Loan Obligor: Any maker, co-maker, guarantor, or other obligor with respect to a Consumer Loan.

Consumer Loan Pool: The Consumer Loans listed on a list delivered to the Purchaser at least one (1) Business Day prior to the related Closing Date and attached to an Assignment and Conveyance as Schedule 1 on the related Closing Date.

Consumer Loan Schedule: With respect to each Consumer Loan Pool, the schedule of Consumer Loans to be annexed to an Assignment and Conveyance as Schedule 1 on each Closing Date for the Consumer Loan Pool delivered on such Closing Date in electronic form, such schedule setting forth the fields as set forth in Exhibit A to Exhibit 1 with respect to each Consumer Loan in the Consumer Loan Pool.

Debtor Relief Laws: Means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect

Defaulted Loan: Means a Consumer Loan for which the Obligor is in default pursuant to the terms of such Consumer Loan.

Due Date: The day of the calendar month on which the Scheduled Payment is due on a Consumer Loan, exclusive of any payment grace period.

E-SIGN: The federal Electronic Signatures in Global and National Commerce Act, as may be amended from time to time.

Electronic Record: A contract or other information record relating to a Consumer Loan that is created, generated, sent, communicated, received or stored by electronic means.

Event of Default: Any one of the events enumerated in Section 12.01.

FDIC:  The Federal Deposit Insurance Corporation, or any successor thereto.

Governmental Authority:   Any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency, intermediary, carrier or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

Initial Closing Date:  The Closing Date on which the Purchaser purchases and the Sellers sell the first Consumer Loans hereunder.

Interest Rate:  With respect to each Consumer Loan, the annual rate of interest provided for in the related Original Note, if such Consumer Loan bears interest.

Loan Agreement:  That certain Loan and Security Agreement, dated as of May 1, 2015, by and between Purchaser, as borrower thereunder, and Lender, as amended, restated, supplemented or otherwise modified from time to time.

Lender:  Fintech Financial, LLC, a Delaware limited liability company, as lender under the Loan Agreement, together with its successors and assigns in such capacity.

Original Note:  The original executed promissory note, deferred presentment agreement, title pledge agreement, line of credit or other contractual arrangement made and executed by any Consumer Loan Obligor in favor of a Seller evidencing a Consumer Loan made by such Seller to such Consumer Loan Obligor, in electronic form or otherwise.

Permitted Liens:  Means such of the following as to which (i) no enforcement, collection, execution, levy or foreclosure proceeding has been commenced, and (ii) assessments or other charges are not yet due and payable or are due but are not delinquent or are being contested in good faith by appropriate proceedings: (a) security interests in favor of the Lender granted by the Sellers and the Purchaser under the Loan Agreement and the other Financing Agreements (as defined in the Loan Agreement) executed by the Sellers and the Purchaser in connection therewith; (b) statutory liens for Taxes or other governmental charges; and (c) mechanics', carriers', workers' and repairers' Liens arising or incurred in the Ordinary Course of Business that are not material to the Business and that do not result from a breach, default or violation by the Company of any Contract, Law or order.

Prepayment:  Any payment or other recovery on a Consumer Loan which is received in advance of its scheduled Due Date.

Purchase Price:  The price paid on the related Closing Date by the Purchaser to the related Seller for the Consumer Loans purchased on such Closing Date as provided in Section 4.

Purchaser:  Argon X LLC, a Delaware limited liability company.

Records: All documents, books, records, computer tapes, disks, software, microfiche records and other information (including, without limitation, computer programs, data processing software and related property and rights) maintained with respect to Consumer Loans.

Recoveries: As provided in Section 4.

Relevant UCC: The Uniform Commercial Code as in effect on the date hereof in the State of Illinois, the state of the related Seller, or as in effect in any other jurisdiction applicable to the transaction.

Scheduled Payment: With respect to any Consumer Loan, the scheduled payment obligations of the Consumer Loan Obligor under the original terms of the Consumer Loan if fully and timely performed in accordance with the original terms thereof.

Stated Balance: As to each Consumer Loan, the amount of such Consumer Loan at origination.

Tax: Any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

Third Party Consents: As provided in Section 7.01(iii).

UETA: The Uniform Electronic Transactions Act, as amended and adopted by the state in which the related Electronic Record is initiated.

**SECTION 2.**  Agreement to Purchase.  The Sellers agree to sell, and the Purchaser agrees to purchase, subject to the terms and conditions set forth herein, from time-to-time, Consumer Loans described in each Assignment and Conveyance and accepted by the Purchaser on the related Closing Date.

**SECTION 3.**  Consumer Loan Schedules.  The applicable Seller shall deliver the Consumer Loan Schedule for a Consumer Loan Package to be purchased on a particular Closing Date to the Purchaser at least one (1) Business Day prior to the related Closing Date.

**SECTION 4.**  Purchase Price.  The Purchase Price for each Consumer Loan listed on the related Consumer Loan Schedule shall be equal to one hundred percent (100%) of the outstanding unpaid balance of the Consumer Loan set forth on such Consumer Loan Schedule. The Purchase Price will be paid by the Purchaser in U.S. dollars in immediately available funds on the related Closing Date. The Purchaser shall own and be entitled to receive with respect to each Consumer Loan purchased all of the following received in respect of a Consumer Loan from and after the date that each Consumer Loan is purchased: (1) all payments of principal and all other recoveries of payments received, (2) all payments of interest, and (3) all late fees and other ancillary fees collected on the related Consumer Loans or amounts of any kind received on account of the Consumer Loans (collectively, "Recoveries"). Purchaser shall not have any obligation or liability to any Consumer Loan Obligor or other customer or client of a Seller, including any obligation to perform any of the obligations of such Seller under any Consumer Loan, whether absolute or contingent or otherwise known or unknown. No such obligation or liability is intended to be assumed by Purchaser, and any assumption is expressly disclaimed.

**SECTION 5.**    Examination of Consumer Loan Files; Corporate Due Diligence.  The applicable Seller shall (a) deliver to the Purchaser, for examination with respect to each Consumer Loan to be purchased on such Closing Date, the related Consumer Loan File, or (b) make the related Consumer Loan File available to the Purchaser for examination at the Seller's offices or such other location as shall otherwise be agreed upon by the Purchaser and the Seller.  Such examination may be made by the Purchaser or its designee at any reasonable time before or after the related Closing Date.  If the Purchaser makes such examination prior to the related Closing Date and identifies any Consumer Loans that do not conform to the terms of the Credit and Collection Policies or the representations and warranties listed in Section 7.02, such Consumer Loans may, at the Purchaser's option, be rejected for purchase by the Purchaser.  If not purchased by the Purchaser, such Consumer Loans shall be deleted from the related Consumer Loan Schedule. The Purchaser may, at its option and without notice to the related Seller, purchase all or part of any Consumer Loan Pool without conducting any partial or complete examination.  The fact that the Purchaser has conducted or has determined not to conduct any partial or complete examination of the Consumer Loan Files shall not affect the Purchaser's right to any relief or remedy provided for in this Agreement.

**SECTION 6.**    Conveyance from Sellers to Purchaser.

**Subsection 6.01.**    Conveyance of Consumer Loans; Possession of Servicing Files.  Each Seller, simultaneously with the payment to the related Seller of the Purchase Price, shall execute and deliver to the Purchaser an Assignment and Conveyance with respect to the related Consumer Loan Pool.  The price paid for the Consumer Loans shall be the Purchase Price with respect thereto.  The cash portion of such Purchase Price shall be paid by means of an immediate cash payment to the applicable Seller by wire transfer on the applicable Closing Date to an account designated by such Seller on or before such Closing Date.  Any Recoveries received by such Seller following the Closing Date shall be transferred to the Purchaser.  On and after each Closing Date hereunder, the Purchaser shall own the Consumer Loans free and clear of any Adverse Claim (other than any Permitted Liens), and Sellers shall not take any action inconsistent with such ownership and shall not claim any ownership or other interest in such Consumer Loans.

**Subsection 6.02.**    Books and Records.  Record title to each Original Note as of the related Closing Date shall be in the name of the Purchaser or one or more designees of the Purchaser, as the Purchaser shall designate.  In connection with the sale and conveyance of the Consumer Loans under this Agreement, each Seller agrees, at its own expense, on or prior to each Closing Date, to indicate or cause to be indicated clearly and unambiguously in its accounting records that the Consumer Loans have been sold to the Purchaser pursuant to this Agreement.  All rights arising out of the Consumer Loans including, but not limited to, all funds and proceeds received by each Seller on and after the Closing Date in connection with a Consumer Loan, shall be vested in the Purchaser or one or more designees of the Purchaser and shall be received and held by such Seller in trust for the benefit of the Purchaser or the assignee of the Purchaser, as the case may be, as the owner of the Consumer Loans pursuant to the terms of this Agreement.

It is the express intention of the parties that the transactions contemplated by this Agreement be, and be construed as, sales of the Consumer Loans by the Sellers and not pledges

of the Consumer Loans by the Sellers to the Purchaser to secure a debt or other obligation of the Sellers. Consequently, the sale of each Consumer Loan shall be reflected as a sale on the applicable Seller's business records, Tax returns and financial statements (subject to the provision for consolidated reporting and Tax returns as permitted under Section 7.03(v)). In the event, for any reason, any transaction contemplated herein is construed by any court or regulatory authority as a borrowing rather than as a sale, the applicable Seller and the Purchaser intend that the Purchaser shall have a perfected first priority security interest in the Consumer Loans listed on the Consumer Loan Schedules, including, without limitation, all rights to Consumer Loan Files and other Records, and all rights of such Seller to agreements therein and to receive from any third party or to take delivery of any documents which constitute a part of the Consumer Loan File and the proceeds of any and all of the foregoing (collectively, the "Collateral"), free and clear of Adverse Claims other than any Permitted Liens. Without limiting the foregoing, each Seller hereby grants to the Purchaser a priority security interest in all of its right, title and interest in, to and under the Collateral, whether now existing or hereafter arising and wherever located, to secure all amounts due and owing by the Sellers to the Purchaser under this Agreement and the Assignment and Conveyances, and this Agreement shall constitute a security agreement under applicable law.

It is the intention of each Seller and the Purchaser that the Consumer Loans shall not be part of the related Seller's estate in the event of the filing of a bankruptcy or similar petition by or against such Seller under any Debtor Relief Law.

**Subsection 6.03.** Delivery of Consumer Loan Documents. The Sellers shall from time to time in connection with each Closing Date, at least one (1) Business Day prior to such Closing Date, deliver and release to the Purchaser those Consumer Loan Documents as required by this Agreement with respect to each Consumer Loan to be purchased and sold on the related Closing Date and set forth on the related Consumer Loan Schedule delivered with such Consumer Loan Documents.

**SECTION 7.** Representations, Warranties and Covenants of the Sellers; Remedies for Breach.

**Subsection 7.01.** Representations and Warranties Respecting the Sellers. The applicable Seller represents, warrants and covenants to the Purchaser as of the Initial Closing Date and each subsequent Closing Date or as of such date specifically provided herein or in the applicable Assignment and Conveyance:

(i) The Seller is duly formed, validly existing and in good standing under the laws of the State of Delaware. The Seller has all licenses, approvals and registrations, at both the federal and state level, to allow it to originate the Consumer Loans, and the Seller is in compliance with any and all restrictions and/or stipulations relating to such licenses approvals and registrations. No licenses, approvals or registrations obtained by the Seller have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii) The Seller has the full power and authority to hold each Consumer Loan, to sell each Consumer Loan and to execute, deliver and perform, and to enter into and consummate, all

transactions contemplated by this Agreement. The Seller has duly authorized the execution, delivery and performance of this Agreement and each Assignment and Conveyance, has duly executed and delivered this Agreement and each Assignment and Conveyance, and this Agreement and each Assignment and Conveyance constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by applicable bankruptcy, insolvency or reorganization principles;

(iii)    After taking into account any third party consents which have been obtained ("Third Party Consents"), the execution and delivery of this Agreement and each Assignment and Conveyance by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's articles of organization or operating agreement or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(iv)    The execution and delivery by the Seller, and the performance and compliance with the terms, of this Agreement and each Assignment and Conveyance will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(v)    The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement and each Assignment and Conveyance;

(vi)    Immediately prior to the payment of the Purchase Price for each Consumer Loan, the Seller was the owner of record of the related Consumer Loan and the indebtedness evidenced by the related Original Note and upon the payment of the Purchase Price by the Purchaser, in the event that the Seller retains record title, the Seller shall retain such record title to each Consumer Loan, each related Original Note and the related Consumer Loan Files with respect thereto in trust for the Purchaser as the owner thereof and only for the purpose of servicing and supervising the servicing of each Consumer Loan;

(vii)    There are no actions, suits, proceedings, orders, or injunctions pending of which the Seller has notice, or to the Seller's knowledge threatened, against or affecting the Seller or the Collateral, at law or in equity, or before or by any Governmental Authority or other tribunal, which (a) could reasonably be expected to result in a Material Adverse Change in the Seller or any Affiliate of the Seller; or (b) could reasonably be expected to result in a Material Adverse Change in all or any portion of the Collateral. Exhibit 2, attached hereto and incorporated herein by this reference, describes all currently pending litigation against the Seller or any Affiliate of the Seller;

(viii)    No consent, approval, authorization or order of any court or governmental agency

or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement and each Assignment and Conveyance or the consummation of the transactions contemplated by this Agreement and each Assignment and Conveyance, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the related Closing Date;

(ix)     The consummation of the transactions contemplated by this Agreement and each Assignment and Conveyance is intended to be in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Original Notes by the Seller pursuant to this Agreement and each Assignment and Conveyance are not subject to bulk transfer laws or any similar statutory provisions;

(x)     Neither this Agreement, each Assignment and Conveyance nor any written statement, report or other document prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement and each Assignment and Conveyance or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading;

(xi)     The consideration received by the Seller upon the sale of the Consumer Loans constitutes fair consideration and reasonably equivalent value for such Consumer Loans;

(xii)     The Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. The Seller is not transferring any Consumer Loan with any intent to hinder, delay or defraud any of its creditors;

(xiii)     The representations and warranties of Purchaser concerning the Seller contained in the Loan Agreement are true and correct in all material respects; and

(xiv)     Other than as disclosed to Purchaser and Lender and except for routine inquires, there are no pending inquires or investigations from the Federal Trade Commission, Illinois trade commission, U.S. Department of Justice, any state Attorneys General, or other governmental inquiry or investigation in connection with the marketing, sales, and origination of Consumer Loans.   The Seller is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any conveyance, directly or indirectly, will be used for a purpose that violates, or would be inconsistent with, Regulations T, U and X promulgated by the Federal Reserve Board from time to time.

**Subsection 7.02.**     Representations   and   Warranties   Regarding   Individual Consumer Loans.  Each Seller hereby represents and warrants to the Purchaser that, as to each related Consumer Loan, as of the related Closing Date for such Consumer Loan (unless such representation and warranty speaks to an earlier time, in which case such representation and warranty shall be deemed made as of such earlier time):

(i)     All information set forth on the related Consumer Loan Schedule with respect to such Consumer Loan is true, correct and complete in all material respects;

(ii)     The Seller has not advanced funds, or induced, solicited or knowingly

received any advance of funds from a party other than the Consumer Loan Obligor, directly or indirectly, for the payment of any amount required by the Original Note;

(iii)    There are no delinquent Taxes or other outstanding charges affecting the related Consumer Loan;

(iv)    The terms of the Original Note and the Consumer Loan have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Consumer Loan;

(v)    The Original Note and the Consumer Loan are not, except generally under Debtor Relief Laws, subject to any right of rescission, reformation, set off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Original Note and Consumer Loan render them unenforceable, in whole or in part, or subject to any right of rescission, reformation, set off, counterclaim or defense, including the defense of usury, and no Debtor Relief Laws, right of rescission, reformation, set off, counterclaim or defense has been asserted with respect thereto, and there is no basis for the Original Note or the Consumer Loan to be modified or reformed without the consent of the holder thereof under applicable law;

(vi)    Each Consumer Loan materially complied with any and all requirements of Applicable Laws and Credit and Collection Policies;

(vii)    Neither the Original Note nor the Consumer Loan has been satisfied, cancelled, subordinated or rescinded, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(viii)    Each of the Original Note and the Consumer Loan is genuine and is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, and the Original Note and the Consumer Loan evidence all the payment obligations of the Consumer Loan Obligor in respect of the Original Note and the Consumer Loan;

(ix)    To the knowledge of Seller, all parties to the Original Note had legal capacity to enter into the Original Note and to execute and deliver the Original Note, and the Original Note has been duly and properly executed by such parties. The Consumer Loan Obligor is a natural person;

(x)    Except as set forth on Schedule 1, to any Assignment and Conveyance, the proceeds of the Consumer Loan have been fully disbursed to or for the account of the Consumer Loan Obligor and there is no obligation for the Seller or the Purchaser to advance additional funds thereunder, and all costs, fees and expenses incurred in making or closing the Original Note have been paid, and the Consumer Loan Obligor is not entitled to any refund of any amounts paid or due to the Purchaser pursuant to the Original Note;

(xi)    The Seller is the sole legal, beneficial and equitable owner of the Original Note and the Consumer Loan. The Seller has full right and authority under all governmental and regulatory bodies having jurisdiction over such Seller, subject to no interest or participation of, or agreement with, any party, to transfer and sell the Original Note and the Consumer Loan to

the Purchaser pursuant to this Agreement free and clear of any Adverse Claim other than any Permitted Liens; and immediately upon the transfers and assignments herein contemplated, the Seller shall have transferred and sold all of its right, title and interest in and to each Original Note and Consumer Loan and the Purchaser will hold good, marketable and indefeasible title to, and be the owner of, each Original Note and Consumer Loan subject to no Adverse Claim (other than any Permitted Liens);

(xii)     No party other than Seller has originated or owned, prior to the applicable Closing Date, the Original Note and Consumer Loan. Seller has been, at all times during such period: (A) formed under the laws of Delaware, (B) qualified to do business in the state or states in which the Consumer Loans were originated, and (C) not doing business in any other jurisdiction so as to require qualification or licensing;

(xiii)    There is no default, breach, violation or event of acceleration existing under the Original Note and Consumer Loan and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(xiv)    The Consumer Loan Documents have been delivered to the Purchaser or its agent or custodian, all in compliance with the specific requirements of this Agreement;

(xv)     Payments on the Original Note shall commence (with respect to any newly originated Consumer Loans) or commenced no more than forty-five (45) days after the proceeds of the Consumer Loan were disbursed. The Original Note, if it bears interest, bears interest at the Interest Rate. Each Consumer Loan complies with the maximum term, maximum number of days between contractual payment dates, minimum loan amount and maximum loan amounts, if any, as set forth in the Loan Agreement;

(xvi)    The origination, collection and servicing practices used by the Seller or its agent with respect to each Consumer Loan have been in all material respect complied with Applicable Laws and the terms of the Consumer Loan;

(xvii)   The Consumer Loan evidenced by the Original Note contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Consumer Loan Obligor. The Original Note and Consumer Loan have not been subject to any bankruptcy proceeding and, to the knowledge of Seller, the Consumer Loan Obligor has not filed for protection under applicable bankruptcy laws. There is no exemption or other right available to the Consumer Loan Obligor or any other person, or restriction on the Seller or any other person, including without limitation, any federal, state or local, law, ordinance, decree, regulation, guidance, attorney general action, or other pronouncement, whether temporary or permanent in nature, other than Debtor Relief Laws applicable to a proceeding filed after the applicable Closing Date, that would interfere with, restrict or delay the ability of the Seller, Purchaser, Lender or any servicer or any successor servicer to enforce its rights thereunder on the related Original Note;

(xviii)   In the event that (A) the sale of Consumer Loans by the Seller is deemed by a

court or applicable regulatory, administrative or other governmental body contrary to the express intent of the parties to constitute a pledge rather than a sale or contribution of the Consumer Loans or (B) if amounts available now or in the future for reimbursement of any Consumer Loans are held to be property of the Seller or a loan to the Seller, or (C) if for any reason this Agreement is held or deemed to be a financing or some other similar arrangement or agreement, then this Agreement creates a valid and continuing security interest (as defined in the Relevant UCC) in the Consumer Loans in favor of the Purchaser, which is enforceable against creditors of and purchasers from the Seller, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, now or hereafter in effect, and by general principles of equity (whether considered in a suit at law or in equity). Upon (x) attachment and (y) the filing of the financing statements described in clause (xxi) below, the security interest in favor of the Purchaser in the Consumer Loans will be prior to all other Liens;

(xix)    The Consumer Loan is not evidenced by an electronic document that constitutes a "transferable record" as defined in the Uniform Electronic Transactions Act;

(xx)    The Seller has caused or will have caused, within ten days of the date hereof, the filing of all appropriate UCC financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted by the Seller to the Purchaser under Section 6.02;

(xxi)    Other than the security interest granted to the Purchaser pursuant to Section 6.02 and except for Permitted Liens, the Seller has not pledged, assigned, sold, granted a security interest in or otherwise conveyed any of the Consumer Loans.  Except with respect to Permitted Liens, the Seller has not authorized the filing of and is not aware of any financing statements against the Seller that include a description of collateral covering the Consumer Loans other than any financing statement relating to the security interest granted to the Purchaser pursuant to Section 6.02;

(xxii)    The Original Note and Consumer Loan were underwritten in accordance with the Credit and Collection Policies in effect at the time the Consumer Loan was originated;

(xxiii)    No Original Note or Consumer Loan contains provisions pursuant to which Scheduled Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Consumer Loan Obligor, or anyone on behalf of the Consumer Loan Obligor, (b) paid by any source other than the Consumer Loan Obligor or (c) contains any other similar provisions which may constitute a "buydown" provision. The Original Note is not a graduated payment Consumer Loan and the Original Note does not have a shared appreciation or other contingent interest feature;

(xxiv)    The Seller has no knowledge of any circumstances or condition with respect to the Original Note, the Consumer Loan, the Consumer Loan Obligor or the Consumer Loan Obligor's credit standing that can reasonably be expected to cause the Original Note or Consumer Loan to be an unacceptable investment, cause the Original Note or Consumer Loan to become delinquent, or adversely affect the value of the Original Note or Consumer Loan;

(xxv)    To the knowledge of Seller, no error, omission, misrepresentation, negligence,

fraud or similar occurrence with respect to an Original Note has taken place on the part of any person, including without limitation the Consumer Loan Obligor or any other party involved in the origination of the Consumer Loan;

(xxvi)     Interest on each Original Note that bears interest is calculated on the basis of a 365-day year;

(xxvii)     No selection procedures were used by the Seller that identified the Consumer Loans as being less desirable or valuable than other comparable Consumer Loans in the Seller's entire portfolio of unsecured consumer loans originated under state licenses held by Seller;

(xxviii)     No Consumer Loan Obligor is the obligor on more than one Original Note, except as permitted by Applicable Law and Credit and Collection Policies;

(xxix)     To the extent that Seller utilizes Equifax, Experian or Trans Union Credit Information Company, the Seller or its servicer with respect to the Consumer Loans has fully furnished, and will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to such credit repositories on a monthly basis;

(xxx)     The Seller has been given fair consideration and reasonably equivalent value in exchange for the sale of such Consumer Loan;

(xxxi)     The Original Notes and Consumer Loans are and shall, subject to Debtor Relief Laws, remain in full force and effect as valid and binding obligations of the respective Consumer Loan Obligors thereof in favor of the Purchaser, as the assignee of all of the Seller's right, title, and interest therein;

(xxxii)     To the knowledge of the Seller, none of the Original Notes is forged or has affixed thereto any unauthorized signatures;

(xxxiii)     There have been no material modifications or amendments whatsoever to the Original Notes and Consumer Loans, other than those expressly approved by Purchaser (or its pledgees) in writing, the originals of which have been delivered to the Purchaser;

(xxxiv)     The Consumer Loan File contains evidence that the parties to any Electronic Record relating to a Consumer Loan have appropriately agreed to the use of such Electronic Record and/or electronic signature such that a binding and enforceable Electronic Record under ESIGN, UETA and other applicable laws has been created;

(xxxv)     All Electronic Records for the Consumer Loans sold to Purchaser comply with the standards of (i) E-SIGN, (ii) the Electronic Signatures in Global and National Commerce Act and any other applicable laws relating to the electronic execution of documents and instruments and, if applicable, UETA as adopted by the state in which the electronic record is initiated, (iii) the Electronic Funds Transfer Act, (iv) all amendments to and rules and regulations promulgated under the foregoing, and (v) any other additional requirements related to the use of electronic signatures, records and disclosures that are imposed by applicable regulatory agencies or state legislation;

(xxxvi)    The delivery to Purchaser or its designee of the Consumer Loan Documents, the filing of UCC financing statements with the Secretary of State of the State of Delaware and the other loan documents create in favor of Purchaser valid and perfected first priority liens and security interests in and to all of the Original Notes. Each Original Note secures the full payment and performance of the related Consumer Loan; and

(xxxvii)    The grant of the security interests described herein by Seller in favor of Purchaser has not adversely affected and will not adversely affect the validity or enforceability of the obligations of the respective makers of the Original Notes thereunder or pursuant to any related documents or instruments.

Subsection 7.03.    Covenants of Sellers.    Each Seller covenants to the Purchaser as follows:

(i)    Information.    The Seller shall furnish to the Purchaser, to the fullest extent permitted by law, such information (including financial information), documents, records or reports with respect to the Consumer Loans as the Purchaser may from time to time reasonably request.

(ii)    Ownership.    The Seller will take all action necessary to effect and maintain the Purchaser's ownership interest in the Consumer Loans free and clear of any Adverse Claim (other than any Permitted Liens).

(iii)    Covenants.    The Seller shall duly observe and perform each of its covenants set forth in this Agreement.

(iv)    Change of Name; Jurisdiction of Organization.    The Seller will not change its name, identity, jurisdiction of organization or corporate structure unless it has given the Purchaser at least thirty (30) days' prior written notice thereof and shall have taken all action necessary or reasonably requested by the Purchaser to amend its existing UCC financing statements and continuation statements so that they are not misleading and to file additional UCC financing statements in all applicable jurisdictions to perfect the ownership interests of the Purchaser and its pledges in the Consumer Loans.

(v)    True Sale.    The Seller will not account for or treat (whether in financial statements or otherwise) the transactions contemplated by this Agreement in any manner other than as a true sale and/or contribution, as the case may be, of the Consumer Loans by the Seller to the Purchaser. The Purchaser may be consolidated with Seller solely for the purposes of filing consolidated income Tax returns and preparing consolidated financial statements (provided such statements show the Purchaser as a separate entity) in accordance with the applicable accounting rules, including GAAP.

(vi)    Legal Conditions to Closing.    The Seller will take all reasonable action necessary to obtain any consent, authorization, permit, license, franchise, order or approval of, or any exemption by, any governmental authority or any other person, required to be obtained or made by it in connection with any of the transactions contemplated by this Agreement.

(vii)    Seller Obligations.    On and after the initial Closing Date, Seller will do, execute

and perform all such other acts, deeds and documents as the Purchaser may from time to time reasonably require in order to carry out the intent of this Agreement.

(viii)  Bankruptcy.  The Seller shall not take any action in any capacity to file any bankruptcy, reorganization or insolvency proceedings against the Purchaser, or cause the Purchaser to commence any reorganization, bankruptcy or insolvency proceedings under any applicable state or federal law, including without limitation any readjustment of debt, or marshaling of assets or liabilities or similar proceedings.

(ix)  Compliance with Laws.  The Seller shall comply in all material respects with all laws, rules and regulations and orders applicable to the Seller with respect to the Consumer Loans.

(x)  No Liens, Etc. Against Consumer Loans.  Other than Permitted Liens, the Seller hereby covenants and agrees not to create or suffer to exist (by operation of law or otherwise) any Adverse Claim upon or with respect to, any of the Consumer Loans or any of its interest therein, if any, or assign any right to receive income in respect thereof. The Seller shall immediately notify the Purchaser of the existence of any such Adverse Claim (other than Permitted Liens) on any of the Consumer Loans and the Seller shall defend the right, title and interest of the Purchaser in, to and under the Consumer Loans, against all claims of third parties.

(xi)  Books and Records.  The Seller shall maintain accounts and records as to each Consumer Loan hereunder accurately and in sufficient detail to permit the reader thereof to know at any time the status of such Consumer Loan, including payments and recoveries made and payments owing (and the nature of each, if applicable). The Seller shall maintain its computer records so that, from and after the time of each Closing Date hereunder, the Seller's master computer records (including any back-up archives) that refer to any Consumer Loans indicate clearly the interest of the Purchaser in such Consumer Loans and that the Consumer Loan is owned by the Purchaser.

(xii)  Preference; Voidability.  The Seller warrants that the conveyance of the Original Notes and Consumer Loans to the Purchaser, and each such conveyance, shall not have been made for or on account of an antecedent debt owed by the Seller to the Purchaser and no such transfer is or may be voidable under any Debtor Relief Laws.

Subsection 7.04.  Remedies for Breach of Representations and Warranties and Covenants.  It is understood and agreed that the representations and warranties set forth in Sections 7.01 and 7.02 shall survive the sale of the Consumer Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Original Note or the examination or lack of examination of any Consumer Loan File.

Upon discovery by a Seller or the Purchaser of a breach of any of the representations and warranties in Sections 7.01 and 7.02 or covenants in Section 7.03, which materially and adversely affects the value, marketability or collectability of the Consumer Loans or the interest of the Purchaser (or which materially and adversely affects the value, marketability or collectability of a Consumer Loan or the interests of the Purchaser in the related Consumer Loan

in the case of a representation and warranty or covenants relating to a particular Consumer Loan), the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days of the earlier of either discovery by or notice to the applicable Seller of any breach of a representation or warranty set forth in <u>Section 7.02</u> (without regard to any knowledge qualifiers therein), which materially and adversely affects the value of a Consumer Loan or the Consumer Loans, such Seller shall use its best efforts promptly to cure such breach in all material respects, and, if such breach cannot be cured, such Seller shall, at the Purchaser's option, repurchase such Consumer Loan or Consumer Loans at the Repurchase Price (as defined below) or provide a substitute Consumer Loan or Consumer Loans acceptable to Purchaser in its discretion.

"<u>Repurchase Price</u>" with respect to any repurchased Consumer Loan means the sum of the outstanding balance of such Consumer Loan plus, if such Consumer Loan accrues interest, the accrued but unpaid interest thereon at the applicable Interest Rate at the time of repurchase, or if such Consumer Loan is not interest bearing the Interest Rate, as defined in the Loan Agreement, <u>multiplied by</u> (ii) a fraction, the numerator of which is the Purchase Price of such Consumer Loan and the denominator of which is the outstanding balance of such Consumer Loan at the time of original purchase by the Purchaser from such Seller.

Any Repurchase Price shall be paid by the applicable Seller directly to the Collection Account (as defined in the Loan Agreement) and, upon such payment, all right, title and interest in and to the related Consumer Loan, together with all related Collateral, shall vest immediately in such Seller. The Purchaser shall cooperate with the related Seller in documenting the transfer of such repurchased Consumer Loan and other Collateral from Purchaser (or Purchaser's assignees) to such Seller, free of any other security interests whatsoever.

For the avoidance of doubt, and subject to <u>Section 10</u> below, a Seller shall not be required to repurchase any Consumer Loan unless arising out of a breach of representation and warranty in <u>Section 7.02</u> and not solely on the failure of any Consumer Loan Obligor to pay amounts due and owing under a Consumer Loan after the sale of such Consumer Loan from such Seller to Purchaser under this Agreement.

**SECTION 8.** <u>Closing</u>. The closing for each Consumer Loan Pool shall take place on the related Closing Date. At the Purchaser's option, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree. The closing for the Consumer Loans to be purchased on each Closing Date shall be subject to each of the following conditions:

(a)     all of the representations and warranties of the related Seller under this Agreement shall be true and correct as of the related Closing Date and no event shall have occurred which, with reasonable notice to such Seller or the passage of time, would constitute a default under this Agreement;

(b)     the Purchaser shall have received, or the Purchaser's attorneys shall have received in escrow, all Closing Documents as specified in <u>Section 9</u>, in such forms as are agreed upon and

acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(c)     the related Seller shall have delivered and released to the Purchaser all documents required pursuant to this Agreement; and

(d)     all other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, the Purchaser shall pay to the applicable Seller on the related Closing Date the Purchase Price by wire transfer of immediately available funds to the account designated by such Seller.

**SECTION 9.**     Closing Documents.

(a)     On or before the Initial Closing Date, the Sellers shall submit to the Purchaser fully executed originals of the following documents:

(1)     this Agreement; and

(2)     the Purchaser and any assignee shall have received evidence reasonably satisfactory to the Purchaser and such assignee of the completion of all recordings, registrations, and filings (including pursuant to the Relevant UCC) as may be necessary or, in the reasonable opinion of the Purchaser or such assignee, desirable to perfect or evidence the sale and assignment by the Sellers to the Purchaser and such assignee of the Sellers' interest in the Consumer Loans and the proceeds thereof.

(b)     The Closing Documents for the Consumer Loans to be purchased on each Closing Date shall consist of fully executed originals of the following documents:

(1)     the related Consumer Loan Schedule to be attached to the related Assignment and Conveyance; and

(2)     an Assignment and Conveyance.

**SECTION 10.**     Repurchase of Defaulted Loans.  Upon any Consumer Loan becoming a Defaulted Loan, the related Seller shall be required to repurchase such Defaulted Loan from the Purchaser by depositing the Repurchase Price for such Consumer Loan in the Collection Account.  Upon any such repurchase, Purchaser shall execute an Assignment and Conveyance in the form of Exhibit 3 hereto to transfer and assign such Defaulted Loan to such Seller.

**SECTION 11.**     Costs.  The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys.  All other costs and expenses incurred in connection with the transfer and delivery of the Consumer Loans and the related Seller's attorney's fees, shall be paid by such Seller.

**SECTION 12.**     Default.

**Subsection 12.01.**   Events of Default.  In case one or more of the following Events of Default by any Seller shall occur and be continuing, that is to say:

(a)    failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser; or

(b)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(c)    the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Seller or of or relating to all or substantially all of its property; or

(d)    the Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(e)    the Seller attempts, without the consent of the Purchaser, to sell or otherwise dispose of all or substantially all of its property or assets, unless the Loan to Borrower from Lender is paid in full upon the closing of such transaction, or to assign this Agreement or to delegate its duties hereunder or any portion thereof; then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Purchaser, by notice in writing to the Seller may, in addition to whatever rights the Purchaser may have at law or in equity to damages, including injunctive relief and specific performance, without prior notice to Seller, any such notice being expressly waived by Seller to the extent permitted by applicable law, upon any amount becoming due and payable by Seller hereunder (whether at the stated maturity, by acceleration or otherwise).

**Subsection 12.02.**   Waiver of Defaults.  No waiver by Purchaser of any default by a Seller in the performance of its obligations hereunder extends to any other Seller or any subsequent or other default or impairs any right consequent thereon.

**SECTION 13.**   Limitation on Rights of Others; Third-Party Beneficiaries.  Nothing in this Agreement, whether express or implied, shall be construed to give any person or entity, other than the parties hereto, any legal or equitable right remedy or claim under or in respect of this Agreement.  Notwithstanding the foregoing, the parties hereto agree that the Lender and its assigns are intended to be, and hereby are, an express third party beneficiary to this Agreement and have the authority to enforce the provisions hereof; provided that neither the Lender nor any

of its assigns shall have any obligation or duty to the Sellers or the Purchaser under this Agreement.

**SECTION 14.** Further Assurances. Each Seller agrees that it holds the Consumer Loans in custody for the Purchaser subject to (i) the Purchaser's right to reject any Consumer Loan under the terms of this Agreement, and (ii) obligation to pay the related Purchase Price for the Consumer Loans. In connection with the foregoing sales, each Seller will record and file at its own expense, on or prior to the Initial Closing Date, a financing statement with respect to the Consumer Loans and such Seller agrees to deliver a file-stamped copy of such financing statement or other evidence of such filings to the Purchaser and the Lender promptly upon receipt.

At the Purchaser's direction, the Sellers shall execute such other documents and instruments as the Purchaser may reasonably request from time to time in order to effectuate the foregoing and shall return to the Purchaser the executed copy of such documents and instruments. Without limiting the generality of the foregoing, each Seller shall forward for filing, or shall cause to be forwarded for filing, at the expense of such Seller, all filings necessary to maintain the effectiveness of any original filings necessary under the Relevant UCC to perfect the Purchaser's security interest described in Section 6.02 and this Section 14, including without limitation (x) UCC continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of such Seller or the Purchaser (such preparation and filing shall be at the expense of the Purchaser, if occasioned by a change in the Purchaser's name), or (2) any change of location of the jurisdiction of organization of such Seller. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

**SECTION 15.** Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or by electronic means (upon reply confirmation of receipt) or, if by other means, when received by the other party at the address as follows (with copies to the Lender as provided in the Loan Agreement):

**SECTION 16.**

(i)     if to the Purchaser:

         ARGON X, LLC
         c/o Argon Credit LLC
         760 Village Center Dr., Suite 230
         Burr Ridge, IL 60527
         Attention:  Raviv Wolfe, CEO
         Email:  rwolfe@argoncredit.com

(ii)    if to any Seller:

         c/o Argon Credit LLC

760 Village Center Dr., Suite 230
Burr Ridge, IL 60527
Attention: Raviv Wolfe, CEO
Email: rwolfe@argoncredit.com

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**SECTION 17.** Severability Clause. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Consumer Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

**SECTION 18.** Counterparts, Facsimile Signatures. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. The parties agree that this Agreement, any documents to be delivered pursuant to this Agreement and any notices hereunder may be transmitted between them by email and/or by facsimile. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties. The original documents shall be promptly delivered, if requested.

**SECTION 19.** Governing Law. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL LAW. THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. SELLER AND PURCHASER AND ANY OTHER PARTY ASSERTING THE RIGHT TO MAINTAIN AN ACTION UNDER TO THIS AGREEMENT, EACH IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE DISTRICT OF DELAWARE FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND (II) WAIVES, TO THE

FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT.

**SECTION 20.** Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and enforceable by the Sellers and the Purchaser and their respective permitted successors and assigns. Notwithstanding anything to the contrary herein, other than the Purchaser's pledge and assignment of its right, title and interest in, to and under this Agreement to the Lender, this Agreement may not be assigned, pledged or hypothecated by the Seller or the Purchaser without the prior written consent of the Lender, as ultimate assignee of Purchaser pursuant to the Loan Documents.

**SECTION 21.** Waivers. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

**SECTION 22.** Exhibits. The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**SECTION 23.** General Interpretive Principles. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c) references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d) reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall mean without limitation by reason of enumeration.

**SECTION 24.** Reproduction of Documents. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in

evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**SECTION 25.**  Further Agreements.  Each Seller and the Purchaser agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

[Signature Page to follow]

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

ARGON X, LLC
a Delaware limited liability company,
(Purchaser)

By: ARGON CREDIT LLC, not in its individual capacity
but solely as Managing Member of Argon X, LLC

By: _____
Name: Raviv Wolfe
Title: Chief Executive Officer


ARGON CREDIT LLC
a Delaware limited liability company,
as a Seller

By: _____
Name: Raviv Wolfe
Title: Chief Executive Officer


[Signature Page to Master Consumer Loan and Purchase Agreement]

**ARGON CREDIT OF ALABAMA LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

**ARGON CREDIT OF CALIFORNIA LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

**ARGON CREDIT OF GEORGIA LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

**ARGON CREDIT OF ILLINOIS LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

**ARGON CREDIT OF LOUISIANA LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

**ARGON CREDIT OF UTAH LLC**
a Delaware limited liability company,
as a Seller

By: _____
Name: Gary Zumski
Title:  President

[Signature Page to Master Consumer Loan and Purchase Agreement]

Exhibit 7

## GUARANTY AND SURETYSHIP AGREEMENT

**THIS GUARANTY AND SURETYSHIP AGREEMENT** (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented, referred to as this "Guaranty"), is made this 1st day of May, 2015 executed by **ARGON CREDIT LLC**, a Delaware limited liability company (the "Parent"), and **ARGON CREDIT OF ALABAMA LLC**, a Delaware limited liability company, **ARGON CREDIT OF CALIFORNIA LLC**, a Delaware limited liability company, **ARGON CREDIT OF LOUISIANA LLC**, a Delaware limited liability company, **ARGON CREDIT OF GEORGIA LLC**, a Delaware limited liability company, **ARGON CREDIT OF UTAH LLC**, a Delaware limited liability company and **ARGON CREDIT OF ILLINOIS LLC**, a Delaware limited liability company (such other limited liability companies being hereinafter individually and collectively referred to as the "Loan Originators", and together with the Parent, the "Guarantor"),

### IN FAVOR OF

**FINTECH FINANCIAL LLC**, a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, its successors and assigns (hereinafter collectively referred to as the "Lender").

### WITNESSETH

**WHEREAS**, pursuant to the terms, conditions, and provisions of that certain Loan and Security Agreement dated of even date herewith, executed by and among, *inter alia*, **ARGON X LLC**, a Delaware limited liability company, (the "Borrower") and the Lender (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented, referred to as the "Loan Agreement"), the Lender has agreed to make available to the Borrower a revolving credit facility in a maximum principal amount of Twenty Million and 00/100 Dollars ($20,000,000.00) (the "Loan Facility"); and

**WHEREAS**, the Loan Facility is evidenced by that certain Revolving Loan Note dated of even date herewith, executed by the Borrower, as maker, in favor of the Lender, as payee, in the maximum principal amount of Twenty Million and 00/100 Dollars ($20,000,000.00) (the "Note"); and

**WHEREAS**, all words and terms not expressly defined herein shall have the respective meanings and be construed herein as provided for in the Loan Agreement; and

**WHEREAS**, the Guarantor has a direct and indirect financial interest in the Borrower and shall receive both a direct and an indirect benefit from the Lender's making the Loan Facility available to the Borrower; and

**WHEREAS**, as an inducement to the Lender to make the Loan Facility available to the Borrower, the Lender has required that the Guarantor unconditionally enter into and execute this Guaranty, hereby guarantying the full, prompt and unconditional payment when due and

performance of certain liabilities and obligations due and owing to the Lender in connection with the Loan Facility, all as more fully set forth and described in Paragraph 1 below.

**NOW, THEREFORE, IN CONSIDERATION OF THE LOAN FACILITY MADE AVAILABLE TO THE BORROWER AND WITH KNOWLEDGE THAT THE LENDER WOULD NOT MAKE THE LOAN FACILITY AVAILABLE BUT FOR THE PROMISES OF THE GUARANTOR HEREUNDER, THE GUARANTOR HEREBY ABSOLUTELY AND UNCONDITIONALLY, REPRESENTS, WARRANTS, AND COVENANTS AS FOLLOWS:**

1. The Guarantor hereby unconditionally and irrevocably guaranties to the Lender, its successors, endorsers, transferees and assigns, and becomes surety as though it were a primary obligor for, the full, prompt and unconditional payment of each and every "Liability of the Borrower" (as such term is defined below) owing to the Lender, when and as the same become due, whether at the stated maturity date, by acceleration or otherwise, including, without limitation, the full, prompt and unconditional performance of each and every term and condition of any transaction or obligation to be kept and performed by the Borrower under the Loan Agreement, Revolving Loan Note, and all of the other Financing Agreements. This Guaranty is a primary obligation of the Guarantor and shall be a continuing agreement of guaranty. Subject to the last paragraph of this Paragraph 1, in the event any Liability of the Borrower shall not be paid or performed according to its terms, the Guarantor shall immediately pay and perform the same, this Guaranty being a guaranty of full payment and performance, and not collectability.

For the purposes of this Guaranty, the defined term "Liability of the Borrower" or "Liabilities of the Borrower" shall include all obligations and liabilities of the Borrower owed to the Lender in connection with the Loan Facility, whether direct or indirect, absolute or contingent, joint or several, monetary or otherwise, now or hereafter existing, due or to become due, to, and all obligations and liabilities of any successor of the Borrower owed to the Lender in connection with the Loan Facility, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing, due or to become due, to, or held by, the Lender in accordance with the terms, conditions, and provisions of the Loan Agreement and in compliance with all applicable laws.

The Lender agrees that if, at a time when no Event of Default exists, Lender makes a demand for repayment of the outstanding Revolving Loans pursuant to Section 2.3 of the Loan Agreement that is based on the withdrawal of Lender's funding sources or the need to repay such funding sources, Lender will not pursue any claims or enforcement action against the Parent under this Guaranty unless and until the Lender has used commercially reasonable efforts to collect the Revolving Loans through the collection of the Eligible Receivables and there remains an unpaid balance of the Obligations of the Borrower; provided, however, that this limitation shall not apply to any enforcement actions that the Lender may elect to take in the event that an Event of Default has occurred and is continuing.

2. To secure all of its obligations and liabilities hereunder, each Guarantor hereby grants to the Lender a security interest in all consumer loans and related contracts, contract files,

2

118167014_6

accounts, receivables and other rights that such Guarantor may from to time assign and transfer directly or indirectly to the Borrower pursuant to assignments or similar documents of transfer, and all proceeds thereof, and hereby authorizes the Lender to file UCC financing statements against such Guarantor with respect thereto.

3.      The Guarantor hereby represents and warrants that all financial statements heretofore delivered by the Guarantor to the Lender, if any, (i) are true, correct and complete in all material respects, fairly represents the Guarantor's financial condition as of the date thereof, and no material adverse change has occurred in the Guarantor's financial condition reflected therein since the dates thereof, which could materially and adversely affect its ability to perform its obligations hereunder and (ii) to its knowledge, no information has been omitted which would make the information previously furnished in such financial statements misleading or incorrect in any material respect. The Guarantor agrees that it shall promptly notify the Lender in writing of the occurrence of any material adverse change in the Guarantor's financial condition.

4.      The Guarantor hereby represents and warrants that it is a limited liability company, duly organized, and validly existing, and in good standing under the laws of the State of Delaware, has all necessary power and authority to transact the business in which it is engaged; is duly licensed or qualified and in good standing in each other jurisdiction in which the conduct of such business requires such licensing or such qualification, except where the failure to be so licensed or qualified would not have a material adverse effect. Guarantor has all necessary power and authority to enter this Guaranty and to execute, deliver and perform this Guaranty and any other document executed in connection with this Guaranty, all of which have been duly authorized by all proper and necessary action by Guarantor.

5.      The Guarantor hereby represents and warrants that neither the execution and delivery of this Guaranty nor any other document, agreement, certificate and instrument to which it is a party or by which it is bound in connection with the Loan Facility, nor the consummation of the transactions contemplated hereunder or thereunder or the compliance with or performance of the terms and conditions herein or therein will result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the Guarantor's property or assets, except as permitted in or anticipated by this Guaranty or the Loan Agreement, or is prevented by, limited by, conflicts with or will result in the breach or violation of or a default under the terms, conditions or provisions of any indenture, evidence of indebtedness, loan or financing agreement, or other material agreement or instrument of whatever nature to which it is a party or by which it is bound, or any provision of any existing law, rule, regulation, order, writ, injunction or decree of any court or governmental authority to which it is subject.

6.      The Guarantor hereby represents and warrants that it is not a party to any action, suit, proceeding, inquiry, hearing or investigation pending, or to the best of the Guarantor's knowledge, after due inquiry and investigation, threatened, in any court of law or in equity, or before or by any governmental authority wherein there is a reasonable probability that an unfavorable determination, decision, decree, ruling or finding would (i) result in any material adverse change in the Guarantor's business, assets, liabilities, financial condition, properties or operations, (ii) materially adversely affect the transactions contemplated by this Guaranty and

3

the Guarantor's ability to perform the Guarantor's obligations hereunder, or (iii) adversely affect the validity or enforceability of this Guaranty. The Guarantor represents and warrants that, to the best of the Guarantor's knowledge, after due inquiry and investigation, it is not in violation of or default with respect to any order, writ, injunction, decree or demand of any such court or Governmental Authority.

7.      The Guarantor hereby represents and warrants that (i) all consents, approvals, orders or authorizations of, or registrations, declarations or filings with any Governmental Authority which are required in connection with the Guarantor's valid execution and delivery of this Guaranty, and the Guarantor's carrying out or performance of any of the transactions required or contemplated hereunder, have been obtained or accomplished and are in full force and effect and (ii) to the best of the Guarantor's knowledge, after due inquiry and investigation, all timely consents, approvals, orders or authorizations of, or registrations, declarations or filings with any Governmental Authority which are required in connection with the making available of the Loan Facility to the Borrower have been obtained or accomplished and are in full force and effect.

8.      Subject to Paragraph 1 above, as the result of issuance of the Guaranty, the Guarantor becomes jointly and severally liable together with the Borrower for all the claims of the Lender towards the Borrower. The Guarantor hereby represents and warrants that (i) the assumption by the Guarantor of the Guarantor's obligations hereunder will result in material benefits to the Guarantor and (ii) this Guaranty, when executed and delivered by the Guarantor, will constitute a legal, valid, and binding obligation on the Guarantor's part, enforceable against the Guarantor in accordance with its terms, subject, as to enforcement of remedies only, to any applicable bankruptcy, insolvency, reorganization, moratorium, similar laws of general application at the time in effect and general principles of equity.

9.      The Guarantor hereby represents and warrants that it has duly filed or caused to be filed all Federal, state and municipal tax reports and returns which are required to be filed by the Guarantor and has paid or made adequate provision for the payment of, all taxes, assessments, fees and other governmental charges which have become due pursuant to said returns, or otherwise pursuant to any assessment received by the Guarantor.

10.     The Guarantor hereby represents and warrants that it has good and marketable title to all of the Guarantor's properties and assets listed in the most recent financial statements delivered to the Lender on or prior to the date hereof (except as otherwise expressly described in said financial statements, and except those properties and assets disposed of since the date of said financial statements in the ordinary course of business).

11.     The Guarantor hereby represents and warrants that to the best of its knowledge (i) it is not in violation of, or in default in any material respect with regard to, any applicable laws and/or regulations which violation or default materially and adversely affect the Guarantor's business, financial condition, property or operations and (ii) it is not in violation of, or in default (nor is there any waiver in effect which, if not in effect, would result in a violation or default) in any material and adverse respect under, any indenture, evidence of indebtedness, loan or

4

financing agreement, or other material agreement or instrument of whatever nature to which it is party or by which it is bound, a default under which might have consequences that would materially adversely affect the Guarantor's business, financial condition, properties or operations.

12. The Guarantor waives notice of acceptance of this Guaranty and notice of any of the Liabilities of the Borrower to which it may apply, and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which it might otherwise be entitled, or which might be required by law and required to be given by the Lender, including, without limitation, all defenses based on suretyship or impairment of collateral (the Guarantor and the Lender intending this waiver to have the effects described in Section 48 of the Restatement (Third) of the Law of Suretyship and Guaranty).

13. The Guarantor's liability hereunder shall be in no way affected, diminished or released by (i) any amendment, change or modification of the provisions of the Loan Agreement or any other Loan Document made to or with the Lender by the Borrower, (ii) any extensions of time for performance required thereby, (iii) the release of the Borrower from performance or observation of any of the agreements, covenants, terms or conditions contained in any of said instruments by the Lender or by operation of law, whether made with or without notice to the Guarantor, (iv) acceptance by the Lender of additional security or any increase, substitution or changes therein, or (v) the release by the Lender of any security or any withdrawal thereof or decrease therein.

14. Without incurring responsibility to the Guarantor and without impairing or releasing the obligations of the Guarantor hereunder, the Lender may at any time and from time to time without the consent of, or notice to the Guarantor, upon any terms or conditions and in whole or in part:

(i) change the manner, place or terms of payment and/or change or extend the time for payment or renew or alter, any Liability of the Borrower or any security therefor, and the guaranty herein made shall apply to the Liabilities of the Borrower as so changed, extended, renewed or altered;

(ii) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged, mortgaged or in which a security interest is given to secure, or howsoever securing, the Liabilities of the Borrower;

(iii) exercise or refrain from exercising any rights against the Borrower or others (including the Guarantor) or against the security, or otherwise act or refrain from acting;

(iv) settle or compromise any Liability of the Borrower, dispose of any security therefor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the

5

118167014_6

payment of any Liability of the Borrower (whether due or not) to creditors of the Borrower other than the Lender and the Guarantor; and

      (v)    apply any sums by whomsoever paid or howsoever realized to any Liability of the Borrower.

15.    No invalidity, irregularity or unenforceability of all or any part of any Liability of the Borrower or the impairment or loss of any security therefor, whether caused by any actions or inactions of the Lender, or otherwise, shall affect, impair or be a defense to this Guaranty.

16.    Upon the occurrence and during the continuance of an "Event of Default" (as such term is defined in the Loan Agreement), the Lender shall be immediately entitled (i) to enforce the obligations of the Guarantor hereunder and (ii) to set-off any money owed by the Lender in any capacity to the Guarantor or any property of the Guarantor in the possession of the Lender in connection with this Guaranty or the Loan Agreement against any of the monetary obligations of the Guarantor to the Lender under this Guaranty, without first giving notice to the Guarantor, and the Lender shall be deemed to have exercised such right of set-off and to have made a charge against any such money or property immediately upon the occurrence of such Event of Default, even though the actual book entries may be made at some time subsequent thereof. The Lender is hereby granted a security interest in all such money and property held by it, which security interest shall be a first priority perfected security interest in favor of the Lender as a result of the Lender's possession of the money and/or other property of the Guarantor. None of the rights of the Lender described in the immediately preceding sentence is intended to diminish or limit the Lender's "set-off rights". Upon any default by the Guarantor with respect to any of the Guarantor's covenants and agreements under this Guaranty, the Lender may (but shall not be so obligated), without waiving or releasing the Guarantor from any of its obligations hereunder, and without prejudice to any other right or remedy of the Lender hereunder, whether or not expressly set forth herein, perform such covenant or agreement in respect of which there shall be a default hereunder and in that regard pay such money as may be required or as the Lender may reasonably deem expedient. Any such monies paid by the Lender as aforesaid, together with interest thereon at the rate then applicable (or which would then have been applicable) under the Loan Agreement shall be obligations of the Borrower evidenced by the Loan Agreement, which obligations shall be due and payable by the Guarantor to the Lender for the account of the Borrower on demand, subject to any other limitations contained in this Guaranty.

17.    The Guarantor hereby waives any right or claim of right to cause a marshaling of the Borrower's assets or to cause the Lender to proceed against any of the security or collateral held by the Lender before proceeding against the Guarantor, and the Guarantor hereby waives any and all legal requirement that the Lender shall institute any action at law or in equity against the Borrower or any other Person with respect to the Loan Agreement or any of the other Financing Agreement, or with respect to any security held by the Lender, as a condition precedent to bringing any action against the Guarantor upon this Guaranty.

6

18.     Until such time as the Loan Facility shall have been indefeasibly repaid in full and terminated, the Guarantor hereby irrevocably waives and relinquishes any and all statutory, contractual, common law, equitable or other claims and rights (i) to seek reimbursement, contribution, indemnification, set-off or other recourse from or against the Borrower in connection with any payments made by the Guarantor under this Guaranty and (ii) to be subrogated to the Lender's rights under the Financing Agreements upon the Guarantor's performance under this Guaranty.

19.     Until such time as the Loan Facility shall have been indefeasibly repaid in full and terminated, this Guaranty is made and shall continue as to any Liability of the Borrower to the Lender without regard to the existence of other collateral or security or guaranties, if any, or to the validity or effectiveness of any or all thereof; and any or all such collateral and security and guaranties may, from time to time, without notice to or consent of the Guarantor, be sold, released, surrendered, exchanged, settled, compromised, waived, subordinated or modified, with or without consideration, on such terms and conditions as may be acceptable to the Lender without in any manner affecting or impairing the liability of the Guarantor.

20.     The Guarantor hereby covenants and agrees that it (i) shall continue to remain in and operate substantially the same line of business presently engaged in by the Guarantor, (ii) shall conduct the Guarantor's business in an orderly, efficient and customary manner, (iii) shall maintain the Guarantor's business, properties and assets necessary to conduct the Guarantor's business in compliance in all material respects with all applicable governmental laws, ordinances, approvals, rules and regulations and requirements, including, without limitation, consumer finance, zoning, sanitary, pollution, building, environmental and safety laws and ordinances, rules and regulations promulgated thereunder, and (iv) shall not sell, transfer, or otherwise dispose of all or substantially all of the Guarantor's properties and assets outside of the ordinary course of business.

21.     (i)     The Guarantor hereby covenants and agrees that it (a) shall keep and maintain complete and accurate books and records in accordance with sound accounting principles and (b) shall permit the Lender and any authorized representatives of the Lender, at the cost and expense of the Guarantor, to have reasonable access to and to inspect, examine and make copies of the Guarantor's books and records, any and all accounts, data and other documents, at all reasonable times upon the giving of reasonable notice of such intent, subject to compliance by Lender with any confidentiality and non-disclosure requirements pursuant to any applicable laws or regulations. Guarantor shall not be obligated to reimburse Lender more than $5,000 for each such inspection, unless an Event of Default shall have occurred and be continuing. In addition, in the event that Guarantor becomes aware of any Event of Default or Material Adverse Change with respect to the Borrower or the Guarantor, then it shall promptly notify the Lender in writing of such occurrence.

        (ii)     The Guarantor hereby covenants and agrees to provide to the Lender those financial statements and other information described in Section 9.6 to the Loan Agreement which are applicable to the Borrower.

7

118167014_6

(iii)     The Guarantor hereby covenants and agrees that it shall furnish to the Lender any other financial information reasonably requested by the Lender.

22.     The Guarantor hereby covenants and agrees that the Guarantor shall prepare and timely file, taking into account any timely filed extensions, all Federal, state and municipal tax returns required to be filed by the Guarantor, and the Guarantor shall promptly pay and discharge all taxes, assessments and other governmental charges or levies imposed upon the Guarantor, or in respect of any of the Guarantor's properties and assets and all lawful claims, before the same shall become in default. The Guarantor hereby covenants and agrees that the Guarantor shall submit to the Lender, upon request, receipted bills showing payment of all taxes, assessments, governmental charges or levies and lawful claims with respect to its properties and assets.

23.     The Guarantor hereby agrees to and does hereby indemnify, protect, defend and save harmless the Lender, and its managers, officers, employees, agents, attorneys and members (hereinafter collectively referred to as the "Indemnified Parties" and individually referred to as an "Indemnified Party") from and against any and all losses, liabilities, damages, liens, expenses, charges, costs, penalties, fines, injunctions, suits, claims, judgments or demands, of any kind or nature (including, without limitation, reasonable legal counsel fees incurred in investigating or defending such claim), suffered by any Indemnified Party and caused by, relating to, arising out of, resulting from, or in any way connected with the Liabilities of the Borrower (hereinafter all of said losses, liabilities, damages, liens, expenses, charges, costs, penalties, fines, injunctions, suits, claims, judgments and demands shall be collectively referred to as "Losses" and individually as a "Loss"). In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against the Guarantor, said Indemnified Party against whom such action was brought shall promptly notify the Guarantor in writing, and the Guarantor shall assume the defense thereof, including the employment of counsel selected by the Guarantor and reasonably satisfactory to said Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to any settlement. Upon the reasonable determination made by said Indemnified Party against whom such action was brought, said Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the sole cost of such Indemnified Party unless such separate counsel is required because of a conflict of interest that prevents the joint representation of such Indemnified Party. The Guarantor shall not be liable for any settlement of any such action effected without the Guarantor's consent, but if settled with the Guarantor's consent, or if there is a final judgment for the claimant in any such action, the Guarantor hereby agrees to indemnify and save harmless said Indemnified Party against whom such action was brought, from and against any loss or liability by reason of such settlement or judgment. The provisions of this Paragraph 23 shall survive the termination of the Loan Facility and the repayment of the indebtedness evidenced by the Loan Agreement, and shall be indefinite.

24.     If claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment for, or on account of, any of the Liabilities of the Borrower, and the Lender repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (ii) any settlement or compromise of any such claim affected by the Lender with any

8

such claimant (including the Borrower), then, and in such event, the Guarantor hereby agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantor, notwithstanding the cancellation of any note or any other instrument evidencing any Liability of the Borrower, and the Guarantor shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

25.     Settlement of any claim by the Lender against the Borrower, whether in any proceeding or not, and whether voluntary or involuntary, shall not reduce the amount due under the terms of this Guaranty except to the extent of the amount paid by the Borrower or the Guarantor in connection with the settlement.

26.     No delay on the part of the Lender in exercising any of its rights, powers or privileges or partial or single exercise thereof under the Loan Agreement, this Guaranty, or any other Loan Document made to or with the Lender by the Borrower shall operate as a waiver of any such privileges, powers or rights. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of the Lender or the obligations of the Guarantor to the Lender in any other respect at any other time.

27.     All rights, powers and remedies afforded to the Lender by reason of this Guaranty are separate and cumulative remedies and no one of such remedies whether or not exercised by the Lender shall be deemed to exclude any of the other remedies available to the Lender nor prejudice availability of any other legal or equitable remedy which the Lender may have with respect to the Loan Facility.

28.     This Guaranty shall be binding upon and inure to the benefit of and be enforceable by the Guarantor and the Guarantor's successors and assigns.

29.     This Guaranty shall terminate upon the termination and repayment in full of the Loan Facility in accordance with its terms. The Borrower or the Guarantor may terminate this Guaranty and all obligations of the Borrower and/or the Guarantor to the Lender under the Loan Agreement and this Guaranty by (i) paying to the Lender all sums due and owing to the Lender hereunder and under the Loan Agreement and the other Financing Agreements and (ii) notifying the Lender in writing that the Loan Facility shall be terminated.

30.     All notices, requests, consents, demands and other communications required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, shall be given in the same manner as set forth in the Loan Agreement, if addressed to the party to whom directed at the addresses specified in the preamble of this Guaranty (unless changed by similar notice in writing given by the particular party whose address is to be changed). This Paragraph 30 shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Guaranty or in any Loan Document or in the other Financing

9

Agreements or to require giving of notice or demand to or upon any Person in any situation or for any reason.

31.     In case of any proceedings to collect any liabilities of the Guarantor owed to the Lender hereunder, the Guarantor shall pay all reasonable costs and expenses of every kind for collection, sale or delivery of any collateral or assets or properties of the Guarantor, including reasonable attorneys' fees, and after deducting such costs and expenses from the proceeds of sale or collection, the Lender may apply any residue to the liabilities of the Guarantor who shall continue to be liable for any deficiency, with interest at the then applicable Default Rate provided for in the Loan Agreement.

32.     The obligations and liabilities hereunder of each person or entity shall be joint and several, and the word "Guarantor" shall mean all or some or any of them. In all references herein to any parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

33.     The Guarantor hereby acknowledges and agrees that it shall have the sole responsibility for obtaining from the Borrower such information concerning the Borrower's financial condition and business operations as it may require, and that the Lender has no duty at any time to disclose to the Guarantor any information relating to the business operations or financial condition of the Borrower.

34.     Any acknowledgment or new promise with regard to the Liabilities of the Borrower, whether by payment of principal or interest or otherwise, and whether by Borrower or others (including Guarantor) shall: (i) toll the running of the statute of limitations in favor of Guarantor against Lender, if the statute of limitations shall have begun to run, and (ii) prevent the operation of the statute of limitations, if the period of such statute of limitations shall have expired.

35.     The validity, interpretation and enforcement of this Guaranty and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New Jersey but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New Jersey.

36.     Guarantor and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the Superior Court of New Jersey, Mercer County, and the United States District Court for the District of New Jersey, Mercer County Vicinage, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Guaranty or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Guaranty or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or

10

otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Guarantor, Borrower, or Borrower's property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Guarantor, Borrower, or Borrower's property).

37.     Guarantor hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Guarantor in any other manner provided under the rules of any such courts.

38.     GUARANTOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS GUARANTY OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS GUARANTY OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  GUARANTOR AND LENDER EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT GUARANTOR OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS GUARANTY WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

[Signature Page Follows on Next Page]

11

118167014_6

**IN WITNESS WHEREOF**, the Guarantor has duly executed and delivered this Guaranty as a document under seal, all as of the day and year first above written, with the intent to be legally bound hereby.

**WITNESS:**

**GUARANTOR:**

**ARGON CREDIT LLC**
a Delaware limited liability company

By: _____
Name: _____

By: _____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF ALABAMA LLC,**
a Delaware limited liability company

By: _____
Name: _____

By: _____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF CALIFORNIA LLC,**
a Delaware limited liability company

By: _____
Name: _____

By: _____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF LOUISIANA LLC,**
a Delaware limited liability company

By: _____
Name: _____

By: _____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF GEORGIA LLC,**
a Delaware limited liability company

By: _____
Name: _____

By: _____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF UTAH LLC,**
a Delaware limited liability company

12

By:_____
Name:_____

By:_____
Name: GARY ZUMSKI
Title: President

**ARGON CREDIT OF ILLINOIS LLC,**
a Delaware limited liability company

By:_____
Name:_____

By:_____
Name: GARY ZUMSK,
Title: President

13

Exhibit 8

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 16-39654 |
| ARGON CREDIT, LLC, *et al.*, | ) | Hon. Deborah L. Thorne |
| | ) | (Jointly Administered) |
| Debtors. | ) | Hearing Date:    June 15, 2017 |
| | ) | Hearing Time:    10:00 a.m. |

## OMNIBUS REPLY OF FUND RECOVERY SERVICES, LLC TO OBJECTIONS TO MOTION TO RESOLVE DISPUTED TRUSTEE ELECTION AND IN OPPOSITION TO MARGON LLC'S MOTION TO RESOLVE DISPUTED ELECTION

Fund Recovery Services, LLC ("FRS") hereby replies (i) to the objections ("Objections") of the interim Chapter 7 Trustee, Eugene Crane (the "Interim Trustee"), Little Owl Argon LLC ("Little Owl") and Margon LLC ("Margon," and together with the Interim Trustee and Little Owl, the "Objectors") to FRS's motion to resolve a disputed trustee election pursuant to Fed. R. Bankr. P. 2003(d)(3) [ECF No. 166] ("Motion") and (ii) in opposition to Margon's motion to resolve the disputed trustee election [ECF No. 176].[1]

## PRELIMINARY STATEMENT

1.      Chapter 7 is "based on the premise that the property of the debtor's estate is held in trust for the creditors and, therefore, the creditors should be permitted to supervise the collection and liquidation of the debtor's estate."  *In re Poage*, 92 B.R. 659, 662 (Bankr. N.D. Tex. 1988).  "To

---

[1] Margon's motion is untimely under Fed. R. Bankr. P. 2003(d), which requires any motion for resolution of a disputed trustee election to be filed within 14 days after the U.S. Trustee files a report of disputed election.  In this case, the U.S. Trustee filed a Report of Disputed Election [ECF No. 164] on May 18, 2017.  Therefore, a motion for resolution of the disputed election was required to be filed no later than June 1, 2017.  Margon's motion was not filed until June 6, 2017.  This Court is without statutory authority to extend the time within which Margon may move to determine the disputed trustee election in the Debtors' cases.  *See* Fed. R Bankr. P. 9006(b) (prohibiting the extension of Rule 2003(d)'s 14-day period for filing a motion to determine a disputed trustee election).  Therefore, Margon's motion should be denied as untimely filed.

{11952-001 REP A0473824.DOC 2}

ensure that a Chapter 7 case remains a creditor-controlled proceeding, the [Bankruptcy] Code permits unsecured creditors to vote for a permanent trustee." *Id.*

2.     There are two debtors before this Court: Argon Credit, LLC ("Argon Credit") and Argon X, LLC ("Argon X"). The Objectors repeatedly (and seemingly deliberately) conflate them, but they need to be analyzed separately. FRS and its predecessor in interest, Princeton Alternative Income Fund, LP ("Princeton"), are the only known claim holders against Argon X. FRS exercised its right at the 341 Meeting[2] to vote its claim to elect a trustee for Argon X. Neither Little Owl nor Margon holds any claim or interest in Argon X and thus, they have no standing to object to FRS's vote for a trustee to administer the Argon X estate. There is no just reason, therefore, why FRS should not be able to select its own trustee to administer the Argon X bankruptcy estate.

3.     With regard to Argon Credit, the Trustee's counsel has ratcheted up the rhetoric and adopted clichéd narratives that present the relationship between FRS, the Debtors and the Debtors' creditors in a false light. The Trustee asserts that FRS and the Debtors have had a "very contentious relationship prior to the Debtors' bankruptcy filings." While that narrative may be true for some debtors and their lenders, there was nothing especially "contentious" in the historical relationship between FRS and the Debtors. There was never any litigation between FRS and the Debtors prior to the Debtors' bankruptcy filing. In fact, the lending relationship was normal between FRS and the Debtors until nine (9) days before the Debtors' bankruptcy filings when the Debtors' EVP of Finance confessed that FRS was undersecured by $8 to $11 million, including $4 million of FRS's collateral that had been diverted to a New York company in which Argon Credit retained an equity interest.

4.     The reality is that FRS has taken many steps to benefit the Debtors' estate and their creditors. This Court may recall that FRS's initial objection related to the lack of adequate protection

---

[2] Unless otherwise defined, capitalized terms carry the same meaning ascribed to them in the Motion.

for the Debtors' proposed use of FRS's cash collateral.  The Debtors were not making new loans and offered no adequate protection for use of $375,000 worth of FRS's collateral.

5.     Nevertheless, throughout several weeks of testimony, FRS consented to the Debtors' use of its cash collateral to fund all necessary business expenses, including most payroll obligations (so that none of the regular employees went unpaid post-petition), rent, software licenses, state lending licenses, utilities and insurance.  FRS did so knowing that no adequate protection was being granted to FRS.

6.     This Court should see the Trustee's objection for what it is – advocacy and rhetoric designed to disenfranchise FRS and retain the Interim Trustee's position in the Debtors' cases.  It should also recognize that Margon's status as a target of the Estates' breach of fiduciary duty claims explains the fervor with which Margon opposes every motion made by FRS in these cases, including the subject Motion.  Continued delay provides Margon and other litigation targets of the Estates with the opportunity to move and shield their assets as this case lingers.

7.     Ultimately, however, the Motion is about a creditor's statutory right to seek the election of a trustee of its choosing.  As discussed below, FRS has valid claims that meet the eligibility requirements for voting for a permanent trustee in these cases, and no objections to FRS's filed claims were filed before the election.  Therefore, the Court should confirm FRS' election of Patrick O'Malley as the permanent trustee.

## ARGUMENT

### I.     The 341 Meeting Was Properly Convened and Noticed to Creditors

8.     The Objectors' procedural objections to the 341 Meeting are without merit and should be overruled.  FRS incorporates the arguments set forth by the United States Trustee in the Election Report as well as the U.S. Trustee's response to the Objections [ECF No. 179].

- 3 -

A.      **FRS's Request for a Trustee Election Was Timely and Was Not Waived.**

9.      In its objection, Margon erroneously asserts that FRS's request – made at the 341 Meeting on May 17, 2017 – to elect a permanent Chapter 7 trustee was "too late" because Mr. Crane had become the permanent trustee due to the passage of some "reasonable period of time" between his interim appointment on April 13, 2017 and the date of the 341 Meeting on May 17, 2017.

10.     Margon's reliance on *In re Computer Learning Centers, Inc.*, 294 B.R. 251 (Bankr. E.D. Va. 2003) is misplaced.  In *Computer Learning Centers*, a successor chapter 7 trustee was appointed after the initial trustee resigned.  The bankruptcy court clerk notified all interested parties that, unless a request for election of a trustee was made within ten (10) days, the successor trustee would become the permanent trustee.  *Id.*, 294 B.R. at 252.  Months later, the chairman of the unofficial creditors' committee requested that the U.S. Trustee – which had not scheduled a supplemental 341(a) meeting – be compelled to schedule one.  *Id.*, 294 B.R. at 252-53.  The court denied the motion, finding that the requesting party did not hold sufficient claims to unilaterally demand a trustee election, that other creditors were unlikely to be interested in such an election, and that the request was untimely because it was beyond the 10-day period fixed by the Court.  *Id.*, 294 B.R. at 253-57.

11.     None of those facts apply to this case.  In the Debtors' cases, the U.S. Trustee sent out notice of the 341 Meeting just <u>two business days</u> after Mr. Crane's interim appointment.  Since the Bankruptcy Code clearly provides that creditors may elect a trustee at a 341(a) meeting, there was no need for FRS to call for an election of a trustee separately from the ordinary statutory framework.

- 4 -

**B.**     **The Objectors' Claims of "Surprise" are Disingenuous and Without Merit.**

12.     The Objectors suggest that they were unfairly surprised by the election of a trustee.

Mr. Crane's attorney claims that he had no knowledge that the purpose of the 341 Meeting was to

elect a permanent trustee.  However, the U.S. Trustee's response makes clear that she discussed the

likelihood of a trustee election in these cases with Mr. Crane on several occasions.  Moreover,

Margon has confirmed that Mr. Crane knew in advance of a possible election, since it was Mr. Crane

that notified Margon of the potential for a trustee election <u>before</u> the 341(a) meeting.  Margon

Objection at 4, n.2.

13.     In addition, almost two weeks before the 341 meeting, at a hearing attended by the

Trustee and Margon, FRS's counsel stated on the record in open court:

> And a note about the continued 341 meeting. The debtor has already testified at a
> 341. My understanding is this is a meeting that's purely convened to see if anybody
> wants to elect a … trustee. The debtor is not going to be there. You might remember
> Mr. Korenthal really gratuitously had testified at the original 341 meeting.

*See* 5-4-17 Transcript, a copy of which is attached hereto as Exhibit A, at 4:16-23.

14.      Regardless of whether the Objectors were notified in advance of the elections, the

contention of "surprise" is meritless in any event.  "The possibility of creditors electing a permanent

trustee, and the interim trustee not serving as permanent trustee, was a situation Congress clearly

contemplated by the enactment of Section 702."  *In re Lake States Commodities, Inc.*, 173 B.R.

642, 649 (Bankr. N.D. Ill. 1994).  Consequently, surprise that a trustee election actually occurs at a

meeting of creditors is never a meaningful basis for objection.  *See id.*

**II.**     **FRS is Entitled to Elect a Trustee in Each of the Debtors' Cases.**

15.     Section 702(a) of the Bankruptcy Code governs the election of a trustee in a chapter 7

case.  That section provides that creditors may vote for a candidate for trustee if they (i) hold an

allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under

section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(i) of the Bankruptcy Code ("Eligible Claims"); (ii) do not have an interest materially adverse to the interests of other creditors entitled to such distribution; and (iii) are not insiders. 11 U.S.C. § 702(a). A candidate for trustee is elected if creditors holding at least 20% in amount of Eligible Claims vote and the candidate receives the majority of votes from those creditors voting. 11 U.S.C. § 702(c).

16.    The requirements for the election of a trustee have been met in these cases. FRS holds Eligible Claims, does not have an interest materially adverse to other creditors, and is not an "insider" of any of the Debtors. FRS also holds claims of more than 20% of all claims in each of the Debtors' cases and cast each of its votes for Patrick O'Malley. Accordingly, Mr. O'Malley received the majority of votes from those creditors voting, and his election should be confirmed by this Court.

### A.    FRS Holds Eligible Claims and Is Entitled to Vote Them

17.    Each of FRS' proofs of claim asserts an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(i) of the Bankruptcy Code. Each of these factors for determining Eligible Claims is discussed below:

#### i.    FRS's Claims are Allowable.

18.    A creditor requesting an election must have an "allowable" claim. Although section 702(a) does not define what constitutes an allowable claim, many courts look to section 502 of the Bankruptcy Code, which governs the allowability of claims and provides, in relevant part, that "[a] claim . . . proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502. Pursuant to Fed. R. Bankr. P. 3001(f), a filed claim constitutes "prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. Proc. 3001(f). *See, e.g., Lake States*, 173 B.R. at 646-47. Thus, since FRS has filed valid proofs of claim

in the Argon Credit and Argon X cases, FRS has allowable claims in both cases.  *See id., see also In re TBR USA, Inc.,* 429 B.R. 599, 613 (Bankr. N.D. Ind. 2010) (a creditor that files a proof of claim that complies with Bankruptcy Rules 3001 and 2003(b)(3) prior to the trustee election, has an "allowable" claim for purposes of section 702(a)).

### ii.    **FRS's Claims are Not "Disputed."**

19.    FRS's claims against Argon Credit and Argon X are not "disputed" for purposes of Section 702(a) of the Bankruptcy Code.  The "conundrum of what to consider in determining a claim's status as disputed under circumstances like these is resolved by a nice, simply-articulated fixed-point rule: 'The proper time to determine the universe of creditors entitled to vote to elect a . . . trustee is as of the time of the election.'"  *In re Petters Co., Inc.* (citing *Amherst Techs., LLC*, 335 B.R. 502, 512 (Bankr. D. N.H. 2006); *In re Williams*, 277 B.R. 114, 117 (Bankr. C.D. Cal. 2002); *In re Aspen Marine Group, Inc.*, 189 B.R. 859, 863 (Bankr. S.D. Fla. 1995)); *see also In re Sforza*, 174 B.R. 656, 658 (post-election objections are late and should not be considered); *Lake States*, 173 B.R. at 647, n.4 (same).

20.    As of the date of the 341 Meeting (and still to this day), neither of the proofs of claim filed by FRS have been properly called into "dispute" in this case.  The Objectors rely on the fact that the Debtors scheduled[3] the FRS claims as "disputed."  However, where (as here) a debtor schedules a claim as "disputed," but the creditor timely files a proof of claim, that creditor is "entitled to vote." *In re Michelex Ltd.*, 195 B.R. 993, 1006 n.28 (Bankr. W.D. Mich. 1996).  *See also* Fed. R. Bankr. P. 2003(b)(3) ("creditor is entitled to vote at a meeting if, at or before the meeting, the creditor has filed a proof of claim . . . unless objection is made to the claim or the proof of claim is insufficient on its face.").

---

[3] The Debtors' Schedules were prepared and filed by Howard Korenthal, the Debtor's former Chief Restructuring Officer, who was retained just a few days before the Petition Date.

- 7 -

21.     Here, FRS has filed a claim in each of the Debtors' cases.  The filing of those claims is *prima facie* evidence as to the validity and amount of such claims.  Fed. R. Bankr. P. 3001(f); *Petters*, 425 B.R. at 549 (Bankr. D. Minn. 2010).  "To shift a claim evidenced that way from the status of deemed allowance toward a determination based on actual legal viability, *an objection must be filed*."  *Id.* (citing Fed. R. Bankr. Proc. 3007(a)) (emphasis added).  No written objection has ever been filed to FRS's proofs of claim.

22.     The objectors seek to invalidate FRS's election of a trustee without ever having filed a written objection to FRS's claims.  FRS's most recent proof of claim against Argon Credit has been on file with the Court since February 6, 2017, which means that the Objectors had ample time to object to FRS's claim prior to the 341 Meeting.  Notwithstanding the Objectors' contentions to the contrary, in the absence of the filing of a formal objection, their vague oral statements at the 341 Meeting were insufficient as a matter of law to render FRS' proofs of claim "disputed" for purposes of Section 702.

### iii.     FRS's Claims Against the Debtors are "Fixed".

23.     A creditor requesting an election under Section 702 must have a "fixed" claim.  Although the Bankruptcy Code does not define when a claim is "fixed" for purposes of trustee elections, case law indicates that a claim is "fixed" if it is not contingent.  *See In re Klein*, 119 B.R. 971, 981-82 (N.D. Ill. 1990), *appeal dism'd*, 940 F.2d 1075 (7th Cir. 1991).  The Supreme Court has noted that a "fixed" claim is one in which the "liability has fastened upon" the debtor.  *Farrey v. Sanderfoot*, 500 U.S. 291, 296 (1991), *cited by Michelex*, 195 B.R. at 1007 n.32.  Thus, when there is no other event that must occur to set the claim against the debtor, the claim is fixed.

24.     Neither Argon Credit nor Argon X has indicated in its schedules that FRS's claims are contingent.  In the absence of such designation, courts have ended the inquiry and determined

- 8 -

that the scheduled claims constitute "fixed" claims against the debtor. Moreover, FRS' proofs of claim set forth the basis for each claim and clearly demonstrate that each of the claims is fixed. Each claim is based on written agreements between FRS and the relevant debtor. There were defaults under each of the agreements prior to the filing of the bankruptcy cases. The indebtedness was accelerated, thereby making the entire amount of the claims due prior to the Petition Date. There is nothing else that needs to take place in order to fasten the liability owing under the various agreements against the respective Debtors. Accordingly, for purposes of Section 702, FRS's claims are "fixed."

25.     The Objectors assert that FRS's claims are not "fixed" because they cannot determine the value of the unsecured portion of the claim since the collateral has not been valued. The Objectors' argument is not about the "fixed" nature of FRS's claims, since the Debtors' liability has attached, but whether FRS's claims are "liquidated." For the reasons set forth below, FRS's claims against the Debtors are liquidated for purposes of Section 702.

### iv.    FRS's Claims are Liquidated.

26.     FRS may elect a trustee because FRS's claims are liquidated within the meaning of Section 702(a). "A debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) a simple mathematical formula." *Poage*, 92 B.R. at 665 (citing *In re Potenza*, 75 B.R. 17, 19 (Bankr. D. Nev. 1987)).

27.     Similarly, in a frequently-cited decision, the Eleventh Circuit Court of Appeals defined a "liquidated" debt as follows:

> Black's Law Dictionary defines a liquidated debt as one where it is certain what is due and how much is due. A liquidated debt is that which has been made certain as to amount due by agreement of the parties or by operation of law. Therefore, the concept of a liquidated debt relates to the amount of liability, not the existence of liability. If the amount of the debt is dependent, however, upon a future exercise of discretion, not restricted by specific criteria, the claim is unliquidated.

{11952-001 REP A0473824.DOC 2}

*United States v. Verdunn*, 89 F.3d 799, 802 (11th Cir. 1996) (internal quotations omitted). "[T]he key factor in distinguishing liquidated from unliquidated claims is *not* the extent of the dispute nor the amount of evidence required to establish the claim, but *whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard*."). *Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1014 (8th Cir. BAP 1997) (emphasis in original).

28.     FRS's claims are liquidated. FRS has calculated the exact amount of its claim and attached to its proofs of claim the documents which provide for the calculation of such claims. The process for calculating FRS's claims is clear under the loan documentation, and it requires basic computation of claims.

29.     If this Court determines that any portion of FRS's claim is not liquidated, FRS should be permitted to vote the liquidated portion of its claim to elect a trustee. See *Klein*, 119 B.R. at 981 (opining that, where creditor holds $29 million in liquidated, undisputed claims and only $1 million in unliquidated claims, creditor is entitled to vote liquidated portion of claim). That outcome is consistent with Rule 2003(b)(3), which provides that, "[n]otwithstanding objection to the amount or allowability of a claim for the purpose of voting, the court may, after such notice and hearing as it may direct, temporarily allow it for that purpose in an amount that seems proper to the court." Fed. R. Bankr. P. 2003(b)(3).

###     B.     FRS does not have an "Interest Materially Adverse" to Other Creditors.

30.     To be eligible to request and vote in an election of a permanent trustee in these cases, FRS cannot have an interest that is materially adverse to the interests of other unsecured creditors. 11 U.S.C. § 702(a)(2). The Bankruptcy Code does not define the phrase "interest materially adverse," but the legislative history to that section indicates that a court will balance the competing factors in any specific instance to make its determination of whether a creditor has an interest

materially adverse to other unsecured creditors.  H.R.Rep. No. 595, 95th Cong., 1st Sess. 378 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6334; S.Rep. No. 989, 95th Cong., 2d Sess. 92–93 (1978), reprinted in 1978 U.S.C C.A.N 5787, 5878–79.  "The relevant time to measure a creditor's adverse interest is the date of the election."  *Klein*, 119 B.R. at 975.

31.     The Objectors assert that FRS holds a materially adverse interest to the Debtors' creditors because FRS's predecessor in interest, Princeton, purportedly received approximately $1.2 million in transfers from Argon Credit in the ninety day period immediately preceding the Petition Date.  The Objectors' assertion that the payments "may" constitute preferential transfers is not sufficient to bar FRS from voting its claims to elect a trustee.  *Poage*, 92 B.R. at 666 (holding that the bare allegation of receipt of preferential transfer without any factual support is insufficient).

32.     The Objectors do not present a colorable preferential transfer claim.  Argon Credit's Statement of Financial Affairs not only discloses the aggregate <u>amount</u> of the purported transfers (which the Objectors seek to highlight), but also the <u>purpose of</u> the transfers.  *See* Argon Credit ECF No. 91 at 55 of 88, ¶ 3.2.  The transfers to Princeton were for "Secured debt."  *Id.*  To the extent that Princeton received those transfers, the underlying funds represented collections on the accounts receivable that constituted Princeton's (now FRS's) collateral.  Therefore, Princeton cannot possibly be liable for preferential transfers because the Interim Trustee would be unable to satisfy Section 547(b)(5)'s requirement that Princeton receive more from the transfers than it would have received if the transfer had not been made and Princeton received distribution on its claim under Chapter 7.  *See* 11 U.S.C. § 547(b)(5).

33.     After all, a "creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest."  *See also Krafsur v. Scurlock Permian Corp. (In re El Paso*

*Refinery, LP)*, 171 F.3d 249, 254-55 (5th Cir. 1999). For that reason, bankruptcy courts have universally determined that even an undersecured creditor incurs no preference liability under § 547(b)(5) when it accepts payment from the proceeds of its own collateral. *See In re Norwalk Furniture Corp.*, 428 B.R. 419, 426-27 (Bankr. N.D. Ohio 2009) (citing cases). A voidable preference must "impair" or "diminish" the estate. *See In re Pitman*, 843 F.2d 235, 241 (6th Cir. 1988). The payments to Princeton did not diminish the estate because the payments constituted funds that were Princeton's cash collateral. Moreover, the payments reduced the amount of the Debtors' debt and provided a corresponding increase in their available credit line with Princeton.

34. The Interim Trustee also asserts that FRS represents an adverse interest to the unsecured creditors because "the Debtors have lodged allegations of lender liability against FRS." Objection, ¶ 2. This is factually untrue. The Debtors have never made lender liability claims against the Debtors. The Debtors' Schedules certainly list no such claims against FRS. See Argon X ECF No. 23 at 11 of 32, lines 74-75 (showing no claims, counterclaims, causes of action or setoff rights); Argon Credit ECF No. 91 at 18 of 88, line 70 (showing no other assets such as claims, counterclaims, causes of action or setoff rights).

35. Only Margon has alleged lender liability, and its allegations thus far are vague and without any evidentiary support. Mere allegations of lender liability and preference claims are insufficient to disqualify FRS from voting. *Amherst Techs.*, 335 B.R. at 509 ("It is not enough, however, to merely object to a creditor's claim in order to disqualify that creditor from participation in the selection of a permanent chapter 7 trustee. The objection cannot be frivolous. It must be supported by more than mere suspicion and may not be interposed for an improper purpose."); *In re USA Capital, LLC*, 251 B.R. 883, 889 (Bankr. D. Colo. 2000).

- 12 -

36.    Margon's lender liability allegations are demonstrably false.  Margon has falsely claimed that Fintech/Princeton had committed to provide a $75 million line of credit.  Attached hereto as Exhibit B is the executed term sheet for the original financing between Fintech Financial and the Debtors.  The "Facility Summary" provides for "[a]n initial $20,000,000 line increasing up to $75 million within nine months if warranted based on certain criteria being met."  In fact, Margon has always known that Fintech's commitment was an initial $20 million line of credit.  Attached hereto as Exhibit C is the Subordination Agreement executed by Margon, which states in the first "Recital" that Fintech will be establishing a $20 million line of credit.

37.    Margon's alternative grounds for a lender liability claim fares no better.  Margon has asserted that Princeton "foisted upon" the Debtors a loan servicer (First Associates) that it believed to be incompetent.  The Debtors entered into an agreement with First Associates on March 25, 2015.  Princeton did not receive an assignment of Fintech's line of credit until May 6, 2015.  Attached hereto as Exhibit D is the Debtors' agreement with First Associates.

38.    Similarly misplaced is the Objectors' assertion that, because FRS's claim against Argon X is partially secured and partially unsecured, FRS <u>automatically</u> has an interest materially adverse to other creditors.    The assertion fails for several reasons.

39.    First, the Objectors fail to recognize that there are no creditors of Argon X other than FRS and its predecessor, Princeton.  Since § 702 speaks in terms of a materially adverse interest in relation to "the interest of [other] creditors entitled to . . . distribution," no adverse interest can arise from FRS' partially secured claim against Argon X.  *See* 11 U.S.C. § 702(a)(2).  There are no other creditors of that estate entitled to distribution.

40.    Second, the United States Trustee Program Policy and Practices Manual Volume 2 (the "<u>UST Manual</u>"), Chapter 7 Case Administration, expressly contemplates that undersecured

creditors <u>can</u> vote the unsecured portion of their claims in trustee elections. *See* UST Manual, Chapter 2-1.6.9 n.5 ("Undersecured creditors may bifurcate their secured and unsecured claims for purposes of requesting an election and voting under section 702."). Thus, it cannot be the case that having a partially unsecured claim, *a fortiori*, results in a creditor having an interest materially adverse to other creditors.

41.     The policy stated in the UST Manual is consistent with the clear weight of authority, which holds that a creditor that has an undersecured claim is not automatically deemed to have an "interest materially adverse" to other unsecured creditors. *In re Oxborrow*, 104 B.R. 356, 358 (E.D. Wash. 1989), *aff'd*, 913 F.2d 751 (9th Cir. 1990) ("secured creditors were eligible to vote the unsecured portion of their claim, if the creditor indicated its claim was undersecured"); *TBR USA*, 429 B.R. at 618 ("a creditor who asserts a secured claim is not disqualified from voting pursuant to 11 U.S.C. § 702(a)(1) solely by virtue of that assertion"); *In re Tartan Constr. Co.*, 4 B.R. 655, 658 (Bankr. D. Neb. 1980) (permitting undersecured creditor to vote in trustee election).

42.     Indeed, in instances in which courts find that creditors hold interests materially adverse to those of other creditors, it is generally because of some action taken by the creditor as opposed to the status of the creditor, in and of itself. The court in *In re Klein*, 110 B.R. 862 (Bankr. N.D. Ill. 1990), *aff'd in part, rev'd in part on other grounds*, 119 B.R. 971 (N.D. Ill. 1990), noted that the classic pattern of material adversity is "a demonstrated pattern of activity, which effectively does, or tends to, reduce recoveries by the estate, whereby a creditor pursues its own separate recoveries in competition with the estate . . . . ." *Id.* at 877. Thus it is the attempt or intention to "separate assets from the pool" that results in material adversity. *Id.*; *Poage*, 92 B.R. at 666 (although circumstances could exist whereby it would be to creditor's advantage to enhance its recovery outside of the

- 14 -

bankruptcy case, no facts existed to show that such circumstances actually existed and therefore creditor was not materially adverse).

43.    The Objectors have vaguely asserted that FRS has taken actions to attempt to enhance its own recovery in these cases at the expense of other creditors by separating assets from the pool.  The Objectors point to FRS's agreement in principle with the original trustee, Deborah Ebner, to finance and prosecute the Estates' claims against the Debtors' directors and officers for breaches of fiduciary duty as if it were a nefarious plot.  The Objectors have distorted the proposal beyond all recognition.

44.    It is obvious why Margon, as targets of the expected litigation, would vigorously oppose the litigation funding agreement, as it provides otherwise impecunious estates up to $825,000 in litigation funding, without incurring any administrative expense unless the litigation is successful. It is clearly in the best interests of the unsecured creditor body as a whole to prosecute the breach of fiduciary duty claims.  FRS and the unsecured creditors share the same interests to liquidate these claims and maximize their value.  Without FRS's financing, the Debtors will be forced to hire contingency fee counsel whose incentives often run contrary to maximizing recoveries.

45.    As part of FRS's proposal, FRS has offered to contribute $100,000 to the Estates' administrative expenses (which, contrary to the Objectors' papers, is not subject to reimbursement) to guard against administrative insolvency, and an additional $100,000 to general unsecured creditors who otherwise would receive no distribution from the estates.  Under certain circumstances, FRS has also offered to waive a portion of its own distribution and disburse those funds to Argon Credit's non-insider general unsecured claims.

46.    Contrary to the Objections, FRS has never tried to acquire the Estates' claims so that recoveries may be saved for itself.  It seeks to prosecute the claims for the Estates derivatively, in the

- 15 -

name of the Estates. FRS has never denied the Trustee the right to retain counsel of his/her choosing to monitor the litigation. In fact, FRS increased the amount of financing offered to ensure that the fees of the Trustee's independent counsel would be satisfied. FRS made all $825,000 available to all attorneys and did not impose a budget which limited the Trustee's counsel fees.

47.     FRS also has been chided by Margon for pursuing FRS's security interest in loans that the Debtors fraudulently sold to Spartan Specialty Finance I SPV, LLC ("SSF") without FRS's consent (as this Court so found) and without paying the proceeds to FRS. However, the Argon Credit schedules merely reflect a 15% equity interest in SSF itself, not that Argon Credit retained an interest in the loans that it sold to SSF. Argon Credit ECF No. 91 at 15 of 88, line 15.20. FRS's efforts to track down its collateral is not detrimental to the Debtors' creditors. If FRS recovers its collateral from SSF, FRS's claims against the Debtors will be reduced, to the benefit of the Debtors' other creditors.[4]

48.     The point is that, for all of the Objectors' wailing about FRS's alleged "adverse interests," they have not provided a single example of FRS acting contrary to the interests of all unsecured creditors. FRS has never asked anyone to waive any claims against it or waive the right to object to FRS's claims. FRS simply asked and negotiated (with court approval) for a claims objection deadline so that it was not funding an estate where its claims might still be subject to disallowance.

49.     In short, FRS has taken no actions that could render its interest materially adverse to other creditors. FRS has exactly the same interests as all other unsecured creditors: to maximize the

---

[4] For all of the Objectors' allegations about the "potential" that the Debtors' retain a property interest in the loans sold to SSF, it should be noted that neither the Interim Trustee nor Margon took any action to even assert the Estates' interest in the SSF loan proceeds or to prevent their further transfer. They seemingly prefer trying to get mileage out of attacking FRS for pursuing its security interest in that collateral. FRS's efforts do not harm the Debtors' creditors; any recovery would reduce FRS's secured claim and thereby reduce its unsecured claim, to the betterment of the unsecured creditor body as a whole.

- 16 -

recovery from the Estates.  Accordingly, FRS is eligible to vote its unsecured claims for the election

of a trustee for each of the Debtors.

### C.      FRS is not an "Insider" of any of the Debtors.

50.      Margon asserts that FRS is an "insider" of the Debtors by virtue of a certain

provision of the Loan and Security Agreement between FRS and Argon X that grants FRS power of

attorney to take certain actions to facilitate collection of Argon X's indebtedness in the event of

Argon X's default.  Margon's effort to stretch the meaning of "insider" to include FRS is unavailing.

> To fall into the category of an 'insider by control,' courts have held that the person or
> entity must have at least a controlling interest in the debtor. . . . Alternatively, courts
> have stated that the person must exercise sufficient authority over the debtor so as to
> unquestionably dictate corporate policy and the disposition of corporate assets.  In
> this context, control means the 'actual exercise of managerial discretion,' or 'usurping
> the power of the debtor's directors and officers to make business decisions.'

*In re TBR USA, Inc.*, 429 B.R. 599, 624-25 (Bankr. N.D. Ind. 2010) (citations omitted).

51.      FRS has never controlled the Debtors' businesses and, therefore, is not an "insider"

for purposes of Section 702 of the Bankruptcy Code.  Margon has cited no action taken by FRS that

demonstrates such alleged "control" of the Debtors.

52.      Until December 7, 2016 – nine days before the Petition Date – Princeton was

providing funding to the Debtors.  Upon learning of the Debtors' fraudulent conduct in selling FRS's

collateral to SSF and delivering inaccurate financial statements to FRS, FRS issued a 10-day notice

of default on the Argon X line of credit.  The 10-day notice period had not concluded when the

Debtors filed their bankruptcy petitions, which stayed FRS from exercising any rights that it may

have under the parties' loan and security agreement.

53.      The limited powers granted to FRS in the event of default are similar to rights granted

to secured creditors under the UCC and are not a sufficient basis on which to deem FRS an "insider"

for trustee election purposes.  Moreover, even if the rights granted to FRS under the LSA "could"

lead to FRS being deemed an "insider," it is clear that FRS never exercised any managerial discretion with regard to the Debtors' businesses.

54.     The Debtors' bankruptcy filings are themselves evidence that FRS did not usurp the power of the Debtors' officers and directors to make business decisions.  FRS has not foreclosed its security interest in the Debtors' assets.  Instead, FRS has worked within – not outside of – the Debtors' bankruptcy cases to liquidate its collateral.  Funds collected on consumer loans are being collected on behalf of the Debtors and applied to FRS's secured claim against Argon X by virtue of a stipulation agreed to by the Objectors.  Margon's objection on the basis that FRS is an "insider" of the Debtors for purposes of determined FRS's eligibility to elect a trustee must be rejected.

**D.     FRS Holds More than 20% of the Unsecured Claims in Each of these Cases.**

55.     FRS clearly holds more than 20% of the unsecured claims in each of the Debtors' cases.  In fact, none of the Objectors have denied this fact.

56.     FRS is the only scheduled creditor of Argon X and was the only creditor to have filed a proof of claim against Argon X at the time of the election.  Thus, FRS represented 100% of the unsecured creditor body of Argon X.

57.     FRS also holds well in excess of 20% of the unsecured claims against Argon Credit. According to the Debtors' schedules, unsecured creditors of Argon Credit (other than FRS) are owed $16,610,647.10.

**CONCLUSION**

58.     FRS holds Eligible Claims in each of these cases, does not have an interest materially adverse to the interests of other unsecured creditors and is not an insider of either of the Debtors.  The Proofs of Claim filed by FRS account for more than 20% of the unsecured claims scheduled or filed

- 18 -

in each of these cases.  FRS, therefore, was eligible to call for and vote in an election in each of these cases.

WHEREFORE, for the forgoing reasons, FRS respectfully requests that the Court (i) find that FRS is eligible to vote its claims in these cases; (ii) overrule the Objectors' objections to the Motion; (iii) confirm the appointment of Patrick O'Malley as permanent trustee in the Debtors' cases; (iv) deny Margon's motion to determine the disputed trustee election as untimely and moot; and (v) grant it such other and further relief to which it may be entitled.

<div style="margin-left:50%">

Respectfully submitted,

Fund Recovery Services, LLC

</div>

Dated:  June 12, 2017

By:   /s/  Peter J. Roberts_____
      One of its attorneys

Peter J. Roberts (#6239025)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654
(312) 541-0151
proberts@shawfishman.com

Valerie A. Hamilton
Sills Cummis & Gross, P.C.
600 College Road East
Princeton, NJ 17110
(609) 227-4600
vhamilton@sillscummis.com

- 19 -

## CERTIFICATE OF SERVICE

Peter J. Roberts certifies that he caused to be served a true copy of the above and foregoing upon the attached Service List through the Court's ECF System, unless otherwise indicated, on this 12th day of June, 2017.

/s/ Peter J. Roberts

**Mailing Information for Case 16-39654**

## Electronic Mail Notice List

- Gabriel Aizenberg     aizenbergg@gtlaw.com, dixonm@gtlaw.com;chilitdock@gtlaw.com
- Michael A Brandess     mbrandess@sfgh.com, bkdocket@sfgh.com
- Eugene Crane     ecrane@craneheyman.com, il41@ecfcbis.com;jmunoz@craneheyman.com;dkobrynski@craneheyman.com
- Eugene Crane     ecrane@craneheyman.com, jmunoz@craneheyman.com;dkobrynski@craneheyman.com;gheyman@craneheyman.com
- William J Factor     wfactor@wfactorlaw.com, wfactorlaw@gmail.com;bharlow@wfactorlaw.com;wfactor@ecf.inforuptcy.com;wfactor myecfmail@gmail.com;r43923@notify.bestcase.com
- Jonathan P Friedland     jfriedland@sfgh.com, bkdocket@sfgh.com
- Matthew T. Gensburg     MGensburg@dandgpc.com
- E. Philip Groben     pgroben@gcklegal.com
- Valerie A Hamilton     vhamilton@sillscummis.com
- Patrick S Layng     USTPRegion11.ES.ECF@usdoj.gov
- Sara E Lorber     slorber@wfactorlaw.com, slorber@ecf.inforuptcy.com;nbouchard@wfactorlaw.com;bharlow@wfactorlaw.com
- Jeffrey K. Paulsen     jpaulsen@wfactorlaw.com, bharlow@wfactorlaw.com;jpaulsen@ecf.inforuptcy.com
- Nancy A Peterman     petermann@gtlaw.com, chilitdock@gtlaw.com;greenbergc@gtlaw.com
- Lars A Peterson     lapeterson@foley.com
- Peter J Roberts     proberts@shawfishman.com
- Christina Sanfelippo     csanfelippo@shawfishman.com, kbobb@shawfishman.com
- Arthur G Simon     asimon@craneheyman.com, gbalderas@craneheyman.com;sclar@craneheyman.com
- Michael J. Small     msmall@foley.com, thardy@foley.com;CHI-LitigationDocket@foley.com
- Brian P Welch     bwelch@craneheyman.com, gbalderas@craneheyman.com

{11952-001 REP A0473824.DOC 2}

Exhibit 9

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 16-39654 |
| | ) | (Jointly Administered) |
| ARGON CREDIT, LLC, *et al.*, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | Hon. Deborah L. Thorne |

| | | |
|---|---|---|
| | ) | |
| EUGENE CRANE, the duly appointed and serving Chapter 7 Trustee for the estates of Argon Credit, LLC and Argon X, LLC, | ) ) ) ) | |
| | ) | Case No. 18-ap-_____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAVIV WOLFE, GARY ZUMSKI, PETER FERRO, JR., BERJ ARAKELIAN, ERIC SCHNOSENBERG, SEAN TOMASZKIEWICZ, HARRY MADANYAN, JOSEPH CANFORA, MARK TRIFFLER, JOHN A. KUHLMAN, JR., BRUCE BREITWEISER, BYRON FAEMARK, BARRY KOSTINER, BERGARVIV, LLC, BROADMARK CAPITAL, LLC, PERAZA CAPITAL AND INVESTMENT, LLC, and BLUE TREBLE SOLUTIONS, LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Defendants.

## COMPLAINT

Eugene Crane, the chapter 7 trustee (the "*Trustee*") for the estates of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*," together with Argon Credit, the "*Debtors*"), by and through his undersigned counsel, files this complaint (the "*Complaint*") against Raviv Wolfe, Gary Zumski, Peter Ferro, Jr., Berj Arakelian, Eric Schnosenberg, Sean Tomaszkiewicz, Harry Madanyan, Joseph Canfora, Mark Triffler, John A. Kuhlman, Jr., Bruce Breitweiser, Byron Faemark, Bergarviv, LLC, Broadmark Capital, LLC, Peraza Capital and Investment, LLC, and Blue Treble Solutions, LLC (collectively, the "*Defendants*"). By this Complaint, the

Trustee seeks entry of a judgment: (i) against the Individual Defendants (defined below) for breach of their fiduciary duties of loyalty and care; (ii) avoiding and recovering certain transfers made by Argon Credit to certain of the Transferee Defendants (defined below) as preferences and/or fraudulent transfers; and (iii) disallowing any claims of the Transferee Defendants. The Trustee states as follows as to all matters:

## NATURE OF THIS ACTION

1.    During the course of the Debtors' limited business operations spanning approximately two years, Argon Credit's officers and members of its board of managers repeatedly breached their fiduciary duties of loyalty and care to the Debtors and to the Debtors' creditors by: (i) scheming to funnel assets away from the Debtors and their creditors, (ii) transferring assets to insiders; (iii) double-pledging assets to the Debtors' secured lender and an insider's lender; (iv) knowingly submitting false or misleading financial information to the Debtors' secured lender, including a false accounts receivable report; (v) paying themselves exorbitant "commissions" without disclosure to or approval of the Debtors' board of managers, (vi) using company funds to pay for personal expenses unrelated to the Debtors' business operations, and (vii) authorizing the Debtors to enter into purported loans with investors which were really contributions of equity and authorizing equity distributions to those investors at a time when the Debtors were insolvent.

2.    All of these actions contributed to the Debtors' inability to meet their financial obligations which ultimately led to the Debtors' secured lender declaring a default under the applicable loan documents and caused the Debtors to file for bankruptcy. The Trustee was appointed to liquidate the Debtors' remaining assets and pursue claims on behalf of the Debtors

and their creditors.  The Trustee files this action to recover damages in excess of $6 million that resulted from the bad acts described below.

## PARTIES

3.      The Trustee is the duly appointed chapter 7 trustee of the Debtors' bankruptcy estates.

4.      Raviv Wolfe ("*Wolfe*") is an individual who, on information and belief, resides in Valparaiso, Indiana.  Wolfe was Argon Credit's chief executive officer and a member of Argon Credit's board of managers at all times relevant to this Complaint.

5.      Gary Zumski ("*Zumski*") is an individual who, on information and belief, resides in Rolling Meadows, Illinois.  Zumski was Argon Credit's chief risk officer at all times relevant to this Complaint and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016.

6.      Peter Ferro, Jr. ("*Ferro*") is an individual who, on information and belief, resides in Minooka, Illinois.  Ferro was Argon Credit's president from June 2016 forward and, further, was a member of Argon Credit's board of managers between September 8, 2014 and February 3, 2015.

7.      Berj Arakelian ("*Arakelian*") is an individual who, on information and belief, resides in San Diego, California.  Arakelian was Argon Credit's chief executive officer from September 8, 2014 through approximately May 2015 and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016.

8.      Eric Schnosenberg ("*Schnosenberg*") is an individual who, on information and belief, resides in Chicago, Illinois.  Schnosenberg was Argon Credit's executive vice president of finance at all times relevant to this Complaint.

3

9. Sean Tomaszkiewicz ("*Tomaszkiewicz*") is an individual who, on information and belief, resides in Naperville, Illinois. Tomaszkiewicz was Argon Credit's vice president of technology and business development at all times relevant to this Complaint.

10. Harry Madanyan ("*Madanyan*") is an individual who, on information and belief, resides in Palos Heights, Illinois. Madanyan was Argon Credit's interim chief operations officer and director of strategy at all times relevant to this Complaint.

11. Joseph Canfora ("*Canfora*") is an individual who, on information and belief, resides in Chicago, Illinois. Canfora was a member of Argon Credit's board of managers at all times relevant to this Complaint.

12. Mark Triffler ("*Triffler*") is an individual who, on information and belief, resides in Lemont, Illinois. Triffler was a member of Argon Credit's board of managers at all times relevant to this Complaint.

13. John A. Kuhlman, Jr. ("*Kuhlman*") is an individual who, on information and belief, resides in Burr Ridge, Illinois. Kuhlman was a member of Argon Credit's board of managers from February 3, 2015 forward.

14. Bruce Breitweiser ("*Breitweiser*") is an individual who, on information and belief, resides in Bloomington, Illinois. Breitweiser was a member of Argon Credit's board of managers from February 12, 2015 forward.

15. Byron Faermark ("*Faermark*") is an individual who, on information and belief, resides in Elmhurst, Illinois. Faermark was a member of Argon Credit's board of managers from February 12, 2015 forward.

16. Barry Kostiner ("*Kostiner*") is an individual who, on information and belief, resides in Monsey, New York.

17.     Bergarviv LLC ("*Bergarviv*") is an Illinois limited liability company with its principal place of business located in Carpentersville, Illinois.

18.     Broadmark Capital, LLC ("*Broadmark*") is a Washington limited liability company with its principal place of business in Seattle, Washington.

19.     Peraza Capital and Investment, LLC ("*Peraza*") is a Florida limited liability company with its principal place of business in Saint Petersburg, Florida.

20.     Blue Treble Solutions, LLC ("*Blue Treble*") is a limited liability company, organized under the laws of the state of Delaware with its principal place of business in Naperville, Illinois.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334. The statutory predicates for the relief requested herein are sections 105(a), 502(b), 502(d), 502(j), 547, 548, and 550 of the Bankruptcy Code.

22.     This Complaint is a core proceeding under 28 U.S.C. § 157(b)(2) and the Trustee consents to entry of a final judgment by the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*").

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### A.  The Debtors' Business Operations

24.     Argon Credit was formed as a Delaware limited liability company on October 15, 2013. Argon Credit did not begin significant business operations until late 2014.  Argon X was formed as a Delaware limited liability company on April 23, 2015.

25.     Argon Credit owns 100% of the interests in Argon X.

5

26.     The Debtors operated a state-by-state consumer loan origination business. Certain non-debtor affiliates executed the loans and the loans were funded and serviced by Argon Credit.  Argon X purchased the consumer loans from the affiliates and Argon Credit serviced the loans.

27.     The Debtors offered unsecured loans up to $35,000 with interest rates between 19% and 95%+, having a twelve to sixty-month term.

**B.  Princeton Credit Facility**

28.     On May 1, 2015, Argon X entered into a Loan and Security Agreement (the "*Fintech Loan Agreement*") with Fintech Financial, LLC ("*Fintech*") which provided Argon X with a revolving line of credit with a maximum loan limit of $20,000,000.  In exchange, Argon X granted Fintech a security interest in certain of its personal property.

29.     Argon Credit and certain of its subsidiaries executed a Guaranty and Suretyship Agreement (the "*Guaranty*") in favor of Fintech which, among other things, guaranteed the full, prompt, and unconditional payment when due of Argon X's liabilities and obligations under the Fintech Loan Agreement.

30.     Pursuant to the terms of the Fintech Loan Agreement and the Guaranty, the Debtors agreed to provide Fintech with financial statements and other information applicable to Argon X and other financial information reasonably requested by Fintech.

31.     On May 6, 2015, Fintech and Princeton Alternative Income Fund, LP ("*Princeton*") entered into an agreement whereby Fintech agreed to sell, assign and transfer to Princeton all of its rights, title, and interests in certain of the Debtors' loans as identified by Fintech from time to time, as well as Fintech's rights and remedies under the Loan and Security Agreement.

32.     On September 30, 2015, Argon X and Fintech entered into that certain First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements (the "*First Amendment*") which, among other things, increased the maximum credit available under the Loan and Security Agreement to $34,000,000.

33.     On February 8, 2016, Argon X and Fintech entered into the Second Amendment to Loan and Security Agreement and Modification to Other Financing Agreements (the "*Second Amendment*," together with the Fintech Loan Agreement and First Amendment, the "*Fintech Loan Agreements*") which, among other things, increased the maximum credit available to Argon Credit to $37,500,000.

34.     On December 7, 2016, Princeton assigned its rights in the Fintech Loan Agreements to Fund Recovery Services, LLC.

### C.  Spartan Allegations

35.     Just 21 days after entering the Fintech Loan Agreements, Barry Kostiner incorporated an entity with a name eerily similar to the Debtors' secured lender Fintech Financial, LLC.  The new entity was named Fintech Asset Management, LLC ("*FTAM*"). FTAM's managing member is Barry Kostiner, who also worked for Argon Credit at the time of the transaction and used an Argon Credit e-mail address for business transactions.

36.     The Debtors sought to sell certain consumer loans in their portfolio to FTAM, which would then transfer the consumer loans to other entities for the purpose of re-pledging those consumer loans to another secured lender.

37.     The Debtors did not disclose this series of transactions to their creditors.

i.     **Entities Involved in Spartan Transaction**

38.    In connection with the contemplated sale, the following companies were incorporated:

    1. FTAM was incorporated in Delaware on May 22, 2015. FTAM's managing member is Barry Kostiner.

    2. Spartan Specialty Finance I, LLC ("*SSF*") was incorporated as a Delaware limited liability company on August 4, 2015. SSF's sole member is FTAM, which is controlled by Barry Kostiner.

    3. SSF Holdings LLC ("*SSF Holdings*") was incorporated as a Delaware limited liability company on August 4, 2015. Raviv Wolfe was the managing member and chief executive officer of SSF Holdings.

    4. Spartan Specialty Finance I SPV, LLC ("*SSF SPV*" together with FTAM, SSF, and SSF Holdings, "*Spartan*") was incorporated as a Delaware limited liability company on October 20, 2015. Its sole member is FTAM, which is controlled by Barry Kostiner.

ii.     **Initial Assignment and Servicing Agreements**

39.    In furtherance of the contemplated transaction, the parties executed four separate agreements on or about July 29, 2015 which set forth a framework for the parties' relationship and eventual sale or assignment of consumer loans.

40.    First, Argon Credit, SSF, and FTAM executed a Servicing Agreement which provided that, among other things:

    1. Argon Credit would originate and transfer certain consumer loans to SSF;

    2. Argon Credit would provide pre-servicing support and administrative services in connection with the consumer loans and would also service the consumer loans, including collecting monies which would be segregated from Argon Credit's other property and then deposited into SSF's account within one business day; and

    3. Argon Credit would receive a servicing fee equal to 15% of the amount invested by SSF in the consumer loans payable in equal monthly installments over 6 months. However, SSF was obligated to pay the fee to FTAM who was then obligated to pay it to Argon Credit. The Servicing

Agreement provides that Argon Credit has no right of recourse against the consumer loans for payment of the servicing fee.

41.    Wolfe signed the Servicing Agreement on behalf of Argon Credit.

42.    Second, Argon Credit, FTAM, and SSF executed a side agreement which provided that Argon Credit granted FTAM a right of allocation for up to 25% of the consumer loans originated by Argon Credit that have an annual percentage rate equal to or exceeding 40% to be assigned to FTAM on a monthly basis. Argon Credit also granted FTAM a right of first refusal to acquire such loans in the event Argon Credit proposed to sell it.

43.    SSF also executed a promissory note (the "*SSF Note*") in favor of SSF Holdings LLC in the principal amount of $330,000, which provided that the proceeds would be used to fund SSF's lending activities of originating and servicing loans. Wolfe signed the SSF Note as CEO of SSF Holdings LLC. The SSF Note called for quarterly payments to be made beginning August 2015 through February 2018 totaling $580,000 as a preferred return prior to equity payout.

44.    SSF and SSF Holdings also executed a subscription agreement pursuant to which SSF issued and sold the Promissory Note to SSF Holdings.

### iii.    Sale of the Consumer Loans to FTAM

45.    On August 20, 2015, Argon Credit and FTAM executed a Master Loan Sale Agreement pursuant to which Argon Credit agreed to sell certain qualified loans to FTAM.

46.    Wolfe signed the Master Loan and Sale Agreement on behalf of Argon Credit.

47.    The Master Loan and Sale Agreement provided that Argon Credit would make entries on its books and records to clearly indicate the sale of certain consumer to FTAM.

48.    On information and belief, Argon Credit sold or assigned consumer loans to FTAM having a face value of at least $4,840,024.67.

49. Upon information and belief, since the interest rates on those loans equaled or exceeded 40%, the actual value was significantly higher than the attributed face value because of the potential cash flow to be generated from interest.

50. However, Argon Credit's books and records reflect that it only received a total of $3,768,438.70 on account of the consumer loans sold to FTAM.

51. Argon Credit continued to service the consumer loans after they were sold to FTAM, but neither SSF nor FTAM ever paid any fees to Argon Credit in exchange for servicing the consumer loans.

52. The consumer loans sold to FTAM were Princeton's collateral and the Debtors did not disclose the transaction to Princeton until December 2016.

53. Argon Credit continued to reflect these consumer loans on its borrowing base certificates and other financial information submitted to Princeton.  In turn, Argon Credit continued to borrow against these phantom loans despite the fact that there was no collateral to support it.

54. During the pendency of the Debtors' chapter 11 bankruptcy cases, this Court found that these loans were "double counted" as Princeton and SSF's collateral.

55. The Debtors' books and records do not reflect whether the Master Loan Sale Agreement or series of transactions with Spartan were approved by Argon Credit's board of managers. In fact, none of the board books maintained by Argon Credit's board of managers includes any board meeting agendas, minutes, or resolutions between May 2015 and May 2016.

56. On information and belief, Wolfe, Arakelian, Schnosenberg, Madanyan, Zumski, Canfora, Triffler, Ferro, Kuhlman, Breitweiser, Tomaszkiewicz, and Faermark (collectively, the "*Individual Defendants*") were each aware at the time or subsequently became aware of the

transactions with Spartan and, further, knew or should have known that the transaction was not disclosed to Princeton and was not reflected on Argon Credit's books and records.

57.     In fact, Schnosenberg, Wolfe, and Arakelian received daily reports regarding the transferred loans and monitored and participated in the transactions.

### iv.     SSF and FTAM Default on Their Loan

58.     On October 31, 2015, SSF SPV entered into a Loan and Security Agreement with Hamilton Funding I LP ("*Hamilton*"), pursuant to which Hamilton agreed to loan up to $10,000,000 to SSF SPV with a delayed draw term loan facility, secured by the assets Argon Credit transferred to SSF SPV, with a 70% loan to collateral value borrowing base (the "*Hamilton Loan*").

59.     FTAM, Kostiner, and Wolfe each guaranteed the Hamilton Loan.

60.     Argon Credit, which continued to act as servicer for the transferred loans, deposited cash proceeds of the loans on a weekly basis into a bank account owned by Spartan, which was subject to a security interest of Hamilton via a deposit account control agreement (the "*Spartan Bank Account*").  Upon information and belief, the deposits into the Spartan Bank Account were approximately $50,000 per week.

61.     Upon information and belief, in or around January 2016, SSF SPV fell into non-compliance with the terms of the Hamilton Loan.  On February 5, 2016, SSF SPV represented to Hamilton that it would use Argon Credit's assets, if necessary, to enable SSF SPV to come into compliance.

62.     On February 5, 2016, Kostiner sent an email on behalf of SSF SPV to Daniel Wirzberger, a representative of Hamilton, stating "Argon is expecting to receive $5 mm from its investors this week, which will enable it to buy all the loans we need this month, as well as

provide the remaining 30% advance on our senior line of credit with you, if needed.  I have been working with my investors to try not to take it from Argon, but if needed, we will be able to draw whatever equity is required from Argon to complete a $7 mm draw on the Hamilton line by the end of February."

63.    On February 23, 2016, Hamilton served a Notice of Event of Default of the Hamilton Loan for failure to replace defaulted receivables. Hamilton accelerated the balance of the loan and sought payment of $4,437,700.17, which consisted of $3,274,629 in principal.

64.    On March 3, 2016, Hamilton took exclusive control of the Spartan Bank Account and began sweeping the cash which Argon Credit was depositing into the account.   Upon information and belief, Hamilton swept at least $705,000 from the Spartan Bank Account.

65.    While SSF SPV and FTAM were engaged in discussions with Hamilton regarding the default under their loan agreements, FTAM and SSF separately engaged in discussions with Argon Credit to repurchase the consumer loans which were Hamilton's collateral.

66.    Upon information and belief, the plan to transfer the consumer loans back to Argon Credit was to hide those assets from Hamilton and prevent any further sweeps of the Spartan Bank Account by Hamilton.

67.    Argon Credit and FTAM executed a repurchase agreement dated March 1, 2016 pursuant to which Argon Credit agreed to repurchase from FTAM the entire pool of consumer loan assets with original principal notes totaling $4,843,024.67 which would be immediately transferred to Argon Credit upon the execution of the agreement.

68.    In consideration for the transfer of the assets, Argon Credit agreed that FTAM would continue to receive the future revenue streams from the loans until the earlier of 18 months or September 30, 2017.

69.     On information and belief, the repurchase agreement was backdated by several weeks and was actually signed on or about March 24, 2016.

70.     Also on March 24, 2016, upon information and belief, SSF SPV sent a letter to Hamilton, rejecting its notices of default and asserting a right to cure such defaults of the Hamilton Loan Agreement.

71.     Despite the purported repurchase agreement, on information and belief the consumer loans were not transferred back to Argon Credit.

72.     SSF SPV filed a voluntary petition for chapter 11 bankruptcy in the Southern District of New York on June 29, 2016 and listed in its schedules of assets and liabilities a loan portfolio having a value of $4,750,000.00.

73.     In that bankruptcy case, Ferro submitted a proof of claim against SSF SPV on behalf of Argon Credit alleging that Argon Credit was owed $712,500 in servicing fees on account of the Servicing Agreement.

### D. Defendants Knowingly Submitted False or Misleading Financial Reports to Princeton

74.     In addition to the foregoing, on information and belief, Argon Credit's officers and board of managers caused Argon Credit to knowingly submit false or misleading financial reports to Princeton.

75.     For example, Argon Credit submitted financial statements, including a balance sheet and borrowing base certificate, to Princeton for the period ending December 31, 2015 which reflected $38,833,915 in accounts receivable, which did not include any allowance for doubtful accounts.  However, Argon Credit's internal balance sheet reflected only $29,982,455 in accounts receivable, which included an allowance of negative $5,376,501 for doubtful accounts.

76.     Argon Credit also submitted financial statements to Princeton dated March 20, 2016, for the period ending February 28, 2016 which reflected $38,320,266 in accounts receivable, which did not include an allowance for doubtful accounts.  However, Argon Credit's internal balance sheet dated just two weeks later on April 5, 2016 reflected only $29,723,922 in accounts receivable, which included an allowance of negative $5,465,289 for doubtful accounts.

77.     Even worse, on or about August 25, 2016, the Individual Defendants, among others, attended a board meeting in which those present discussed the Debtors' balance sheet and income statement as of July 31, 2016 as well as a draft report of the Debtors' 2015 consolidated financial statements performed by an independent accounting firm.

78.     The balance sheet as of July 31, 2016 circulated to those present reflected total assets of $34,298,154.38, which included an allowance for doubtful accounts of -$6,383,492.43.

79.     On information and belief, the draft report of the Debtors' 2015 consolidated financial statements reflected total assets of $32,992,577.

80.     Nevertheless, the July 2016 balance sheet submitted to Princeton in mid-August 2016 reflected $40,419,664.38 in assets and did not include a $6 million deduction for doubtful accounts.

81.     The Debtors did not inform Princeton of the over-inflated financials until on or about December 7, 2016 at which time Princeton immediately provided the Debtors with notice of intent to call the loan.

82.     Thus, the Individual Defendants assisted the Debtors in keeping two sets of books and records – one set for internal purposes and one set for submission to Princeton to permit Argon X to continue borrowing against its credit facility.

### E.  Argon Credit's Equity Structure and Equity Contributions Disguised as Loans

83.    Argon Credit originally had three members: Noax, LLC ("*Noax*"), B Money Holdings, LLC ("*B Money*"), and Gary Zumski.

84.    Noax is, on information and belief, owned and controlled by Raviv Wolfe.

85.    B Money is, on information and belief, owned and controlled by Berj Arakelian.

86.    Through a series of subsequent transactions, Argon Credit expanded its members to include Margon, LLC, Little Owl Argon LLC, Mark Triffler Declaration of Trust Dated December 5, 1991, and The Cardinal Trust (collectively, the "*New Investors*").

87.    Each of the New Investors purportedly loaned money to Argon Credit for which they received promissory notes that required quarterly interest payments at a specified annual percentage rate with a maturity date several years later.

88.    The amounts purportedly loaned by the New Investors are summarized follows:

| New Investor | Total Purported Loan |
|---|---|
| Margon, LLC | $1,365,000 |
| Little Owl Argon LLC | $7,000,000 |
| Triffler Declaration of Trust dated December 5, 1991 | $1,000,000 |
| The Cardinal Trust | $1,000,000 |
| **Total:** | **$10,365,000** |

89.    Contemporaneously with the promissory notes, Argon Credit and the New Investors also executed subscription agreements pursuant to which the New Investors acquired membership interests of Argon Credit commensurate with the amount of their purported loans.

90.    Thus, Argon Credit's officers and board of managers caused Argon Credit to incur more than $10 million in purported debt under promissory notes payable to equity owners who obtained their equity interests for no additional consideration.

91.    In purpose and effect, these supposed loans were equity contributions.

15

92.    Between February 2015 and the December 16, 2016, Argon Credit made at least $2,038,373.41 in interest payments to the New Investors, which were really equity distributions, summarized as follows:

| New Investor | Total Payments |
| --- | --- |
| Margon, LLC | $1,023,611.12 |
| Little Owl Argon LLC | $847,595.63 |
| Triffler Declaration of Trust dated December 5, 1991 | $99,444.44 |
| The Cardinal Trust | $74,722.22 |
| **Total:** | **$2,038,373.41** |

### F. Commissions Paid to Broadmark and Peraza

93.    In April 2015, Argon Credit purportedly entered into a services agreement (the "*Broadmark Agreement*") with Broadmark and Alhambra Circle Partners, LLC ("*Alhambra*") to employ Broadmark and Alhambra to assist it with certain debt and capital raise efforts.

94.    Alhambra is owned by its principal, Bruce Goldstein.

95.    The Broadmark Agreement is dated April 21, 2015, only nine days prior to the date of the Fintech Loan Agreement, and was signed by Broadmark on April 30, 2015, one day prior to the date of the Fintech Loan Agreement.

96.    Broadmark and Alhambra purportedly assisted the Debtors in connection with obtaining the Princeton loan, equity transactions with Little Owl, Triffler Trust, and Cardinal Trust, and the transactions with Spartan.

97.    At some point subsequent to entering into the Broadmark Agreement, Alhambra disassociated from Broadmark and began working with Peraza.

98.    No formal assignment of the Broadmark Agreement was ever made to Peraza.

99.    The Fintech Loan Agreement's terms regarding use of proceeds permitted payment of transaction fees only out of the initial draw.

100.   The First Amendment to the Fintech Loan Agreement expressly prohibited use of loan proceeds to pay commissions or finder's fees.

101.   Between May 2015 and June 2016, Argon Credit made several transfers to Broadmark totaling $528,333.33 (the "*Broadmark Transfers*") on account of purported consulting fees owed under the Broadmark Agreement, as set forth in Exhibit 1 to this Complaint.

102.   At least $360,000 of the Broadmark Transfers were attributed to finder's fees purportedly earned for procuring the Princeton loan.

103.   On information and belief, certain of the Broadmark Transfers are traceable to Princeton loan proceeds subsequent to the initial draw.

104.   These commissions were not disclosed to Fintech or Princeton.

105.   Additionally, between November 2015 and June 2016, Argon Credit made several transfers to Peraza totaling $248,791.67 (the "*Peraza Transfers*") on account of purported consulting fees, as set forth in Exhibit 2 to this Complaint.

106.   At least $180,000 of the Peraza Transfers were on account of the Princeton loan.

107.   However, no consulting fees were ever owed to Peraza because the Broadmark Agreement was never assigned to Peraza and no other written agreement existed between Argon Credit and Peraza with respect to alleged commissions.

108.   Indeed, Peraza filed a proof of claim against Argon Credit admitting that "[o]n further consideration, Peraza determined that the claim is properly and entirely owed to Broadmark."

### G.  Transfers to or for the Benefit of Insiders

109.    During the two year period of Argon Credit's operations, Wolfe, Zumski, Arakelian, and Tomaszkiewicz caused Argon Credit to pay hundreds of thousands of dollars to or for their own benefit, often times for little or no value to Argon Credit.

i.    <u>Bergarviv Transfers</u>

110.    For example, between May 11, 2015 and October 2, 2015, Argon Credit paid $381,000 (the "*Bergarviv Transfers*") to Bergarviv, which is owned in whole or in part by Arakelian and Wolfe through their respective companies B Money and Noax.  A summary of the Bergarviv Transfers is attached hereto as <u>Exhibit 3</u>.

111.    The Bergarviv Transfers were purportedly on account of commissions owed to Bergarviv relating to the Princeton loan.

112.    However, both B Money and Noax were already equity owners of Argon Credit and Wolfe and Arakelian both received salaries from Argon Credit during that time period.

113.    On information and belief, these commissions were not disclosed to or approved by Argon Credit's board of managers.

ii.    <u>Personal Las Vegas Trip</u>

114.    Additionally, in October 2015, Wolfe caused Argon Credit to pay more than $7,000 (the "*Las Vegas Trip Expenses*") in airfare, hotel, meal, and entertainment charges for certain of the Debtors' executives to take a weekend getaway in Las Vegas, Nevada to celebrate an increase in the Princeton credit facility.

115.    Argon Credit did not receive any value in exchange for the Las Vegas Trip Expenses and these transfers were made at a time when Argon Credit was struggling financially and was insolvent.

    iii.   <u>Blue Treble Payments</u>

116.    Wolfe and Tomaszkiewicz, both officers of Argon Credit, caused Argon Credit to enter into an arrangement with Blue Treble, an entity owned and managed by Tomaszkiewicz, purportedly to develop software on behalf of Argon Credit.

117.    However, Tomaszkiewicz was already an officer of Argon Credit and obligated to perform his duties for the benefit of Argon Credit.

118.    Instead, Tomaszkiewicz took advantage of Argon Credit and caused Argon Credit to make hundreds of thousands of dollars in payments to Blue Treble for his personal benefit.

119.    Specifically, during the two year period prior to the Petition Date, Argon Credit made transfers to Blue Treble totaling at least $214,050.28 (the "*Blue Treble Two Year Payments*"), including at least $52,643.00 (the "*Blue Treble One Year Payments*" together with the Blue Treble Two Year Payments, the "*Blue Treble Payments*") in the year prior to the Petition Date.  A list of the Blue Treble Payments is attached hereto as <u>Exhibit 4</u>.

    iv.   <u>Catalyst Lease for Personal Apartment</u>

120.    In May 2016, Wolfe also caused Argon Credit to enter into a six-month apartment lease (the "*Catalyst Lease*") with Gateway Catalyst THC, LLC in May 2016 for a monthly rent of $2,680.00.

121.    The Catalyst Lease identified Wolfe as the occupant of the apartment located at 123 North Des Plaines, Chicago, IL 60661.

122.    The Debtors' business operations did not require the use of a residential apartment and, upon information and belief, Wolfe and other Argon Credit employees used the apartment for personal, rather than business, use.

123.    Morever, Wolfe caused Argon Credit to pay for tens of thousands of dollars of his personal expenses including:

1.  Tires for his car;

2.  Food and alcohol purchases;

3.  iTunes purchases; and

4.  At least $18,145.51 on Wolfe's personal Discover card and $24,718.84 on Wolfe's personal American Express card.

124.    Finally, after Princeton called default of the Fintech Loan Agreements in December 2016, it proposed certain cuts to the Debtors' operations, including a demand that senior management not be paid with the upcoming Friday, December 16, 2016 payroll.

125.    Instead, on the eve of the Debtors' bankruptcy filing, Wolfe and Zumski did the exact opposite and caused Argon Credit to add each of them to Argon Credit's payroll processor, The Synergy Companies, Inc., for the very first time in order to pay themselves tens of thousands of dollars in purported vacation and "incentive" time for 2014 and 2015.

126.    Specifically, on or about December 16, 2016, the Debtors' Petition Date, Argon Credit's payroll processor caused to be paid to Wolfe $57,992.30 (the "*Wolfe Incentive Payments*") in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit.

127.    On that same date, Argon Credit's payroll processor caused to be paid to Zumski $31,664.80 (the "*Zumski Incentive Payments*") in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit.

128.    No other Argon Credit employees received any payment for purported incentive time during that same payroll period.

20

## H. Argon Credit's Financial Condition

129.    Argon Credit's books and records reflect that it was insolvent at all times relevant to this Complaint.

130.    Argon Credit's tax return for the calendar year ending December 31, 2014 states that it had total operating income of only $136,834, yet it took on $365,000 in purported debt to Margon under the First Margon Loan during that same time period.

131.    Specifically, Argon Credit's internal balance sheet reflects that as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative equity of $8,641.03.

132.    From that point forward, Argon Credit's financial condition deteriorated each month that it continued to operate and its negative equity balance increased each month.

133.    An independent accountant's review of Argon Credit's finances reflected that as of December 31, 2015, Argon Credit had negative equity of $11,285,946.

134.    That same accountant's review stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708 for the year ended December 31, 2015.

135.    As of November 30, 2016, Argon Credit's internal balance sheet reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

## I. Debtors' Bankruptcy Filings

136.    On December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

137.    On January 11, 2017, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7.

138.    The Trustee was appointed as interim chapter 7 trustee on April 17, 2017 and confirmed by the Court on July 6, 2017.

## COUNT I

**(Breach of Fiduciary Duty Against Wolfe, Zumski, Ferro, Arakelian, Schnosenberg, Tomaszkiewicz, Madanyan, Canfora, Triffler, Kulhman, Breitweiser, and Faermark)**

139.    The Trustee repeats, realleges, and incorporates paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140.    At all times relevant to this Complaint, as applicable to each, Wolfe, Zumski, Ferro, Arakelian, Schnosenberg, Tomaszkiewicz, Madanyan, Canfora, Triffler, Kulhman, Breitweiser, and Faermark owed fiduciary duties of care and loyalty to Argon Credit because they were officers or members of Argon Credit's board of managers.

141.    Specifically, Wolfe breached his fiduciary duty of loyalty by engaging in, among other things, one or more of the following acts:

1.  Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans to or for the benefit of companies in which, on information and belief, Wolfe had a personal financial interest given that he guaranteed FTAM's loan with Hamilton;

2.  Authorizing Argon Credit to pay $381,000 to Bergarviv in purported commissions which personally benefitted Wolfe and which were not disclosed to or authorized by Argon Credit's board of managers;

3.  Authorizing Argon Credit to pay himself $57,992.30 for purported vacation time and 2014 and 2015 "incentive time" on the eve of Argon Credit's bankruptcy filing; and

4.  Authorizing Argon Credit to pay for his personal expenses which did not benefit Argon Credit, including tires for his vehicle, food and entertainment, the Catalyst Lease, and the Las Vegas Trip.

142.     Zumski breached his fiduciary duty of loyalty by authorizing Argon Credit to pay himself $31,664.80 for purported vacation time and 2014 and 2015 "incentive time" on the eve of Argon Credit's bankruptcy filing.

143.     Arakelian breached his fiduciary duty of loyalty by among other things, authorizing Argon Credit to pay $381,000 to Bergarviv in purported commissions which personally benefitted Arakelian and which were not disclosed to or authorized by Argon Credit's board of managers.

144.     Tomaszkiewicz breached his fiduciary duty of loyalty by entering into an arrangement with Argon Credit on behalf of his company, Blue Treble, to pay himself more than $214,000 for supposed software development services at a time Tomaszkiewicz was already employed by Argon Credit and receiving a salary and which fees were exorbitant in relation to the purported services provided.

145.     In taking these actions, Wolfe, Zumski, Arakelian, Tomaszkiewicz did not place the best interests of Argon Credit over other interests.  Instead, they authorized transactions on which they appeared on both sides and took actions that benefitted themselves personally at the expense of Argon Credit.

146.     Wolfe also breached his fiduciary duty of care by engaging in, among other things, one or more of the following acts:

1.  Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

2.  Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM, thereby causing Argon Credit to be in breach of the Fintech Loan Agreement;

23

3. Causing Argon Credit to submit false financial information to Princeton which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more funds from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements;

4. Causing Argon Credit to enter into the Broadmark Agreement and pay more than $700,000 to Broadmark and Peraza for commissions which were exorbitant, above market rate, and for which Argon Credit did not receive reasonably equivalent value; and

5. Causing Argon Credit to pay millions of dollars to Margon, Little Owl, Triffler Trust, and Cardinal Trust which were, in reality, equity distributions to members at a time when Argon Credit was insolvent.

147. Triffler, Kuhlman, Canfora, and Zumski, breached their fiduciary duties of care by engaging in, among other things, one or more of the following acts:

1. Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

2. Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM which caused Argon Credit to be in breach of the Fintech Loan Agreement;

3. Causing Argon Credit to submit false financial information or failing to correct such information submitted to Princeton, which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more debt from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements;

4. Causing Argon Credit to enter into the Broadmark Agreement and pay more than $700,000 to Broadmark and Peraza for commissions which were exorbitant, above market rate, and for which Argon Credit did not receive reasonably equivalent value; and

5. Causing Argon Credit to pay millions of dollars to Margon, Little Owl, Triffler Trust, and Cardinal Trust which were, in reality, equity distributions to members at a time when Argon Credit was insolvent.

148.    Breitweiser, Faermark, Schnosenberg, and Ferro breached their fiduciary duties of care by among other things, causing Argon Credit to submit false financial information or failing to correct such information submitted to Princeton, which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more funds from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements.

149.    In taking these actions, the Individual Defendants were grossly negligent because they caused Argon Credit to incur more debt to Princeton than it was entitled to borrow with insufficient assets to collateralize such loan, cause Argon Credit to breach its loan agreements with Princeton, and make millions of dollars in equity distributions and pay above market rate for alleged services while Argon Credit was insolvent.

150.    These breaches of fiduciary duty of loyalty and care caused damages to Argon Credit and its creditors in an amount to be determined at trial.

## COUNT II

### (Aiding and Abetting Breach of Fiduciary Duty Against Barry Kostiner)

151.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

152.    At all times relevant to this Complaint, Wolfe owed fiduciary duties of loyalty and care to Argon Credit because he was an officer and a member of Argon Credit's board of members.

153.    Wolfe repeatedly breached his fiduciary duties of loyalty by authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans to or for the benefit of companies in which, on

information and belief, Wolfe had a personal financial interest given that he guaranteed FTAM's

loan with Hamilton.

154.    Wolfe also breached his fiduciary duties of care by engaging in, among other

things, one or more of the following acts:

1.  Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

2.  Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM which caused Argon Credit to be in breach of the Fintech Loan Agreement; and

3.  Causing Argon Credit to submit false financial information to Princeton which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more debt from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements.

155.    Kostiner knowingly participated with Wolfe to perform each of the acts described

above, including causing the Spartan entities to be incorporated, causing Spartan to execute the

series of documents pursuant to which Argon Credit's consumer loans were sold to FTAM,

causing Spartan to pay Argon Credit less than reasonably equivalent value in exchange for the

consumer loans, and causing Spartan not to pay any servicing fees due and owing to Argon

Credit of more than $700,000.

156.    While acting as a consultant for Argon Credit, Kostiner assisted Wolfe in

breaching his fiduciary to argon Credit by arranging for Spartan to purchase consumer loans

from Argon Credit without paying reasonably equivalent value in exchange for the consumer

loans, having Argon Credit first acquire loans on its balance sheet and in its portfolio before

assigning such loans to Spartan, executing a Memorandum of Understanding on or about July 2,

2015, which acknowledged that Spartan was funded from Argon Credit's balance sheet,

requesting and, upon information and belief, receiving copies of Argon Credit's financial statements while he was operating Spartan, and requesting and receiving notification of incoming wires to Argon Credit from Schnosenberg.

157.    Kostiner set up the Spartan entities while he worked for Argon Credit and used an Argon Credit e-mail address for Spartan's business transactions.

158.    Wolfe and Kostiner's actions caused significant harm to Argon Credit because it caused Argon Credit to incur more debt to Princeton than it was entitled to borrow with insufficient assets to collateralize such loan, caused Argon Credit to breach its loan agreements with Princeton, and ultimately funneled millions in assets away from Argon Credit without Argon Credit receiving equivalent value in exchange.

159.    Kostiner's actions caused damages to Argon Credit in an amount to be determined at trial.

### COUNT III

**(Avoidance of Preference Period Transfers
Pursuant to 11 U.S.C. § 547 Against Wolfe and Zumski)**

160.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

161.    During the (90) day period prior to the Petition Date, Argon Credit made the Zumski Incentive Payments and Wolfe Incentive Payments (collectively, the "*Incentive Payments*") to Zumski and Wolfe, respectively

162.    Each Incentive Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name which was transferred to Argon Credit's payroll processor with the specific direction to transfer those funds to Zumski and Wolfe in the amount of the Incentive Payments.

163.    Each of the Incentive Payments was a transfer to, or for the benefit of, the Zumski and Wolfe because each Incentive Payment either reduced or fully satisfied a debt then owed by Argon Credit to Zumski and Wolfe for vacation and incentive time owed to them.

164.    Each Incentive Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Zumski and Wolfe before such Incentive Payments were made.

165.    Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Incentive Payment was made while Argon Credit was insolvent.

166.    Furthermore, pursuant to section 547(f) of the Bankruptcy Code, Argon Credit is presumed to have been insolvent during the 90 days prior to the Petition Date and is therefore presumed to have been insolvent on the date of the Incentive Payments.

167.    Each Incentive Payment was made on or within 90 days prior to the Petition Date.

168.    Each Incentive Payment enabled Zumski and Wolfe to receive more than they would receive if:

1.    Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

2.    such Incentive Payments had not been made; and

3.    Zumski and Wolfe received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

169.    By reason of the foregoing, the Trustee may avoid the Incentive Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT IV

**(In the Alternative to Count III, Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548(a)(1)(B) Against Wolfe and Zumski)**

170.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

28

171.    Argon Credit made the Zumski Incentive Payments and Wolfe Incentive Payments (collectively, the "*Incentive Payments*") to Zumski and Wolfe, respectively.

172.    Each Incentive Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name which was transferred to Argon Credit's payroll processor with the specific direction to transfer those funds to Zumski and Wolfe in the amount of the Incentive Payments.

173.    Each Incentive Payment was made within the two years prior to the Petition Date.

174.    To the extent that the Incentive Payments were not made on account of antecedent debts owed by Argon Credit to Wolfe and Zumski, Argon Credit did not receive reasonably equivalent value in exchange for the Incentive Payments.

175.    Argon Credit's liabilities exceeded its assets at the time of each of the Incentive Payment, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

176.    Accordingly, on the date each Incentive Payment was made, Argon Credit:

   i.    was insolvent or became insolvent as a result of the Incentive Payments;

   ii.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

   iii.    intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

177.    For these reasons, the Trustee may avoid the Incentive Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT V

**(Avoidance of Preference Period Transfers
Pursuant to 11 U.S.C. § 547 Against Arakelian)**

178.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

179.    During the ninety days prior to the Petition Date, Argon Credit made two payments totaling $15,000 (the "*Arakelian Payments*") to Arakelian consisting of a wire transfer in the amount of $7,500 on November 4, 2016 and a wire transfer in the amount of $7,500 on December 1, 2016.

180.    Each Arakelian Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

181.    Each of the Arakelian Payments was a transfer to, or for the benefit of, Arakelian because each Arakelian Payment either reduced or fully satisfied a debt then owed by Argon Credit to Arakelian on account of a promissory note.

182.    Each Arakelian Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Arakelian before such Arakelian Payment was made.

183.    Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Arakelian Payment was made while Argon Credit was insolvent.

184.    Furthermore, pursuant to section 547(f) of the Bankruptcy Code, Argon Credit is presumed to have been insolvent during the 90 days prior to the Petition Date and is therefore presumed to have been insolvent on the dates of the Arakelian Payments.

185.    Each Arakelian Payment was made on or within 90 days prior to the Petition Date.

186.    Each Arakelian Payment enabled Arakelian to receive more than he would receive if:

    1.   Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

    2.   such Arakelian Payments had not been made; and

    3.   Arakelian received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

187.    By reason of the foregoing, the Trustee may avoid the Arakelian Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT VI

### (In the Alternative to Count V, Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B) Against Arakelian)

188.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

189.    During the ninety days prior to the Petition Date, Argon Credit made two payments totaling $15,000 (the "*Arakelian Payments*") to Arakelian consisting of a wire transfer in the amount of $7,500 on November 4, 2016 and a wire transfer in the amount of $7,500 on December 1, 2016.

190.    Each Arakelian Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

191.    Each Arakelian Payment was made within the two years prior to the Petition Date.

192.    To the extent that the Arakelian Payments were not made on account of antecedent debts owed by Argon Credit to Arakelian, Argon Credit did not receive reasonably equivalent value in exchange for the Arakelian Payments.

193.     Argon Credit's liabilities exceeded its assets at the time of each of the Arakelian Payments, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

194.     Accordingly, on the date each Arakelian Payment was made, Argon Credit:

     i.     was insolvent or became insolvent as a result of the Arakelian Payment;

     ii.     was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

     iii.     intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

195.     For these reasons, the Trustee may avoid the Arakelian Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT VII

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B) Against Bergarviv)

196.     The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

197.     Each Bergarviv Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

198.     Each Bergarviv Transfer was made within the two years prior to the Petition Date.

199.     On information and belief, each Bergarviv Transfer was not made on account of an antecedent debt owed by Argon Credit to Bergarviv because transfers were made on account of purported commissions owed in connection with the Princeton loan which were not disclosed to or authorized by Argon Credit's board of managers.

200.    Additionally, Argon Credit did not receive reasonably equivalent value in exchange for the Bergarviv Transfers because B Money and Noax were already equity owners of Argon Credit and Raviv Wolfe received a salary from Argon Credit of approximately $116,000 between November 2014 and October 2015.

201.    Furthermore, Argon Credit paid more than $500,000 to or for the benefit of Broadmark and Peraza, representing purported commissions owed in connection with the same Princeton loan.

202.    These commissions were not authorized by Argon Credit's board of managers or disclosed to Princeton and were substantially above market for any commissions which would be properly owed.

203.    Argon Credit's liabilities exceeded its assets at the time of each of the Bergarviv Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

204.    Accordingly, on the date each Bergarviv Transfer was made, Argon Credit:

    i.     was insolvent or became insolvent as a result of the Bergarviv Transfers;

    ii.     was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

    iii.     intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

205.    For these reasons, the Trustee may avoid the Bergarviv Transfers as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT VIII

**(Avoidance of Preferential Transfers to Blue Treble Pursuant to 11 U.S.C. § 547(b))**

206.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

207.    During the one year prior to the Petition Date, the Debtors continued to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, direct deposit or otherwise to certain entities, including Blue Treble.

208.    During the one year prior to the Petition Date, Argon Credit made the Blue Treble One Year Payments to Blue Treble.

209.    Upon information and belief, Blue Treble was a creditor, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Blue Treble One Year Payments.

210.    Each Blue Treble One Year Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

211.    Each of the Blue Treble One Year Payments was a transfer to, or for the benefit of, Blue Treble because each Blue Treble One Year Payment either reduced or fully satisfied a debt then owed by Argon Credit to Blue Treble.

212.    Upon information and belief, each Blue Treble One Year Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Blue Treble before such transfers were made.

213.    Argon Credit's liabilities exceeded its assets at the time of each of the Blue Treble One Year Payments.

214.    Specifically, Argon Credit's balance sheet ending January 31, 2016 reflects assets of $35,965,479.62 and liabilities of $44,194,338.59, resulting in negative $8,228,858.97 in equity and the balance sheet ending November 30, 2016 reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

215.    Accordingly, each Blue Treble One Year Payments was made while Argon Credit was insolvent.

216.    At all times relevant to the Complaint, Blue Treble was an insider of Argon Credit because, on information and belief, Blue Treble was owned and/or controlled by Tomaszkiewicz who was Argon Credit's vice president of technology and business development and had the ability to direct Argon Credit's assets.

217.    Furthermore, on information and belief, the checks issued to Blue Treble were mailed to Tomaszkiewicz's home address and, effectively, Blue Treble and Tomaszkiewicz are one and the same.

218.    Each Blue Treble One Year Payment was made on or within one year prior to the Petition Date.

219.    Each Blue Treble One Year Payment enabled Blue Treble to receive more than it would receive if:

   1.  Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

   2.  such Blue Treble One Year Payment had not been made; and

   3.  the Blue Treble received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

220.    By reason of the foregoing, the Trustee may avoid the Blue Treble One Year Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT IX

### (In the Alternative to Count VIII, Avoidance of Fraudulent
### Transfers Under 11 U.S.C. §548(a)(1)(B))

221.     The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

222.     Each Blue Treble Two Year Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

223.     Each Blue Treble Two Year Payment was made within the two years prior to the Petition Date.

224.     To the extent any of the Blue Treble Two Year Payments were not made on account of an antecedent debt owed by Argon Credit, Argon Credit did not receive reasonably equivalent value in exchange for the transfers.

225.     Argon Credit's liabilities exceeded its assets at the time of each of the Blue Treble Two Year Payments, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

226.     Accordingly, on the date each Blue Treble Two Year Payment was made, Argon Credit:

> 1. was insolvent or became insolvent as a result of the Blue Treble Two Year Payment;
>
> 2. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or
>
> 3. intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

227.    For these reasons and to the extent any of the Blue Treble Two Year Payments were not made on account of an antecedent debt owed by Argon Credit, the Trustee may avoid the Blue Treble Two Year Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT X

### (Avoidance of Fraudulent Obligations and Transfers Under 11 U.S.C. § 548(a)(1)(B) Against Broadmark and Peraza)

228.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

229.    Each Broadmark Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

230.    Each Broadmark Transfer was made within the two years prior to the Petition Date.

231.    Each Broadmark Transfer was made to or for Broadmark's benefit.

232.    Argon Credit did not receive reasonably equivalent value in exchange for incurring the obligations under the Broadmark Agreement or for making the Broadmark Transfers because the parties entered into the Broadmark Agreement just days prior to the closing of the Fintech Loan Agreement, a time when the vast majority of the work performed to effectuate the transaction had already been done.

233.    Furthermore, the commissions to be paid to Broadmark under the Broadmark Agreement were exorbitant in light of market rates, the effort required, and the fact that certain of Argon Credit's officers, including Wolfe, already had responsibility for identifying borrowing opportunities and equity raising opportunities and were paid a salary for their efforts.

234.    Similarly, each Peraza Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

235. Each Peraza Transfer was made within the two years prior to the Petition Date.

236. Each Peraza Transfer was made to or for Peraza's benefit.

237. Argon Credit did not receive reasonably equivalent value in exchange for the Peraza Transfers because: (i) Argon Credit did not owe any debt to Peraza and had no legal obligation to make the Peraza Transfers to Peraza, and (ii) for the reasons stated above, any commissions purportedly owed in connection with the Princeton loan, equity raises, or SSF sale were exorbitant, did not represent market value for the services provided, and Argon Credit's officers already had responsibility for identifying borrowing and equity raising opportunities.

238. Argon Credit's liabilities exceeded its assets at the time of each of the Broadmark Transfers and Peraza Transfers (collectively, the "*Commission Payments*"), including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

239. Accordingly, on the date each Commission Payments were made and the obligations under the Broadmark Agreement incurred, Argon Credit:

1. was insolvent or became insolvent as a result of the Commission Payments and obligations under the Broadmark Agreement;

2. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

3. intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

240. For these reasons, the Trustee may avoid the Commission Payments and obligations under the Broadmark Agreement as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT XI

### (Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550)

241.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 240 as though fully set forth herein.

242.    Wolfe was either: (a) the initial transferee of the Wolfe Incentive Payments, (b) the entity for whose benefit the Wolfe Incentive Payments were made or (c) an immediate or mediate transferee of an initial transferee.

243.    Zumski was either: (a) the initial transferee of the Zumski Incentive Payments, (b) the entity for whose benefit the Zumski Incentive Payments were made or (c) an immediate or mediate transferee of an initial transferee.

244.    Arakelian was either: (a) the initial transferee of the Arakelian Payments, (b) the entity for whose benefit the Arakelian Payments were made or (c) an immediate or mediate transferee of an initial transferee.

245.    Bergarviv was either: (a) the initial transferee of the Bergarviv Transfers, (b) the entity for whose benefit the Bergarviv Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

246.    Blue Treble was either (a) the initial transferee of the Blue Treble Payments, (b) the entity for whose benefit the Blue Treble Payments were made or (c) an immediate or mediate transferee of an initial transferee.

247.    Broadmark was either (a) the initial transferee of the Broadmark Transfers, (b) the entity for whose benefit the Broadmark Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

248.    Peraza (together with Wolfe, Zumski, Arakelian, Bergarviv, Blue Treble, and Broadmark, the "*Transferee Defendants*") was either (a) the initial transferee of the Peraza Transfers (together with the Wolfe Incentive Payments, Zumski Incentive Payments, Arakelian Payments, Bergaviv Transfers, Blue Treble Payments, and Broadmark Transfers, the "*Challenged Transfers*"), (b) the entity for whose benefit the Peraza Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

249.    To the extent that the Challenged Transfers are avoided pursuant to sections 547 or 548 of the Bankruptcy Code, the Trustee may recover the Challenged Transfers, or their value, from the applicable Transferee Defendants or any mediate or immediate transferee pursuant to section 550 of the Bankruptcy Code.

250.    By reason of the foregoing, the Trustee may recover the Challenged Transfers or the value thereof from the applicable Transferee Defendants pursuant to section 550 of the Bankruptcy Code.

## COUNT XII
### (Disallowance of Claims Pursuant to 11 U.S.C. § 502(d))

251.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 250 as though fully set forth herein.

252.    Section 502(d) of the Bankruptcy Code provides, in relevant part, that the claim of any entity or transferee receiving a payment that is avoidable under sections 547 or 548 of the Bankruptcy Code shall be disallowed unless the entity or transferee turns over the payment or value of the payment.

253.    The Transferee Defendants are the transferee of the Challenged Transfers.

254.    The Transferee Defendants have either filed proofs of claims against the Debtors, may have claims against the Debtors, or may assert claims against the Debtors in the future.

255.    The Transferee Defendants have neither paid nor surrendered the Challenged Transfers, or the value thereof, to Argon Credit's estate.

256.    The Trustee objects to any and all claims of the Transferee Defendants, including without limitation, all pre-petition and post-petition claims pursuant to section 502(d) of the Bankruptcy Code.

257.    By reason of the foregoing, any claim which the Transferee Defendants have filed must be disallowed pursuant to section 502(d) of the Bankruptcy Code until the Challenged Transfers, or the value thereof are returned to the Argon Credit's estate.

WHEREFORE, the Trustee requests the entry of a judgment against the Defendants granting the following relief:

(a) As to Count I, finding that: (i) Wolfe, Zumski, Arakelian, and Tomaszkiewicz are liable for breach of fiduciary duty of loyalty owed to Argon Credit and its creditors and awarding damages to the Trustee in an amount to be determined at trial; and (ii) the Individual Defendants are liable for breach of fiduciary duty of care owed to Argon Credit and its creditors and awarding damages to the Trustee in an amount to be determined at trial;

(b) As to Count II, entering judgment in favor of the Trustee and against Kostiner for aiding and abetting breaches of fiduciary duty owed to Argon Credit in an amount to be determined at trial;

(c) As to Count III, avoiding the Incentive Payments pursuant to section 547 of the Bankruptcy Code as follows: (i) as to Wolfe, avoiding the Wolfe Incentive Payments in the amount of $57,992.30, and (ii) as to Zumski, avoiding the Zumski Incentive Payments in the amount of $31,664.80;

(d) As to Count IV, in the alternative to Count III, avoiding the Incentive Payments pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Wolfe, avoiding

the Wolfe Incentive Payments in the amount of $57,992.30, and (ii) as to Zumski, avoiding the Zumski Incentive Payments in the amount of $31,664.80;

(e) As to Count V, avoiding the Arakelian Payments pursuant to section 547 of the Bankruptcy Code in the amount of $15,000.00;

(f) As to Count VI, in the alternative to Count V, avoiding the Arakelian Payments pursuant to section 548 of the Bankruptcy Code in the amount of $15,000.00;

(g) As to Count VII, avoiding the Bergarviv Transfers pursuant to section 548 of the Bankruptcy Code in the amount of $381,000;

(h) As to Count VIII, avoiding the Blue Treble One Year Payments pursuant to section 547 of the Bankruptcy Code in the amount of $52,643;

(i) As to Count IX, in the alternative to Count VIII, avoiding the Blue Treble Two Year Payments pursuant to section 548 of the Bankruptcy Code in the amount of $214,050.28;

(j) As to Count X, avoiding the Commission Payments pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Broadmark, avoiding the Broadmark Transfers in the amount of $528,333.33, and (ii) as to Peraza, avoiding the Peraza Transfers in the amount of $248,791.67;

(k) As to Count XI, ordering the Transferee Defendants to return the Challenged Transfers, as applicable, or their value to the Argon Credit's estate pursuant to section 550 of the Bankruptcy Code;

(l) As to Count XII, disallowing any claims of the Transferee Defendants pursuant to section 502(d) of the Bankruptcy Code unless and until the amount of the Challenged Transfers, or their value, as applicable, are returned to Argon Credit's estate;

(m) Award the Trustee pre-judgment interest at the legally allowable rate;

(n) Assess all fees and costs of this action against the Defendants; and

(o) Grant such other and further relief as is just and proper.

Dated:  December 14, 2018          **EUGENE CRANE, CHAPTER 7 TRUSTEE**

By: /s/ Shelly A. DeRousse
    One of His Attorneys

Shelly A. DeRousse, Esq.
Elizabeth L. Janczak, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
Telephone:  312.360.6000
Facsimile:   312.360.6520
sderousse@freeborn.com
ejanczak@freeborn.com

**EXHIBIT 1**

## Broadmark Transfers

| Date | Method | Transfer Amount |
|---|---|---|
| 5/8/2015 | Wire | $150,000.00 |
| 5/29/2015 | Wire | $75,000.00 |
| 6/29/2015 | Wire | $75,000.00 |
| 8/4/2015 | Wire | $20,000.00 |
| 9/1/2015 | Wire | $20,000.00 |
| 10/1/2015 | Wire | $20,000.00 |
| 11/20/2015 | Wire | $20,000.00 |
| 2/23/2016 | Wire | $60,000.00 |
| 3/4/2016 | Wire | $20,000.00 |
| 3/4/2016 | Wire | $20,000.00 |
| 4/1/2016 | Wire | $20,000.00 |
| 5/4/2016 | Wire | $20,000.00 |
| 6/7/2016 | Wire | $8,333.33 |
| | **Total:** | **$528,333.33** |

# EXHIBIT 2

## Peraza Transfers

| Date | Method | Transfer Amount |
|---|---|---|
| 11/20/2015 | Wire | $180,000.00 |
| 2/23/2016 | Wire | $3,750.00 |
| 3/4/2016 | Wire | $17,500.00 |
| 4/4/2016 | Wire | $17,500.00 |
| 5/4/2016 | Wire | $17,500.00 |
| 6/7/2016 | Wire | $12,541.67 |
| | **Total:** | **$248,791.67** |

# EXHIBIT 3

**Bergarsky Transfers**

| Date | Method | Transfer Amount |
|------|--------|----------------|
| 5/11/2015 | Counter Withdrawal | $61,000.00 |
| 6/3/2015 | Check 1147 | $40,000.00 |
| 6/25/2015 | Check 1153 | $40,000.00 |
| 7/15/2015 | Check 1212 | $40,000.00 |
| 8/7/2015 | Check 2020 | $40,000.00 |
| 9/1/2015 | Check 2056 | $40,000.00 |
| 9/9/2015 | Check 2073 | $40,000.00 |
| 9/17/2015 | Check 2089 | $40,000.00 |
| 10/2/2015 | Check 2107 | $40,000.00 |
| | **Total:** | **$381,000.00** |

## EXHIBIT 4

### Transfers to Blue Treble Solutions, LLC

| Date | Check No. | Amount |
|------|-----------|--------|
| 6/2/2015 | 1164 | $5,472.00 |
| 6/2/2015 | 1165 | $1,462.50 |
| 7/9/2015 | 1185 | $2,743.00 |
| 7/9/2015 | 1208 | $11,250.00 |
| 8/4/2015 | 2017 | $11,970.00 |
| 8/11/2015 | 2027 | $11,137.28 |
| 8/28/2015 | 2045 | $14,930.50 |
| 9/15/2015 | 2088 | $15,660.00 |
| 11/9/2015 | 2142 | $31,894.00 |
| 12/2/2015 | 2177 | $15,288.00 |
| 2/23/2016 | 2170 | $39,600.00 |
| 2/5/2016 | 2256 | $15,622.00 |
| 6/23/2016 | 2500 | $3,471.00 |
| 7/29/2016 | 2550 | $16,000.00 |
| 8/5/2016 | 2581 | $5,500.00 |
| 9/9/2016 | 2620 | $5,000.00 |
| 10/14/2016 | 2653 | $5,000.00 |
| 11/15/2016 | 3012 | $2,050.00 |
| | **Total:** | **$214,050.28** |

Exhibit 10

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE:<br><br>ARGON CREDIT, LLC, *et al.*,<br><br>Debtors. | ) Case No. 16-39654<br>) (Jointly Administered)<br>)<br>) Chapter 7<br>)<br>) Hon. Deborah L. Thorne |

| | |
|---|---|
| EUGENE CRANE, the duly appointed and serving Chapter 7 Trustee for the estates of Argon Credit, LLC and Argon X, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MARGON LLC, LITTLE OWL ARGON, LLC, MARK TRIFFLER as trustee of MARK TRIFFLER DECLARATION OF TRUST DATED DECEMBER 5, 1991, and BARRY EDMONSON as trustee of THE CARDINAL TRUST,<br><br>Defendants. | )<br>)<br>)<br>)<br>) Case No. 18-ap-_____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Eugene Crane, the chapter 7 trustee (the "*Trustee*") for the estates of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*," together with Argon Credit, the "*Debtors*"), by and through his undersigned counsel, files this complaint (the "*Complaint*") against Margon LLC ("*Margon*"), Little Owl Argon, LLC ("*Little Owl*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), and Barry Edmonson as trustee of The Cardinal Trust ("*Cardinal Trust*" together with Margon, Little Owl, and Triffler Trust, the "*Defendants*"). For his Complaint, the Trustee states as follows:

## NATURE OF THIS ACTION

1.     This action arises out of a series of transactions between Argon Credit and the Defendants by which the Defendants purportedly loaned funds to Argon Credit and Argon Credit made supposed principal and interest payments to the Defendants totaling more than $2.5 million on account of those purported loans.  However, Argon Credit and the Defendants also entered into simultaneous subscription agreements by which the Defendants received equity in Argon Credit for no additional consideration and which was commensurate with the amount of their purported loans.  In reality, these supposed loans were disguised equity contributions and Argon Credit's principal and interest payments to Defendants were actually equity distributions.

2.     Argon Credit was insolvent at the time of each of the $2.5 million in payments to Defendants and, accordingly, the Trustee seeks to avoid and recover those transfers as fraudulent under section 548 of title 11 of the United States Code (the "*Bankruptcy Code*").

## PARTIES

3.     The Trustee is the duly appointed chapter 7 trustee of the Debtors' bankruptcy estates.

4.     Margon is an Illinois limited liability company and member of Argon Credit, with its principal place of business in Burr Ridge, Illinois.

5.     Little Owl is a Florida limited liability company and member of Argon Credit, with its principal place of business in Milwaukee, Wisconsin.

6.     Triffler Trust is a trust and member of Argon Credit.  On information and belief, Mark Triffler is the trustee for Triffler Trust and is an individual with a principal residence located in Lemont, Illinois.

7.      Cardinal Trust is a trust and member of Argon Credit.  On information and belief,
Barry Edmonson is the trustee for Cardinal Trust and is an individual with a principal residence
located in Shorewood, Illinois.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334.
The statutory predicates for the relief requested herein are sections 105(a), 502(b), 502(d),
502(j), 547, 548, and 550 of the Bankruptcy Code,  28 U.S.C. § 2201 and 6 Del. C. § 18-607.

9.      This Complaint is a core proceeding under 28 U.S.C. § 157(b)(2) and the Trustee
consents to entry of a final judgment by the United States Bankruptcy Court for the Northern
District of Illinois (the "*Court*").

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### A.  The Debtors' Business Operations

11.      Argon Credit was formed as a Delaware limited liability company on October 15,
2013. Argon X was formed as a Delaware limited liability company on April 23, 2015.
However, Argon Credit did not begin significant business operations until late 2014.

12.      The Debtors operated a state-by-state consumer loan origination business.
Certain non-debtor affiliates executed the loans and the loans were funded and serviced by
Argon Credit.  Argon X purchased the consumer loans from the non-debtor affiliates and Argon
Credit serviced the loans.

13.      The Debtors offered unsecured loans up to $35,000 with interest rates between
19% and 95%+, having a twelve to sixty-month term.

**B. Argon Credit's Equity Structure and "Loans" From Defendants**

14.    Argon Credit originally had three members: Noax, LLC, BMoney Holdings, LLC, and Gary Zumski.

15.    Through a series of subsequent transactions, Argon Credit expanded its members to include the Defendants who, as of December 16, 2016, held approximately 33.56% of the membership interests in Argon Credit.

     i.    <u>Margon Promissory Notes, Subscription Agreements, and Transfers</u>

16.    Margon is an investor in Argon Credit and in 2014 it executed two sets of subscription agreements and promissory notes.

*a. First Margon Note and Subscription Agreement*

17.    On or about September 8, 2014, Margon and Argon Credit executed the Argon Credit, LLC 20% APR Two Year Revolving Line of Credit Promissory Note (the "*First Margon Note*") pursuant to which Margon purportedly loaned Argon Credit $250,000 with a commitment to loan up to $750,000 (the "*First Margon Loan*").

18.    The parties also executed a security agreement which purported to grant Margon a security interest in Argon Credit and Argon X's accounts receivable and receivables.

19.    Contemporaneously with the First Margon Note, Argon Credit and Margon executed a subscription agreement (the "*First Margon Subscription Agreement*") pursuant to which Margon acquired 200,000 Class A Units of Argon Credit, which equaled 20% of Argon Credit's outstanding voting interests, at a price of $3.75 per unit.  A true and correct copy of the First Margon Note and First Margon Subscription Agreement are attached hereto as <u>Group Exhibit 1</u>.

20.     Margon made no payments to Argon Credit as consideration for the First Margon Subscription Agreement other than the First Margon Loan.

21.     The First Margon Note and First Margon Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

22.     On or about September 8, 2014, Argon Credit entered into the First Amended and Restated Limited Liability Company Operating Agreement (the "*First Amended Operating Agreement*") which added Margon as a member of Argon Credit and granted Margon three managers on Argon Credit's seven-member board of managers.

23.     Pursuant to the First Amended Operating Agreement, one of Margon's manager designees, Joseph Canfora, was appointed as the chair of the board of managers.

24.     Mark Triffler was also appointed as one of Margon's designees on Argon Credit's board of managers.

25.     Margon ultimately funded $365,000 of the First Margon Loan by making the following transfers to Argon Credit:

| Date | Amount |
| --- | --- |
| 10/7/2014 | $115,000.00 |
| 10/15/2014 | $134,000.00 |
| 10/15/2014 | $116,000.00 |

26.     On or about May 1, 2015, Margon, Fintech Financial LLC ("*Fintech*"), the Debtors, and certain of Argon Credit's subsidiaries executed a subordination agreement which subordinated the debt and security interests of Margon to those of Fintech, the predecessor-in-interest to Fund Recovery Services, LLC ("*FRS*").

### b. *Second Margon Note and Subscription Agreement*

27.     On November 6, 2014, Margon and Argon Credit executed the Argon Credit, LLC 15% APR Three Year Revolving Line of Credit Promissory Note (the "*Second Margon Note*" together with the First Margon Note, the "*Margon Notes*") pursuant to which Margon purportedly loaned Argon Credit an additional $250,000 with a commitment to loan up to $1 million (the "*Second Margon Loan*" together with the First Margon Loan, the "*Margon Loans*").

28.     The parties also executed an amended security agreement purporting to grant Margon a security interest in Argon Credit and Argon X's accounts receivable and receivables.

29.     Contemporaneously with the Second Margon Note, Argon Credit and Margon executed a second subscription agreement (the "*Second Margon Subscription Agreement*, together with the First Margon Subscription Agreement, the "*Margon Subscription Agreements*") pursuant to which Margon acquired 100,000 Class A Units of Argon Credit, which equaled 10% of Argon Credit's outstanding voting interests, at a price of $10.00 per unit.  A true and correct copy of the Second Margon Note and Second Margon Subscription Agreement are attached hereto as <u>Group Exhibit 2</u>.

30.     Margon made no payments to Argon Credit as consideration for the Second Margon Subscription Agreement other than the Second Margon Loan.

31.     The Second Margon Note and Second Margon Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

32.     On or about November 6, 2014, the members of Argon Credit entered into the Second Amended and Restated Limited Liability Company Operating Agreement, which adjusted Margon's increased equity ownership of Argon Credit to reflect a total of 30% of the membership interests.

33.     Margon ultimately funded $1 million of the Second Margon Loan by making the following transfers to Argon Credit:

| Date | Amount |
|---|---|
| 11/10/2014 | $100,000.00 |
| 11/10/2014 | $45,000.00 |
| 11/10/2014 | $105,000.00 |
| 11/24/2014 | $45,000.00 |
| 11/25/2014 | $205,000.00 |
| 12/11/2014 | $45,000.00 |
| 12/15/2014 | $105,000.00 |
| 12/29/2014 | $45,000.00 |
| 1/5/2015 | $205,000.00 |
| 1/28/2015 | $42,000.00 |
| 1/29/2015 | $40,000.00 |
| 1/29/2015 | $18,000.00 |

34.     On February 8, 2016, Margon, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into an amended and restated subordination agreement pursuant to which Margon's debt and security interests were subordinated to those of Fintech.

35.     As of Argon Credit's bankruptcy filing, Margon held 30% of the membership interests in Argon Credit.

### c. Transfers to Margon

36.     Ultimately, Margon funded approximately $1.365 million of the Margon Loans.

37.     Between February 2015 and June 2016, Margon received at least $1,023,611.12 (the "*Margon Transfers*") in transfers from Argon Credit, including at least $197,416.68 (the "*Margon Preference Period Transfers*") in the year prior to the bankruptcy filing.  A list of the Margon Transfers is attached hereto and incorporated herein as Exhibit 3.

38.     The Margon Transfers were not consistent with the schedule of purported interest payments due to Margon under the Margon Notes, however.

39.    Specifically, the First Margon Note called for quarterly interest payments at an annual percentage rate of 20% of the then-outstanding principal and the Second Margon Note called for quarterly interest payments as an annual percentage rate of 15% of the then-outstanding principal.

40.    Based on Argon Credit's books and records and the amount and timing of the Margon Transfers set forth in Exhibit 3, Margon was overpaid on purported interest payments by approximately $588,000.

41.    For example, Argon Credit's books and records reflect that Margon only funded $365,000 of the First Margon Loan but on February 6, 2015, Argon Credit transferred $300,000 to Margon supposedly on account of the First Margon Loan.

42.    This amount far exceeded any interest payment then due and owing to Margon and substantially reduced the principal amount of the First Margon Loan.

43.    In total, Argon Credit paid Margon at least $500,000 on account of the First Margon Loan despite the fact that only approximately $120,904.11 in interest payments were due and owing under the First Margon Note during that same time period.

44.    As to the Second Margon Loan, Argon Credit's books and records reflect that Argon Credit paid Margon at least $417,611.12 despite the fact that only $208,208.55 in interest payments were due and owing under the Second Margon Note during that same time period.

45.    Argon Credit did not make any quarterly payments to Margon for the third or fourth quarter of 2016 as was required by the Margon Notes.

46.    On May 30, 2017, Margon filed a proof of claim against Argon Credit asserting a claim in the amount of $2,059,694.44 of which it claimed $497,750 as secured and the remaining $1,561,944.44 as unsecured.

ii.   Little Owl Promissory Note, Subscription Agreement, and Transfers

47.   Little Owl is also an investor in Argon Credit and in 2015 and 2016 it also executed two sets of subscription agreements and promissory notes.

*a. First Little Owl Note and Subscription Agreement*

48.   On or about February 3, 2015, Little Owl and Argon Credit executed the Argon Credit, LLC-Little Owl Argon 18% APR Three Year Promissory Note (the "*First Little Owl Note*") pursuant to which Little Owl purportedly loaned Argon Credit $3 million (the "*First Little Owl Loan*").

49.   Contemporaneously therewith, Argon Credit and Little Owl executed a subscription agreement (the "*First Little Owl Subscription Agreement*") pursuant to which Little Owl acquired 90,322 Class A Units of Argon Credit, which equaled 8% of Argon Credit's outstanding voting interests.  A true and correct copy of the First Little Owl Note and First Little Owl Subscription Agreement is attached hereto as Group Exhibit 4.

50.   Little Owl made no payments to Argon Credit as consideration for the First Little Owl Subscription Agreement other than the First Little Owl Loan.

51.   The First Little Owl Note and First Little Owl Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

52.   On or about February 3, 2015, Argon Credit entered into the Third Amended and Restated Limited Liability Company Operating Agreement (the "*Third Amended Operating Agreement*") which added Little Owl as a member of Argon Credit.

53.   The Third Amended Operating Agreement also granted Little Owl one of the seven positions on Argon Credit's board of managers and reduced Margon's board designees to

two.  Joseph Canfora, one of Margon's designated managers, retained his position as chairman of the board.

54.     Little Owl transferred $3 million to Argon Credit on February 3, 2015.

55.     On or about May 1, 2015, Little Owl, Fintech, the Debtors, and certain of Argon Credit's subsidiaries executed a subordination agreement which subordinated the debt of Little Owl to that of Fintech.

*b. Second Little Owl Note and Subscription Agreement*

56.     On February 6, 2016, Little Owl and Argon Credit executed the Argon Credit, LLC-Little Owl Argon, LLC Promissory Note (the "*Second Little Owl Note*" together with the First Little Owl Note, the "*Little Owl Notes*") pursuant to which Little Owl purportedly loaned Argon Credit an additional $4 million (the "*Second Little Owl Loan*").

57.     Contemporaneously therewith, Argon Credit and Little Owl executed a second subscription agreement (the "*Second Little Owl Subscription Agreement*, together with the First Little Owl Subscription Agreement, the "*Little Owl Subscription Agreements*") pursuant to which Little Owl acquired 80,299 Class A Units of Argon Credit, which equaled 7.11% of Argon Credit's outstanding voting interests.  A true and correct copy of the Second Little Owl Note and Second Little Owl Subscription Agreement is attached hereto as Group Exhibit 5.

58.     Little Owl made no payments to Argon Credit as consideration for the Second Little Owl Subscription Agreement other than the Second Little Owl Loan.

59.     The Second Little Owl Note and Second Little Owl Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

60.    On February 8, 2016, Little Owl, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into an amended and restated subordination agreement pursuant to which Little Owl's debt was subordinated to that of Fintech.

61.    On or about February 12, 2016, the members of Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement (the "*Fourth Amended Operating Agreement*"), which adjusted Little Owl's increased equity ownership of Argon Credit to reflect a total of 15.11% of the membership interests.

62.    The Fourth Amended Operating Agreement also expanded Argon Credit's board of managers to nine members and granted Little Owl three of the nine seats.

63.    Little Owl transferred $4 million to Argon Credit on or about February 12, 2016.

64.    As of Argon Credit's bankruptcy filing on December 16, 2016, Little Owl held 15.11% of the membership interests in Argon Credit.

### c. *Little Owl Bridge Loan*

65.    Little Owl further contends that it loaned an additional $2.65 million (the "*Bridge Loan*" together with the First Little Owl Loan and Second Little Owl Loan, the "*Little Owl Loans*") to Argon Credit between July 2016 and November 2016.

66.    However, Little Owl cannot locate an executed promissory note evidencing the purported Bridge Loan.

67.    Little Owl also did not identify any terms of the purported Bridge Loan, such as an interest rate, repayment terms, or maturity date.

### d. *Transfers to Little Owl*

68.    Between May 2015 and May 2016, Little Owl received at least $847,595.63 (the "*Little Owl Transfers*") in transfers from Argon Credit, including at least $447,759.56 (the "*Little*

*Owl Preference Period Transfers*") in the year prior to the bankruptcy filing.  A list of the Little Owl Transfers is attached hereto and incorporated herein as <u>Exhibit 6</u>.

69.    Based on Argon Credit's books and records, Argon Credit underpaid the purported quarterly interest payments due to Little Owl by nearly $37,000 on account of the Little Owl loans through the second quarter of 2016 and did not make any quarterly payments to Little Owl for the third or fourth quarters of 2016 as required by the Little Owl Notes.

70.    On May 25, 2017, Little Owl filed a proof of claim against Argon Credit asserting an unsecured claim in the amount of $10,481,092.89.

   iii.    <u>Cardinal Trust Promissory Note, Subscription Agreement, and Transfers</u>

71.    On or about February 6, 2016, Cardinal Trust and Argon Credit executed the Argon Credit, LLC-Cardinal Trust Promissory Note (the "*Cardinal Trust Note*") pursuant to which Cardinal Trust purportedly loaned Argon Credit $1 million (the "*Cardinal Trust Loan*").

72.    Contemporaneously therewith, Argon Credit and Cardinal Trust executed a subscription agreement (the "*Cardinal Trust Subscription Agreement*") pursuant to which Cardinal Trust acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests.  A true and correct copy of the Cardinal Trust Note and Cardinal Trust Subscription Agreement is attached hereto as <u>Group Exhibit 7</u>.

73.    Cardinal Trust made no payments to Argon Credit as consideration for the Cardinal Trust Subscription Agreement other than the Cardinal Trust Loan.

74.    The Cardinal Trust Note and Cardinal Trust Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

75.     On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement which added Cardinal Trust as a member of Argon Credit.

76.     Cardinal Trust transferred $500,000 to Argon Credit on November 9, 2015 and an additional $500,000 to Argon Credit on February 12, 2016.

77.     Thus, Cardinal Trust funded half of the balance of the Cardinal Trust Loan nearly three months prior to executing the Cardinal Trust Note.

78.     On or about February 8, 2016, Cardinal Trust, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of Cardinal Trust to that of Fintech.

79.     Between February 2016 and May 2016, Cardinal Trust received at least $94,444.44 (the "*Cardinal Trust Transfers*") in transfers from Argon Credit.  A list of the Cardinal Trust Transfers is attached hereto and incorporated herein as Exhibit 8.

80.     Based on Argon Credit's books and records, Argon Credit overpaid the purported quarterly interest payments due to Cardinal Trust by more than $27,000 through the second quarter of 2016 and did not make any quarterly payments to Cardinal Trust for the third or fourth quarters of 2016 as required by the Cardinal Trust Note.

81.     On May 30, 2017, Cardinal Trust filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

  iv.     Triffler Trust Promissory Note, Subscription Agreement, and Transfers

82.     On or about February 6, 2016, Triffler Trust and Argon Credit executed the Argon Credit, LLC-Mark Triffler Declaration of Trust Dated December 5, 1991 Promissory Note (the "*Truffler Trust Note*" together with the Margon Notes, Little Owl Notes, and Cardinal Trust

Note, the "*Notes*") pursuant to which Triffler Trust purportedly loaned Argon Credit $1 million (the "*Triffler Trust Loan*" together with the Margon Loans, Little Owl Loans, and Cardinal Trust Loan, the "*Loans*").

83.     Contemporaneously therewith, Argon Credit and Triffler Trust executed a subscription agreement (the "*Triffler Trust Subscription Agreement*" together with the Margon Subscription Agreements, Little Owl Subscription Agreements, and Cardinal Trust Subscription Agreement, the "*Subscription Agreements*") pursuant to which Triffler Trust acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests.  A true and correct copy of the Triffler Trust Note and Triffler Trust Subscription Agreement is attached hereto as Group Exhibit 9.

84.     Triffler Trust made no payments to Argon Credit as consideration for the Triffler Trust Subscription Agreement other than the Triffler Trust Loan.

85.     The Triffler Trust Note and Triffler Trust Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

86.     On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement which added Triffler Trust as a member of Argon Credit.

87.     Triffler Trust transferred $500,000 to Argon Credit on November 9, 2015 and an additional $500,000 to Argon Credit on February 6, 2016.

88.     Thus, Triffler Trust funded half of the balance of the Triffler Trust Loan nearly three months prior to executing the Triffler Trust Note.

89.     On or about February 8, 2016, Triffler Trust, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of Triffler Trust to that of Fintech.

90.     Between February 2016 and May 2016, Triffler Trust received at least $74,722.22 (the "*Triffler Trust Transfers*" together with the Margon Transfers, Little Owl Transfers, and Cardinal Trust Transfers, the "*Challenged Transfers*") in transfers from Argon Credit.  A list of the Triffler Trust Transfers is attached hereto and incorporated herein as Exhibit 10.

91.     Argon Credit overpaid the purported quarterly interest payments due to Triffler Trust by approximately $1,000 through the second quarter of 2016 and did not make any quarterly payments to Triffler Trust for the third or fourth quarters of 2016 as required by the Triffler Trust Note.

92.     On May 30, 2017, Triffler Trust filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

**C. Argon Credit's Financial Condition**

93.     Argon Credit's books and records reflect that it was insolvent at the time of each of the Challenged Transfers.

94.     Argon Credit's tax return for the calendar year ending December 31, 2014 states that it had total operating income of only $136,834, yet it took on $365,000 in purported debt to Margon under the First Margon Loan during that same time period.

95.     Argon Credit's internal balance sheet reflects that as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative $8,641.03 in equity.

96.    From that point forward, Argon Credit's financial condition deteriorated each month that it continued to operate and its negative equity balance increased each month.

97.    An independent accountant's review of Argon Credit's finances reflected that as of December 31, 2015, Argon Credit had negative equity of $11,285,946.

98.    That same accountant's review stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708 for the year ended December 31, 2015.

99.    As of November 30, 2016, Argon Credit's internal balance sheet reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative equity of $7,162,685.51.

### D.  Debtors' Bankruptcy Filings

100.    On December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

101.    On January 11, 2017, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7.

102.    The Trustee was appointed as interim chapter 7 trustee on April 17, 2017 and confirmed by the Court on July 6, 2017.

## COUNT I

### (Recharacterization of Defendants' Loans as Equity Pursuant to
### 28 U.S.C. § 2201, Sections 105(a), 502(b) and 502(j) of the Bankruptcy Code)

103.    The Trustee repeats, realleges, and incorporates paragraphs 1 through 102 of the Complaint as if fully set forth herein.

104.    Where a debt instrument carries certain indicia of an equity contribution, this Court may recharacterize such debt instrument as equity pursuant to section 502(b) of the

16

Bankruptcy Code, provided that such claim may be recharacterized "under any applicable law." 11 U.S.C. § 502(b).

105.    By agreement of the parties and operation of law, Illinois law governs the Notes and Subscription Agreements.

106.    Illinois and federal bankruptcy law both recognize a cause of action for recharacterization.  Accordingly, the Court has the authority to recharacterize the Defendants' debts against Argon Credit to equity under sections 105(a) and 502(b) and 28 U.S.C. § 2201 and Illinois law.

107.    Additionally, under section 502(j) of the Bankruptcy Code, a claim that has been allowed may be reconsidered for cause, according to the equities of the case.  This section provides further support for the recharacterization of a previously allowed claim as equity.

108.    In evaluating whether a debt instrument should be recharacterized as equity, courts consider the following non-exclusive factors:

      i.    the names given to the instruments, if any, evidencing indebtedness;
     ii.    the presence or absence of a fixed maturity date and schedule of payments;
    iii.    the presence or absence of a fixed rate of interest and interest payments;
     iv.    the source of repayments;
      v.    the adequacy or inadequacy of capitalization;
     vi.    the identity of interest between the creditor and the stockholder;
    vii.    the security, if any, for the advances;
   viii.    the corporation's ability to obtain financing from outside lending institutions;
     ix.    the extent to which the advances were subordinated to the claims of outside creditors;
      x.    the extent to which the advances were used to acquire capital assets;
     xi.    the presence or absence of a sinking fund to provide repayments;
    xii.    the ratio of shareholder loans to capital;
   xiii.    the amount or degree of shareholder control;
   xiv.    the right to enforce payment of principal and interest;
    xv.    participation in management flowing as a result of the transaction;
   xvi.    the intent of the parties; and
   xvii.    the failure of the debtor to repay the obligation on the due date or to seek postponement.

109.    The foregoing factors are not exhaustive, and courts have found that a recharacterization analysis is inherently fact-specific.

110.    In the present case, based upon the Trustee's investigation, the purported Loans made to Argon Credit by the Defendants carry numerous indicia of equity, which suggests that they should be recharacterized.  At a minimum, the following indicia support this relief:

i.    Defendants received membership interests in Argon Credit commensurate with the amount of their purported Loans for no additional consideration;

ii.    Upon executing the Notes and Subscription Agreements, Argon Credit's operating agreements were immediately amended to reflect the Defendants' new equity ownership interests;

iii.    Margon and Little Owl were granted the right to place their own designees on Argon Credit's board of members;

iv.    The parties did not comply with the schedule of interest payments purportedly due to Defendants under the Notes, especially as to Margon and Little Owl;

v.    Argon Credit was insolvent or otherwise lacked adequate capitalization at the time of each of the Loans, including at the time of the First Margon Loan in 2014 when it had total operating income of $136,834;

vi.    Each of the Loans were subordinated to Fintech and Defendants' ability to enforce payments of principal and interest was effectively blocked by the subordination agreements;

vii.    The Margon Loans were made to Argon Credit at its inception, before Argon Credit had commenced substantial business operations;

viii.    Margon and Little Owl were already insiders at the time of the Second Margon Loan and Second Little Owl Loan;

ix.    Mark Triffler was already a member of Argon Credit's board of managers at the time of the Triffler Trust Loan; and

x.    On information and belief, Argon Credit was unable to obtain financing from outside lending institutions at the time of the Loans; and

xi. Upon information and belief, the Defendants' intent was for the Loans to disguise their purchases of equity in Argon Credit.

111.    Pursuant to 28 U.S.C. § 2201, this Court is authorized to declare the rights and other legal relations of the Trustee and the Defendants with respect to the enforceability and nature of the Notes and Loans.  The Trustee requests a declaration that the Notes and Loans bear significant indicia of equity contributions and should be recharacterized as such.

112.    For the foregoing reasons, the Loans should be recharacterized as equity infusions, and any payments made to the Defendants on account thereof should be disgorged to Argon Credit's estate and any liens granted in favor of Margon on Argon Credit's assets should be declared null and void.

## COUNT II

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B))

113.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 112 as though fully set forth herein.

114.    Each of the Challenged Transfers to Defendants constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

115.    Each Challenged Transfer was made within the two years prior to the Petition Date.

116.    The Loans were disguised equity contributions or consideration for the purchase of equity interests in Argon Credit.

117.    The Loans should be recharacterized as contributions of equity in Argon Credit.

118.    Because the Loans should be recharacterized as equity contributions, the Challenged Transfers were actually member distributions and not made on account of an antecedent debt owed by Argon Credit and Argon Credit did not receive reasonably equivalent value in exchange for the Challenged Transfers.

119.    Argon Credit's liabilities exceeded its assets at the time of each of the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

120.    Accordingly, on the date each Challenged Transfer was made, Argon Credit:

    i.    was insolvent or became insolvent as a result of the Challenged Transfer;

    ii.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

    iii.    intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

121.    For these reasons, the Trustee may avoid the Challenged Transfers as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT III

### (Recovery of Challenged Transfers Pursuant to 6 Del. C. § 18-607)

122.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 121 as though fully set forth herein.

123.    Argon Credit is a limited liability company organized under the laws of the State of Delaware.

124.    The Delaware Limited Liability Company Act provides, in relevant part:

> (a) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company . . . exceed the fair value of the assets of the limited liability company . . . .

> (b) A member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution.

6 Del. C. § 18-607.

125.    At the time of each of the Challenged Transfers, Argon Credit's liabilities exceeded the fair value of its assets after giving effect to the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

126.    On information and belief, each of the Defendants knew at the time of the Challenged Transfers that Argon Credit's liabilities exceeded the fair value of its assets because the Defendants regularly received copies of Argon Credit's financial reports.

127.    Accordingly, to the extent that this Court recharacterizes the Loans as equity contributions, the Defendants received the Challenged Transfers in violation of 6 Del. C. § 18-607(a) and the Defendants are liable to Argon Credit's estate for the amount of the Challenged Transfers.

128.    By reason of the foregoing, the Trustee seeks entry of judgment in his favor and against the Defendants pursuant to 6 Del. C. §§ 18-607(a) and (b) in the amount of the Challenged Transfers as applicable to each Defendant.

## COUNT IV

**(In the Alternative, Avoidance of Preference Period Transfers Pursuant to 11 U.S.C. § 547)**

129.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 102 as though fully set forth herein.

130.    During the one year period prior to the Petition Date (the "*Preference Period*"), Argon Credit made the Margon Preference Period Transfers, Little Owl Preference Period Transfers, Cardinal Trust Transfers, and Triffler Trust Transfers (collectively, the "*Preference Period Transfers*") to the Defendants.

131.    To the extent that the Court does not recharacterize the Loans as equity, the Defendants were creditors, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Preference Period Transfers.

132.    Each Preference Period Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

133.    Each of the Preference Period Transfers was a transfer to, or for the benefit of, the Defendants because each Preference Period Transfer either reduced or fully satisfied a debt then owed by Argon Credit to the Defendants on account of the Loans.

134.    Each Preference Period Transfer was made for, or on account of, an antecedent debt owed by Argon Credit to the Defendants before such Preference Period Transfers were made.

135.    Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Preference Period Transfer was made while Argon Credit was insolvent.

136.    Each of the Defendants was an insider of Argon Credit at the time of the Preference Period Transfers because, among other things, they or their designees were members of Argon Credit's board of managers and each of the Defendants were persons in control of Argon Credit because they had the ability to direct or approve Argon Credit's business transactions and policies.

137.    Each Preference Period Transfer was made on or within one year prior to the Petition Date.

138.    Each Preference Period Transfer enabled the Defendants to receive more than they would receive if:

      i.     Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

      ii.    such Preference Period Transfer had not been made; and

      iii.   the Defendants received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

139.    By reason of the foregoing, the Trustee may avoid the Preference Period Transfers as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT V

**(In the Alternative, Avoidance of Transfers Pursuant to
11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304)**

140.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 102 as though fully set forth herein.

141.    During the two years period prior to the Petition Date (the "*Two Year Reach Back Period*"), Argon Credit made the Challenged Transfers to the Defendants.

142.    To the extent that the Court does not recharacterize the Loans as equity, the Defendants were creditors, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Challenged Transfers.

143.    At the time the Challenged Transfers were made through the Petition Date, the Internal Revenue Service (the "*IRS*") was a creditor of Argon Credit.

144.    The IRS filed a proof of claim against Argon Credit for non-payment of federal taxes in the total amount of $867,595.72, including taxes owed as far back as 2014.

145.    The IRS was, or would have been, a creditor holding an allowable unsecured claim against Argon Credit that would have a right under applicable nonbankruptcy law to avoid the Challenged Transfers.

146.    The Challenged Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304(a)(2).

147.    Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may stand in the place of the IRS with respect to claims under 28 U.S.C. § 3304(a)(2)

148.    The Challenged Transfers were made to insiders because the Defendants or their designees were members of Argon Credit's board of managers and/or each of the Defendants were persons in control of Argon Credit because they had the ability to direct or approve Argon Credit's business transactions and policies.

149.    To the extent that the Court does not recharacterize the Loans as equity, each Challenged Transfer was made for, or on account of, an antecedent debt owed by Argon Credit to the Defendants before such Challenged Transfers were made.

150.    The Challenged Transfers were made while Argon Credit was insolvent because Argon Credit's liabilities exceeded the fair value of its assets after giving effect to the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

151.    The Defendants had reasonable cause to believe that Argon Credit was insolvent at the time of the Challenged Transfers because the Defendants or their designees were members of the board of managers and Defendants regularly received copies of Argon Credit's financial reports.

152.    Accordingly, to the extent that the Court does not recharacterize the Loans as equity, the Challenged Transfer are avoidable pursuant to section 544 of the Bankruptcy Code and 28 U.S.C. § 3304.

## COUNT VI

### (Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550)

153.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 152 as though fully set forth herein.

154.    The Defendants were either: (a) the initial transferee of the Challenged Transfers and Preference Period Transfers, (b) the entity for whose benefit the Challenged Transfers and Preference Period Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

155.    To the extent that the Challenged Transfers or Preference Period Transfers are avoided pursuant to sections 544, 547 or 548 of the Bankruptcy Code, the Trustee may recover the Challenged Transfers, Preference Period Transfers, or their value, from the applicable Defendants or any mediate or immediate transferee pursuant to section 550 of the Bankruptcy Code.

156.    By reason of the foregoing, the Trustee may recover the Challenged Transfers, Preference Period Transfers, or the value thereof from the applicable Defendants pursuant to section 550 of the Bankruptcy Code.

## COUNT VII

### (Disallowance of Claims Pursuant to 11 U.S.C. § 502(d))

157.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 157 as though fully set forth herein.

158.    Section 502(d) of the Bankruptcy Code provides, in relevant part, that the claim of any entity or transferee receiving a payment that is avoidable under sections 544, 547 or 548 of the Bankruptcy Code shall be disallowed unless the entity or transferee turns over the payment or value of the payment.

159.    The Defendants are the transferee of the Challenged Transfers and Preference Period Transfers.

160.    The Defendants have each filed proofs of claim against Argon Credit's bankruptcy estate.

161.    The Defendants have neither paid nor surrendered the Challenged Transfers, Preference Period Transfers, or the value therefor to Argon Credit's estate.

162.    The Trustee objects to any and all claims of the Defendants, including without limitation, all pre-petition and post-petition claims pursuant to section 502(d) of the Bankruptcy Code.

163.    By reason of the foregoing, any claim which the Defendants have filed must be disallowed pursuant to section 502(d) of the Bankruptcy Code until the Challenged Transfers, Preference Period Transfers, or the value thereof are returned to the Argon Credit's estate.

WHEREFORE, the Trustee requests the entry of a judgment against the Defendants granting the following relief:

(a) As to Count I, recharacterizing the Defendants' Loans to Argon Credit as equity

contributions pursuant to 28 U.S.C. § 2201 and 11 U.S.C. §§ 105(a), 502(b) and 502(j);

(b) As to Count II, avoiding the Challenged Transfers to the Defendants pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(c) As to Count III, in favor of the Trustee and against the Defendants for violation of 6 Del. C. § 18-607 as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little Owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(d) As to Count IV, to the extent the Court does not grant judgment in favor of the Trustee on Counts I-III, avoiding the Preference Period Transfers pursuant to section 547 of the Bankruptcy Code as follows: (i) as to Margon, in an amount not less than $197,416.68, (ii) as to Little Owl, in an amount not less than $447,759.56, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(e) As to Count V, to the extent the Court does not grant judgment in favor of the Trustee on Counts I-III, avoiding the Challenged Transfers to the Defendants pursuant to section 544 of the Bankruptcy Code and 28 U.S.C. §3304 as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(f) As to Count VI, ordering the Defendants to return the Challenged Transfers or Preference Period Transfers, as applicable, or their value to the Argon Credit's estate

pursuant to section 550 of the Bankruptcy Code;

(g) As to Count VII, disallowing any claims of the Defendants pursuant to section 502(d) of the Bankruptcy Code unless and until the amount of the Challenged Transfers, Preference Period Transfers, or their value, as applicable, are returned to Argon Credit's estate;

(h) As to all Counts, the Court award the Trustee pre-judgment interest at the legally allowable rate;

(i) As to all Counts, the Court assess all fees and costs of this action against the Defendants; and

(j) Such other and further relief as is just and proper.

Dated:  December 14, 2018          **EUGENE CRANE, CHAPTER 7 TRUSTEE**

By: /s/ Shelly A. DeRousse
    One of His Attorneys

Shelly A. DeRousse, Esq.
Elizabeth L. Janczak, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
Telephone:  312.360.6000
Facsimile:   312.360.6520
sderousse@freeborn.com
ejanczak@freeborn.com

# Exhibit 11

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Settlement Agreement*") is made as of August 5, 2020, by and between Karen R. Goodman (the "*Trustee*"), the chapter 7 trustee in the bankruptcy cases of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*" and, together with Argon Credit, the "*Debtors*") on the one side, and Margon LLC ("*Margon*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), Barry Edmonson as trustee of The Cardinal Trust (the "*Cardinal Trust*"), Joseph Canfora ("*Canfora*"), Mark Triffler ("*Triffler*"), Peter Ferro, Jr. ("*Ferro*"), and Meghan Hubbard ("*Hubbard*" and, together with Margon, Triffler Trust, Cardinal Trust, Canfora, Triffler, and Ferro, the "*Settling Defendants*") on the other side.

### RECITALS

**WHEREAS**, on December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), which are being jointly administered as Case No. 16-39654;

**WHEREAS**, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7 on January 11, 2017;

**WHEREAS**, on January 11, 2017, Deborah K. Ebner was appointed the interim chapter 7 trustee of the Debtors' estates;

**WHEREAS**, on April 17, 2017, Deborah K. Ebner resigned as chapter 7 trustee and Eugene Crane (the "*Predecessor Trustee*") was appointed as interim chapter 7 trustee whose appointment was confirmed by the Bankruptcy Court on July 6, 2017;

**WHEREAS**, on June 1, 2020, the Trustee was appointed as the successor chapter 7 trustee after Mr. Crane's resignation;

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00948 in the Bankruptcy Court against Ferro, Canfora, and Triffler, among others (the "*Insider Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00947 in the Bankruptcy Court against Margon, the Triffler Trust, and the Cardinal Trust, among others (the "*Avoidance Claims Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00942 in the Bankruptcy Court against Hubbard (the "*Hubbard Adversary*" and, together with the Insider Adversary and Avoidance Claims Adversary, the "*Adversary Proceedings*");

**WHEREAS**, the Trustee has stepped into the shoes of the Predecessor Trustee as plaintiff in the Adversary Proceedings;

**WHEREAS**, on May 30, 2017, Margon filed a proof of claim against Argon Credit in the total amount of $2,059,964.22, with a secured claim of $497,750.00, as Claim No. 17 (the

"*Margon Proof of Claim*");

**WHEREAS**, after the Petition Date, Margon incurred certain costs and expenses related to the preservation of the Debtors' estates, including the expense of shipping the Debtors' records to the Predecessor Trustee, for which it claims it is entitled to reimbursement from the estate as an administrative priority claim pursuant to Section 503 of the Bankruptcy Code or such other applicable law, in an approximate amount of $20,000.00 (the "*Margon Administrative Claim*" and, together with the Margon Proof of Claim, the "*Margon Claims*");

**WHEREAS**, on May 30, 2017, the Cardinal Trust filed a proof of claim against Argon Credit in the amount of $1,124,444.44, as Claim No. 16 (the "*Cardinal Trust Proof of Claim*");

**WHEREAS**, on May 30, 2017, the Triffler Trust filed a proof of claim against Argon Credit in the amount of $1,124,444.44, as Claim No. 18 (the "*Triffler Trust Proof of Claim*" and together with the Cardinal Trust Proof of Claim and the Margon Claims, the "*Claims*");

**WHEREAS**, the Settling Defendants assert that they have certain defenses to the claims asserted by the Trustee in the Adversary Proceedings; and

**WHEREAS**, the Parties have exchanged information, negotiated and now desire to resolve all matters respecting the Adversary Proceedings and the Claims, upon the terms and conditions set forth below.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1.    **The Parties.** Trustee, Debtors, and the Settling Defendants shall include any and all of their respective current and former predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, executives, shareholders, partners, members, agents, sureties, insurers, employees, attorneys, purchasers, relatives, heirs, and trusts.

2.    **Settlement Sum.** The Settling Defendants shall deliver to the Trustee the sum of $371,000.00 (the "*Settlement Sum*") in full satisfaction of the claims asserted against them in the Adversary Proceedings, which shall be comprised of cash payments from the Settling Defendants and remaining proceeds of the directors and officers insurance policy (the "*Insurance Proceeds*"), which covers the claims raised in the Insider Adversary.

3.    **Payment of Settlement Sum.** The Settlement Sum shall be paid by wire transfer or one or more checks delivered to the Trustee. Settling Defendants shall provide payment contemporaneously with the execution of this  Settlement Agreement. The Insurance Proceeds shall be provided to the Trustee from the insurance carrier as soon as practicable. The Settlement Sum will be held by the Trustee or her counsel in an IOLTA account until an order approving the Settlement Agreement is entered by the Bankruptcy Court, at which time it will be transferred to the Debtors' estates.  The Settlement Sum shall be paid as follows:

**By Wire Transfer**:

Using the wire transfer instructions and form attached hereto as Exhibit A.

**By Check(s)**:

Payable to:   Karen R. Goodman, Chapter 7 Trustee for the estate of Argon Credit, LLC

Delivered to:   Arthur G. Simon, Esq.
Crane, Simon, Clar & Goodman
135 S. LaSalle Street, Suite 3705
Chicago, Illinois 60603

4.    **Claims Waiver**. The Settling Defendants agree to waive the Claims they have asserted against the Debtors and such claims shall be deemed satisfied in full by this Settlement Agreement.

5.    **Conditions of Settlement**. This Settlement Agreement is intended to be one part of a semi-global settlement between the Trustee and the Settling Defendants, among other defendants, and is conditioned upon the occurrence of the effective date of settlements between the Trustee and John A. Kuhlman ("*Kuhlman*"), Byron Faermark ("*Faermark*"), and Bruce Breitweiser ("*Breitweiser*"), after such settlements have been approved by the Bankruptcy Court and payment of such settlements have cleared the Trustee's bank account. This Settlement Agreement is also conditioned upon the clearance through the Trustee's bank account of payment of the remaining proceeds of the Insurance Policy.

6.    **Effective Date.** This Settlement Agreement will become effective upon the first date on which all of the following conditions have been met (the "*Effective Date*"): (i) the full execution of this Settlement Agreement by each of the Parties; (ii) entry of a final, non-appealable order approving this Settlement Agreement entered by the Bankruptcy Court; (iv) the date on which the Settlement Sum clears the Trustee's bank account; (v) entry of a final, non-appealable order approving settlements between the Trustee and Kuhlman, Faermark, and Breitweiser; and (vi) the date on which payments owed by Kuhlman, Faermark, and Breitweiser to the Trustee pursuant to settlements with those defendants have cleared the Trustee's bank account.

7.    **Dismissal of Adversary Proceedings**. Within five business days after the later of (i) an order by the Bankruptcy Court authorizing the Trustee to implement the terms of this Agreement becomes a final order and (ii) the Effective Date of this Settlement Agreement, the Trustee will cause each of the Adversary Proceedings to be dismissed, with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7041(a)(1)(A) and such dismissal order shall state that the Bankruptcy Court shall retain jurisdiction to enforce this Settlement Agreement. The notice of dismissal shall expressly provide that each of the Adversary Proceedings will be dismissed with prejudice with each party to bear its own costs.

8.    **Trustee's Release**. The Trustee, solely in her capacity as Chapter 7 trustee for the Debtors, hereby releases each of the Settling Parties from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, the operation of their business, and/or the Adversary

Proceedings, including without limitation the claims for relief asserted or that could have been asserted in the Adversary Proceedings. Notwithstanding the forgoing, the Trustee's Release is not a release, waiver, or discharge of obligations of the Settling Parties under this Agreement.

9. **Settling Parties' Release**. Each of the Settling Parties hereby releases the Trustee, solely in her capacity as the Chapter 7 Trustee for the Debtors, the Debtors, and the Debtors' bankruptcy estates, from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that arise from or relate to the Debtors or the operation of their business, including any such claims that could have been asserted by the Settling Parties in the Adversary Proceedings. Notwithstanding the forgoing, the Settling Parties' Release is not a release, waiver, or discharge of obligations of the Trustee under this Agreement.

10. **Scope of Releases**. It is the intention of the Parties that, notwithstanding the possibility that the Parties or their counsel discover or gain a more complete understanding of the facts, events or law pertaining in any way to the Adversary Proceedings which, if presently known or fully understood, would have affected the releases in ¶¶ 8-9, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth in ¶¶ 8-9, without regard to the subsequent discovery or existence of different or additional facts, events or law. The Parties expressly waive any and all rights they may have under any statute or common law principle which would limit the effect of the releases in ¶¶ 8-9 to those claims actually known or suspected to exist at the time of the effectiveness of the releases in ¶¶ 8-9. The Parties represent and warrant that they own the rights released herein and they have not assigned or transferred or purported to assign or transfer any of such rights to any other person or entity..

11. **Allocation of Consideration**. The consideration paid by the Settling Defendants shall be allocated as follows: (i) $191,000.00 of the Settlement Sum, including the Insurance Proceeds shall be allocated collectively toward settlement of the Insider Adversary; and (ii) $180,000.00 of the Settlement Sum and the Claims waivers shall be allocated toward the Avoidance Claims Adversary and Hubbard Adversary. This Settlement Agreement is intended to settle the claims against the Settling Defendants in all of the Adversary Proceedings and is contingent upon the payment of the full Settlement Sum, among other things, and nothing in this paragraph shall be construed as the Trustee's agreement to accept partial payment of the Settlement Sum for settlement of any one of the Adversary Proceedings without payment of the full Settlement Sum.

12. **Bankruptcy Court Approval.** Within seven (7) days after the full execution of this Settlement Agreement, the Trustee shall file a motion in the Bankruptcy Court seeking entry of an order approving this Settlement Agreement.

13. **Counterparts.** This Settlement Agreement may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same. This Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

14. **Authority to Enter into Settlement Agreement.** The undersigned represent and warrant that they have full authority to execute this Settlement Agreement on behalf of their respective Party or client and have obtained all necessary approvals. This Settlement Agreement

is the resolution of disputed claims and nothing herein shall be deemed an admission against any Party.

15. **Entire Agreement.** This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof. No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

16. **Governing Law.** This Settlement Agreement shall be construed and enforced in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of Illinois, without regard to the conflicts of law or principles thereof.

17. **No Admission of Liability.** This Agreement constitutes a compromise of disputed claims, and neither this Agreement nor any of its provisions, terms or conditions constitutes an admission of liability or wrongdoing on the part of any of the Parties. Neither can this Agreement and its provisions, terms or conditions be offered or received into evidence in any action or proceeding as evidence of an admission of liability or wrongdoing.

18. **Successors.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.

**TRUSTEE:**

KAREN R. GOODMAN,
CHAPTER 7 TRUSTEE FOR THE
ESTATES OF ARGON CREDIT,
LLC AND ARGON X, LLC

By: _Karen R Goodman_

Printed Name: _Karen R Goodman_

Title: _Trustee_

**SETTLING DEFENDANTS:**

MARGON LLC

By: _____

Printed Name: _Peter A Fera_

Title: _Manager_

MARK TRIFFLER as trustee of MARK
TRIFFLER DECLARTION OF TRUST
Dated December 5, 1991

By: _____

Printed Name: _Mark Triffler_

Title: _Trustee_

**BARRY EDMONSON as trustee of THE CARDINAL TRUST**

By: _____

Printed Name: _Barry Edmonson_

Title: _Trustee_

**MARK TRIFFLER**

By: _____
    Mark Triffler

**MEGHAN HUBBARD**

By: _____
    Meghan Hubbard

**JOSEPH CANFORA**

By: _____
    Joseph Canfora

**PETER FERRO, JR.**

By: _____
    Peter Ferro, Jr.

6

# ACH Setup Instructions

### Please fax this form to the bank initiating the ACH

**Date:** _____

## Beneficiary Bank Information

**Bank name & address:**                                      **Bank ABA number:**

Metropolitan Commercial Bank                              ███████

99 Park Avenue

New York, NY, 10016                                           **Bank phone number:**

                                                             (212) 365-6739

## Beneficiary Information

Account Number: ████ _____

Beneficiary Name: Argon Credit, LLC    Case no. 16-39654 _____

Reference: _____

**Dollar Amount:** _____ (not required)

## Contact Information

Fiduciary Name: Karen R. Goodman, Trustee _____

Contact Phone Number: 312-641-6777 _____

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Settlement Agreement*") is made as of September 11, 2020, by and between Karen R. Goodman (the "*Trustee*"), the chapter 7 trustee in the bankruptcy cases of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*" and, together with Argon Credit, the "*Debtors*") on the one side, and Bruce Breitweiser (the "*Settling Defendant*") on the other side.

### RECITALS

**WHEREAS**, on December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), which are being jointly administered as Case No. 16-39654;

**WHEREAS**, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7 on January 11, 2017;

**WHEREAS**, on January 11, 2017, Deborah K. Ebner was appointed the interim chapter 7 trustee of the Debtors' estates;

**WHEREAS**, on April 17, 2017, Deborah K. Ebner resigned as chapter 7 trustee and Eugene Crane (the "*Predecessor Trustee*") was appointed as interim chapter 7 trustee whose appointment was confirmed by the Bankruptcy Court on July 6, 2017;

**WHEREAS**, on June 1, 2020, the Trustee was appointed as the successor chapter 7 trustee after Mr. Crane's resignation;

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00948 in the Bankruptcy Court against the Settling Defendant, Joseph Canfora ("*Canfora*"), Mark Triffler ("*Triffler*"), Peter Ferro, Jr. ("*Ferro*"), Meghan Hubbard ("*Hubbard*"), Byron Faermark ("*Faermark*"), and John A. Kuhlman ("*Kuhlman*"), among others (the "*Insider Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00947 in the Bankruptcy Court against Margon LLC ("*Margon*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), Barry Edmonson as trustee of The Cardinal Trust (the "*Cardinal Trust*"), among others (the "*Avoidance Claims Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00942 in the Bankruptcy Court against Hubbard (the "*Hubbard Adversary*" and, together with the Insider Adversary and Avoidance Claims Adversary, the "*Adversary Proceedings*");

**WHEREAS**, the Trustee has stepped into the shoes of the Predecessor Trustee as

plaintiff in the Adversary Proceedings;

**WHEREAS**, the Settling Defendant assert that he has certain defenses to the claims asserted by the Trustee in the Insider Adversary; and

**WHEREAS**, the Parties have exchanged information, negotiated and now desire to resolve all matters respecting the Insider Adversary, upon the terms and conditions set forth below.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1.    **The Parties.** Trustee, Debtors, and the Settling Defendant shall include any and all of their respective current and former predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, executives, shareholders, partners, members, agents, sureties, insurers, employees, attorneys, purchasers, relatives, heirs, and trusts.

2.    **Settlement Sum.** The Settling Defendant shall deliver to the Trustee the sum of $12,500.00 (the "*Settlement Sum*") in full satisfaction of the claims asserted against him in the Insider Adversary, which shall be comprised of cash payments from the Settling Defendant and remaining proceeds of the directors and officers insurance policy (the "*Insurance Proceeds*") which covers the claims raised in the Insider Adversary.

3.    **Payment of Settlement Sum.** The Settlement Sum shall be paid by wire transfer or one or more checks delivered to the Trustee. Settling Defendant shall provide payment contemporaneously with the execution of this Settlement Agreement.  The Insurance Proceeds shall be provided to the Trustee from the insurance carrier as soon as practicable. The Settlement Sum will be held by the Trustee or her counsel in an IOLTA account until an order approving the Settlement Agreement is entered by the Bankruptcy Court, at which time it will be transferred to the Debtors' estates.  The Settlement Sum shall be paid as follows:

**By Wire Transfer**:

Using the wire transfer instructions and form attached hereto as <u>Exhibit A</u>.

**By Check(s)**:

Payable to:    Karen R. Goodman, Chapter 7 Trustee for the estate of Argon Credit, LLC

Delivered to:  Arthur G. Simon, Esq.
                      Crane, Simon, Clar & Goodman
                      135 S. LaSalle Street, Suite 3705
                      Chicago, Illinois 60603

If the Court denies the motion to approve the Settlement Agreement, the Settlement Sum shall be returned to the Defendant(s) within 14 days

4.    **Claims Waiver**.  The Settling Defendant agrees to waive the Claims he has asserted against the Debtors and such claims shall be deemed satisfied in full by this Settlement Agreement.

5.    **Conditions of Settlement**.  This Settlement Agreement is intended to be one part of a semi-global settlement between the Trustee and the Settling Defendant, among other defendants, and is conditioned upon the occurrence of the effective date of settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Margon, Triffler Trust, and Cardinal Trust after such settlements have been approved by the Bankruptcy Court and payment of such settlements have cleared the Trustee's bank account. This Settlement Agreement is also conditioned upon the clearance through the Trustee's bank account of payment of the remaining proceeds of the Insurance Policy.

6.    **Effective Date.**  This Settlement Agreement will become effective upon the first date on which all of the following conditions have been met (the "*Effective Date*"): (i) the full execution of this Settlement Agreement by each of the Parties; (ii) entry of a final, non-appealable order approving this Settlement Agreement entered by the Bankruptcy Court; (iv) the date on which the Settlement Sum clears the Trustee's bank account; (v) entry of a final, non-appealable order approving settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Margon, Triffler Trust, and Cardinal Trust; and (vi) the date on which payments owed by Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Margon, Triffler Trust, and Cardinal Trust to the Trustee pursuant to settlements with those defendants have cleared the Trustee's bank account.

7.    **Dismissal of Insider Adversary**.  Within five business days after the later of (i) an order by the Bankruptcy Court authorizing the Trustee to implement the terms of this Agreement becomes a final order and (ii) the Effective Date of this Settlement Agreement, the Trustee will cause the Insider Adversary to be dismissed against the Settling Defendant, with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7041(a)(1)(A) and such dismissal order shall state that the Bankruptcy Court shall retain jurisdiction to enforce this Settlement Agreement. The notice of dismissal shall expressly provide that the Insider Adversary will be dismissed against the Settling Defendant with prejudice with each party to bear its own costs.

8.    **Trustee's Release**.  The Trustee, solely in her capacity as Chapter 7 trustee for the Debtors, hereby releases the Settling Defendant from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, the operation of their business, and/or the Insider Adversary, including without limitation the claims for relief asserted or that could have been asserted in the Insider Adversary. Notwithstanding the forgoing, the Trustee's Release is not a release, waiver, or discharge of obligations of the Settling Defendant under this Agreement.

9.    **Settling Defendant's Release**.  The Settling Defendant hereby releases the Trustee, solely in her capacity as the Chapter 7 Trustee for the Debtors, the Debtors, and the Debtors' bankruptcy estates, from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that arise from or relate to the Debtors or the operation of their business, including any such claims that could have been asserted by the Settling Defendant in the Insider

Adversary. Notwithstanding the forgoing, the Settling Defendant's Release is not a release, waiver, or discharge of obligations of the Trustee under this Agreement.

10. **Scope of Releases**. It is the intention of the Parties that, notwithstanding the possibility that the Parties or their counsel discover or gain a more complete understanding of the facts, events or law pertaining in any way to the Insider Adversary which, if presently known or fully understood, would have affected the releases in ¶¶ 8-9, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth in ¶¶ 8-9, without regard to the subsequent discovery or existence of different or additional facts, events or law. The Parties expressly waive any and all rights they may have under any statute or common law principle which would limit the effect of the releases in ¶¶ 8-9 to those claims actually known or suspected to exist at the time of the effectiveness of the releases in ¶¶ 8-9. The Parties represent and warrant that they own the rights released herein and they have not assigned or transferred or purported to assign or transfer any of such rights to any other person or entity.

11. **Bankruptcy Court Approval.** Within seven (7) days after the full execution of this Settlement Agreement, the Trustee shall file a motion in the Bankruptcy Court seeking entry of an order approving this Settlement Agreement.

12. **Counterparts.** This Settlement Agreement may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same. This Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

13. **Authority to Enter into Settlement Agreement.** The undersigned represent and warrant that they have full authority to execute this Settlement Agreement on behalf of their respective Party or client and have obtained all necessary approvals. This Settlement Agreement is the resolution of disputed claims and nothing herein shall be deemed an admission against any Party.

14. **Entire Agreement.** This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof. No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

15. **Governing Law.** This Settlement Agreement shall be construed and enforced in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of Illinois, without regard to the conflicts of law or principles thereof.

16. **No Admission of Liability.** This Agreement constitutes a compromise of disputed claims, and neither this Agreement nor any of its provisions, terms or conditions constitutes an admission of liability or wrongdoing on the part of any of the Parties. Neither can this Agreement and its provisions, terms or conditions be offered or received into evidence in any action or proceeding as evidence of an admission of liability or wrongdoing.

17. **Successors.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.

**TRUSTEE:**

**KAREN R. GOODMAN,
CHAPTER 7 TRUSTEE FOR THE
ESTATES OF ARGON CREDIT,
LLC AND ARGON X, LLC**

By: _____

Printed Name: _____

Title: _____

**SETTLING DEFENDANT:**

**BRUCE BREITWEISER**

By: _____
     Bruce Breitweiser

# ACH Setup Instructions

### Please fax this form to the bank initiating the ACH

**Date:** _____

## Beneficiary Bank Information

**Bank name & address:**

Metropolitan Commercial Bank

99 Park Avenue

New York, NY, 10016

**Bank ABA number:**

███████

**Bank phone number:**

(212) 365-6739

## Beneficiary Information

Account Number: ██████ _____

Beneficiary Name: Argon Credit, LLC    Case no. 16-39654 _____

Reference: _____

**Dollar Amount:** _____ (not required)

## Contact Information

Fiduciary Name: Karen R. Goodman, Trustee _____

Contact Phone Number: 312-641-6777 _____

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Settlement Agreement*") is made as of September 11, 2020, by and between Karen R. Goodman (the "*Trustee*"), the chapter 7 trustee in the bankruptcy cases of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*" and, together with Argon Credit, the "*Debtors*") on the one side, and Byron Faermark (the "*Settling Defendant*") on the other side.

## RECITALS

**WHEREAS**, on December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), which are being jointly administered as Case No. 16-39654;

**WHEREAS**, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7 on January 11, 2017;

**WHEREAS**, on January 11, 2017, Deborah K. Ebner was appointed the interim chapter 7 trustee of the Debtors' estates;

**WHEREAS**, on April 17, 2017, Deborah K. Ebner resigned as chapter 7 trustee and Eugene Crane (the "*Predecessor Trustee*") was appointed as interim chapter 7 trustee whose appointment was confirmed by the Bankruptcy Court on July 6, 2017;

**WHEREAS**, on June 1, 2020, the Trustee was appointed as the successor chapter 7 trustee after Mr. Crane's resignation;

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00948 in the Bankruptcy Court against the Settling Defendant, Joseph Canfora ("*Canfora*"), Mark Triffler ("*Triffler*"), Peter Ferro, Jr. ("*Ferro*"), Meghan Hubbard ("*Hubbard*"), John A. Kuhlman ("*Kuhlman*"), and Bruce Breitweiser ("*Breitweiser*"), among others (the "*Insider Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00947 in the Bankruptcy Court against Margon LLC ("*Margon*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), Barry Edmonson as trustee of The Cardinal Trust (the "*Cardinal Trust*"), among others (the "*Avoidance Claims Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00942 in the Bankruptcy Court against Hubbard (the "*Hubbard Adversary*" and, together with the Insider Adversary and Avoidance Claims Adversary, the "*Adversary Proceedings*");

**WHEREAS**, the Trustee has stepped into the shoes of the Predecessor Trustee as

plaintiff in the Adversary Proceedings;

**WHEREAS**, the Settling Defendant assert that he has certain defenses to the claims asserted by the Trustee in the Insider Adversary; and

**WHEREAS**, the Parties have exchanged information, negotiated and now desire to resolve all matters respecting the Insider Adversary, upon the terms and conditions set forth below.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1.      **The Parties.** Trustee, Debtors, and the Settling Defendant shall include any and all of their respective current and former predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, executives, shareholders, partners, members, agents, sureties, insurers, employees, attorneys, purchasers, relatives, heirs, and trusts.

2.      **Settlement Sum.** The Settling Defendant shall deliver to the Trustee the sum of $12,500.00 (the "*Settlement Sum*") in full satisfaction of the claims asserted against him in the Insider Adversary, which shall be comprised of cash payments from the Settling Defendant and remaining proceeds of the directors and officers insurance policy (the "*Insurance Proceeds*") which covers the claims raised in the Insider Adversary.

3.      **Payment of Settlement Sum.** The Settlement Sum shall be paid by wire transfer or one or more checks delivered to the Trustee. Settling Defendant shall provide payment contemporaneously with the execution of this Settlement Agreement. The Insurance Proceeds shall be provided to the Trustee from the insurance carrier as soon as practicable.   The Settlement Sum will be held by the Trustee or her counsel in an IOLTA account until an order approving the Settlement Agreement is entered by the Bankruptcy Court, at which time it will be transferred to the Debtors' estates.   The Settlement Sum shall be paid as follows:

**By Wire Transfer**:

Using the wire transfer instructions and form attached hereto as <u>Exhibit A</u>.

**By Check(s)**:

Payable to:      Karen R. Goodman, Chapter 7 Trustee for the estate of Argon Credit, LLC

Delivered to:   Arthur G. Simon, Esq.
Crane, Simon, Clar & Goodman
135 S. LaSalle Street, Suite 3705
Chicago, Illinois 60603

If the Court denies the motion to approve the Settlement Agreement, the Settlement Sum shall be returned to the Defendant(s) within 14 days

4.     **Claims Waiver**.  The Settling Defendant agrees to waive the Claims he has asserted against the Debtors and such claims shall be deemed satisfied in full by this Settlement Agreement.

5.     **Conditions of Settlement**.  This Settlement Agreement is intended to be one part of a semi-global settlement between the Trustee and the Settling Defendant, among other defendants, and is conditioned upon the occurrence of the effective date of settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust after such settlements have been approved by the Bankruptcy Court and payment of such settlements have cleared the Trustee's bank account. This Settlement Agreement is also conditioned upon the clearance through the Trustee's bank account of payment of the remaining proceeds of the Insurance Policy.

6.     **Effective Date.**  This Settlement Agreement will become effective upon the first date on which all of the following conditions have been met (the "*Effective Date*"): (i) the full execution of this Settlement Agreement by each of the Parties; (ii) entry of a final, non-appealable order approving this Settlement Agreement entered by the Bankruptcy Court; (iv) the date on which the Settlement Sum clears the Trustee's bank account; (v) entry of a final, non-appealable order approving settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust; and (vi) the date on which payments owed by Canfora, Triffler, Ferro, Hubbard, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust to the Trustee pursuant to settlements with those defendants have cleared the Trustee's bank account.

7.     **Dismissal of Insider Adversary**.  Within five business days after the later of (i) an order by the Bankruptcy Court authorizing the Trustee to implement the terms of this Agreement becomes a final order and (ii) the Effective Date of this Settlement Agreement, the Trustee will cause the Insider Adversary to be dismissed against the Settling Defendant, with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7041(a)(1)(A) and such dismissal order shall state that the Bankruptcy Court shall retain jurisdiction to enforce this Settlement Agreement. The notice of dismissal shall expressly provide that the Insider Adversary will be dismissed against the Settling Defendant with prejudice with each party to bear its own costs.

8.     **Trustee's Release**.  The Trustee, solely in her capacity as Chapter 7 trustee for the Debtors, hereby releases the Settling Defendant from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, the operation of their business, and/or the Insider Adversary, including without limitation the claims for relief asserted or that could have been asserted in the Insider Adversary. Notwithstanding the forgoing, the Trustee's Release is not a release, waiver, or discharge of obligations of the Settling Defendant under this Agreement.

9.     **Settling Defendant's Release**.  The Settling Defendant hereby releases the Trustee, solely in her capacity as the Chapter 7 Trustee for the Debtors, the Debtors, and the Debtors' bankruptcy estates, from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that arise from or relate to the Debtors or the operation of their business, including any such claims that could have been asserted by the Settling Defendant in the Insider

Adversary. Notwithstanding the forgoing, the Settling Defendant's Release is not a release, waiver, or discharge of obligations of the Trustee under this Agreement.

10. **Scope of Releases**. It is the intention of the Parties that, notwithstanding the possibility that the Parties or their counsel discover or gain a more complete understanding of the facts, events or law pertaining in any way to the Insider Adversary which, if presently known or fully understood, would have affected the releases in ¶¶ 8-9, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth in ¶¶ 8-9, without regard to the subsequent discovery or existence of different or additional facts, events or law. The Parties expressly waive any and all rights they may have under any statute or common law principle which would limit the effect of the releases in ¶¶ 8-9 to those claims actually known or suspected to exist at the time of the effectiveness of the releases in ¶¶ 8-9. The Parties represent and warrant that they own the rights released herein and they have not assigned or transferred or purported to assign or transfer any of such rights to any other person or entity.

11. **Bankruptcy Court Approval.** Within seven (7) days after the full execution of this Settlement Agreement, the Trustee shall file a motion in the Bankruptcy Court seeking entry of an order approving this Settlement Agreement.

12. **Counterparts.** This Settlement Agreement may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same. This Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

13. **Authority to Enter into Settlement Agreement.** The undersigned represent and warrant that they have full authority to execute this Settlement Agreement on behalf of their respective Party or client and have obtained all necessary approvals.  This Settlement Agreement is the resolution of disputed claims and nothing herein shall be deemed an admission against any Party.

14. **Entire Agreement.**  This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof. No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

15. **Governing Law.**  This Settlement Agreement shall be construed and enforced in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of Illinois, without regard to the conflicts of law or principles thereof.

16. **No Admission of Liability.**  This Agreement constitutes a compromise of disputed claims, and neither this Agreement nor any of its provisions, terms or conditions constitutes an admission of liability or wrongdoing on the part of any of the Parties.  Neither can this Agreement and its provisions, terms or conditions be offered or received into evidence in any action or proceeding as evidence of an admission of liability or wrongdoing.

17. **Successors.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.

**TRUSTEE:**

**KAREN R. GOODMAN,
CHAPTER 7 TRUSTEE FOR THE
ESTATES OF ARGON CREDIT,
LLC AND ARGON X, LLC**

By: _____

Printed Name: _____

Title: _____

**SETTLING DEFENDANT:**

**BYRON FAERMARK**

By: _____
      Byron Faermark

## ACH Setup Instructions

### Please fax this form to the bank initiating the ACH

**Date:** _____

## Beneficiary Bank Information

**Bank name & address:**

Metropolitan Commercial Bank

99 Park Avenue

New York, NY, 10016

**Bank ABA number:**

████████

**Bank phone number:**

(212) 365-6739

## Beneficiary Information

Account Number: ██████5 _____

Beneficiary Name: Argon Credit, LLC    Case no. 16-39654 _____

Reference: _____

**Dollar Amount:** _____ (not required)

## Contact Information

Fiduciary Name: Karen R. Goodman, Trustee _____

Contact Phone Number: 312-641-6777 _____

# SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Settlement Agreement*") is made as of September 11, 2020, by and between Karen R. Goodman (the "*Trustee*"), the chapter 7 trustee in the bankruptcy cases of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*" and, together with Argon Credit, the "*Debtors*") on the one side, and John A. Kuhlman (the "*Settling Defendant*") on the other side.

## RECITALS

**WHEREAS**, on December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), which are being jointly administered as Case No. 16-39654;

**WHEREAS**, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7 on January 11, 2017;

**WHEREAS**, on January 11, 2017, Deborah K. Ebner was appointed the interim chapter 7 trustee of the Debtors' estates;

**WHEREAS**, on April 17, 2017, Deborah K. Ebner resigned as chapter 7 trustee and Eugene Crane (the "*Predecessor Trustee*") was appointed as interim chapter 7 trustee whose appointment was confirmed by the Bankruptcy Court on July 6, 2017;

**WHEREAS**, on June 1, 2020, the Trustee was appointed as the successor chapter 7 trustee after Mr. Crane's resignation;

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00948 in the Bankruptcy Court against the Settling Defendant, Joseph Canfora ("*Canfora*"), Mark Triffler ("*Triffler*"), Peter Ferro, Jr. ("*Ferro*"), Meghan Hubbard ("*Hubbard*"), Byron Faermark ("*Faermark*"), and Bruce Breitweiser ("*Breitweiser*"), among others (the "*Insider Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00947 in the Bankruptcy Court against Margon LLC ("*Margon*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), Barry Edmonson as trustee of The Cardinal Trust (the "*Cardinal Trust*"), among others (the "*Avoidance Claims Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00942 in the Bankruptcy Court against Hubbard (the "*Hubbard Adversary*" and, together with the Insider Adversary and Avoidance Claims Adversary, the "*Adversary Proceedings*");

**WHEREAS**, the Trustee has stepped into the shoes of the Predecessor Trustee as

plaintiff in the Adversary Proceedings;

**WHEREAS**, the Settling Defendant assert that he has certain defenses to the claims asserted by the Trustee in the Insider Adversary; and

**WHEREAS**, the Parties have exchanged information, negotiated and now desire to resolve all matters respecting the Insider Adversary, upon the terms and conditions set forth below.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1. **The Parties.** Trustee, Debtors, and the Settling Defendant shall include any and all of their respective current and former predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, executives, shareholders, partners, members, agents, sureties, insurers, employees, attorneys, purchasers, relatives, heirs, and trusts.

2. **Settlement Sum.** The Settling Defendant shall deliver to the Trustee the sum of $60,000.00 (the "*Settlement Sum*") in full satisfaction of the claims asserted against him in the Insider Adversary, which shall be comprised of cash payments from the Settling Defendant and remaining proceeds of the directors and officers insurance policy (the "*Insurance Proceeds*") which covers the claims raised in the Insider Adversary.

3. **Payment of Settlement Sum.** The Settlement Sum shall be paid by wire transfer or one or more checks delivered to the Trustee contemporaneously with the execution of this Settlement Agreement. The Settlement Sum will be held by the Trustee or her counsel in an IOLTA account until an order approving the Settlement Agreement is entered by the Bankruptcy Court, at which time it will be transferred to the Debtors' estates. The Settlement Sum shall be paid as follows:

**By Wire Transfer**:

Using the wire transfer instructions and form attached hereto as Exhibit A.

**By Check(s)**:

Payable to:  Karen R. Goodman, Chapter 7 Trustee for the estate of Argon Credit, LLC

Delivered to:  Arthur G. Simon, Esq.
Crane, Simon, Clar & Goodman
135 S. LaSalle Street, Suite 3705
Chicago, Illinois 60603

If the Court denies the motion to approve the Settlement Agreement, the Settlement Sum shall be returned to the Defendant(s) within 14 days

4.    **Claims Waiver**.  The Settling Defendant agrees to waive the Claims he has asserted against the Debtors and such claims shall be deemed satisfied in full by this Settlement Agreement.

5.    **Conditions of Settlement**.  This Settlement Agreement is intended to be one part of a semi-global settlement between the Trustee and the Settling Defendant, among other defendants, and is conditioned upon the occurrence of the effective date of settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Breitweiser, Margon, Triffler Trust, and Cardinal Trust after such settlements have been approved by the Bankruptcy Court and payment of such settlements have cleared the Trustee's bank account.

6.    **Effective Date.**  This Settlement Agreement will become effective upon the first date on which all of the following conditions have been met (the "*Effective Date*"): (i) the full execution of this Settlement Agreement by each of the Parties; (ii) entry of a final, non-appealable order approving this Settlement Agreement entered by the Bankruptcy Court; (iv) the date on which the Settlement Sum clears the Trustee's bank account; (v) entry of a final, non-appealable order approving settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Breitweiser, Margon, Triffler Trust, and Cardinal Trust; and (vi) the date on which payments owed by Canfora, Triffler, Ferro, Hubbard, Faermark, Breitweiser, Margon, Triffler Trust, and Cardinal Trust to the Trustee pursuant to settlements with those defendants have cleared the Trustee's bank account.

7.    **Dismissal of Insider Adversary**.  Within five business days after the later of (i) an order by the Bankruptcy Court authorizing the Trustee to implement the terms of this Agreement becomes a final order and (ii) the Effective Date of this Settlement Agreement, the Trustee will cause the Insider Adversary to be dismissed against the Settling Defendant, with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7041(a)(1)(A) and such dismissal order shall state that the Bankruptcy Court shall retain jurisdiction to enforce this Settlement Agreement. The notice of dismissal shall expressly provide that the Insider Adversary will be dismissed against the Settling Defendant with prejudice with each party to bear its own costs.

8.    **Trustee's Release**.  The Trustee, solely in her capacity as Chapter 7 trustee for the Debtors, hereby releases the Settling Defendant from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, the operation of their business, and/or the Insider Adversary, including without limitation the claims for relief asserted or that could have been asserted in the Insider Adversary. Notwithstanding the forgoing, the Trustee's Release is not a release, waiver, or discharge of obligations of the Settling Defendant under this Agreement.

9.    **Settling Defendant's Release**.  The Settling Defendant hereby releases the Trustee, solely in her capacity as the Chapter 7 Trustee for the Debtors, the Debtors, and the Debtors' bankruptcy estates, from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that arise from or relate to the Debtors or the operation of their business, including any such claims that could have been asserted by the Settling Defendant in the Insider Adversary. Notwithstanding the forgoing, the Settling Defendant's Release is not a release, waiver, or discharge of obligations of the Trustee under this Agreement.

10. **Scope of Releases**. It is the intention of the Parties that, notwithstanding the possibility that the Parties or their counsel discover or gain a more complete understanding of the facts, events or law pertaining in any way to the Insider Adversary which, if presently known or fully understood, would have affected the releases in ¶¶ 8-9, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth in ¶¶ 8-9, without regard to the subsequent discovery or existence of different or additional facts, events or law. The Parties expressly waive any and all rights they may have under any statute or common law principle which would limit the effect of the releases in ¶¶ 8-9 to those claims actually known or suspected to exist at the time of the effectiveness of the releases in ¶¶ 8-9. The Parties represent and warrant that they own the rights released herein and they have not assigned or transferred or purported to assign or transfer any of such rights to any other person or entity.

11. **Bankruptcy Court Approval.** Within seven (7) days after the full execution of this Settlement Agreement, the Trustee shall file a motion in the Bankruptcy Court seeking entry of an order approving this Settlement Agreement.

12. **Counterparts.** This Settlement Agreement may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same. This Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

13. **Authority to Enter into Settlement Agreement.** The undersigned represent and warrant that they have full authority to execute this Settlement Agreement on behalf of their respective Party or client and have obtained all necessary approvals. This Settlement Agreement is the resolution of disputed claims and nothing herein shall be deemed an admission against any Party.

14. **Entire Agreement.** This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof. No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

15. **Governing Law.** This Settlement Agreement shall be construed and enforced in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of Illinois, without regard to the conflicts of law or principles thereof.

16. **No Admission of Liability.** This Agreement constitutes a compromise of disputed claims, and neither this Agreement nor any of its provisions, terms or conditions constitutes an admission of liability or wrongdoing on the part of any of the Parties. Neither can this Agreement and its provisions, terms or conditions be offered or received into evidence in any action or proceeding as evidence of an admission of liability or wrongdoing.

17. **Successors.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.

**TRUSTEE:**

**KAREN R. GOODMAN,**
**CHAPTER 7 TRUSTEE FOR THE**
**ESTATES OF ARGON CREDIT,**
**LLC AND ARGON X, LLC**

By:_____

Printed Name: _____

Title:_____

**SETTLING DEFENDANT:**

**JOHN A. KUHLMAN**

By:_____
    John A. Kuhlman

**TRUSTEE:**

**KAREN R. GOODMAN,**
**CHAPTER 7 TRUSTEE FOR THE**
**ESTATES OF ARGON CREDIT,**
**LLC AND ARGON X, LLC**

By: _Karen R Goodman_

Printed Name: _Karen R Goodman_

Title: _Trustee_

**SETTLING DEFENDANT:**

**JOHN A. KUHLMAN**

By:_____
        John A. Kuhlman

# ACH Setup Instructions

### Please fax this form to the bank initiating the ACH

**Date:** _____

## Beneficiary Bank Information

**Bank name & address:**                                    **Bank ABA number:**

    Metropolitan Commercial Bank                       ███████

    99 Park Avenue

    New York, NY, 10016                                **Bank phone number:**

                                                   (212) 365-6739

## Beneficiary Information

Account Number:  █████ _____

Beneficiary Name:  Argon Credit, LLC    Case no. 16-39654 _____

Reference: _____

**Dollar Amount:** _____ (not required)

## Contact Information

Fiduciary Name:   Karen R. Goodman, Trustee _____

Contact Phone Number:  312-641-6777 _____

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Settlement Agreement*") is made as of September 11, 2020, by and between Karen R. Goodman (the "*Trustee*"), the chapter 7 trustee in the bankruptcy cases of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*" and, together with Argon Credit, the "*Debtors*") on the one side, and Harry Madanyan (the "*Settling Defendant*") on the other side.

### RECITALS

**WHEREAS**, on December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), which are being jointly administered as Case No. 16-39654;

**WHEREAS**, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7 on January 11, 2017;

**WHEREAS**, on January 11, 2017, Deborah K. Ebner was appointed the interim chapter 7 trustee of the Debtors' estates;

**WHEREAS**, on April 17, 2017, Deborah K. Ebner resigned as chapter 7 trustee and Eugene Crane (the "*Predecessor Trustee*") was appointed as interim chapter 7 trustee whose appointment was confirmed by the Bankruptcy Court on July 6, 2017;

**WHEREAS**, on June 1, 2020, the Trustee was appointed as the successor chapter 7 trustee after Mr. Crane's resignation;

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00948 in the Bankruptcy Court against the Settling Defendant, Joseph Canfora ("*Canfora*"), Mark Triffler ("*Triffler*"), Peter Ferro, Jr. ("*Ferro*"), Meghan Hubbard ("*Hubbard*"), Byron Faermark ("*Faermark*"), John A. Kuhlman ("*Kuhlman*"), and Bruce Breitweiser ("*Breitweiser*"), among others (the "*Insider Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00947 in the Bankruptcy Court against Margon LLC ("*Margon*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), Barry Edmonson as trustee of The Cardinal Trust (the "*Cardinal Trust*"), among others (the "*Avoidance Claims Adversary*");

**WHEREAS**, on December 14, 2018, the Predecessor Trustee filed an adversary proceeding case number 18-ap-00942 in the Bankruptcy Court against Hubbard (the "*Hubbard Adversary*" and, together with the Insider Adversary and Avoidance Claims Adversary, the "*Adversary Proceedings*");

**WHEREAS**, the Trustee has stepped into the shoes of the Predecessor Trustee as

plaintiff in the Adversary Proceedings;

**WHEREAS**, the Settling Defendant assert that he has certain defenses to the claims asserted by the Trustee in the Insider Adversary; and

**WHEREAS**, the Parties have exchanged information, negotiated and now desire to resolve all matters respecting the Insider Adversary, upon the terms and conditions set forth below.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented to and agreed by and between the Parties as follows:

1.　**The Parties.** Trustee, Debtors, and the Settling Defendant shall include any and all of their respective current and former predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, executives, shareholders, partners, members, agents, sureties, insurers, employees, attorneys, purchasers, relatives, heirs, and trusts.

2.　**Settlement Sum.** The Settling Defendant shall deliver to the Trustee the sum of $10,000.00 (the "*Settlement Sum*") in full satisfaction of the claims asserted against him in the Insider Adversary, which shall be comprised of cash payments from the Settling Defendant and remaining proceeds of the directors and officers insurance policy (the "*Insurance Proceeds*") which covers the claims raised in the Insider Adversary.

3.　**Payment of Settlement Sum.** The Settlement Sum shall be paid by wire transfer or one or more checks delivered to the Trustee contemporaneously with the execution of this Settlement Agreement. The Settlement Sum will be held by the Trustee or her counsel in an IOLTA account until an order approving the Settlement Agreement is entered by the Bankruptcy Court, at which time it will be transferred to the Debtors' estates. The Settlement Sum shall be paid as follows:

**By Wire Transfer**:

Using the wire transfer instructions and form attached hereto as Exhibit A.

**By Check(s)**:

Payable to:　Karen R. Goodman, Chapter 7 Trustee for the estate of Argon Credit, LLC

Delivered to:　Arthur G. Simon, Esq.
　　　　　　 Crane, Simon, Clar & Goodman
　　　　　　 135 S. LaSalle Street, Suite 3705
　　　　　　 Chicago, Illinois 60603

4.    **Claims Waiver.**  The Settling Defendant agrees to waive the Claims he has asserted against the Debtors and such claims shall be deemed satisfied in full by this Settlement Agreement.

5.    **Conditions of Settlement**.  This Settlement Agreement is intended to be one part of a semi-global settlement between the Trustee and the Settling Defendant, among other defendants, and is conditioned upon the occurrence of the effective date of settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust after such settlements have been approved by the Bankruptcy Court and payment of such settlements have cleared the Trustee's bank account.

6.    **Effective Date.**  This Settlement Agreement will become effective upon the first date on which all of the following conditions have been met (the "*Effective Date*"): (i) the full execution of this Settlement Agreement by each of the Parties; (ii) entry of a final, non-appealable order approving this Settlement Agreement entered by the Bankruptcy Court; (iv) the date on which the Settlement Sum clears the Trustee's bank account; (v) entry of a final, non-appealable order approving settlements between the Trustee and Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust; and (vi) the date on which payments owed by Canfora, Triffler, Ferro, Hubbard, Faermark, Kuhlman, Breitweiser, Margon, Triffler Trust, and Cardinal Trust to the Trustee pursuant to settlements with those defendants have cleared the Trustee's bank account.

7.    **Dismissal of Insider Adversary**.  Within five business days after the later of (i) an order by the Bankruptcy Court authorizing the Trustee to implement the terms of this Agreement becomes a final order and (ii) the Effective Date of this Settlement Agreement, the Trustee will cause the Insider Adversary to be dismissed against the Settling Defendant, with prejudice pursuant to Federal Rule of Bankruptcy Procedure 7041(a)(1)(A) and such dismissal order shall state that the Bankruptcy Court shall retain jurisdiction to enforce this Settlement Agreement. The notice of dismissal shall expressly provide that the Insider Adversary will be dismissed against the Settling Defendant with prejudice with each party to bear its own costs.

8.    **Trustee's Release**.  The Trustee, solely in her capacity as Chapter 7 trustee for the Debtors, hereby releases the Settling Defendant from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that are general and common to the Debtors and their creditors, that have been brought or were able to be brought exclusively by the Trustee, and/or arise from or relate to the Debtors, the operation of their business, and/or the Insider Adversary, including without limitation the claims for relief asserted or that could have been asserted in the Insider Adversary. Notwithstanding the forgoing, the Trustee's Release is not a release, waiver, or discharge of obligations of the Settling Defendant under this Agreement.

9.    **Settling Defendant's Release**.  The Settling Defendant hereby releases the Trustee, solely in her capacity as the Chapter 7 Trustee for the Debtors, the Debtors, and the Debtors' bankruptcy estates, from any and all claims, demands, obligations, debts, and causes of action of every kind or nature, in law or equity, whether now known or unknown, vested or contingent, that arise from or relate to the Debtors or the operation of their business, including any such claims that could have been asserted by the Settling Defendant in the Insider Adversary. Notwithstanding the forgoing, the Settling Defendant's Release is not a release, waiver, or discharge of obligations of the Trustee under this Agreement.

3

10.    **Scope of Releases**. It is the intention of the Parties that, notwithstanding the possibility that the Parties or their counsel discover or gain a more complete understanding of the facts, events or law pertaining in any way to the Insider Adversary which, if presently known or fully understood, would have affected the releases in ¶¶ 8-9, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth in ¶¶ 8-9, without regard to the subsequent discovery or existence of different or additional facts, events or law. The Parties expressly waive any and all rights they may have under any statute or common law principle which would limit the effect of the releases in ¶¶ 8-9 to those claims actually known or suspected to exist at the time of the effectiveness of the releases in ¶¶ 8-9. The Parties represent and warrant that they own the rights released herein and they have not assigned or transferred or purported to assign or transfer any of such rights to any other person or entity.

11.    **Bankruptcy Court Approval.**   Within seven (7) days after the full execution of this Settlement Agreement, the Trustee shall file a motion in the Bankruptcy Court seeking entry of an order approving this Settlement Agreement.

12.    **Counterparts.** This Settlement Agreement may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same. This Settlement Agreement may be signed and transmitted electronically or by facsimile, which shall be deemed to have the full force and effect of original ink signatures.

13.    **Authority to Enter into Settlement Agreement.** The undersigned represent and warrant that they have full authority to execute this Settlement Agreement on behalf of their respective Party or client and have obtained all necessary approvals.  This Settlement Agreement is the resolution of disputed claims and nothing herein shall be deemed an admission against any Party.

14.    **Entire Agreement.**  This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof. No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

15.    **Governing Law.**  This Settlement Agreement shall be construed and enforced in accordance with the provisions of the Bankruptcy Code and, where not inconsistent, the laws of Illinois, without regard to the conflicts of law or principles thereof.

16.    **No Admission of Liability.**   This Agreement constitutes a compromise of disputed claims, and neither this Agreement nor any of its provisions, terms or conditions constitutes an admission of liability or wrongdoing on the part of any of the Parties.  Neither can this Agreement and its provisions, terms or conditions be offered or received into evidence in any action or proceeding as evidence of an admission of liability or wrongdoing.

17.    **Successors.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective assigns and successors, including trustees and receivers.

**TRUSTEE:**

**KAREN R. GOODMAN,**
**CHAPTER 7 TRUSTEE FOR THE**
**ESTATES OF ARGON CREDIT,**
**LLC AND ARGON X, LLC**

By:_____

Printed Name: _____

Title:_____

**SETTLING DEFENDANT:**

**HARRY MADANYAN**

By: _____
    Harry Madanyan

**TRUSTEE:**

**KAREN R. GOODMAN,**
**CHAPTER 7 TRUSTEE FOR THE**
**ESTATES OF ARGON CREDIT,**
**LLC AND ARGON X, LLC**

By: *Karen R Goodman*

Printed Name: *Karen R Goodman*

Title: *Trustee*

**SETTLING DEFENDANT:**

**HARRY MADANYAN**

By:_____
    Harry Madanyan

# ACH Setup Instructions

Please fax this form to the bank initiating the ACH

Date: _____

## Beneficiary Bank Information

**Bank name & address:**

    Metropolitan Commercial Bank

    99 Park Avenue

    New York, NY, 10016

**Bank ABA number:**

████████

**Bank phone number:**

    (212) 365-6739

## Beneficiary Information

Account Number: ████████ _____

Beneficiary Name: ___ Argon Credit, LLC    Case no. 16-39654 _____

Reference: _____

**Dollar Amount:** _____(not required)

## Contact Information

Fiduciary Name: ___ Karen R. Goodman, Trustee _____

Contact Phone Number: ___ 312-641-6777 _____

Exhibit 12

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.:   16-39654 |
| ARGON CREDIT, LLC, et al. | ) | (Jointly Administered) |
| | ) | |
| | ) | Chapter:  7 |
| | ) | Honorable Deborah L. Thorne |
| | ) | |
| Debtor(s) | ) | |

**ORDER GRANTING MOTION FOR ENTRY ORDER: (I) PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT WITH CERTAIN ADVERSARY DEFENDANTS, AND (II) APPROVING PAYMENT OF CONTINGENCY FEE**

This matter coming before the Court upon the motion (the "Motion") of Karen R. Goodman (the "Trustee"), the chapter 7 Trustee in the above-captioned cases, for entry of an order approving the Trustee's settlement with Peter Ferro, Jr., Harry Madanyan, Joseph Canfora, Mark Triffler, John Kuhlman, Bruce Breitweiser, Byron Faermark, Margon LLC ("Margon"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 ("Triffer Trust"), Barry Edmonson as Trustee of The Cardinal Trust ("Cardinal Trust"), and Meghan Hubbard , and approving payment of the contingency fee to Freeborn & Peters LLP ("Freeborn"); due and proper notice having been given under the circumstances; Little Owl Argon, LLC having filed a limited objection and Fund Recovery Services, LLC having filed a notice of objection, Little Owl Argon, LLC and Fund Recovery Services, LLC both having appeared and were heard by the Court at the hearing the Motion; and for good cause shown;

IT IS HEREBY ORDERED that:

1) The settlement between the Trustee, on the one hand, and Margon, Triffler Trust, Cardinal Trust, Joseph Canfora, Mark Triffler, Peter Ferro, Jr., and Meghan Hubbard, on the other hand, the terms of which are set forth in the Settlement Agreement attached to the Motion as Exhibit 1, is hereby approved.

2) The settlement between the Trustee and Bruce Breitweiser, the terms of which are set forth in the Settlement Agreement attached to the Motion as Exhibit 2, is hereby approved.

3) The settlement between the Trustee and Byron Faermark, the terms of which are set forth in the Settlement Agreement attached to the Motion as Exhibit 3, is hereby approved.

4) The settlement between the Trustee and John Kuhlman, the terms of which are set forth in the Settlement Agreement attached to the Motion as Exhibit 4, is hereby approved.

5) The settlement between the Trustee and Harry Madanyan, the terms of which are set forth in the Settlement Agreement attached to the Motion as Exhibit 5, is hereby approved.

6) The Trustee is authorized to pay Freeborn, on an interim basis, the amount of $80,000.00 representing the Settlement Amount Contingency Fee (as defined in the Motion) due and owing on account of the settlement approved in this Order.

7) Notwithstanding anything to the contrary in the settlement agreements approved by this order, the

terms of the settlement agreements shall only release claims of the estate or the Trustee and shall not
release or have any effect on non-derivative, direct claims of third parties, or on defenses to such claims.

Enter:

Honorable Deborah L. Thorne

United States Bankruptcy Judge

Dated:    10/20/2020

**Prepared by:**

Elizabeth L. Janczak
Freeborn & Peters LLP
311 S. Wacker Dr. Suite 3000
Chicago, IL 60606

Exhibit 13

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In re:

**SPARTAN SPECIALTY FINANCE I SPV, LLC,**

Debtor.

---------------------------------------------------------X

Chapter 11

Case No:  16- 22881 (RDD)

### ORDER APPROVING STIPULATION AND AGREEMENT RESOLVING, AMONG OTHER THINGS, DEBTOR'S MOTION FOR USE OF CASH COLLATERAL AND FIXING AMOUNT OF SECURED CLAIM

Upon the motion [Dkt. No. 59] (the "Motion") of the debtor and debtor in possession

herein, Spartan Specialty Finance I SPV, LLC (the "Debtor"), for an order pursuant to 11 U.S.C.

§ 363 and Fed. R. Bankr. Rule 9019 approving a Stipulation and Agreement Resolving Debtor's

Motion for Use of Cash Collateral and Fixing Amount of Secured Claim, a copy of which is

attached as an Exhibit hereto (the "Settlement") between the Debtor, Hamilton Funding 1 LP,

and Barry Kostiner, individually; and there being due and sufficient notice of the Motion; and

upon the objection of Fund Recovery Services, LLC ("FRS"); and and upon the record of the

hearing held by the Court on the Motion on May 19, 2017; and, after due deliberation, the Court

having found and concluded that the Settlement is fair and reasonable, a proper exercise of the

Debtor's judgment and in the best interests of the Debtor's estate and creditors; and no additional

notice or hearing being required; and good and sufficient cause appearing, it is hereby

**ORDERED**, that the Motion is granted as provided herein, the Settlement is approved,

and the Debtor is authorized to perform it according to its terms; and it is further

**ORDERED** that, in approving the Settlement, the Court makes no findings or

determination regarding FRS' rights or interest in consumer loans and the proceeds thereof that

are a subject of the Settlement, and this Order is without prejudice to any claim FRS may assert

in another forum with respect to any such rights or interest or to all other parties' rights and

defenses with respect to any such claim.

**DATED:**  White Plains, New York
          May 26, 2017

/s/Robert D. Drain
**HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

| | |
|---|---|
| | |
| | |
| | |
| | |

| | |
|---|---|
| | |
| | |

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re:

**SPARTAN SPECIALTY FINANCE I SPV,
LLC,**

                          Debtor.

-----------------------------------------------------
X

Chapter 11

Case No:  16- 22881 (RDD)

## <u>ORDER DISMISSING CHAPTER 11 CASE</u>

Upon the motion [Dkt. No. 59] (the "Motion") of Spartan Specialty Finance I SPV, LLC, the debtor and debtor in possession herein (the "Debtor") for an order dismissing this chapter 11 case, pursuant to 11 U.S.C. §§ 105(a), 305(a) and 1112(b); and there being due and sufficient notice of the Motion; and upon the objection of Fund Recovery Services, LLC ("FRS"); and upon the record of the hearing held by the Court on the Motion on May 19, 2017; and, after due deliberation, the Court having found and concluded that the Debtor has established sufficient cause for the dismissal of this case, including in light of the Stipulation and Agreement among the Debtor, Hamilton Funding 1 LP and Barry Kostiner, individually (the "Settlement") that was also the subject of the May 19, 2017 hearing and was approved by an order (the "Settlement Approval Order") of the Court entered on today's date, on the conditions set forth herein; and the Court having found that the dismissal of this case on the conditions set forth herein, rather than its conversion to a case under chapter 7 of the Bankruptcy Code, is in the interests of the Debtor's creditors and, to the extent relevant, the Debtor's interst holders; and no additional notice or hearing being required, it is hereby

**ORDERED**, that the Motion is granted as provided herein; and it is further

**ORDERED,** that, as provided in the Settlment, the Debtor shall reserve from the cash that is the subject of the Settlement (the "Cash"): (a) $135,000, which, subject to submission to Hamilton of invoices by the Debtor's counsel for services rendered in connection with this chapter 11 case, the Debtor shall promptly pay as legal fees to Debtor's counsel to the extent substantiated by such invoices, and (b) sufficient cash to make a 35% distribution to non-insider creditors who have filed timely claims in this case, which the Debtor shall promptly pay to each such creditor after receiving an executed affidavit in the form annexed hereto as Exhibit "A" that such creditor holds non-insider claims); and it is further

**ORDERED**, that, promptly after the foregoing payments to the Debtor's counsel and non-insider creditors, the Debtor shall cause a certificate to be filed on the docket of this case that such payments were made; and it is further

**ORDERED**, that the Debtor shall reserve sufficient funds from the Cash to pay the Office of the United States Trustee the amount of any quarterly fees due pursuant to 28 U.S.C. § 1930 and any applicable interest due pursuant to 31 U.S.C. § 3717, which fees and interest, if any, shall be paid within ten (10) days of the entry of this Order. Upon the payment of such quarterly fees, the Debtor shall simultaneously provide to the United States Trustee an affidavit indicating cash disbursements for the year 2017; and it is further

**ORDERED**, that the this chapter 11 case is dismissed pursuant to 11 U.S.C. §§ 105(a). 305(a) and 1112(b); and it is further

**ORDERED**, that, sufficient cause appearing, pursuant to 11 U.S.C. § 349(a) this Order and the Court's Order, of even date herewith, approving the Stipulation (the "Settlement Approval Order" shall survive the dismissal of this case and remain enforceable pursuant to their terms in all respects; and it is further

**ORDERED,** that the Court shall retain jurisdiction over all matters relating to the

implementation or interpretation of this Order and the Settlement Approval Order; and it is

further

**ORDERED**, that this Order is without prejudice to any claim FRS may assert in another

forum with respect to its rights or interest in the Cash or to all other parties' rights and defenses

with respect to any such claim; and it is further

Dated: White Plains, New York
      May 26, 2017

                /s/Robert D. Drain_____
                **HONORABLE ROBERT D. DRAIN**
                **UNITED STATES BANKRUPTCY JUDGE**

| | |
|---|---|
| | |
| | |
| | |

| | |
|---|---|
| | |
| | |

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

|  |  |  |
|---|---|---|
|  |  |  |

Exhibit 14

| | |
|---|---|
| FUND RECOVERY SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SPARTAN SPECIALTY FINANCE I SPV, LLC; HAMILTON FUNDING 1, LP; and EXIGENT ALTERNATIVE CAPITAL, LLC,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>BERGEN COUNTY<br><br>DOCKET NO.<br><br>Civil Action |

---

## BRIEF IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS AND ISSUANCE OF WRIT OF ATTACHMENT ON *EX PARTE* BASIS

---

SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
Attorneys for Plaintiff

Of Counsel and on the Brief:

Valerie A. Hamilton (Attorney ID # 018201995)
Michael Carucci (Attorney ID # 025192008)

Plaintiff Fund Recovery Services, LLC ("Plaintiff" or "FRS") respectfully submits this Brief together with the accompanying Verified Complaint ("Compl.") and the exhibits thereto in support of its request for entry of an Order To Show Cause With Temporary Restraints and for the issuance of Writs of Attachment on an *ex parte* basis.

## **INTRODUCTION**

This application is brought to stop the further transfer of funds that serve as collateral for a $37.5 million line of credit. The debtor granted Plaintiff a lien and security interest in those funds – receivables, among other property – which was duly perfected as a first priority security interest. Without first satisfying this lien, the debtor later sold $4 million of Plaintiff's collateral packaged in a portfolio of assets to Defendant Spartan Specialty Finance I SPV, LLC ("Spartan"), a third party with close ties to the debtor, which in turn pledged that property to two foreign lenders: Defendants Hamilton Funding 1, L.P. ("Hamilton") and Exigent Alternative Capital LLC ("Exigent"). The transfer and pledge of these monies was done to defraud and hinder Plaintiff. Spartan has collected approximately $1.3 million in cash from the collateral, which at the moment sits in two bank accounts in this County. Unless the Court grants this application now, however, these funds will be transferred yet again – this time pursuant to the terms of a settlement agreement or to Spartan's creditors in Jerusalem – and be lost for good.

Until May 26, 2017, Defendant Spartan was a debtor in bankruptcy. Plaintiff's collateral is its only valuable asset. Because of Spartan's bankruptcy case, the proceeds of the collateral were not disbursed, but were held in two bank accounts in this County. On or about April 28, 2017, Defendants reached an agreement to disburse the loan proceeds and to dismiss Spartan's bankruptcy case. By orders entered on May 26, 2017, the bankruptcy court approved the agreement settling disputes between Spartan and Hamilton and granted Spartan's motion to

dismiss its bankruptcy case. The bankruptcy court expressly declined to make any findings regarding the extent and priority of the parties' interests in the assets.

This case will do little to protect FRS' chances of recovery absent immediate assistance from this Court. Entry of the bankruptcy court orders triggered a race by Defendants to cause the $1.3 million in cash to be disbursed to Defendants. Plaintiff is especially concerned that Defendants Exigent and Hamilton, which maintain business offices in Israel, will remove the funds beyond the reach of American courts, making them effectively irretrievable. In fact, Defendant Exigent has recently deregistered with the U.S. Securities and Exchange Commission. Defendants Spartan and Hamilton sought to delay entry of the Order dismissing Spartan's bankruptcy case long enough for them to transfer $1.3 million in cash to Hamilton while Plaintiff remained subject to the automatic stay in bankruptcy.

Accordingly, Plaintiff seeks a Writ of Attachment against funds the Defendants have deposited (or will deposit) in two certain bank accounts to ensure that, at the end of the day, at least some recovery may be possible. Further, FRS seeks immediate *ex parte* Orders designed to protect against Defendants Exigent and Hamilton absconding to a foreign country with FRS's collateral. For the reasons set forth herein, such relief is both necessary and proper.

## ARGUMENT

### I.     THIS COURT IS AUTHORIZED TO ENTER WRITS OF ATTACHMENT AND SUCH RELIEF SHOULD BE GRANTED.

New Jersey law provides for the issuance of pre-judgment writs of attachment. Pursuant to *Rule* 4:60-5(a), a writ of attachment may be issued when:

> (1)     there is a probability that final judgment will be rendered in favor of the plaintiff;
>
> (2)     there are statutory grounds for the issuance of the writ; and

2

(3)     there is real or personal property of the defendant at a specific location within the state which is subject to attachment.

Further, a writ of attachment may be issued without notice to the defendant "if the court finds from specific facts shown by affidavit or verified complaint that the giving of such notice is likely to defeat the execution of the writ." *Rule* 4:60-5(b). All four factors are present here for the Court to issue the Writ of Attachment on an *ex parte* basis.

## A.     Plaintiff Demonstrates A Probability That Final Judgment Will Be Awarded In Its Favor.

New Jersey's Writ of Attachment statutes are to be "liberally construed as a remedial law for the protection of resident and non-resident creditors and claimants." *Pomeroy v. Simon,* 29 *N.J. Super.* 439, 447 (App. Div. 1954), *aff'd,* 17 N.J. 59 (1954); *see also Tanner Assocs., Inc. v. Ciraldo,* 33 *N.J.* 51 (1960) (the remedy of a writ of attachment "was early recognized and constantly employed in New Jersey").

Accordingly, Plaintiff is only required to present a *prima facia* case in order to satisfy the first requirement of a "probability that final judgment will be awarded in their favor." *See, e.g., Pomeroy,* 29 *N.J. Super.* at 447. Further, such proof may be drawn exclusively from plaintiff's own affidavits. *See Allied Fin. Corp. v. Steel Panel Sales Corp.,* 86 *N.J. Super.* 65 (App. Div. 1964), *certif. denied,* 44 *N.J.* 411 (1965); *see also Mueller v. Seaboard Commercial Corp.,* 5 *N.J.* 28, 32 (1950) (In a motion to dissolve or quash an attachment, the averments in the original papers on which the attachment was granted "are deemed true, and all legitimate deductions and inferences from what appears in such papers must be made and construed in favor of plaintiff, and if such papers show a *prima facie* case for the attachment, this is sufficient.").

Here, Plaintiff asserts a security interest in consumer loans and their proceeds, approximately $1,300,000 of which are currently on deposit at Cross River Bank and TD Bank.

FRS has attached to its Verified Complaint copies of the loan documents which grant its security interests in the loans and their proceeds, as well as the UCC financing statements that perfect FRS's interests. *See* Compl., Exhs. B - K. The debtor, Argon X, LLC ("Argon X") defaulted on its obligations to FRS under the LSA when it, among other things, filed for bankruptcy. The bankruptcy court granted FRS relief from the stay "to allow [FRS] to exercise any and all of the rights and remedies provided by applicable law, FRS's loan documents, and its agreements with the Debtors." Compl., Exh. M. Defendant Spartan took the Portfolio of assets subject to Plaintiff's duly-perfected, first priority security interest. Compl., ¶ 25. Defendants are not bona fide purchasers of the Portfolio. They were not only aware of FRS's security interest in loans originated by Argon X, but Defendants utilized Plaintiff's loan documents as a model for their financing transaction, even creating loan documents redlined against Plaintiff's original loan documents. Accordingly, Plaintiff demonstrates a probability that final judgment will be awarded in its favor.

Plaintiff can also demonstrate a probability of success on its claim for conversion. Under New Jersey law, conversion is defined as "the exercise of any act of dominion in denial of another's title to . . . chattels, or inconsistent with such title." *Marsellis-Warner Corp. v. Rabens*, 51 *F. Supp. 2d* 508, 525 (D.N.J. 1999) (quoting *Mueller v. Technical Devices Corp.*, 8 *N.J.* 201, 207 (N.J. 1951). The elements of conversion in New Jersey are: "(a) that the property and right to immediate possession thereof belong to the plaintiff; and (b) the wrongful act of interference with that right by the defendant." *Davis v. Connolly*, No. 09-cv-4629 (D.N.J. Feb. 11, 2010) (quoting *First National Bank v. North Jersey Trust Co.*, 18 *N.J. Misc.* 449 (N.J. 1940)); *see also Marsellis-Warner Corp.*, 51 *F. Supp. 2d* at 525.

Here, Plaintiff presents ample proof of conversion. As set forth in the Verified Complaint and established by the supporting exhibits, the loans in the Portfolio were pledged to FRS and sold to Defendant Spartan. Compl. ¶ 20. Furthermore, there is no question that the *res* at issue in this case consists of the proceeds of the loans in the Portfolio. Defendants clearly have asserted dominion and control over the proceeds, including the *res* at issue in this case, in derogation of FRS's security interest. Again, sufficient facts have already been presented showing a probability that Plaintiff will prevail.

Finally, to state a claim for unjust enrichment under New Jersey law, a plaintiff must allege "(1) that defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *Wanaque Borough Sewerage Auth. v. Twp. of West Milford*, 677 *A.2d* 747 (N.J. 1996) (citation omitted). Unjust enrichment is a form of quasi-contractual liability that exists when the defendant has received a benefit from plaintiff that it would be inequitable for him to retain. *Hassler v. Sovereign Bank*, 644 *F. Supp. 2d* 509, 519 (D.N.J. 2009). However, such liability is precluded where the subject matter of the claim is governed by an express contract between the parties, in which case the plaintiff is limited to contractual remedies. *Suburban Transfer Serv. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983).

Here, the subject matter of Defendant's claim arises in tort. Defendants are exerting control over assets that constitute Plaintiff's Collateral, and they are deriving cash benefit from that Collateral. It would be unjust for Defendants to deprive Plaintiff FRS of its right to receive the revenues generated from its collateral and for Defendants to retain same. Accordingly, Plaintiff demonstrates a probability that final judgment will be awarded in its favor.

**B.      Statutory Grounds Exist For The Issuance Of A Writ Of Attachment.**

The statutory grounds for issuance of a writ of attachment are set out at *N.J.S.A.* §
2A:26-2.  Those grounds include, "where the defendant absconds or is a nonresident of this
State, and a summons cannot be served on him in this State . . . ." *N.J.S.A.* § 2A:26-2(b).

In this case, each of the Defendants is a non-resident of New Jersey.  They were each
formed in Delaware and have business offices located in New York.  Defendants Exigent and
Hamilton conduct business from offices in Jerusalem, Israel.  Defendants may not be served with
a summons in New Jersey because they are unlikely to be found within the state.  Furthermore,
Plaintiff is not aware of any real estate owned by the Defendants in New Jersey, and to the best
of Plaintiff's knowledge, none of the Defendants have any employees working in New Jersey.
Therefore, statutory grounds exist for the issuance of a writ of attachment.

**C.      Plaintiff Has Located Property In The State Of New Jersey.**

Plaintiff has identified property of Defendants located in New Jersey subject to
attachment.  Specifically, that property consists of approximately $1,300,000 on deposit in
accounts maintained at Cross River Bank and TD Bank, N.A.  Accordingly, the third prong of
*Rule* 4:60-5 is satisfied and the Court may issue a writ of attachment.

**D.      *Ex Parte* Relief Is Justified.**

Plaintiffs are also entitled to issuance of the Writ on an *ex parte* basis.  *Rule* 4:60-5(b)
provides, in pertinent part:  "In order for issuance of a writ of attachment without notice to the
defendant may be entered by the court ... if the court finds from specific facts shown by affidavit
or verified complaint that the giving of such notice is likely to defeat the execution of the writ."

In this regard, Plaintiff demonstrates that Defendants Hamilton and Exigent have
business offices in Jerusalem, Israel from which they regularly conduct their business.

Furthermore, Exigent recently terminated its registration with the Securities and Exchange Commission. Compl., Exh. L. The Spartan bankruptcy court entered written orders approving a settlement between Defendants Spartan and Hamilton which provides for Hamilton to receive $1,000,000 and Hamilton's lawyers to receive an additional $125,000 from the bank accounts maintained at TD Bank and Cross River Bank. Defendants tried to expedite the bankruptcy court's entry of the order approving the settlement between Spartan and Hamilton, which would enable Spartan to transfer the $1.3 million in funds to Hamilton, even while they sought to delay entry of the dismissal order, which, if granted, would terminate the automatic stay and allow Plaintiff to obtain the injunctive relief currently requested from this Court. FRS will have virtually no chance of recovery once the Defendants remove the funds from the reach of American courts. That being the case, giving Defendants advanced notice is likely to defeat the execution of the Writ. *Ex parte* relief is therefore warranted.

## II. DEFENDANTS SHOULD BE ENJOINED FROM DISBURSING THE PROCEEDS OF FRS'S COLLATERAL.

Plaintiff can easily be stymied by Defendants. To level the playing field, Plaintiff asks that this Court preserve the existing *status quo*. Plaintiff asks that Defendants be enjoined from attempting to and/or actually transferring, encumbering, disposing of, moving, or in any way impairing the *Res*. Such relief is warranted.

In deciding whether to grant the type of relief sought here, a court considers:

(i)    The plaintiff's likelihood of success on the merits at a final hearing;

(ii)   The extent to which the plaintiff is being irreparably harmed absent injunctive relief;

(iii)  The extent to which the defendants will suffer harm if injunctive relief is granted; and

(iv)   The public interest in having such relief granted or denied.

*See, e.g., Pappan Enters., Inc. v. Hardee's Food Sys. Inc.*, 143 F.3d 800, 803 (3d Cir. 1998).

Granting or denying a request for injunctive relief rests within the court's sound discretion. *Kershner v. Mazurkiewicz,* 670 *F.2d* 440, 443 (3d Cir. 1982). While a court must balance all four factors set forth above, *id.,* particular emphasis rests upon the likelihood of success and the risk of irreparable harm. *See, e.g., In re Arthur Treacher's Franchisee Litig.,* 689 *F.2d* 1137, 1143 (3d Cir. 1982).

**A.    Plaintiff Is Likely To Succeed On Its Claims.**

As set forth above, it is manifest that Plaintiff will succeed upon the claims against Defendants. Indeed, for a preliminary injunction to issue it suffices that a plaintiff be found likely to succeed on just one claim. *Marsellis-Wamer Corp. v. Rabens,* 51 *F. Supp. 2d* 508 (D. N.J. 1999).

**B.    Plaintiff Will Be Irreparably Harmed Absent Injunctive Relief.**

Preliminary injunctions may properly issue to preclude the risk of dissipation of assets. *Marsellis-Wamer Corp.,* 51 *F. Supp. 2d* at 532; *Andrews v. Holloway,* 1995 *WL* 875883 at * 11 (D. N.J. 1995). "[A] money judgment which is uncollectible is not an adequate remedy at law. The fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury." *Id.* at 531 (internal citations omitted). The fact that the payment of money is sought in the litigation does not limit a court's ability to grant injunctive relief. Courts have routinely held that the "unsatisfiability of a money judgment can constitute irreparable injury."

*Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205-06 (3d Cir. 1990) (declaring injunctive relief a "reasonable measure to preserve the status quo pending final determination of the questions raised" by the litigation). Plaintiff's legal remedy, without recourse to the fund in the hands of Cross River Bank and TD Bank, would be inadequate. The instant action could easily become an empty exercise if the Defendants are not halted from transferring the $1.3 million in cash before determination of the Plaintiff's security interest therein. The second prong for injunctive relief is therefore satisfied.

### C.     The Relief Sought Poses No Hardship To Defendants.

Plaintiff has not requested a change in the current flow of funds arising from the collection of the consumer loan collateral. The funds comprising the *Res* have been accumulating in Cross River Bank and TD Bank at least since Defendant Spartan filed its bankruptcy petition in June 2016. If the relief is granted, the *status quo* will be maintained. The only thing that Defendants will not be able to do is dissipate or abscond with $1.3 million, which has led to the filing of this case. Accordingly, the third prong for injunctive relief is satisfied.

### D.     Injunctive Relief is in the Public Interest.

It almost always will be the case that the public interest will favor an injunction where the plaintiff faces an irreparable injury and has a likelihood of success on the merits. *See, e.g., AT&T Co. v. Winback and Conserve Program, Inc.,* 42 *F.3d* 1421, 1427 (3d Cir. 1994), *cert. denied,* 514 *U.S.* 1103 (1995). Injunctive relief here advances the public interest. Injunctive relief will permit FRS to enforce its security interest in the Portfolio and the proceeds thereof while precluding the Defendants from removing the *res* from the jurisdiction of the Court while this case is pending.

**E. The Bond, If Any, Should Be Minimal.**

A plaintiff in attachment may be required to give bond to the defendant in an amount fixed by the Court, or the Court may exercise its discretion to dispense with the giving of a bond. *N.J.S.A.* 2A:26-7. Here, the bond imposed should be minimal, if at all. A bond is discretionary when issuing a Writ of Attachment pursuant to *Rule* 4:60-5(d). The relief sought here is temporary. Prior to the commencement of this action, the Defendants voluntarily deposited the funds to be attached in Cross River Bank and TD Bank, and the attachment will only continue in place a situation the Defendants chose for themselves. If attachment is granted, the *Res* will remain on deposit at the banks and interest will continue to be earned during the pendency of this action. Accordingly, the scope of possible loss to Defendants would be minimal.

## CONCLUSION

For the foregoing reasons, this Court should issue the proposed Order To Show Cause With Temporary Restraints and Order For Writ of Attachment.

Respectfully submitted,

SILLS CUMMIS & GROSS, P.C.

By: _Valerie Hamilton_

Valerie A. Hamilton, Esq.
Michael Carucci, Esq.

Dated: May 26, 2017

Exhibit 15

Valerie A. Hamilton, Esq. (Attorney ID # 018201995)
Michael S. Carucci, Esq. (Attorney ID # 025192008)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000

Attorneys for Plaintiff-Appellant
Fund Recovery Services, LLC

```
---------------------------------x
                                 : SUPERIOR COURT OF NEW JERSEY
FUND RECOVERY SERVICES, LLC      : APPELLATE DIVISION
                                 : DOCKET NO. F-1863-16
        Plaintiff-Appellant,     :
                                 : ON APPEAL FROM:
v.                               : SUPERIOR COURT OF NEW JERSEY,
                                 : CHANCERY DIVISION, BERGEN COUNTY
SPARTAN SPECIALTY FINANCE I SPV, : DOCKET NO. C-155-17
LLC, HAMILTON FUNDING 1, LP; and :
EXIGENT ALTERNATIVE CAPITAL, LLC,: SAT BELOW:
                                 : HON. MENELAOS W. TOSKOS, J.S.C.
        Defendants-Respondents.  :
                                 :            Civil Action
---------------------------------x
```

---

### BRIEF OF PLAINTIFF-APPELLANT
### FUND RECOVERY SERVICES, LLC IN SUPPORT OF
### MOTION FOR STAY PENDING APPEAL AND MOTION FOR LEAVE TO APPEAL

---

Of Counsel and On the Brief:
    VALERIE A. HAMILTON, Esq.
    MICHAEL S. CARUCCI, Esq.

## TABLE OF CONTENTS

<div align="right">PAGE</div>

PRELIMINARY STATEMENT .......................................... 1

PROCEDURAL HISTORY ............................................. 2

STATEMENT OF FACTS ............................................. 4

    A.    Plaintiff's $37.5 Million Line of Credit ........... 4

    B.    The Mechanics of Funding Consumer Loans Under the LSA .................................................. 5

    C.    Loans Pledged to Plaintiff Are Sold to Defendant Spartan, Using Financing from Defendants Exigent and Hamilton ........................................ 7

    D.    Spartan's Bankruptcy Filing and the Funds at Issue in this Litigation .......................... 8

    E.    Plaintiff Seeks Emergent Relief from the Trial Court .............................................. 11

ARGUMENT ..................................................... 11

I.    This Court Should Issue a Stay Pending Appeal to Stop Non-resident Defendants from Absconding with $1.4 Million in Cash from Collateral in which Plaintiff Has a Security Interest (Pa1 – Pa2) ...................... 11

    A.    A Stay Will Avoid Irreparable Harm to Plaintiff .... 13

    B.    Plaintiff's Claims Are Settled as a Matter of Law .. 15

    C.    Plaintiff Has a Reasonable Likelihood of Success ... 15

        1.    Plaintiff is likely to succeed on the enforcement of its security interest. ......... 16

            a.    Argon X granted Plaintiff a lien in consumer loans, and that lien continued undiminished despite sale of the loans to Spartan ............................... 16

            b.    Even if Spartan acquired the Portfolio from Argon Credit, rather than Argon X, Plaintiff has a security interest by virtue of Argon Credit's Guaranty ........ 18

        2.    Plaintiff is likely to succeed on its conversion claim ............................. 27

        3.    Plaintiff is likely to succeed on its unjust enrichment claim ............................. 29

    D.    The Balance of Hardships Favors a Stay ............. 29

**TABLE OF CONTENTS**
*(continued)*

PAGE

II.  This Court Should Grant Plaintiff Leave to Appeal the
     Trial Court's June 27, 2017, Order to Dissolve
     Temporary Restraints and Writ of Attachment
     (Pa1 – Pa2) ......................................... 30

     A.  The Trial Court Erred in Dissolving the Temporary
         Restraints ...................................... 31

         1.  The trial court's determination that
             Plaintiff would not sustain irreparable harm
             if temporary relief was not granted was
             erroneous. .................................. 31

         2.  The trial court's determination that
             Plaintiff does not have a likelihood of
             success on the merits was erroneous. ........ 32

         3.  The trial court erred in finding that the
             balance of the hardships did not favor
             temporary injunctive relief for Plaintiff ... 34

     B.  The Trial Court Erred By Dissolving the Writ of
         Attachment ...................................... 35

         1.  The trial court erred in finding Plaintiff
             lacked a statutory basis for obtaining a
             writ ........................................ 35

         2.  The trial court erred in finding that
             Plaintiff was unlikely to obtain final
             judgment in its favor ....................... 36

CONCLUSION .............................................. 37

## TABLE OF AUTHORITIES

CASES                                                    PAGE(S)

Avila v. Retailers & Mfrs. Distribution,
    355 N.J. Super. 350 (App. Div. 2002)...................11, 12

Barnhart v. Thomas,
    540 U.S. 20 (2003) .......................................21, 22

Booth v. U.S. Fid. & Guar. Co.,
    3 N.J. Misc. 735 (Sup. Ct. 1925) ...........................20

Brundage v. Estate of Carambio,
    195 N.J. 575 (2008) ........................................31

City of Gloucester City v. Beazer Homes Corp.,
    2014 N.J. Super. Unpub. LEXIS 126,
    (App. Div. Jan. 23, 2014) ..................................20

Crowe v. DeGioia,
    90 N.J. 126 (1982) ....................................passim

First Nat'l Bank v. North Jersey Trust Co.,
    18 N.J. Misc. 449 (1940) ...................................27

Gerardi v. Pelullo,
    16 F.3d 1363 (3d Cir. 1994) ................................13

Gosschalk v. Gosschalk,
    48 N.J. Super. 566 (App. Div. 1958) ........................30

Hassler v. Sovereign Bank,
    644 F. Supp. 2d 509 (D.N.J. 2009) ..........................29

Hoxworth v. Blinder, Robinson & Co., Inc.,
    903 F.2d 186 (3d Cir. 1990) ................................13

Marsellis-Wamer Corp. v. Rabens,
    51 F. Supp. 2d 508 (D.N.J. 1999) .......................13, 31

Matturri v. Bd. of Trs. of the Judicial Ret. Sys.,
    173 N.J. 368 (2002) ........................................21

Mueller v. Technical Devices Corp.,
    8 N.J. 201 (1951) ..........................................27

## TABLE OF AUTHORITIES
### *(continued)*

**CASES**                                                        **PAGE(S)**

Romano v. Maglio,
    41 N.J. Super. 561 (App. Div. 1956) ........................ 31

State v. Gelman,
    195 N.J. 475 (2008) ....................................... 21

T.I. McCormack Trucking Co. v. United States,
    251 F. Supp. 526 (D.N.J. 1966) ............................ 21

Wanaque Borough Sewerage Auth. v. Twp. of West
    Milford, 144 N.J. 564 (1996) .............................. 29

Waste Mgmt. of N.J. v. Union Cnty. Utils. Auth.,
    399 N.J. Super. 508 (App. Div. 2008) ...................... 12

**STATUTES**

11 U.S.C. § 541 ............................................... 24

N.J.S.A. 2A:26-2(d) .......................................... 35

N.J.S.A. 12A:9-315(a) ..................................... *passim*

## <u>PRELIMINARY STATEMENT</u>

With the permission of the Court, Plaintiff-Appellant Fund Recovery Services, LLC ("FRS" or "Plaintiff") files the accompanying motions for a stay pending appeal and for leave to appeal. In these two motions, Plaintiff seeks a stay pending appeal and leave to appeal the trial court's June 27, 2017, Order to dissolve temporary restraints and a writ of attachment. Until that Order, Defendants had been temporarily enjoined from withdrawing or transferring approximately $1.4 million in which Plaintiff asserts a security interest, and two bank accounts holding those funds had been attached.

This Court should issue a stay pending appeal for four reasons. <u>First</u>, a temporary stay would avert irreparable harm to Plaintiff. Without a stay, Defendant Spartan Specialty Finance I SPV ("Spartan") <u>will</u> transfer $1.4 million to non-resident Defendant Hamilton Funding 1, LP ("Hamilton") and others, and any final judgment enforcing Plaintiff's security interest will be a pyrrhic victory because the judgment will be uncollectable. <u>Second</u>, the trial court correctly found that Plaintiff's claims for enforcement of its security interest, conversion, and unjust enrichment are settled as a matter of law. <u>Third</u>, Plaintiff has made a preliminary showing that it will likely succeed on those claims because Plaintiff has a security interest in the loan portfolio regardless of whether the loan portfolio was owned by

Argon X or Argon Credit when transferred. <u>Finally</u>, a stay is appropriate because Defendants will not be unduly harmed, whereas Plaintiff would be without an effective remedy.

Leave for appeal should be granted so that the Appellate Division may correct the trial court's errors of law and fact when it dissolved the temporary restraints and writ of attachment. As to temporary restraints, the trial court's determination regarding the lack of irreparable harm, likelihood of success on the merits, and the balancing of hardships were in error. In dissolving the writ of attachment, the trial court erred when analyzing the statutory basis for issuance of the writ and incorporated its prior error as to Plaintiff's likelihood of success on the merits.

<u>PROCEDURAL HISTORY</u>

This litigation began on May 26, 2017 when Plaintiff filed a Verified Complaint for Writ of Attachment and Injunctive Relief to enforce a duly-perfected security interest in consumer loans and proceeds that were pledged to Plaintiff's predecessor in connection with financing. Pa27.

On that same day, the trial court granted the Order to Show Cause with Temporary Restraints and Other Relief, enjoining and restraining Defendants directly or indirectly from withdrawing or transferring any funds from accounts at TD Bank, N.A. and Cross River Bank. Pa284. The trial court also ordered a Writ of

Attachment to attach no more than $37,291,193.98 in the aforementioned bank accounts. Pa287. TD Bank and Cross River Bank were successfully served with the Writ by a sheriff's officer on May 30, 2017 and June 2, 2017, respectively. Pa289; Pa291.

Defendants Hamilton and Exigent subsequently moved to dissolve the Temporary Restraints and Writ of Attachment on June 7, 2017. Pa293. A hearing on the motion took place on June 9, 2017, during which the trial court requested additional briefing. Pa715. At a subsequent hearing on June 27, 2017 (Pa4), the trial court granted Defendants' motion to dissolve the Temporary Restraints and Writ of Attachment (Pa1).

The trial court stayed its June 27, 2017, Order until July 7, 2017 to permit Plaintiff an opportunity to apply to this Court for emergent relief. Pa1. On June 29, 2017, Plaintiff filed an application for permission to file an emergent motion for a stay pending appeal, which was granted on the same day. Pa3. In accordance with this Court's Disposition, Plaintiff now moves to stay the trial court's June 27, 2017, Order and moves for leave to appeal.

## STATEMENT OF FACTS

### A.   Plaintiff's $37.5 Million Line of Credit

Plaintiff FRS is the assignee of Princeton Alternative Income Fund LP ("Princeton"),[1] which in turn was the assignee of Fintech Financial, LLC ("Fintech"), as lender, under a Loan and Security Agreement dated May 1, 2015 (as amended, the "LSA"). Pa46. Under the LSA, Argon X was authorized to borrow up to $37.5 million under a revolving credit line (the "Argon Line of Credit"). Pa133. As of December 16, 2016, Argon X was indebted to Plaintiff for not less than $37,291,193.98. Pa29.

Argon Credit and its various subsidiaries, including Argon X, were in the business of originating unsecured loans to below-prime consumer borrowers over the internet, and relied on the Argon Line of Credit to finance those loans. Pa29. The consumer loans were assigned to Argon X pursuant to a Master Consumer Loan Purchase Agreement dated May 1, 2015 (the "Master Agreement"). Pa144.

Argon X's obligation to repay the Argon Line of Credit was evidenced by a Revolving Loan Note dated May 1, 2015 (the

---

[1] On May 6, 2015, Fintech, as seller, and Princeton, as buyer, entered into a Master Assignment of Loans, pursuant to which Fintech sold, transferred and assigned to Princeton all of Fintech's right, title and interest in and to the Argon Line of Credit, together with and including all of Fintech's rights and remedies under the LSA, the Guaranty & Suretyship Agreement and all related loan transaction documents. Pa203. On or about December 7, 2016, Princeton assigned its rights and interests under the LSA, Guaranty and related loan transaction documents to FRS. Pa219. Financing statements have been duly recorded to perfect the relevant security interests and evidence the transfer of security interests to Plaintiff. Pa192; Pa212; Pa223.

"Note"). Pa173. To secure repayment, Argon X granted Plaintiff a blanket security interest in Argon X's property (collectively, the "Collateral"). Pa65. The Collateral includes, among other things, all of Argon X's consumer loan receivables and their proceeds, including the $1.4 million in cash proceeds that are currently on deposit at Cross River Bank and TD Bank, the subject of the writ of attachment.

Argon X's obligations under the Note were also guaranteed by its parent, Argon Credit, and each of its subsidiaries. Pa178. Through the Guaranty and Suretyship Agreement dated May 1, 2015 (the "Guaranty"), Argon Credit granted Plaintiff "a security interest in all consumer loans and related contracts, contract files, accounts, receivables and other rights that such Guarantor may from time to time assign and transfer directly or indirectly to [Argon X] pursuant to assignments or similar documents of transfer, and all proceeds thereof . . . ." Pa180. Plaintiff perfected its security interests in the Collateral by filing UCC financing statements against Argon X, Argon Credit and each of the subsidiaries. Pa192; Pa212; Pa223.

**B.   The Mechanics of Funding Consumer Loans Under the LSA**

In the ordinary course of business, Argon Credit's subsidiary would make a consumer loan to a borrower. Pa575. On an almost daily basis, Argon X made requests from the Argon Line of Credit (each, a "Draw Request") to fund consumer loans and,

in return, pledged a specific, itemized list of loans that were being funded by and pledged to Plaintiff as collateral. Pa576.

A Draw Request primarily consisted of three (3) documents: an instruction letter, an Affidavit & Advance Request, and a corresponding list of loans to be funded by and pledged to Plaintiff. Pa576. In the instruction letter, Argon X would request to draw down from its credit line and transfer the funds to Argon Credit. Pa581. Argon X provided a schedule of consumer loans and represented to Plaintiff that Argon Credit had advanced the loan principal for each of the consumer loans identified on that schedule. Pa582-585.

Under the LSA, a Draw Request could not be made unless Argon X certified that: (i) the consumer loans comply with the representations and warranties contained in Section 8.17 of the LSA, including the representation that the loan was assigned to Argon X pursuant to duly executed assignment documents (Pa81 (Section 8.17(c)); (ii) the receivables with respect to the consumer loans will meet all of the criteria of Eligible Receivables, including the requirement that the receivables arise from consumer loans assigned to Argon X by an executed assignment document (Pa50 (Section 1.22)); and (iii) assignment documents have been executed assigning such consumer loans to Argon X (Pa61 (Section 2.7)). In the Affidavit & Advance Request, Argon X affirmed that "All conditions precedent to

6

[its] right to receive the Draw Request have been met in accordance with the terms of the [LSA], excepts [sic] as follows: No Exceptions." Pa582. Thus, Argon X certified that it had received an assignment of the loans identified on the schedule attached to the Draw Request.

Argon X hired a servicing company, First Associates Loan Servicing, LLC ("First Associates"), to collect loan payments from consumer borrowers, and those proceeds were remitted by First Associates to Argon X. Pa674. Argon X, in turn, remitted those payments to Plaintiff. Pa689.

### C. Loans Pledged to Plaintiff Are Sold to Defendant Spartan, Using Financing from Defendants Exigent and Hamilton

Plaintiff's financing arrangement with Argon X proceeded uneventfully until December 7, 2016, when Argon Credit and Argon X's management admitted to Plaintiff that the value of the Collateral was insufficient to satisfy the Note by $8 to $11 million. Plaintiff learned, for the first time, that in November/December of 2015 approximately 1,000 loans and related proceeds (the "Portfolio") that had been previously pledged to Plaintiff were sold to Defendant Spartan. Pa607.

Spartan was formed by Argon Credit's former Vice President of Capital Markets, Barry Kostiner, and Argon Credit owns a 15% equity interest in Spartan. Pa32; Pa634. The loans in the Portfolio match the loan numbers Argon X pledged to Plaintiff in

connection with draw requests Argon X made to Plaintiff. Pa546; Pa712 (testimony of Argon Credit's Executive Vice President of Finance that the Portfolio consists of loans that were "sold off of the Princeton line and put on to the [Spartan] line").

Spartan financed the purchase of the Portfolio by borrowing from Defendant Hamilton, a subsidiary of Defendant Exigent. Exigent and Hamilton regularly transact business from an office in Jerusalem, Israel (Pa44-45), and after Plaintiff asserted its superior interest in the Portfolio, Exigent terminated its registration with the Securities Exchange Commission ("SEC") effective December 22, 2016. Pa233.

To secure its debt, Spartan purportedly pledged the Portfolio to Hamilton. Pa299. Defendants knew that Plaintiff held a perfected security interest in the Portfolio, as Defendants used Plaintiff's loan documents as a model for their own financing transaction, even creating loan documents redlined against Plaintiff's original loan documents. Pa32-33. Meanwhile, Plaintiff was unaware of the sale of the Portfolio, did not consent to it, and received no compensation.

### D. Spartan's Bankruptcy Filing and the Funds at Issue in this Litigation

On June 29, 2016, Spartan filed a chapter 11 bankruptcy voluntary petition in the United States Bankruptcy Court for the Southern District of New York (the "Spartan Bankruptcy Court")

under Case No. 16-22881 (RDD).[2] Since the filing of Spartan's bankruptcy case, Defendant Spartan has collected and deposited in two bank accounts (Cross River Bank Acct ending in -909; TD Bank Acct No. ending in -251) approximately $1.4 million in cash proceeds from the Portfolio, and more proceeds may be deposited (the "Res").

During the pendency of the Spartan bankruptcy case, Defendants Hamilton and Exigent were prohibited from taking the Res without Spartan's consent. Collections on the Portfolio remained in escrow, growing to approximately $1.3 million. Pa506. On or about April 28, 2017, Defendants agreed to dispose of the Res, failing to recognize Plaintiff's security interest in the Res. Pa238. By Order dated May 26, 2017 (the "Settlement Order"), the Spartan Bankruptcy Court approved Defendants' settlement agreement over Plaintiff's objections. Pa257. The Spartan Bankruptcy Court reasoned that, so long as it was making findings related solely to the rights between Spartan and Hamilton, the settlement did not prejudice Plaintiff. Therefore, in entering the Settlement Order, the Spartan Bankruptcy Court expressly stated that it was making no findings regarding FRS's

---

[2] Argon Credit and Argon X filed bankruptcy petitions in the Northern District of Illinois, Case No. 16-39654 and 16-39655, respectively. Plaintiff obtained relief from the automatic stay in the Argon bankruptcy cases to pursue its rights against Argon and the Collateral. Pa235. Under the order, FRS was granted stay relief "to allow it to exercise any and all of the rights and remedies provided by applicable law, FRS's loan documents, and its agreements with the Debtors." *Id.*

interest in the Portfolio and its proceeds, and that Plaintiff was free to assert such rights in another forum. Pa257-58.

In addition, the Spartan Bankruptcy Court granted Spartan's motion to dismiss its bankruptcy case. Pa279. In argument on the settlement and dismissal motions, the Spartan Bankruptcy Court suggested that, immediately upon dismissal of the Spartan bankruptcy case, Plaintiff seek emergent relief in another forum to asserts its rights in its collateral. Pa522.

Under the terms of the settlement, the Res will be released from escrow and spent substantially as follows:

    i)    Defendant Hamilton will receive $1 million from the Res within 2 days after entry of the Approval Order;
    ii)   Hamilton's counsel will receive $125,000 from the Res;
    iii)  Spartan's counsel may receive up to $135,000 from the Res;
    iv)  Approximately $200,000 of the Res will be used to pay Spartan's general unsecured claims; and
    v)   Spartan's bankruptcy case was dismissed.

Pa238-254.

In light of Defendant Exigent's and Hamilton's place of business in Jerusalem, Israel, the cancellation of Exigent's SEC registration, and the likely insufficiency of the collateral to satisfy both Plaintiff's and Defendants' claims, there is a clear danger that Defendants will transfer, sell, move, or otherwise dissipate assets located in New Jersey, including the Res. Indeed, Defendants already sought to hinder FRS's collection efforts by requesting that the Spartan Bankruptcy

Court expedite entry of the Settlement Order (which would enable Spartan to transfer the Res outside the reach of this Court), but delay entry of the Dismissal Order (which meant that Plaintiff would be stayed from seeking emergent relief while the Res was moved). The Spartan Bankruptcy Court refused this litigation tactic and entered the Settlement Order and Dismissal Order simultaneously on May 26, 2017. Pa279.

**E.    Plaintiff Seeks Emergent Relief from the Trial Court**

On May 26, 2017, immediately upon entry of the Settlement Order and Dismissal Order, Plaintiff commenced this action and sought emergent relief restraining the transfer of the Res during the pendency of this action to enforce Plaintiff's first-priority security interest in the Portfolio. No court has ever adjudicated Plaintiff's rights in the Portfolio.

<div align="center">ARGUMENT</div>

**I.    THIS COURT SHOULD ISSUE A STAY PENDING APPEAL TO STOP NON-RESIDENT DEFENDANTS FROM ABSCONDING WITH $1.4 MILLION IN CASH FROM COLLATERAL IN WHICH PLAINTIFF HAS A SECURITY INTEREST (Pa1 – Pa2)**

A court should exercise its discretion to stay a decision pending appeal when the equities favor it. Avila v. Retailers & Mfrs. Distribution, 355 N.J. Super. 350, 354 (App. Div. 2002). In recognition of those equities, the trial court correctly stayed its June 27, 2017, Order to permit Plaintiff an opportunity to pursue this appeal. Pa2. This Court should

<div align="center">11</div>

preserve the status quo, continuing that stay pending appeal, because the equities favor allowing the Court an opportunity to hear the appeal before Defendants abscond with $1.4 million in cash in which Plaintiff has a security interest.

When deciding whether to grant a stay courts often consider: (1) whether irreparable harm will result if a stay is not granted; (2) whether the underlying legal claim is settled; (3) the likelihood of success on appeal; and (4) whether the hardship to the movant if the stay is denied will outweigh any hardship to the prevailing party if the stay is granted. Crowe v. DeGioia, 90 N.J. 126, 132-34 (1982); Avila, supra, 355 N.J. Super. at 354. When the requested relief merely preserves the status quo, "a court may take a less rigid view" and "place less emphasis on a particular Crowe factor if another greatly requires the issuance of the remedy." Waste Mgmt. of N.J. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520 (App. Div. 2008). Because "the point of temporary relief is to maintain the parties in substantially the same condition when the final decree is entered as they were when the litigation began," the ultimate issue on a motion for a stay is whether "the equities favor the grant of temporary relief to maintain the status quo pending the outcome of a final hearing." Crowe, supra, 90 N.J. at 134.

On balance, the equities and the Crowe factors weigh substantially in favor of granting the requested stay.

## A.  A Stay Will Avoid Irreparable Harm To Plaintiff

This Court should stay the trial court's June 27, 2017, Order pending appeal to avoid irreparable harm to Plaintiff. In general, harm is irreparable "if it cannot be redressed adequately by monetary damages." Crowe, supra, 90 N.J. at 132 (emphasis added). An uncollectible monetary judgment is not an adequate remedy at law. Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 531 (D.N.J. 1999). Thus, the fact that "payment of monies is involved does not automatically preclude a finding of irreparable injury." Ibid. In fact, appellate courts have routinely held that the "unsatisfiability of a money judgment can constitute irreparable injury." Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994); Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 205-06 (3d Cir. 1990) (declaring injunctive relief a "reasonable measure to preserve the status quo pending final determination of the questions raised" by the litigation).

Here, Plaintiff will be irreparably harmed if the temporary restraints and writ of attachment are dissolved before the Court can decide Plaintiff's appeal. Without a stay, about $1.4 million in cash currently held in the attached bank accounts will be gone forever. Defendant Spartan will transfer those monies to Defendant Hamilton and their counsel, pursuant to a

settlement agreement between Defendants Spartan and Hamilton. Pa264. As all Defendants are non-residents of New Jersey, including Defendants Hamilton and Exigent being based in Israel, those monies will escape the jurisdiction of New Jersey courts and, worse, will likely fall outside the reach of any court in the United States. Pa28; Pa44-45. The imminent transfer of the Res, combined with the fact that all Defendants are non-residents and Hamilton and Exigent are based in Israel, means that Plaintiff will be unable to obtain any meaningful relief should it prevail against Defendants.

More to the point, should Plaintiff obtain a monetary judgment against Defendants, it will likely be uncollectible. Spartan's bankruptcy case was dismissed one month ago without paying its creditors in full, but instead only paying 35% of their claims. Pa272. Before the trial court, Defendant Spartan attempted to assuage concerns regarding Plaintiff's ability to collect on a monetary judgment against it by pointing to unpaid balances owed on the loans Spartan currently possesses. But this is cold comfort. Collections on those receivables is uncertain because the loans were made to subprime borrowers, and Spartan has not been discharged of its substantial debts to other creditors.

In short, the ensuing harm to Plaintiff - the transfer of its cash collateral among non-resident Defendants, who are

either located overseas or clearly have insufficient assets – is irreparable. Under these circumstances, any subsequent monetary award obtained by Plaintiff has no realistic chance of recovery, leaving Plaintiff to suffer harm that "cannot be redressed adequately by monetary damages." Crowe, supra, 90 N.J. at 132. This is exactly an irreparable harm that "should be averted until opportunity is afforded for a full and deliberate investigation of the case." Ibid. (internal quotation omitted).

**B.    Plaintiff's Claims Are Settled As a Matter of Law**

The second Crowe factor disfavors injunctive relief "when the legal right underlying plaintiff's claim is unsettled." Crowe, supra, 90 N.J. at 133. As the trial court found, Plaintiff's underlying legal claims concerning enforcement of its security interest, conversion, and unjust enrichment are settled as a matter of law. Therefore, this factor supports a stay.

**C.    Plaintiff Has A Reasonable Likelihood of Success**

The third Crowe factor merely requires Plaintiff to make a "preliminary showing" of a reasonable likelihood of success. Ibid. The movant need not demonstrate certain victory to be granted a stay. In fact, this factor is "tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis for refusing to maintain the status quo."

_Ibid._ Plaintiff has made a preliminary showing that it has a reasonable probability of succeeding on each of its claims.

> **1.   Plaintiff is likely to succeed on the enforcement of its security interest.**

Plaintiff has presented a _prima facie_ claim for the enforcement of a security interest. It brought claims to enforce its security interest in the proceeds of the Portfolio. Plaintiff alleges that Spartan acquired its entire portfolio of consumer loans from Argon X. Pa712. Those loans had already been funded by Plaintiff's predecessor and were pledged as collateral for the $37.5 million line of credit. Pa32.

> **a.   Argon X granted Plaintiff a lien in consumer loans, and that lien continued undiminished despite sale of the loans to Spartan.**

Plaintiff has a security interest in the Portfolio and its proceeds by virtue of a generalized security interest granted by Argon X to Plaintiff's predecessor. Under the LSA, Plaintiff's predecessor was granted "a continuing security interest in, a lien upon and a right of set off against . . . all personal and real property and fixtures and interests in property and fixtures of [Argon X] . . . ." Pa65. Argon X obtained interests in the consumer loans originated by Argon Credit and its subsidiaries by assignment from Argon Credit. Pa145.

Thus, Argon X granted a generalized security interest in all assets to Plaintiff's predecessor in consideration for a

$37.5 million line of credit. This security interest was perfected by the filing of a UCC financing statement. Pa192; Pa212; Pa223. The subsequent secret transfer of the loans (Argon X's assets) to Defendant Spartan does not affect Plaintiff's security interest, which was preserved as a matter of law. See N.J.S.A. 12A:9-315(a) ("a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest, and … attaches to any identifiable proceeds of collateral.")

Defendants will likely try to cast doubt as to whether Argon Credit ever assigned its loans to Argon X (at which point the security interest granted by Argon X to Plaintiff's predecessor would attach). Plaintiff has sufficient evidence to make a preliminary showing at this early stage of litigation that the loans were assigned by Argon Credit to Argon X, before they were acquired by Spartan.

The record consists of a series of documents and evidence that, taken together, demonstrate that Argon Credit in fact assigned the loans to Argon X, namely:

> (1)   Argon X's bankruptcy Schedules expressly state that it transferred the Portfolio to Spartan (Pa607);
>
> (2)   Argon X's bankruptcy Schedules also show that Argon X owns the entire consumer loan portfolio (Pa597) and

that FRS's predecessor has a security interest in such loans (Pa599);

(3) the Argon X Cash Account Activity report and the Argon Credit and Argon X consolidated general ledger show that First Associates paid loan collections to Argon X, not Argon Credit (Pa674; Pa676);

(4) the settlement payment records from Argon X to FRS acknowledge FRS's security interest in the entire consumer loan portfolio (Pa690);

(5) the Master Agreement provides for the blanket assignment of loans through which Argon X acquired loans from Argon Credit (Pa145); and

(6) the way in which the credit line functioned with each draw request consisting of documentation and sworn statements evincing assignments pledging a specific, itemized list of loans that were being funded by the draw request and pledged to FRS as collateral (Pa582-585).

All of these facts are strong evidence that Argon X received an assignment of consumer loans, including the subset of loans (the Portfolio) that were subsequently sold, improperly, to Spartan.

        **b.   Even if Spartan acquired the Portfolio from Argon Credit, rather than Argon X, Plaintiff has a security interest by virtue of Argon Credit's Guaranty.**

Defendants might argue, as it did below, that Plaintiff does not have a security interest because Spartan's loan portfolio was acquired from Argon Credit, not Argon X, and were never assigned to Argon X. Even if the loans remained the property of Argon Credit, Plaintiff has made a preliminary showing that it has a security interest in the loans by virtue of Argon Credit's Guaranty.

Argon Credit guaranteed Argon X's obligations under the credit facility and granted to Plaintiff a first priority security interest in all consumer loans held by Argon Credit. Pa179. The Guaranty provides, in relevant part:

> To secure all of its obligations and liabilities hereunder, each Guarantor [Argon Credit and its state-based subsidiaries] hereby **grants to the Lender** [FRS] **a security interest in all consumer loans and related contracts, contract files, accounts, receivables and other rights that such Guarantor may from to time assign and transfer directly or indirectly to the Borrower** [Argon X] **pursuant to assignments or similar documents of transfer, and all proceeds thereof,** and hereby authorizes the Lender to file UCC financing statements against such Guarantor with respect thereto.

Pa180 (emphasis added). Thus, Plaintiff has a security interest in Argon Credit's consumer loans and related contracts, contract files, accounts and receivables, which was perfected by the filing of a UCC financing statement. Pa192; Pa212; Pa223. By operation of law, Plaintiff's security interest in the consumer

loans continued and attached when they were apparently sold to Defendant Spartan. See N.J.S.A. 12A:9-315(a).

Defendants might argue that this provision of the Guaranty grants Plaintiff a security interest only in loans that Argon Credit assigned to Argon X. In other words, without executed assignments, Defendants maintain that no loans were assigned to Argon X, and therefore, Plaintiff has no security interest in any of the loans in the Portfolio.

Defendants' interpretation of the Guaranty is patently absurd, as it would <u>never</u> yield an enforceable security interest to Plaintiff in <u>any</u> property. If Defendants' interpretation were followed, the only security interest that Plaintiff acquired would be in loans Argon Credit no longer owned because such loans had been transferred to Argon X. Of course, Argon Credit cannot grant a security interest in loans that it does not own after assignment to Argon X.

Defendants' interpretation of the Guaranty, which leads to an absurd result at odds with the parties' intent, should not be credited. See City of Gloucester City v. Beazer Homes Corp., 2014 N.J. Super. Unpub. LEXIS 126, at *13 (App. Div. Jan. 23, 2014) (contracts will not generally be read in a manner that produces an absurd result) (Pa758); Booth v. U.S. Fid. & Guar. Co., 3 N.J. Misc. 735, 737 (Sup. Ct. 1925) (court is bound by the terms of a contract, unless giving effect to the plain

meaning of the words "would bring about an unreasonable or absurd result").

Defendants' interpretation of the Guaranty is also flawed because it violates the doctrine of the last antecedent. The "last antecedent doctrine" is a rule of construction used to resolve textual ambiguity created by modifying or qualifying phrases. The doctrine states that modifying or qualifying phrases will only be applied to those words immediately before them, and not to remote phrases, unless a common sense reading clearly dictates that the context or whole of the statute intends it to apply more broadly. Barnhart v. Thomas, 540 U.S. 20, 27-28 (2003); State v. Gelman, 195 N.J. 475, 484 (2008); Matturri v. Bd. of Trs. of the Judicial Ret. Sys., 173 N.J. 368, 387 (2002) ("Moreover, it is an established rule of construction that words of relation presumptively refer to the nearest antecedent. Qualifying phrases refer solely to the last antecedent, unless a contrary intention appears.") (internal citations omitted) (Coleman, J., dissenting). If the modifier is intended to relate to more than the last antecedent, a comma is used to set off the modifier from the entire series. T.I. McCormack Trucking Co. v. United States, 251 F. Supp. 526, 533 (D.N.J. 1966). Such a comma is absent here.

In Barnhart v. Thomas, 540 U.S. 20 (2003), the seminal authority on the doctrine of the last antecedent, the United

States Supreme Court illustrated how the doctrine works. The Court posited a situation in which parents warned a teenage son, "You will be punished if you throw a party or engage in any other activity that damages the house." In its unanimous opinion, the Court said, "If the son nevertheless throws a party and is caught, he should hardly avoid punishment by arguing that the house was not damaged." *Barnhart*, *supra*, 540 U.S. at 27. Under the last antecedent doctrine, the relative pronoun "that" attaches only to "other activity," not to "party" as well.

Similarly, in this case, Plaintiff has a security interest in "all consumer loans and related contracts, contract files, accounts, receivables and other rights *that such Guarantor may from to time assign and transfer directly or indirectly to the Borrower [Argon X] pursuant to assignments or similar documents of transfer, and all proceeds thereof,* . . . ." Pa180. Under the last antecedent doctrine, the relative pronoun "that" attaches to "other rights" and not to the preceding items in the list (i.e., consumer loans and related contracts, contract files, accounts, and receivables). If the modifying clause had been set aside by commas – like the clause ", and all proceeds thereof," – it could be read to apply to all the previous antecedents. But the absence of commas indicates it applies only to "other rights."

Under the Guaranty, Plaintiff has been granted a security interest in <u>all</u> of Argon Credit's consumer loans and related contracts, contract files, accounts and receivables.[3] This is the only interpretation of the Guaranty that both avoids an absurd result and is mandated by the doctrine of the last antecedent.

Defendants might also assert, as they did before the trial court, that Plaintiff's filing of an unsecured proof of claim against Argon Credit in bankruptcy (Pa752) is inconsistent with Plaintiff's assertion of a lien in the Spartan loan portfolio. Defendants are wrong because the enforcement of Plaintiff's security interest against assets <u>in the hands of Spartan</u> is not inconsistent with Plaintiff's statement that it holds no lien against assets currently <u>in the Argon Credit bankruptcy estate</u>.

In March 2015, Plaintiff's predecessor, Princeton, made a loan to Argon X, secured by the Guaranty of Argon Credit. Pa179. The Guaranty grants Princeton a security interest in all loans that Argon Credit owns. Pa180. Over 10,000 loans were made and

---

[3] It is clear from (i) the Argon X bankruptcy Schedules that show Argon X is the sole owner of the entire consumer loan portfolio (Pa597) and that FRS's predecessor has a security interest in such loans (Pa599); (ii) the Argon Credit and Argon X general ledger (Pa674; Pa676); and (iii) the settlement payment records from Argon X to FRS (Pa690) that Argon Credit intended to – and operated as though it had – assigned the loans in all of the Draw Requests to FRS. Where an assignment was intended, but is determined to have been defective in some way (e.g., the lack of an executed Assignment), even Defendants' interpretation of the Guaranty would result in a finding that FRS has a security interest in the loans, as they are consumer loans that the Guarantor assigned and transferred to Argon X pursuant to alternative documents of transfer.

23

funded by Princeton. Princeton's security interest attaches to all of them.

In November/December 2015, Argon Credit sold a subset of about 1,000 loans to Spartan, for which Spartan allegedly paid Argon Credit approximately $3.5 million. Pa607. Immediately upon the sale, Argon Credit no longer had an interest in the loans. No portion of the purchase price was paid to Princeton; Princeton did not know about the sale and did not consent to it. Princeton's security interest followed the loans into the hands of the purchaser, Spartan. See N.J.S.A. 12A:9-315(a).

Spartan has been collecting the loan proceeds. In its attached bank accounts, about $1.4 million in proceeds is currently on deposit. In this action, Princeton's assignee, FRS, is suing to enforce its security interest, and to obtain the loan proceeds.

Argon Credit and its subsidiary, Argon X, each filed a bankruptcy petition in Chicago on December 16, 2016. The filing of a bankruptcy case creates an estate consisting of all assets (in bankruptcy parlance, all interests of the debtor in property). 11 U.S.C. § 541. Those assets are listed on the debtor's bankruptcy schedules. A bankruptcy trustee is charged with the duty to liquidate the assets for the benefit of creditors. Any creditors who wish to receive payment from a bankrupt debtor must file a "proof of claim" stating the nature

and amount of the claim and whether there exists any collateral securing the debt.

Argon Credit and Argon X each listed its assets and liabilities on its respective bankruptcy schedules. Argon X's bankruptcy schedules state that it owns a loan portfolio of $36,977,362.44, with a lien in favor of Princeton in an "unknown" amount.[4] Pa599. Plaintiff filed a proof of claim against Argon X that states its total claim is $37,291,193.98, secured by a loan portfolio believed to be worth not more than $25,591,193.98. Pa753. The balance of the claim, $11,700,000, was filed as an unsecured claim.

Argon Credit's bankruptcy schedules state that, by virtue of its Guaranty of the Argon X line of credit, it owes approximately $37 million to Princeton. Pa641. The debt to Princeton is secured by assets Argon Credit values at $0. Pa641. Having reviewed Argon Credit's list of assets, Plaintiff accepted Argon Credit's representation that its Guaranty was valueless and filed a proof of claim asserting a $37.5 million unsecured claim against Argon Credit.

The filing of an unsecured claim against Argon Credit is not inconsistent with the enforcement of FRS's lien against

---

[4] The value of the lien is "unknown" because the value of the portfolio depends upon future payments to be made by consumer borrowers, and whether the borrowers will perform or default is uncertain as of the date of the filing of the schedules.

Defendants to the extent they hold property to which Plaintiff's lien attached.

Plaintiff is not seeking the avoidance of the transfer of loans from Argon Credit to Spartan and demanding that Spartan return the portfolio to the Argon Credit bankruptcy estate, at which point Plaintiff could assert its security interest in the returned assets and receive all of the proceeds. If that were the case, Plaintiff would agree that the filing of an unsecured proof of claim would be inconsistent with that relief.

However, Plaintiff is not asserting that Defendant Spartan must return the Portfolio to Argon Credit. Argon Credit sold the Portfolio to Spartan and was paid for it. Argon Credit no longer has an interest in the Portfolio and, to date, no legal action has been instituted by the Argon Credit bankruptcy trustee asserting that fair value was not paid for the Portfolio.

Plaintiff does not envision any assets returning to Argon Credit's bankruptcy estate, and certainly no such relief is sought through Plaintiff's Verified Complaint. Rather, Plaintiff is seeking to enforce its lien in the Portfolio and its proceeds, which, by statute, remained attached and followed into the hands of the Spartan. See N.J.S.A. 12A:9-315(a).

Enforcing Plaintiff's security interest against assets in the hands of Spartan is not inconsistent with FRS's statement that it is not asserting a lien in any assets that are part of

26

the Argon Credit bankruptcy estate as of December 2016 (when the bankruptcy cases were filed), February 2017 (when the proof of claim was filed) or today.

**2. Plaintiff is likely to succeed on its conversion claim.**

Plaintiff has preliminarily shown a likelihood of success on its claim for conversion. Under New Jersey law, conversion is defined as "the exercise of any act of dominion in denial of another's title to . . . chattels, or inconsistent with such title." Mueller v. Technical Devices Corp., 8 N.J. 201, 207 (1951). The elements of conversion in New Jersey are: "(a) that the property and right to immediate possession thereof belong to the plaintiff, and (b) the wrongful act of interference with that right by that defendant." First Nat'l Bank v. North Jersey Trust Co., 18 N.J. Misc. 449 (1940).

Here, Plaintiff has made the requisite showing of conversion. As discussed above, Plaintiff has an enforceable, duly-perfected security interest in the loan and proceeds currently possessed by Spartan. Plaintiff was granted that security interest by Argon X through the Loan and Security Agreement, or in the alternative, by Argon Credit through the Guaranty. Defendant Spartan is clearly exercising dominion and control over the proceeds, and will transfer those proceeds, in derogation of Plaintiff's security interest.

Defendants might argue that Plaintiff cannot succeed on its conversion claim because the Spartan Bankruptcy Court approved a settlement and dismissed the bankruptcy case. Defendants would be wrong that the Spartan Bankruptcy Court rejected Plaintiff's rights to the loan proceeds or that Defendant Hamilton has a right to possess them. Quite the opposite, Plaintiff has not had an opportunity to demonstrate its superior rights in the property. In fact, the Spartan Bankruptcy Court specifically emphasized that neither the settlement agreement nor its Settlement Order would constitute any finding by the court as to any interest FRS may have in the Debtor's assets or against Hamilton. Pa525.

To crystalize this important fact, the Spartan Bankruptcy Court made sure to specifically preserve Plaintiff's ability to adjudicate its rights in the property in the Settlement Order. Pa257; Pa281. Thus, the Spartan Bankruptcy Court did not, in any way, impair Plaintiff's rights to the property. No evidentiary was held and the Spartan Bankruptcy Court expressly declined to make any findings regarding lien priority.

For purposes of conversion, Plaintiff has presented a reasonable likelihood of success by establishing through its Verified Complaint and supporting papers that it has a secured interest in the attached property.

3. **Plaintiff is likely to succeed on its unjust enrichment claim.**

To state a claim for unjust enrichment under New Jersey law, a plaintiff must allege "(1) that defendant has received a benefit from the plaintiff, and (2) that the retention of that benefit by the defendant is inequitable." Wanaque Borough Sewerage Auth. v. Twp. of West Milford, 144 N.J. 564, 575 (1996) (citation omitted). Unjust enrichment is a form of quasi-contractual liability that exists when the defendant has received a benefit from plaintiff that it would inequitable for him to retain. Hassler v. Sovereign Bank, 644 F. Supp. 2d 509, 519 (D.N.J. 2009).

Plaintiff is likely to succeed on its unjust enrichment claim because Defendants have, or undoubtedly will, receive the benefit of $1.4 million of loan proceeds in which Plaintiff has a security interest. Quite simply, it would be inequitable for Defendants to retain this benefit at the expense, and derogation, of Plaintiff's superior security interest. The secured interest inexorably ties the parties together and is sufficient as a matter of New Jersey law. See Wanaque Borough Sewerage Auth., supra, 144 N.J. at 575.

D. **The Balance Of Hardships Favors A Stay**

Finally, a stay should be granted when "injustice would be perpetrated on the one seeking the stay, and no hardship,

29

prejudice or inconvenience would result to the one against whom it is sought." Gosschalk v. Gosschalk, 48 N.J. Super. 566, 579 (App. Div. 1958), aff'd, 28 N.J. 73 (1958). In this case, the balance of the hardships strongly favors a stay. As discussed above, if the matter is not stayed, the dissolution of temporary injunctive relief here would destroy any meaningful chance of Plaintiff to enforce its security interest on the loan proceeds because Defendants will abscond with $1.4 million. Should Plaintiff then prevail on its claims in this case, it will not be able to enforce any monetary judgment against any Defendant.

By contrast, preserving the status quo does not impose an undue hardship on Defendants. In approving the settlement agreement, the bankruptcy court specifically preserved Plaintiff's right to seek immediate emergent relief. Pa257. In addition, the loan proceeds have been effectively frozen since June 2016 when Spartan filed for bankruptcy and no undue hardship has been suffered by Defendants for one year as a result of not accessing those proceeds.

## II. THIS COURT SHOULD GRANT PLAINTIFF LEAVE TO APPEAL THE TRIAL COURT'S JUNE 27, 2017, ORDER TO DISSOLVE TEMPORARY RESTRAINTS AND WRIT OF ATTACHMENT (Pa1 – Pa2)

Pursuant to Rule 2:2-4, "the Appellate Division may grant leave to appeal, in the interest of justice, from an interlocutory order of a court[.]" "The Appellate Division enjoys considerable discretion in determining whether the

'interest of justice' standard has been satisfied and, as a result, whether to grant a motion for leave to file an interlocutory appeal." Brundage v. Estate of Carambio, 195 N.J. 575, 599 (2008) (citing cases granting motions for leave to file an interlocutory appeal). Leave to appeal should be granted "where there is some showing of merit and justice calls for [the Appellate Division's] interference in the cause." Romano v. Maglio, 41 N.J. Super. 561, 568 (App. Div. 1956).

### A. The Trial Court Erred in Dissolving the Temporary Restraints

#### 1. The trial court's determination that Plaintiff would not sustain irreparable harm if temporary relief was not granted was erroneous.

As stated above, in general, harm is irreparable "if it cannot be redressed adequately by monetary damages." Crowe, supra, 90 N.J. at 132 (emphasis added). An uncollectible monetary judgment is not an adequate remedy at law. Marsellis-Wamer Corp, supra, 51 F. Supp. 2d at 531.

The trial court stated that there was "no indication that [Plaintiff] won't be able to collect on their claim." Pa23 (Tr. 37:23). To the contrary, the record contains evidence that: (1) all Defendants are non-residents of New Jersey, and but for the Res being located within the state, jurisdiction over them likely could not be had (Pa28); (2) Defendants Hamilton and Exigent are based in Israel (Pa44-45); (3) Defendant Spartan's

31

bankruptcy case was dismissed with only partial payment of creditor claims (the bankruptcy settlement provides for only 35% payment to certain creditors) and without discharging the balance of indebtedness (Pa272); (4) the transfer of $1.4 million will occur immediately upon dissolution of the stay (Pa264); and (5) because the Portfolio consists of unsecured loans to subprime borrowers, the collectability of the Portfolio is uncertain (Pa29).

Plaintiff submits that, on appeal, this Court would reverse the trial court's erroneous determination and, therefore, Plaintiff should be granted leave to appeal the dissolution of temporary restraints.

  **2. The trial court's determination that Plaintiff does not have a likelihood of success on the merits was erroneous.**

As an initial matter, the trial court applied an improper legal standard when it determined that Plaintiff failed to show a likelihood of success on the merits, and this error should be corrected on appeal. The trial court stated that Plaintiff had not shown a reasonable likelihood of success on the merits because "the material facts are clearly contested." Pa24 (Tr. 38:9). This is clear error.

Under <u>Crowe</u>, Plaintiff need only make a "preliminary showing" of a reasonable likelihood of success. 90 <u>N.J.</u> at 133. The movant need not demonstrate certain victory in order to be

granted a stay. The Supreme Court has stated that "mere doubt as to the validity of the claim is not an adequate basis" for denying injunctive relief. Ibid.

Here, the sole basis cited by the trial court for dissolution of temporary restraints was its observation that the material facts were "clearly contested." Pa24 (Tr. 38:9). The trial court's exclusive reliance upon Defendants' challenge of facts set forth in Plaintiff's Verified Complaint to find a lack of reasonable likelihood of success on the merits was clear error, and Plaintiff should be granted leave to rectify it on appeal.

Second, to the extent that the trial court found that the assignment by Argon Credit to Argon X is "missing," the trial court erred. Pa23 (Tr. 37:4). As set forth at length in Section I.C.1.a above, there is substantial evidentiary support in the record showing that Argon X received an assignment of the consumer loan portfolio from Argon Credit, and Plaintiff's blanket security interest attached to such loans. For substantially the reasons set forth above, the trial court's preliminary determination otherwise is clearly erroneous.

Third, the trial court erred when it interpreted the Guaranty contrary to the way it should be read under the doctrine of the last antecedent. See supra, Section I.C.1.b.

3.   **The trial court erred in finding that the balance of the hardships did not favor temporary injunctive relief for Plaintiff.**

In finding that the balance of the hardships weighed in favor of dissolving the temporary relief, the trial court cited New Jersey's public policy favoring settlements. Pa24 (Tr. 38:13-16). While it is true that New Jersey's public policy favors settlement, there are countervailing public policies that the trial court overlooked. New Jersey also has a strong public policy favoring enforcement of security interests, which is evidenced by the Legislature codifying into statute the continuation of a secured creditor's security interest when property is transferred without consent. See N.J.S.A. 12A:9-315(a). In addition, the Supreme Court in Crowe granted temporary relief so the litigants had an opportunity for "a full and deliberate investigation of the case." Crowe, supra, 90 N.J. at 132. That same relief should be permitted to Plaintiff.

The trial court's ruling was premised upon its erroneous determination that Plaintiff does not have a likelihood of success on the merits. In light of Plaintiff's security interest, the harm to Defendants clearly exceeds the harm to Plaintiff. By contrast, the attached funds have been held in their current bank accounts for more than a year, since the automatic stay of Spartan's bankruptcy case prohibited their release. Dissolution of the stay will result in the immediate

dissipation of the funds, without any reasonable prospect of their recovery after entry of judgment.

**B. The Trial Court Erred By Dissolving the Writ of Attachment**

    **1. The trial court erred in finding Plaintiff lacked a statutory basis for obtaining a writ.**

When dissolving the writ, the trial court stated that it was "not too concerned" about service of process because Defendants had agreed to accept service of the Verified Complaint. Pa24 (Tr. 39:6-7). New Jersey law provides that a writ is proper when the defendant "is a non-resident and a summons cannot be served upon him in this state." N.J.S.A. 2A:26-2(d). Notwithstanding the fact that their counsel agreed to accept service, Defendants _are_ non-residents who cannot be served a summons in New Jersey. A non-resident defendant's counsel's acceptance of service does not satisfy the statutory requirement that a summons be able to be "served upon [the defendant] in this state." Ibid.

The trial court committed further error by overlooking Plaintiff's argument that Defendants will abscond, which is an independent statutory basis for issuance of a writ of attachment. Pa24 (Tr.38:17–39:17); N.J.S.A. 2A:26-2(d). In this case, it is undisputed that each Defendant is a non-resident of New Jersey. Defendants Exigent and Hamilton conduct business from offices in Israel, and Exigent deregistered with the SEC

after Plaintiff began asserting its rights in the Portfolio. Pa28; Pa44-45. Recall, at the time, all Defendants knew that they had utilized Plaintiff's loan documents as a form for their own transaction and, therefore, knew the breadth of Plaintiff's security interest. Pa32-33. Moreover, Defendants unsuccessfully attempted to persuade the Spartan Bankruptcy Court to delay entry of the order dismissing Spartan's bankruptcy case until the settlement was consummated, the funds were disbursed, and were beyond reach of Plaintiff. Pa35. The Spartan Bankruptcy Court prevented Defendants from achieving their scheme, and Plaintiff requires an injunction to avoid irreparable harm that is certain to occur imminently without a stay pending appeal.

> **2.   The trial court erred in finding that Plaintiff was unlikely to obtain final judgment in its favor.**

For the same reasons set forth in Section I.C. above, the trial court erred when dissolving the writ because it erroneously determined that Plaintiff is unlikely to obtain final judgment against Defendants in this litigation.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Fund Recovery Services, LLC respectfully submits that the trial court's June 27, 2017, Order be stayed pending appeal and that Plaintiff be granted leave to appeal that Order.

SILLS CUMMIS & GROSS P.C.
Attorneys for Plaintiff-Appellant
Fund Recovery Services, LLC

By: _____
VALERIE A. HAMILTON

Dated:  July 3, 2017

Exhibit 16

ORDER ON EMERGENT MOTION
————————————————

Fund Recovery Services,

       Plaintiff,

    v.

Spartan Specialty Finance I
SPV, LLC, Hamilton Funding 1,
LP; and Exigent Alternative
Capital, LLC,

      Defendants.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. AM-664-16
MOTION NO. M-7731-16
PART J
JUDGE(S):  FISHER
           FASCIALE

EMERGENT MOTION
FILED:    7/3/17          BY: Fund Recovery Services

ANSWER(S) FILED: 7/6/17      BY: Hamilton Funding and
                             Exigent Alternative

ORDER
————

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON
THIS   7th      DAY OF July, 2017 HEREBY ORDERED AS FOLLOWS:

EMERGENT MOTION
FOR

Leave to Appeal              GRANTED    DENIED    OTHER
                             (   )   ( X )   (   )

Stay Pending Appeal         GRANTED    DENIED    OTHER
                             (   )   ( X )   (   )

SUPPLEMENTAL:

Although we have denied plaintiff's application for a stay, we
will temporarily stay the order in question for seven days in
order to provide for an orderly request for a stay in the Supreme
Court, should plaintiff seek to pursue such relief.  The order in

question is hereby stayed until the close of business on July 14, 2017.

FOR THE COURT:

_____

CLARKSON S. FISHER, JR., P.J.A.D.



**FILED**

JUL 11 2017



CLERK



## Supreme Court of New Jersey
## Single-Justice Disposition on Application for Emergent Relief (*Rule* 2:9-8)

| Case title: Fund Recovery Services, LLC v. Spartan Specialty Finance 1 SPV, LLC |
|---|

| Supreme Court docket number: 079703 (S-149-16) | Appellate Division docket number (if available): N/A |
|---|---|

| Applicant's name: Fund Recovery Services, LLC |
|---|

**The applicant's request for permission to file an emergent motion and any related request for a temporary stay or other relief pending disposition of an emergent motion are DENIED for the following reason(s):**

☐ 1. The matter does not concern a genuine emergency or otherwise does not warrant adjudication on short notice. The applicant may file a regular motion for review by the Superior Court, Appellate Division in the ordinary course.

☐ 2. The Appellate Division has entered an order or judgment, and the matter is not emergent or otherwise does not warrant adjudication on short notice. The applicant may file a regular motion for review by the Supreme Court in the ordinary course.

☐ 3. The application concerns an order entered during or on the eve of trial as to which there is no prima facie showing that immediate interlocutory intervention is required. The applicant may file a regular motion in the appropriate court for review in the ordinary course.

☐ 4. The applicant must obtain a signed order or disposition from the Appellate Division before requesting relief from the Supreme Court.

☑ 5. Other: The application for emergent relief is denied because applicant has failed to establish irreparable injury or any other basis for emergent relief under the requirements of Crowe v. DiGioia, 90 N.J. 126, 133 (1982).

Date: 7/11/2017          By: _____

Name: Justice Walter F. Timpone

Exhibit 17

SILLS CUMMIS & GROSS P.C.
Valerie A. Hamilton, Esq. (Attorney ID # 018201995)
Michael S. Carucci, Esq. (Attorney ID # 025192008)
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
Attorneys for Plaintiff

| | |
|---|---|
| FUND RECOVERY SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SPARTAN SPECIALTY FINANCE I SPV, LLC; HAMILTON FUNDING 1, LP; and EXIGENT ALTERNATIVE CAPITAL, LLC,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>BERGEN COUNTY<br><br>DOCKET NO. C-155-17<br><br>Civil Action<br><br>**NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE PURSUANT TO RULE 4:37-1(a)** |

TO:     Clerk of the Superior Court of New Jersey
        Chancery Division: Bergen County
        Bergen County Justice Center
        10 Main Street, Room 418
        Hackensack, New Jersey 07601

PLEASE TAKE NOTICE that pursuant to Rule 4:37-1(a), Plaintiff, Fund Recovery

Services, LLC, hereby voluntarily dismisses this matter as to all defendants without prejudice and

without costs to any party.

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-7000
*Attorneys for Plaintiff*
*Fund Recovery Services, LLC*

By: _____
        VALERIE A. HAMILTON, ESQ.

Dated: July 19, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I filed this Notice of Voluntary Dismissal Without Prejudice Pursuant to Rule 4:37-1(a), to the Clerk of the Superior Court and served one copy of the same on the following via email:

Kenneth J. Rubinstein, Esq.
Joseph M. Vann, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, New York 10170-2499
*Attorneys for Defendants-Respondents*
*Hamilton Funding 1, LP and Exigent Alternative Capital, LLC*

Matthew C. Capozzoli, Esq.
Robinson Brog Leinwand Greene Genovese & Gluck P.C.
875 Third Avenue, 9th floor
New York, New York 10022
*Attorneys for Defendant-Respondent*
*Spartan Specialty Finance I SPV LLC*

VALERIE A. HAMILTON, ESQ.

Dated: July 19, 2017

Exhibit 18

SILLS CUMMIS & GROSS P.C.
Valerie A. Hamilton, Esq. (Attorney ID # 018201995)
Michael Carucci, Esq. (Attorney ID # 025192008)
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
Attorneys for Plaintiff

| | |
|---|---|
| FUND RECOVERY SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SPARTAN SPECIALTY FINANCE I SPV, LLC; HAMILTON FUNDING 1, LP; and EXIGENT ALTERNATIVE CAPITAL, LLC,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>BERGEN COUNTY<br><br>DOCKET NO.<br><br>Civil Action<br><br>**VERIFIED COMPLAINT FOR WRIT OF ATTACHMENT AND INJUNCTIVE RELIEF** |

Plaintiff Fund Recovery Services, LLC., by way of Verified Complaint against Defendants Spartan Specialty Finance I SPV, LLC; Hamilton Funding 1, LP; and Exigent Alternative Capital, LLC (collectively, the "Defendants"), says:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action because the personal property that is the subject of this litigation is located in this County.

2. Venue is proper in this County because the personal property that is the subject of this litigation is located within this County.

## NATURE OF THE ACTION

3. This action is brought to enforce a duly-perfected security interest in proceeds of consumer loans, which loans and proceeds were pledged as collateral for financing provided by Plaintiff's predecessor-in-interest. The proceeds at issue in this action are on deposit in this

County at (i) Cross River Bank, which bank is chartered and headquartered in Teaneck, Bergen County, New Jersey and (ii) TD Bank, which bank has a branch located in Hackensack, Bergen County, New Jersey. Emergent relief is necessary because Plaintiff has reason to expect an imminent transfer of those proceeds out of the United States of America.

## THE PARTIES

4.     Plaintiff Fund Recovery Services, LLC ("FRS" or "Plaintiff") is a Delaware limited liability company with a business address located at 100 Canal Pointe Boulevard, Princeton, New Jersey 08540.

5.     Upon information and belief, Defendant Spartan Specialty Finance I SPV, LLC ("Spartan") is a Delaware limited liability company, with a business address of 85 Horton Drive, Monsey, New York 10952.

6.     Upon information and belief, Defendant Exigent Alternative Capital LLC ("Exigent") is a Delaware limited liability company, with a business address of 250 Park Avenue, 7th Floor, New York, New York 10177. In addition, Exigent regularly conduct business from offices located in Jerusalem, Israel. A true and correct copy of Exigent's internet home page is annexed hereto as **Exhibit** A.

7.     Upon information and belief, Defendant Hamilton Funding 1, LP ("Hamilton") is a Delaware limited partnership with a business address of 250 Park Avenue, 7th Floor, New York, New York 10177. Hamilton is a wholly owned subsidiary of Defendant Exigent that regularly conducts business from offices in Jerusalem, Israel. See **Exhibit A** hereto.

8.     Upon information and belief, non-party Cross River Bank is a New Jersey chartered bank headquartered in Teaneck, Bergen County, New Jersey.

9.      Upon information and belief, non-party TD Bank, N.A. is a national bank with several business locations throughout Bergen County, New Jersey.

## FACTUAL BACKGROUND

**The Financing At Issue**

10.      Plaintiff is the assignee of the rights of Princeton Alternative Income Fund LP ("Princeton"), which in turn was the assignee of Fintech LLC ("Fintech"), as lender, under a May 1, 2015, Loan and Security Agreement (the "LSA"), pursuant to which Fintech established a revolving credit facility (the "Argon Line of Credit") for Argon X, LLC ("Argon X") in the original principal amount of up to $20 million (collectively, the "Argon Line of Credit"). A true and correct copy of the LSA is annexed hereto as **Exhibit B**.

11.      The LSA was twice amended to increase the Argon Line of Credit from $20 million to $34 million ("First Amendment") and from $34 million to $37.5 million ("Second Amendment"), respectively. True and correct copies of the First Amendment and Second Amendment to the LSA are annexed hereto as **Exhibit C**. As of December 16, 2016, Argon X was indebted to FRS in the amount of not less than $37,291,193.98.

12.      Argon Credit LLC ("Argon Credit") and its subsidiaries, including Argon X (collectively, "Argon"), were in the business of originating small unsecured loans to consumer borrowers over the internet, and relied on the financing from Fintech as a source of funds to make those loans. The consumer loans were assigned to Argon X pursuant to that certain Master Consumer Loan Purchase Agreement dated May 1, 2015 (the "Master Agreement"). A true and correct copy of the Master Agreement is annexed hereto as **Exhibit D**.

13.     Argon X's obligation to repay the Argon Line of Credit was evidenced by a Revolving Loan Note dated May 1, 2015. A true and correct copy of the Revolving Loan Note is annexed hereto as **Exhibit E**.

14.     To secure repayment, Argon X granted Fintech a security interest in, and lien upon, all of Argon X's personal and real property, whether then owned or thereafter acquired or existing and wherever located (collectively, the "Collateral"). LSA, Section 5.1. The Collateral in which Fintech obtained a security interest includes, without limitation, (i) all of Argon X's consumer loan receivables then owned or thereafter originated or acquired by Argon X, and all amounts due and to become due thereunder (the "Receivables"); (ii) all payments received on or with respect to the Receivables, including all payments of principal, interest and other fees paid by Account Parties (as defined in the LSA) pursuant to the Contracts or otherwise collected or received in respect of the Receivables (the "Collections"); (iii) all instruments, including without limitation, all promissory notes and any other instruments related to the Receivables, whether in tangible or electronic form; (iv) all Accounts, including without limitation the Accounts related to the Receivables; (v) all Contract Files; and (vi) all of the Pledged Accounts and all other monies, credit balances, deposits and other property of [Argon X] then or thereafter held or received by or in transit. *Id.*

15.     Argon X's obligations under the LSA were guaranteed by Argon Credit and each of its subsidiaries. A true and correct copy of the Guaranty & Suretyship Agreement is annexed hereto as **Exhibit F.** To secure the guaranty, Argon Credit and its subsidiaries granted to Fintech (FRS's predecessor in interest) "a security interest in all consumer loans and related contracts, contract files, accounts, receivables and other rights that such Guarantor may from time to time

assign and transfer directly or indirectly to [Argon X] pursuant to assignments or similar documents of transfer, and all proceeds thereof . . ." *Id.*

16.     Fintech perfected its security interests in the Collateral by filing UCC financing statements against Argon X, Argon Credit and its subsidiaries.  True and correct copies of the relevant UCC financing statements are attached hereto as **Exhibit G**.

17.     On May 6, 2015, Fintech, as seller, and Princeton, as buyer, entered into a Master Assignment of Loans, pursuant to which Fintech sold, transferred and assigned to Princeton all of Fintech's right, title and interest in and to the Argon Line of Credit, together with and including all of Fintech's rights and remedies under the LSA, the Guaranty & Suretyship Agreement and all related loan transaction documents.  A true and correct copy of the Master Assignment of Loans from Fintech to Princeton is annexed hereto as **Exhibit H.**  Princeton filed a UCC statement regarding the assignment.  A true and correct copy of the relevant UCC financing statement is attached hereto as **Exhibit I.**

18.     On or about December 7, 2016, Princeton assigned all of its right, title and interest in and under all agreements between Princeton and Argon X, including all right, title and interest in the LSA, the Guaranty & Suretyship Agreement and all related loan transaction documents to FRS. A true and correct copy of the Assignment of Loan Asset between Princeton and FRS is annexed hereto as **Exhibit J.**  FRS filed a UCC statement regarding the assignment.  A true and correct copy of the relevant UCC financing statement is attached hereto as See **Exhibit K.**

19.     Through the assignments described in paragraphs 15 and 16 above, Plaintiff holds all of the lender's rights and interests in the loan agreements and related Collateral, including the proceeds on deposit at Cross River Bank and TD Bank.

**Argon Fraudulently Resells Loans Previously Pledged to FRS**

20.     Upon information and belief, Argon X sold to defendant Spartan loans and related proceeds (the "Portfolio") that were previously pledged to FRS as collateral for the Argon Line of Credit.  The loans in the Portfolio match the loan numbers Argon X pledged to Plaintiff in connection with draw requests Argon X made to Plaintiff.

21.     Upon information and belief, Defendant Spartan financed the purchase of the Portfolio by borrowing from Defendant Hamilton.

22.     Upon information and belief, Spartan pledged the Portfolio to Hamilton to secure its indebtedness to Hamilton.

23.     The transfer to Spartan and pledge to Hamilton were in derogation of Plaintiff's rights as a secured party.

24.     The transfer to Spartan and pledge to Hamilton were not made at arms -length, and, upon information and belief, were made to defraud Plaintiff of its collateral, as:

(A)     Upon information and belief, Defendant Spartan was formed by Barry Kostiner;

(B)     Upon information and belief, Barry Kostiner is the sole member of Fintech Asset Management LLC, which, in turn, is the sole member of Spartan;

(C)     Upon information and belief, prior to creating Spartan, Barry Kostiner was Vice President of Capital Markets for Argon Credit;

(D)     Defendant Spartan and Argon Credit have many common equity holders;

(E)     At the time Defendant Spartan acquired the Portfolio, the Defendants knew that Princeton held a perfected security interest therein, but nevertheless purported to pledge the same collateral to Hamilton as if Plaintiff's lien was non-existent.  That Defendants knew of

6

Plaintiff's security interest in the Portfolio is evidenced by the fact that the Defendants used Plaintiff's loan documents as a model for their own financing transaction, even creating loan documents redlined against Plaintiff's original loan documents;

        (F)    Upon information and belief, Exigent and its subsidiary, Hamilton, maintain a business office in Jerusalem, Israel. Exigent terminated its registration with the Securities Exchange Commission effective December 22, 2016. A true and correct copy of the SEC Termination is annexed hereto as **Exhibit L.**

    25.    Notwithstanding the transfer and pledge to Hamilton, the loans in the Portfolio and their proceeds remain subject to FRS's duly-perfected, first priority security interest.

**Spartan's Bankruptcy Filing and the Funds at Issue in this Litigation**

    26.    On June 29, 2016, Spartan filed a chapter 11 bankruptcy voluntary petition in the United States Bankruptcy Court for the Southern District of New York under Case No. 16-22881 (RDD).[1]

    27.    Upon information and belief, since the filing of Spartan's bankruptcy case, Spartan has collected and deposited in two bank accounts (Cross River Bank Acct ending in -909; TD Bank Acct No. ending in -251) approximately $1,300,000 in cash proceeds from the Portfolio, and more proceeds may be deposited (the "Res").

    28.    During the pendency of the Spartan bankruptcy case, Defendants Hamilton and Exigent were prohibited from taking the Res without Spartan's consent.

---

[1] Argon Credit, LLC and Argon X, LLC filed bankruptcy petitions in the Northern District of Illinois, Case No. 16-39654 and 16-39655, respectively. Plaintiff obtained relief from the automatic stay in the Argon bankruptcy cases to pursue its rights against Argon and the Collateral. A true and correct copy of the Order (I) Granting Relief from the Automatic Stay to Fund Recovery Services, LLC and (II) Converting Debtors' Cases to Chapter 7 is annexed hereto as **Exhibit M**. Under the Stay Relief Order, FRS was granted stay relief "to allow it to exercise any and all of the rights and remedies provided by applicable law, FRS's loan documents, and its agreements with the Debtors." *Id.*

29.     On or about April 28, 2017, the Defendants reached agreement for the disposition of the Res, which disposition fails to recognize Plaintiff's security interest in the Res. A true and correct copy of the Defendants' settlement agreement is annexed hereto as **Exhibit N**.

30.     By Order dated May 26, 2017 (the "Approval Order"), the Bankruptcy Court approved the Defendants' settlement agreement, but expressly provided that it was making no findings regarding FRS' interest in the Portfolio and its proceeds. A true and correct copy of the Approval Order is annexed hereto as **Exhibit O**. In addition, the Bankruptcy Court granted Spartan's motion to dismiss its bankruptcy case. A true and correct copy of the order dismissing Spartan's bankruptcy case (the "Dismissal Order") is annexed hereto as **Exhibit P**.

31.     Under the terms of the settlement, the Res will be released from escrow and spent substantially as follows:

i)      Defendant Hamilton will receive $1,000,000 from the Res within 2 days after entry of the Approval Order;

ii)     Hamilton's counsel will receive $125,000 from the Res;

iii)    Spartan's counsel may receive up to $135,000 from the Res; and

iv)     Approximately $200,000 of the Res will be used to pay Spartan's general unsecured claims; and

v)      Spartan's bankruptcy case will be dismissed.

32.     In light of Defendant Exigent's and Hamilton's place of business in Jerusalem, Israel, the cancellation of Exigent's SEC registration, and the likely insufficiency of the collateral to satisfy both Plaintiff's and Defendants' claims, there is a danger that Defendants will transfer, sell, move, or otherwise dissipate assets located in New Jersey, including the Res.

33.     Defendants have already sought to hinder FRS's collection efforts by trying to expedite entry of the Approval Order, which would enable Spartan to transfer all funds at TD Bank, NA and Cross River Bank to Hamilton, even while they sought to delay entry of the Dismissal Order, which, if granted, would terminate the automatic stay and allow Plaintiff to obtain relief from this Court.

34.     Plaintiff has no adequate remedy at law.

## FIRST COUNT
**(Prejudgment Writ of Attachment Pursuant To R. 4:60-1 et seq. and N.J.S.A. 2A:26-2)**

35.     Plaintiff repeats and incorporates the allegations of the foregoing paragraphs of the Complaint as though fully set forth herein.

36.     Plaintiff seeks a prejudgment writ of attachment on the disputed funds pursuant to R. 4:60-1 et seq. and N.J.S.A. 2A:26-2.

37.     There is probability that final judgment will be rendered in favor of Plaintiff, declaring FRS to have a valid and enforceable first priority security interest in the Res.

38.     Statutory grounds exist for the issuance of a writ of attachment pursuant to N.J.S.A. 2A:26-2(b) because each of the Defendants is a non-resident of this State and a summons cannot be served upon them in this State.

39.     The Res on deposit at Cross River Bank and TD Bank constitutes personal property within a specific location in the State of New Jersey that is subject to attachment.

40.     FRS is entitled to the entry of an immediate order to protect the rights of FRS as a secured creditor with respect to the Collateral, and to prevent the impairment thereof.

41.     By reason of the foregoing, writs of attachment should issue attaching the Res for the benefit of FRS.

42.     In addition to the specific rights and remedies set forth in the LSA, Guaranty & Suretyship Agreement and related loan documents, FRS is entitled to such rights and remedies as otherwise provided by the New Jersey Uniform Commercial Code with respect to its collateral.

**WHEREFORE,** Plaintiff demands judgment in its favor and against all Defendants for the following:

A.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res, in accordance with the terms of the LSA;

B.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res, in accordance with the New Jersey Uniform Commercial Code and applicable law;

C.     Restraining and enjoining Spartan, Hamilton and Exigent, any purported assignee thereof, any direct or indirect transferee therefrom and/or any person or entity acting or purporting to act for any one or more of them, from attempting to and/or actually selling, assigning, diminishing, dissipating, transferring, encumbering, disposing of, moving, restraining or in any way impairing the loans in the Portfolio and their proceeds, including without limitation, the Res;

D.     Ordering the turnover of FRS' of the loans in the Portfolio and their proceeds, including without limitation, the Res;

E.     Issuance of one or more Writs of Attachment with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res;

F.     Permitting the FRS' immediate and continuing access to the loans in the Portfolio and their proceeds, including without limitation, the Res, and all books and

records relating thereto, any purported assignee thereof, any direct or indirect

transferee therefrom and/or any person or entity acting or purporting to act for any

one or more of them;

G.     Attorneys' fees and costs of suit; and

H.     Such other and further relief as this Court deems just, equitable and proper.

## SECOND COUNT
### (Conversion)

43.     FRS repeats and reiterates each and every allegation set forth in the preceding

Counts of this Complaint as if fully set forth at length herein.

44.     FRS has a duly-perfected, first priority security interest in the loans in the

Portfolio and their proceeds, including without limitation, the Res.

45.     FRS has a right to immediate possession in the loans in the Portfolio and their

proceeds, including without limitation, the Res.

46.     The Defendants are wrongfully interfering with FRS's rights in the loans in the

Portfolio and their proceeds, including without limitation, the Res.

**WHEREFORE,** Plaintiff demands judgment in its favor and against all Defendants for the

following:

A.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the

Portfolio and their proceeds, including without limitation, the Res, in accordance

with the terms of the LSA;

B.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the

Portfolio and their proceeds, including without limitation, the Res, in accordance

with the New Jersey Uniform Commercial Code and applicable law;

C. Restraining and enjoining Spartan, Hamilton and Exigent, any purported assignee thereof, any direct or indirect transferee therefrom and/or any person or entity acting or purporting to act for any one or more of them, from attempting to and/or actually selling, assigning, diminishing, dissipating, transferring, encumbering, disposing of, moving, restraining or in any way impairing the loans in the Portfolio and their proceeds, including without limitation, the Res;

D. Ordering the turnover of FRS' of the loans in the Portfolio and their proceeds, including without limitation, the Res;

E. Issuance of one or more Writs of Attachment with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res;

F. Permitting the FRS' immediate and continuing access to the loans in the Portfolio and their proceeds, including without limitation, the Res, and all books and records relating thereto, any purported assignee thereof, any direct or indirect transferee therefrom and/or any person or entity acting or purporting to act for any one or more of them;

G. Attorneys' fees and costs of suit; and

H. Such other and further relief as this Court deems just, equitable and proper.

## **THIRD COUNT**
### **(Unjust Enrichment)**

47. FRS repeats and reiterates each and every allegation set forth in the preceding Counts of this Complaint as if fully set forth at length herein.

48. Defendants have been benefited by the receipt of the proceeds of the Portfolio.

49.     Defendants will be unjustly enriched if FRS's rights in the loans within the Portfolio and their proceeds, including without limitation, the Res, is not enforced.

**WHEREFORE,** Plaintiff demands judgment in its favor and against all Defendants for the following:

A.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res, in accordance with the terms of the LSA;

B.     Enforcing FRS' remedies as a secured creditor with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res, in accordance with the New Jersey Uniform Commercial Code and applicable law;

C.     Restraining and enjoining Spartan, Hamilton and Exigent, any purported assignee thereof, any direct or indirect transferee therefrom and/or any person or entity acting or purporting to act for any one or more of them, from attempting to and/or actually selling, assigning, diminishing, dissipating, transferring, encumbering, disposing of, moving, restraining or in any way impairing the loans in the Portfolio and their proceeds, including without limitation, the Res;

D.     Ordering the turnover of FRS' of the loans in the Portfolio and their proceeds, including without limitation, the Res;

E.     Issuance of one or more Writs of Attachment with respect to the loans in the Portfolio and their proceeds, including without limitation, the Res;

F.     Permitting the FRS' immediate and continuing access to the loans in the Portfolio and their proceeds, including without limitation, the Res, and all books and records relating thereto, any purported assignee thereof, any direct or indirect

13

transferee therefrom and/or any person or entity acting or purporting to act for any one or more of them;

G.    Attorneys' fees and costs of suit; and

H.    Such other and further relief as this Court deems just, equitable and proper.


SILLS CUMMIS & GROSS P.C.
Attorneys for Plaintiff, Fund Recovery Services, LLC

By: _____
Valerie A. Hamilton
Michael Carucci, Esq.

Dated: May 26, 2017

14

## VERIFICATION

Jack Cook, of full age, pursuant to 28 U.S.C. §1746, declares as follows:

1.      I am Chief Operating Officer of Fund Recovery Services, LLC.

2.      The Verified Complaint and the matters stated therein are true and correct except as to those matters therein stated to be upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
JACK COOK

Dated:  May 25, 2017

15

## CERTIFICATION

Pursuant to *R.* 4:5-1(b)(2), I certify that, to the best of my knowledge, information and belief, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, except in connection with the pending bankruptcy cases of Argon Credit (Case No. 16-39654) and Argon X, LLC (Case No. 16-39655) in the U.S. Bankruptcy Court for the Northern District of Illinois, and no such action or arbitration is contemplated at this time. I further certify that no other parties should be joined in this action at this time.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Valerie A. Hamilton

Dated: May 26, 2017

Exhibit 19

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
 GENERAL EQUITY PART
BERGEN COUNTY, NEW JERSEY
DOCKET NO. C-155-17
APP. DIV. NO.

FUND RECOVERY SERVICES, LLC,   )
                                )
        Plaintiff,              )
                                )           TRANSCRIPT
     vs.                        )               of
                                )         HEARING ON MOTION
SPARTAN SPECIALTY FINANCE       )           TO DISSOLVE
1 SPV, LLC, HAMILTON FUNDING    )        TEMPORARY RESTRAINTS
1 LP and EXIGENT ALTERNATIVE    )
CAPITAL, LLC,                   )
                                )
        Defendants.             )

                     Place: Bergen County Superior Court
                            Justice Center, 10 Main St.
                            Hackensack, N.J. 07601

                     Date:  June 27, 2017

BEFORE:

     HONORABLE MENELAOS W. TOSKOS, J.S.C.

TRANSCRIPT ORDERED BY:

     ARPI SALBASHIAN, LEGAL ASSISTANT
     (Cohen Tauber Spievack & Wagner, P.C.)

APPEARANCES:

     MICHAEL S. CARUCCI, ESQ. and
     VALERIE A. HAMILTON, ESQ.
     (Sills, Cummis & Gross, P.C.)
     Attorneys for the Plaintiff

                Transcriber Dolores Hastings, AD/T 417
                **APPEALING TRANSCRIPTS INC.**
                8 Victoria Drive
                Clark, New Jersey 07066
                (732) 680-1610 / Fax (732) 680-1615
                Appealingtrans@gmail.com
                Digitally Recorded
                Operator, Michael R. Griffith

APPEARANCES: (continued)

      JOSEPH VANN, ESQ. and
      KENNETH J. RUBINSTEIN, ESQ.
      (Cohen, Tauber, Spievack & Wagner, P.C.)
      Attorneys for Defendants Hamilton Funding, I, LP
      and Exigent Alternative Capital, LLC
      (Counsel admitted pro hac vice)

      MATTHEW C. CAPOZZOLI, ESQ.
      (Robinson, Brog, Leinwand, Greene,
      Genovese & Gluck)
      Attorney for Defendant Spartan Specialty Finance

3

1                         I N D E X

2                                            Page(s)

3    Argument:

4        By Mr. Carucci                 4, 7, 15, 18, 28

5        By Ms. Hamilton              5, 10, 17, 22, 31

6        By Mr. Rubinstein                18, 25, 32

7        By Mr. Vann                      25, 30, 31

8        THE COURT:  Decision                   34

9

10   MR. CARUCCI:  Application for a Stay        40

11       Argument by Mr. Rubinstein             40

12       THE COURT:  Decision                   41

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    THE COURT:  Good afternoon, you may be
2  seated.  This is Fund Recovery v. Spartan and Hamilton
3  and it's Docket Number C-155-17.  Counsel, your
4  appearances?
5    MR. CARUCCI:  Good afternoon, Your Honor,
6  Michael Carucci from Sills, Cummis & Gross on behalf of
7  Plaintiff, Fund Recovery Services.
8    MS. HAMILTON:  Valerie Hamilton, Sills,
9  Cummis & Gross.
10    MR. RUBINSTEIN:  Good afternoon, Your Honor,
11  Kenneth Rubinstein and Joseph Vann on behalf of
12  defendants Hamilton and Exigent.
13    MR. CAPOZZOLI:  Matthew Capozzoli from
14  Robinson Brog on behalf of Defendant Spartan Specialty.
15    THE COURT:  Okay.  All right.  So I asked you
16  to come back because I requested some supplemental
17  materials, which you both gave which address the two
18  issues that I was interested in, first, with respect to
19  the security interest and second, with respect to if
20  the restraints were lifted what would happen to the
21  res, in other words does the status quo argument apply,
22  is there a chance that the defendants would not be able
23  to pay any judgment that you might be able to obtain.
24  So okay, okay, go ahead.  You're going to argue it?
25    MR. CARUCCI:  Yes, Your Honor.

5

1    Your Honor, right before I go into the two
2  central issues regarding the security interest and the
3  irreparable harm, I just want to begin by reminding the
4  Court that the complaint at issue here alleges that a
5  fraud was perpetrated by Argon and Spartan, that the
6  vice president of Argon Credit, Barry Kostner
7  (phonetic), formed Spartan, that he was aware of the
8  loans that, and the line of credit, that my client's
9  predecessor extended to Argon, that they were aware of
10  --
11    THE COURT:  And that's based on them signing
12  -- taking the agreements, the security agreements and
13  loan documents that you had and marking them up and
14  using them for theirs, right?
15    MR. CARUCCI:  That as well, Your Honor.
16    THE COURT:  Okay.  So let me ask you a
17  question.  So if this was a concern of fraud why didn't
18  you do something in the bankruptcy court when you had
19  an opportunity to do something?  Why didn't you file a
20  claim against them?
21    MR. CARUCCI:  Well, --
22    MS. HAMILTON:  So the bar date had passed by
23  the time that we had first learned about the transfer
24  of the loans.  Spartan filed their bankruptcy, I
25  believe, in April.

6

1    THE COURT:  Okay.
2    MS. HAMILTON:  And so we didn't learn about
3  the transfer of Fund Recovery's --
4    THE COURT:  Till December or something like
5  that?
6    MS. HAMILTON:  Until December, that's right.
7    THE COURT:  So --
8    MS. HAMILTON:  And so at that point, we then
9  immediately filed papers to say, you know, that's --
10  that's our money and the issue in that case was whether
11  or not they could use the cash collateral.  And so
12  that's where we were opposing it, use of the cash
13  collateral.
14    MR. CARUCCI:  Right.
15    THE COURT:  Well, -- okay.
16    MS. HAMILTON:  And the judge didn't rule on
17  that issue, he ultimately approved the settlement.
18    THE COURT:  Well, I still don't understand
19  why you didn't try to pursue that.  He actually set,
20  you know, set up a -- when you say the bar date, I
21  guess that's a federal bankruptcy rule, right?  But
22  there's no relief from that at all?  I mean you can't
23  say there's no tolling of that date or?
24    MS. HAMILTON:  But to file -- to file a claim
25  is to say that you want to participate in a

7

1  distribution.  To object to the use of your cash is to
2  say that that's my money, all right?  And so what we
3  did is we -- that's where we attacked and said that's
4  our money.  And when I -- when I was given an
5  opportunity to speak to Judge Drain about that issue he
6  said you need to return to Illinois because I am
7  concerned about a stay issue.  And we did exactly that
8  and got stay relief, but we -- you know, we were only
9  able to bring that so far as to get stay relief to file
10  opposition because by that time these parties had
11  together settled and agreed to divide up Fund Recovery
12  Services' money between themselves.  And so that's why
13  we wound up here, because we've been chasing the money.
14    THE COURT:  Okay.
15    MR. CARUCCI:  So, Your Honor, that brings us
16  to the money that Spartan holds right now in the
17  attached accounts.  And there is no dispute that
18  Spartan acquired its loan portfolio from Argon, Argon
19  Credit specifically.  And no -- no one will dispute
20  that here, that the proceeds that they've collected on
21  that loan portfolio was from -- essentially from our
22  predecessor, it was financed through our predecessor.
23  So the question is do we have a security interest in
24  those proceeds, and the answer is yes.
25    There is only one of two ways that the loan

8

1   portfolio could have gotten in the hands of Spartan.
2   It either came from Argon Credit or Argon X.  If it
3   came from Argon Credit, we have a security interest by
4   virtue of the guarantee agreement whereby Argon Credit
5   guaranteed payment and not just that, but granted the
6   lender here, my client, a security interest in all
7   consumer loans.  So that's if it came from Argon
8   Credit.  If the loan portfolio came from Argon X we
9   have a generalized security interest which is also
10  perfected, both security interests have been duly
11  perfected.  And there's no dispute that we have that
12  generalized security interest with Argon X.  Okay?  The
13  -- the only dispute that the defendants raise is well,
14  you don't have a piece of paper, namely the assignment
15  that assigned from Argon Credit to Argon X the loans,
16  even though Argon X was the one drawing off of our line
17  of credit.  Okay?  And they say well, where's that one
18  piece of paper?  But, Your Honor, in our supplemental
19  memorandum we give the Court all of the indicia of that
20  assignment.
21          First consider the way that the line of
22  credit operated, the way it functioned.  Each draw
23  request that was made by Argon X consisted of 1) an
24  instrument letter, 2) sworn statements that they were
25  in compliance with the agreements that were governing

9

1   the transaction, okay, which pertained to the
2   assignment of the -- of the loans, and 3) they were
3   also to identify the specific loans that were being
4   financed.  And those loans, again there's no question
5   that Spartan's loan portfolio tied right back to the
6   ones that were financed under our line of credit.  So
7   that's one indicia of the assignment.
8          The second is the way that the master
9   consumer loan purchase agreement just operated.  It
10  provides for the blanket assignment of loans to which
11  Argon X acquired loans from Credit.  So Argon Credit --
12  Argon X again would make the request off the line of
13  credit and Argon Credit would essentially drop those
14  loans into Argon X.  Argon X's cash account activity
15  report and Argon Credit and Argon X's consolidated
16  general ledger actually showed that the payments on the
17  loans were being put into Argon X.  Okay?  So the
18  payments to -- by the consumer borrowers, okay, on
19  those loans, were being paid directly to Argon X.  And
20  so if they were never assigned why was payment ever
21  given to Argon X?  Just -- it wouldn't make any sense.
22          And then finally, the Argon X and Argon
23  Credit bankruptcy schedules say that Argon X is the
24  sole owner of these loans.  And finally, there's a --
25  there's some of the payment records too from Argon X

10

```
 1    that acknowledge my client's security interest in a
 2    specific loan which again was assigned to Spartan.  So
 3    there's all of the indicia of this assignment and
 4    defendants essentially argue well, you don't have that
 5    one piece of paper though.  And oh, you've made this
 6    argument already --
 7              THE COURT:  Five times.
 8              MR. CARUCCI:  You know, four or five times,
 9    however many times.
10              THE COURT:  They said five times in their
11    papers.
12              MR. CARUCCI:  Five times, right?  And the
13    fact of the matter is, Your Honor, never was it
14    adjudicated.  This is not res judicata.
15              THE COURT:  But see, I just don't understand
16    why -- I can't imagine that bankruptcy judges aren't
17    doing their work.  Why didn't they do -- why didn't
18    somebody adjudicate it?
19              MS. HAMILTON:  Your Honor, so I was the one
20    who was in front of the bankruptcy court, so I can
21    address that.
22              THE COURT:  I saw that.
23              MS. HAMILTON:  So when we first learned about
24    the transfer of the loans the -- we immediately went
25    into the bankruptcy court and filed papers.  We didn't
```

11

```
 1    have a hearing on that in December, it wasn't until
 2    March that we had our first hearing on that.
 3              THE COURT:  March 1st.
 4              MS. HAMILTON:  Right, March 1st was our first
 5    hearing on that.  At that point, Judge Drain indicated
 6    that he thought there was the potential that he was
 7    going to be deciding Argon Credit's interest --
 8              THE COURT:  Right.  So he sent you --
 9              MS. HAMILTON:  -- in the loans.
10              THE COURT:  -- to Chicago and you went to
11    Chicago.
12              MS. HAMILTON:  So we said you know what?
13    Automatic stays are common, we went to Chicago.  So --
14    so -- so I was in Chicago, figuratively, with my motion
15    pending to get stay relief when the defendants resolved
16    their case.  So I got stay relief at least to oppose
17    that.  And Judge Drain was clear in the orders that he
18    was not adjudicating my client's interest.  You had two
19    parties, a lender and a debtor, who say that they want
20    to resolve their dispute.  He said to me he's not going
21    to hold them up from their dispute; you want to go
22    somewhere else, go somewhere else, it's not in this
23    court.  But we were absolutely diligent.  I don't know,
24    I --
25              THE COURT:  How could he do that though?  How
```

12

1    could he -- how could he say okay, the settlement --
2              MS. HAMILTON:  Well, I opposed.  I -- you
3    know, I -- you know, we're --
4              THE COURT:  The settlement -- and he knows
5    the settlement is going to take the money out, right?
6    You're there, how can he say okay, I'm not going to
7    decide whether or not you have a security interest in
8    this collateral but I'm going to let the money go and
9    I'm lifting the stay once I let the money go because
10   the case is resolved?
11             MS. HAMILTON:  So -- so -- so that's
12   interesting, Your Honor.  I would say that every
13   indication is, is that Judge Drain anticipated exactly
14   this happening.  He said to me -- no, really, because -
15   -
16             THE COURT:  Okay.
17             MS. HAMILTON:  -- he said to me when this
18   case is dismissed you need to run into court.  He
19   thought I was going to go into Chicago.  I don't have
20   the ability to bring them into Chicago, they don't have
21   jurisdiction over that, the money is here in New
22   Jersey, we belong here.  But -- but he did say as soon
23   as this case is dismissed do that.  Your Honor, I'd
24   also say that there was, on the last day of the
25   bankruptcy case pending, the judge ruled orally from

13

1    the bench and he asked that orders be submitted.  The -
2    - the --
3              THE COURT:  I noticed that was on the 19th.
4              MS. HAMILTON:  Right.  So the defendants
5    here, there are two orders, right?  One is to approve
6    the settlement and the second one is to dismiss the
7    case.  And what the defendants here did is they only
8    submitted to the judge the order which would approve
9    the settlement.  And there was back and forth or e-
10   mails with the judge over whether or not the judge
11   should enter both orders simultaneously because I said
12   to the judge the effect of you entering them
13   separately, approving the settlement, means that the
14   money would leave and I would be stayed by the
15   automatic stay.  The dismissal of the case however,
16   let's every party pursue their rights.  And so the
17   judge simultaneously entered the orders and that, to
18   me, is an indication that he understood and wanted all
19   parties to be on equal footing.  He told me to go run
20   into the appropriate court and I've done so.  And he
21   deliberately entered those orders together because he
22   was asked multiple times by these defendants here to
23   withhold the dismissal of the case order so that they
24   could have the money leave.  And, Your Honor, that's
25   further indication that money is leaving, it's

14

 1   irreparable harm.  The case is going to be over.  If
 2   the money leaves, $1.4 million is gone.  There's no way
 3   to get that back.
 4            THE COURT:  Don't they have like $3.35
 5   million?
 6            MS. HAMILTON:  No, Your Honor.  So -- so what
 7   the letter says -- you have to read the letter
 8   carefully.  And what it says is that there is a
 9   principal balance due on these loans.  These loans are
10   loans to unsecured -- they're unsecured loans to
11   subprime borrowers.  And there is, on their books, $4.7
12   million that's owed on these loans.  They don't have it
13   in, you know, in the bank.  And they have a hope that
14   they're going to collect that amount.  Whether that's
15   accurate or not I don't know.  They say that the -- as
16   of June 12th the unpaid principal balance was $2.7
17   million and they expected principal and interest of
18   $3.35 million.  We have no idea whether that money is
19   coming in.  But I think the key point there is all of
20   this money constitute proceeds of the loans that were
21   first pledged to my client and sold out from under our
22   security interest to these defendants.  All of the
23   proceeds belong to it, not just, you know, after
24   Hamilton or Exigent gets repaid, they're financing to
25   Spartan, all of it is.

15

 1            MR. CARUCCI:  Right.  Argon --
 2            MS. HAMILTON:  We're owed $37 million.
 3            THE COURT:  Did they draw down on the whole -
 4   - the whole loan?  Line of credit?
 5            MS. HAMILTON:  Yeah, the whole line of
 6   credit.  I mean it's -- you know, it's half a million,
 7   I think is -- but yeah.
 8            THE COURT:  Okay.  All right, Mr. Carucci.
 9            MR. CARUCCI:  So, Your Honor, as Ms. Hamilton
10   said, the entire -- those loan -- the loan portfolio
11   was sold by Argon to Spartan without our consent and
12   without first satisfying our -- our lien as well.  And
13   in addition, if I can move onto the irreparable harm
14   element here that Ms. Hamilton was articulating, in
15   addition to the fact that these are high risk unsecured
16   loans from on-line borrowers, okay, and there's just a
17   mere hope that they may be collected, Ms. Hamilton is
18   absolutely right that all of those proceeds belong to
19   my client and it has a security interest in it.  As far
20   as irreparable harm goes, in addition to that reason we
21   know that the defendants are non-resident defendants.
22   Now that alone, as you know, Your Honor, gives a -- a
23   basis for the writ of attachment under the New Jersey
24   Court Rules, and for good reason, right?  Because when
25   there are non-resident defendants we know it's just

16

1  difficult to chase those defendants down to collect any
2  -- any monies.  And, Your Honor, that's essentially
3  what this comes down to, is this inability to collect
4  any judgment that the plaintiff may receive in this
5  case, the fact that they're non-state defendants that
6  are -- and also, Your Honor, that the bankruptcy
7  agreement specifically calls for payment of those
8  monies to Defendant Hamilton and Defendant Exigent and
9  their attorneys who are present here today.  I mean
10  those monies will go by virtue of that settlement
11  agreement.  And so there is no question that the res
12  will be depleted immediately upon any dissolution of
13  the temporary restraints or the injunction.
14  Furthermore, if the injunction is lifted, Your Honor,
15  defendants can simply move the -- the monies to
16  different accounts that are outside this Court's
17  jurisdiction as well.  So there is sufficient grounds
18  for a showing of irreparable harm here.
19          And the balance of the hardships is very
20  slight on the defendants in that the bankruptcy -- the
21  bankruptcy court in the Spartan bankruptcy effectively
22  stayed any type of recovery of monies since June of
23  2016.  So there hasn't been any hardship done to the
24  defendants.  Meanwhile, my client hasn't been able to
25  assert and obtain any recovery on his $37 million line

17

1  of credit that its owed.  So, Your Honor, we
2  respectfully request a short window to obtain discovery
3  in this case and a trial within the next 45 to 60 days.
4          THE COURT:  What type of -- I know this was
5  asked in the opposition, what type of discovery would
6  you -- do you envision doing?
7          MR. CARUCCI:  Well, Your Honor, there's
8  certainly important questions of conduct between Argon
9  and Spartan in terms of what they knew when and their
10  state of mind when they -- they sold the loan
11  portfolio.
12          THE COURT:  Spartan paid market value for
13  those loans if I'm not mistaken, right?
14          MR. CARUCCI:  I don't know.  If Your Honor
15  wants --
16          MS. HAMILTON:  We don't have access to
17  Argon's records about that.  We know that money was not
18  paid to Princeton, our predecessor, and so the security
19  interest by statutes remains on those.
20          THE COURT:  Yeah, but I'm just saying if -- I
21  guess your argument would then be, and you've made
22  this, that they weren't a bona fide purchaser for
23  value.
24          MS. HAMILTON:  Correct.
25          THE COURT:  But their argument at least is,

18

1    on the face, that they paid market value for the loans.
2           MR. CARUCCI:  Your Honor, we would also
3    likely seek discovery on -- you know, to further
4    evidence any assignment and the -- between Argon Credit
5    and Argon X and how exactly the transfers took place
6    between Argon Credit and Argon X, if any, or Argon to
7    Spartan.  So there are -- there are a number of issues
8    that we certainly seek discovery on, but not just paper
9    discovery of course, but obviously oral testimony.  And
10   we believe that that will further support the fact that
11   we have a security interest in the attached property.
12   So that's what we would likely seek discovery on, Your
13   Honor.
14           THE COURT:  All right.
15           Mr. Rubinstein?
16           MR. RUBINSTEIN:  Thank you, Your Honor.
17           A couple of quick points and then some more
18   substantive ones.  First of all, there's no claim for
19   fraud in this complaint, so they started out by saying
20   --
21           THE COURT:  Unjust enrichment and conversion.
22           MR. RUBINSTEIN:  There's no claim for fraud.
23   There's no claim for fraud against my clients, there's
24   no claim for fraud against Spartan.  So I'm not sure,
25   their whole theory of fraud upon which everything is

19

1    based is not even in their complaint.
2           Second of all, Judge Drain specifically
3    invited them to start an adversary proceeding in that
4    court to explore the things they haven't explored and
5    now they claim they need to explore.  He specifically
6    told them if you want to start an adversary proceeding
7    to look into the actions of Spartan and it's
8    principals, do it, I'm giving you time; it's March 1st,
9    I'm giving you 90 days.  They didn't do anything.
10   Every single argument they've made before this Court
11   has been made there, considered before the bankruptcy
12   court and rejected by the bankruptcy court, every
13   single argument.  And there is no way Judge Drain would
14   have entered the order and dismissed that case if in
15   fact any of their arguments held water or smelled or
16   passed the smell test or they sought discovery or
17   anything they're now claiming before this Court they
18   should be able to do here.
19           THE COURT:  Well, what --
20           MR. RUBINSTEIN:  And, Your Honor, here is the
21   hammer.
22           THE COURT:  Go ahead.
23           MR. RUBINSTEIN:  May I approach the bench?
24           THE COURT:  What is it?  Is it the testimony?
25   Is it --

20

1    MR. RUBINSTEIN:  No, it's a proof of claim
2  that they filed in Chicago indicating they're an
3  unsecured creditor.
4    THE COURT:  Bring it up.  That wasn't
5  attached?
6    MR. RUBINSTEIN:  It was not, Your Honor,
7  because I pulled it off the docket since the last
8  hearing.  And, Your Honor, the proof of claim is made
9  under penalty of perjury, signed by Ms. Hamilton on
10 behalf of the law firm and by Jack Cook, the Chief
11 Operating Officer of Fund Recovery Services.  And the
12 debtor is Argon Credit LLC.  And on page 3 it's signed
13 by Mr. Cook and on page 2, question 9, "Is all or part
14 of the claim secured?"  And the answer is "No."  Under
15 penalty of perjury in the bankruptcy proceeding in
16 Chicago they have filed a document that says their
17 claim against Argon Credit is not secured.
18    MS. HAMILTON:  Your Honor, --
19    MR. RUBINSTEIN:  And the reason why this came
20 to our attention, Your Honor, is because they're
21 fighting in Chicago now about who's going to be the
22 trustee.  And the trustee filed an affidavit last week
23 in which he says, "F.R.S. is asserting an unsecured
24 claim."  And this is the U.S. Trustee's response and I
25 can give a copy to Your Honor as well.

21

1    THE COURT:  Okay.
2    MR. RUBINSTEIN:  And on paragraph 13 the
3  Trustee indicates, "Confirming that F.R.S. filed a
4  proof of claim in Argon Credit LLC, asserting an
5  unsecured claim."  Meanwhile they've come before this
6  Court three times at least in papers and now today on
7  the record and before the bankruptcy court alleging
8  they have a security interest in the Argon Credit
9  collateral, yet they have filed under penalty of
10 perjury documents with the court in Chicago, the
11 bankruptcy court, saying their claim is unsecured.
12 That is beyond the pale, Your Honor.  In addition,
13 Princeton, they're -- I'm not sure how they're
14 affiliated, Princeton also filed an unsecured claim
15 against Argon Credit in the Chicago bankruptcy
16 proceeding.  So they come before this Court, they come
17 before the bankruptcy court specifically asserting a
18 contrary representation to what they filed in Chicago
19 under penalty of perjury.
20    Your Honor, there is absolutely -- they don't
21 even come close to establishing any likelihood of
22 probability of success on the merits here, which is the
23 standard.  They don't come close to establishing any
24 irreparable harm.  Our client has been harmed.  It's
25 been one month now, if not more, that we've not been

22

1    able to use the proceeds that were supposed to go to
2    us, we've had to expend legal fees coming here and
3    arguing this before the Court and submitting papers and
4    they haven't sniffed anything over and above the same
5    arguments that were made, considered and rejected by
6    Judge Drain.  There is no way Judge Drain would have
7    allowed an order to be entered in his court and dismiss
8    the bankruptcy case in his court, directing funds be
9    disbursed to my client if anything they're arguing
10   before Your Honor held any water whatsoever, or held
11   any credibility.
12            THE COURT:  Thank you, Mr. Rubinstein.
13            Okay, Mr. Vann?  Are you going to say -- add
14   anything or?
15            MR. VANN:  Your Honor, I'll sit quietly.  If
16   there's a reason to speak after more argument I'll be
17   happy to, --
18            THE COURT:  All right.
19            MR. VANN:  -- but at this point I think Your
20   Honor gets the full input of what's going on.
21            THE COURT:  You too, Mr. Capozzoli?
22            MR. CAPOZZOLI:  Yes.
23            THE COURT:  Thank you.
24            Okay, go ahead, Ms. Hamilton.
25            MS. HAMILTON:  Your Honor, what they didn't

23

1    give you was the proof of claim that we filed against
2    Argon X.  The Argon X bankruptcy schedules, which we
3    have consistently said here say that the loans that my
4    client is secured in were dropped to Argon X.  That is
5    where our collateral is.  We're -- we have secured --
6            THE COURT:  Say that again?  What did you --
7    I'm sorry.  So you're saying your proof of claim
8    against Argon X --
9            MR. CARUCCI:  There are two debtors.
10           THE COURT:  Yeah, I know.
11           MS. HAMILTON:  So there -- the Argon X --
12           THE COURT:  There's Argon Credit and Argon X.
13           MS. HAMILTON:  -- is a secured proof of
14   claim.
15           THE COURT:  So you're saying this proof of
16   claim against Argon Credit --
17           MS. HAMILTON:  Right.
18           THE COURT:  -- is unsecured?
19           MS. HAMILTON:  Correct, because --
20           THE COURT:  The proof of claim against Argon
21   X that you filed is a secured claim?
22           MS. HAMILTON:  Is a secured claim based on
23   the loans.
24           THE COURT:  All right.
25           MS. HAMILTON:  So if it -- you know, so we --

1    it is --
2              THE COURT:  But isn't -- didn't you argue in
3    your brief that you have a security interest in Argon
4    Credit?
5              MS. HAMILTON:  We -- we have a --
6              THE COURT:  Because under the general --
7    under their guarantee and their -- did I understand
8    that correctly?
9              MS. HAMILTON:  You do.  What -- what's --
10   what are the assets that are behind the guarantee.
11   It's -- there's no --
12             THE COURT:  But that would be contrary to
13   what's over here.
14             MS. HAMILTON:  No, no, no, it's not, because
15   -- because the guarantee -- there are no assets at
16   Argon Credit which would satisfy this guarantee.
17             THE COURT:  Okay.
18             MS. HAMILTON:  Argon Credit doesn't have any
19   assets.  All of the assets for these debtors are the
20   loans and the loans were dropped to Argon X.  Okay?
21             THE COURT:  Right.
22             MS. HAMILTON:  So -- so we have a secure --
23   it was a blanket security interest in -- in Argon X and
24   the loans.  There are no other assets for this estate
25   in Argon Credit.  So it --

1              THE COURT:  I thought -- I thought everybody
2    agreed that they did have a security interest in Argon
3    X --
4              MR. RUBINSTEIN:  Yes.
5              THE COURT:  -- when they -- when they --
6    okay, when they loaned them the money.
7              MR. RUBINSTEIN:  But their argument before
8    the Court here and before the Court, Judge Drain, was -
9    -
10             THE COURT:  No, no.
11             MR. RUBINSTEIN:  Right.
12             THE COURT:  Go ahead.
13             MR. RUBINSTEIN:  Their argument was we have a
14   security interest in Argon Credit because that's where
15   we got our loans from.
16             THE COURT:  Right, that's what I just said.
17             MR. RUBINSTEIN:  Exactly, Your Honor, you're
18   exactly right.  And they filed something that says we
19   don't have a security interest.
20             THE COURT:  Okay.
21             MR. VANN:  Your Honor, when we were in
22   bankruptcy court and I was arguing before Judge Drain I
23   deferred greatly out of respect for Sills Cummis making
24   these arguments, a very respected firm.  I'm losing my
25   respect as these hearings continue because you cannot

26

1   file an unsecured claim in a bankruptcy court sworn
2   under penalty of perjury, imprisonment, a $500,000 fine
3   unless you believe it.  And no one does.  And when push
4   comes to shove their client wasn't going to perjure
5   himself either and he filed -- they filed it the way it
6   was supposed to be filed.  In Argon X they filed
7   secured and they filed not only secured but partially
8   secured because they wanted to engage in the bankruptcy
9   craft permitted to them that says I'm allowed as a
10  secured creditor to waive part of my security interest
11  so I become an unsecured claim there also.  Even on the
12  secured creditor they are --
13          THE COURT:  Okay, Mr. Vann, you kind of lost
14  me on the last one.
15          MR. VANN:  Well, let's just -- let's just
16  leave it that the -- the claim against Argon X was not
17  only filed secured but partially unsecured as well so
18  they can engage with the trustee because only unsecured
19  claims can vote for trustee.  So they want to control
20  that case as well.  But on Argon Credit, they filed
21  unsecured which we did not know because we never
22  thought to look until the trustee in their recent spat
23  with F.R.S. that's trying to challenge the trustee's
24  appointment yet again, the trustee laid out the claims.
25  So we went looking and we discovered that --

27

1           THE COURT:  Okay.  So if -- if, and I'm --
2   there's no reason for me to doubt it.  If here's the
3   unsecured -- the allegation it's unsecured.  And I just
4   heard from Ms. Hamilton that it's an unsecured claim.
5   So if Argon X is unsecured, you don't have security in
6   Argon X --
7           MR. VANN:  Argon Credit.
8           MS. HAMILTON:  In Argon Credit.
9           THE COURT:  I mean Argon, Argon Credit, then
10  the argument about the general guarantee is out --
11          MR. VANN:  Correct.
12          THE COURT:  -- and we're really looking at
13  the assignment question.  Right?  Is that -- am I
14  right?  No?  You're shaking your head no.
15          MR. VANN:  No.  Your Honor, the guarantee
16  never gave them a secured interest anyway as we've
17  shown.
18          THE COURT:  No, that was your argument before
19  --
20          MR. VANN:  Correct.
21          THE COURT:  -- when you thought there was a
22  security interest.
23          MR. VANN:  They don't have -- and now they're
24  admitting themselves they don't have a security
25  interest in Argon Credit LLC which simply vindicates,

1   validates and supports the arguments we've been making,
2   that there is no security interest in that document or
3   they would have asserted it in Chicago.  And to say in
4   a bankruptcy case -- there is not a secured lender that
5   files a claim unsecured if it is secured because it has
6   no idea until the end of the bankruptcy case what
7   assets may be recovered, what assets may be there.
8   They say themselves they haven't gotten into the books
9   of Argon, they don't know.  They would have filed a
10  secured claim if they had the right to, if it didn't
11  violate the law to do so.  They would have done it,
12  every bank in the world would have done it.  If they
13  have a secured position they don't write it off and say
14  unsecured until the very end, they go in saying
15  secured.  And even if internally they've written it
16  off, they say secured.  And I've represented many
17  lenders, as Ms. Hamilton has, and she knows that well.
18          MR. CARUCCI:  Your Honor, --
19          THE COURT:  Go ahead.
20          MR. CARUCCI:  -- may I be heard?
21          THE COURT:  Yes, Mr. Carucci.
22          MR. CARUCCI:  Thank you.
23          Your Honor, the simple fact of the matter is
24  that Argon, either Argon X or Argon Credit, sold their
25  loan portfolio to Spartan without our knowledge,

1   without first paying our lien off.  How did they do it?
2   We don't know because it was done without our consent.
3   They expect us to tell the Court how exactly it
4   happened when we didn't have -- we never granted
5   consent.  The complaint alleges, in paragraph 25, under
6   the heading "Argon Fraudulently Re-Sells Loans
7   Previously Pledged to F.R.S. - That upon information
8   and belief, Argon X sold to Defendant Spartan loans and
9   related proceeds that were previously pledged to F.R.S.
10  for the Argon line of credit."  The loans in the
11  portfolio matter.
12          THE COURT:  But let's go slow.
13          MR. CARUCCI:  Sure.
14          THE COURT:  Argon Credit to Argon X, Argon X
15  to Spartan.  Right?  Okay?
16          MR. CARUCCI:  Yes, Your Honor, exactly.
17          THE COURT:  But --
18          MR. VANN:  Argon Credit to Spartan.
19          THE COURT:  Right -- no, the other way
20  around.
21          MR. CARUCCI:  Argon Credit to Argon X, which
22  made the draw requests off of that line of credit,
23  okay?  And then -- then from Argon X to Spartan.
24          THE COURT:  Right.
25          MR. CARUCCI:  Okay?

1   THE COURT:  Okay.
2   MR. CARUCCI:  Now, Your Honor, if they are
3   going to represent --
4   THE COURT:  But you --
5   MR. CARUCCI:  -- that it went back from Argon
6   X to Argon Credit, okay?  The moment it went to Argon X
7   we have a generalized blanket security interest in all
8   of Argon X's property.  That, under New Jersey law,
9   continues and is maintained, despite any subsequent
10  transfers.  So if -- Your Honor, if the defendants'
11  counsel right now is representing that Argon X sent
12  those loans back down to Argon Credit and then sold
13  them to Spartan?  The generalized security interest
14  that my client has by virtue of the assignment from
15  Argon Credit to Argon X is still maintained.  That's
16  what we alleged in the complaint.  There is no
17  misrepresentation here.
18  THE COURT:  Okay.
19  MR. CARUCCI:  And I take exception to any --
20  MR. VANN:  Your Honor, as he pointed out in a
21  footnote, their own L.S.A. that they put forward to the
22  Court says if Argon Credit is going to transfer
23  something to Argon X it will be pursuant to assignment
24  and to all loans that Argon Credit has will even be
25  eligible to be sold to Argon X and Argon X retains the

1   right to reject.  As a third party coming in, Spartan
2   saw loans that were owned by Argon Credit and bought
3   them from Argon Credit and there's never been an
4   assignment showing that it was pre-sold to anyone else.
5   When Spartan bought them from Argon Credit, Argon
6   Credit owned them.  This lender did not have a security
7   interest in Argon Credit; never did, never has.  No
8   consent was needed.  No security interest has ever been
9   shown, no assignment has been shown.
10  THE COURT:  So you're -- so you're saying
11  that the purchase was made directly from Spartan to
12  Argon Credit, not Argon X?
13  MR. VANN:  From -- Spartan from Argon Credit.
14  THE COURT:  Okay.
15  MR. VANN:  And it wouldn't be the first time
16  that somebody affiliated with an owner of assets,
17  knowing the assets, makes an offer on them and goes and
18  starts up his own business.  There was nothing
19  nefarious about it when our client came in to make a
20  loan to this person who was acquiring the portfolio of
21  assets of loans from Argon Credit that had originated
22  the loans and that were selling it to them for fair
23  value paid.
24  THE COURT:  Okay.
25  MS. HAMILTON:  Your Honor, I want discovery

32

1    on that issue.
2            MR. VANN:  So go to Chicago.
3            MS. HAMILTON:  I mean, that's --
4            MR. VANN:  That's where the fraud was
5    committed.  They admit the fraud may have been in
6    Argon, that's in Chicago, go do discovery there.  They
7    had their chance in bankruptcy court.
8            MR. RUBINSTEIN:  And, Your Honor, when we
9    were here last time these same arguments were made
10   except that today they're flip-flopping and since they
11   see that the road to Argon Credit is now foreclosed by
12   their own client's actions, now they're arguing oh, but
13   Argon X we should look at because that was the security
14   interest.  No one denies they have security interest
15   against Argon X.  We've questioned five times over and
16   never have they responded in a straightforward manner
17   as to why our borrower did not have the right to
18   purchase assets from Argon Credit that had never been
19   sold before, that were owned by Argon Credit for which
20   they paid fair value.  It's plain and simple.  And
21   frankly, I dispute the fact that there's no
22   jurisdiction in Chicago, every bankruptcy court
23   constitutionally is given the power over property of
24   the estate.  If they believed there was property in the
25   estate the trustee of Argon would be pursuing it, the

33

1    secured lender would be pursuing it in that forum and
2    they never have.  They've never brought Barry Kostner
3    in and say you did something wrong, please come in and
4    address your wrongdoings.  They haven't brought Spartan
5    in, they haven't brought Hamilton in.  They're
6    following the money because it's their last ditch
7    effort when they failed in bankruptcy court, but they
8    have no nexus to the money.  They weren't a secured
9    creditor of Argon Credit plain and simple and if that
10   doesn't end the day for them I don't know whatever will
11   because this has been going on far enough.  We had five
12   times in front of Judge Drain and now twice here.  I
13   think Your Honor will understand our frustration at the
14   many times that they've been given an opportunity to
15   say -- make the arguments over and over again without
16   anything fresh, anything -- Your Honor last time said
17   to them if you bring me a document and you get it,
18   maybe Judge Drain was giving you a chance to bring me a
19   document and show me something, and that is the only
20   reason why the judge ended the order that way.  He said
21   at the hearing you haven't shown me; you're asking me
22   to enjoin, I can't enjoin on what you've shown me.
23   Maybe someday you'll be able to, but it's not here, not
24   now.  Then Your Honor last time we were here said I'll
25   give you a chance, one more chance, come in with

1    something.  They haven't and they concede today they
2    don't have a secured credit against Argon Credit so now
3    they shift and argue well, we have one against Argon X.
4    But that means nothing as to Argon Credit or Spartan or
5    Hamilton.
6            THE COURT:  Okay.  All right.  Anything else?
7    Anybody?  No?  Okay.
8            So this is the date that -- it's not actually
9    a return date, this is a motion to dissolve the
10   restraints that I entered which granted injunctive
11   relief and also provided for a writ of attachment.
12           And this case stems out of financing and
13   funding.  The plaintiffs here are -- the plaintiffs
14   here allege that they have a security interest in loans
15   that were used as collateral for their line of credit
16   in the amount of $37,500,000 that was drawn down on by
17   Argon X, and that loan was provided by the plaintiff's
18   predecessor, Princeton.  It was guaranteed by Argon
19   Credit and a UCC-1 was filed against Argon X.  In 2015,
20   in October, Argon Credit sold loans to Spartan.  The
21   plaintiff claims -- alleges that those loans were the
22   loans that were pledged as collateral to Princeton and
23   that's where the dispute arises.
24           The Court had previously, in a somewhat ex-
25   parte manner, granted the injunctive relief, although

1    there was an attempt to reach out to counsel and there
2    was a phone conversation.  But since then, counsel for
3    the defendants has had an opportunity -- have had an
4    opportunity to submit their opposition.  And the
5    defendants claim that Spartan was a -- in bankruptcy in
6    New York City, and I should state parenthetically that
7    Argon and Argon -- Argon Credit and Argon X were both
8    in bankruptcy in Chicago, and that Spartan purchased
9    these -- these loans from Argon Credit and was -- and
10   was -- and it did so by a line of credit provided by
11   Hamilton to Spartan.  And in the bankruptcy court in
12   New York -- in New York or New Jersey?
13           COUNSEL:  It was in New York, Your Honor.
14           THE COURT:  In New York, right.
15           COUNSEL:  Westchester.
16           THE COURT:  Right.  There was two
17   applications, one to -- by Spartan to be able to use
18   the money generated from these loans to pay their daily
19   expenses.  That was eventually granted, I think in the
20   amount of $15,000 a month, not quite the amount they
21   originally requested.  At the time that that was done,
22   or maybe subsequently, there was a motion made to set
23   that aside by the plaintiffs, making the arguments that
24   they had a security interest in those loans.  And that
25   was -- that motion was denied.  Subsequently, there was

1     a motion to approve the settlement between Spartan and
2     Hamilton which formed the basis for this case.   That
3     settlement allowed for the payment of $1,400,000 to be
4     transferred to Hamilton.   The funds are sitting in a
5     bank in New Jersey and the plaintiff brought this
6     action, asking that the Court restrain that settlement.
7     The settlement was approved by Judge Drain in somewhat
8     of a -- well, he was clear in his description of what
9     he felt with respect to the plaintiff's claims, but he
10    did, in the end, do two things; one, he approved the
11    settlement, two, he did it without prejudice which
12    allowed the plaintiff to bring the action here.
13            The argument essentially by the plaintiff is
14    that the -- that they still have a security -- they
15    have a security interest in these liens [sic].   The
16    defendants claim that they don't have a security
17    interest in these liens [sic], that they have paid fair
18    market value for these -- I'm sorry, loans, I called
19    them liens, for the loans when they purchased it from
20    Spartan and that -- that in fact if -- and that they
21    purchased it from Argon Credit and that there was no
22    security interest by Argon Credit.   The plaintiffs
23    argue that Argon Credit guaranteed the payment by Argon
24    X to the plaintiff's predecessor and that guarantee
25    provided for the security interest.   But the language

1     in the guarantee doesn't say that, it says security
2     interest in any loans that are assigned by Argon Credit
3     to Argon X.   And so the assignment appears to be
4     missing.   The proof of claim filed in Chicago by the
5     plaintiffs against Argon Credit indicates that their
6     loan is unsecured.
7             And as we all know, preliminary injunctive
8     relief is an extraordinary remedy and our courts have
9     cautioned that it should only be entered upon clear and
10    convincing evidence of entitlement to that relief.
11    Crowe v. DeGioia, 90 N.J. 126, that's the case that the
12    Supreme Court also sets for the standards by which a
13    movant bears the burden of demonstrating clearly and
14    convincingly entitlement to injunctive relief.   The
15    first is that there's immediate and irreparable harm
16    and I don't see where that's going to occur here.   One
17    of the reasons that we adjourned this was to -- to see
18    if there was some kind of evidence that could be
19    supplied to the Court which would demonstrate that if -
20    - if the injunction was lifted the -- the res in this
21    case would disappear, they could still sue the
22    defendants they're suing, the case would continue,
23    there's no indication that they won't be able to
24    collect on their -- on their claim.   There were
25    previous arguments that were made, but those don't seem

1    to have panned out.
2          So the second criteria of <u>Crowe v. DeGioia</u> is
3    the applicable law -- underlying law is well settled,
4    it is.  The third is that the material facts are not
5    substantially disputed and there exists a reasonable
6    probability of success on the merits.  As was
7    demonstrated by the two oral arguments here and the
8    arguments in front of Judge Drain, the material facts
9    are clearly contested, so that hasn't been satisfied.
10    And the balancing of the hardships favors the issuance
11    of the requested relief, I don't see that either.  And
12    I'm considering the fact that this was a settlement
13    that was approved by the bankruptcy court.  New
14    Jersey's public policy is to -- in favor of enforcement
15    of settlements and in essence this would stop the
16    settlement.
17          So with those three, and I should also
18    address the pre-judgment attachment writ that was
19    obtained, which is under N.J.S.A. 2A:26-1.  The --
20    essentially the criteria for obtaining a writ of
21    attachment is under 2A:26-2 and the applicable
22    provision appears to be d) where plaintiff has a claim
23    of equitable nature as to which money damages -- money
24    judgment is demanded against a defendant and the
25    defendant absconds or is a non-resident and a summons

1    cannot be served upon him in this state.  The
2    defendants are non-residents, they're Delaware
3    entities.  The issue of whether a summons can be
4    served, as they've indicated in their papers, they're
5    willing to accept service, counsel, for -- for the --
6    defendants are willing to accept service, so I'm not
7    too concerned about that.  Nonetheless, the case law
8    says that, and I think it's <u>Russell v. Fred G. Pole</u>
9    <u>Company</u> (phonetic), 7 N.J. 32, the Court should only
10    issue a writ where plaintiff exhibits a probability of
11    success on the merits in addition to satisfying the
12    statutory criteria.  So I'm not totally convinced that
13    the statutory criteria has been satisfied just because
14    they're non-residents, but more importantly, I don't
15    see where there's a probability of success on the
16    merits as I've just indicated with respect to the
17    injunctive relief that was granted.
18          So for those reasons I'll sign your order,
19    I'll dissolve the restraints.
20          MR. RUBINSTEIN:  Thank you, Your Honor.  Your
21    Honor, the one procedural thing is that I believe our
22    responsive papers to the complaint are probably due
23    sometime next week, but I could work it out with
24    counsel in terms of a response.  We'll be making a
25    motion to dismiss obviously, but I'll work that out

40

1    with counsel.
2           THE COURT:  Okay.
3           MR. CARUCCI:  Your Honor, plaintiff would
4    respectfully request of the Court -- moves -- excuse
5    me, Your Honor.  Plaintiff respectfully moves to stay
6    the Court's decision pending an opportunity to appeal.
7           THE COURT:  Okay.  You want to file an
8    emergent appeal to the Appellate Division, right?
9           MR. CARUCCI:  Yes, Your Honor.
10          THE COURT:  Okay.
11          You want to be heard on that?
12          MR. RUBINSTEIN:  Yes, Your Honor.  I just
13   don't believe there's any basis for it, it's just
14   another attempt to delay.  This is basically an appeal
15   of the bankruptcy court and they had an opportunity and
16   they lost again.
17          THE COURT:  Well, that was a question I
18   didn't ask but I had written it down.
19          MR. RUBINSTEIN:  Correct.
20          THE COURT:  Why didn't they appeal the
21   bankruptcy court decision, but okay.
22          MR. RUBINSTEIN:  Okay.  So this -- this is
23   basically their appeal of that decision rather than go
24   the District Court in New York which would have been
25   the proper forum for the appeal then.  They came here

41

1    and started a new proceeding.  We don't believe there's
2    any basis for any stay of this decision.  We've already
3    been stayed effectively for the last five weeks by the
4    ex-parte motion they brought before the Court and by
5    this proceeding.  There's no reason to continue this --
6    I don't want to use the word -- I just want to use an
7    adjective I don't want to use here, Your Honor.  But
8    there's no reason to continue this, Your Honor.
9    There's no reason or basis for any stay here.
10          THE COURT:  Okay, I understand what you're
11   saying.
12          All right, look, a stay is governed by the
13   same criteria that I just spoke about with respect to
14   preliminary injunctive relief because a stay is
15   injunctive relief.  Nonetheless, I have to give them an
16   opportunity to at least go to the Appellate Division.
17   There's a holiday coming up and everything like that,
18   I'll grant a short stay.  So you can file your
19   application for emergent relief, whether the Appellate
20   Division accepts it or not is another matter.
21          MR. RUBINSTEIN:  Your Honor, we respectfully
22   request -- we didn't have time to do this the first
23   time, we respectfully request them to post a bond then
24   because this is ridiculous.  They should have to post a
25   bond.

42

1    THE COURT:  I'm only going to -- I'm going to
2 give him a stay until July 7th, which is next Friday.
3 So I don't -- I don't see a basis for -- for posting a
4 bond for a short stay to allow them to file an
5 application to the Appellate Division to see if they'll
6 take the question or not.  Okay.
7    MR. CARUCCI:  Thank you.
8    MR. RUBINSTEIN:  Thank you, Your Honor.
9
10    (END OF PROCEEDINGS)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43

CERTIFICATION

    I, DOLORES S. HASTINGS, the assigned transcriber,
do hereby certify the foregoing transcript of
proceedings of June 27, 2017, digitally recorded, index
number from 3:37:52 to 4:27:43, is prepared to the best
of my ability and in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript of the
proceedings as recorded.


**/s/ Dolores S. Hastings**          June 29, 2017
Dolores S. Hastings AD/T 417
APPEALING TRANSCRIPTS, INC.
CLARK, NEW JERSEY

Exhibit 20

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION,
  GENERAL EQUITY PART
BERGEN COUNTY, NEW JERSEY
DOCKET NO. C-155-17
APP. DIV. NO.

FUND RECOVERY SERVICES, LLC,   )
                               )
        Plaintiff,             )
                               )          TRANSCRIPT
     vs.                       )              of
                               )       HEARING ON MOTION
SPARTAN SPECIALTY FINANCE      )         TO DISSOLVE
1 SPV, LLC, HAMILTON FUNDING   )      TEMPORARY RESTRAINTS
1 LP and EXIGENT ALTERNATIVE   )
CAPITAL, LLC,                  )
                               )
        Defendants.            )

                        Place: Bergen County Superior Court
                               Justice Center, 10 Main St.
                               Hackensack, N.J. 07601

                        Date:  June 9, 2017

BEFORE:

     HONORABLE MENELAOS W. TOSKOS, J.S.C.

TRANSCRIPT ORDERED BY:

     ARPI SALBASHIAN, LEGAL ASSISTANT
     (Cohen Tauber Spievack & Wagner, P.C.)

APPEARANCES:

     MICHAEL S. CARUCCI, ESQ. and
     VALERIE A. HAMILTON, ESQ.
     (Sills, Cumis & Gross, P.C.)
     Attorneys for the Plaintiff

                    Transcriber Dolores Hastings, AD/T 417
                    **APPEALING TRANSCRIPTS INC.**
                    8 Victoria Drive
                    Clark, New Jersey 07066
                    (732) 680-1610 / Fax (732) 680-1615
                    Appealingtrans@gmail.com
                    Digitally Recorded
                    Operator, Daniel T. Paxton

APPEARANCES: (continued)

        JOSEPH VANN, ESQ. and
        KENNETH J. RUBINSTEIN, ESQ.
        (Cohen, Tauber, Spievack & Wagner, P.C.)
        Attorneys for Defendants Hamilton Funding, I, LP
        and Exigent Alternative Capital, LLC
        (Counsel admitted pro hac vice)

        MATTHEW C. CAPOZZOLI, ESQ.
        (Robinson, Brog, Leinwand, Greene,
        Genovese & Gluck)
        Attorney for Defendant Spartan Specialty Finance

3

1                          I N D E X

2                                              Page(s)

3     THE COURT:  Order - Attorneys Vann and          4

4     Rubinstein admitted pro hac vice

5     Argument:

6        By Mr. Rubinstein                   5, 31, 46, 60

7        By Mr. Capozzoli            12, 14, 33, 58, 60

8        By Mr. Carucci              13, 20, 26, 43, 47

9        By Ms. Hamilton         17, 27, 35, 39, 50, 52

10       By Mr. Vann                22, 37, 42, 44, 49

11

12    THE COURT:  Comments / Colloquy            53

13    (Ruling reserved)

14

15

16

17

18

19

20

21

22

23

24

25

4

1   THE COURT:  Your appearances?
2   MR. CARUCCI:  Good afternoon, Your Honor,
3   Michael Carucci from Sills, Cummis & Gross on behalf of
4   Plaintiff, Fund Recovery Services.
5   MS. HAMILTON:  And Valerie Hamilton, Sills,
6   Cummis & Gross for Fund Recovery Services.
7   MR. VANN:  Good morning, Your Honor, Joseph
8   Vann of Cohen, Tauber, Spievack & Wagner, P.C. on
9   behalf of Defendants Hamilton Funding I, LP and Exigent
10  Alternative Capital, LLC.  Your Honor, we have
11  submitted to the Court pro hac vice motions, including
12  for my partner, Ken Rubenstein, who will be arguing
13  with the Court's permission.
14  THE COURT:  Um-hum.
15  MR. RUBINSTEIN:  Good morning, Your Honor.
16  THE COURT:  Good morning.
17  MR. CAPOZZOLI:  Good morning, Your Honor,
18  Matthew Capozzoli from Robinson Brog on behalf of
19  Spartan.
20  THE COURT:  Okay.  All right, there was no
21  objection and I signed the orders for the pro hac vice
22  admission, so --
23  MR. RUBINSTEIN:  Thank you, Your Honor.
24  THE COURT:  -- we'll give you a copy.
25  Okay, so this is your application to dissolve

5

1   the restraints which were entered prohibiting the
2   transfer of the funds and issuing a writ of attachment
3   pending the return date of the order to show cause.
4   Okay, Mr. Rubinstein, you're going to argue it?
5   MR. RUBINSTEIN:  Thank you, Your Honor.
6   Your Honor, what the plaintiff brought to you
7   on May 26th, late in the afternoon, was the exact same
8   arguments as they raised before the bankruptcy court,
9   going all the way back to a bankruptcy proceeding that
10  started in June of last year.
11  THE COURT:  Okay.  So that was twice in your
12  papers you said, once when they made the motion, there
13  was a motion by Spartan for funds to be paid monthly in
14  order to accept -- to pay their expenses and your --
15  your papers said they made the same -- same arguments,
16  that this was collateral that Argon X had which was
17  their collateral.  And then the second time was March -
18  - May.
19  MR. RUBINSTEIN:  They made the argument, Your
20  Honor, as an objection to a cash collateral motion in
21  March.
22  THE COURT:  In March.  And then in May, as
23  part of the settlement?
24  MR. RUBINSTEIN:  Correct.  And then --
25  THE COURT:  The issue to lift the stay?

6

1    MR. RUBINSTEIN:  Correct.  And in March there
2  was a hearing before Judge Drain in the Federal
3  Bankruptcy Court in Westchester and they raised these
4  arguments that this was their collateral, that the
5  judge should not allow Spartan to do anything with
6  respect to Hamilton and a whole series of arguments.
7  And the judge essentially said to them well, show me
8  the proof and I'll take it under consideration, but I
9  don't have anything before me now.
10    Subsequent to that hearing there was a motion
11 to approve a settlement between the debtor and my
12 client, Hamilton.  And FRS, the plaintiff in this case,
13 filed an objection to that settlement, again raising
14 the same argument saying don't allow the settlement,
15 Your Honor, because we have a right to this collateral,
16 we have a right to this cash.  And yet again they
17 didn't come forward with any of the evidence the judge
18 had mentioned in March they needed to come forward
19 with.
20    So there was a hearing in May on the
21 settlement motion and to dismiss the bankruptcy case.
22 During that hearing, and it was Ms. Hamilton on behalf
23 of the plaintiff there, she argued again the same thing
24 she had been arguing for six months, don't let this
25 cash go out, don't let this collateral go out because

7

1  we have a right to it.  The judge said well, I've given
2  you every opportunity, what you're asking for now is
3  basically an attachment, a pre-judgment attachment,
4  what you're asking for now is an injunction without the
5  proper procedures and motions.  I've given you every
6  opportunity and you have not come forward to the Court
7  with any evidence that would suggest to me that you
8  have a better or a perfected interest in this
9  collateral of the debtor in bankruptcy.  And they lost.
10 And the judge entered the stipulation of settlement
11 between my client and the debtor and the judge entered
12 an order dismissing the bankruptcy case.  And part of
13 those orders was that this cash and these funds would
14 be disbursed according to a schedule, some of which is
15 going to my client Hamilton, and the judge entered that
16 order.  And the order was entered on May 26th and an
17 hour later the plaintiff ran to this Court and said
18 stop the proceedings, we have a likelihood of success
19 on the merits and we should get a writ of attachment, a
20 very extraordinary relief, Your Honor, because we have
21 a right to that collateral and that cash.
22    And I can stop there, because to achieve the
23 extraordinary remedy that they're seeking from this
24 Court and they got on May 26th, you need a very, very
25 high standard.  You need to be basically at the 10 or 5

**8**

 1    yardline going into the end zone and say, judge, stop
 2    it because we're going to win this case and if you
 3    don't stop if, you know, we have no remedy.  Not only
 4    were they not close to the goal line, they were close
 5    to their own goal line.  They had a bankruptcy court
 6    order saying that this cash and this collateral should
 7    be disbursed, some of which to my client.  They had
 8    every opportunity to make these arguments to the
 9    bankruptcy court judge to stop the disbursements of
10    money and they made every argument.  There is not one
11    argument in their papers that's different here today
12    and that they made to the judge to try to stop the
13    settlement from happening in the bankruptcy court.
14    Every single thing in their papers was argued to the
15    bankruptcy court judge and over every argument they
16    made, the bankruptcy court said -- the bankruptcy court
17    judge said you don't have enough here, you haven't
18    shown to me why you have a better right or any right to
19    this collateral and this cash.  And over -- over every
20    argument they made he rejected it, allowed the
21    settlement to go through.  And then they run to this
22    court and said we have a likelihood of success on the
23    merits that that cash and collateral is ours.  It's
24    beyond the pale, Your Honor.
25              THE COURT:  Well, I understand what you're

**9**

 1    saying and it's a good argument, but Judge Drain didn't
 2    do anything; I mean I wish he did, but he didn't.  He
 3    didn't make a ruling, he didn't hold a hearing, he
 4    didn't do anything from what I can tell.  In fact,
 5    because of what Ms. Hamilton was saying he ended up
 6    putting that little exculpatory clause in the order
 7    that said you can go anywhere you want.  He suggested
 8    you go back to Illinois where there was a pending
 9    motion for a stay in the Illinois bankruptcy court,
10    right?  In Chicago.
11              MR. RUBINSTEIN:  Well, actually, Your Honor,
12    I disagree to some extent, I think he did something.  I
13    think he entered an order --
14              THE COURT:  Well he did.
15              MR. RUBINSTEIN:  -- that the cash is going to
16    be distributed this way.
17              THE COURT:  No, I -- I agree with you.
18              MR. RUBINSTEIN:  What he didn't -- I'm sorry.
19              THE COURT:  But I'm -- I agree 100 percent.
20    And I said it's a strong argument, there's an order
21    there.  And he did raise what you indicated, saying
22    hey, what are you doing?  Where's -- where's Argon?
23    Where's the trustee in bankruptcy out of Chicago?  Why
24    aren't they here?  Why aren't they saying this is their
25    collateral?  I understand that.  Maybe if he stopped

10

1  there it would have been a little even stronger.  But
2  then at that point, for some reason, I don't know why,
3  he starts to say well, you know, you can go do this
4  somewhere else and I'm going to suggest you go to
5  Chicago.
6           MR. RUBINSTEIN:  Two points, Your Honor.
7           THE COURT:  Go ahead.
8           MR. RUBINSTEIN:  The first point is they have
9  a very, very high burden here to show probability of
10 success on the merits.
11          THE COURT:  That's true.
12          MR. RUBINSTEIN:  Just based on the bankruptcy
13 court order they cannot do that.  Just based on the
14 fact that Judge Drain heard every argument they've made
15 before you and said I don't see it, they don't have a
16 high probability of success on the merits, just based
17 on that.
18          THE COURT:  Yeah, you argued that with
19 respect to the conversion and the unjust enrichment.
20          MR. RUBINSTEIN:  Absolutely.  The judge said
21 we have a right to those funds.  How do they have a
22 high probability of success on the merits?  We have a
23 court order that says we have a right to those funds.
24          Point two, Your Honor - Judge Drain didn't go
25 the next step and absolutely knock them out of the box

11

1  because he couldn't, because they have claims and
2  issues with Argon X and Argon Credit and if he went so
3  far as to say, FRS, you're done, that could have
4  prejudiced their rights in Chicago and these are
5  parties that have not appeared in the case.  So Judge
6  Drain, very cognizant of the fact that there's a case
7  in Chicago that involves FRS and involves Argon and
8  Argon X, he's not going to step over and say I'm not
9  ruling on any of your rights because you may have
10 rights against Argon and Argon X, what I'm saying in
11 this court, in this bankruptcy of Spartan, is that you
12 don't have rights to this cash and this collateral, and
13 that's the order he entered.  And there's no way --
14 there's no way that they can overcome the high hurdles
15 they need to sustain for writ of attachment in this
16 court and a temporary restraining order or preliminary
17 injunction for that matter.  They don't even come
18 close.  Conversion -- their two claims are conversion,
19 meaning we don't have a right to the assets, but a
20 judge said we do.  And unjust enrichment, which means
21 the same thing basically, we don't have a right to the
22 collateral and the cash, but a judge said we do.  So
23 how can they sustain that burden here?  And I'm sorry
24 they ran to you, you know, the Friday before Memorial
25 Day and we didn't have an opportunity to really explain

**12**

1   to you what was going on, but you know, it happened, so
2   we're here now.
3            THE COURT:  Okay.  Thank you, Mr. Rubinstein.
4            Mr. Vann, do you have anything?
5            MR. VANN:  No, thank you.
6            MR. CAPOZZOLI:  I'd like to add one point,
7   Your Honor, if I may?
8            THE COURT:  Go ahead, Mr. Capozzoli.
9            MR. CAPOZZOLI:  Mr. Capozzoli for Spartan.
10  The one thing that strikes me about the application
11  viewed in the context of Judge Drain's order is I
12  understand that notwithstanding the claims that they
13  may have, essentially what they've done is -- well,
14  their argument hinges on the concept that Judge Drain
15  entered an order and then gave them leave to go to
16  another court to take that order apart.  Judges don't
17  do that in my experience, maybe I'm wrong, but
18  certainly it would seem like a strange way to proceed.
19  So our position is, payments under the settlement
20  agreement should be made, that order should be
21  satisfied, that bankruptcy case should remain
22  dismissed.  And then, of course, plaintiff's are free
23  to do whatever they want once that money's been
24  attributed.
25           THE COURT:  So you're saying what Judge Drain

**13**

1   did with his, you know, little language there in the
2   order, was that this money is gone but you can go after
3   Hamilton and Exigent for whatever you want in any other
4   court and --
5            MR. CAPOZZOLI:  I mean even -- frankly, even
6   for the same money, but the distributions pursuant to
7   the settlement agreement should be made.  That
8   agreement should go forward as drafted and approved by
9   the Court.
10           THE COURT:  Okay.
11           All right, Mr. Carucci or Ms. Hamilton?
12           MR. CARUCCI:  Yes.
13           THE COURT:  Mr. Carucci, go ahead.
14           MR. CARUCCI:  Yes, Your Honor.
15           Your Honor, defendants' motion hinges almost
16  entirely on the fact that a bankruptcy court entered an
17  order that merely approved a settlement agreement
18  between consenting parties.  That order did not in any
19  way adjudicate the rights of my client that it has a
20  security interest in the collateral that would be
21  distributed.  In fact, as Your Honor said, the Court
22  went out of its way to make clear not just in the
23  transcript, which is before Your Honor, but also in the
24  orders approving the settlement agreement and in the
25  order dismissing the case made very clear in both of

**14**

1　those orders that those orders would not be with
2　prejudice at all to my client's rights.  But the Court
3　was making absolutely no finding whatsoever as to my
4　client's security interest in the collateral, he was
5　merely entering an order to approve the settlement.
6　And the fact that, you know, counsel is making this
7　argument is essentially one of estoppel and it -- it is
8　certainly not binding on this Court.
9　　　　　Unfortunately the -- the property at issue
10　here is related because for our client -- yes, Your
11　Honor?
12　　　　　THE COURT:  Okay.  So let me ask you a couple
13　of questions.  Part of their defense, of their defense,
14　is that there's no valid assignment to Argon X -- Argon
15　X?  Isn't that what you said?
16　　　　　MR. CAPOZZOLI:  Your Honor, from Argon Credit
17　to Argon X.  Argon Credit, LLC was the originator of
18　loans.
19　　　　　THE COURT:  Right.
20　　　　　MR. CAPOZZOLI:  Argon Credit, LLC sold loans
21　to Spartan.  They have a secured interest against Argon
22　X, not Argon Credit, LLC.  Argon Credit, LLC is a
23　guarantor of the loan facility that Argon X, as
24　borrower, has with their predecessor in interest lender
25　to Argon X.  So what Judge Drain was basically saying

**15**

1　is where's the beef?  In December, when they first
2　showed up with the cross objection, motion to limit
3　cash collateral, in March when they showed up and in
4　May when they showed up, arguing by the way in May in
5　front of the judge with their papers, that well, Argon
6　Credit is a guarantor but that guarantee is secured.
7　And they made all the arguments, unrealistic arguments
8　to the judge to try to justify why there wasn't a
9　security interest against Argon Credit's collateral.
10　So the judge said, in his transcript if you saw it, and
11　it seems like the Court is very familiar, having read
12　the papers, the Judge said in May -- and in March he
13　says it's a documentary issue, where's the assignment?
14　In May he says you're going to come forward with the
15　assignment.  So when he left open going to another
16　court he said I'm not going to do this for everybody
17　but you're here, we haven't had an evidentiary hearing
18　because you didn't bring one on.  You had all the time
19　in the world to start an adversary proceeding, which
20　the Court may be familiar is a discrete lawsuit for the
21　determination of interest in a bankruptcy, and you
22　didn't.  So we're here in May, I'm not going to stop
23　this, you're asking for pre-judgment attachment, you've
24　never come forward with the evidence.  And so we're
25　sitting here today having filed the same exact

1    arguments and documents they filed in this court as in
2    that court and they still haven't produced -- that's
3    what Judge Drain said, you haven't produced what you
4    need to, to get your remedy.  So we're not saying it's
5    a preclusion issue, Your Honor.  He clearly said if
6    ever you can produce it then go, you know, God bless
7    you, try, but from what you've shown me, which by the
8    way is the same that they're showing you now, I just
9    don't see it.  I can't do an attachment, I can't stop
10   the legitimate U.C.C. filed by Hamilton against
11   Spartan, I can't stop Spartan which has a bill of sale
12   for these loans, it owns them.  It's no different than
13   if someone were to come to Your Honor's home --
14            THE COURT:  That's another question too,
15   right?  Isn't that an issue also?  You're saying it's a
16   valid -- it was a bona fide sale, a valid sale.  They
17   were saying it was a fraudulent sale if I'm not
18   mistaken.  Right?
19            MR. CAPOZZOLI:  Your Honor, first of all, I'm
20   not saying anything like that.  I'm saying -- and
21   they're not saying fraud either, they're saying unjust
22   enrichment and conversion.
23            THE COURT:  No, I know, but -- I thought they
24   were shaking their head when I just said that, so.
25            MR. RUBINSTEIN:  That's in Chicago when they

1    say that, they haven't said it here.
2            THE COURT:  Okay.
3            MR. CAPOZZOLI:  And, Your Honor, Judge Drain
4    noticed the fact that they've been in this case since
5    December, FRS, right?
6            THE COURT:  Yeah.
7            MR. CAPOZZOLI:  They have three shots.  In
8    baseball they would have been out by strikes, right?
9    And so how much time do we give them to come up with
10   the evidence and can you enter a T.R.O. on the basis of
11   what they've shown?  That's all I'm asking, where's the
12   beef?
13            THE COURT:  Okay.  Well, I interrupted Mr.
14   Carucci, or Ms. Hamilton?
15            MS. HAMILTON:  Your Honor, I was present in
16   the bankruptcy court.
17            THE COURT:  Yeah, I saw that.
18            MS. HAMILTON:  It was in Illinois and -- and
19   the -- in New York.  So we haven't had three shots at
20   it.  We arrived in December, we never got a hearing
21   until March, that's the first we appeared in front of
22   the judge.  And at that hearing the judge said I've got
23   a couple problems, one is I don't -- I'm not sure you
24   can be here because we've got a bankruptcy pending in
25   Argon and if I determine your rights, perhaps I'm

18

1  determining Argon's rights, I don't know.  Would you
2  please go to Illinois and ask for stay relief.  Okay?
3              THE COURT:  Which you did?
4              MS. HAMILTON:  Which I did.  Okay.
5              THE COURT:  And that still hasn't been
6  decided?
7              MS. HAMILTON:  It still hasn't been decided.
8  It's now been withdrawn because it's moot at this
9  point.  But --
10             THE COURT:  Why moot?
11             MS. HAMILTON:  Well, because the judge in New
12 York has dismissed the bankruptcy case and he's not
13 going to decide anything, I don't -- I don't need to
14 determine Argon's rights.  Argon sold these loans,
15 there's no question Argon sold these loans to -- to --
16 Argon's rights are done.  But I have a security
17 interest under the U.C.C., all right?  So -- so -- and
18 that attaches even if a sale occurs.  So I don't
19 believe that Argon has any interest in those loans.
20             But so we -- we did go.  And because we --
21 Judge Drain wasn't going to allow me to file a
22 complaint in his court or any, you know, injunctive
23 relief in his court without having gotten some stay
24 relief from Illinois.  I was trying to get that and
25 that's when Spartan filed its motion to prove its

19

1  settlement.  And I said to the judge in Illinois at the
2  very least allow me to oppose this settlement.  Right?
3  I mean I may not be able to file a complaint and
4  adjudicate these rights in New York, but at least allow
5  me to file an objection.  And he said okay, here's your
6  stay relief to go file an objection, and that's what we
7  did.  And when the judge dismissed the case he was very
8  clear to say I'm making no findings to affect your
9  rights or anyone else's rights.  So you're preserved, I
10 think you ought to -- so as soon as I enter a dismissal
11 you're free to go, that's the starting gun to try and
12 attach these funds.  And that's what we did.
13             THE COURT:  Okay.  So let me ask you a
14 question.  The -- if I dissolve the restraints their
15 argument is the money disappears, the res of the case
16 is gone and we don't have any ability to recoup these
17 funds which -- in which we have a, allegedly have a
18 security interest in prior to your clients' securities.
19 What's your response to that?  I know you indicated
20 that you say look, -- well, first of all you are -- you
21 are a non-resident because both -- both companies are
22 Delaware, all right?  But then there was the argument
23 well, we have offices in New York.  Apparently they
24 tried to serve in New York and there was nobody there
25 and they were unable to serve.  So what happens here?

1    Let's say okay, fine, now you say sue us, sue us, you
2    get a judgment, there's nothing there and their
3    security is gone.  I mean that's -- that's your
4    argument, right?
5              MR. VANN:  Your Honor, this --
6              MR. CARUCCI:  Exactly, Your Honor.  The
7    entire case will --
8              THE COURT:  Why don't you let him finish?
9              MR. CARUCCI:  Your Honor, the entire case
10   will be rendered meaningless at that point.  We have
11   not had an evidentiary hearing to determine our rights.
12   We have a security interest in the property.  There
13   have been draw requests that have come from Argon X to
14   our predecessors on the precise loans, the specifically
15   identified loans that -- that we gave a line of credit
16   on and have a security interest in.  If -- if the Court
17   dissolves the writ of attachment and the injunction
18   this -- this case is rendered meaningless, the money
19   will go out of state and there will be no way on which
20   my client can enforce its security interest.
21             Now I would add too that it's not just unjust
22   enrichment and -- and conversion claims, but at the
23   bottom, at the core of this is really an enforcement of
24   our security interest which no court, the bankruptcy
25   court in New York or Illinois, has had an evidentiary

1    hearing to determine, and quite the opposite in New
2    York, the bankruptcy court specifically said was not
3    making any such finding.
4              So, Your Honor, this case -- the -- the
5    proceeds that we're talking about right here that are -
6    - that we understand have been attached, in TD Bank and
7    Cross River Bank two weeks ago, have essentially been
8    frozen by virtue of the bankruptcy filing a year ago.
9    So for one year the money has been sitting in that bank
10   account, okay?  And the moment that we could actually
11   try to adjudicate our rights, which was when the
12   bankruptcy court case was dismissed and the stay was
13   lifted, that's why we had to come to Your Honor two
14   weeks --
15             THE COURT:  No, I understand that.
16             MR. CARUCCI:  So for -- up until that time,
17   for a year that cash in those accounts was not touched.
18             THE COURT:  No, I know it's been sitting
19   there all during the -- because of the stay by the
20   bankruptcy court.
21             MR. CARUCCI:  And -- and -- right.  And my
22   point --
23             THE COURT:  And I guess Judge Drain also said
24   before that, that money was being swept, so it was
25   going out anyway, right?  So --

22

1    MR. CARUCCI:  Right.  And my argument, Your
2    Honor, is that there would be absolutely no harm to
3    defendants.
4         THE COURT:  I know, I figured you were going
5    there.
6         MR. CARUCCI:  Okay.  Thank you, Your Honor.
7         THE COURT:  Okay.
8         All right, Mr. Rubinstein, -- oh, Mr. -- Mr.
9    Vann.  So the question is if this money disappears, if
10   they lose the res and that's it, they're --
11        MR. VANN:  Your Honor, they chose to come
12   here and talk about -- well, I don't want to exaggerate
13   it, probably about 25 percent of the collateral that
14   belongs to Spartan.  Remember, Spartan's business is
15   the consumer loans.  The underlying consumer loans it
16   still owns, they're still collecting the money, the
17   money comes to Spartan.  Yes, there is cash as well,
18   but that's perhaps 25 percent.  In bankruptcy court the
19   number bandied about was over $5 million in this loan
20   package that Spartan owns.  So it's not true that this
21   is the only collateral, this is the only thing that
22   they can enforce against.
23        THE COURT:  All right.  So if I understand
24   your argument, that if this stay is lifted and the
25   money disappears and in the worst case scenario that

23

1    they fear is that they -- the money is gone forever.
2    Okay?  That they're not hurt because Spartan still has
3    other assets that -- these other -- the other loans?
4    This is what?  25 percent?
5         MR. VANN:  I'm simply clarifying a fact for
6    the Court.  The Court should understand that it's not
7    just a million three and cash, --
8         THE COURT:  Um-hum?
9         MR. VANN:  -- there's a $5 million loan
10   portfolio of underlying consumer loans that are paying
11   on their loans each month that creates the money along
12   the way.  And they're still doing it because there's
13   about a $5 million loan portfolio.  What I will say as
14   argument --
15        THE COURT:  And their total claim is three
16   something?
17        MR. VANN:  Their total claim of $37 million -
18   -
19        MR. RUBINSTEIN:  Against Argon.
20        MR. VANN:  -- is against somebody else.
21   Look, since December they've known about this
22   bankruptcy.  They bring to this Court and they brought
23   to the bankruptcy court snippets of what occurred in
24   Chicago but they never ever brought either of the
25   defendants, any of the defendants, into.  They're

**24**

1   selectively using forums in a sense because they go to
2   Chicago, they say we were burnt by this entity in
3   Chicago.  They may have been, Your Honor, they may well
4   have been burnt by that entity because that entity,
5   what did it do wrong?  So far the only evidence we've
6   ever seen in any court is that entity kept telling them
7   you still have a security interest in these loans,
8   they're still in -- we still own them when in fact they
9   didn't own them.  So could there have been a fraud out
10  there?  I can't say that there wasn't, I can't say that
11  there was, we were never party to that.  And they
12  deliberately didn't make us a party to that because
13  they could have at any time.  Judge Drain said to them
14  start something in Chicago, here, do whatever you want.
15          The question to the Court today though is
16  having given them all these chances, not having come
17  forward the way Judge Drain, the federal bankruptcy
18  judge, said if you need an attachment you've got to
19  come forward with something, you haven't.  So this
20  Court needs to ask itself today, it doesn't really
21  matter that much about money, there is other
22  collateral, but have they made the showing necessary in
23  the first place to even get to that secondary issue of
24  what's going to happen with the money, which is just a
25  portion of the collateral anyway.  Have they

**25**

1   demonstrated to this Court they have a direct link to
2   these assets?  When I'm in my home and I sit in my
3   home, if someone were to come along with a cop and say,
4   officer, this is my house.  Why?  Because I have a
5   mortgage against some house in Chicago.  You'd look at
6   them like they were crazy.  The officer would say you
7   need to show me something more, I just can't go barge
8   in this house; the title is in his name, he's been
9   living there for 20 years.  Same thing here.  Spartan
10  has a bill of sale.  Now maybe a court one day will
11  have an evidentiary hearing on that and it will be in a
12  proper context and procedure where Spartan can prove
13  completely and vindicate its rights.  We're hampered
14  and handicapped today because they haven't brought that
15  on for the T.R.O. purposes.  All they're saying is we
16  have a direct interest that's strong enough, we've made
17  a strong enough showing that this Court should do an
18  extraordinary thing and basically say I know, Spartan,
19  it's your money, it's been sitting in your accounts all
20  this time, it's not in anyone else's account but yours,
21  you've got a bill of sale, Hamilton has a security
22  interest, a U.C.C. filed against you, there's no other
23  U.C.C.  They never filed a claim in bankruptcy court
24  saying this is ours, they could have.  And with that
25  slim read, without anything concrete, they're basically

1   saying to this Court go out on a tree limb that's very,
2   very shaky and enter an order without the requisite
3   showing.  That's what we're arguing, Your Honor.  In
4   terms of the facts I'm just trying simply to elucidate
5   them because most of the facts were brought before the
6   bankruptcy court and not here.
7            THE COURT:  Okay.
8            MR. CARUCCI:  Your Honor, I would just add
9   that counsel's metaphor is not with standing.  Okay?
10  The real equity here lies in the fact that the
11  property, the res, is in this jurisdiction.  We're not
12  going around the country selecting jurisdictions for
13  convenience, we're here in Bergen County only because
14  the bank accounts are in Bergen County and we know that
15  the money is here.  If the stay -- if -- if the
16  injunction and the writ is dissolved defendants are
17  just free to take the money out of the jurisdiction.
18  They can -- they could basically change the
19  instructions from where the money lands and put it in
20  another bank account in any other state.  We've had a
21  very difficult time serving them even in New York.  We
22  believe that there are connections between Argon and
23  Spartan, in the sense of Barry Kushner (phonetic) which
24  is in the complaint.  Counsel believes that we need to
25  prove definitively right now, right here and now as if

1   this were a full trial with witnesses and what not, all
2   of our claims.  That's not the case, Your Honor, we
3   just need to demonstrate a reasonable likelihood of
4   success on our claims.  And we believe we have
5   demonstrated we have the requisite security interest.
6   We have a master loan and security agreement whereby
7   Argon Credit drops the loans to Argon X.  We have
8   those, we have that.  We also have the draw requests
9   from Argon X to our predecessors, the loans we funded,
10  the specifically identifiable loans.  That is in our
11  papers.  We've made the requisite showing.  Those have
12  -- that is exactly what has been alleged here.  Okay?
13  And therefore, we -- if -- because of that security
14  interest we're here to enforce it.  We are here to
15  finally enforce our client's rights and we have not
16  unfortunately been able to do that in any other forum
17  in those two bankruptcy court proceedings right now.
18  We've done everything that those courts have asked.
19  We've been very responsive in any requests that the
20  courts have in the bankruptcy courts.  In fact, that's
21  in part why we're here now.
22            THE COURT:  Why did Judge Drain allow the
23  settlement to go through then?  I mean why would he let
24  the money go?
25            MS. HAMILTON:  I don't think he did let the

28

1 money go, Your Honor.  He -- what -- he approved the
2 settlement as between these two parties.  He has two
3 parties before him who don't -- who don't want to fight
4 over the money.  But he said to me, and put in his
5 order, but if you think you've got a right to them and
6 they're in some jurisdiction, go get them.
7          THE COURT:  Okay.  So he said --
8          MS. HAMILTON:  So --
9          THE COURT:  The argument Mr. Vann just said,
10 well why didn't you do it in front of him?  He was
11 asking for it.
12          MS. HAMILTON:  But -- well, so I -- what he
13 said is that I couldn't file, I needed to go get stay
14 relief.  I've been, unfortunately, hampered by the
15 imposition of the automatic stay.  All right?  So what
16 happened was on December 7th, D-Day, we found out that
17 Argon had sold these loans out from our security
18 interest.  We then went diligently to find where are
19 these loans, these loans were sent to Spartan.
20 Spartan's in bankruptcy in New York, I can't go sue a
21 bankrupt debtor.  I've got to go to them, I've got to
22 go into New York to the bankruptcy case and plead my
23 case there because I'm stayed from suing them anywhere
24 else.  I can't file a claim against them in Illinois
25 where those -- where the loans were originated, I can't

29

1 bring them there because they're subject to
2 jurisdiction and an automatic stay in New York.  Okay,
3 so we go to New York and we say, Judge, here's my
4 cross-motion, those are my funds.  Okay?
5          We have a hearing on March 1st.  At March 1st
6 he says I'm a little concerned about that proceeding
7 that's happening in Illinois, please go there.  By the
8 way, don't think you're taking my debtor to Illinois,
9 it's going to happen here before me.  Okay.  Meanwhile,
10 Hamilton and Spartan are still arguing over the money.
11 All right?  That's why it never left.  Hamilton swept
12 the debtor, the -- the Spartan account just before the
13 bankruptcy, seven hundred and fifty thousand plus money
14 swept right out of the account.  Spartan says I'm out
15 of business, they swept my money and they file and they
16 say Hamilton has destroyed my business.  They fight
17 that out right up until the settlement.  Then they say
18 let's make peace, we'll divide up FRS's money between
19 ourselves.
20          So I opposed that settlement and said, Your
21 Honor, I've got to get a hearing on the merits; not
22 here, go somewhere else, if these two parties no longer
23 want to fight how can I stop them?  I'm not going to
24 tell them I have to keep this case open and let them
25 fight, they don't want to fight, so I'm going to let

30

1  them go somewhere else and there must be a court who
2  can adjudicate your interest in these funds.  And he
3  specifically put that in the order.
4         THE COURT:  Well what about the other loans
5  that they had, that Spartan has?
6         MS. HAMILTON:  So there are loans.  These are
7  proceeds of loans that are continuing to be managed.
8  Right?  But this -- this race is here.  There's no --
9  basically what's going to happen is I -- I've
10  identified proceeds that are of my collateral.  Okay?
11  And I have -- I filed an action in the proper court
12  where those funds are located.  And so they want to say
13  this is $1.4 million or $5 million that's out there.
14  Let's just take the $1.4 million off the table and
15  you're going to have to go look for the -- the other
16  $3.5 million.  At some point there's no money, there's
17  no -- there's no way to -- to get at those funds.  How
18  can the top monies be -- be left off and I'm left with
19  the dregs?  It can't be.  I should be able to assert my
20  security interest in the first funds because what's
21  going to happen in the next court, because it won't be
22  here, the money will be directed to some other court
23  and I've got to institute yet another action somewhere
24  else, is going to be that why -- you know, the -- you
25  know, did the judge in Chancery allow these funds to be

31

1  released?  I've got to be able to chase the first
2  funds.  And I said from the beginning to the end, and
3  if you've read the transcript from the May hearing in
4  front of Judge Drain, and I know you have, you know, he
5  says to me this settlement won't harm you, you're going
6  to be able to go somewhere else to adjudicate it.  And
7  I'm here looking for those funds which -- that have
8  been identified.
9         THE COURT:  Go ahead, Mr. Rubinstein.
10         MR. RUBINSTEIN:  Your Honor, there's two
11  points.  One, with respect to service, we accepted
12  service, --
13         THE COURT:  I saw the that.
14         MR. RUBINSTEIN:  -- so don't bring this whole
15  service issue up because we've always accepted service
16  for our client, they do have an office address in New
17  York, they are a Delaware LP.
18         Second of all, I -- you know, Ms. Hamilton's
19  plea is very nice here but it's the same exact thing
20  she said in March and May and the judge specifically
21  said, Judge Drain said to her specifically in May, I
22  gave -- I gave you a chance to come forward, you still
23  haven't shown me anything.  And now she's saying it's
24  ours, it's ours, it's ours.  She made the arguments to
25  Judge Drain for three to six months and he said you

32

1  still haven't shown me anything, I can't hold this up
2  any longer. You haven't shown me that you have a
3  superior right to the cash and collateral that Hamilton
4  has. So if you want to go fight somewhere --
5        THE COURT: Let me ask you a question. And
6  we've all talked about a evidentiary hearing - what has
7  to be done to determine who has the priority here,
8  Hamilton or --
9        MR. RUBINSTEIN: Nothing, Judge Drain already
10 decided. Judge Drain already decided that this cash
11 and collateral gets disbursed in accordance with the
12 schedule in the settlement. They already had an
13 opportunity, they didn't bring an evidentiary hearing,
14 they didn't do anything, all they filed was an
15 objection. Judge Drain said you had every opportunity,
16 you had 90 days between March and May to do something,
17 you didn't do something. And just because she said --
18 Ms. Hamilton says well, Chicago this and the trustee
19 that? Why would that hamper us? If she has claims and
20 issues against Argon X and Argon Credit or whatever
21 Argon entity she wants, that's in Chicago, let her go
22 sue them, let her do whatever. She had a full and fair
23 opportunity to do whatever she needed in New York and
24 she couldn't. Judge Drain said that's it, I gave you
25 every opportunity, I'm done.

33

1        There is absolutely nothing I've heard today
2  different than what we've heard for the last six months
3  and noting that comes close to satisfying the standard
4  she has to meet here for the relief she's seeking.
5        MR. CAPOZZOLI: Your Honor, to answer your
6  question directly, because it's a legitimate question,
7  you know, if this matter were to proceed in this court
8  or any other court, and I recognize that as belligerent
9  as they've been, as persistent that they've been,
10 they've suffered a huge loss from their borrower. And
11 when I stood before Judge Drain I recognized it and I
12 said look, I understand (indiscernible) we're still
13 stuck with them. They're not going away because they
14 can't go away, they're so wounded they have to lash out
15 at everybody. That's what I said basically before
16 Judge Drain. I said but from what you have in front of
17 you, they haven't made a showing. And I'll say today,
18 there are many layers to the onion that they'd have to
19 peel away at and prove to you every single layer in
20 their favor to eventually get equity, not law, equity,
21 because the fact is that legally Spartan owns what it
22 owns. It's got a bill of sale, we have a U.C.C., our
23 client against them, that's the legal. They're saying
24 equitably if I peel enough layers for you and show you,
25 each layer has to be a piece of evidence of course, and

1     show you that at its core there was something terribly
2     wrong in the way that Spartan got it. But of course,
3     Your Honor, what they're not mentioning to you is that
4     Spartan paid basically full value for these loans. The
5     money went to Argon. They've never said the money
6     didn't go to Argon, they're saying we didn't get it.
7     Well, when somebody comes and buys something they pay
8     the money that they have to pay to get the object. As
9     between them and Argon, I can't help it if Argon didn't
10     give them that money. But we come back today to this
11     is not our burden today. Legally, as a matter of legal
12     rights, --
13             THE COURT: Believe me, I understand.
14             MR. CAPOZZOLI: So yes, if you --
15             THE COURT: So I did read that in the papers,
16     in your papers, that's why I mentioned before that your
17     argument is that there was a bona fide sale, that, as
18     you indicated, they paid market value. Their argument
19     is that it was a fraud I guess.
20             MR. VANN: They haven't alleged fraud, Your
21     Honor.
22             THE COURT: I'm sorry, what?
23             MR. VANN: They haven't --
24             MR. CAPOZZOLI: Not by -- by Argon maybe.
25     That's not here and there's no probability of success

1     on that.
2             MR. RUBINSTEIN: And you have to --
3             THE COURT: Right. That somehow it wasn't a
4     valid sale and that their -- their security lien -- I
5     guess -- I guess where the funds went. Right?
6             MS. HAMILTON: Yes. So, Your Honor -- Your
7     Honor, under the U.C.C. I've got a security interest.
8             THE COURT: On the proceeds of the sale?
9             MS. HAMILTON: On the proceeds of the sale.
10     It attaches even if sold.
11             THE COURT: But -- but what Mr. Vann said --
12             MS. HAMILTON: So -- so the question is are
13     they a bona fide purchaser for value, is their --
14             THE COURT: Right.
15             MS. HAMILTON: -- is the defense that they're
16     arguing. And I can show you that -- that -- that these
17     defendants took Princeton's loan documents and marked
18     them up. Even Judge Drain --
19             THE COURT: No, I saw that.
20             MS. HAMILTON: Right.
21             THE COURT: Okay.
22             MS. HAMILTON: Even Judge Drain said yeah, I
23     don't think that -- I don't think they're, you know,
24     innocent here.
25             THE COURT: But --

36

```
 1            MS. HAMILTON:  They certainly knew about it.
 2            MR. CAPOZZOLI:  No.  Actually Judge Drain
 3    said you haven't shown me that, that's what he actually
 4    said.
 5            THE COURT:  Okay.  But I'm just saying, even
 6    if they did that, what does that prove?  They took
 7    their loan documents and marked it up.  Okay.
 8            MS. HAMILTON:  No.  What it proves is they're
 9    not a bona fide purchaser.
10            THE COURT:  They used it as a forum --
11            MS. HAMILTON:  All right?  They understood --
12    they understood that we had a security interest by
13    documents in loans.
14            THE COURT:  Are you saying that the money
15    didn't get to Argon?
16            MS. HAMILTON:  I'm not saying the money
17    didn't get to Argon, but I'm --
18            THE COURT:  So then --
19            MS. HAMILTON:  But I'm -- I'm saying that my
20    security interest in the loans was not released.
21            THE COURT:  Right.  But then it would --
22            MS. HAMILTON:  Because no lien release was --
23            THE COURT:  But then it would -- but then, as
24    we just mentioned, it would follow the proceeds and if
25    the money went to Argon your security interest is
```

37

```
 1    there, isn't it?  Isn't that the answer?
 2            MS. HAMILTON:  These are the proceeds of
 3    those loans.
 4            COUNSEL:  No.
 5            THE COURT:  How?
 6            MS. HAMILTON:  They -- these loans, my
 7    collateral, --
 8            THE COURT:  Um-hum?
 9            MS. HAMILTON:  -- has been transferred to
10    them, to -- to --
11            THE COURT:  Right, for value, for money.
12    Argon transferred it over to Spartan for money, that
13    money went back, allegedly went back to Argon and --
14            MS. HAMILTON:  I don't know that.  I don't --
15    I don't have proof of that but I -- I don't --
16            THE COURT:  Well, that's the question.
17            MS. HAMILTON:  Okay, but -- but where is the
18    document which releases my security interest in that
19    loan portfolio?
20            THE COURT:  Okay.
21            MS. HAMILTON:  There's no document.
22            THE COURT:  I -- go ahead.
23            MR. VANN:  Your Honor, that assumes a fact
24    not in evidence basically because the very same
25    question was raised in front of Drain over and over
```

**38**

1    again.  Judge Drain asked it - where is the assignment?
2    You keep -- you're against Argon X, not Argon Credit,
3    LLC.  Your security interest, Argon X, they have Argon
4    Credit who sold the loans, where is your security
5    interest there?  We can't even get to all of your
6    points until you show us that.  Where is this?  And he
7    kept saying where is this, where is this, I can't do
8    anything until you show me that, otherwise it's not a
9    prima facie case, I'm no further along than I was on
10   May 1 -- I'm -- he meant March 1.  Right?  He said you
11   need to show me more than that.  In March he says, you
12   know, where is the assignment at page 20 of his
13   transcript in May.  Right?  "And did you show the
14   assignments from Argon X?"  And the question is avoided
15   of course because there are none.  And it's been since
16   December.  By the way, in December, while they
17   (indiscernible) hearing, they moved for relief from
18   stay from Judge Drain to go against these assets for
19   the same argument.  Then they objected to cash
20   collateral in March again and then they came in, in May
21   again.  And every time the judge is asking the same
22   question - well you're against Argon X, how do you jump
23   the river to Argon Credit to even start making your
24   arguments?  That's a threshold issue, Judge Drain
25   recognized it.  How do you even begin to argue these

**39**

1    are my proceeds?  You've got to establish that you had
2    a security interest against the person who sold it to
3    Spartan.  You know?  That's like someone has -- going
4    back to the metaphors that counsel doesn't seem to
5    like, if someone has a security interest against my
6    neighbor and comes to me and says therefore I have a
7    security interest against you.
8          THE COURT:  Okay.
9          MS. HAMILTON:  Your Honor, I would just say I
10   do have a security interest against Argon.  I have a
11   security interest based on the loan security agreement
12   that is perfected by the filing of the U.C.C., that is
13   part of the record.  I have a master assignment
14   agreement and I'll show it to you, it's Exhibit B to
15   the -- to the --
16         THE COURT:  B?  Complaint.
17         MS. HAMILTON:  -- complaint, is the loan
18   security agreement.  All right?  It's been amended
19   twice, those are Exhibit C.  Exhibit D is the master
20   consumer loan purchase agreement.  This is an agreement
21   whereby Argon Credit assigns loans to Argon X.  Okay?
22   The -- then the mechanism is that there's a $37.5
23   million line of credit available to Spartan -- to
24   Argon.  Okay?  Argon, on a daily basis, says I'd like
25   to draw down on that line of credit.  Okay?  Here are

**40**

1    the loans that I want you to fund and will be pledged
2    to you, if you fund them.  So we do.  And so on a daily
3    basis there's a draw request which itemizes the loans
4    that are -- that are being funded and pledged.  Okay?
5    So -- and there is a -- a filing, a U.C.C., to perfect
6    all of those security interests.  We not only have a
7    security interest at -- at the originators.  So you've
8    got Argon Credit and its state based subsidiaries.  In
9    order to do business in each state around the country
10   it creates a subsidiary that's licensed to make loans
11   to consumers within that state.  It originates there
12   and sends it to Argon Credit.  The master agreement
13   that is attached here at Exhibit D assigns the --
14   provides for assignment from Argon Credit to Argon X,
15   Argon X is our borrower.  We have a security interest
16   in Argon X and we have a security interest -- that
17   security interest is guaranteed by the parent, Argon
18   Credit, and with a perfected security interest, again
19   U.C.C. filings that are part of the record, for that as
20   well.  We are -- we have the U.C.C. filings at the
21   originator, at the parent and at the subs that took the
22   assignments of these security -- of these consumer
23   loans.
24             THE COURT:  So --
25             MS. HAMILTON:  We are secured down along the

**41**

1    chain.
2             THE COURT:  All right, look, let me try it
3    another way.
4             MS. HAMILTON:  Um-hum.
5             THE COURT:  All right, let's figure it out,
6    try to figure it out another way.  If the -- if Argon
7    sells to Argon Credit -- Argon X sells to Argon Credit?
8    Is that --
9             MS. HAMILTON:  No.  Argon Credit and it's
10   subs is where it originates and Argon Credit --
11             THE COURT:  Okay.
12             MS. HAMILTON:  -- would drop it into a
13   subsidiary that we as a lender ask them to set up.  We
14   are the only --
15             THE COURT:  I'm saying when these loans were
16   sold to Spartan, okay?
17             MS. HAMILTON:  Okay, yeah.
18             THE COURT:  The loans are sold to Spartan.
19   What happens to your, assuming you have one, your
20   security interest?
21             MS. HAMILTON:  Right.  Under the New Jersey
22   U.C.C., it's 12A:9-315, my security interest is
23   maintained in any collateral that I have a security
24   interest, whether it's sold, transferred, disposed of
25   in any manner.  All right?  And so,

**42**

1    "A security interest continues in collateral,
2    notwithstanding sale, lease, license, exchange or other
3    disposition thereof unless the secured party authorized
4    the disposition free of the security interest" -- no
5    question we didn't authorize it, we didn't know it had
6    one -- "and attaches to any identifiable proceeds of
7    the collateral.
8         THE COURT:  Okay.  And attaches?
9         MS. HAMILTON:  And attaches, so I have both.
10        THE COURT:  So theoretically you have both --
11        MS. HAMILTON:  Yes.
12        THE COURT:  -- because that makes sense
13   because as in this case, if you didn't get the money
14   from the sale from Argon, then you'd be out with
15   nothing.
16        MS. HAMILTON:  Correct.
17        THE COURT:  Okay.  So the real question then
18   comes down to is this somebody saying I have a mortgage
19   on my neighbor's house so I'm coming in and taking your
20   house?  Or do you have a valid mortgage on your house?
21   And you're saying no, they're saying yes.  Right?
22        MR. VANN:  They need to show you, and they
23   haven't, and I'll ask the same questions that Judge
24   Drain asked of them.  I -- Judge Drain said I saw the
25   affidavit (indiscernible), where is the assignment?

**43**

1    She just told you that her -- the L.S.A., the loan sale
2    agreement between Argon Credit and Argon X, said there
3    will be an assignment that reflects the loans I sell to
4    you.  Where is that assignment?  We've been asking for
5    seven months now in front of a federal bankruptcy judge
6    who asked it himself.  In order for them to have a
7    security interest --
8         THE COURT:  Okay, so stop.  Let's see.
9         MS. HAMILTON:  The answer is --
10        THE COURT:  Where is that assignment?
11        MS. HAMILTON:  -- it's in the draw requests.
12   The draw -- the draw request is made from Argon X to
13   us.
14        THE COURT:  When they -- when they draw down
15   from the $37 million loan?
16        MS. HAMILTON:  When they draw they say here's
17   the list of loans.
18        THE COURT:  Okay.
19        MS. HAMILTON:  And there are -- and they're
20   done on a daily basis.  The record would be huge, there
21   are 400 of them that have been done.  You know, for
22   each time a draw request is made it itemizes those
23   loans.
24        MR. CARUCCI:  Your Honor, we also have
25   testimony from Argon's executive vice president of

1  finance who admits under oath that the loans pledged to
2  our predecessor went on Spartan's line.  So we have
3  evidence.  They -- they may try to poke holes here and
4  there in the strength of that evidence, but it's
5  certainly a reasonable likelihood of success for this,
6  for these purposes now.
7           MR. VANN:  Your Honor, that was a leap in
8  logic.  Judge Drain dealt with these very arguments,
9  dealt with these very documents and didn't find it and
10  I'll explain why he did it.  They keep getting past
11  this one page of their own document - in order for
12  Argon Credit to have assigned a loan to Argon X it must
13  be represented by an assignment, not a loan request.
14           THE COURT:  Where are you?  Which --
15           MR. VANN:  Well, this is in our Exhibit --
16  I'm sorry, Your Honor, this is our Exhibit 10.
17           THE COURT:  Well, don't be sorry, I'm just
18  trying to read this.
19           MR. VANN:  The master consumer loan purchase
20  agreement.
21           THE COURT:  Okay.
22           MR. VANN:  And if you go to page 26 of 170 on
23  the top, --
24           THE COURT:  Okay.
25           MR. VANN:  -- 25, you'll see there's a form

1  of assignment.  If you read the entire L.S.A. you'll
2  see that not all loans that Argon Credit proffers to
3  Argon X because Argon X didn't have to buy, that's why
4  there's an assignment form.  If we're going t sell you
5  a loan, Argon X, you've got to accept it of course,
6  there are parameters for which loans will fit into a
7  box that we can even try to sell to you and it will be
8  reflected by an assignment.  And Argon Credit never
9  assigned, that we've seen anywhere, these loans to
10  Argon X.  Instead, Argon Credit sold them to Spartan.
11  There were many loans Argon X bought from Argon Credit
12  that Argon Credit sold to Argon X, but not these, these
13  were sold to Spartan.  They're saying no, Your Honor,
14  we have a security interest against everything.  Why?
15  Because we have a U.C.C. filed on Argon X based upon a
16  loan facility agreement that Argon X is the borrower
17  and no -- and not Argon Credit.  Argon Credit is not a
18  borrower, it is a guarantor.
19           Now, you can ask them also where the
20  provision that says Argon Credit says I'm going to
21  secure my guarantee and what is it actually securing?
22  It's securing any loans that Argon Credit sells to
23  Argon X.  And they argued in front of Judge Drain that
24  that's not what it should mean, even though it says it,
25  it means really anything that Argon Credit owns, which

1   makes no sense because their documents don't say it.
2   And that's what they're struggling over.  They don't
3   have the evidentiary document that shows Argon Credit,
4   which created the loans, sold these loans to Argon X
5   which was their borrower against which they had a
6   security interest.
7           Now I don't know what testimony was in the
8   Chicago court because they didn't bring us in there for
9   a reason, because they don't have a document.  We
10  already said in front the bankruptcy judge in White
11  Plains they don't have this document, where is it, and
12  the judge asked the same question.  So they were highly
13  motivated not to bring us anywhere near Chicago,
14  because in Chicago it was them against their borrower
15  where they claim they had a good fight.
16          MR. RUBINSTEIN:  And, Your Honor, the last
17  point is it just -- it mystifies me how they go back
18  and say we have a probability of any success when every
19  single argument incurred here today in their papers was
20  made before Judge Drain and he rejected that.  Every
21  single argument they made to stop the settlement and
22  stop the dismissal of the bankruptcy case was made and
23  he rejected them.  And to come in here and say well, in
24  front of a new judge with less of a record, we have a
25  probability of success on the merits and can meet our

47

1   standards is -- it's ridiculous.
2           THE COURT:  Yeah, but at the same time he --
3   he clearly said I'm not going to make any findings of
4   fact, I'm not going to rule on this, go and sue them
5   somewhere else.
6           MR. VANN:  But a -- but a --
7           MS. HAMILTON:  What do you mean by an
8   evidentiary --
9           MR. VANN:  Because, Your Honor, he didn't
10  want to preclude the possibility that she was asking --
11          THE COURT:  Of going after the other
12  collateral.
13          MR. VANN:  No.  That that which she was
14  asking for the whole time might one day show up in
15  another court if they could find evidence.  He didn't
16  want to say I'm ruling on the evidence because he
17  didn't -- because they never proffered what he was
18  asking for.  So he says I don't have to consider that
19  then, I can say it's between Hamilton and Spartan, the
20  only parties of legal title on this, I can make a
21  decision.  You want to equitably one day convince a
22  court otherwise?  Then you'll be bringing them
23  something you didn't bring to me evidently.
24          THE COURT:  So how are you going to do that?
25          MR. CARUCCI:  Well, Your Honor, first I'm not

48

1    going to get into the state of mind of Judge Drain.
2                THE COURT:  No, put that aside.
3                MR. CARUCCI:  The order is clear, it's --
4                THE COURT:  How do you prove --
5                MR. CARUCCI:  How do we prove it?  Your
6    Honor, we believe we have sufficient proof now.  We
7    will -- we -- by virtue of the -- the master assignment
8    agreement.  Now counsel argues that our entire claims
9    rise and fall on the presence or absence of one
10   document.  Well, believe me, we are going to pursue in
11   discovery to obtain those documents.  But more than
12   that and aside from that, we still have the master
13   assignment agreement.  We also have the testimony from
14   Argon's executive vice president of finance, admitting
15   under oath that those loans that were pledged to us
16   went on Spartan's line.  Okay?  That's an admission
17   that is very powerful, in my opinion.  And we also have
18   the draw requests from Argon X to our predecessors,
19   okay, that specifically identified the loans, okay,
20   that we gave a line of credit on.  Now there wouldn't
21   have been that draw request if there hadn't been an
22   assignment.
23               So we have more than enough proof to at least
24   make the standard, to meet the standard of a reasonable
25   likelihood of success.  They might not believe it is

49

1    100 percent conclusive proof because of a hole here and
2    there, but that's not the standard, Your Honor, that's
3    not the standard at all.  And we have not had an
4    evidentiary hearing, we have not had that, even a
5    limited opportunity to make that case.  And with -- and
6    if the -- the Court dissolves the temporary relief, the
7    provisional relief that we've had, then this -- this is
8    essentially meaningless and our clients may be out to
9    pasture with no hope of recovering any of the proceeds
10   that it gave, a $37 million line of credit on.  Thank
11   you, Your Honor.
12               MR. VANN:  Your Honor, once again, they
13   didn't bring us to Chicago because out in Chicago, and
14   we're not bound by something that occurred where they
15   didn't bring us in, but they know that if we were there
16   I would have asked the witnesses the same thing I asked
17   Judge Drain and Judge Drain asked them - well, you're
18   saying this, but where's the document?  There's no
19   document.  Where's the nexus?  There is no nexus.  Do I
20   doubt for a moment that there may have been some
21   untoward conduct by their borrower against them?  Yeah,
22   unfortunately it happens with banks and borrowers all
23   the time.  But where's the documents?  Where's
24   evidence?  The argument just now did not get them
25   there.  And where's the likelihood of success on this

50

1 extraordinary remedy?  The fact that someone testified
2 yes, I asked you for money against these even when I
3 didn't have them anymore?  Okay, so that -- it lies in
4 Chicago.
5         MS. HAMILTON:  No, no, that's not what
6 happened, no way.
7         MR. VANN:  And I was -- I would have asked in
8 Chicago the same thing, where is the document.  They
9 say master assignment agreement - yeah, it provides for
10 an assignment document. Where's the evidence, the
11 direct evidence?  If I was coming to my neighbor's
12 house I wouldn't be just coming with nothing, I'd say
13 here's my titled document, I own this.  Judge, that's
14 irreparable harm and likelihood of success.  They
15 cannot show it because it never happened.
16         MS. HAMILTON:  The last piece I'd like to
17 address is let's assume they're right.  Let's assume
18 that the loans weren't assigned from Argon Credit to
19 Argon X.  All right?  Argon Credit had it and Argon
20 Credit is a guarantor of the Argon X line.  Okay?  So -
21 - and the security interest is in Argon Credit's --
22 Argon Credit, in its guarantee, grants a security
23 interest to perfect it -- to secure that guarantee.
24         THE COURT:  Say that again?
25         MS. HAMILTON:  Argon Credit --

51

1         THE COURT:  Um-hum?
2         MS. HAMILTON:  -- granted to our predecessor
3 a security interest in collateral to secure it's
4 guarantee.  Okay?  And that's in Exhibit F to the
5 complaint, paragraph 2 on page 2.  It says,
6         "To secure all of its obligations and
7 liabilities hereunder, each guarantor" -- and the
8 guarantors are Argon Credit and the state subsidiaries
9 -- "grants to the lender," our predecessor, "a security
10 interest in all consumer loans and related contracts,
11 files, accounts receivables and other rights that such
12 guarantor may from time to time assign and transfer
13 directly or indirectly to the borrower pursuant to
14 assignments or similar documents of transfer and all
15 proceeds and hereinafter authorizes the lender to file
16 U.C.C. financing statements against such guarantor with
17 respect thereto."
18         And in fact we did file U.C.C. financing
19 statements to secure that security interest and that's
20 part of the record here.  So G is the U.C.C. in favor
21 of Princeton.  All right?  And then at K it assigns
22 from Princeton to Fund Recovery Services, the plaintiff
23 here.  These are the documents.  I mean --
24         THE COURT:  Okay.
25         MR. VANN:  Your Honor, I just hope the Court

52

1   was listening to that paragraph because that's exactly
2   what I said earlier.  The only thing Argon Credit ever
3   said is I will guarantee the loans and I will secure
4   them by those that I assign to Argon Credit -- Argon X
5   with documents of assignment.  So the only thing they
6   ever pledged was those loans that they sold to Argon X.
7   We're at the document that shows that, otherwise you
8   don't get to this document either.
9           MS. HAMILTON:  Does that make any sense?  How
10  do you -- how do you take a security interest in
11  something you assign?  I -- they're saying you're
12  supposed to have a security interest in loans that you
13  assign, that you have assigned.  It doesn't make any
14  sense, that's not what you would do.
15          MR. VANN:  Your Honor, it's the same argument
16  they made before Judge Drain, it's the same argument on
17  which he said we don't have enough here, where is the
18  assignment document.  This was in their pleading that
19  was filed before the May 1 hearing again.  And, Your
20  Honor, I'm not he scrivener of their documents.  They
21  entered into their documents, it is what it says.
22  There is no nexus to Argon Credit, LLC on loans that it
23  owns unless it assigns them to Argon X.  And then they
24  -- and why would they do that?  I can only conjecture -
25  because this way they get it both ways.  They made sure

53

1   that the stuff that's sold to Argon X is absolutely
2   their collateral; they were never sold to Argon X,
3   Argon Credit sold to Spartan.  And there is no
4   demonstration high enough for this Court to decide
5   otherwise at this point which means that they haven't
6   met the standard before this Court any more than they
7   did with the same arguments and same documents before
8   Judge Drain.
9           THE COURT:  Okay, maybe, I don't know.  I am
10  having difficult with this back and forth, I really am.
11  All right.  So the application is brought to stop a
12  further transfer of funds that allegedly served as
13  collateral for a $37.5 million line of credit.  The
14  plaintiffs claim that they perfected a first priority
15  security interest and that the lien continues on these
16  loans that were sold to the Defendant Spartan, which in
17  turn, as a result of a settlement in the bankruptcy
18  court, are being transferred to the Defendants Hamilton
19  Funding and Exigent Alternative Capital, LLC.
20          The plaintiff came in on the Friday before
21  Memorial Day and asked for an ex-parte injunction.  The
22  Court had asked them, the plaintiff's counsel, to get
23  in touch with defendants' counsel who were representing
24  the defendants in bankruptcy.  There was a telephone
25  call made but defendants' counsels didn't participate

54

1    and the Court granted the injunctive relief, including
2    the pre-writ of attachment that was requested.  The
3    Court also provided for a dissolution on 24 hours
4    notice and the application is being made today.
5            The argument by the defendants is that
6    essentially this was, if not decided in the bankruptcy
7    proceeding in New York, it was -- it was discussed
8    there and there was an opportunity there for the
9    plaintiff to demonstrate to Judge Drain, the bankruptcy
10   judge, that they had a perfected priority security
11   interest in the -- in the -- in the collateral, in the
12   funds.
13           Additionally, there was an argument made that
14   the proceeding in bankruptcy in Illinois by -- where
15   Argon was being declared bankrupt, that there was a
16   motion made there in an attempt to -- to protect their
17   interests.  That motion was never heard, I'm told today
18   it's being dismissed as moot.  I guess that motion was
19   to bring the bankruptcy trustee into the bankruptcy
20   proceeding in New York and now that the bankruptcy
21   proceeding is over that motion is moot.
22           The claim by the defendants is that there is
23   no assignment of the security interest, that there's no
24   valid security interest on these -- on these accounts
25   and on these funds and -- and that the plaintiff had an

55

1    opportunity to prove this both in Illinois and in New
2    York and failed to do so.  And that's the -- the issue
3    here before this Court.  So there's concern by the
4    defendants [sic] that once these funds are dissipated
5    there will be no way that they could, if in fact they
6    have a security interest, protect their client's
7    interest on these funds.
8            So the Court recognizes that under Crowe v.
9    DeGioia, 90 New Jersey 126, injunctive relief is an
10   extraordinary remedy and should only be entered into by
11   a showing of clear and convincing entitlement to the
12   injunctive relief.  The Court recognizes also that
13   under that Supreme Court decision, reported at 90 New
14   Jersey 126, there are four criteria that have to be
15   demonstrated; 1) that irreparable harm is likely to
16   occur if the relief is denied, 2) the applicable
17   underlying law is well settled, 3) the material facts
18   are not substantially disputed and there exists a
19   reasonable probability of ultimate success on the
20   merits, and 4) the balance of the hardship favors the
21   issuance of the requested relief.
22           All right, so is there immediate and
23   irreparable harm?  There could be if in fact this money
24   disappears and there's no way to get it.  I'm not
25   satisfied that that's clearly and convincingly been

56

1   demonstrated to me, that irreparable harm is likely to
2   occur.  Additionally, there appears to be other loans
3   that Spartan has that can be used to satisfy the --
4   satisfy the Argon obligation to the plaintiff.  The
5   applicable underlying law is well settled, that is
6   material facts are not substantially disputed; they
7   certainly are.  And the balance of the hardship favors
8   the issuance of the requested relief, that's also not
9   clearly and convincingly demonstrated partially because
10  New Jersey recognizes that public policy is it favors
11  settlements and that was a settlement.
12          All right.  Is that the end of it?  I don't
13  know because we also have the application under <u>Waste</u>
14  <u>Management v. Morris County Municipal Utilities</u>
15  <u>Authority</u>, 433 N.J. Super. 445 in which the Court
16  recognized that under certain circumstances the facts
17  that the <u>Crowe</u> criteria have not been demonstrated
18  clearly and convincingly, the Court may still enter
19  injunctive relief and take a less rigid view of the
20  <u>Crowe</u> criteria.  And that occurs if the res, and here
21  the funds, of the litigation would be destroyed or
22  substantially impaired.  I'm not 100 percent convinced
23  that that's going to happen either.  I have two big
24  issues in mind; 1) is there a valid security interest
25  that you have in those funds and 2) if the settlement

57

1   goes through, the injunction is lifted and the
2   settlement goes through, is that it?  Or are you still
3   going to be able to pursue your client's claims against
4   the defendants?
5           I'd like to have, at least give you an
6   opportunity to put some testimony on something and you
7   can do that fairly quickly.  I mean the return date is
8   the 23rd, that's two weeks from now.  The stay has been
9   in place in the bankruptcy court for nine or ten
10  months.  You can make a motion to dismiss.  I think you
11  indicated in your papers you wanted to make a motion to
12  dismiss the case anyway saying they don't have a valid
13  security interest.
14          So what I'm going to do is, I'll maintain the
15  -- maintain the injunctive relief, I won't rule on your
16  motion.  The 23rd is two weeks from this Friday, do you
17  want to make the motion to strike and say there is no -
18  - no security interest here and therefore they have no
19  claims for these funds?  I'm trying to figure the way
20  to get this to a point where I can make a determination
21  that Judge Drain, for whatever reason, whether he
22  didn't do it because they didn't put anything in front
23  of him or he didn't do it because he didn't want to do
24  it, he didn't do it.  But we all agree he didn't do it.
25  Right?  Regardless of his motivation.  What -- what's -

58

1  - give me the procedure.
2         MR. CAPOZZOLI:  Well, Your Honor --
3         THE COURT:  And recognizing that your client
4  wants to get this settlement done as quickly as
5  possible.
6         MR. CAPOZZOLI:  Your Honor, we were making a
7  motion -- they have two claims in their complaint, for
8  conversion --
9         THE COURT:  And unjust enrichment.
10         MR. CAPOZZOLI:  -- and unjust enrichment.
11  Based on Judge Drain's order there can't be either of
12  them because how can we --
13         THE COURT:  No, I under --
14         MR. CAPOZZOLI:  How can we possibly convert
15  funds that Judge Drain said should be disbursed to us?
16         THE COURT:  Well, again, he also has that
17  exculpatory clause, a disclaimer that says, you know,
18  but I'm not pre-judging anything, I'm not making a
19  determination.
20         MR. CAPOZZOLI:  But he made the determination
21  based on the same arguments.  There's nothing new we've
22  heard today, there's nothing new in their papers, it's
23  the same arguments upon which he approved the
24  settlement, so there's nothing new.
25         THE COURT:  Then why did he even put that in

59

1  there?  That's the problem I'm having.
2         MR. CAPOZZOLI:  Because they are, and Ms.
3  Hamilton argued to him, you know, effusively, about the
4  issues involving the Chicago bankruptcy with Argon
5  Credit and Argon X and Judge Drain commented to her and
6  said well nobody showed up in my courtroom from Argon
7  Credit and Argon X and nobody tried to intervene in
8  this case, so I can't rule on anything there and I'm
9  not going to touch any of the interest vis-a-vis you,
10  Argon X and Argon Credit, and things happen there,
11  things happen there.  And so --
12         THE COURT:  Okay, so --
13         MR. CAPOZZOLI:  So it has nothing to do with
14  this -- this --
15         THE COURT:  I'm not -- I'm not judging that
16  motion.
17         MR. CAPOZZOLI:  Right.  It has nothing to do
18  with this res, it has nothing to do with these funds.
19  Judge Drain specifically said these funds get disbursed
20  according to the settlement order over your objection.
21         THE COURT:  Okay, I understand what you're
22  saying, I understand.  I'm not ruling on it yet.  You
23  can make that, I'm not telling you not to make that,
24  that's part of your argument.  I would assume the other
25  part of your argument is going to be that there's no

60

1   security interest here.  Am I right or wrong that it
2   hasn't been proven?  Mr. Vann or Rubinstein?
3           MR. CAPOZZOLI:  It's their burden and they
4   haven't shown it yet.
5           THE COURT:  No, I understand that.  Am I
6   right?
7           MR. RUBINSTEIN:  There's no assignment from
8   Argon Credit to Argon X, therefore they have no --
9           THE COURT:  Okay.  Do you want to make your -
10  - do you want to do this in the form of a motion and
11  then let them come up with --
12          MR. CAPOZZOLI:  Your Honor, I'm just -- you
13  know, they have a very high burden to -- I understand
14  your predicament.
15          THE COURT:  No, they do, I agree with you.
16          MR. CAPOZZOLI:  And they -- they didn't meet
17  it on May 26th frankly because of an incomplete record,
18  they didn't meet it today and now we're being hamstrung
19  by the possibilities out there that they still haven't
20  shown in seven months.  So procedurally what should we
21  do?  You know, I have no idea because they -- they
22  aren't -- they have not satisfied their burden for the
23  relief they're seeking here today.  So hypothetically,
24  if that -- if the T.R.O. was and the writ attachment
25  was dissolved today we would still have to make a

61

1   motion to dismiss the claims and still have to litigate
2   those claims if the motion was denied.
3           THE COURT:  Okay.
4           MR. CAPOZZOLI:  But -- and the funds, as Mr.
5   Vann pointe out, --
6           THE COURT:  So -- I understand what you're
7   saying.
8           MR. CAPOZZOLI:  Yeah.
9           THE COURT:  Why shift the burden if you make
10  your motion, I understand that.  So why don't we --
11          MR. CAPOZZOLI:  We'll still make the motion
12  anyway.
13          THE COURT:  -- leave it?  It's two weeks,
14  okay?  I'm doing this -- I'm using it as the status
15  quo.  You can submit anything else you want to submit
16  and you can oppose it in two weeks.  Okay?  And that's
17  two weeks from today.  And then I'll -- I'll rule on --
18  I'll rule on whether it stays or doesn't stay.  At that
19  point it's whether it's a preliminary injunction or
20  not.  And the burden is yours to prove that you have a
21  security interest, that Judge Drain didn't already
22  basically decide it with respect to these particular
23  accounts and -- and that the money is going to -- and
24  then if they're gone and you have some kind of a claim
25  it's gone forever.  Okay?  And then -- so let's figure

62

1    out when, since you're already both -- I mean I don't
2    need another ten inches of papers, I just need to have
3    those issues addressed.  When can you get yours in and
4    then they can get their's in and then you can do a
5    little reply if you want, because quite frankly, think
6    about what happened here.  It was a Friday afternoon
7    and you ran in and it was yesterday and, you know, I
8    was getting papers faxed last night at 11:00, so I just
9    want to have an opportunity to digest everything --
10           MS. HAMILTON:  Right.
11           THE COURT:  -- and make sure I understand
12   everyone's arguments comprehensively.
13           MR. RUBINSTEIN:  So I just understand, in
14   other words you're asking them to produce exhibits,
15   documentary evidence.  If they produce documentary
16   evidence we'll have an opportunity to respond to it, if
17   they don't then we basically have concluded the T.R.O.
18   hearing?
19           THE COURT:  Yeah.  I'm going to give them one
20   more, I hate to say it, bite at the apple if you will,
21   that's going to say here's why we have a security
22   interest, here's why Judge Drain's signing of the order
23   doesn't preclude the unjust enrichment and --
24           MR. CARUCCI:  Conversion.
25           THE COURT:  -- conversion claim.

63

1            MR. RUBINSTEIN:  Well, if they could file
2    whatever additional exhibit they have by next Thursday
3    we could respond the following Wednesday, it would give
4    the Court two days to look at everything.
5            MR. CAPOZZOLI:  That's fine.
6            THE COURT:  Okay.  You want to do that?
7            MR. CARUCCI:  Your Honor, I was going to
8    suggest Friday, the 16th, which is consistent with Your
9    Honor's earlier briefing schedule I believe.
10           THE COURT:  Okay.  So I already have -- let
11   me see the order to show cause, that might already take
12   care of it.  I have it right here.
13           MS. HAMILTON:  Their response would be due
14   today.
15           MR. CARUCCI:  Because their response -- their
16   motion is, you know, --
17           MR. VANN:  No, that's the other way around.
18           MR. CARUCCI:  Their papers -- then we would
19   have an opportunity to --
20           THE COURT:  Okay.  All right.
21           MR. CARUCCI:  -- in a more timely fashion
22   oppose the -- or reply on the 16th.
23           THE COURT:  Okay.  So you've got your
24   theoretical -- well, actually it's not even
25   theoretical, you're following the -- you're a little

**64**

```
 1    early by one day.
 2            MS. HAMILTON:  Yeah.
 3            THE COURT:  So you already got your
 4    opposition papers in, they have a reply on June 16th,
 5    which is next Friday.  I'll give you an opportunity to
 6    do a surreply if something comes in.  Okay?
 7            MR. VANN:  And just to be clear, Your Honor,
 8    it's on the two or three issues you just mentioned?
 9    Nothing -- no --
10            THE COURT:  Those three issues.  Right?  I
11    mean that's the only --
12            MR. VANN:  Exactly, exactly.
13            THE COURT:  Is there anything else that I
14    need to --
15            MR. CAPOZZOLI:  There might be an issue with
16    respect to whether or not the transfer to Spartan was -
17    - whether Spartan is a good faith purchaser for value.
18    I mean they need to establish that to make their claim,
19    I think.  You don't think so?  All right.
20            MR. RUBINSTEIN:  I mean that's -- that's --
21            THE COURT:  Well, let's put it this way -
22    even if they were or weren't, they're still claiming a
23    security interest on the collateral, so it doesn't
24    matter, right?
25            DEFENSE COUNSEL:  Right.
```

**65**

```
 1            DEFENSE COUNSEL:  Right.
 2            THE COURT:  I mean even if they were --
 3            DEFENSE COUNSEL:  Well, --
 4            THE COURT:  -- if they were in good faith and
 5    the money is there and if the money was never given to
 6    them they're lifting their lien off the collateral, so
 7    it doesn't matter as far as I can see.
 8            DEFENSE COUNSEL:  For the first $4 million
 9    (indiscernible) defendants are -- I understand what --
10    they want to keep it limited and I'm okay with that.
11            DEFENSE COUNSEL:  It's their motion.
12            THE COURT:  Okay.  All right.  So why don't
13    we do that?  Why don't you -- so you can get something
14    in on -- what did we say?  The 19th?  The 20th?  The
15    20th?
16            DEFENSE COUNSEL:  When are -- their papers on
17    the 15th?
18            THE COURT:  Their's is getting in on the
19    16th.
20            MS. HAMILTON:  On the 16th.
21            THE COURT:  That's a Friday, that's a week
22    from today.
23            DEFENSE COUNSEL:  So, Your Honor, we'll get
24    it in by the close of business the 21st?
25            THE COURT:  Okay, fine.  All right.
```

66

1    DEFENSE COUNSEL:  It's going to be very
2    brief, Your Honor, I mean --
3    THE COURT:  Okay, as long as it's brief it's
4    okay, that's fine.
5    DEFENSE COUNSEL:  I mean right now it's
6    nothing because they haven't proven it, so if they come
7    forward with something else I'll address it with the
8    Court.
9    THE COURT:  Okay.  All right.  And why don't
10   I do this?  Why don't I carry your application to the
11   23rd?  Okay?  All right?
12   DEFENSE COUNSEL:  And, Your Honor, just to
13   give us a chance, you know, preferably I don't want the
14   papers at midnight Friday night the 16th.
15   THE COURT:  Yeah, we're giving you till
16   Friday so get them in early.
17   MS. HAMILTON:  We'll get them in.
18   DEFENSE COUNSEL:  Thank you.
19   THE COURT:  Thanks, because I'd like to read
20   them too.
21   DEFENSE COUNSEL:  Thank you, Your Honor.
22   DEFENSE COUNSEL:  Thank you, Your Honor.
23   THE COURT:  And I hate to suggest this but
24   I'm going to suggest it - if there's any way to work
25   out something else I think it would be to everybody's

67

1    benefit, so -- I don't know if that will ever happen,
2    but I just throw that out.
3
4                    (END OF PROCEEDINGS)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**68**

<u>CERTIFICATION</u>

    I, DOLORES S. HASTINGS, the assigned transcriber, do hereby certify the foregoing transcript of proceedings of June 9, 2017, digitally recorded, index number from 9:48:23 to 11:00:13, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded.


**/s/ Dolores S. Hastings**     June 10, 2017
Dolores S. Hastings AD/T 417
APPEALING TRANSCRIPTS, INC.
CLARK, NEW JERSEY