**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---------------------------------------------------------- x

| | | |
|---|---|---|
| FUND RECOVERY SERVICES, LLC, a | ) | |
| Delaware limited liability company, as assignee | ) | Case No. 1:20-cv-5730 |
| of PRINCETON ALTERNATIVE INCOME | ) | |
| FUND, L.P., a Delaware limited partnership, | ) | |
| | ) | **AMENDED COMPLAINT** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RBC CAPITAL MARKETS, LLC, a Minnesota | ) | |
| limited liability company; JAMES I. UIHLEIN, an | ) | |
| individual; JAMES P. UIHLEIN, an individual; | ) | |
| JOHN A. KUHLMAN, JR., an individual; | ) | |
| GLENORA COMPANY, a Wisconsin corporation; | ) | |
| LITTLE OWL ARGON, LLC, a Florida limited | ) | |
| Liability company; RAVIV WOLFE, an individual; | ) | |
| NOAX, LLC, an Indiana limited liability | ) | |
| company; GARY ZUMSKI, an individual; | ) | |
| BERJ ARAKELIAN, an individual; B MONEY | ) | |
| HOLDINGS, LLC, an Illinois limited liability | ) | |
| company; BERGARVIV, LLC, an Illinois | ) | **JURY TRIAL DEMANDED** |
| limited liability company; ERIC | ) | |
| SCHNOSENBERG, an individual; PETER | ) | |
| FERRO, JR., an individual; MARGON LLC, an | ) | |
| Illinois limited liability company; SEAN | ) | |
| TOMASZKIEWICZ, an individual; BLUE | ) | |
| TREBLE SOLUTIONS, LLC, a Delaware | ) | |
| limited liability company; JOSEPH | ) | |
| CANFORA, an individual; MARK TRIFFLER, | ) | |
| an individual; MARK TRIFFLER as Trustee | ) | |
| of the MARK TRIFFLER TRUST, an | ) | |
| Illinois trust; BRUCE BREITWEISER, an | ) | |
| individual; BYRON FAERMARK, an | ) | |
| individual; BARRY KOSTINER, an individual; | ) | |
| FINTECH ASSET MANAGEMENT, LLC, a | ) | |
| Delaware limited liability company; SSF | ) | |
| HOLDINGS LLC, a Delaware limited liability | ) | |
| company; SPARTAN SPECIALTY FINANCE | ) | |
| I LLC, a Delaware limited liability company; | ) | |
| SPARTAN SPECIALTY FINANCE I SPV, | ) | |
| LLC, a Delaware limited liability company; | ) | |
| BRUCE GOLDSTEIN, an individual; | ) | |

1

BROADMARK CAPITAL, LLC, a Washington )
limited liability company; PERAZA CAPITAL & )
INVESTMENT, LLC, a Florida limited liability )
company; ALHAMBRA CIRCLE PARTNERS, )
LLC, a Florida limited liability company; )
BARRY EDMONSON, an individual; BARRY )
EDMONSON, as Trustee of the CARDINAL )
TRUST, an Illinois trust; DANIEL )
WIRZBERGER, an individual; and MERIT )
GAMING MANAGEMENT GROUP, L.P., an )
Illinois limited partnership, )
  )
Defendants. )
-------------------------------------------------------- x

# **AMENDED COMPLAINT**

**ASHMAN LAW, LLC**
2801 Orange Brace Road
Riverwoods, Illinois 60603
(312) 596-1700

**MITTS LAW, LLC**
1822 Spruce Street
Philadelphia, Pennsylvania 19103
(215) 866-0110

***Attorneys for Plaintiff FUND RECOVERY
SERVICES, LLC, as assignee of
PRINCETON ALTERNATIVE INCOME
FUND, L.P.***

Dated: May 15, 2021

# TABLE OF CONTENTS

Page

AMENDED COMPLAINT ...................................................................................7

NATURE OF THE ACTION.................................................................................7

PARTIES .................................................................................................................9

PLAINTIFF ............................................................................................................9

DEFENDANT INDIVIDUALS AND ENTITIES ..............................................10

NON-DEFENDANT INDIVIDUALS AND ENTITIES ....................................16

JURISDICTION AND VENUE ..........................................................................17

INTERSTATE COMMERCE .............................................................................18

FACTUAL BACKGROUND ...............................................................................19

The Argon Entities ...............................................................................................19

Fintech Loan Agreement Finances The Argon Entities ...................................20

Fraudulent Transfer Of Consumer Loans To SPARTAN FINANCE...........24

SPARTAN FINANCE And FTAM Defaulted On Hamilton Funding Loan...........39

Various Defendants Knowingly Submitted False And Misleading Financial Reports
To PAIF...................................................................................................................42

Argon Credit's Financial Condition...................................................................58

Prohibited Interest Payments In Violation Of Subordination Agreements ...............61

Board Of Manager Appointments By Creditor Members...............................70

Prohibited Fees, Commissions And Other
Payments To Argon Insiders And Third Parties ..............................................71

Argon Entities' Bankruptcy Filings ..................................................................75

RICO FACTUAL PREDICATES........................................................................77

**The RICO Scheme And RICO Enterprise** ....................................................79

**Pattern Of Racketeering: False Financials As A Pattern**............................80

**Pattern Of Racketeering: Divestiture And
Diversion Of Accounts Receivable As A Pattern** ....................................81

**RICO Offenses** ..............................................................................................83

**Predicate Offenses – Wire Fraud & 18 U.S.C. § 2134** .................................83

**Participation Of Defendants In Pattern Of Racketeering Activity** .............85

**Princeton Has Financially Suffered As A Result Of The Predatory, Racketeering And
Otherwise Unlawful Conduct Described Herein**..........................................85

# COUNTS OF AMENDED COMPLAINT

**COUNT ONE** .......................................................................................................**86**
CONDUCT AND PARTICIPATION IN A RICO
ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY
(18 U.S.C. § 1962(c))
(Against **ALL DEFENDANTS**)

**COUNT TWO** .......................................................................................................**88**
CONSPIRACY TO ENGAGE IN A
PATTERN OF RACKETEERING ACTIVITY
(18 U.S.C. § 1962(d))
(Against **ALL DEFENDANTS**)

**COUNT THREE** ...................................................................................................**89**
FRAUD/INTENTIONAL MISREPRESENTATION
(Against **ALL DEFENDANTS**)

**COUNT FOUR**......................................................................................................**95**
AIDING AND ABETTING FRAUD/INTENTIONAL MISREPRESENTATION
(Against **ALL DEFENDANTS**)

**COUNT FIVE**.......................................................................................................**97**
FRAUDULENT CONCEALMENT
(Against **ALL DEFENDANTS**)

**COUNT SIX** .......................................................................................................**100**
AIDING AND ABETTING FRAUDULENT CONCEALMENT
(Against **ALL DEFENDANTS**)

**COUNT SEVEN**.................................................................................................**102**
FRAUDULENT/INTENTIONAL INDUCEMENT
(Against **ALL DEFENDANTS**)

**COUNT EIGHT** .................................................................................................**108**
CONVERSION
(Against **ALL DEFENDANTS**)

**COUNT NINE**....................................................................................................**109**
AIDING AND ABETTING CONVERSION
(Against **ALL DEFENDANTS**)

**COUNT TEN**......................................................................................................**111**
CIVIL CONSPIRACY
(Against **ALL DEFENDANTS**)

**COUNT ELEVEN**......................................................................................................**112**
    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
    (Against **ALL DEFENDANTS**)

**COUNT TWELVE**......................................................................................................**113**
    BREACH OF PERSONAL GUARANTY
    (Against **WOLFE** and **ZUMSKI**)
    (Jury Trial Waived By Charged Defendants)

**COUNT THIRTEEN**...................................................................................................**116**
    BREACH OF CONTRACT
    (Against **LITTLE OWL, MARGON, CARDINAL TRUST** and
    **TRIFFLER TRUST**)
    (Jury Trial Waived By Charged Defendants)

**PRAYER FOR RELIEF**.............................................................................................**118**

**JURY TRIAL DEMANDED**.......................................................................................**120**

## AMENDED COMPLAINT

Plaintiff Fund Recovery Services, LLC ("FRS"), as assignee of Princeton Alternative Income Fund, L.P. ("PAIF") (together, FRS and PAIF, "Princeton"), by and through its undersigned counsel, Mitts Law, LLC and Ashman Law, LLC, for its Amended Complaint against Defendants alleges as follows:

## NATURE OF THE ACTION

1.      Defendants engaged in racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and violated the common law of Illinois and/or Delaware with respect to their involvement in and association with Argon Credit, LLC ("Argon Credit"), and Argon X, LLC ("Argon X") (together, Argon Credit and Argon X, the "Argon Entities").[1]

2.      This action seeks compensatory, consequential, treble and punitive damages for the unlawful and prohibited acts and conduct of Defendants as described herein as the RICO Scheme.

3.      By this Amended Complaint, FRS seeks entry of a judgment against Defendants, all of whom FRS alleges conspired to violate, and did violate, RICO.

4.      Specifically, the RICO Scheme sought to induce Princeton into extending more credit on its Revolving Note (the "Loan Proceeds") by purposefully and repeatedly providing false financial information to Princeton so as to hinder Princeton's discovery of the underlying fraudulent diversion of the Loan Proceeds. The deception delayed Princeton's eventual declaration of an event of default.  The "lend more + delay default" RICO Scheme was directed at no creditor of the Argon Entities other than Princeton.

---

[1] Both Argon Credit and Argon X filed for bankruptcy. *See In re Argon Credit, LLC et al.*, Case No. 16-39654 (jointly administered) (N.D. Ill. 2016) (the "Argon Bankruptcy")). This Complaint neither asserts any claims against the Argon Entities nor asserts any claims on behalf of, or otherwise owned by, the Argon Entities.

5.      The initial harm caused to Princeton by the RICO Scheme was not the divestiture of the Secured Collateral or the Prohibited Transfers or the non-payment of the PAIF Settlement Funds (as such terms are defined herein), although each of those injuries did occur and worsened Princeton's financial position, but was the inducement of Princeton to lend its funds initially and then increase its credit line not once but twice, with the first increase occurring at the very time that the Spartan Transactions were being initially conducted and created (collectively, the Loan Proceeds, Secured Collateral, Prohibited Transfers and PAIF Settlement Funds, the "Princeton Property").[2]

6.      Princeton further alleges that Defendants, by and through their varying illicit activity and conduct of the RICO Scheme, violated Illinois and/or Delaware common law for various unlawful acts including, without limitation, (i) fraud/intentional misrepresentation, (ii) aiding and abetting fraud/intentional misrepresentation, (iii) fraudulent concealment, (iii) aiding and abetting fraudulent concealment, (iv) conversion, (v) aiding and abetting conversion, (vi) civil conspiracy, (vii) tortious interference with contractual relations, (viii) breach of personal guaranty and (ix) breach of subordination agreements.

7.      Princeton suffered monetary damages proximately caused by the RICO Scheme in the amount of $238,014,066.18 as more fully set forth in **COUNT I** herein.

8.      Defendants who engaged in and benefitted from the RICO Scheme include the following:

|       |       |
|-------|-------|
| (i)   | **RBC CAPITAL MARKETS, LLC** ("RBC Capital"); |
| (ii)  | **JAMES I. UIHLEIN** ("JI UIHLEIN"); |
| (iii) | **JAMES P. UIHLEIN** ("JP UIHLEIN"); |
| (iv)  | **JOHN A. KUHLMAN, JR.** ("KUHLMAN"); |
| (v)   | **GLENORA COMPANY** ("GLENORA"); |

---

[2] The term "Princeton Property" is an all-inclusive term designed to capture all of the property losses that Princeton suffered as the result of the RICO Scheme, in whatever form, regardless of whether the descriptions are overlapping and/or include subsets of other property lost by Princeton.

| (vi) | **LITTLE OWL ARGON, LLC** ("LITTLE OWL"); |
|---|---|
| (vii) | **RAVIV WOLFE** ("WOLFE"); |
| (viii) | **NOAX, LLC** ("NOAX"); |
| (ix) | **GARY ZUMSKI** ("ZUMSKI"); |
| (x) | **BERJ ARAKELIAN** ("ARAKELIAN"); |
| (xi) | **B MONEY HOLDINGS, LLC** ("BMONEY"); |
| (xii) | **BERGARVIV, LLC** ("BERGARVIV"); |
| (xiii) | **ERIC SCHNOSENBERG** ("SCHNOSENBERG"); |
| (xiv) | **PETER FERRO, JR.** ("FERRO"); |
| (xv) | **MARGON LLC** ("MARGON"); |
| (xvi) | **SEAN TOMASZKIEWICZ** ("TOMASZKIEWICZ"); |
| (xvii) | **BLUE TREBLE SOLUTIONS, LLC** ("BLUE TREBLE"); |
| (xviii) | **JOSEPH CANFORA** ("CANFORA"); |
| (xix) | **MARK TRIFFLER** ("TRIFFLER"); |
| (xx) | **MARK TRIFFLER TRUST** ("TRIFFLER TRUST"); |
| (xxi) | **BRUCE BREITWEISER** ("BREITWEISER"); |
| (xxii) | **BYRON FAERMARK** ("FAERMARK"); |
| (xxiii) | **BARRY KOSTINER** ("KOSTINER"); |
| (xxiv) | **FINTECH ASSET MANAGEMENT, LLC** ("FTAM"); |
| (xxv) | **SSF HOLDINGS LLC** ("SSF HOLDINGS"); |
| (xxvi) | **SPARTAN SPECIALTY FINANCE I LLC** ("SPARTAN FINANCE"); |
| (xxvii) | **SPARTAN SPECIALTY FINANCE I SPV, LLC** ("SPARTAN SPV"); |
| (xxviii) | **BRUCE GOLDSTEIN** ("GOLDSTEIN"); |
| (xxix) | **BROADMARK CAPITAL, LLC** ("BROADMARK"); |
| (xxx) | **PERAZA CAPITAL & INVESTMENT, LLC** ("PERAZA"); |
| (xxxi) | **ALHAMBRA CIRCLE PARTNERS, LLC** ("ALHAMBRA"); |
| (xxxii) | **BARRY EDMONSON** ("EDMONSON"); and |
| (xxxiii) | **CARDINAL TRUST** ("CARDINAL TRUST"); |
| (xxxiv) | **DANIEL WIRZBERGER** ("WIRZBERGER"); and |
| (xxxv) | **MERIT MANAGEMENT GROUP, L.P.** ("MERIT GAMING"), |

(collectively, "Defendants").

## PARTIES

## PLAINTIFF

9.     FRS is a Delaware limited liability company with its principal place of business in Princeton, New Jersey, and is wholly owned by PAIF as its sole member. FRS is the assignee of all right, title and ownership interest of PAIF in the Fintech Loan Agreement and related documents, including the Secured Collateral of the Argon Entities.

10.     PAIF is a Delaware limited partnership with its principal place of business in Princeton, New Jersey. PAIF assigned all of its right, title and ownership interest in the Fintech Loan Agreement and related documents, including the Secured Collateral of the Argon Entities to FRS.

## DEFENDANT INDIVIDUALS AND ENTITIES

11.     WOLFE is an individual who is a citizen of Illinois. WOLFE was a founder of Argon Credit and served as Argon Credit's chief executive officer and a member of Argon Credit's board of managers at various times relevant to this Amended Complaint. WOLFE is an owner of NOAX and SSF HOLDINGS and part-owner member of BERGARVIV.

12.     ZUMSKI is an individual who is a citizen of Illinois. ZUMSKI was a founder of Argon Credit and served as Argon Credit's chief risk officer at all times relevant to this Amended Complaint and was a member of Argon Credit's board of managers from, at least, May 2015 through February 12, 2016.

13.     FERRO is an individual who is a citizen of Illinois. FERRO was Argon Credit's president from June 2016 forward and was a member of Argon Credit's board of managers between September 8, 2014 and February 3, 2015. FERRO is also a part-owner member of MARGON and part-owner of, and an executive with, MERIT GAMING.

14.     ARAKELIAN is an individual who is a citizen of California. ARAKELIAN was a founder of Argon Credit and served as Argon Credit's chief executive officer from September 8, 2014 through approximately May 2015 and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016. ARAKELIAN is also the owner of BMONEY and a part-owner member of BERGARVIV.

15. SCHNOSENBERG is an individual who is a citizen of Indiana. SCHNOSENBERG was Argon Credit's executive vice president of finance at all times relevant to this Amended Complaint.

16. TOMASZKIEWICZ is an individual who is a citizen of Illinois. TOMASZKIEWICZ was Argon Credit's vice president of technology and business development at all times relevant to this Complaint and is the owner of BLUE TREBLE.

17. CANFORA is an individual who is a citizen of Illinois. CANFORA was a member of Argon Credit's board of managers at all times relevant to this Amended Complaint and is also part-owner of MARGON and the Chief Executive Officer and part-owner and executive of MERIT GAMING.

18. TRIFFLER is an individual who is a citizen of Illinois. TRIFFLER was a member of Argon Credit's board of managers at all times relevant to this Amended Complaint and is trustee of the TRIFFLER TRUST, a part-owner of MARGON, and an executive and part-owner of MERIT GAMING. TRIFFLER is being sued in both his individual capacity and as Trustee of TRIFFLER TRUST and as an executive and owner and executive of MERIT GAMING.

19. TRIFFLER TRUST is an Illinois trust with its principal place of business in Lemont, Illinois. TRIFFLER TRUST was also a part-owner member of Argon Credit.

20. KUHLMAN is an individual who is a citizen of Illinois. KUHLMAN, a FINRA-registered broker-dealer with RBC Wealth Management, a division of RBC CAPITAL, provided investment advice to GLENORA, LITTLE OWL, JI UIHLEIN and JP UIHLEIN, and was a member of Argon Credit's board of managers from February 3, 2015 forward. KUHLMAN was acting, at all times relevant to this Amended Complaint and wherever and whenever referenced

herein, both individually and at the direction and benefit of, and as a steward for, RBC CAPITAL, LITTLE OWL, JI UIHLEIN, JP UIHLEIN and GLENORA.

21.     BREITWEISER is an individual who is a citizen of Illinois. BREITWEISER was a member of Argon Credit's board of managers from February 12, 2015 through December 2016.

22.     FAERMARK is an individual who is a citizen of Illinois. FAERMARK was a member of Argon Credit's board of managers from February 12, 2015 through December 2016.

23.     KOSTINER is an individual who is a citizen of New York. KOSTINER is the owner of FTAM, SPARTAN FINANCE and SPARTAN SPV.

24.     BERGARVIV is an Illinois limited liability company with its principal place of business located in Carpentersville, Illinois. ARAKELIAN and WOLFE own BERGARVIV.

25.     GOLDSTEIN is an individual who is a citizen of Florida. GOLDSTEIN was a FINRA-registered representative of BROADMARK and PERAZA, and the owner of ALHAMBRA at all times relevant to this Complaint.

26.     ALHAMBRA is a Florida limited liability company with its principal place of business in Coconut Grove, Florida.

27.     BROADMARK is a Washington limited liability company with its principal place of business in Seattle, Washington. BROADMARK employed GOLDSTEIN as a FINRA-registered representative.

28.     PERAZA is a Florida limited liability company with its principal place of business in Saint Petersburg, Florida. PERAZA employed GOLDSTEIN as a FINRA-registered representative.

29.     BLUE TREBLE is a limited liability company, organized under the laws of the state of Delaware with its principal place of business in Naperville, Illinois. TOMASZKIEWICZ owns BLUE TREBLE.

30.     LITTLE OWL is a Florida limited liability company with its principal place of business in Sarasota, Florida. LITTLE OWL's managers were JI UIHLEIN and JP UIHLEIN and LITTLE OWL's investment in the Argon Entities was further managed by GLENORA. GLENORA's representatives include Jill M. Newman ("Newman"), Jordan Crawford ("Crawford") and Elizabeth Dunn ("Dunn"). LITTLE OWL was a part-owner member of Argon Credit.

31.     RBC CAPITAL is a Minnesota limited liability company with its principal place of business in New York, New York, and offices in Chicago, Illinois.

32.     JI UIHLEIN is an individual who is a citizen of both Florida and Wisconsin. JI UIHLEIN was a part-owner member, manager and investor in LITTLE OWL and GLENORA at all times relevant to this Amended Complaint.

33.     JP UIHLEIN is an individual who is a citizen of both Florida and Wisconsin. JP UIHLEIN was a part-owner member, manager and investor in LITTLE OWL and GLENORA at all times relevant to this Amended Complaint.

34.     GLENORA is a domestic business corporation with its principal place of business in Wisconsin. GLENORA is part-owner and joint manager of LITTLE OWL and is the entity through which JI UIHLEIN and JP UIHLEIN invested in the Argon Entities.

35.     MARGON is a limited liability company with its principal place of business in Burr Ridge, Illinois. MARGON is owned by FERRO, CANFORA and TRIFFLER TRUST and was a part-owner of Argon Credit.

36.     CARDINAL TRUST is an Illinois trust with its principal place of business in Burr Ridge, Illinois. CARDINAL TRUST was a part-owner of Argon Credit.

37.     EDMONSON is an individual who is a citizen of Illinois. EDMONSON was the trustee of CARDINAL TRUST at all times relevant to this Amended Complaint as well as an executive with, and part-owner of, MERIT GAMING. EDMONSON is being sued both in his individual capacity and as trustee of CARDINAL TRUST and as executive with, and part-owner of, MERIT GAMING.

38.     NOAX is a limited liability company with its principal place of business in Valparaiso, Indiana. NOAX is partially owned and controlled by WOLFE and is a part-owner member of Argon Credit.

39.     BMONEY is an Illinois limited liability company with its principal place of business in Schaumburg, Illinois. BMONEY is owned by ARAKELIAN and was a part-owner member of Argon Credit.

40.     FTAM is a Delaware limited liability company that is owned by KOSTINER and is the managing member of SPARTAN FINANCE and SPARTAN SPV.

41.     SPARTAN FINANCE is a Delaware limited liability company with its principal place of business in Monsey, New York. SPARTAN FINANCE is owned by FTAM.

42.     SSF HOLDINGS is a Delaware limited liability company that was part-owner member of SPARTAN FINANCE. WOLFE was the managing member and chief executive officer of SSF HOLDINGS.

43.     SPARTAN SPV is a Delaware limited liability company and its sole member was FTAM.

44.     WIRZBERGER is an individual who is a citizen of New York, and currently owns and is managing Pearl Manor Capital Partners based in New York, New York. WIRZBERGER was an executive with Exigent Alternative Capital at all times relevant to this Amended Complaint.

45.     MERIT GAMING is an Illinois-based limited partnership. MERIT GAMING's executives included FERRO, CANFORA, TRIFFLER and EDMONSON. Those executives used MERIT GAMING as a tool to effectuate the fraud described herein.

46.     The "Argon Insiders" include those Defendants who were an owner, board member/manager and/or an executive officer of the Argon Entities and who, through various since-discovered communications, knew or should have known that the Argon Entities were insolvent and nevertheless aided and abetted, participated in, and/or acquiesced with knowledge to, the pervasive rampant fraud that was being committed against, and concealed from, Princeton.

47.     The Argon Insiders knew and were aware of, and aided and abetted in, all acts and decisions by those Defendants in control of the Argon Entities that (i) delivered false financial information to Princeton and (ii) defrauded Princeton out of the value of its Princeton Property and diverted it away from Princeton's control and oversight.

48.     The Argon Insiders include the following Defendants: KUHLMAN, RBC CAPITAL, JI UIHLEIN, JP UIHLEIN, LITTLE OWL, WOLFE, NOAX, ZUMSKI, ARAKELIAN, BMONEY, SCHNOSENBERG, FERRO, MARGON, TOMASKIEWICZ, CANFORA, TRIFFLER, TRIFFLER TRUST, BREITWEISER, FAERMARK, GLENORA, KOSTINER, CARDINAL TRUST and EDMONSON.

49.     The "Argon Outsiders" include those Defendants who were owned by, affiliated with, managed by or executed self-dealing transactions with, any one or more of the Argon Entities and/or Argon Insiders who perpetrated and/or financially benefitted from the RICO Scheme.

50. The Argon Outsiders include the following Defendants: BERGARVIV, BLUE TREBLE, GOLDSTEIN, PERAZA, BROADMARK, ALHAMBRA SSF HOLDINGS, SPARTAN FINANCE, SPARTAN SPV, WIRZBERGER, MERIT GAMING and FTAM.

## NON-DEFENDANT INDIVIDUALS AND ENTITIES

51. Fintech Financial, LLC ("Fintech Financial") is a limited liability company that has its principal place of business in Mission, South Dakota, and executed the Fintech Loan Agreement. Pursuant to the Fintech Loan Agreement, Fintech Financial is the original secured lender to the Argon Entities which sold, transferred and assigned all of its right, title and ownership interest in the secured assets of the Argon Entities to PAIF. Fintech Financial also acted as PAIF's agent at various times after the assignment of the Fintech Loan Agreement to PAIF.

52. Argon Credit is a Delaware limited liability company that had its principal place of business in Chicago, Illinois. Argon Credit is the sole owner of Argon X.

53. Argon Credit was owned by CARDINAL TRUST, ZUMSKI, LITTLE OWL, MARGON, TRIFFLER TRUST, NOAX and BMONEY, and is now a bankrupt entity.

54. Argon X is a Delaware limited liability company that had its principal place business in Chicago, Illinois. Argon X is wholly owned by Argon Credit and is now a bankrupt entity.

55. RSM US LLP ("RSM") is a limited liability partnership, organized under the laws of the state of Iowa with its principal place of business at One South Wacker Drive, Suite 800, Chicago, IL 60606. RSM is also an accounting firm that, on September 6, 2016, prepared an Independent Accountant's Review Report (the "Independent Report") of the Consolidated Financial Report of the Argon Entities, as of December 31, 2015.

56.     The fundamental findings of the Independent Report were that, as of December 31, 2015, "[t]he events and circumstances described above create substantial doubt about the [Argon Entities'] ability to continue as a going concern." The Independent Report further found that, at all times relevant to this Amended Complaint (*i.e.*, from May 2015 through December 2016), and as otherwise demonstrated herein, the Argon Entities were insolvent.

## JURISDICTION AND VENUE

57.     This Court has jurisdiction over Princeton's RICO claims pursuant to, *inter alia*, 28 U.S.C. § 1331 because Princeton sets forth claims under RICO, 18 U.S.C. §§ 1964(c), 1965(a).

58.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship, inasmuch as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  The sole member of FRS is PAIF, which is a Delaware limited partnership with a principal place of business in New Jersey.  To the best of FRS's knowledge, no Defendant or, for limited liability defendants, none of their members, shares a same state of citizenship with FRS.

59.     This Court has supplemental jurisdiction over Princeton's common law claims that arise under the laws of the State of Illinois and Delaware pursuant to 28 U.S.C. § 1367 because such state law claims are factually related to Princeton's RICO claims and are part of the same case or controversy under Article III of the United States Constitution.

60.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), as many Defendants reside or do business in this District and the events or omissions giving rise to the claims asserted herein, both the RICO and state common law claims, occurred in this District.

61.     This Court has personal jurisdiction over Defendants under 735 ILCS 5/2-209(a)(1) and the United States Constitution because Defendants have transacted business within the State

of Illinois and Northern District of Illinois and purposefully availed themselves of the privilege of conducting activities within the State of Illinois and the Northern District of Illinois, and Defendants should have reasonably expected their actions to have consequences within the State of Illinois and the Northern District of Illinois.

## INTERSTATE COMMERCE

62.     Princeton maintains offices in New Jersey.

63.     Princeton disbursed the Loan Proceeds to the Argon Entities through the use of the United States mail, emails, interstate wires and other electronic communications platforms.

64.     The Argon Entities maintained offices in Chicago, Illinois.

65.     The Argon Entities conducted business in various jurisdictions around the country including, without limitation, Utah, Georgia, Louisiana, Illinois, Alabama, California and Missouri (the "Argon Markets"), through its various wholly-owned "special purpose entity" subsidiaries (the "Argon Subsidiaries").[3]

66.     The Argon Entities and Argon Subsidiaries ran client acquisition marketing campaigns and advertisements that appeared in the Argon Markets.

67.     The Argon Entities actively solicited potential clients, secured business, and collected interest and fees from out-of-state clients residing in the Argon Markets, as well as financed their operations using the Loan Proceeds disbursed pursuant to the Fintech Loan Agreement through the use of the United States mail, emails, interstate wires and other electronic communications platforms.

---

[3] The Argon Subsidiaries included: (i) Argon Credit of Alabama, LLC; (ii) Argon Credit of California, LLC; (iii) Argon Credit of Louisiana, LLC; (iv) Argon Credit of Georgia, LLC; (v) Argon Credit of Utah, LLC; (vi) Argon Credit of Missouri, LLC; and (vii) Argon Credit of Illinois, LLC.

68.     The business activities of Princeton, as the owner of the Princeton Property, and the Argon Entities substantially affected interstate commerce and used regular communications in interstate commerce, including the United States mail, e-mails, the internet and interstate wires.

## FACTUAL BACKGROUND

### The Argon Entities

69.     Argon Credit was formed as a Delaware limited liability company on October 15, 2013.

70.     Argon Credit did not begin significant business operations until late 2014.

71.     At that time, the member owners of Argon Credit included NOAX, MARGON, ZUMSKI and BMONEY, and the Board of Managers included WOLFE, ARAKELIAN, ZUMSKI, CANFORA, FERRO and TRIFFLER.

72.     Argon Credit formed Argon X as a Delaware limited liability company on April 23, 2015.

73.     Argon Credit owns one hundred percent (100%) of the membership interests in Argon X.

74.     Argon Credit and the Argon Subsidiaries were the originators of state-by-state internet-marketed unsecured consumer "subprime" loans that, depending upon the creditworthiness of the potential borrower, were for amounts upwards of $35,000.00 and at interest rates ranging from 19% to 95%, with terms ranging from 12 to 60 months (the "Consumer Loans").

75.     The Argon Subsidiaries documented the Consumer Loans, while Argon Credit provided the financing for the Consumer Loans through the Loan Proceeds disbursed by Princeton through the Fintech Loan Agreement.

76.     After the Consumer Loans were documented and funded, Argon Credit sold the Consumer Loans to Argon X, but retained the management of the servicing operations of the Consumer Loans, including the collection of all servicing charges, interest, fees and principal payments.

77.     The Argon Entities classified troubled Consumer Loans which became more than 60 days past due as "Doubtful Accounts."

## Fintech Loan Agreement Finances The Argon Entities

78.     On May 1, 2015, in order to finance the operations of the Argon Entities, Fintech Financial, as lender, and Argon X, as borrower, entered into both a Loan and Security Agreement (the "LSA") and Revolving Loan Note (the "Revolving Note").

79.     Argon Credit and certain of the Argon Subsidiaries executed a Guaranty and Suretyship Agreement (the "Argon Credit Guaranty") in favor of Fintech Financial which, among other things, guaranteed the full, prompt and unconditional payment and performance of Argon X's liabilities and obligations under the Fintech Loan Agreement and granted Fintech Financial a security interest in all of Argon Credit's assets (collectively, the LSA, Revolving Note and Argon Credit Guaranty, as well as all other related financing documents, executed contemporaneously therewith, the "Fintech Loan Agreement").

80.     The Fintech Loan Agreement provided the Argon Entities with an initial revolving line of credit with a maximum limit of $20,000,000.00.

81.     Pursuant to the terms of the Fintech Loan Agreement, among other obligations, Argon Credit paid PAIF a weekly settlement that included 100% of the principal collected and up to 30% of the interest collected and Argon Credit would additionally be obligated to reserve up to

15% of weekly interest collected for loan losses (with the interest amount being trued-up at month end based on a *per diem* interest calculation) (collectively, the "PAIF Settlement Funds").

82.     To secure repayment of their borrower obligations under the Revolving Note, and pursuant to the Fintech Loan Agreement, the Argon Entities granted Fintech Financial, and Fintech Financial perfected,[4] a security interest in, and lien upon, all of the assets of the Argon Entities, including the Receivables and Collections from the Consumer Loans originated by Argon Credit and the Argon Subsidiaries (the "Secured Collateral").

83.     In addition, on June 4, 2015, Argon X perfected a security interest in all assets of Argon Credit and each of the Argon Subsidiaries.

84.     Thus, Princeton held a perfected security interest in all assets (*i.e.*, the Secured Collateral) of both (i) Argon Credit and (ii) Argon X including, without limitation, Argon X's security interest in all assets of Argon Credit.[5]

85.     The Argon Credit Guaranty was further amended in September 2015 to include a provision that prohibited Argon Credit from "directly or indirectly" engaging in the selling or transferring of "any [of Argon Credit's] property to, any officer, manager, agent or other person affiliated with" Argon Credit (the "Prohibited Transfer").

---

[4] Fintech Financial's security interest was perfected through the following filings on the Secretary of State of the District of Delaware: (i) UCC-1 #20152393261 (filed on June 4, 2015); (ii) UCC-1 #20152393881 (filed on June 4, 2015); (iii) UCC-1 #20152394186 (filed on June 4, 2015); and (iv) UCC-1 Amendment #20152660917 (filed on June 4, 2015).

[5] Argon Credit, pursuant to the Argon Credit Guaranty, "unconditionally and irrevocably [guaranteed] … as though it were a primary obligor for the full prompt and unconditional payment of each and every "Liability of the Borrower" … [and] the full, prompt and unconditional performance of each and every term and condition of any transaction or obligation to be kept and performed by the Borrower under the Loan Agreement, Revolving Loan Note, and all of the other Financing Agreements." Thus, the Argon Credit Guaranty was both a "guaranty of full payment and performance," including the performance and perfection of Argon X's security interest in all of Argon Credit's assets.

86.     In addition, WOLFE and ZUMSKI, as individual owner members of Argon Credit, provided limited personal guarantees of Argon X's obligations under the Revolving Note (the "Personal Guaranty"), which similarly guaranteed the full, prompt and unconditional payment of Argon X's liabilities and obligations under the Fintech Loan Agreement.[6]

87.     The Revolving Note's initial principal amount of Loan Proceeds of up to $20 million was later increased on two different occasions, first on September 30, 2015 (the "First Amendment") (increased to $34,700,000.00), and then second on February 12, 2016 (the "Second Amendment") (increased to $37,500.000.00), to permit Argon X to borrow up to a total of $37.5 million.[7]

88.     During its negotiations with the Argon Entities, Fintech Financial included PAIF in the negotiations in order to ensure that the underlying loan and financing documents would be acceptable to PAIF as the anticipated assignee of the Fintech Loan Agreement.

89.     On May 6, 2015, Fintech Financial and PAIF entered into a Master Assignment of Loans Agreement whereby Fintech Financial agreed to sell, assign and transfer to PAIF all of Fintech Financial's right, title, and ownership interest in the identified Consumer Loans and its interest in, without limitation, the Secured Collateral, Prohibited Transfers and PAIF Settlement Funds.

90.     After the assignment to Princeton, Fintech Financial remained involved in the continued mechanics of the Fintech Loan Agreement, serving at times solely as PAIF's agent in

---

[6] The obligations of the Personal Guaranty were limited to those circumstances where Princeton was not paid due to, among other reasons, fraud. Because Princeton alleges that WOLFE and ZUMSKI committed fraud to the loss of Princeton, they remain liable under the terms of the Personal Guaranty.

[7] References hereafter to the Fintech Loan Agreement include the First Amendment and Second Amendment.

order, in part, to effectuate the First Amendment, Second Amendment and subsequent subordination agreements.

91.     At all times from the date of the assignment to PAIF until the filing of the Argon Bankruptcy, the Argon Entities, Fintech Financial and all Defendants fully understood that PAIF held and controlled all applicable rights as lender of the Loan Proceeds disbursed pursuant to the Fintech Loan Agreement.

92.     Consequently, at all times relevant to this Amended Complaint, PAIF was entitled to enforce all of the rights and remedies provided by the Fintech Loan Agreement.

93.     Pursuant to the terms of the Fintech Loan Agreement, the Argon Entities agreed to provide Fintech Financial (and PAIF by assignment) with accurate, timely and complete financial statements and other information applicable to the operations of the Argon Entities and other financial information as reasonably requested by Fintech Financial/PAIF.

94.     The Fintech Loan Agreement contains multiple provisions regarding the disclosure of accurate and truthful financial records and information from each of the Argon Entities to Fintech Financial (and PAIF, as successor) (the "Financial Covenants").

95.     The Financial Covenants are located in the LSA, as amended, and without limitation, at sections 2.7, 4.1, 4.2, 5.3(d), 7.1, 7.2, 8.3, 8.17, 8.18, 9.6, 9.7, 9.9, 9.12 and 9.19 therein, as well as various similar provisions in the Revolving Note, Argon Credit Guaranty and Personal Guaranties.

96.     The Financial Covenants also include those amending provisions in the First Amendment and Second Amendment, as well as the various subordination agreements described herein.

## Fraudulent Transfer Of Consumer Loans To SPARTAN FINANCE

97.     On May 22, 2015, within only a few weeks of the execution of the Fintech Loan Agreement, KOSTINER, acting as Argon Credit's Vice President of Capital Markets, with the knowledge, awareness and complicity of other Argon Insiders including, without limitation, WOLFE, ZUMSKI and ARAKELIAN, formed FTAM for the fraudulent purpose of utilizing the Loan Proceeds to acquire certain Consumer Loans and using an entity name that was intentionally similar to Fintech Financial's proper name.

98.     Whereas Fintech Financial's proper name is "Fintech Financial, LLC," KOSTINER's fraudulent entity was named "Fintech Asset Management, LLC."

99.     With the knowledge of other Argon Insiders, KOSTINER, as FTAM's sole managing member, used his Argon Credit e-mail address for business transactions related to FTAM.

100.     KOSTINER, as well as the other Argon Insiders working closely with him, were aware of the Fintech Loan Agreement and Financial Covenants.

101.     By email dated June 5, 2015, WOLFE, as CEO of Argon Credit, gave instructions to Harry Madanyan ("Madanyan"), Argon Credit's Director of Strategy and Program Management, to give KOSTINER and Robert Sheybani ("Sheybani"), another Argon Credit executive, unfettered access to the online drop box of the financing documents related to the Fintech Loan Agreement.

102.     The purpose of WOLFE's instructions was to aid and abet KOSTINER in forming and creating FTAM's operations through which KOSTINER, WOLFE, ZUMSKI, ARAKELIAN and others, intended to divest and divert the Princeton Property away from Princeton's control and oversight.

103.     KOSTINER, WOLFE, ZUMSKI and others shared drafts of the Fintech Loan Agreement with WIRZBERGER who later utilized them to further the fraud described herein.

104.     KOSTINER and Sheybani, at Madanyan's suggestion, used their Argon Credit email addresses to access the drop box of Fintech Loan Agreement financing documents in order to be less conspicuous and to shield their activities from anyone at Fintech Financial and/or PAIF.

105.     By email dated June 29, 2015, SCHNOSENBERG, as Argon Credit's CFO, with the knowledge and approval of WOLFE and others, wired five thousand dollars ($5,000.00) from Argon Credit's accounts to KOSTINER, as payment for KOSTINER's efforts in establishing FTAM, the linchpin in the fraud directed at misappropriating and converting Princeton's Loan Proceeds disbursed through the Fintech Loan Agreement.

106.     Thereafter, during July 2015, and the months following, KOSTINER, WOLFE, ARAKELIAN, SCHNOSENBERG and other Argon Insiders and Argon Outsiders, including WIRZBERGER, entertained potential investors for the funding of the various Spartan Transactions,[8] during which time KOSTINER, with the assistance of various Argon Insiders, utilized Argon Credit's investor presentation to present to potential funders of the Spartan Transactions.

107.     On August 4, 2015, FTAM, at KOSTINER's direction, formed SPARTAN FINANCE and acted as its managing member.

108.     Also on August 4, 2015, WOLFE formed SSF HOLDINGS and acted as its managing member and chief executive officer.

---

[8] The "Spartan Transactions" were, in effect, operations of various entities controlled by Defendants that included the name "Spartan" into which Defendants transferred the Spartan Loans that had been acquired using Princeton's Loan Proceeds disbursed to the Argon Entities through the Fintech Loan Agreement.

109.     Thereafter, on August 20, 2015, WOLFE (as Argon Credit's CEO) and KOSTINER (as the managing member of FTAM) executed a Master Loan Sale Agreement ("Master Agreement") pursuant to which Argon Credit agreed to (purportedly) sell certain Consumer Loans (*i.e.*, the Spartan Loans) to FTAM that had been originated using the Loan Proceeds disbursed pursuant to the Fintech Loan Agreement.

110.     The Master Agreement provided that Argon Credit would make entries on its books and records to indicate the sale of the Spartan Loans to FTAM, but any such financials reflecting the sale of these Spartan Loans to FTAM were never provided or disclosed to Princeton.

111.     As part of the fraud in establishing the Spartan Entities, on August 21, 2015, WOLFE and KOSTINER executed an Affidavit and Purchase Funding Request, which was the purchase of the first tranche of the Spartan Loans.

112.     Through a series of emails from August 25, 2015 to August 29, 2015, KOSTINER, on behalf of FTAM as well as other Argon Insiders, such as WOLFE and ARAKELIAN, actively negotiated the specific terms of the Spartan Transactions with other third parties who included, in part, WIRZBERGER with Exigent Capital, an entity that subsequently financed the Spartan Transactions as the senior debt holder.

113.     By email dated September 10, 2015, KOSTINER forwarded the template agreements (taken from the Fintech Loan Agreement) to WIRZBERGER at Exigent Capital with instructions that these template agreements would form the underlying basis for the Spartan Transactions.

114.     With the knowledge and understanding that the Spartan Loans had been originated using the Loan Proceeds, WIRZBERGER, by email dated September 21, 2015, and copying

WOLFE and KOSTINER, among others, prepared new loan documents for the Spartan Transactions modeled from the Fintech Loan Documents.

115. WIRZBERGER and others including, without limitation, WOLFE and KOSTINER, knew that the Spartan Transactions were intended to divest Princeton of its value in those Loan Proceeds being disbursed to Argon Credit through the Fintech Loan Agreement.

116. By email dated September 24, 2015, KOSTINER admitted to WOLFE and ARAKELIAN that the new FTAM loan documents were "just a mark up off of Argon's existing loan docs with Princeton."

117. On or about October 12, 2015, KOSTINER also prepared and circulated a document entitled "FTAM-Argon Structure Overview Memo" (the "Spartan Memo").

118. The Spartan Memo is a blueprint of the Spartan Transactions and details the interrelated relationships between the various parties involved in the Spartan Transactions, including the Argon Entities as well as the following Defendants identified in the Spartan Memo: WOLF, ARAKELIAN, ZUMSKI, MARGON, LITTLE OWL, BERGARVIV, KOSTINER, FTAM and SSF HOLDINGS.

119. The Spartan Memo mirrored the structure of the Fintech Loan Agreement and demonstrated the efforts of certain Argon Insiders and Argon Outsiders to defraud Princeton as owner of the Princeton Property by diverting and divesting Princeton of its value in the Loan Proceeds disbursed to the Argon Entities through the Fintech Loan Agreement.

120. Consistent with the Spartan Memo, Argon Credit, FTAM and SPARTAN FINANCE executed a servicing agreement (the "Spartan Servicing Agreement") which provided that, among other things: (i) Argon Credit would originate and transfer the Spartan Loans to SPARTAN FINANCE; (ii) Argon Credit would provide pre-servicing support and administrative

services in connection with the Spartan Loans and would also service the Spartan Loans, including collecting PAIF Settlement Funds (due to Princeton) which would be segregated from Argon Credit's other Secured Collateral and then deposited into SPARTAN FINANCE's account within one business day; and (iii) Argon Credit would receive a servicing fee equal to fifteen percent of the amount invested by SPARTAN FINANCE in the Spartan Loans payable in equal monthly installments over six months (the "Spartan Servicing Fees");[9] *provided, however*, SPARTAN FINANCE was only obligated to pay the Spartan Servicing Fees to FTAM, which was then allegedly obligated to pay such Spartan Servicing Fees to Argon Credit, but the Spartan Servicing Agreement failed to provide Argon Credit with a right of recourse against the Spartan Loans for payment of the Spartan Servicing Fees if FTAM failed to remit such Spartan Servicing Fee to Argon Credit.

121. FTAM failed to remit any Spartan Servicing Fees or PAIF Settlement Funds to Princeton or Argon Credit at any time.

122. Further consistent with the Spartan Memo, Argon Credit, FTAM and SPARTAN FINANCE also executed a side agreement which provided that Argon Credit granted FTAM a right of allocation for up to twenty-five percent of those additional Consumer Loans originated by Argon Credit that had an annual percentage rate equal to or exceeding 40% to be assigned to FTAM on a monthly basis (the "40% Loans").

123. Argon Credit also granted FTAM a right of first refusal to acquire the 40% Loans if Argon Credit proposed to sell them.

124. None of the Spartan Transactions were ever disclosed to Princeton.

---

[9] The PAIF Settlement Funds that were owed but not paid to Princeton from the Spartan Loans represented a subset of the Spartan Servicing Fees.

125.     Even as late as October 13, 2015, KOSTINER, working closely with Sheybani, was plagiarizing from the form financing documents utilized in the Fintech Loan Agreement, including form draw requests, in order to model the Spartan Transactions.

126.     KOSTINER, with the knowledge of WOLFE, ZUMSKI, ARAKELIAN, SCHNOSENBERG, MARGON, LITTLE OWL, BERGARVIV, FTAM and SSF HOLDINGS and all other Argon Insiders and Argon Outsiders, formed FTAM for the sole purpose of acquiring and servicing a portfolio of Consumer Loans, being funded through Princeton's Loan Proceeds and being transferred to FTAM (the "Spartan Loans"), thereby divesting Princeton of its value in its Princeton Property.

127.     Thereafter, on October 20, 2015, FTAM, through KOSTINER as its sole member, formed SPARTAN SPV (collectively, SPARTAN SPV, SPARTAN FINANCE and SSF HOLDINGS, the "Spartan Entities").

128.     At this same time, by email dated October 21, 2015, KUHLMAN, acting on behalf of himself and RBC CAPITAL, wrote to SCHNOSENBERG, WOLFE, ZUMSKI, FERRO, CANFORA, TRIFFLER and EDMONSON about his concerns surrounding the sustainability model for the Argon Entities.

129.     As KUHLMAN stated in that October 2015 email: "As we discussed at the last board meeting **we would all like to know how the hamster gets off the hamster wheel.**" (emphasis supplied).

130.     KUHLMAN, however, failed to heed his own warning, as he revealed in an October 2015 email:

> I simply want to know at what level Argon's portfolio needs to stabilize in order to get to a point where shareholders can take distributions without damaging Argon's balance sheet, income statement and continued growth realizing the growth curve will flatten. … **I don't like surprises nor do I like waiting**

**around for what I consider to be necessary information flow, i.e. sustainability modeling and the like**.

(emphasis supplied).

131.    On October 31, 2015, SPARTAN SPV entered into a Loan and Security Agreement with Hamilton Funding, pursuant to which Hamilton Funding agreed to loan up to $10,000,000.00 to SPARTAN SPV with a delayed draw term loan facility, secured by the assets Argon Credit transferred to SPARTAN SPV, with a 70% loan to collateral value borrowing base (the "Hamilton Funding Loan").

132.    FTAM, KOSTINER and WOLFE each also guaranteed the Hamilton Funding Loan.

133.    Argon Credit, which continued to act as servicer for the Spartan Loans, diverted the Spartan Servicing Fees (*i.e.*, Princeton's PAIF Settlement Funds and other Collections and Receivables) collected from the Spartan Loans on a weekly basis into a bank account owned by SPARTAN FINANCE, which was subject to a security interest of Hamilton Funding through a deposit account control agreement (the "Spartan Bank Account").

134.    Argon Credit made deposits into the Spartan Bank Account of approximately $50,000.00 per week, all of which was a wrongful diversion of the Princeton Property away from Princeton's control and oversight.

135.    By email dated November 11, 2015, Newman, as President of GLENORA, the entity that owned LITTLE OWL, and the investment company that managed JI UIHLEIN's and JP UIHLEIN's various investments through RBC CAPITAL, upon reviewing the financials provided by the Argon Entities, expressed significant concern, as had KUHLMAN two weeks earlier, that the "current model [was] not sustainable."

136.    In fact, as demonstrated by RSM's Independent Report, the Argon Insiders knew that the Argon Entities were insolvent as early as the execution of the Fintech Loan Agreement.

137.    Thereafter, with the knowledge, and at the direction of, the Argon Insiders and Argon Outsiders, Argon Credit used Princeton's Loan Proceeds from the Revolving Note to originate the Spartan Loans that Argon Credit transferred to FTAM for an alleged aggregate purchase price of approximately $4.7M (the "Spartan Loan Purchase Price"), incurred over the course of several months following the initial tranche in August 2015.

138.    Specifically, Argon Credit transferred or assigned to FTAM the Spartan Loans, totaling approximately 1,162 separate consumer loans, all originated using Princeton's Loan Proceeds disbursed through Argon Credit or the Argon Subsidiaries, with a specific face value of at least $4,703,138.99, during the time period of July 13, 2015, through December 10, 2015.

139.    The Spartan Loans also represented the most lucrative assets in the portfolio giving the best yields with borrowers in the best credit rating brackets and the least likely to default.

140.    Newman included SCHNOSENBERG, WOLFE, KUHLMAN (with RBC CAPITAL), RBC, JI UIHLEIN and JP UIHLEIN on her November 11, 2015 email, all of whom were similarly informed about the *unsustainability* of the Argon business model as well as about the Spartan Transactions and Doubtful Accounts missing from those financial documents and disclosures being delivered to Princeton.

141.    In that same email, Newman questioned, and requested information pertaining to, the Spartan Transactions, with particular reference to those assets being held by a Spartan entity, as well as information pertaining to delinquent Consumer Loans (*i.e.*, the Doubtful Accounts).

142.    The troubling questions raised by Newman's November 2015 email demonstrated an awareness of the very instruments of fraud (namely the existence and significance of the

undisclosed (i) Doubtful Accounts and (ii) Spartan Transactions) being used by the Argon Insiders and Argon Outsiders to divest Princeton of its value in its Princeton Property.

143.    Despite being aware of these issues in November 2015, neither GLENORA, nor any other Argon Insider on that email string or otherwise, ever attempted to stop the fraud and instead, to the contrary, participated in such fraud to Princeton's financial detriment and loss of its Princeton Property.

144.    By email dated November 13, 2015, KUHLMAN, using his RBC CAPITAL email address, communicated with WOLFE and SCHNOSENBERG.  That November 13, 2015 email included earlier emails which had included, as recipients, JI UIHLEIN, JP UIHLEIN, and Newman and Crawford as representatives of GLENORA.

145.    These Defendants including, without limitation, KUHLMAN, RBC CAPITAL, WOLFE, SCHNOSENBERG, JI UIHLEIN, JP UIHLEIN and GLENORA, approved of the Spartan Transactions, despite their understanding and knowledge that the Spartan Loans had been acquired using Princeton's Loan Proceeds and that the PAIF Settlement Funds were not being paid to Princeton for the Spartan Loans.

146.    Specifically, by email dated November 13, 2015, Crawford of GLENORA was impressed by the generation of additional consumer loans:

> I was surprised by the partial sale of debt that took place with Spartan Specialty Finance, can we please provide additional documentation for the transaction **including the price they are paying for buying these existing loans from your books**? It is impressive that you have been able to generate over 2,300 loans 10/1-11/11/2015, would it be possible to provide updated financials for October? **We also look forward to further discussion regarding Princeton Capital** as I am surprised the line of credit is only for 12 month when your outstanding receivables averages 36 months.

(emphasis supplied).

147.    Through these various emails, KUHLMAN (as representative of RBC CAPITAL, and acting on behalf of JI UIHLEIN and JP UIHLEIN), WOLFE, SCHNOSENBERG, JI UIHLEIN, JP UIHLEIN and GLENORA were all aware of the Spartan Transactions and yet failed to take any action to stop the fraud of selling Consumer Loans that had been originated using Princeton's Loan Proceeds to a third party without prior authorization or approval from Princeton.

148.    By email dated November 13, 2015, KUHLMAN took a pot shot at Crawford's earlier email in a separate communication with WOLFE and SCHNOSENBERG:

> The response report you put together was excellent. **It appears Jordan [Crawford] is searching for anything possible to disrupt Little Owl's comfort but it won't work.** :).

(emphasis supplied).

149.    KUHLMAN, working at the behest of, and as a steward for, RBC CAPITAL, JI UIHLEIN, JP UIHLEIN, GLENORA and LITTLE OWL, would not allow Crawford's queries about the purchase price of the Spartan Loans to disrupt the Spartan Transactions.

150.    At this same time, by email dated November 16, 2015, WOLFE, as CEO of Argon Credit, with a copy to KOSTINER and ARAKELIAN, and a subsequent forwarding to SCHNOSENBERG, advised First Associates, the vendor servicing those Consumer Loans originated by Argon Credit, that a portion of the Consumer Loans was being acquired by the Spartan Entities (*i.e.*, the Spartan Loans) and that those Spartan Loans had already been acquired by Argon Credit and were already being serviced by First Associates: "All of the loans to be acquired by SSFISPV will be loans that have already been acquired by Argon and boarded onto the Argon portfolio at First Associates."

151.    In that same email, WOLFE advised First Associates that it was Argon Credit's intention that it was going to sell to FTAM upwards of $15 million in loans and further advised

First Associates to wire the "cash flows" generated by these Spartan Loans (*i.e.*, the Spartan Servicing Fees) to a bank account managed and controlled by KOSTINER and FTAM: "Please wire the cash flows associated with the SSFISPV portfolio to a First Republic bank account, the same way Argon receives it wires. Fintech Asset Management is the Managing Member and 100% equity owner of SSF I SPV."

152.    This servicing revenue, generated by the Spartan Loans, included the Spartan Servicing Fees that, in part, included the PAIF Settlement Funds that were diverted from Princeton and that now, upon the explicit instructions of WOLFE as Argon Credit's CEO, was to be disbursed to FTAM which had no legal obligation to return them to Princeton or the Argon Entities.

153.    In a series of emails, dated November 16, 19, 24 and 26, 2015, KOSTINER, WOLFE, ARAKELIAN, SCHNOSENBERG and WIRZBERGER exchanged information and documents regarding the establishment of the Spartan Entities and execution of the documents pertaining to the Spartan Transactions.

154.    By email dated November 26, 2015, KOSTINER provided WIRZBERGER with confirmation of separate wire transfers of $500K each from TRIFFLER and CARDINAL TRUST to an Argon Credit bank account titled "ARGON NEW OPE Acct" (the "Spartan Investment").

155.    KOSTINER had received the wire transfer confirmation of the $1.0M from SCHNOSENBERG who, along with other Argon Insiders, was working closely with KOSTINER and WOLFE to effectuate the Spartan Transactions.

156.    At that same time, SCHNOSENBERG, by an earlier email, dated November 17, 2015, had represented to PAIF's representatives that Argon Credit had taken in the $1.0M investment (*i.e.*, the Spartan Investment) ***without*** any disclosure that that the Spartan Investment

was actually being used as an investment prop for the Spartan Transactions and that the Spartan Investment was going to be recharacterized as debt owed to CARDINAL TRUST and TRIFFLER.

157.    On November 23, 2015, WOLFE and KOSTINER prepared and executed a Conveyance and Certification of Release document, whereby WOLFE, on behalf of Argon Credit, acknowledged the sale of the Spartan Loans to SPARTAN SPV, as executed by KOSTINER, "**without recourse**." (emphasis supplied).

158.    The definition of "without recourse" means a formula used to disclaim responsibility for future nonpayment, especially of a negotiable financial instrument.

159.    In effect, WOLFE transferred the Spartan Loans without there being any legal responsibility of SPARTAN SPV, the new owner, to pay for them.

160.    The Argon Entities' books and records, as provided to Princeton during the term of the Fintech Loan Agreement, failed to reflect any disclosure of the Master Agreement or the Spartan Transactions, and no Defendant otherwise disclosed the existence or extent of the Spartan Transactions to Princeton.

161.    The Argon Entities used Princeton's Loan Proceeds disbursed pursuant to the Fintech Loan Agreement totaling approximately $4.8 million to originate the Spartan Loans.

162.    However, when Argon Credit allegedly transferred such Spartan Loans to FTAM, FTAM never paid full, fair or indeed any value for Argon Credit's sale of the Spartan Loans to FTAM and PAIF never received any value from Argon Credit for the sale of such Spartan Loans, including Princeton's rights to its PAIF Settlement Funds and value for its Princeton Property.

163.    Instead the purchase price of those Spartan Loans was retained by FTAM, KOSTINER, WOLFE, ZUMSKI and other Argon Insiders and Argon Outsiders who owned and controlled the Spartan Entities.

164.    This was confirmed and admitted to by SCHNOSENBERG at the end of the fraud in December 2016, just days before the Argon Entities declared bankruptcy.

165.    As further evidence of the fraudulent activity concerning the Spartan Transactions, by email dated November 26, 2015, KOSTINER confirmed to WIRZBERGER that SSF HOLDINGS, which included, according to KOSTINER's email, "the Argon management team and their investors," had lent $790,000 to SPARTAN FINANCE, through a promissory note (the "Spartan Note").

166.    The funding for the Spartan Note actually came directly from Princeton's Loan Proceeds disbursed to Argon Credit through the Fintech Loan Agreement and not "the Argon Management team and their investors."

167.    The Spartan Loans at all times represented Princeton's Loan Proceeds disbursed to the Argon Entities through the Fintech Loan Agreement, and as Princeton's Property that were encumbered by PAIF's perfected security interest and property rights.

168.    These Defendants and others, as evidenced and demonstrated by these and other emails, were well aware of the structure of the Spartan Transactions and that such Spartan Transactions were predicated upon the diversion of the value of Princeton's Loan Proceeds without commensurate payment of any true value.

169.    As detailed below and noted above, FTAM never paid the PAIF Settlement Funds or any other Spartan Servicing Fees generated by the Spartan Loans to Princeton as the owner of the Princeton Property or Argon Credit, but rather absconded with those funds to the pecuniary advantage of Defendants.

170. The Spartan Loans, when transferred to FTAM, were also doubly pledged to another secondary secured lender (*i.e.*, Hamilton Funding I, L.P. ("Hamilton Funding")), without the knowledge of, or consent by, PAIF.

171. The Spartan Transactions were fraudulent at their inception given that the Argon Insiders and Argon Outsiders that facilitated the Argon Transactions knew that the transfer of the Spartan Loans to FTAM divested Princeton of its value in its Loan Proceeds without Princeton's knowledge or approval.

172. Along with other Argon Insiders and Argon Outsiders, WOLFE, as CEO of Argon Credit, and owner of NOAX, along with KOSTINER, ZUMSKI, ARAKELIAN, WIRZBERGER and other Defendants, were the ringleaders of the RICO Scheme and underlying fraud by (i) arranging for FTAM and the Spartan Entities to transfer the Spartan Loans to FTAM without paying reasonably equivalent value, (ii) having Argon Credit first acquire loans on its balance sheet using Princeton's Loan Proceeds before transferring and assigning such Spartan Loans to Spartan, and (iii) then failing to provide Princeton with truthful financial documents regarding the Princeton Property and the financial health of the Argon Entities.

173. The double pledge of the Spartan Investment to underwrite the Spartan Transactions and deceive PAIF into believing that Argon Credit had received $1.0M in investment is reflective of the fraud that was occurring without disclosure to PAIF and in a sustained effort to devalue the Princeton Property.

174. The Argon Entities, with the knowing, intentional and complicit understanding of the Argon Insiders, failed to disclose the Spartan Transactions to Princeton until December 2016.

175.    Argon Credit continued to reflect the value of these Spartan Loans (as if they were not transferred to FTAM) on Argon Credit's borrowing base certificates (the "BB Certificates")[10] and other financial information submitted to Princeton pursuant to the terms of Fintech Loan Agreement (as set forth in greater detail below); *provided, however*, the fact that these Spartan Loans were transferred by Argon Insiders to Argon Outsiders was fraudulently concealed from Princeton.

176.    In turn, Argon Credit continued to borrow the Loan Proceeds from the Revolving Note against these phantom Spartan Loans despite the fact that, unbeknownst to PAIF, there was no Secured Collateral to support such increased borrowing.

177.    WOLFE, ARAKELIAN, SCHNOSENBERG, ZUMSKI, CANFORA, TRIFFLER, FERRO, KUHLMAN, BREITWEISER, TOMASKIEWICZ and FAERMARK and all other Argon Insiders were each aware at the time, or subsequently became aware, of the Spartan Transactions and Spartan Loans and, further, knew, or should have known, that the Spartan Transactions and Spartan Loans were neither disclosed to Princeton and nor disclosed on Argon Credit's BB Certificates and other financial documents being provided to Princeton pursuant to the Financial Covenants included in the Fintech Loan Agreements.

178.    In fact, SCHNOSENBERG, WOLFE and ARAKELIAN and, without limitation, other Argon executive insiders received daily reports regarding the Spartan Loans and monitored and participated in the Spartan Transactions, all to the financial detriment of Princeton as the owner of the Princeton Property.

---

[10] Argon Credit's extent of borrowing is predicated upon eligible Receivables (as defined in the LSA). In this case, the Spartan Loans were included in the Receivables, even though such Receivables from the Spartan Loans were fictitious.

179.     The entirety of the Spartan Transactions was a pattern of deceptive and fraudulent conduct and acts intended to deceive Princeton and defraud Princeton of its value in, and ownership of, the Princeton Property (the "Spartan Fraud").

180.     The Spartan Fraud began almost simultaneously upon the execution of the Fintech Loan Agreement by various Argon Insiders and Argon Outsiders, all of whom possessed a demonstrated knowledge that the Spartan Transactions would violate the terms of the Fintech Loan Agreement and its Financial Covenants.

### SPARTAN FINANCE And FTAM Defaulted On Hamilton Funding Loan

181.     SPARTAN FINANCE financed the purported purchase of the Spartan Loans by, among other things, borrowing from Hamilton Funding.

182.     To secure its indebtedness to Hamilton Funding, SPARTAN FINANCE pledged the Spartan Loans as collateral for the Hamilton Funding Loan.

183.     In or around January 2016, only 3 months after funding, SPARTAN SPV fell into noncompliance with the terms of the Hamilton Funding Loan.

184.     On February 5, 2016, unbeknownst to Princeton, SPARTAN SPV represented to Hamilton Funding that it would use Princeton's Loan Proceeds and Argon Credit's assets funded through the Loan Proceeds (and as otherwise pledged to and perfected by Princeton and Argon X), if necessary, to enable SPARTAN SPV to achieve compliance with the Hamilton Funding Loan.

185.     On February 5, 2016, just 7 days before the increase of Princeton's line of credit on the Revolving Note as reflected by the Second Amendment, KOSTINER sent an email, on behalf of SPARTAN SPV, to WIRZBERGER, a representative of Hamilton Funding, stating that "Argon is expecting to receive $5 mm from its investors this week, which will enable it to buy all the loans we need this month, **as well as provide the remaining 30% advance on our senior line of credit**

**with you, if needed**. I have been working with my investors to try not to take it from Argon, but if needed, **we will be able to draw whatever equity is required from Argon to complete a $7 mm draw on the Hamilton Funding line by the end of February**." (emphasis supplied).

186.    KOSTINER, with the knowledge and blessing of Argon's Board of Managers who would have to approve his plan, is describing the RICO Scheme by wanting to utilize those funds from Princeton's Loan Proceeds, as the "senior line of credit" for Argon Credit, in order to keep the Spartan Entities in good graces with Hamilton Funding, its lender.

187.    KOSTINER failed to satisfy the Spartan Entities' noncompliance and, on February 23, 2016, Hamilton Funding served a Notice of Event of Default of the Hamilton Funding Loan for failure to replace defaulted receivables.

188.     Hamilton Funding accelerated the balance of the loan and sought payment of $4,437,700.17, which consisted of $3,274,629.00 in principal.

189.    On March 3, 2016, Hamilton Funding took exclusive control of the Spartan Bank Account and began sweeping the Spartan Servicing Fees, which included the PAIF Settlement Funds due to, but not being paid to, Princeton.

190.    Hamilton Funding swept more than $700K from the Spartan Bank Account.

191.    While SPARTAN SPV and FTAM were engaged in discussions with Hamilton Funding regarding the default under the Hamilton Funding Loan, FTAM and SPARTAN FINANCE separately engaged in discussions with Argon Credit to return the Spartan Loans to Argon Credit.

192.    KOSTINER, WOLFE, FTAM and other Argon Insiders were in effect going to "double down" on the fraud already being committed against Princeton as the owner of the

Princeton Property and now commit additional fraud against Hamilton Funding by transferring the Spartan Loans back to Argon Credit.

193.    The plan to transfer the Spartan Loans back to Argon Credit was an additional fraudulent plan to hide those Spartan Loan assets from Hamilton Funding and prevent Hamilton Funding from continuing to sweep the Spartan Bank Account.

194.    Argon Credit and FTAM executed a repurchase agreement, dated March 1, 2016 (the "Repurchase Agreement"),[11] pursuant to which Argon Credit agreed to transfer back from FTAM, and FTAM agreed to re-transfer to Argon Credit, the assets represented by the Spartan Loans with original principal notes totaling $4,843,024.67 which would be immediately transferred to Argon Credit upon the execution of the repurchase agreement.

195.    In consideration for the transfer of the Spartan Loan assets, Argon Credit agreed that FTAM would continue to receive the future Spartan Servicing Fees, including the PAIF Settlement Funds, from the Spartan Loans until the earlier of 18 months or September 30, 2017.

196.    FTAM and Argon Credit agreed to backdate the Repurchase Agreement by several weeks, but actually signed the Repurchase Agreement on or about March 24, 2016.

197.    Also, on March 24, 2016, SPARTAN SPV sent a letter to Hamilton Funding, rejecting its notices of default and asserting a right to cure such Hamilton Funding Loan defaults.

198.    Despite the purported Repurchase Agreement, the Spartan Loans were not transferred back to Argon Credit.

199.    SPARTAN SPV filed a voluntary petition for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York on June 29, 2016 and listed in its

---

[11] The title "Repurchase Agreement" is a misnomer because it presumes that there had been an original purchase when there was not; rather, the original event was a fraudulent transfer of the Spartan Loans to the Spartan Entities.

schedules of assets and liabilities a loan portfolio (*i.e.*, the stolen Spartan Loans) having a value of $4,750,000.00.

200.    In that bankruptcy case, FERRO, on behalf of Argon Credit, submitted a proof of claim against SPARTAN SPV alleging that Argon Credit was owed $712,500.00 in Spartan Servicing Fees on account of the Spartan Servicing Agreement.

201.    The Spartan Servicing Fees included Princeton's PAIF Settlement Funds that were not being paid to Princeton on a weekly basis.

202.    FERRO and other Argon Insiders knew that the Spartan Servicing Fees and the PAIF Settlement Funds were to be paid to PAIF and Argon Credit by FTAM, but FTAM never made those payments. The Spartan Servicing Fees and PAIF Settlement Funds were knowingly, as part of the RICO Scheme, converted by FTAM, KOSTINER, WOLFE, ZUMSKI and other Argon Insiders and Argon Outsiders during the term of the Spartan Transactions, for their own financial benefit.

**Various Defendants Knowingly Submitted**
**False And Misleading Financial Reports To PAIF**

203.    Simultaneous with the Spartan Fraud and the concealment of the transfer of the Spartan Loans, the Argon Insiders, including Argon Credit's senior executives, owners and board managers, knowingly, willfully, intentionally, recklessly and negligently caused the Argon Entities to submit false, misleading and deceptive financial reports to Princeton in further violation of the Financial Covenants.

204.    The purpose of the delivery of false financial information to Princeton was to deceive and cause Princeton to delay in declaring an event of default of the Revolving Note until such time as the Argon Insiders and Argon Outsiders could abscond with the value of Princeton's Loan Proceeds disbursed through the Fintech Loan Agreement.

205.    For example, Argon Credit submitted financial statements, including a balance sheet and BB Certificate, to PAIF for the period ending December 31, 2015, which reflected $38,833,915.00 in accounts receivable (*i.e.*, Receivables and Collections) but which failed to reflect the Doubtful Accounts.

206.    However, contrary to the documents provided to PAIF, Argon Credit's internal trial balance and balance sheet reflected only $29,982,455.00 in accounts receivable, which included an allowance of negative $5,376,501.74 for the Doubtful Accounts (Line Item No. 12040) (as of December 31, 2015).

207.    The value of these Doubtful Accounts was noted on Argon Credit's internal Profit and Loss Statement for the period January to December 2015 as a Provision Expense (Line Item No. 68010).

208.    Argon Credit also submitted financial statements to PAIF dated March 20, 2016 for the period ending February 28, 2016, which reflected $38,320,266.00 in accounts receivable, but which did not disclose the existence of the Doubtful Accounts.

209.    However, Argon Credit's internal balance sheet, that was purposefully and fraudulently not disclosed to PAIF and dated just two weeks later on April 5, 2016, reflected only $29,723,922.00 in accounts receivable, which included an allowance of negative $5,465,289.00 for the Doubtful Accounts.

210.    The balance sheet, as of July 31, 2016, circulated to those present at the August 25, 2016 Board Meeting, reflected total assets of $34,298,154.38, which included an allowance for the Doubtful Accounts of negative $6,383,492.43.

211.    Nevertheless, the July 2016 balance sheet submitted to Princeton in mid-August 2016 instead fraudulently reflected $40,419,664.38 in assets and failed to include a $6 million deduction for the Doubtful Accounts.

212.    On the following additional occasions through the following Defendants, the internal financials records presented to the Argon Insiders, and concealed from Princeton, included the following:

    (i)    By email dated April 7, 2016 (at 1:46 p.m.), SCHNOSENBERG to KOSTINER with 2015 Argon Financials, showing at line 28 "12040 Allowance for Doubtful Accounts" of $5,376,501.74;

    (ii)    By email dated May 9, 2016 (at 5:48 p.m.), SCHNOSENBERG to WOLFE, with Argon Financials for the first quarter (Jan-Mar 2016) with the Balance Sheet at line 33 reflecting "12040 Allowance for Doubtful Accounts" growing from $5.4 million in January 2016 to $5.5 million in March 2016;

    (iii)    By email dated June 6, 2016 (at 11:18 a.m.), Rebecca Nelson sent a Board Report for upcoming board meeting that included the May 2016 Balance Sheet reflecting at line 35 "12040 Allowance for Doubtful Accounts" of $5.895 million; and

    (iv)    By email dated September 1, 2016, at the same time that the Argon Insiders were intending to continue to draw down on the Revolving Note, EDMONSON sent an aging report, dated as of July 31, 2016, to GLENORA, FERRO, KUHLMAN, CANFORA, FAERMARK, BREITWEISER, JI UIHLEIN, JP UIHLEIN, WOLFE and SCHNOSENBERG that reflected nearly $6,980,969 in Doubtful Accounts, all of which was fraudulently and actively concealed from Princeton.

213.    In addition, the following is a chart of emails (the "False Financial Email Chart"), including (i) date of the email, (ii) sender of the email, (iii) the PAIF recipients of the email and (iv) the documents attached to those emails, that were used to facilitate the scheme to deliver false financial information to PAIF, all of which is incorporated herein as if set forth at length.

| DATE | DEFENDANT SENDER | PRINCETON RECIPIENT(S) | DEFENDANT RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|---|
| 9/9/15-9/10/15 | SCHNOSENBERG | Bob Farrell (PAIF), Shari Chorba (PAIF) | WOLFE, GOLDSTEIN | Re: Borrowing Base August (includes Borrowing Base Calculation as of 8/31/15, Detailed Tracking Sheet, Argon Aging Portfolio Performance, Argon Aging Portfolio by Percentages, Argon Aging Portfolio by Amount and Borrowing Base Calculation as of Today |
| 9/9/15-9/25/15 | SCHNOSENBERG | Bob Farrell (PAIF) | GOLDSTEIN WOLFE Harry Madanyan | Re: Borrowing Base August (includes Argon Credit Balance Sheet 8/31/15 and Argon Credit Income Statement January-August 2015 |
| 10/2/15-10/4/15 | SCHNOSENBERG | Walt Wojciechowski (PAIF), Phil Burgess (PAIF), Bob Farrell (PAIF) | WOLFE | Re: Financial Statement Questions (includes answers to questions and Promissory Note between Argon Credit and Berj Arakelian) |
| 10/23/15 | SCHNOSENBERG | Bob Farrell (PAIF) | | 9.15 FS Reporting Package (includes Argon Credit Trial Balance as of September 30, 2015, Argon Credit Balance Sheet as of September 30, 2015, Argon Credit Profit and Loss January-September 2015, Argon Credit General Ledger September 2015 and Argon Credit Borrowing Base Calculation as of 9/30/15) |
| 11/11/15 | SCHNOSENBERG | Bob Farrell (PAIF) | | Re: Portfolio Snapshot |
| 11/16/15 | SCHNOSENBERG | Bob Farrell (PAIF) | | Re: 10.15 Financial Reporting.xlsx (includes Argon Credit Trial Balance a of 11/1/16, Argon Credit Balance Sheet as of 10/31/15, Argon Credit Profit and Loss January-October 2015, Argon Credit General Ledger October 2015 and Argon Credit Borrowing Base Calculation as of 10/31/15) |

| DATE | DEFENDANT SENDER | PRINCETON RECIPIENT(S) | DEFENDANT RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|---|
| 11/16/15-11/17/15 | SCHNOSENBERG | Bob Farrell (PAIF), Phil Burgess (PAIF) | | Re: 10.15 Financial Reporting.xlsx (email only) |
| 6/15/16 | SCHNOSENBERG | Jack Cook (PAIF) Shari Chorba (PAIF) | WOLFE | 05.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report and Argon Bank Reconciliation Reports Argon Credit, LLC – May) |
| 6/17/16 | SCHNOSENBERG | Jack Cook (PAIF) | | 05.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp) |
| 7/18/16 | SCHNOSENBERG | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF) | WOLFE | 06.16 Argon Financial Statements.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp and Bank of America Bank Statement Argon Credit, LLC – June) |
| 8/15/16 | SCHNOSENBERG | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | WOLFE | 07.16 Argon FS.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp) |
| 10/6/16 | SCHNOSENBERG | Howard Davner (PAIF), Jack Cook (PAIF) | WOLFE | 08.16 Argon FS.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report, Interest TrueUp, and Bank of America Bank Statements Argon Credit, LLC July/August) |
| 10/17/16 | SCHNOSENBERG | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | WOLFE | 09.2016 FS Argon.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Bank Statements, Borrowing Base, Interest TrueUp) |

| DATE | DEFENDANT SENDER | PRINCETON RECIPIENT(S) | DEFENDANT RECIPIENT(S) | DOCUMENTS ATTACHED TO EACH EMAIL |
|---|---|---|---|---|
| 10/19/16 | Adam Diekelman (on behalf of Board of Managers) | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba (PAIF), Victoria Behnke (PAIF) | SCHNOSENBERG WOLFE | 09.16 Argon Financial Statements (includes Bank of America Bank Statement for Argon Credit, LLC and Elk Grove Village Bank Statement for Argon X, LLC – September 2016) |
| 11/21/16 | Adam Diekelman (on behalf of Board of Managers) | Howard Davner (PAIF) | | Elk Grove Village Bank Statements for Argon X, LLC – 10/31/16 |
| 11/21/16 | Adam Diekelman (on behalf of Board of Managers) | Howard Davner (PAIF), Jack Cook (PAIF), Shari Chorba PAIF), Victoria Behnke (PAIF) | WOLFE SCHNOSENBERG | 10.2016 FSV1.xlsx (includes Trial Balance, Balance Sheet, Profit/Loss, General Ledger, Borrowing Base, Aging Report) |
| 11/22/16 | Adam Diekelman (on behalf of Board of Managers) | Howard Davner (PAIF) | SCHNOSENBERG | Bank of America Bank Statement Argon Credit, LLC – October 2016 |

214.    In short, the financial documents that the Argon Insiders discussed during the Board of Manager meetings that were approved and forwarded to Princeton failed to reveal the significant financial impairment caused by the Doubtful Accounts.

215. The following is a chart of those Defendant attendees at the Board of Manager Meetings for which Princeton has information:

| DATE | DEFENDANT ATTENDEES<br><br>ARGON CREDIT<br>MEETING of BOARD OF MANAGERS |
|---|---|
| 5/18/15 | WOLFE, CANFORA, FERRO, TRIFFLER, ZUMSKI and EDMONSON |
| 5/12/16 | CANFORA, TRIFFLER, EDMONSON, FERRO, WOLFE, TOMASCKIEWCZ, SCHNOSENBERG, KUHLMAN and FAERMARK |
| 6/21/16 | CANFORA, SCHNOSENBERG, BREITWEISER, EDMONSON, FERRO, KUHLMAN, FAERMARK, TRIFFLER, WOLFE and TOMASCKIEWCZ |
| 8/25/16 | BREITWEISER, EDMONSON, FERRO, WOLFE, TOMASCKIEWCZ, TRIFFLER, FAERMARK, KUHLMAN, SCHNOSENBERG, CANFORA and ZUMSKI |

Case: 1:20-cv-05730 Document #: 117 Filed: 05/15/21 Page 48 of 123 PageID #:1351

| DATE | DEFENDANT ATTENDEES<br><br>ARGON CREDIT<br>MEETING of BOARD OF MANAGERS |
|---|---|
| 9/2016 | TRIFFLER, BREITWEISER, TOMASCKIEWCZ, SCHNOSENBERG, EDMONSON, FERRO, WOLFE, ZUMSKI, KUHLMAN and FAERMARK |
| 10/2016 | WOLFE, SCHNOSENBERG, TRIFFLER, EDMONSON, KUHLMAN, BREITWEISER, FAERMARK, TOMASCKIEWCZ and FERRO |
| 11/2016 | TRIFFLER, FAERMARK, FERRO, KUHLMAN, CANFORA, WOLFE, SCHNOSENBERG, ZUMSKI and EDMONSON |

216.    The purpose of the delivery of false financial information to Princeton was obvious.

217.    This was revealed in the Argon Credit Board Meeting Notes which WOLFE circulated by email dated May 10, 2016 to KUHLMAN, CANFORA, TRIFFLER, FAERMARK, FERRO, BREITWEISER, EDMONSON and SCHNOSENBERG.

218.    WOLFE wrote in the May 2016 Board Agenda:

Fund Strategy: The purpose is to separate the lucrative assets from the origination platform that incurs significant operating expenses. **This strategy provides the opportunity to create significant distributions while simultaneously defraying risk of a lender (Princeton) at the operating company level calling a loan.**

(emphasis supplied).

219.    Specifically, as explained to and unchallenged by the Board of Managers, the purpose of transferring the Spartan Loans (as the "lucrative assets" referenced in WOLFE's email) was to "create significant distributions" that would financially benefit the Argon Insiders to the detriment of Princeton.

220.    Defendants proceeded to do precisely that by isolating and transferring the most "lucrative assets" to the Spartan Entities, namely those Consumer Loans that had the highest credit ratings in Argon Credit's portfolio and which would generate the most stable stream of income

with regard to the Spartan Servicing Fees, leaving the remaining portfolio significantly weakened and burdened by an ever-growing percentage of Doubtful Accounts.

221.    WOLFE's statement to the Board of Managers is damning inasmuch as it is a statement of affirmation as to the RICO Scheme that had at its core the plundering of the Princeton Property while deceiving Princeton into not calling the Revolving Note and continuing to disburse Loan Proceeds through the Fintech Loan Agreement.

222.    For example, by email dated May 13, 2016 (at 11:15 a.m.), KUHLMAN wrote to WOLFE, SCHNOSENBERG, FERRO, EDMONOSON, TRIFFLER, FAERMARK, CANFORA and BREITWEISER, challenging Argon's sustainability model that had been presented to him by these other Argon Insiders.

223.    In this email, only days after WOLFE's statement to the Board Managers, KUHLMAN acknowledged that, at that time, his clients' investment focus (RBC CAPITAL, GLENORA, LITTLE OWL, JI UIHLEIN and JP UIHLEIN) has been on principal protection and income (debt interest payments), but challenged the Argon Insiders' focus, stating that **"Argon Management has ignored important disciplines and strayed from its original business plan."** (emphasis added).

224.    KUHLMAN was acknowledging the impact that the fraudulent Spartan Transactions was having on the operations of the Argon Entities.

225.    KUHLMAN admonished the Argon Insiders in his May 2016 email:

> **The board should know what Argon's action plan is.** From my perspective it appears default rate analytics, servicing, fund raising, operating expense management and the Gary/Berj situation need to be addressed.

(emphasis added).

226.    Despite this admonition, KUHLMAN failed to act on behalf of himself, LITTLE

OWL, GLENORA, RBC CAPITAL, JI UIHLEIN and JP UIHLEIN, and aided and abetted the

continued fraudulent depletion of Princeton's Loan Proceeds being disbursed to the Argon Entities

through the Fintech Loan Agreement.

227.    By email dated July 27, 2016 (at 12:49 p.m.), KUHLMAN disavowed the concerns

Newman had raised in November 2015 about the sustainability of the Argon Entities, stating:

> **The Uihlein Family [*i.e.*, JI UIHLEIN and JP UIHLEIN] and
> [GLENORA] agreed to fund based on the belief that the business model
> works and the talent at Argon can be managed to successfully attain
> significant profitability.** Byron [FAERMARK], Bruce [BREITWEISER] and
> I (as their advisors) agree one hundred percent. Without their financial support
> Argon would cease to exist.

(emphasis supplied).

227.    Any yet, at the same time that KUHLMAN was extolling the virtues of the Argon

Credit executive team, the board of managers were considering the need for a bridge investment

of $3.0M.

228.    Specifically, by email, dated July 22, 2016, EDMONDSON circulated a proposed

term sheet ("Member Term Sheet") and made certain that, among others, JP UIHLEIN received a

copy of that email and attachment.

229.    This Member Term Sheet included proposed investments by LITTLE OWL,

FERRO, TRIFFLER and CANFORA as well as increases in salaries of ZUMSKI and WOLFE,

and that FERRO and MERIT GAMING would receive guaranteed contracts.

230.    This Member Term Sheet also included a provision whereby the interest rate for

all existing subordinated Member Notes would accrue at the "increased" interest rate of twenty

percent (20%), an increase, like the proposed additional investments and the Member Term Sheet

itself, was neither disclosed nor discussed with Princeton which was unaware of the need for such

significant additional investment or proposed payments, all of which would have been an improper and unapproved use of the Loan Proceeds.

228.    As the summer of 2016 progressed, the Argon Insiders became well aware of the fraudulent activities and the dire financial condition of the Argon Entities.

229.    Specifically, on or about August 25, 2016, several Argon Insiders[12] attended a board meeting in which those present discussed the Argon Entities' balance sheet and income statement as of July 31, 2016, as well as a draft of the Independent Report (as prepared by RSM) of the Argon Entities' 2015 consolidated financial statements.

230.    Despite the significant financial troubles, the Board Minutes reflect not only a decision to continue to draw down on Princeton's Loan Proceeds (at a time when the Board members knew that the Argon Entities were insolvent), but there was also significant discussion regarding the Spartan Transactions, the Spartan Loans and the SPARTAN SPV Bankruptcy, all of which were dragging on the financial performance of the Argon Entities, and none of which was disclosed to Princeton.

231.    The results of, and follow-up regarding, that August 2016 Board Meeting were discussed in an email dated August 30, 2016 sent by KUHLMAN to JI UIHLEIN, JP UIHLEIN, GLENORA, FERRO, EDMONSON, BREITWEISER, FAERMARK, CANFORA, TRIFFLER and WOLFE.

232.    The Board Minutes and the August 30, 2016 email confirmed that those attendees had a copy of the draft Independent Report in their possession and that the Independent Report had been discussed at the August 2016 Board Meeting.

---

[12] The Board Meeting Minutes dated August 25, 2016 (the "Board Minutes") identified that defendants BREITWEISER, EDMONSON, FERRO, WOLFE, TRIFFLER, FAERMARK, KUHLMAN, SCHNOSENBERG, CANFORA and ZUMSKI were present.

233.    The Independent Report raised significant concerns about the sustainability of the Argon Entities' business model and acknowledged that the Argon Entities' financial statements were false and had omitted line items for Doubtful Accounts, a significant material omission that was purposeful and intended to deceive Princeton.

234.    In an email dated October 7, 2016, KUHLMAN, as self-proclaimed "Steward of the JI UIHLEIN Family," reiterated to EDMONSON, FERRO, WOLFE, SCHNOSENBERG, FAERMARK, BREITWEISER, CANFORA and TRIFFLER that:

> Little Owl will not contribute further capital or extend loans to Argon in order to protect its current investment. **Glenora and I are very serious about proper asset allocation for the Uihlein's.** A determination has been made that enough is enough regarding our investment in Argon. The family is wealthy as a result of being disciplined in its investment approach.

(emphasis supplied).

235.    KUHLMAN's October 7, 2016 email confirms that KUHLMAN, RBC CAPITAL, GLENORA, LITTLE OWL, JI UIHLEIN and JP UIHLEIN were all acting cooperatively and in concert as a single voice as controlling investors, insiders and active managers of the operations of the Argon Entities.

236.    In fact, demonstrated by their inclusion on numerous operational emails regarding the financial issues with Argon Credit, JI UIHLEIN and JP UIHLEIN were *de facto* members of the Board of Managers and Argon Credit's executive team.

237.    For example, as early as early November 2015, JP UIHLEIN and JI UIHLEIN were being keep apprised and copied by Newman on her emails that acknowledged their awareness of the Spartan Transactions.

238.    Then, a subsequent email, dated July 14, 2016, KUHLMAN was exchanging emails with JP UIHLEIN and JI UIHLEIN, and including FERRO (using FERRO's MERIT GAMING

email address), regarding the summary report (*i.e.*, RSM's Independent Report) that detailed significant financial problems with the Argon Entities, including RSM's notations that the financial statements failed to include the Doubtful Accounts.

239.    In that email, JP UIHLEIN was requesting that the Independent Report be sent to him at his home in Wyoming.

240.    At that same time in July 2016, Casey Howard, an administrative assistant with Argon Credit, was instructed to forward the same draft Independent Report to the following defendants: BREITWESIER; FAERMARK; JP UIHLEIN; CANFORA; and TRIFFLER.

241.    In a similar manner, in November 2016, SCHNOSENBERG circulated weekly burn rate emails detailing the cash flow needs of Argon Credit through-out 2016 and in particular four (4) emails in the month of November 2016 alone, on which JP UIHLEIN and even Ryan Gilbertson, the Uihleins' polo buddy and settlement representative, among others, were copied on those burn rate emails.

242.    The use of their own "polo-buddy" representative (Ryan Gilbertson) demonstrated that JP UIHLEIN and JI UIHLEIN were running rogue controls over the operations of the Argon Entities.

243.    Similarly, there are emails, dated in early December 2016, which are circulating and discussing various versions of resolutions to be considered by the board of managers, where it was being discussed whether to file for bankruptcy before advising Princeton, and the involvement of JI UIHLEIN and JP UIHLEIN is obvious inasmuch as they are included on the email distributions and thus deeply involved in the management of their investment in the Argon Entities.

244.     In fact, LITTLE OWL had been funding a bridge loan of $2.65 million to the Argon Entities in an effort to keep the Argon Entities current with regard to their interest payments to Princeton on the Revolving Note.

245.     For example, by email, dated September 30, 2016, to EDMONDSON, FERRO and WOLFE, SCHNOSENBERG requested a draw down on a "line of credit" from LITTLE OWL, TRIFFLER TRUST, MARGON, TRIFFLER and CANFORA of $675,751.

246.     However, there was no formal "line of credit" but rather an agreement amongst these Defendants to continue to bridge fund the Argon Entities *without* disclosing to Princeton their awareness of the serious financial problems being confronted by the Argon Entities while simultaneously approving the delivery of false financials and yet knowing the issues raised by RSM's Independent Report, all in violation of the Financial Covenant and meant to delay the inevitable notice of default.

247.     Princeton had no idea there was an informal "line of credit" and would have announced an event of default if it had become aware.

248.     On that same date, EDMONDSON sent an email to the Board of Managers including, FERRO, WOLFE, KUHLMAN, BREITWEISER, FAERMARK, CANFORA, TRIFFLER, and JP UIHLEIN, as well as Newman and Crawford as representatives of LITTLE OWL and GLENORA, requesting Board approval for a draw on this purported "line of credit" in the amount of $675,751.

249.     By email, dated October 7, 2016, Crawford delivered an email confirming that LITTLE OWL had funded an investment (made a loan) of $596,891.00 which provided sufficient funds to the Argon Entities in order to meet their obligations to Princeton (thereby delaying and avoiding for another 2 months the inevitable).

250. On that email from Crawford, the following defendants were copied: JP UIHLEIN; FERRO; WOLFE; SCHNOSENBERG; EDMONSON; KUHLMAN; BREITWEISER; FAERMARK; CANFORA; TRIFFLER.

251. In fact, LITTLE OWL's alleged monthly "investments" to the Argon Entities was in just the right amount to ensure that the Argon Entities continued to meet their financial obligations to Princeton and keep Princeton in the dark at a time that the entire Board of Managers knew that Argon Entities were insolvent and was an effort to ensure that the RICO Scheme of "lend more + delay default" continued for as long as possible.

252. Just a month later, by emails dated November 17 and 23, 2016, KUHLMAN was communicating with FERRO, inquiring about efforts that should be made to "approach Princeton with a restructuring plan" and needing "a good explanation as to why we shouldn't approach [Princeton] sooner than later regarding some relief."

253. KUHLMAN's November 17, 2016 email acknowledged that the Princeton situation was being discussed with JI UIHLEIN and JP UIHLEIN, who were being kept apprised of the operational and financial issues with the Argon Entities.

254. In fact, from the beginning of LITTLE OWL's ownership and KUHLMAN's assistance, advice and stewardship on behalf of JI UIHLEIN, JP UIHLEIN, LITTLE OWL and GLENORA, KUHLMAN was working extensively with other Argon Insiders to manage the operations of the Argon Entities.

255. For example, by an earlier email dated September 22, 2016, JP UIHLEIN wrote to FERRO, copying KUHLMAN, GLENORA and JI UIHLEIN, regarding a specific request to continue to be kept in the loop with regard to the operations of the Argon Entities and the efforts to raise additional capital and reorganize their operations.

55

256. There were subsequent emails (each dated September 23, 2016) continuing this discussion and demonstrating JI UIHLEIN's and JP UIHLEIN's active involvement in the operations of the Argon Entities.

257. In addition, there was an email dated November 1, 2016 (at 10:08 a.m.), from Newman, on behalf of GLENORA, JI UIHLEIN and JP UIHLEIN, to SCHNOSENBERG, FERRO, WOLFE and KUHLMAN, where Newman, at the direction of JI UIHLEIN and JP UIHLEIN, requested weekly cash burn models, thereby further demonstrating JI UIHLEIN's and JP UIHLEIN's active involvement through their investing agents.

258. By the time that it became apparent that the Argon Entities were going to fail and the RICO Scheme could no longer be hidden from Princeton, KUHLMAN, wrote a December 5, 2016 letter to the Board of Managers (styled as "Argon Credit Corp. Board of Directors,"[13]) purporting to disclaim his personal knowledge of the underlying fraud.

259. Specifically, KUHLMAN denied any knowledge of certain payments to WOLFE (the "Wolfe Fees") and MARGON and KUHLMAN further alleged that he had received "bad information" about these **aforementioned fees, First Associates, SSF, Princeton, default rates, sustainability modeling and loan portfolio adjustments**." (emphasis supplied).

260. While KUHLMAN tried to deny his involvement with the factual predicates of the RICO Scheme, he simultaneously acknowledged that he knew of SSF, Princeton and "loan portfolio adjustments," which is merely his antiseptic euphemism for the fraudulent transfer of Princeton's Loan Proceeds.

---

[13] At the time, in December 2016, Argon Credit was a limited liability company, though originally Argon Credit was formed as a corporation.

261.    In KUHLMAN's letter, KUHLMAN acknowledged that, when confronted, WOLFE asserted to KUHLMAN that the Wolfe Fees were paid "from Princeton," which is a falsity.

262.    Finally, in that same letter, KUHLMAN expressed the hope that WOLFE and MARGON would return the payments they received because KUHLMAN did "not want to be held accountable for someone else's actions and poor decisions."

263.    KUHLMAN's effort to distance himself from his knowledge of the operations of the Argon Entities and his attendant responsibility at the time of the filing of the Argon Bankruptcy in December 2016 is not to be credited, especially given his initial expressions of concern and then his efforts to praise the Argon Entities.

264.    In fact, KUHLMAN's concerns about the operations of the Argon Entities were voiced at a much earlier time in November 2015 which he disregarded.

265.    Despite his own stated concerns, KUHLMAN failed in his role as an Argon Insider and knew or should have known of the fraudulent inducement of Princeton to increase its credit line with the Revolving Note while failing to disclose the severe financial impairments caused by the Doubtful Accounts.

266.    The Argon Insiders and Board of Managers assisted the Argon Entities in keeping two sets of books and records – one set for internal control purposes and the other fraudulent set for submission and disclosure to PAIF that would permit the Argon Entities the ability to continue borrowing against the increased line of credit provide by the Revolving Note, at a time when, if PAIF had been fully informed, PAIF would have issued a notice of an event of default.

## Argon Credit's Financial Condition

267.    Argon Credit's books and records reflect that Argon Credit was insolvent at the time of the execution of the Fintech Loan Agreement and thereafter.

268.    The Independent Report of the Argon Entities' Consolidated Financials ending December 31, 2015 reflected that Argon Credit had negative equity of $11,285,946.00 as of that time.

269.    The Independent Report stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708.00 for the year ended December 31, 2015.

270.    As a result, RSM concluded in its Independent Report that the "events and circumstances described above create substantial doubt about the [Argon Entities'] ability to continue as a going concern."

271.    RSM did not audit the Consolidated Financials, instead only performing a review of them, and after such review, RSM could not express an opinion as to whether the financial statements of the Argon Entities were free from material misstatements.

272.    The Argon Entities' financial condition continued to deteriorate each month that they operated, and their negative equity balance increased each month, none of which was disclosed to Princeton and all of which was fraudulently concealed from Princeton.

273.    RSM advised in its final version of the Independent Report that the Consolidated Financial Report of the Argon Entities dated December 31, 2015 was incomplete because it failed to include "substantially all disclosures relating to impaired loans and troubled debt restructuring have been omitted from these consolidated financial statements."

274.    RSM noted that the Argon Entities' financial statements omitted the negative financial impact of the Doubtful Accounts, a fact well known among the Argon Insiders.

275.     Not only were the underlying financials of the Argon Entities fraudulently concealed from PAIF, but the very existence of the Independent Report was also not discovered by Princeton until after the Argon Entities had filed for bankruptcy.

276.     In one section, the Independent Report contained a curious reference that certain Argon Insiders had told RSM, as they were preparing the Independent Report, that "[i]f necessary, the investment company [*i.e.*, PAIF] extending the line of credit would increase the limit."

277.     This statement is a falsity and under no circumstances was PAIF considering, or even asked to consider, an increase of the already twice amended and increased Revolving Note.

278.     This statement is another fraudulent attempt by the Argon Insiders communicating with RSM to deceive and hide from the effects of their collective fraud, and to suggest to RSM as independent examiners that they have a financial solution to the fraudulent financial morass that they had created, but failed to disclose to their secured and guaranteed lender, PAIF.

279.     As of November 30, 2016, Argon Credit's internal balance sheet reflected assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

280.     The financial deterioration of the Argon Entities was occurring from the inception of the Fintech Loan Agreement and was knowingly, willfully, intentionally, recklessly and negligently concealed from Princeton.

281.     Princeton became aware of the predatory and racketeering acts for the first time on December 7, 2016, which was when SCHNOSENBERG admitted to Princeton's representatives that Argon Credit had transferred more than $4 million worth of Princeton's Property.

282.     Specifically, on December 7, 2016, FERRO, WOLFE and SCHNOSENBERG, along with convicted felon Ryan Gilbertson ("Gilbertson"), a family friend of defendant Uihleins

(JI UIHLEIN and JP UIHLEIN), approached Princeton to advise that the Argon Entities were $8 to $11 million underwater on their credit line.

283.    At that time, Princeton had no knowledge (i) of FERRO or his relationship to, or executive leadership role at, the Argon Entities, or (ii) of Gilbertson prior to that meeting.

284.    Gilbertson represented himself to Princeton's executives to be a representative of the interests of the JP UIHLEIN, JI UIHLEIN and LITTLE OWL, in the hope that the Fintech Loan Agreement could be restructured.

285.    In an effort to curry favor with the Princeton executives, Gilbertson explained that he was the former college roommate of the younger James Uihlein and that he had been asked by the Uihlein family to broker a resolution between the Argon Entities and Princeton.

286.    Gilbertson attempted to tout the purported benefits of the underwriting technologies of the Argon Entities when, in fact, such technologies were virtually non-existent and worthless.[14]

287.    Nevertheless, it was, at this time, in December 2016 that SCHNOSENBERG admitted that (i) Argon Credit transferred the Spartan Loans that had been pledged as Secured Collateral to PAIF to SPARTAN SPV without turning the proceeds of that sale over to PAIF, and (ii) there was an $8-$11 million shortfall in the value of the collateral securing the credit line (though the actual shortfall turned out to be closer to approximately $17.5 million).

288.    As a result, on that same date, December 7, 2016, pursuant to Section 12.5 of the LSA, PAIF not only declared a default of its loan but it further assigned all of its right, title and ownership interest in, and claims to the Fintech Loan Agreement, all other financing agreements, and the Secured Collateral to FRS.

---

[14] Gilbertson, who was subsequently convicted of a federal securities scam, the illicit proceeds of which were used to purchase polo ponies, mentioned that he and James Uihlein played polo together in Florida and continued to run in the same circles in the Florida "Rich Men of the Polo world."

289. Princeton delivered a letter, dated December 7, 2016, that demanded immediate payment of $37,017,774.97, which represented the total outstanding principal and interest on the Fintech Loan Agreement and stated that the basis for the event of default was "Borrower's admitted and intentional failure to provide full and accurate financial information pursuant to the Loan Agreement, constituting an Event of Default under the Loan Agreement."

## Prohibited Interest Payments In
## Violation Of Subordination Agreements

290. At the time of the execution of the Fintech Loan Agreement in May 2015, Argon Credit had five members: NOAX; BMONEY; ZUMSKI; MARGON; and LITTLE OWL.

291. Argon Credit admitted two additional members in February 2016: TRIFFLER TRUST and CARDINAL TRUST.

292. Argon Credit entered into various promissory notes (the "Member Creditor Notes") with LITTLE OWL, MARGON, CARDINAL TRUST and TRIFFLER TRUST (collectively, the "Member Creditors"), which were later the subject of initial and subsequent subordination agreements with Princeton that prohibited interest payments to each of the Member Creditors under certain conditions, including the insolvency of Argon Credit.

293. The respective loan amounts of the Member Creditor Notes to Argon Credit are summarized as follows:

| MEMBER CREDITOR | TOTAL NOTE AMOUNT |
|---|---|
| MARGON | $1,365,000.00 |
| LITTLE OWL | $7,000,000.00[15] |
| TRIFFLER TRUST | $1,000,000.00 |

---

[15] As described below, LITTLE OWL also made an additional $2.65 million bridge loan to Argon Credit in 2016 as part of the effort to avoid or delay the declaration of a default on the Revolving Note by PAIF.

| CARDINAL TRUST | $1,000,000.00 |
|---|---|
| **TOTAL** | **$10,365,000.00** |

**Member Creditor Promissory Notes**

**LITTLE OWL**

294. On or about February 3, 2015, LITTLE OWL and Argon Credit executed the Argon Credit, LLC-Little Owl Argon 18% APR Three Year Promissory Note (the "First Little Owl Note") pursuant to which LITTLE OWL transferred $3 million to Argon Credit (the "First Little Owl Transaction").

295. Thereafter, on February 6, 2016, LITTLE OWL and Argon Credit executed the Argon Credit, LLC-Little Owl Argon LLC Promissory Note (the "Second Little Owl Note," together with the First Little Owl Note, the "Little Owl Notes") pursuant to which, on February 12, 2016, LITTLE OWL transferred an additional $4 million to Argon Credit (the "Second Little Owl Transaction").

296. Between May 2015 and May 2016, LITTLE OWL received the following transfers from Argon Credit pursuant to the terms of the Little Owl Notes (the "Little Owl Transfers"):

| DATE | PAYMENTS TO LITTLE OWL |
|---|---|
| 5/8/15 | $135,000.00 |
| 8/5/15 | $130,573.77 |
| 11/12/15 | $134,262.30 |
| 2/9/16 | $144,590.16 |
| 5/4/16 | $285,245.90 |
| 5/18/16 | $17,923.50 |
| **TOTAL** | **$847,595.63** |

## MARGON

297.    On or about September 8, 2014, MARGON and Argon Credit executed the Argon Credit, LLC 20% APR Two Year Revolving Line of Credit Promissory Note (the "First Margon Note"), pursuant to which MARGON purportedly loaned Argon Credit $250,000.00 with a commitment to loan up to $750,000.00 (the "First Margon Loan").

298.    On November 6, 2014, MARGON and Argon Credit executed the Argon Credit, LLC 15% APR Three Year Revolving Line of Credit Promissory Note (the "Second Margon Note" together with the First Margon Note, the "Margon Notes") pursuant to which MARGON purportedly loaned Argon Credit an additional $250,000.00 with a commitment to loan up to $1 million (the "Second Margon Loan," together with the First Margon Loan, the "Margon Loans").

299.    Between May 2015 and June 2016, MARGON received at least $474,194.45 (the "Margon Transfers") in transfers from Argon Credit.

300.    The Margon Transfers included the following:

| Date | Method | Transfer |
|------|--------|----------|
| 5/8/2015 | Check 1141 (Account x7142) | $37,083.33 |
| 6/9/2015 | Check 1181 (Account x7142) | $23,000.00 |
| 8/5/2015 | Wire (Account x7142) | $50,833.33 |
| 9/9/2015 | Wire (Account x7142) | $23,000.00 |
| 10/8/2015 | Wire (Account x7142) | $23,000.00 |
| 10/8/2015 | Wire (Account x7142) | $23,000.00 |
| 10/8/2015 | Wire (Account x7142) | $23,000.00 |
| 11/9/2015 | Wire (Account x7142) | $51,111.11 |
| 12/10/2015 | Wire (Account x1965) | $22,750.00 |
| 2/5/2016 | Wire (Account x1965) | $50,555.56 |
| 2/8/2016 | Wire (Account x1965) | $50,555.56 |

| 3/9/2016 | Wire (Account x1965) | $22,750.00 |
| 5/6/2016 | Wire (Account x1965) | $50,555.56 |
| 6/8/2016 | Wire (Account x1965) | $23,000.00 |
| | **TOTAL** | $474,194.45 |

301.    The Margon Transfers were inconsistent with the schedule of purported interest payments due to MARGON under the Margon Notes.

## **CARDINAL TRUST**

302.    On or about February 6, 2016, CARDINAL TRUST and Argon Credit executed the Argon Credit, LLC-Cardinal Trust Promissory Note (the "Cardinal Trust Note") pursuant to which CARDINAL TRUST loaned Argon Credit $1 million (the "Cardinal Trust Loan").

303.    CARDINAL TRUST transferred $500,000.00 to Argon Credit on November 9, 2015 (prior to the execution of the Cardinal Trust Note) and an additional $500,000.00 to Argon Credit on February 12, 2016.

304.    CARDINAL TRUST funded half of the balance of the Cardinal Trust Loan nearly three months prior to executing the Cardinal Trust Note.

305.    The first payment of $500,000 by CARDINAL TRUST was a payment made in order to demonstrate to WIRZBERGER in November 2015 that Argon Credit had received an equity investment from its existing investors, even though it was subsequently characterized as debt.

306.    Between February 2016 and May 2016, CARDINAL TRUST received at least $94,444.44 in transfers from Argon Credit (the "Cardinal Trust Transfers").

307.    The Cardinal Trust Transfers included the following:

| **TRANSFER DATE** | **METHOD** | **TRANSFER AMOUNT** |
| --- | --- | --- |

| 2/5/2016 | Wire (Account x1965) | $25,722.22 |
|---|---|---|
| 2/8/2016 | Wire (Account x1965) | $24,722.22 |
| 5/6/2016 | Wire (Account x1965) | $50,000.00 |
| | **TOTAL** | **$99,444.44** |

## TRIFFLER TRUST

308.     On or about February 6, 2016, TRIFFLER TRUST and Argon Credit executed the Argon Credit, LLC-Mark Triffler Declaration of Trust Dated December 5, 1991 Promissory Note (the "Triffler Trust Note" together with the Margon Notes, Little Owl Notes, and Cardinal Trust Note, the "Member Creditor Notes"), pursuant to which TRIFFLER TRUST purportedly loaned Argon Credit $1 million (the "Triffler Trust Loan" together with the Margon Loans, Little Owl Loans, and Cardinal Trust Loan, the "Loans").

309.     TRIFFLER TRUST transferred $500,000.00 to Argon Credit on November 9, 2015, and an additional $500,000.00 to Argon Credit on February 6, 2016.

310.     TRIFFLER TRUST funded half of the balance of the Triffler Trust Loan nearly three months prior to executing the Triffler Trust Note.

311.     That occurred because the first payment of $500,000 by TRIFFLER TRUST was a payment made in order to demonstrate to WIRZBERGER in November 2015 that Argon Credit had received an equity investment from its existing investors, even though it was subsequently characterized as debt.

312.     Between February 2016 and May 2016, TRIFFLER TRUST received at least $74,722.22 in transfers from Argon Credit (the "Triffler Trust Transfers") (collectively, Triffler Trust Transfers, Margon Transfers, Little Owl Transfers, and Cardinal Trust Transfers, the "Challenged Transfers").

313.     The Triffler Trust Transfers included the following:

| TRANSFER DATE | METHOD | TRANSFER AMOUNT |
|---|---|---|
| 2/5/2016 | Wire (Account x1965) | $24,722.22 |
| 5/6/2016 | Wire (Account x1965) | $50,000.00 |
| | **TOTAL** | **$74,722.22** |

### Subordination Agreements With Member Creditors

314.    On or about May 1, 2015, as part of the Fintech Loan Agreement financing, MARGON and LITTLE OWL executed initial subordination agreements ("Original Subordination Agreements") with the Argon Entities and Princeton which subordinated their respective debts owed pursuant to their respective Member Creditor Notes (the "Subordinated Debt") to those of Princeton.

315.    On February 8, 2016, at the time of the Second Little Owl Transaction, CARDINAL TRUST and TRIFFLER TRUST both executed subordination agreements with regard to their respective debt and LITTLE OWL and MARGON each executed amended and restated subordination agreements (collectively, the "Subordination Agreements") (the Member Creditors are referred to hereafter as the "Subordinated Defendants").

316.    The Subordination Agreements, as did the Original Subordination Agreements, provided that the Subordinated Defendants agreed to subordinate and postpone "the payment and the time of payment of all of the Subordinated Debt."

317.    The Original Subordination Agreements and Subordination Agreements at Paragraph 3 required that "until the Senior Lender has given written notice to the [Subordinated Defendants] that all Obligations to the Senior Lender have been fully and indefeasibly paid and satisfied in full, no Obligor shall pay to the [Subordinated Defendant], and the [Subordinated Defendant] shall not accept or receive, any payment of principal, interest, fees, costs and expenses under the Subordinated Debt." (the "No Payment Provision").

318.    The Original Subordination Agreements and the Subordination Agreements provided an exception to the No Payment Provision.

319.    Specifically, under that same No Payment Provision, interest payments could be made to the Subordinated Defendants in certain limited circumstances.

320.    The No Payment Provision provided that "so long as no Event of Default has occurred under the Loan Documents or would result from such payment, [Argon Credit] shall be entitled to pay and the Subordinated Lender shall be entitled to accept and receive, the scheduled payments of principal and interest . . . under the Subordinated Debt, but only when such payments are scheduled under the current Subordinated Loan Documents, correct and complete copies of which have been provided to the Senior Lender."

321.    Pursuant to the terms of the various notes, between May 5, 2015, and December 16, 2016, Argon Credit made at least $1,495,956.74 in interest payments to the Subordinated Defendants summarized as follows:

| Subordinated Defendant | Total Interest Payments |
|:---:|:---:|
| MARGON | $474,194.45 |
| LITTLE OWL | $847,595.63 |
| TRIFFLER TRUST | $99,444.44 |
| CARDINAL TRUST | $74,722.22 |
| **TOTAL** | **$1,495,956.74** |

322.    Newman, as manager of LITTLE OWL, in a sworn declaration dated December 2, 2019 submitted to the court in the Argon Bankruptcy, admitted that LITTLE OWL treated the interest payments received from Argon Credit "as payments made pursuant to the terms of the

Little Owl Notes" and that LITTLE OWL "applied the Little Owl Transfers to reduce the debt owed to Little Owl by Argon Credit pursuant to the terms of the Little Owl Notes."

323.    However, at the time that Argon Credit paid, and the Subordinated Defendants accepted, the interest payments, the Subordinated Defendants knew or should have known that Argon Credit was insolvent and that, thus, there existed an Event of Default which prohibited the payment by Argon Credit, and the receipt by any of the Subordinated Defendants, of any interest payments with regard to any of the outstanding Member Creditor Notes held by the Subordinated Defendants.

324.    Specifically, as supported by RSM's Independent Report, Argon Credit's books and records demonstrated that Argon Credit was insolvent at the time of each of these interest payments to the Subordinated Defendants.

325.    The insolvency of Argon Credit precipitated the necessity of an additional infusion of capital by LITTLE OWL which transferred an additional $2.65 million to Argon Credit between July 2016 and November 2016 (the "Bridge Loan").

326.    The Bridge Loan was not secured by a lien and LITTLE OWL cannot locate an executed promissory note evidencing the purported Bridge Loan. LITTLE OWL also did not identify any terms of the purported Bridge Loan, such as an interest rate, repayment terms, or maturity date.

327.    Rather, the Bridge Loan was made at various times and in various amounts so as to ensure that Argon Credit could make its interest payments to Princeton and thereby delay Princeton's calling of the Revolving Note, which would have ended access to Princeton's lending sources.

328.    The Argon Insiders who were either members or on the Board of Managers created a draft Member Term Sheet, dated July 2016 ("Member Term Sheet"), which related to the proposed Bridge Loan financing, and which was initially drafted to include a recital that Argon Credit was "insolvent and operations will cease as the close of business on July 22, 2016, without the Members agreement" to the terms of a new equity infusion by LITTLE OWL, FERRO, TRIFFLER and CANFORA.

329.    It is evident that the Argon Insiders knew that the Argon Entities were insolvent.

330.    Each of MARGON, LITTLE OWL, CARDINAL TRUST and TRIFFLER TRUST knew at the time of the Challenged Transfers that Argon Credit's liabilities exceeded the fair value of its assets because they regularly received copies of Argon Credit's financial reports. Therefore, their respective receipt of the Challenged Transfers violated the Subordination Agreements.

331.    In that same Member Term Sheet, the Board of Managers of Argon Credit and Member Creditors, without disclosure to Princeton, agreed to increase the outstanding loan indebtedness of Argon Credit to LITTLE OWL, MARGON, CARDINAL TRUST and TRIFFLER TRUST to a flat twenty percent (20%).

332.    These same Argon Insiders approved payment of a consultant fee to FERRO in the amount of $200,000.00 and a one-year guaranty contract for $60,000.00 to Merit Management Group, L.P., which is owned by Argon Insiders.

333.    These were more self-serving fraudulent efforts to further wrongfully diminish the value of Princeton's Loan Proceeds being disbursed to the Argon Entities through the Fintech Lona Agreement.

334.    The Challenged Transfers were approved by the Subordinated Defendants as well as by NOAX, ZUMSKI, BMONEY, WOLFE, TRIFFLER, FAERMARK, BREITWEISER,

CANFORA and KUHLMAN, as well as other Argon Insiders, all of whom knew or should have known that the Challenged Transfers were in violation of the Subordination Agreements.

335.    Moreover, the Subordinated Defendants failed to disclose or otherwise provide any notice to Princeton as to their respective demands for, and receipt of, such prohibited interest payments.

336.    LITTLE OWL and MARGON had also considered making an additional bridge loan of $3.0 million to the Argon Entities in October 2016.

337.    The Board of Managers, which at that time included, among others, WOLFE, KUHLMAN, TRIFFLER, CANFORA, and FAERMARK, failed to disclose to Princeton either the necessity of bridge financing for the Argon Entities or that such bridge financing was going to come from LITTLE OWL or MARGON, or that the Challenged Transfers were continuing to be made.

### Board Of Manager Appointments By Creditor Members

324.    Pursuant to its investments in Argon Credit and the restated operating agreements of Argon Credit, LITTLE OWL was permitted to appoint various members of Argon Credit's board of managers, including, initially, KUHLMAN who was also acting as an outside financial advisor to LITTLE OWL, GLENORA, JI UIHLEIN and JP UIHLEIN.

325.    When LITTLE OWL appointed KUHLMAN to the Argon Credit's board of managers, LITTLE OWL was aware of KUHLMAN's prior acquaintance with FERRO, CANFORA and EDMONSON, as well as other Argon Insiders.

326.    LITTLE OWL also appointed FAERMARK and BREITWEISER as its additional members on the Argon Credit board of managers. FAERMARK was an outside attorney for LITTLE OWL from approximately December 2014 to September 2016. BREITWEISER was

appointed upon the recommendation of KUHLMAN and was an outside tax advisor to LITTLE OWL.

327.    Similarly, MARGON, pursuant to its investment in Argon Credit, appointed CANFORA and TRIFFLER to Argon Credit's Board of Managers.

**Prohibited Fees, Commissions And**
**Other Payments To Argon Insiders And Third Parties**

328.    Between May 2015 and December 2016, Argon Insiders knowingly and fraudulently approved of prohibited transfers of fees, commissions and other payments ("Prohibited Payments") to other Argon Insiders and third parties that are directly traceable to the proceeds of the Fintech Loan Agreement subsequent to the initial draw.

329.    During this two-year period of Argon Credit's operations, WOLFE, ZUMSKI, ARAKELIAN and TOMASZKIEWICZ, and the Board of Managers, caused Argon Credit to pay hundreds of thousands of dollars to or for their own insider self-dealing benefit, often for little or no value to Argon Credit, all of which were in violation of the Financial Covenants and were done so knowingly, willfully, intentionally, recklessly and negligently, all in an effort to further defraud Princeton of the value of its Princeton Property and specifically of its Loan Proceeds for their personal financial gain.

330.    The Argon Insiders and Board of Managers knew that the Fintech Loan Agreement expressly prohibited use of the Loan Proceeds to pay such Prohibited Payments.

331.    The Prohibited Payments included Argon Credit payments to: (i) GOLDSTEIN and BROADMARK totaling $528,333.33 (the "Broadmark Transfers"); (ii) GOLDSTEIN, now with PERAZA, for purported consulting fees of $248,791.67 (the "Peraza Transfers");[16] (iii)

---

[16] None of Prohibited Payments were ever owed to PERAZA because the Broadmark Agreement was never assigned to PERAZA and no other written agreement existed between Argon Credit and PERAZA with respect to these specific Prohibited Commission Payments. There was an agreement between Peraza and

BERGARVIV, which is owned in whole or in part by WOLFE and ARAKELIAN, through their respective companies, BMONEY and NOAX, Argon Credit in the amount of $381,000.00 (the "Bergarviv Transfers"); (iv) BLUE TREBLE, in the amount of $214,050.28 (the "Blue Treble Two Year Payments"), including at least $52,643.00 (the "Blue Treble One Year Payments," together with the Blue Treble Two Year Payments, the "Blue Treble Payments"); (v) WOLFE for more than $7,000.00 (the "Las Vegas Trip Expenses") in airfare, hotel, meal and entertainment charges for a unapproved celebratory trip to Las Vegas; (vi) WOLFE for a six-month apartment lease with Gateway Catalyst THC, LLC, for a monthly rent of $2,680.00, where WOLFE would engage in lavish parties; (vii) WOLFE and ZUMSKI for illegitimate vacation and incentive time for 2014 and 2015 in the amount of $57,992.30 for WOLFE and $31,664.80 for ZUMSKI (the vacation/incentive time payments to WOLFE and ZUMSKI, the "Incentive Payments"); and (viii) WOLFE in the amount of tens of thousands of dollars of unapproved personal expenses ("Wolfe Expenses") including, without limitation:

- Tires for his car;

- Food and alcohol purchases;

- iTunes purchases; and

- At least $18,145.51 on WOLFE's personal Discover card and $24,718.84 on WOLFE's personal American Express card.

332. Broadmark Transfers, Peraza Transfers and Bergarviv Transfers regarded prohibited commissions for assistance for securing: (i) the loan from Fintech Financial; (ii) the

---

Argon Credit, but that agreement did not cover the Prohibited Commissions. Indeed, PERAZA filed a proof of claim against Argon Credit admitting that "[o]n further consideration, [PERAZA] determined that the claim is properly and entirely owed to [BROADMARK]."

equity transactions with LITTLE OWL, TRIFFLER TRUST and CARDINAL TRUST; and (iii) the Spartan Transactions.

333. Specifically, on or about April 21, 2015, Argon Credit purportedly entered into a services agreement (the "Broadmark Agreement") with BROADMARK and ALHAMBRA to employ BROADMARK and ALHAMBRA to assist Argon Credit with certain debt and capital raising efforts.

334. GOLDSTEIN owns ALHAMBRA and was a FINRA-registered representative of Broadmark.

335. The Broadmark Agreement, executed only a short time period prior to the execution of the Fintech Loan Agreement, was actually signed by BROADMARK on April 30, 2015, one day prior to the execution date of the Fintech Loan Agreement.

336. Broadmark and ALHAMBRA purportedly assisted the Argon Entities in connection with obtaining: (i) the loan from Fintech Financial; (ii) the equity transactions with LITTLE OWL, TRIFFLER TRUST and CARDINAL TRUST; and (iii) the Spartan Transactions.

337. At some point subsequent to entering into the Broadmark Agreement, ALHAMBRA disassociated itself from BROADMARK when GOLDSTEIN joined PERAZA as a registered representative and, pursuant to a February 15, 2016 agreement among ALHAMBRA, Argon Credit and PERAZA (the "Peraza Agreement").

338. GOLDSTEIN, through PERAZA, continued the capital raising efforts on behalf of the Argon Entities.

339. There was no formal assignment of the Broadmark Agreement to PERAZA.

340. The Fintech Loan Agreement's terms regarding the use of the Loan Proceeds from the Revolving Note permitted payment of transaction fees only out of the initial draw and only as approved and disclosed.

341. Moreover, the First Amendment to the Fintech Loan Agreement expressly prohibited use of the loan proceeds to pay a commission or finder's fees to any person or entity.

342. Regardless of the contractual provisions prohibiting such Prohibited Payments, Argon Credit made the Broadmark Transfers and Peraza Transfers which are a fraudulent use of the Loan Proceeds.

343. The Argon Insiders knowingly, willfully, intentionally, recklessly and negligently failed to disclose the Prohibited Payments to Fintech Financial or PAIF.

344. The diversion of the Peraza Transfers for the benefit of Argon Outsiders was a knowing and fraudulent theft and conversion of the Loan Proceeds and was only possible because of the rampant fraud occurring in the operations of the Argon Entities to the financial detriment of Princeton.

345. Similarly, WOLFE and TOMASZKIEWICZ, both Argon Insiders, caused Argon Credit to enter into an arrangement with BLUE TREBLE, an entity owned and managed exclusively by TOMASZKIEWICZ, purportedly to develop software on behalf of Argon Credit.

346. However, TOMASZKIEWICZ was already an officer of Argon Credit and obligated to perform his duties for the benefit of Argon Credit and not be paid an additional insider payment through BLUE TREBLE.

347. Instead, TOMASZKIEWICZ took advantage of the fraud being perpetrated at the Argon Entities by the various Argon Insiders and Argon Outsiders and caused Argon Credit to make hundreds of thousands of dollars in payments to BLUE TREBLE for his personal benefit.

348.     In addition, Las Vegas Trip Expenses continued to exhaust the Loan Proceeds for fraudulent unapproved purposes and these transfers were made at a time when Argon Credit was struggling financially and otherwise insolvent.

349.     The Argon Entities' business operations did not require the use of a residential apartment and WOLFE and other Argon Credit employees used the apartment for personal, rather than business, use.

350.     No other Argon Credit employees received any Incentive Payments for purported incentive time during that same payroll period except WOLFE and ZUMSKI.

351.     The Argon Insiders, including the entire Board of Managers, knowingly, willfully, intentionally, recklessly and negligently failed to disclose the Prohibited Payments to Princeton.

352.     The diversion of all of these Prohibited Payments for the benefit of the Argon Insiders was a knowing and fraudulent theft and conversion of Princeton's Loan Proceeds and was only possible because of the fraud occurring in the operations of the Argon Entities under the auspices and approval of the Board of Managers to the financial detriment of Princeton.

**Argon Entities' Bankruptcy Filings**

353.     On December 16, 2016 (the "Petition Date"), the Argon Entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

354.     As of December 16, 2016, the balance due from the Argon Entities to FRS under the Revolving Note was at least $37,291,193.98.

355.     FRS subsequently filed proofs of claim against each of the Argon Entities.[17]

---

[17] Specifically, FRS originally filed a secured proof of claim against Argon Credit, but then amended its filing to being an "unsecured" proof of claim. The purpose for the amendment was two-fold. First, the amendment was strategic inasmuch as FRS wanted to control the "unsecured" class of creditors against Argon Credit so that FRS would be in a better influential position with regard to electing a bankruptcy trustee. Second, the amendment to a purely unsecured claim against Argon Credit reflected the reality that Argon Credit had virtually no assets of value remaining, and thus FRS recognized that any security interest

356. FRS's proofs of claim, as amended, assert an unsecured claim against Argon Credit in the amount of $37,291,193.98, an unsecured claim against Argon X in the amount of $11,700,000.00, and a secured claim against Argon X in the amount of $25,591,193.98.

357. On January 11, 2017, the Argon Bankruptcy was converted from a Chapter 11 bankruptcy to a Chapter 7 bankruptcy.

358. During the pendency of the Argon Bankruptcy, the Bankruptcy Court determined in a written opinion that the Argon Entities were fraudulently concealing the "double counting" of the Spartan Loans as Princeton and SPARTAN FINANCE's collateral.

359. Specifically, the Court determined as follows:

> Evidence was presented by each side as to the actual value of the portfolio and the value of the assets pledged to FRS through the Loan and Security Agreement. Testimony was presented concerned the apparent sale of a portion of the loan portfolio to Spartan Specialty Finance I SPV LLC ("SSF") in 2015. No written consent by Princeton (at the time the name of the lender) for the sale to SSF was presented and FRS' witnesses testified that they did not know about the sale and did not consent. Because of the sale of approximately $3 million of the Loan Portfolio, these loans are seemingly double pledged as security to both SSF and FRS. The Debtors continue to include these in their reports of the existing loan portfolio to FR throughout the period after the date.

(footnote omitted).

360. The Court further ruled: "The court observed that the funds from the sale were not turned over to Princeton and although the sold loans continued to be listed on the Debtors' aging report, those sold loans were also the collateral of SSF and certain insiders of the [Argon Entities]. In effect, those sold loans were being 'double counted' as both collateral of SSF and Princeton."

---

was almost certainly worthless. The true value was in the consumer loan portfolio, which was owned by Argon X.

361.     During the Bankruptcy, the Spartan Entities and certain bankruptcy defendants attempted to deflect their liability for their fraud by citing to non-binding non-executed documents as the basis for their purported authority to engage in the fraudulent Spartan Transactions.

362.     They falsely asserted that the revenue earned from the sale of the Spartan Loans was reflected on certain financial statements of the Argon Entities and that, therefore, PAIF had valid advance notice of the Spartan Transactions and had thereby consented to the sale of the Spartan Loans and the diversion of the Loan Proceeds and PAIF Settlement Funds away from Princeton's control and oversight.

363.     The bankruptcy court rejected their baseless arguments as there are no documents demonstrating that PAIF had consented to the sale of the Spartan Loans and/or had acquiesced to the Spartan Transactions.

364.     The arguments of these bankruptcy defendants in the Argon Bankruptcy represent their continuing efforts to deflect their individual liability for their fraud and fraudulent concealment of the Spartan Transactions and Spartan Loans, all to the significant financial detriment of Princeton.

365.     The fact is that these Defendants knowingly, intentionally and fraudulently induced Princeton to increase its line of credit under the Revolving Note and not only divested Princeton of its control and oversight over its Loan Proceeds but further failed to remit to Princeton (i) the proceeds from the sale of the Spartan Loans and (ii) the PAIF Settlement Funds generated by the Spartan Loans and owed directly to Princeton.

## RICO FACTUAL PREDICATES

366.     Defendants (each, a "RICO Defendant") acted in concert, together and with others, from May 2015 through December 2016 in various capacities, at various times, to convert to their

pecuniary advantage through a series of overt and covert predatory and racketeering acts, predicated upon the fraudulent inducement of Princeton to increase its line of credit funding pursuant to the Revolving Note, simultaneous with the concerted delivery of false financial information to the Princeton as the owner of the Princeton Property that was purposeful in its inducement of Princeton to delay noticing an event of default, all of which included a plethora of violations of mail and wire fraud and other state laws prohibiting such unlawful, harmful, predatory and deceptive conduct.

367.    Among other things, the RICO Defendants' predicate acts, beginning in May 2015 (within days of the closing on the Fintech Loan Agreement), included the systemic formation of the Spartan Entities that would be the recipient of the diversion of the Princeton Property away from the control and oversight of Princeton, including the conversion of the Spartan Servicing Fees, including the PAIF Settlement Funds.

368.    RICO Defendants made widespread use of the United States mails and interstate wires to knowingly create the Spartan Entities through which the RICO Scheme was designed and intended to be effectuated.

369.    In order to effectuate the RICO Scheme, RICO Defendants fraudulently concealed the existence, nature and extent of the RICO Scheme from Princeton and engaged in a pattern of deception by the delivery of false financial information and the non-disclosure of the Spartan Transactions, all of which was designed to mislead Princeton and to delay the issuance of a notice of an event of default.

370.    As part of the RICO Scheme, using the Loan Proceeds from Princeton, Argon Credit and the Argon Subsidiaries originated, funded and serviced the Spartan Loans across the internet and through the United States Mail and/or interstate wires.

371. The RICO Defendants orchestrated this widespread deceptive and fraudulent RICO Scheme to defraud Princeton as the owner of the Princeton Property.

372. The RICO Defendants used the illicit Spartan Servicing Fees and PAIF Settlement Funds to enrich themselves.

373. The RICO Scheme harmed Princeton by directly and proximately decreasing, and indeed decimating, Princeton's value in its Loan Proceeds, the PAIF Settlement Funds, its Secured Collateral and the Prohibited Transfers and converting and stealing business opportunities that rightfully would have been Princeton's but for the RICO fraud.

**The RICO Scheme And RICO Enterprise**

374. The RICO Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "RICO Enterprise."

375. Each RICO Defendant participated in the operation or management of the RICO Enterprise because they engaged in, and otherwise aided and abetted in, acts that they knew would further the RICO Scheme including, without limitation, (i) the drafting, reviewing, revising, approving, endorsing and/or disseminating of fraudulent and misleading financial information (the "False Financials") and (ii) the structuring and implementation of the Spartan Transactions, all in furtherance of the continued fraudulent misuse of the Princeton Property, including the fraudulent inducement of Princeton to continue to lend and increase its credit line, for the financial benefit of FTAM and the Spartan Entities (to the financial loss and detriment of Princeton), all of which served to perpetuate the RICO Scheme.

376. The RICO Defendants associated together, under an association in fact organization, with the common purpose of using the Argon Entities (through the use of the False

Financials) as a vehicle and means for misusing and diverting to their own pecuniary advantage and benefit Princeton's value in, and control and oversight over, the Princeton Property.

377.    The Argon Entities are now bankrupt but functioned as a continuing unit.

378.    The Argon Entities had an independent existence and purpose beyond the predicate acts and pattern of racketeering itself, which included the origination and generation of Collections and Receivables from the Consumer Loans.

379.    The Argon Entities had a distinct structure based on the essential operating functions of the Argon Entities and the particular role that each Defendant had within and outside of the operations of the Argon Entities, as owner/member, senior executive, board manager and/or contractual partner.

380.    As set forth above in detail, the Argon Entities are engaged in interstate commerce.

**Pattern Of Racketeering: False Financials As A Pattern**

381.    The pattern of racketeering involved, *inter alia*, the knowing and intentional drafting, reviewing, revising, approving, endorsing and/or disseminating of the False Financials utilized by RICO Defendants to enable them to use and divert from Princeton control of the Princeton Property to their financial betterment and to the financial loss and detriment of Princeton.

382.    Each instance of authorizing, approving, endorsing and/or disseminating a False Financial to Princeton is a discrete act in furtherance of the RICO Scheme.

383.    In support of demonstrating this RICO Scheme, the False Financial Email Chart, set forth *supra*, is a chart of emails, including (i) date of the email, (ii) sender of the email, (iii) the PAIF recipients of the email and (iv) the documents attached to those emails, that were used to facilitate the scheme, all of which is incorporated herein as if set forth at length.

384.    Moreover, the purposeful and fraudulent delivery of each False Financial to Princeton (i) involved the use of the mail and wires across interstate lines, (ii) constituted wire fraud as defined by 18 U.S.C. § 1343 and (iii) had a direct, proximate and material deleterious impact on Princeton's value in the Princeton Property.

385.    As a result of each False Financial, RICO Defendants effectuated the RICO Scheme, which was to secure unhindered and unabated continued access to the Loan Proceeds of the Revolving Note which could then be monetized by RICO Defendants to fund their fraud perpetrated through the diversion of those Loan Proceeds and all other Princeton Property through the Spartan Transactions and Spartan Fraud.

### Pattern Of Racketeering: Divestiture And Diversion Of Accounts Receivable As A Pattern

386.    From May 2015 until December 2016, the RICO Defendants stole and defrauded Princeton of its control in and over the Princeton Property, inducing Princeton, not once but twice to increase the Loan Proceeds being disbursed through the Revolving Note.

387.    Within only a few days of the execution of the Fintech Loan Documents, certain RICO Defendants began to put into action a plot to subvert Princeton's value in, and control and oversight over, the Princeton Property for their own insider self-dealing.

388.    As part of this RICO Scheme, RICO Defendants began to plunder the Loan Proceeds that Princeton disbursed pursuant to the Fintech Loan Agreement, while simultaneously disseminating the False Financials to Princeton.

389.    RICO Defendants created and implemented the Spartan Fraud involving the Spartan Transactions that had, at its core, the conversion and diversion of the Loan Proceeds and other Princeton Property from the control and oversight of Princeton for the financial benefit of certain Argon Insiders and Argon Outsiders.

390.     The RICO Defendants' diversion of the Loan Proceeds and PAIF Settlement Funds and conversion of the Spartan Servicing Fees caused Princeton to suffer direct losses and further harmed Princeton and its business by hampering the financial viability of the Argon Entities to perform.

391.     The RICO Defendants orchestrated and structured the diversion of the Loan Proceeds and PAIF Settlement Funds and conversion of the Spartan Servicing Fees through the implementation of the Spartan Transactions and Spartan Fraud, consistent with the blueprint prepared and circulated by KOSTINER beginning in May 2015 and the Spartan Memo.

392.     In order to cover up the RICO Scheme and hide their involvement, the RICO Defendants created and disseminated the False Financials and stole revenue directly due to Princeton in the form of the PAIF Settlement Funds through the undisclosed Spartan Transactions.

393.     Each act by the RICO Defendants that furthered these active concealment efforts constituted a separate racketeering act that collectively constituted distinct patterns over that same time period.

394.     The RICO Defendants were able to commit the predicate offenses by virtue of their insider status and control of the Argon Entities as the RICO Enterprise, either as owner/member, senior executive, board manager and/or contractual partner, with the aid of other Argon Insiders and Argon Outsiders.

395.     The RICO Defendants, acting in the furtherance of the operations of the Argon Entities, engaged in a pattern of racketeering by: (a) knowingly and intentionally preparing, drafting, reviewing, revising, approving, endorsing and/or disseminating False Financials to Princeton as the owner of the Princeton Property; (b) diverting and converting for their own

financial benefit the revenue due and owing to Princeton in the form of, without limitation, the PAIF Settlement Funds; and (d) concealing the RICO Enterprise from Princeton.

396. The RICO Defendants, in their pattern of racketeering activity, regularly used interstate telephone and facsimile transmission lines, cellular phones and internet transmission while they were engaging in interstate commerce for the purposes of committing fraud or deceit, conspiring to commit fraud or deceit, and harming Princeton by directly and proximately diverting and converting the Loan Proceeds, PAIF Settlement Funds and other Princeton Property.

## RICO Offenses

397. Each RICO Defendant is associated with the Argon Entities, and has conducted, or participated in, the operations of the Argon Entities through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d).

398. As alleged with particularity below, the RICO Defendants conspired together to violate 18 U.S.C. §§ 1962(c) and (d).

## Predicate Offenses – Wire Fraud & 18 U.S.C. § 2134

399. The RICO Defendants knowingly and willfully devised a scheme to draft and disseminate the False Financials and fraudulently divert the Princeton Property that constituted the Loan Proceeds, PAIF Settlement Funds, Secured Collateral and/or Prohibited Transfer away from Princeton and/or Princeton's control and oversight.

400. The RICO Scheme constituted a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or

artifice to defraud that person or those persons of money or property having a value of $5,000 or more," in violation of 18 U.S.C. § 2314.

401.    The RICO Defendants knowingly and willfully devised a manner by which they could divert and steal the Princeton Property, including the Loan Proceeds, PAIF Settlement Funds, Secured Collateral and/or Prohibited Transfer, for their own self-dealing benefit.

402.    The RICO Defendants elected to fund, in part, and operate fraudulently the Argon Entities through the misuse of the Princeton Property, including Loan Proceeds disbursed through the Fintech Loan Agreement.

403.    Each of the predicate fraudulent offenses described in the preceding paragraphs involved knowing use by the RICO Defendants of interstate telephone and facsimile transmission lines, cellular phones, and internet or wire transmission to disseminate the False Financials and divert and diminish Princeton's value in, and control and oversight over, the Princeton Property.

404.    As part of the RICO Scheme, for example, through their control and direction of the Argon Entities, the RICO Defendants not only effectuated the Spartan Fraud, but controlled the delivery of the False Financials to Princeton as the owner of the Princeton Property.

405.    The RICO Scheme began as early as May 2015 and continued at least through December 2016.

406.    As a result of the RICO Scheme, Princeton incurred damages in excess of $22,000,000.00 and additional damages from the redirection of its entire business operations to focus on surviving from its relationship with RICO Defendants.

**Participation Of RICO Defendants In The Pattern Of Racketeering Activity**

407.    In addition to the facts set forth herein, each RICO Defendant who was an Argon Insider used his respective insider position with the Argon Entities to develop and implement the RICO Scheme.

408.    Each RICO Defendant further used their respective positions to control, manage, approve, endorse and/or disseminate the False Financials and diversion and diminishment of the value of the Princeton Property.

409.    The efforts by each RICO Defendant in furtherance of the RICO Scheme were accomplished through, *inter alia*, electronic mail, the internet, U.S. mail, facsimile and interstate telephone wires.

410.    Each RICO Defendant knew that the dissemination of the False Financials and diversion of the Loan Proceeds, PAIF Settlement Funds, Secured Collateral and/or Prohibited Transfer were false and fraudulent and harmed Princeton as the owner of the Princeton Property.

411.    Each RICO Defendant orchestrated, directed, approved, managed, endorsed, supervised, and otherwise controlled various aspects of the operations of the Argon Entities that permitted each of them to facilitate the dissemination of the False Financials and diversion of the Loan Proceeds, PAIF Settlement Funds, Secured Collateral and/or Prohibited Transfer.

**Princeton Has Financially Suffered As A Result Of The
Predatory, Racketeering And Otherwise Unlawful Conduct Described Herein.**

412.    As a result of the predatory, racketeering and unlawful acts of the various RICO Defendants, as described herein, Princeton has been directly and proximately damaged through loss of the value in and control and oversight over the Loan Proceeds, PAIF Settlement Funds, Secured Collateral, Prohibited Transfer, lost profits, higher costs and loss of goodwill and name

recognition in the consumer loan marketplace, from as early as December 2016 through the present.

## COUNT ONE

### CONDUCT AND PARTICIPATION IN A RICO
### ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

(18 U.S.C. § 1962(c))

**All Defendants**

413.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

414.    At all relevant times, Princeton was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

415.    At all relevant times, each RICO Defendant was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

416.    RICO Defendants worked together, and in concert, participating in the conduct of the affairs of the RICO Enterprise through the aforementioned pattern of racketeering activities.

417.    The facts demonstrate that RICO Defendants each unlawfully, willingly and knowingly performed the acts or omissions, and conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise, namely legitimate business affairs of the Argon Entities, through the means of a pattern of illegitimate racketeering activities, all predicated upon the RICO Scheme to falsify financial records in order to fraudulently divert and divest Princeton of its Princeton Property.

418.    As a direct and proximate consequence of the aforementioned violations of 18 U.S.C. § 1962(c), Princeton has directly and proximately suffered substantial injury to its business and property within the meaning of 18 U.S.C. § 1964(c) including, but not limited to, diminished

value in and control and oversight over, the Princeton Property as well as irreparable loss of goodwill and business opportunities.

419. Princeton's damages from the unlawful action of RICO Defendants include, but are not limited to, the following, together with allowed costs and counsel fees:

|  | **TOTAL DAMAGES** |
|---|---|
| Argon Impairment | $27,727,970.71 |
| Lost interest income | $22,471,411.28 |
| Lost participation fees | $2,375,000.00 |
| Legal Expenses | $7,227,184.19 |
| Accounting Fees - Re-stating due to fraud | $25,000.00 |
| Lost Investment Opportunities | $31,675,000.00 |
| Lost Value of Fund Company | $146,512,500.00 |
| **Grand Total of Damages** | **$238,014,066.18** |

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against RICO Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT TWO

## CONSPIRACY TO ENGAGE IN A
## PATTERN OF RACKETEERING ACTIVITY

### (18 U.S.C. § 1962(d))

### All Defendants

420.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

421.    RICO Defendants associated in fact with the RICO Enterprise in order to perpetrate the RICO Scheme.

422.    The RICO Enterprise was engaged in and affected interstate commerce.

423.    The RICO Defendants conducted and participated, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through the aforementioned pattern of racketeering in violation of 18 U.S.C. § 1962(c).

424.    Since, as early as May 2015, in various manners and efforts, the RICO Defendants cooperated jointly and severally in the commission of two or more of the overt predicate acts, namely the use of the United States mail and interstate wires, that are itemized in 18 U.S.C. § 1961(1)(A) and (B), in order to effectuate the RICO Scheme.

425.    The conspiracy of RICO Defendants to commit those acts violates 18 U.S.C. § 1962(d).

426.    The RICO Defendants committed two or more of the overt predicate acts itemized above in the preceding paragraphs in a manner intended to further their racketeering activities, in violation of 18 U.S.C. § 1962(d).

427. As a result of the RICO Scheme, Princeton has incurred direct and proximate damages in excess of $238,014,066.18 including, but not limited to, harm and loss of its Princeton Property.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against RICO Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief, including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT THREE

## FRAUD/INTENTIONAL MISREPRESENTATION

### All Defendants

428. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

429. Princeton specifically charges all Defendants with fraud and/or intentional misrepresentation in this Count.

430. Defendants identified in this Count, based on the facts set forth in this Amended Complaint, knowingly, willfully, intentionally and/or recklessly committed fraud against Princeton as the owner of the Princeton Property to Princeton's financial detriment by scheming to steal, abscond, convert and otherwise wrongfully deprive Princeton of its Princeton Property.

431. At all times relevant to this Amended Complaint, as set forth herein, each Defendant named in this Count was an Argon Insider, managed an Argon Insider or was substantively involved in the management of the Argon Entities due to the nature of their

investments in and/or contracts with the Argon Entities, and they each committed fraud against Princeton through their unlawful schemes to divest Princeton of the value of, and the control and oversight over, its Princeton Property to Princeton's financial detriment and their own financial benefit.

432.    Many of these Defendants were executive officers of the Argon Entities, were on the Board of Managers of the Argon Entities or were direct controlling owner members of the Argon Entities.

433.    As set forth herein with particularity, Defendants identified in this Count knowingly, willfully, intentionally and recklessly committed fraud against Princeton as the owner of the Princeton Property, without limitation, in the following ways: (i) the diversion and conversion of Princeton's value in, and control and oversight over, the Princeton Property for no fair exchange of value through the transferring of the Spartan Loans to FTAM and the Spartan Entities which were affiliated with an Argon Insider and/or the Argon Entities, including the knowing failure to remit to Princeton the PAIF Settlement Funds and other Spartan Servicing Fees to the Argon Entities; (ii) relatedly, the fraudulent inducement of Princeton to continue lending and increasing its lending its Loan Proceeds that were intending to be used for purposes other than the underlying reasons for which they were being disbursed; (iii) the submission to Princeton as the owner of the Princeton Property of false and misleading financial statements and information on a repeated regular basis, as demonstrated by the False Financial Email Chart (*see supra*), that failed to disclose an accurate and truthful financial picture of the Argon Entities, its Doubtful Accounts and the Spartan Transactions in order to induce Princeton not to declare an earlier event of default; and (iii) the authorization and approval of the payment of the Prohibited Payments.

434.     As set forth herein with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by these various Defendants named in this Count, as set forth herein in detail, that amounted to active fraud and/or intentional misrepresentation as to the schemes to divest and diminish the value of the Princeton Property that had as its purpose the fraudulent inducement of causing Princeton to "lend more and delay default."

435.     Specifically, Defendants named in this Count, at various times and in various manners as set forth at length in this Amended Complaint, made misrepresentations, omitted material facts and otherwise failed to disclose material information to Princeton, all in bad faith and with malicious intention to deceive, defraud and divest Princeton as the owner of the Princeton Property of its rights in the Princeton Property including, *inter alia*, without limitation the RICO Scheme, Spartan Fraud, False Financials and Prohibited Payments.

436.     For example, KOSTINER, an executive with Argon Credit at the time and using an Argon Credit e-mail address for business transactions related to the Spartan Transactions, knowingly schemed and conspired with WOLFE, ZUMSKI, FERRO, ARAKELIAN, SCHNOSENBERG, CANFORA, TRIFFLER, KUHLMAN, BREITWEISER, and FAERMARK, and those other Defendants identified in this Amended Complaint, without limitation, to cause: (i) the Spartan Entities to be incorporated as an instruments of fraud; and (ii) FTAM and the Spartan Entities to execute the Spartan Transactions through which RICO Defendants defrauded Princeton by inducing Princeton to "lend more" and "delay default."

437.     KOSTINER's activities and the Spartan Transactions were all known to the Argon Insiders and Argon Outsiders, all of whom were well aware of the Fintech Loan Agreement and related Financial Covenants owed to Princeton as the owner of the Princeton Property.

438.    These named Defendants absconded with and converted to their own financial benefit the Princeton Property which included, in part, the purchase price of the Spartan Loans allegedly and the Spartan Servicing Fees, including the PAIF Settlement Funds.

439.    In particular, among other losses, Princeton lost its weekly PAIF Settlement Funds as well as the value of the Loan Proceeds that were used to originate the Spartan Funds only to have them transferred to the Spartan Entities for no equivalent value.

440.    ZUMSKI committed fraud against Princeton by authorizing Argon Credit to pay himself $31,664.80 for purported vacation time and 2014 and 2015 "incentive time" on the eve of the Argon Bankruptcy which was a fraudulent use of the Loan Proceeds.

441.    ARAKELIAN committed fraud against Princeton by, among other things, authorizing Argon Credit to pay $381,000.00 to BERGARVIV in purported commissions which personally benefitted ARAKELIAN and which were not disclosed to Princeton or otherwise an authorized or permitted use of the Loan Proceeds.

442.    In taking and authorizing and/or approving these various actions, Defendants committed fraud against Princeton and diminished and decimated the value of its Princeton Property for their self-serving interests.

443.    Such Defendants undertook prohibited, self-interested, self-dealing fraudulent transactions on which they appeared on both sides and took actions that financially benefitted themselves personally at the financial cost of, and detriment to, Princeton as the owner of the Princeton Property.

444.    In taking these actions, and disclosing the False Financials to Princeton, such Defendants acted knowingly and intentionally causing Princeton (i) to continue lending its Loan Proceeds at a time that Princeton would have served a notice of default and (ii) to increase its line

of credit for the disbursement of the Loan Proceeds from $20M to $37.5M, each of which diminished and decimated the value of the Princeton Property.

445.    Defendants, at various times and in various manners, were the only source of material financial information for Princeton as the owner of the Princeton Property, and Princeton could not discover the repeated pervasive fraud perpetrated by Defendants by other reasonable means or methods of discovery until it was too late and Princeton's Princeton Property had been diverted, converted, depleted, stolen and otherwise materially diminished.

446.    As described in this Amended Complaint, Defendants actively colluded to thieve, steal and otherwise convert the Loan Proceeds disbursed pursuant to the Fintech Loan Agreement and Revolving Note and subsequently schemed to hide these material misrepresentations, omissions and non-disclosures from Princeton.

447.    As a direct and proximate cause of Defendants' fraud and/or intentional misrepresentations set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury including the material loss of its Princeton Property and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

448.    In addition, among other duties owed to Princeton, Defendants owed a duty of full disclosure to Princeton pursuant to the principles outlined in and guided by the Restatement (Second) of Torts § 551 (1977)

449.    Defendants owed a duty of full disclosure where Defendants presented to Princeton on a repeated basis, partial and incomplete statements of false financial facts that were known to be misleading and deceptive and meant to induce Princeton into both continuing its lending of the Loan Proceeds, but also to increase its lending of the Loan Proceeds from $20M to $37.5M.

450.     The information that Defendants omitted from the financial reports repeatedly an knowingly delivered to Princeton, including without limitation, the information concerning the financial impact of the Doubtful Accounts and Spartan Transactions, was material to Princeton's decision-making process as to whether to continue lend the Loan Proceeds and/or deliver a notice of default.

451.     Defendants made repeated materially incomplete disclosures and as a result, pursuant to Section 551, owed a duty to disclose whatever additional material information was necessary to prevent Defendants' partial disclosures from misleading Princeton.

452.     In other words, where Defendants decided to deliver any financial information to Princeton, once they forwarded false financial information, they accepted a duty imposed on them to speak the full truth and failed to do so.

453.     The aforementioned acts of fraud and/or intentional misrepresentation were intentional, reckless, wanton and outrageous and entitle Princeton as the owner of the Princeton Property to the recovery of punitive damages against Defendants.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT FOUR

## AIDING AND ABETTING FRAUD/INTENTIONAL MISREPRESENTATION

### All Defendants

454.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

455.    Princeton specifically charges in this Count all Defendants with aiding and abetting the fraud and/or intentional misrepresentation (as set forth in the preceding Count).

456.    Defendants identified in this Count, based on the facts set forth in this Amended Complaint, knowingly, willfully, intentionally and recklessly aided and abetted in the commission of the fraud being committed against Princeton as the owner of the Princeton Property.

457.    As set forth herein with particularity, these Defendants identified in this Count knowingly, willfully, intentionally and recklessly aided and abetted the active fraud set forth in the preceding Count.

458.    Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Count, who committed various tortious activity and wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Count and otherwise described herein.

459.    Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Count and otherwise described herein.

460.    As set forth here in with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as

set forth herein in detail, at various times to protect the interests of Princeton as the owner of the Princeton Property in the various transactions described herein.

461.    Defendants, at various times and in various manners as set forth at length in this Amended Complaint, have aided and abetted misrepresentations, omissions of material facts and failures to disclose material information to Princeton as the owner of the Princeton Property, all in bad faith and with malicious intention to deceive.

462.    Defendants, at various times and in various manners, were the only source of material information for Princeton, and the repeated fraud that was pervasive throughout the entire time period of this Amended Complaint was not discoverable by Princeton by other reasonable means or methods of discovery until after it was too late and Princeton's assets were depleted and/or stolen.

463.    Indeed, as described in this Amended Complaint, these Defendants actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded, increased and distributed, to hide these material misrepresentations, omissions and non-disclosures from Princeton.

464.    Through the aiding and abetting of the various misrepresentations, omissions and non-disclosures, Defendants have aided and abetted in the fraud and/or intentional misrepresentation against Princeton as the owner of the Princeton Property.

465.    In addition, among other duties owed to Princeton, Defendants owed a duty of full disclosure to Princeton pursuant to the principles outlined in and guided by the Restatement (Second) of Torts § 551 (1977).

466.    As a direct and proximate cause of Defendants' conduct of aiding and abetting the fraud and/or intentional misrepresentation set forth in this Count and as otherwise set forth herein

in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Princeton Property and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

467.     The aforementioned acts of aiding and abetting fraud and/or intentional misrepresentation were intentional, reckless, wanton and outrageous and entitle Princeton to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT FIVE**

**<u>FRAUDULENT CONCEALMENT</u>**

**All Defendants**

468.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

469.     Princeton specifically charges all Defendants with fraudulent concealment in this Count.

470.     As set forth elsewhere in this Amended Complaint with particularity, including the preceding Counts, Defendants identified in this Count, based on the facts set forth in this Amended Complaint, knowingly, willfully, intentionally and/or recklessly concealed the fraud that these

Defendants committed against Princeton as the owner of the Princeton Property to Princeton's financial detriment.

471.    As set forth herein with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, that amounted to active fraudulent concealment of the divestiture and theft of the Princeton Property.

472.    Specifically, Defendants, at various times and in various manners as set forth at length in this Amended Complaint, have made misrepresentations, omitted material facts and otherwise failed to disclose material information to Princeton, all in bad faith and with malicious intention to deceive and commit the fraud that is set forth with particularity elsewhere in this Amended Complaint.

473.    Defendants, at various times and in various manners, were the only source of material financial information for Princeton as the owner of the Princeton Property, and Princeton could not discover the repeated pervasive fraud by other reasonable means or methods of discovery until after it was too late and Princeton's Princeton Property was depleted and/or stolen.

474.    Indeed, as described in this Amended Complaint, Defendants identified in this Count, actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded to the Argon Entities, and subsequently increased, to hide these material misrepresentations, omissions and non-disclosures from Princeton as the owner of the Princeton Property.

475.    Through their respective misrepresentations, omissions and non-disclosures, as well as the failure to fulfill their duty to advise Princeton as the secured party of the fraud and to

otherwise prevent such fraud, Defendants have committed fraudulent concealment against Princeton as the owner of the Princeton Property.

476.    In addition, among other duties owed to Princeton, Defendants owed a duty of full disclosure to Princeton pursuant to the principles outlined in and guided by the Restatement (Second) of Torts § 551 (1977).

477.    Defendants owed a duty of full disclosure where Defendants presented to Princeton on a repeated basis, partial and incomplete statements of false financial facts that were known to be misleading and deceptive and meant to induce Princeton into both continuing its lending of the Loan Proceeds, but also to increase its lending of the Loan Proceeds from $20M to $37.5M.

478.    As a direct and proximate cause of Defendants' conduct of fraudulent concealment set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Princeton Property and therefore seeks compensatory damages, and such other and further relief as may be just, equitable and proper.

479.    The aforementioned acts of fraudulent concealment were intentional, reckless, wanton and outrageous and entitle Princeton as the owner of the Princeton Property to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT SIX

## AIDING AND ABETTING FRAUDULENT CONCEALMENT

### All Defendants

480.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

481.     In this Count, Princeton specifically charges all Defendants with aiding and abetting the fraudulent concealment set forth in the preceding Count.

482.     Defendants identified in this Count, based on the facts set forth in this Amended Complaint, knowingly, willfully, intentionally and recklessly aided and abetted in the concealment of the fraud being committed against Princeton as the owner of the Princeton Property (as set forth in particularity elsewhere in this Amended Complaint).

483.     Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Count, who committed various tortious activity and wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Count and otherwise described herein.

484.     Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Count and otherwise described herein.

485.     As set forth here in with particularity, Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by the various Defendants, as set forth herein in detail, at various times to protect the interests of Princeton as the owner of the Princeton Property in the various transactions described herein.

486.    Defendants, at various times and in various manners as set forth at length in this Amended Complaint, have aided and abetted misrepresentations, omissions of material facts and failures to disclose material information to Princeton as the owner of the Princeton Property, all in bad faith and with malicious intention to deceive Princeton as the owner of the Princeton Property.

487.    Defendants, at various times and in various manners, were the only source of material information for Princeton, and the repeated fraud that was pervasive throughout the entire time period of this Amended Complaint was not discoverable by Princeton by other reasonable means or methods of discovery until after it was too late and Princeton's assets were depleted and stolen.

488.    Indeed, as described in this Amended Complaint, several of Defendants actively colluded, after the proceeds of the Fintech Loan Agreement and Revolving Note had been funded and increased at various times, were distributed, to hide these material misrepresentations, omissions and non-disclosures from Princeton.

489.    Through the aiding and abetting of the various misrepresentations, omissions and non-disclosures, as well as the failure to fulfill their duty to advise Princeton as the secured party of the fraud, Defendants have aided and abetted in the fraudulent concealment against Princeton.

490.    In addition, among other duties owed to Princeton, Defendants owed a duty of full disclosure to Princeton pursuant to the principles outlined in and guided by the Restatement (Second) of Torts § 551 (1977).

491.    As a direct and proximate cause of Defendants' conduct of fraudulent concealment set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained irreparable harm and suffered substantial injury to its Princeton Property and therefore seeks compensatory damages and such other and further relief as may be just, equitable and proper.

492.    The aforementioned acts of aiding and abetting fraudulent concealment were intentional, reckless, wanton and outrageous and entitle Princeton to the recovery of punitive damages against Defendants named herein.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT SEVEN

## FRAUD/INTENTIONAL INDUCEMENT

### All Defendants

493.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

494.    Princeton specifically charges all Defendants with fraudulent inducement in this Count.

495.    Defendants fraudulently induced Princeton to lend, continue lending and increasing its lending its Loan Proceeds that were intended to be used for purposes other than the underlying reasons for which they were being disbursed.

496.    Within a few weeks of closing on the original Fintech Loan in May 2015, KOSTINER, acting as Argon Credit's Vice President of Capital Markets, with the knowledge, awareness and complicity of other Argon Insiders including, without limitation, WOLFE, ZUMSKI and ARAKELIAN, formed FTAM for the fraudulent purpose of utilizing the Loan

Proceeds to acquire certain Consumer Loans and to divest and divert Princeton of the value of, and the control and oversight over, the Princeton Property.

497.    SCHNOSENBERG, as Argon Credit's CFO, with the knowledge and approval of WOLFE and others, began using FTAM as the linchpin in the fraud directed at misappropriating and converting Princeton's Loan Proceeds disbursed through the Fintech Loan Agreement.

498.    On August 4, 2015, FTAM, at KOSTINER's direction, formed SPARTAN FINANCE and acted as its managing member. Thereafter, on August 20, 2015, WOLFE (as Argon Credit's CEO) and KOSTINER (as the managing member of FTAM) executed the Master Agreement pursuant to which the Spartan Loans were transferred to FTAM and that were originated using the Loan Proceeds disbursed pursuant to the Fintech Loan Agreement.

499.    Defendants, including WOLFE, KOSTINER and others, knew that the Spartan Transactions were intended to divest Princeton of its value in those Loan Proceeds being disbursed to Argon Credit pursuant to the Fintech Loan Agreement.

500.    Argon Insiders and Argon Outsiders knowingly and intentionally entered into the Spartan Transactions as well as make the Prohibited Payments to defraud Princeton as owner of the Princeton Property by diverting and divesting Princeton of its value in the Loan Proceeds disbursed to the Argon Entities pursuant to the Fintech Loan Agreement.

501.    KOSTINER, with the knowledge of WOLFE, ZUMSKI, ARAKELIAN, SCHNOSENBERG, MARGON, LITTLE OWL, BERGARVIV, FTAM and SSF HOLDINGS and all other Argon Insiders and Argon Outsiders, formed FTAM for the sole purpose of acquiring and servicing the Spartan Loans, being funded through Princeton's Loan Proceeds and being transferred to FTAM without a return of reciprocal value, thereby divesting Princeton of its value in, and control and oversight over, its Princeton Property.

502.     The Argon Entities' books and records that were provided to Princeton during the term of the Fintech Loan Agreement, failed to reflect any disclosure of the Spartan Transactions and omitted the Doubtful Accounts, and no Defendant otherwise disclosed the existence or extent of the Spartan Transactions or the Doubtful Accounts to Princeton.

503.     The Spartan Transactions were fraudulent at their inception given that the Argon Insiders and Argon Outsiders that facilitated the Argon Transactions knew that the transfer of the Spartan Loans to FTAM divested Princeton of its value in its Loan Proceeds without Princeton's knowledge or approval.

504.     Argon Credit continued to reflect the value of these Spartan Loans (as if they were not transferred to FTAM) on Argon Credit's financial documents submitted to Princeton pursuant to the terms of Fintech Loan Agreement while simultaneously omitting information about the Doubtful Accounts.

505.     Argon Credit continued to borrow the Loan Proceeds from the Revolving Note against these phantom Spartan Loans despite the fact that, unbeknownst to PAIF at the time, the Spartan Loans were no longer owned by the Argon Entities necessary to support such increased borrowing.

506.     WOLFE, ARAKELIAN, SCHNOSENBERG, ZUMSKI, CANFORA, TRIFFLER, FERRO, KUHLMAN, RBC CAPITAL, LITTLE OWL, BREITWEISER, TOMASKIEWICZ and FAERMARK and all other Argon Insiders were each aware at the time, or subsequently became aware, of the Spartan Transactions and Spartan Loans and, further, knew, or should have known, that the Spartan Transactions and Spartan Loans were neither disclosed to Princeton nor disclosed on Argon Credit's financial documents being provided to Princeton pursuant to the Financial Covenants included in the Fintech Loan Agreements.

507. The Spartan Fraud began almost simultaneously upon the execution of the Fintech Loan Agreement by various Argon Insiders and Argon Outsiders, all of whom possessed a demonstrated knowledge that the Spartan Transactions would violate the terms of the Fintech Loan Agreement and its Financial Covenants.

508. Simultaneous with the Spartan Fraud and the concealment of the transfer of the Spartan Loans, the Argon Insiders, including Argon Credit's senior executives, owners and board managers, knowingly, willfully, intentionally, recklessly and negligently caused the Argon Entities to submit false, misleading and deceptive financial reports to Princeton in further violation of the Financial Covenants that omitted information about the Spartan Transactions and/or the Doubtful Accounts.

509. For example, Argon Credit submitted financial statements, including a balance sheet, to PAIF for the period ending December 31, 2015, which reflected $38,833,915.00 in accounts receivable (*i.e.*, Receivables and Collections) but which failed to reflect the Doubtful Accounts, thereby mispresenting and overstating the actual accounts receivable by more than $8.8 million.

510. Argon Credit also submitted financial statements to PAIF, dated March 20, 2016, for the period ending February 28, 2016, which reflected $38,320,266.00 in accounts receivable, but which did not disclose the existence of the Doubtful Accounts, thereby mispresenting and overstating the actual accounts receivable by approximately $8.6 million.

511. In mid-August 2016, Argon Credit submitted to Princeton a July 2016 balance sheet which falsely stated $40,419,664.38 in assets but failed to include a $6 million deduction for the Doubtful Accounts, again thereby mispresenting and overstating the actual accounts.

512.     Moreover, the False Financial Email Chart (*see supra*) details seventeen specific deliveries of false representations of material facts related to the financial status and performance of the Argon Entities, all of which were meant to induce Princeton to continue to lend its Loan Proceeds and not precipitate an event of default.

513.     The purpose of the delivery of false financial information to Princeton was to allow for the plundering of the Princeton Property while deceiving Princeton into not calling the Revolving Note and continuing to disburse and indeed increase the Loan Proceeds being disbursed pursuant to the Fintech Loan Agreement.

514.     The fraudulent and misleading financial information provided to Princeton was done in furtherance of the continued fraudulent misuse of the Princeton Property, including the fraudulent inducement of Princeton to continue to lend and increase its credit line (not once but twice from $20M to $37.5M), for the financial benefit of FTAM and the Spartan Entities (to the financial loss and detriment of Princeton).

515.     Defendants fraudulently induced Princeton to continue lending and to increase its lending to Argon (not once but twice from $20M to $37.5M), so that Defendants could use the Loan Proceeds for purposes other than the underlying reasons for which they were being disbursed.

516.     As part of this scheme, Defendants submitted to Princeton, as the owner of the Princeton Property, false and misleading financial statements and information on a repeated regular basis, as demonstrated by the False Financial Email Chart (*see supra*), that failed to disclose an accurate and truthful financial picture of the Argon Entities, its Doubtful Accounts and the Spartan Transactions in order to induce Princeton not to declare an earlier event of default.

517.     Princeton justifiably relied upon the misrepresentations, active omissions of and the failures to disclose by these various Defendants that amounted to active fraud and/or intentional

misrepresentation as to the schemes to divest and diminish Princeton's value in, and control and oversight over, the Princeton Property that had as its purpose the fraudulent inducement of causing Princeton to "lend more and delay default."

518.     In taking these actions, and disclosing the False Financials to Princeton, such Defendants acted knowingly and intentionally causing Princeton (i) to continue lending its Loan Proceeds at a time that Princeton would have served a notice of default and (ii) to increase its line of credit for the disbursement of the Loan Proceeds from $20M to $37.5M, each of which diminished and decimated Princeton's value in, and control and oversight over, the Princeton Property.

519.     As a direct and proximate cause of Defendants' fraud and/or intentional misrepresentations set forth in this Count and as otherwise set forth herein in particularity, Princeton has sustained and suffered substantial injury including the material loss of its Princeton Property and therefore seeks compensatory damages, and such other and further relief, including restitution and disgorgement of ill-gotten unjust gains, as may be just, equitable and proper.

520.     In addition, among other duties owed to Princeton, Defendants owed a duty of full disclosure to Princeton pursuant to the principles outlined in and guided by the Restatement (Second) of Torts § 551 (1977).

521.     Defendants owed a duty of full disclosure where Defendants presented to Princeton on a repeated basis, partial and incomplete statements of false financial facts that were known to be misleading and deceptive and meant to induce Princeton into both continuing its lending of the Loan Proceeds, but also to increase its lending of the Loan Proceeds from $20M to $37.5M.

522. The aforementioned acts of fraud and/or intentional misrepresentation were intentional, reckless, wanton and outrageous and entitle Princeton as the owner of the Princeton Property to the recovery of punitive damages against Defendants.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT EIGHT

## CONVERSION

### All Defendants

523. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

524. Based on the foregoing, all Defendants, at various times and in various manners, stole, thieved and absconded away with the Loan Proceeds that Princeton would never have lent had it known of the fraudulent intent of Defendants.

525. Princeton increased its line of credit for those Loan Proceeds to be disbursed pursuant to the Revolving Note not once but twice, with the first being in September 2015 pursuant to the Frist Amendment and the second in February 2016 pursuant to the Second Amendment.

526. These Loan Proceeds were disbursed pursuant to explicit funding requests into a separate segregated account held and controlled by the Argon Entities, which were then

subsequently used to acquire the Spartan Loans that were diverted to FTAM and the Spartan Entities.

527.     Defendants never intended to use the Loan Proceeds that were disbursed to the Argon Entities pursuant to the Fintech Loan Agreement for the underlying legitimate purposes and instead intended at all times to use the Loan Proceeds to acquire the Spartan Loans that would then be transferred without value to the Spartan Entities.

528.     Therefore, Princeton always held an immediate, absolute unconditional right of possession by common law and pursuant to the terms, conditions and covenants of the Fintech Loan Agreement to these Loan Proceeds specifically disbursed to originate the Spartan Loans.

529.     By letter, dated December 7, 2016, and by the filing of the original Complaint in this matter, Defendants demanded a return of the Loan Proceeds to which Defendants have refused to comply.

530.     The conversion by such Defendants was intentional, malicious and/or reckless and without lawful justification or the consent of Princeton, warranting the award of punitive damages against such Defendants.

531.     As a result of such conversion, Princeton has suffered significant financial losses and been deprived of the full value of its Princeton Property.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

Case: 1:20-cv-05730 Document #: 117 Filed: 05/15/21 Page 110 of 123 PageID #:1413

Case: 1:20-cv-05730 Document #: 117 Filed: 05/15/21 Page 110 of 123 PageID #:1413

**COUNT NINE**

**AIDING AND ABETTING CONVERSION**

**All Defendants**

532.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

533.     Based on the foregoing, all Defendants, at various times and in various manners, aided and abetted in the stealing, thieving and absconding away of the Loan Proceeds, as set forth in the preceding Conversion Count, all to their personal financial gain while knowing and should have known that such Loan Proceeds were the property of Princeton to which Princeton held an absolute unconditional right of possession where Defendants never intended to use the Loan Proceeds for the underlying purposes as provided by the Fintech Loan Agreement.

534.     The aiding and abetting the conversion by such Defendants was intentional, malicious and/or reckless and without lawful justification or the consent of Princeton, warranting the award of punitive damages against such Defendants.

535.     Defendants identified in this Count substantially aided and abetted the various tortfeasors, identified in the preceding Conversion Count, who committed various tortious activity and wrongful acts against Princeton thereby causing injury to Princeton, as are set forth in the preceding Conversion Count and otherwise described herein.

536.     Defendants identified in this Court were regularly and contemporaneously aware of their role in substantially aiding and abetting the tortious activity and wrongful acts as are set forth in the preceding Conversion Count and otherwise described herein.

537.     As a result of such aiding and abetting of such conversion, Princeton has suffered significant financial losses and been deprived of the full value of its Princeton Property.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## COUNT TEN

## CIVIL CONSPIRACY

### All Defendants

538.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

539.     All Defendants, as described herein with particularity, combined and agreed with other various Defendants at various times, with malicious intent, to harm, divest and diminish Princeton of its value in, and control and oversight over, the Princeton Property and to otherwise engage in unlawful overt acts and achieve objectives by the unlawful means described above herein, all to the intended financial detriment of Princeton.

540.     The conspiracy involving Defendants began upon the execution of the Fintech Loan Agreement and continued until the filing of the Argon Bankruptcy.

541.     Plaintiff suffered damages as a result of the conspiratorial acts of Defendants, all done in furtherance of their common intentional and knowing plan and design to defraud Princeton

as the owner of the Princeton Property and divest and diminish Princeton's value in, and control and oversight over, the Princeton Property.

542.    The conspiratorial actions of Defendants were willful, wanton and outrageous, and justify the award of punitive damages.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT ELEVEN**

**<u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS</u>**

**All Defendants**

543.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

544.    In this Count, FRS specifically charges all Defendants with tortious interference with contractual relations regarding the Fintech Loan Agreement.

545.    At all times relevant to this Amended Complaint, all Defendants knew that Princeton was the primary secured lender and that the Princeton Property was the property of Princeton being disbursed to the Argon Entities through the Revolving Note pursuant to the Fintech Loan Agreement.

546.    All Defendants also knew or should have known that Princeton as the lender of the Loan Proceeds was entitled to full compliance with those Financial Covenants and all other

representations, warranties and covenants agreed to by the Argon Entities set forth in the Fintech Loan Agreement.

547. Defendants knew or should have known that the fraud that Defendants were either committing or aiding and abetting the commission of, was purposefully and intentionally interfering with the Financial Covenants and all other representations, warranties and covenants agreed to by the Argon Entities necessary for full compliance with the Fintech Loan Agreement.

548. Put differently, by the conduct alleged in this Amended Complaint, Defendants, who were aware of and knowledge regarding the various contractual obligations of the Argon Entities with regard to the Fintech Loan Agreement, intentionally and purposefully caused the Argon Entities to breach the Fintech Loan Agreement, causing significant damages to Princeton.

549. As a direct and proximate cause of the fraud or aiding and abetting in the commission of a fraud against Princeton as the owner of the Princeton Property, Defendants were willful, wanton and outrageous, justifying the award of punitive damages.

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT TWELVE**

**<u>BREACH OF PERSONAL GUARANTY</u>**

**WOLFE and ZUMSKI**

**(Jury Trial Waived By Charged Defendants)**

550.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

551.     Princeton specifically charges Defendants WOLFE and ZUMSKI in this Count with Breach of the Personal Guaranty.

552.     As an express condition of the execution of the Fintech Loan Agreement, WOLFE and ZUMSKI each executed the Personal Guaranty.

553.     The Personal Guaranty provided that WOLFE and ZUMSKI personally guaranteed the "full, prompt and unconditional payment when due and performance of certain liabilities and obligations due and owing" by the Argon Entities to Fintech Financial pursuant to the Fintech Loan Agreement.

554.     The Personal Guaranty provided in Section 1 that "[i]n the event any Liability of [Fintech Financial] shall not be paid or performed according to its terms, the Guarantor shall immediately pay and perform the same, this Guaranty being a guaranty of full payment and performance, and not collectability."

555.     The Personal Guaranty further provided that this Personal Guaranty equally applied to "any successor" to Fintech Financial.

556.     The Argon Entities are in default of their obligations under the Fintech Loan Agreement by virtue of their failure to make timely principal and interest payments as required under the Fintech Loan Agreement and as demanded by Princeton.

557.     The Personal Guaranty provided that the guaranty was only limited to those "losses, damages, expenses and liabilities incurred by the Lender (including reasonable attorneys' fees and costs reasonably incurred and in connection therewith arising out of or in connection with any of the following circumstances:

(i)    "fraud or intentional misrepresentation by the Borrower, the Parent, any Loan Originator or any Affiliate thereof in connection with the Loan Facility;

(ii)    the gross negligence or willful misconduct of the Borrower, the Parent, any Loan Originator or any Affiliate thereof;

(iii)    the misappropriation or conversion by the Borrower, the Parent, any Loan Originator or any Affiliate thereof of any of the Receivables, the Collections or other Collateral, including without limitation any diversion or misapplication thereof that is not permitted by the Loan Agreement and other Financing Agreements;

(iv)    the grant by the Borrower, the Parent or any Loan Originator to any Person (other than the Lender) of any security interest, lien or other encumbrance on any of the Receivables, the Collections or other Collateral, or the assignment, transfer or conveyance to any Person (other than the Lender) of any other interest in any of the Receivables, the Collections or other Collateral, other than the Assignments contemplated by the Loan Agreement; or

(v)    the seizure or forfeiture of the Receivables, the Collections or other Collateral, or any portion thereof, resulting from any alleged misconduct or wrongdoing of the Borrower, the Parent, any Loan Originator or any Affiliate thereof."

(collectively, the "Limited Exceptions").

558.    As a direct and proximate cause of the fraud being asserted against Princeton by the RICO Defendants, including WOLFE and ZUMSKI, as set forth in detail *supra*, Princeton has suffered significant monetary losses.

559.    FRS is the current holder of the Personal Guaranty.

560.    Judgment has not been entered against either WOLFE or ZUMSKI on the Personal Guaranty in any other jurisdiction.

561.    For the reasons set forth in great particularity throughout this Amended Complaint, WOLFE and ZUMSKI are obligated pursuant to the Personal Guaranty to repay to Princeton its losses sustained because WOLFE's and ZUMSKI's fraud implicated and triggered the Limited

Exceptions for which WOLFE and ZUMSKI can now be held liable under the terms of the Personal Guaranty.

562.     The Personal Guaranty specifically provides at Paragraph 28 that "[i]n the case of any proceedings to collect any liabilities of the Guarantor owed to the Lender hereunder, the Guarantor shall pay all reasonable costs and expenses of every kind for collection, sale or delivery of any collateral or assets or properties of the Guarantor, including reasonable attorneys' fees ... ."

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants WOLFE and ZUMSKI, jointly and severally, in an amount in excess of the amount of $238,014,066.18, together with treble damages, punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

**COUNT THIRTEEN**

**<u>BREACH OF CONTRACT</u>**

**LITTLE OWL, MARGON, CARDINAL TRUST** and **TRIFFLER TRUST**

**(Jury Trial Waived By Charged Defendants)**

563.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

564.     As an express condition of the execution of the Fintech Loan Agreement, the Subordinated Defendants executed subordination agreements whereby they each agreed not to receive interest payments from Argon Credit for the outstanding notes that each of the Subordinated Defendants held from Argon Credit if there was an event of default.

565.    The Original Subordination Agreements and the Subordination Agreements included the No Payment Provision that provided that "until the Senior Lender has given written notice to the [Subordinated Defendants] that all Obligations to the Senior Lender have been fully and indefeasibly paid and satisfied in full, no Obligor shall pay to the [Subordinated Defendant], and the [Subordinated Defendant] shall not accept or receive, any payment of principal, interest, fees, costs and expenses under the Subordinated Debt."

566.    The No Payment Provision, however, included an exception that "so long as no Event of Default has occurred under the Loan Documents or would result from such payment, [Argon Credit] shall be entitled to pay and the Subordinated Lender shall be entitled to accept and receive, the scheduled payments of principal and interest … under the Subordinated Debt, but only when such payments are scheduled under the current Subordinated Loan Documents, correct and complete copies of which have been provided to the Senior Lender."

567.    At the time that Argon Credit paid, and the Subordinated Defendants accepted, the interest payments, the Subordinated Defendants knew or should have known that Argon Credit was insolvent and thus there existed an Event of Default which would have prohibited the payment of any interest payments to the Subordinated Defendants.

568.    Moreover, the Subordinated Defendants failed to disclose or otherwise provide any notice to Princeton as to their respective demands for and receipt of such interest payments.

569.    Plaintiff was incapable of providing notice as due under the Subordination Agreements due to the fraud whereby these same Member Creditors failed to disclose to Princeton the true financial condition of the Argon Entities.

570.    If Plaintiff had known that the Argon Entities were insolvent, none of the Challenged Transfers would have been made.

571.    The Subordinated Defendants, by their acceptance of the interest payments, have breached their respective Subordination Agreements and Original Subordination Agreements.

572.    For the reasons set forth in great particularity throughout this Amended Complaint, the Subordination Defendants are obligated pursuant to the Subordination Agreement to repay to Princeton those interest payments that were received by each of them in violation of the Subordination Agreements.

573.    The Subordination Agreements specifically provide at Paragraph 17 that "[t]he [Subordinated Defendants] agree[] to indemnify and to hold [Princeton], its officers, directors, agents and employees harmless for any and all losses, damages, liabilities, expenses and obligations, including reasonable attorneys' fees and expense, as they arise relating to actions of the Subordinated Lender taken contrary to this Agreement."

**WHEREFORE,** Princeton respectfully requests that the Court enter judgment against Defendants set forth and identified in this Count, jointly and severally, in an amount in excess of the amount of $75,000.00, including compensatory and punitive damages, pre-judgment interest and such other relief including, without limitation, disgorgement of their ill-gotten unjust gains and restitution of those financial gains back to Princeton, as may be appropriate and in accordance with the law, including attorneys' fees, expenses and costs of suit.

## PRAYER FOR RELIEF

**WHEREFORE,** FRS respectfully prays that:

574.    This Court enter judgment that:

a.    The various Defendants identified herein have violated RICO by engaging in prohibited racketeering activities to further their schemes to defraud, divert and deprive Princeton of its Princeton Property through the repeated (i) submission of false financial

documents meant to delay Princeton's declaration of an event of default and (ii) diversion and diminishment of the value of the Princeton Property away from Princeton's control and oversight, all actively concealed from and to the financial loss and detriment of Princeton all as more fully set forth above and as will be proven at trial; and

b. The various Defendants identified herein have knowingly, willfully, intentionally, recklessly and negligently violated Illinois and/or Delaware common law in various manners: (i) by committing fraud and fraudulent concealment of such fraud meant to defraud, divert and deprive Princeton from its Princeton Property through the repeated submission of false financial documents meant to delay Princeton's declaration of an event of default and diversion of Princeton Property to third parties away from the control and oversight of Princeton, all actively concealed from and to the financial loss and detriment of Princeton; (ii) by aiding and abetting certain Defendants of these violations of Illinois and/or Delaware common law; and (iii) by otherwise thieving and absconding with and defrauding Princeton of the value of the Princeton Property.

575. This Court award a monetary amount to compensate FRS for those compensatory losses and damages sustained by FRS as a result of the various violations of RICO and Illinois and Delaware common law, as set forth above in the preceding paragraphs, caused and committed by various Defendants as set forth above with particularity.

576. All Defendants, as identified herein, be required, in the alternative, to account for and disgorge to FRS all funds and assets that were Princeton Property, all of which FRS is entitled to pursuant to RICO and Illinois and/or Delaware common law.

577. This Court award to FRS recovery of: (i) the costs of the instant suit, including its reasonable attorneys' fees and costs incurred herein, as provided by RICO, 18 U.S.C. § 1964.

578.    This Court award treble, punitive and exemplary damages to FRS based on the various acts and conduct of various Defendants in violation of RICO and Illinois and/or Delaware common law and the damages of $238,014,066.18 suffered by the FRS.

579.    This Court award such other, different and further relief, including disgorgement of ill-gotten unjust gains and restitution, as the Court may deem just, equitable and proper.

## **JURY TRIAL DEMANDED**

FRS hereby demands a trial by jury, except as to the Breach of the Guaranty and Breach of Contract claims for which the named Defendants have contractually waived their right to a jury trial.

[**Remainder Of Page Left Intentionally Blank**]

[**Signature Page Follows**]

Dated: Chicago, Illinois

May 15, 2021

**FUND RECOVERY SERVICES, LLC, a Delaware limited liability company, as assignee of PRINCETON ALTERNATIVE INCOME FUND, L.P., a Delaware limited partnership,**

Maurice R. Mitts

_____

One of Its Attorneys

(Pa. Bar No. 50297) (*Pro Hac Vice*)
Gerard M. McCabe (Pa. Bar No. 66564)
(*Pro Hac Vice*)
Geoffrey P. Huling (Pa. Bar No. 75800)
(*Pro Hac Vice*)
MITTS LAW, LLC
1822 Spruce Street
Philadelphia, PA 19103
215.866.0110 (p)
215.866.0111 (f)
mmitts@mittslaw.com
gmccabe@mittslaw.com
ghuling@mittslaw.com


Kenneth J. Ashman (ARDC 6206515)
ASHMAN LAW, LLC
2801 Orange Brace Road
Riverwoods, Illinois 60015
312.596.1700 (p)
312.873.3800 (f)
kashman@ashman.law

## CERTIFICATE OF SERVICE

I, Kenneth J. Ashman, certify that on May 15, 2021, true and correct copies of the foregoing was filed electronically through the Northern District of Illinois CM/ECF electronic filing system, which will send a notification of filing to all counsel of record and unrepresented parties.

/s/ *Kenneth J. Ashman*