**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FUND RECOVERY SERVICES, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )  **Case No. 20 C 5730** |
| | ) |
| **RBC CAPITAL MARKETS, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

An entity that the Court will refer to, for the sake of convenience, as Princeton[1]

has sued thirty-five defendants[2] for violations of federal and state law, including the

Racketeer Influenced Corrupt Organizations Act (RICO). Some of the defendants[3] have

filed or joined in a motion to dismiss, contending, among other things, that (1) the RICO

---

[1] The named plaintiff is Fund Recovery Services, LLC (FRS), but it is Princeton Alternative Income Fund, L.P. (PAIF) that was the alleged target of the defendants' purportedly fraudulent actions. PAIF owns FRS and has assigned to FRS its interests in the case. The Court thus refers to FRS and PAIF collectively in the opinion as Princeton.

[2] The defendants are RBC Capital Markets, LLC; James I. Uihlein; James P. Uihlein; John A. Kuhlman, Jr.; Glenora Company; Little Owl Argon, LLC; Raviv Wolfe; NOAX, LLC; Gary Zumski; Berj Arakelian; B Money Holdings, LLC; Bergarviv, LLC; Eric Schnosenberg; Peter Ferro, Jr.; Margon LLC; Sean Tomaszkiewicz; Blue Treble Solutions, LLC; Joseph Canfora; Mark Triffler; Mark Triffler Trust; Bruce Breitweiser; Byron Faermark; Barry Kostiner; Fintech Asset Management, LLC (FTAM); SSF Holdings LLC; Spartan Specialty Finance I LLC (Spartan Finance); Spartan Specialty Finance I SPV, LLC (Spartan SPV); Bruce Goldstein; Broadmark Capital, LLC; Peraza Capital & Investment, LLC; Alhambra Circle Partners, LLC; Barry Edmonson; Cardinal Trust; Daniel Wirzberger; and Merit Management Group, L.P.

[3] The following defendants did not join in the motion to dismiss: NOAX; Bergarviv; FTAM; SSF Holdings; Spartan Finance; Spartan SPV; Broadmark; and Peraza.

claims are time-barred; (2) Princeton lacks standing to bring these claims; (3) Princeton is precluded from relitigating certain issues; and (4) Princeton fails to state a RICO claim under 18 U.S.C. § 1962(c) and a RICO conspiracy claim under 18 U.S.C. § 1962(d). For the reasons below, the Court grants the defendants' motion.

## Background

 The pending motion to dismiss concerns Princeton's amended complaint, the crux of which is that the defendants fraudulently induced it "to lend, continue lending, and extend more credit" to the now-bankrupt Argon Entities "by purposefully and repeatedly providing false financial information." Pl.'s Resp. at 6. Princeton alleges that the defendants fraudulently diverted assets properly belonging to Princeton and hid the financial insolvency of the Argon Entities, thereby delaying Princeton's declaration of default on its loan. Because Princeton was fraudulently induced to lend more money to the Argon Entities, Princeton claims, it suffered great financial injury when the Argon Entities filed for bankruptcy.

For the purposes of the motion to dismiss, the Court will take all of the amended complaint's factual allegations as true. These allegations are summarized in more detail below.

## A.    The Fintech Loan Agreement

Argon Credit and its subsidiaries, including Argon X, were "the originators of state-by-state internet-marketed unsecured consumer 'subprime' loans." Am. Compl. ¶ 74. Argon Credit provided the financing for the consumer loans, and the subsidiaries documented the loans. In May 2015, Argon X and an entity called Fintech Financial, which is not a party to this case, entered into the Fintech Loan Agreement, which

provided the Argon Entities with a revolving line of credit with a maximum limit of $20,000,000. These funds, it appears, were used by the Argon Entities to make consumer loans. The maximum limit under the line of credit was later increased, first to $34,700,000 on September 30, 2015 and then to $37,500,000 on February 12, 2016.

As part of the Fintech Loan Agreement, Argon Credit and some of its subsidiaries executed a guaranty in favor of Fintech Financial, under which, among other things, they guaranteed Argon X's performance under the Fintech Loan Agreement and granted Fintech Financial a security interest in all of Argon Credit's assets. Under the agreement, Argon Credit was to pay Princeton—the anticipated assignee of the Loan Agreement—a weekly "settlement" that included one hundred percent of the principal collected from borrowers and up to thirty percent of the interest collected. Argon Credit was also obligated to reserve up to fifteen percent of weekly interest collected to cover loan losses (collectively, with the weekly settlement, the "PAIF Settlement Funds"). The Argon Entities granted Fintech Financial a security interest in all of their assets, which Fintech Financial perfected, and they agreed to provide Fintech Financial with accurate and timely financial statements regarding their operations.

Fintech Financial subsequently assigned all of its right, title, and ownership interest in the Fintech Loan Agreement to Princeton. Thus Princeton was entitled to enforce all of the rights and remedies outlined in the Fintech Loan Agreement and had a perfected security interest in all of the assets of the Argon Entities.

## B.    The Spartan Fraud

Princeton alleges that about three weeks after the execution of the Fintech Loan Agreement, Barry Kostiner (acting as Argon Credit's Vice President of Capital Markets)

3

formed FTAM, the alleged "linchpin in the fraud directed at misappropriating and converting Princeton's Loan Proceeds disbursed through the Fintech Loan Agreement." Am. Compl. ¶ 105.  In August 2015, Raviv Wolfe (as Argon Credit's CEO) and Kostiner (as FTAM's sole managing member) entered into an agreement whereby Argon Credit agreed to sell certain consumer loans (the Spartan Loans) to FTAM.  The Spartan Loans had been originated using the money disbursed pursuant to the Fintech Loan Agreement, and they represented the most lucrative assets in Argon Credit's portfolio, with a value totaling at least $4,703,138.99.

From July 13, 2015 through December 10, 2015, Argon Credit transferred the Spartan Loans to FTAM.  Despite the transfer, Princeton alleges, Argon Credit continued to reflect the value of the Spartan Loans on its borrowing base certificates and other financial information submitted to Princeton.

In October 2015, Spartan SPV—another entity formed by FTAM and Kostiner— entered into a loan agreement with Hamilton Funding I, L.P.  Hamilton Funding agreed to loan up to $10,000,000 to Spartan SPV, secured by the assets that Argon Credit transferred to Spartan SPV, including the Spartan Loans.  The Spartan Loans, which were subject to Princeton's security interest in Argon Credit's assets, were thus double-pledged to Hamilton Funding.  Princeton alleges that despite knowledge that the transfer of the Spartan Loans violated the Fintech Financial Agreement, none of the defendants disclosed these transactions to Princeton.  Nor did any of them disclose to Princeton that Argon Credit's financial documents were inaccurate.

## C.    The collapse of the scheme

In early 2016, Spartan SPV fell into noncompliance with the Hamilton Funding

Loan. Hamilton Funding served a notice of default on the Spartan Entities and accelerated the balance of the loan. It then took exclusive control of the Spartan Bank Account and swept the servicing fees derived from the Spartan Loan Agreement.

That same year, an independent auditor report was released, stating that the Argon Entities had been insolvent as of at least May 2015—the month the Fintech Financial Agreement was signed. The report further noted that the Argon Entities' financial statements contained material misrepresentations and omissions. For example, the report indicated that the Argon Entities' financial documents did not note the existence of so-called "Doubtful Accounts," or consumer loans that were more than 60 days past due. The report concluded that there was "substantial doubt" that the Argon Entities would be able to continue in business. Am. Compl. ¶ 270. The Board of Managers of Argon Credit was aware of the findings of this report and discussed them in a meeting in August 2016. Despite this awareness, Princeton alleges, the Board of Managers decided to continue to draw down on Princeton's loan proceeds at the meeting.

In June 2016, Spartan SPV filed for bankruptcy. The Argon Entities followed suit shortly after, filing for bankruptcy in December 2016. At that time, the Argon Entities owed Princeton at least $37,291,193.98.

On September 25, 2020, Princeton sued the defendants, asserting claims under RICO and several state laws. Princeton filed an amended complaint on May 15, 2021 after the defendants moved to dismiss the original complaint. The defendants

subsequently filed the present motion to dismiss.[4]

## Discussion

### A.     Statute of limitations

The Supreme Court has established a four-year statute of limitations for civil RICO claims. *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 926 (7th Cir. 2015). The limitations period begins to run as soon as the plaintiff knew or should have known of its injury. *Id.* In their motion to dismiss, the defendants contend that Princeton's RICO claims are time-barred. They contend that Princeton first learned of its injury in March 2016 at the latest, and thus the RICO limitation period ended in March 2020. In contrast, Princeton contends that it first learned of its injury in December 2016, making its September 2020 complaint timely. Princeton further argues that the question of when it knew of its injuries "is inherently factual and inappropriate to be resolved at this preliminary motion to dismiss stage." Pl.'s Resp. at 25.

The Court agrees with Princeton that the statute of limitations inquiry is too fact-bound to be decided on a motion to dismiss. *See Sidney Hillman Health Ctr.*, 782 F.3d at 928 (stating that defenses such as statute of limitations typically depend on facts that are not before the court during a motion to dismiss for failure to state a claim). As Princeton states, the Court is, on a motion to dismiss, obligated to take the well-pleaded factual allegations in the amended complaint as true, including Princeton's allegation that it first learned of the defendants' fraudulent conduct in December 2016. This is so,

---

[4] The defendants have filed four memoranda in support of their motion to dismiss. For the purposes of this opinion, however, the Court finds it sufficient to address only the first two memoranda [dkt. nos. 125 & 126] and does not make any rulings on the arguments contained within the other two [dkt. nos. 127 & 128].

6

even if, as the defendants contend, Princeton previously made contradictory factual allegations in a different case. The Federal Rules of Civil Procedure permit this kind of contradictory pleading. *See, e.g., Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012) ("[T]here's no rule against inconsistent pleadings in different suits, or for that matter a single suit.").

The defendants argue that the Court should dismiss Princeton's RICO claims as time-barred based on two court filings: an adversary complaint brought by Princeton's bankruptcy trustee against officers of Princeton, and Princeton's Fifth Amended Disclosure Statement submitted in support of its Fifth Amended Joint Chapter 11 Plan of Reorganization. They ask the Court to take judicial notice of these documents.

The Court assumes for present purposes that it can take judicial notice of these documents and therefore consider them in determining whether the RICO claim is time-barred. The question, however, is what significance the Court should derive from these documents. The defendants appear to contend that the Court should take these other filings as true and as, therefore, establishing the untimeliness of the RICO claim. The Court disagrees. It would be error to take the statements within these documents as establishing the truth for purposes of the motion to dismiss. *See Watkins v. United States*, 854 F.3d 947, 950–51 (7th Cir. 2017) (affirming the district court's decision where it "did not take notice of the validity of the substance of the allegations within it, but rather took notice only of the existence and timing of those allegations"); *see also* 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5106.4 (2d ed.1990).

Princeton's prior statements are binding for present purposes only if they amount

7

to judicial admissions or are subject to judicial estoppel. They are neither. A judicial admission is, "in effect, a waiver." *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000). It is a "formal concession[ ] in the pleadings" that has "the effect of withdrawing a fact from contention." *Solon v. Gary Cmty. Sch. Corp.*, 180 F.3d 844, 858 (7th Cir. 1999). Even if the statements in the bankruptcy case qualify, "a judicial admission binds only in the litigation in which it is made." *Higgins*, 217 F.3d at 954. "In any other suit . . . it operates merely as an evidentiary admission" and thus is not a basis for dismissal at this early stage in the litigation. *See id.*

Similarly, Princeton is not judicially estopped from alleging that it first learned of its RICO injury in December 2016. The doctrine of judicial estoppel precludes a party from changing positions after a court in a previous case relied on the party's statement or contention to find in its favor. *Peterson*, 676 F.3d at 597. To invoke judicial estoppel, the invoking party must therefore show: (1) the earlier and the later statements are inconsistent; (2) the party prevailed in the earlier proceeding based on the earlier statement; and (3) allowing the party to assert an inconsistent position would provide it with an unfair advantage if not estopped. *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012). The defendants cannot meet the second element, as they have not shown, and have made no effort to show, that the bankruptcy court relied on the earlier statements to rule in Princeton's favor. Although the bankruptcy court may have approved the Disclosure Statement, there is no basis in the record to find that this was premised on the allegation that Princeton first learned of its RICO injury in March 2016. Judicial estoppel therefore does not apply.

8

**B.    Standing**

A bankruptcy trustee is the only party that can sue to represent the interests of a bankrupt entity's creditors as a class.  *See Koch Refin. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343–44 (7th Cir. 1987).  Individual creditors do not have standing to pursue claims for injuries suffered by the debtor, even if they are indirectly injured by that injury.  *Id.*  But a trustee cannot bring the "personal claims" of individual creditors; only the creditors can bring such claims.  *Id.* at 1348.

A claim is personal where "the claimant is harmed and 'no other creditor has an interest in the cause.'"  *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (citing *Koch Refin.*, 831 F.2d at 1348).  Thus, "[t]o determine whether an action accrues individually to a claimant or generally to a corporation, then, [courts] must look to the injury for which relief is sought."  *Levey v. Division (In re Teknek, LLC)*, 563 F.3d 639, 647 (7th Cir. 2009).  If the "creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner," then the claim is general, and the creditor lacks standing to sue the debtor.  *Koch*, 831 F.2d at 1349.  But if the creditor can "show separate and distinct injuries" from other creditors, then it has "the opportunity to pursue" its claims.  *Fisher*, 155 F.3d at 881.

The defendants argue that Princeton lacks standing to bring its claims because (1) "the sole injury asserted arises from the allegedly wrongful depletion, diversion, and transfer of Argon's assets from Argon," which they contend is an injury general to all of Argon's creditors, and (2) "Princeton's lawsuit is virtually identical to the adversary complaints the Argon Trustee has brought against many of the same Defendants."

9

Defs.' Mem. [dkt. no. 125] at 15.  The Court finds neither argument persuasive.[5]

On the first point, the Court finds that Princeton has sufficiently alleged injuries other than those caused by the wrongful diversion of the Argon Entities' assets.  The amended complaint clearly alleges that the injury to Princeton occurred because the defendants "induce[d] Princeton into extending more credit on its Revolving Note . . . by purposefully and repeatedly providing false financial information to Princeton so as to hinder Princeton's discovery of the underlying fraudulent diversion of the Loan Proceeds."  Am. Compl. ¶ 4.  It states:

> The initial harm caused to Princeton by the RICO Scheme was not the divestiture of the Secured Collateral or the Prohibited Transfers or the non-payment of the PAIF Settlement Funds . . . although each of those injuries did occur and worsened Princeton's financial position, but was the inducement of Princeton to lend its funds initially and then increase its credit line not once but twice, with the first increase occurring at the very time that the Spartan Transactions were being initially conducted and created . . . .

Id. ¶ 5.  These alleged injuries to Princeton are different from those caused by the diversion of the Argon Entities' corporate assets, and as alleged they were caused directly by the defendants' alleged fraud against Princeton.

Seventh Circuit precedent suggests that, where a plaintiff has alleged direct fraud against it in addition to the wrongful divestment of corporate assets, as Princeton has in this case, the plaintiff has standing to bring a RICO claim.  *See, e.g., Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (holding that the plaintiffs had standing because "[a]lthough a part of the underlying scheme was the diversion of corporate

---

[5] The defendants make similar arguments with respect to Princeton's standing to assert its state law claims in Counts 3 through 11.  For the same reasons, the Court rejects these arguments.

assets . . . an essential part of the scheme, on which its success depended, was the fraudulent taking from the plaintiffs of exceptionally large quantities of fuel"); *Fisher*, 155 F.3d at 881 (stating that "[s]ome . . . of the individual investors may be able to show acts of fraud . . . that imposed a separate and distinct injury on that person"); *In re Teknek, LLC*, 563 F.3d at 648 (explaining that "fraud inflicts a separate and distinct injury on its victims, one that is inflicted directly on those victims by its perpetrators").

Because Princeton has alleged a separate injury that it suffered aside from that caused by the wrongful depletion of the Argon Entities' corporate assets, the cases that the defendants cite are distinguishable. *See, e.g., Koch*, 831 F.2d at 1343; *Wooten v. Loshbough*, 951 F.2d 768, 769–70 (7th Cir. 1991). The only Seventh Circuit case the defendants cite in response to Princeton's fraudulent inducement argument is *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989).[6] The plaintiff in *Mid-State Fertilizer*, however, only dealt directly with the defendants, and the court found that "direct *dealing* is not the same as direct *injury*." *Id.* at 1336 (emphasis in original). In this case, Princeton has alleged direct dealing that it contends led to direct injury.

The defendants further contend that Princeton's claims belong to the Argon estate because Princeton supposedly "has substantially reproduced the claims the Argon Trustee has already brought for virtually identical conduct against many of the same Defendants." Defs' Mem. [dkt. no. 125] at 25. To this end, the defendants have

---

[6] The other cases that the defendants cite are two bankruptcy cases, a Northern District of Illinois case, and a Tenth Circuit case. These cases are not binding on this Court, and it declines to follow them because they are not persuasive. *See United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) (noting that "[o]pinions 'bind' only within a vertical hierarchy").

11

provided the Court with a long table listing allegations from Princeton's complaint that "cop[y] or very-closely track[]" the allegations in the Argon Trustee's complaint. *Id.* at 26–28. But there's no rule against making allegations that are similar to allegations that others have made. It is enough, for the purposes of standing, that Princeton has alleged a distinct injury unique from those of the other creditors. The claims that Princeton is making are not the Argon Trustee's claims.

One final note: the parties spill much ink debating whether Princeton has a security interest in the assets of the Argon Entities and, if so, whether having such a security interest is sufficient to transform Princeton's claims into personal ones. Because the Court finds that Princeton has standing on a separate ground, it is unnecessary for the Court to analyze the security interest issue. Similarly, the Court need not decide whether the defendants' alleged double pledging of the Spartan Loans to Hamilton Funding transforms Princeton's claims into personal claims.

## C. Issue preclusion

In June 2016, Spartan SPV filed for bankruptcy, listing the Spartan Loans in its schedules of assets and liabilities. The bankruptcy court approved a settlement agreement between Spartan SPV and Hamilton Funding that permitted the disbursement of the Spartan Loans to Hamilton Funding. As a result, Princeton filed an *ex parte* application in the Superior Court of New Jersey seeking a temporary restraining order and a preliminary injunction to stop the disbursement of the loans. The New Jersey court denied Princeton's request for relief, finding that it had failed to meet its burden to show that it had a security interest in the Spartan Loans. After Princeton's request for a stay pending appeal of the decision was denied, it voluntarily dismissed its

complaint.

Based on the New Jersey court's decision, the defendants argue that Princeton is precluded from relitigating the Spartan Fraud issue. The law of the state where a prior decision was rendered determines whether the doctrine of issue preclusion, or collateral estoppel, precludes relitigation in federal court of issues decided by a state court. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). Under New Jersey law, issue preclusion applies when these five elements are met:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the prior proceeding's court issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Jabri v. Bank of Am.*, No. 20-17004 (SDW) (LDW), 2021 WL 672934, at *6, n.7 (D.N.J. Feb. 22, 2021).

The "final judgment" element is an insurmountable hurdle for the defendants' issue preclusion argument, so the Court will address it first. Princeton argues that there was no final judgment in the New Jersey case because the complaint was voluntarily dismissed, "foreclosing any additional possibility for an adjudication on the merits of the asserted claims in that particular NJ state court proceeding." Pl.'s Resp. Br. at 49. It explains that "[t]he only 'final' judgment that resulted from that litigation was that, based upon the evidence submitted by Plaintiff, that Plaintiff had not met the preliminary prejudgment attachment burden, not that Plaintiff had lost the opportunity to present and pursue their claims asserted in the verified complaint." *Id.* The Court agrees.

13

Under New Jersey law, determinations made in the context of a motion for preliminary injunctive relief have no preclusive effect. *See, e.g., N.J. Div. of Youth & Fam. Servs. v. R.D.*, 207 N.J. 88, 118 n.11 (N.J. 2011) (stating that there is a "salutary rule that, based on the differences in purpose and procedure, bars the preclusive use of determinations made in respect of the issuance or denial of preliminary injunctions in a later-made summary judgment motion"); *Township of Monroe v. Love*, No. A-2350-19, 2021 WL 3136103, at *2 (N.J. Super. Ct. App. Div. July 26, 2021) ("The Chancery court's prior decision was not dispositive of any issue; it was merely a denial of a request for a preliminary injunction based on an incomplete record.").

The defendants' cited Seventh Circuit cases do not govern because, as the defendants themselves state in their briefs, the preclusive effect of a state court decision is governed by the law of the state where the decision was rendered. Moreover, the defendants misstate the law of the Seventh Circuit. They claim that "courts in this Circuit have routinely determined that motions for preliminary relief can have preclusive effect," Defs'. Reply [dkt. no. 142] at 21, but the Seventh Circuit has made it clear that the general rule is that preliminary injunction decisions generally do not have preclusive effect. *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979) (stating that a preliminary injunction decision will not ordinarily foreclose subsequent litigation unless it is necessarily based upon a determination that constitutes "an insuperable obstacle to the plaintiff's success on the merits").

Because the defendants fail to show that the New Jersey decision was a final judgment, issue preclusion does not apply. Even if it did apply, however, the security interest issue does not affect the Court's decision. As previously stated, the Court need

not address the security interest issue because it finds that Princeton's allegations

regarding the defendants' alleged delivery of false financial documents is sufficient to

give it standing.

**D.    Failure to state a RICO claim**

To survive a motion to dismiss for failure to state a claim, "the complaint must

'state a claim for relief that is plausible on its face.'"  *Doe v. Columbia Coll. Chi.*, 933

F.3d 849, 854 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir.

2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The court must view the

complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded

factual allegations and making all possible inferences from the allegations in the

plaintiff's favor."  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

Count 1 of the amended complaint asserts a RICO claim under 18 U.S.C. §

1962(c).  Count 2 alleges a RICO conspiracy in violation of 18 U.S.C. § 1962(d).  The

Court finds that the amended complaint fails to adequately plead the elements of both

claims.

**1.    18 U.S.C. § 1962(c)**

A RICO claim comprises the following four elements:  (1) conduct; (2) of an

enterprise; (3) through a pattern; and (4) of racketeering activity.  *See Muskegan Hotels,*

*LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021).  The defendants argue that the

15

amended complaint fails to adequately plead several of these elements.[7]

### a. Predicate acts

The defendants argue that the plaintiffs fail to adequately allege that each of the defendants committed two predicate acts as required for a substantive RICO claim. In response, Princeton points to paragraph 213 of the amended complaint, which includes a table of e-mails that certain defendants allegedly sent to Princeton containing false financial documents. Princeton further contends that the amended complaint alleges other predicate acts in addition to the delivery of these False Financials, but it does not cite to any specific paragraphs in the amended complaint. Because the Court cannot identify any allegations of other types of predicate acts, it appears that the only alleged predicate acts involve mail and wire fraud.

Allegations of mail and wire fraud in a civil RICO claim require the showing of the following elements: "(1) the defendant has participated in a scheme to defraud and (2) the defendant has mailed or has knowingly caused another to mail a letter or other matter for the purpose of executing the scheme." *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir. 1994). Mail and wire communications need not be fraudulent in and of themselves; rather, they simply need to further or carry out the scheme to defraud. *United States v. Ashman*, 979 F.2d 469, 482 (7th Cir. 1992).

The amended complaint adequately alleges involvement in mail and/or wire fraud with respect to some defendants, but not most of them. Paragraph 213 of the amended

---

[7] The defendants also argue that Princeton's amended complaint fails to plead its allegations of fraud with particularity as required by Federal Rule of Civil Procedure 9(b). The Court does not address these arguments, however, because the case can be dismissed on other grounds. For purposes of this opinion, the Court assumes that the amended complaint meets the requirements of Rule 9(b).

complaint lists several e-mails that Princeton alleges were sent in furtherance of the scheme. It identifies Schnosenberg as a sender of these e-mails and Wolfe, Goldstein, and Schnosenberg as receiving at least one of them. These allegations, together with the other mail fraud-related allegations in the amended complaint, are sufficient to allege the participation of Schnosenberg, Goldstein, and Wolfe in mail or wire fraud. Paragraph 213 also contains factual allegations sufficient to give rise to an inference that other defendants were involved in the decision to send the e-mails in furtherance of the alleged scheme. According to the amended complaint, Adam Diekelman sent four e-mails to Princeton with fraudulent financial information on behalf of the Board of Managers. Diekelman is not a defendant in this case, but from his e-mails, one can reasonably infer that other members of the Board of Managers participated in the alleged mail or wire fraud. Reading the complaint liberally, the Court finds that the amended complaint adequately alleges involvement in mail and/or wire fraud with respect to Schnosenberg, Goldstein, Wolfe, and the other members of the Board of Managers of Argon Credit. It does not, however, with respect to any of the other defendants.[8]

### b.    Pattern

The defendants also argue that Princeton fails to allege a pattern of racketeering activity. Under 18 U.S.C. § 1961(5), the plaintiff must allege "at least two acts of racketeering activity" within a ten-year period to plead a pattern. But that, alone, is not

---

[8] Princeton contends that it is only required to allege two predicate acts of racketeering activity by the enterprise as a whole, not by each defendant. This is true for a RICO conspiracy claim under section 1962(d), but it is not the case for section 1962(c) claims. *See Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001).

enough.  To plead a pattern of racketeering activity, the plaintiff must also satisfy the "continuity plus relationship" test with respect to the predicate acts.  *Menzies v. Seyfarth Shaw, LLP*, 943 F.3d 328, 336 (7th Cir. 2019).  The defendants do not dispute that the amended complaint meets the relationship element of the test, which asks whether the predicate acts are related to one another.  *Id.* at 337.  They do, however, dispute that the amended complaint satisfies the continuity element.  To determine whether a complaint sufficiently alleges continuity, courts assess the following factors:  "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries."  *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986).

### i.      Number and variety of predicate acts

Princeton has alleged at least eleven acts of mail or wire fraud, which weighs in favor of establishing the required continuity.  But all are the same type of criminal offense, which weighs against a finding of continuity.  This is especially true given that the Seventh Circuit has "repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern."  *Jennings v. Auto. Meter Prods., Inc.*, 495 F.3d 466, 475 (7th Cir. 2007).

### ii.      Length of time over which acts were committed

The Seventh Circuit has suggested that this factor is the most important.  *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) ("Duration is perhaps the closest thing we have to a brightline continuity test.") (internal quotation omitted).  The amended complaint alleges a pattern of racketeering activity from May

2015 through December 2016, a total of twenty months. Although there is no brightline rule for duration, the Seventh Circuit "ha[s] not hesitated to find that closed periods lasting several months to several years did not qualify as 'substantial' enough to satisfy continuity." *Roger Whitmore's*, 424 F.3d at 673. The defendants cite to several Seventh Circuit cases where the court found that the requisite continuity was lacking in schemes about as long or longer than the one in this case. *See* Defs.' Mem. [dkt. no. 126] at 15; *see also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (collecting cases). In *United States Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1267–68 (7th Cir. 1990), however, the Seventh Circuit suggested that two years was a significant amount of time (although the Court notes that two years is quite a bit longer than twenty months). Given the relative lack of authority supporting Princeton's position, this factor weighs slightly against a finding of continuity.

### iii.    Number of victims

Princeton argues that there were multiple victims of the scheme, but it doesn't specify exactly who the other victims were. Reading the complaint liberally, the Court determines that there were two victims of the scheme: Princeton and Hamilton Funding. Although there were other creditors hurt by the scheme, only Princeton and Hamilton Funding were not also alleged to be co-conspirators. The fact that there were only two victims cuts against the contention that the criminal acts were continuous.

### iv.    The presence of separate schemes

Princeton alleges a single scheme: a scheme to fraudulently induce it to increase the Argon Entities' line of credit through the delivery of false financials. Although the Seventh Circuit has held that "the mere fact that the predicate acts relate to the same

19

overall scheme . . . does not mean that the acts automatically fail to satisfy the pattern requirement," the presence of a single scheme does weigh against such a finding. *Morgan*, 804 F.2d at 975.

### v. The occurrence of distinct injuries

Neither party discusses this factor, but it weighs against a finding of continuity in this case. According to Seventh Circuit precedent, "identical economic injuries suffered over the course of two years stemming from a single contract [are] not the type of injuries which Congress intended to compensate via the civil provisions of RICO." *Vicom*, 20 F.3d at 782. This is what Princeton alleges here. All of Princeton's injuries are economic and related to the same contract, the Fintech Financial Agreement.

*   *   *

Having assessed the relevant factors, the Court concludes that the amended complaint fails to meet the continuity element of the standard for a RICO "pattern." This case is similar to *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 663 (7th Cir. 1992), where the court held that the complaint did not allege the required continuity because "the allegations involve multiple acts of mail fraud in furtherance of a single scheme . . . and resulted in nondistinct injuries." In *Talbot*, the court assumed that the conspiracy extended over four years, which is quite a bit longer than here, but it still held that the continuity requirement was not met. The Court therefore dismisses the RICO claim due to its failure to adequately allege a pattern of racketeering activity. Nevertheless, the Court addresses the defendants' other arguments.

### c. Enterprise

An association-in-fact enterprise, which is what the plaintiff alleges in this case, is

20

a group of persons associated together for a common purpose of engaging in a course of conduct. *Boyle v. United States*, 556 U.S. 938, 944 (2009). To show an enterprise, the plaintiff must allege at least three structural features: (1) a purpose; (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to continue to pursue the enterprise's purpose. *Id.* The enterprise also must have "a structure and goals separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991).

The Court concludes that the amended complaint adequately alleges the three requisite structural features. The amended complaint alleges that the defendants had the shared purpose of keeping the line of credit from Princeton open as long as possible. This purpose was separate from the predicate acts of mail and wire fraud. Additionally, the amended complaint heavily details the relationships among those associated with the enterprise. The scheme is also alleged to have lasted for twenty months, long enough to pursue the shared purpose.

The defendants argue that there are other requirements to plead an enterprise and that Princeton fails to meet these requirements. Not so. In *Boyle*, the Supreme Court made clear that an association-in-fact enterprise need not have any additional structural features beyond those listed above. *Boyle*, 556 U.S. at 946. The defendants' cases that suggest otherwise were all decided before *Boyle* and thus do not govern.

The defendants also argue that Princeton's allegations regarding the enterprise are implausible in that they describe all of the defendants as ringleaders of the enterprise. This argument misinterprets the allegations in the amended complaint, however. Princeton does not allege that *all* of the defendants were ringleaders of the

enterprise. Rather, it identifies at least six of the defendants as ringleaders and states generically that "other Argon Insiders and Argon Outsiders" were also ringleaders. Am. Compl. ¶ 172. This does not mean that *all* of the Argon Insiders and Argon Outsiders were ringleaders, just that at least some of them were. The Court therefore disagrees with the defendants' contention that "Plaintiff's allegations of leadership are nonsensical." Defs.' Mem. [dkt. no. 126] at 20.

In addition to their arguments concerning structure, the defendants contend that Princeton fails to allege participation in the enterprise by every defendant.[9] The participation element requires the plaintiff to show—or, in the present context, allege— that each defendant "somehow operate[d] or manage[d] the enterprise." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 966 (7th Cir. 2000). This includes "lower-rung participants who are under the direction of upper management." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995).

The amended complaint satisfies this requirement. Each defendant is alleged to have been part of the RICO enterprise, and they are all alleged to have participated in either directing or carrying out some part of the scheme, e.g. helping create the Spartan Entities, funding the Argon Entities, sending the False Financials, etc. There is enough in the complaint to suggest that even the less-involved defendants were, at the very least, involved in managing the enterprise, albeit under the direction of upper management of the enterprise. *See id.* at 979.

The defendants' last enterprise-related argument is that Princeton fails to identify

---

[9] Although the defendants characterize this as an enterprise-related argument, it is actually an argument that the plaintiff doesn't allege the requisite "conduct" for a RICO claim. *See Reves v. Ernst & Young*, 507 U.S. 170, 177–178 (1993).

a person that is distinct from the RICO enterprise. "[T]o establish liability under [section] 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). In other words, the plaintiff must allege that there is a distinct entity—separate from any of the defendants—that is the enterprise. *Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004). In this context, courts look to whether the defendants involved themselves in the affairs of the other defendants, as well as other signs that the defendants had not just a commercial relationship but that "they had joined together to create a distinct entity." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854–55 (7th Cir. 2013).

The Court finds that the amended complaint contains sufficient factual allegations giving rise to a reasonable inference that the enterprise was a distinct entity from the defendants. The complaint illustrates that most of the defendants were significantly interconnected: they shared board members, regularly communicated, had some power over the decisions made at other companies, and received regular and intimate financial updates about the Argon Entities. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015) (finding that there was an enterprise because the plaintiff alleged "an unusual degree of economic interdependence among the entities" and that "the entities [did] not operate as completely separate entities"). This is sufficient on a motion to dismiss.

### d.    Causation

The defendants argue that Princeton does not adequately allege but for and

proximate causation.  The Court disagrees.  With respect to but for causation, the complaint clearly explains how the scheme caused Princeton to lose money and how each defendant contributed to the scheme.

The defendants' proximate cause argument is essentially a repackaging of their standing argument:  they contend that proximate cause is lacking because Princeton was only indirectly injured by way of harm done to the Argon Entities.  The Court overrules this argument for the same reason it rejected the defendants' standing argument.  Princeton has adequately alleged a distinct and personal injury proximately caused by the defendants.

**2.      18 U.S.C. § 1962(d)**

Because liability under section 1962(d) is "not coterminous with liability under [section] 1962(c)," the Court must examine the RICO conspiracy claim, despite dismissing the substantive RICO claim.  *MCM Partners*, 62 F.3d at 979 (quotation omitted).  The defendants argue that Princeton cannot show the requisite agreements necessary to plead a RICO conspiracy.  To state a claim under section 1962(d), "a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals."  *Slaney*, 244 F.3d at 600.

The Court first notes that, given its conclusion that Princeton failed to adequately allege that the defendants engaged in a pattern of racketeering activity, it follows that Princeton has also failed to adequately allege that the defendants agreed to engage in a pattern of racketeering activity.  The Court dismisses the RICO conspiracy claim on this

24

basis.

The RICO conspiracy claim is also deficient with respect to at least some defendants because Princeton does not adequately allege that all the defendants made an agreement that someone would commit at least two predicate acts. First, it is not clearly alleged that all of the defendants even knew about the mail and wire fraud. For example, some of the Argon Outsiders, like Alhambra, are alleged only to have been involved in assisting some defendants in executing business transactions with other defendants. They are not alleged to have knowledge of the predicate acts, nor is it apparent that their knowledge can be inferred from the mere fact that they received "prohibited commissions" for their assistance. Am. Compl. ¶ 332. Second, even if the defendants knew about the fraud, it is not clearly alleged that they all agreed to it. This is true of both Argon Insiders and Argon Outsiders. Although the amended complaint suggests that all of the defendants financially benefited from the alleged fraud committed against Princeton, aside from that, there's very little in the complaint that suggests that all of them were working in agreement to commit this alleged fraud.

The Court therefore concludes that the amended complaint, in its present form, contains sufficient factual allegations to support an inference of agreement only among those directly connected with the mail and wire fraud, namely Schnosenberg, Goldstein, Wolfe, and the Board of Managers of Argon Credit.

**3.      State law claims**

Because the Court dismisses both the section 1962(c) RICO claim and the section 1962(d) conspiracy claim against all defendants, it declines to exercise supplemental jurisdiction over the state law claims. *See Bilow v. Much Shelist Freed*

*Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001). The state law claims are therefore dismissed for lack of subject matter jurisdiction.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motion to dismiss [dkt. no. 124]. Unless the plaintiff files, by February 8, 2022, a motion for leave to amend with a proposed amended complaint that adequately states a claim over which the Court has subject matter jurisdiction, the Court will enter final judgment dismissing its federal claims with prejudice and its state claims for lack of supplemental jurisdiction. A telephonic status hearing is set for February 14, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

MATTHEW F. KENNELLY
United States District Judge

Date: January 17, 2022